*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

October 2, 2014

**BY ECF**

The Honorable Lorna G. Schofield
United States District Judge
Southern District of New York
Thurgood Marshall U.S. Courthouse
40 Foley Square, Room 201
New York, New York 10007

  Re: *United States* v. *Antione Chambers*,
     S2 13 Cr. 345 (LGS)

Dear Judge Schofield:

  The Government respectfully writes regarding the defendant's motion to strike the eyewitness identification testimony of Demi Torres. For the reasons stated below, the Government believes that such a motion should be construed as a continuation or renewal of the defendant's motion to suppress identification evidence, and that the appropriate course of action under the governing Second Circuit case law is to have Detective Deloren testify outside the presence of the jury regarding the identification procedures used with Demi Torres.

<u>Legal Standard</u>

  In evaluating whether an in-court identification is constitutionally permissible, courts generally engage in a two-step inquiry. First, the court determines whether the pre-trial identification procedures were impermissibly suggestive. If they were, the court then determines whether the in-court identification was so tainted by the pretrial procedures as to be unreliable under the "totality of the circumstances." *United States* v. *Kwong*, 69 F.3d 663, 666 (2d Cir. 1995). This distills to an inquiry into whether the in-court identification was independently reliable. *Neil v. Biggers,* 409 U.S. 188, 198-99, 93 S.Ct. 375, 381-82, 34 L.Ed.2d 401 (1972); *United States v. Wong,* 40 F.3d 1347, 1359 (2d Cir.1994), *cert. denied,* --- U.S. ----, 115 S.Ct. 1968, 131 L.Ed.2d 858 (1995); *United States v. Tortora,* 30 F.3d 334, 338 (2d Cir. 1994).

  Factors for assessing reliability include: (1) the witness's opportunity to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness; and (5) the length of time between the crime and the identification. *Manson v. Brathwaite,* 432 U.S. 98, 114-16, 97 S.Ct. 2243, 2253-54, 53 L.Ed.2d 140 (1977); *Wong,* 40 F.3d at 1359; *Tortora,* 30 F.3d at 338. These factors must be assessed under " 'the totality of the circumstances, and the linchpin of

admissibility is reliability.'" *Tortora,* 30 F.3d at 338 (quoting *United States v. Concepcion,* 983 F.2d 369, 378 (2d Cir.1992), *cert. denied,* 510 U.S. 856, 114 S.Ct. 163, 126 L.Ed.2d 124 (1993)).

The Second Circuit has also stated that: "in the absence of a very substantial likelihood of irreparable misidentification [,]' ... [identification] evidence is for the jury to weigh." United States v. Brewer, 36 F.3d 266, 270 (2d Cir. 1994).  *See also Foster* v. *California*, 394 U.S. 440, 442 n. 2, 89 S.Ct. 1127, 1128 n. 2, 22 L.Ed.2d 402 (1969) ("The reliability of properly admitted eyewitness identification ... is a matter for the jury.").

Applicable Facts

On cross-examination yesterday, Demi Torres made the following statements about a photograph or photographs of the defendant that she was shown during pretrial procedures:

Q. Now, you were interviewed a couple of days later by Detective Deloren Ellis, right?
A. Yes.
Q. That's the same person, right?  And where was that interview?
A. In the precinct.
Q. And what happened during that interview?
A.  He asked me the same thing of what happened that night and then put me to look at the mugshot photos on the Internet – on the computer.
Q. On the computer?
A. Uh-huh.
Q. And did he take notes?
A. I don't remember.
Q. Were you looking at single shots or photo arrays of multiple people at the same time?
A. Yeah, multiple people at the same time.

(Tr. 477-478)

Later, in her testimony, she stated about a second showing:

Q.  Let's go a couple of months after the incident, right? A couple months after the incident, Detective Deloren calls you back, right?
A. Yes.
Q. You go to the precinct.  You meet with him, right?
A. Yes.
Q. What does he say to you in preparation for your viewing those photos?
A. That they just found an updated photo.
Q. I'm sorry?
A. He just found updated photos.

(Tr. 481)

She then testified about the updated photo that she observed:

    A. It was on the computer.
    Q. Okay. What happens then?
    A. They had different photos.
    Q. Right.
    A. And I said that the person looked like him, but it just looked younger.
    Q. Okay. Which looked younger? The photo?
    A. Not the one from the article. It was a different photo. Yes, it was a photo.
    Q. It was that photo?
    A. No.
    Q. You saw a completely different photo?
    A. Yes.
    Q. Not that photo, not the article, but another photo you were shown by Detective Deloren?
    A. Yes, on the -- the same base, you know how it was by six pictures, but this time, it was pulled up as one.
    Q. Pulled up as one?
    A. Yes.
    Q. Just him?
    A. Yes.
    Q. But that's a totally separate photo than anything you have in front of you?
    A. Yes.
    Q. And different from the Internet?
    A. Yes.
. . . .
    A. No, it's from -- where -- I don't know what it's called, but where the six photos are on the computer from where I put a description, it was from, I guess, that base, that window.
    Q. Yeah, but you saw it in a separate photo –
    A. Yes.
    Q. -- that he pulled it out for you separately or you saw it separately, just one by one by one?
    A. No, that time it was, like, when you click one of those photos, how it pulls up the picture bigger, it zooms it in, it was like that.
    Q. So you got to see it for the one shot, big screen, right?
    A. Yes.

(Tr. 487-88).

And finally:

    Q. But then you went home -- and by the way, just so we're sure, the first photo you saw of him is none of these photos that we have here, right, it's a different photo?
    A. Yes.
    Q. Did you see the website photograph before or after, just to be clear, you signed and circled what's marked as Government Exhibit 1001?
    A. That was before.
    Q. Now, you said in response to the question by Ms. Tekeei that you couldn't yourself click on any of the six photos on the computer and get the single shot, right?
    A. No.

Q. So who did that for you?
A. He didn't click -- I didn't pick one and he clicked it. It was already opened, that one.
Q. I don't understand. When you say "he," you mean Detective Deloren?
A. Yes, Detective Deloren.
Q. So he provided you with a single screen shot of Mr. Chambers, right?
A. Yes, that was the second time I went there.
Q. He did that for you?
A. It was already there.
Q. It was already there?
A. Yes.
Q. He had it waiting for you?
A. I guess. Yes. When -- the time I've seen six photos, that was the first time I was there, and that was a bunch of them; the second time I went there, they had photos.
Q. Of him alone, just Mr. Chambers?
A. Yes.
Q. Single shot, single screen?
A. Yes.

(Tr. 501).

After reviewing the 3500 materials, the Government believes that yesterday was the first time that Ms. Torres made statements about a single photo (not from an internet newspaper article) shown by Detective Deloren to Ms. Torres.

Following Ms. Torres's testimony, the defense made a motion to strike Ms. Torres's in-court identification, based in part on the testimony that there was a fourth photo shown to Ms. Torres and that the defense had an issue with how a photo array was created. (Tr. 507). Defense counsel indicated that his issue with Detective Deloren was about his "credibility," and that the question of how the photo array was created was "an issue," for which defense counsel wanted to examine Detective Deloren as part of the defense case:

> The second part is with respect to his recollection versus Ms. Torres. Well, fine. He testified the way he testified, she testified the way she testified, Ms. Torruella the way she testified. In that context, that's not an issue. But the other thing is an issue. Maybe you'll came him on our case to talk about this, if that's necessary. I don't think it should be necessary. I think that this is, again -- first of all, I don't like the idea of private conversations and reporting them back to what he says as opposed to getting him here and finding out what the truth is or at least get at the truth through proper examination

(Tr. 514).

After trial yesterday, the Government spoke with Detective Deloren, who advised us as that he recalls only showing Ms. Torres three photographs of Mr. Chambers: (1) a photo array on or

about May 29, 2013 (the "May 29 Photo Array"), (2) a single photograph of Antione Chambers from the website of the Harrisburg, Pennsylvania *Patriot-News*, dated November 14, 2011 (the "*Patriot-News* Photo"), and (3) a second photo array on June 6, 2013 (the "June 6 Photo Array"). He did not show Ms. Torres a single, full-screen picture of Mr. Chambers.

As the Government's 3500 material shows, during a January 24, 2014 interview, Ms. Torres stated that she was shown three photographs of the person she later identified as Mr. Chambers: (1) "a photo array containing six photographs," (2) "a photograph that was part of an article about a park," that she "thought the face in the photo of a guy doing pull-ups on the monkey bars may have been that of the UM involved in the robbery," and (3) a photo array containing six pictures, one of which she circled and signed under. (*See* 3507-01). After this interview, the Government obtained from Detective Deloren a copy of the photograph he showed her, which was attached as Exhibit B to the Government's February 24, 2014 Letter to the Court regarding the *Patriot-News* Photograph. As documented in notes from the Government's August 22, 2014 meeting with Ms. Torres, Ms. Torres stated that she searched for Mr. Chambers's name on the internet and saw the photograph she had been shown by Detective Deloren. (*See* 3507-03). On September 26, 2014, Ms. Torres stated that she could not remember when she saw the article photo with the pull-up bar—before or after the photo array identification—and the pull-up bar photograph looked like the guy with her mother the night of the robbery. (*See* 3507-06).

Detective Deloren also explained how he created the photo array involving the updated photograph of Antione Chambers that he received from probation. He explained that he provided the fillers to match the characteristics of Chambers after reviewing photos in photo manager that were generated from general characteristics provided by Detective Deloren. Detective Deloren chose to place Chambers in the second position, but that he does not always place suspects in the second position of an array. (In fact, Detective Deloren placed Chambers differently in the first photo array). He also explained that he chose individuals with facial hair to be the fillers so that they could match the photograph of Chambers, who had facial hair at the time. Detective Deloren also indicated that based on the characteristics that he presented, there was over 3000 matches of individuals, and that he personally selected the five fillers for that photo array.

## Analysis

The applicable question for the Court is whether the pretrial identification procedures were impermissibly suggestive as to taint the in-court identification so that the in-court identification was unrealiable "under the totality of the circumstances." *United States* v. *Kwong*, 69 F.3d 663, 666 (2d Cir. 1995). The Government submits that there is an inadequate factual record upon which to make that determination because without Detective Deloren's testimony – subject to cross-examination –this Court cannot make a determination based on the "totality of the circumstances." The Second Circuit has stated: "Determining whether procedures are impermissibly suggestive requires a *careful consideration of the totality of the circumstances*." *Piper v. Portuondo*, 82 Fed.Appx. 51, 52, 2003 WL 22469735, *2 (2d Cir. 2003) (italics added).

This Court has previously denied the defendant's motion to suppress identification evidence on two occasions. The only new facts that have been raised during the trial which

relate to the pretrial identification procedures are (1) the statement by Demi Torres that she was shown a second single photograph of Antione Chambers; and (2) the 3500 material which references Detective Deloren's creation of the second photo array.

Detective Deloren has not testified about these events. The Court has made a preliminary assessment that it intends to strike Demi Torres's testimony without hearing from Detective Deloren about his practices. The appropriate course of action the Government submits is to have Detective Deloren testify outside the presence of the jury as part of a *Wade* hearing so that the Court can have a full record as to whether the pretrial identification procedures were impermissibly suggestive. The Government recognizes that it previously opposed a request for a Wade hearing based on the facts as told by the witnesses at the time. Given Ms. Torres's testimony, we consent to a hearing on this issue, and in fact, believe that a hearing is warranted under the governing case law.

Once Detective Deloren testifies, the question for the Court then is whether the pretrial identification procedures were impermissibly suggestive and then, whether the "in-court identification was independently reliable." Factors in assessing that reliability are (1) the witness's opportunity to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness; and (5) the length of time between the crime and the identification. *Manson* v. *Brathwaite*, 432 U.S. 98, 114-16, 97 S.Ct. 2243, 2253-54, 53 L.Ed.2d 140 (1977); Wong, 40 F.3d at 1359; Tortora, 30 F.3d at 338. These factors must be assessed under "'the totality of the circumstances, and the linchpin of admissibility is reliability.'" *Tortora*, 30 F.3d at 338 (quoting *United States* v. *Concepcion*, 983 F.2d 369, 378 (2d Cir.1992), cert. denied, 510 U.S. 856, 114 S.Ct. 163, 126 L.Ed.2d 124 (1993)).

Therefore, the defendant's motion to strike Ms. Torres's identification testimony should be denied. The appropriate course of action is to allow Detective Deloren to testify outside the presence of the jury as to identification procedures employed with respect to Ms. Torres as part of a motion to suppress identification evidence.

                            Respectfully submitted,

                            PREET BHARARA
                            United States Attorney
                            Southern District of New York

By:    /S/_____
        Negar Tekeei / Santosh Aravind
        Assistant United States Attorneys
        (212) 637-2482/1045

cc:    Joshua Dratel, Esq. (by ECF and E-mail)