E9TMCHA1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA

4              v.                        13 CR 345(LGS)

5   ANTIONE CHAMBERS,

6                Defendant.

7   ------------------------------x

8                                       New York, N.Y.
                                        September 29, 2014
9                                       9:30 a.m.

10

    Before:
11
                        HON. LORNA G. SCHOFIELD,
12
                                            District Judge
13

14                         APPEARANCES

15

    PREET BHARARA
16       United States Attorney for the
         Southern District of New York
17   SANTOSH ARAVIND
     NEGAR TEEKEI
18       Assistant United States Attorneys

19   JOSHUA L. DRATEL
     WHITNEY SCHLIMBACH
20       Attorneys for Defendant

21   ALSO PRESENT:   JOHN REYNOLDS, FBI
                     JENNIFER HANSMA, Paralegal AUSA
22

23

24

25

E9TMCHA1

```
1              (Case called)

2              MR. ARAVIND:  Good morning, your Honor, Santosh

3    Aravind and Negar Teekei for the government.  With us at

4    counsel table is Jennifer Hansma, who is a paralegal specialist

5    with our office, and John Reynolds, a special agent with the

6    FBI.

7              THE COURT:  Good morning.

8              MR. DRATEL:  Good morning, your Honor, Joshua Dratel

9    for Mr. Chambers who is standing beside me.  Ms. Schlimbach

10   will be up here in a minute.

11             THE COURT:  Good morning, everyone.  Thank you for

12   being prompt.

13             What we have first, as a first order of business

14   today, is a Section 104 hearing to decide a, quote, preliminary

15   question about whether a witness is qualified and privilege

16   exists or evidence is admissible.  Here the question is whether

17   the evidence is admissible.  And the evidence we are talking

18   about has to do with a statement or nonstatement by Mr. Brown

19   regarding Mr. Chambers.  And so I would like to have that

20   hearing now.

21             The one thing I would mention is that I had sent or I

22   had asked my law clerk to send to the parties notice that I

23   would like to hear about, quote, Brown's safety valve proffered

24   statements which the government referenced in its September 24

25   submission to me.  And I don't know if Agent Reynolds can talk
```

E9TMCHA1

1    about that when he's on the stand as well and whether you have

2    documents that relate to that.

3                MR. ARAVIND:  He is planning to, your Honor, and just

4    for the Court's reference, I'm happy to hand up a copy.  The

5    safety valve 302 is referenced in 3501-39, and the notes

6    underlying that safety valve are referenced in 3501-40.

7                THE COURT:  I would be pleased to take a copy.

8                Are you prepared to start?

9                MR. ARAVIND:  Yes, your Honor.

10               The government calls Special Agent John Reynolds.

11    JOHN REYNOLDS,

12         called as a witness by the Government,

13         having been duly sworn, testified as follows:

14    DIRECT EXAMINATION

15    BY MR. ARAVIND:

16    Q.  Good morning.

17    A.  Good morning.

18    Q.  Can you please state and spell your name for the record.

19    A.  Sure.  First name is John, J-o-h-n.  Last name is Reynolds,

20    R-e-y-n-o-l-d-s.

21    Q.  Where do you work?

22    A.  I'm currently a special agent with the Federal Bureau of

23    Investigation.

24    Q.  How long have you been a special agent with the FBI?

25    A.  Approximately eight years.

E9TMCHA1                              Reynolds – direct

1    Q.   What field office do you work in?

2    A.   Currently assigned to the New York field office.

3    Q.   What squad do you work in?

4    A.   Squad C11.

5    Q.   What are your duties and responsibilities, Special Agent,

6    as a member of C11?

7    A.   Our squad investigates drug trafficking crimes, crimes of

8    violence related to drug trafficking, and we are also

9    responsible for extraterritorial matters in Africa and Europe.

10   Q.   Before the FBI, what did you do for a living?

11   A.   I was a New York City police officer.

12   Q.   What types of cases did you investigate as a New York City

13   police officer?

14   A.   As a police officer I was a regular uniformed police

15   officer, and my last four years I was an anticrime police

16   officer, which dealt with mostly firearm–related arrests and

17   other violent street crimes.

18   Q.   Special Agent Reynolds, have you ever participated in

19   postarrest interviews of defendants?

20   A.   Yes.

21   Q.   Approximately how many postarrest interviews have you

22   conducted or participated in as a member of the FBI?

23   A.   At least 50.

24   Q.   What about as a member of the NYPD?

25   A.   Over a hundred.

E9TMCHA1                          Reynolds – direct

1   Q.  Special Agent Reynolds, are you familiar with an

2   investigation of Tyrone Brown, Steven Glisson and Antione

3   Chambers?

4   A.  Yes, I am.

5   Q.  What was your role with respect to that investigation?

6   A.  I was the FBI case agent.

7   Q.  What does it mean to be the FBI case agent?

8   A.  You do everything that a typical detective or investigator

9   does, subpoenas, search warrants, interviews, arrests.  Also,

10  you are like a manager.  Like in a case like this, you would

11  liaison a lot with a lot of law enforcement agencies like in

12  this case the New York Police Department and the U.S.

13  Attorney's Office.

14  Q.  Did there come a time when you participated in an arrest of

15  Tyrone Brown?

16  A.  Yes, sir.

17  Q.  What day was that?

18  A.  April 8, 2013.

19  Q.  At the time was Brown arrested on federal charges?

20  A.  When I first met Mr. Brown and spoke with him, he was under

21  arrest for state charges.

22  Q.  What were those state charges?

23  A.  Narcotics possession.

24  Q.  What did you do that day?

25  A.  It was the evening.  I was at home.  I received a telephone

E9TMCHA1                         Reynolds - direct

1    call from Detective Ellis Deloren of the Bronx robbery squad

2    from the New York City Police Department notifying me that he

3    had arrested Tyrone Brown for drug charges and that Tyrone

4    Brown was currently at his office in the Bronx, at which time I

5    responded to the Bronx robbery squad.

6    Q.   What did you do when you got to the Bronx robbery squad

7    office?

8    A.   I briefly spoke with detective Deloren regarding the

9    circumstances of Mr. Brown's arrest, and after that we began to

10   interview Mr. Brown.

11   Q.   Did you administer Miranda warnings?

12   A.   Yes, I did.

13   Q.   Orally or in writing?

14   A.   Both.  First I read verbatim the Miranda warning forms for

15   the FBI.  And following reading those warnings to Mr. Brown and

16   explaining and ensuring that he understood those, I also

17   provided him a copy of the Miranda form, provided him an

18   opportunity to review it himself.

19   Q.   Did he do that?

20   A.   Yes, he did.

21   Q.   Did he waive his Miranda rights?

22   A.   Yes, he did.

23   Q.   In what way did he waive his Miranda rights?

24   A.   He signed the form.

25   Q.   Did Mr. Brown make any statements --

1            THE COURT:  Just so I'm clear, was this all before he

2    made any statements to you?

3            THE WITNESS:  Yes, ma'am.

4            THE COURT:  Thank you.

5    Q.  After signing the Miranda form, did Mr. Brown make any

6    statements?

7    A.  Yes, sir.

8    Q.  What, if anything, did Mr. Brown tell you about the

9    identity of the robbers who robbed Emma Torruella and David

10   Barea?

11   A.  Mr. Brown at first denied knowledge of both robbers or the

12   robbers involved.  He eventually acknowledged that somebody

13   known to him as Dee.  We later identified as Steven Glisson.

14           THE COURT:  D, so it's clear for the reporter, D as in

15   dog?

16           THE WITNESS:  Yes, ma'am.  He eventually identified

17   Mr. Glisson as one of those robbers.

18           THE COURT:  What did he say about Dee that led to his

19   ultimately identifying him as Glisson?

20           THE WITNESS:  Based on our interviews of the victims,

21   we already knew the identity of Dee and Mr. Glisson.  So when

22   he was referring to somebody as Dee, he -- not at first.  He

23   claimed not to know him.  He eventually identified a photograph

24   that we had of Mr. Glisson as Dee, as the person he was

25   referring to as Dee.

1          THE COURT:  So he said the guy was Dee?

2          THE WITNESS:  Yes, ma'am.

3          THE COURT:  And then you showed him a photograph and

4     he confirmed that was it?

5          THE WITNESS:  Correct.  As first he wouldn't ID him,

6     and eventually later on in an interview he did identify him.

7     Q.  What about the second robber.  What did Mr. Brown say with

8     respect to the second robber?

9     A.  For much of the interview he claimed to have no knowledge

10    of the other robber.  And then as we concluded the interview or

11    at the very end of the interview he said he had seen this

12    person before.  And after he was pressed some more he said he

13    goes by the name of T or he knows him as T, something to that

14    extent.

15    Q.  Approximately how long did this interview last?

16    A.  Over three hours.

17    Q.  Who was asking questions during the interview?

18    A.  Both Detective Deloren and myself.

19         THE COURT:  What else, if anything, did he say about

20    T?

21         THE WITNESS:  It was somebody that he had just seen a

22    couple of times.  Like I said, at first he claimed not to know

23    the person at all.  Then he eventually said he had seen him

24    before only a couple of times.  And then, again, when he is

25    pressed some more then he finally says, I think he goes by the

1    name of T or he goes by the name of T.

2              THE COURT:  Did you try to get him to ID a photograph?

3              THE WITNESS:  No, ma'am.

4    Q.  Why not?

5    A.  When the context of T came up, like I said, it was towards

6    the end of the interview and much of the interview with

7    Mr. Brown had progressed from, again, I don't know anything;

8    okay, I know a little bit; okay, I do know this.  And, again,

9    T -- the reference to T came up at the very end of the

10   interview and it was the same thing.  I don't know him at all.

11   Okay, maybe I've seen him before.  Okay, maybe his name is T.

12             We had decided it's already midnight for the

13   interview.  We thought Mr. Brown was going to be someone who

14   was going to cooperate.  We figured we could follow up on this

15   point at a later time.  And plus the information that he

16   provided us we believed him not to be completely truthful and

17   it was not enough information to go back to a computer and do a

18   search for a likelihood of a photo that we could then show him.

19             THE COURT:  You had a photo with you of Glisson, but

20   you didn't have a photo with you of Chambers.  Is that right?

21             THE WITNESS:  Yes, ma'am.  Because at that time the

22   only person that we knew for sure or at least in our minds for

23   sure that had participated in the robbery, again, based on the

24   victims, was Mr. Glisson.  So that was the only photo that we

25   had at that time.

1          THE COURT:  Thank you.

2    Q.  Just to be clear, was Antione Chambers a target of your

3    investigation at the time of the postarrest interview, April 8,

4    2013?

5    A.  Not only was he not a target, he was somebody I had no

6    knowledge of at all.

7    Q.  Did you have a photograph of Mr. Chambers with you during

8    your postarrest interview of Mr. Brown?

9    A.  No, sir.

10   Q.  Was anyone taking notes during the postarrest interview?

11   A.  Yes, sir.

12   Q.  Were those notes a verbatim recitation of what Brown told

13   you?

14   A.  No, sir.

15   Q.  Was the postarrest statement --

16          THE COURT:  Who was taking the notes?

17          THE WITNESS:  I was.

18   Q.  Was the postarrest statement recorded, either video or

19   audio recorded?

20   A.  No.  At that time it was not.  The FBI's policy to record

21   such interviews.  And, in addition, at that time the rule

22   actually was, if you wanted to record an interview you had

23   actually had to get special permission to do so.

24          THE COURT:  And since Brown inculpated himself, why

25   didn't you have him sign something?

1              THE WITNESS:  Again, that's just not the FBI policy.

2     That's not how we do things.  When I was a police officer, yes,

3     that was something that I had done in the past, was to actually

4     either have the defendant write a statement and then sign it,

5     or even if the person was unable or unwilling to, maybe we

6     would write something and have him sign it.  But that's not the

7     way the FBI conducts those types of interviews.

8              MR. ARAVIND:  With the Court's permission I would like

9     to show Special Agent Reynolds two documents, 3501-04 and

10    3501-05.

11             THE COURT:  You may.

12    Q.  Do you recognize, Special Agent Reynolds, those two

13    documents?

14    A.  I do.

15    Q.  What are they?

16    A.  3501-04 is my FBI report 302 regarding our interview of

17    Mr. Brown on the 8th, and 3501-05 are my notes.

18             THE COURT:  If I wanted to look at that, are they in

19    these notebooks?

20             MR. ARAVIND:  Yes.  And I think I handed up a set for

21    your Honor.

22             THE COURT:  I have 3501-39 and the second page of

23    that, and then I have 3501-40, which is three pages, but I

24    don't seem to have 04 and 05.

25             MR. ARAVIND:  I thought I handed it up to your Honor.

1        THE COURT:  This is all I have.

2        MR. ARAVIND:  We can hand up another copy.

3        THE COURT:  Am I meant to have 3501-40?

4        MR. ARAVIND:  I have not shown the witness yet, but

5   you should have all relevant documents.

6        Your Honor, the government offers for purposes of this

7   hearing 3501-4 and 3501-5.

8        THE COURT:  The usual rules of evidence don't apply in

9   104 conferences.  So I will go ahead and accept these at

10  Court's Exhibit 1 and 2, 04 being 1 and 05 being 2.

11  Q.  Special Agent Reynolds, can you explain to Judge Schofield

12  how you went about taking notes and how those notes turned into

13  a 302?

14  A.  Sure.  The notes, obviously, I take during the interview.

15  I try to write down a fair amount as much as I can.  Certainly

16  the parts, the significant parts at the conclusion of the

17  interview, either that day, the next day or some days

18  afterwards.  I'll sit down and use the notes to draft my 302.

19  Q.  When was the 302 drafted as compared to the interview of

20  Mr. Brown on April 8, 2013?

21  A.  The interview and notes, obviously, were done on the 8th,

22  and the 302 was drafted on the 10th.

23  Q.  Now, Special Agent Reynolds, on the 302 there is a

24  reference to a, quote unquote, unidentified male.  Was that

25  Mr. Brown's term or your term?

E9TMCHA1                        Reynolds - direct

1    A.  No.  That's my term, signifying that I don't have an

2    identity for that person to whom he is referencing.

3    Q.  And that person was the second robber that was subsequently

4    identified as Antione Chambers?

5    A.  Yes, sir.

6    Q.  Had you identified Chambers at that point?

7    A.  No.

8           THE COURT:  Is there anything in the notes that refers

9    to T or the second robber?

10          THE WITNESS:  No, ma'am.

11          THE COURT:  Nothing at all?

12          THE WITNESS:  No, ma'am.

13   Q.  Why not?

14   A.  As I said earlier, that came at the conclusion of the

15   interview, when we were getting ready to take Mr. Brown from

16   the Bronx robbery office down to 26 Federal Plaza for

17   processing.  And I wasn't at that point taking notes.

18          Additionally, like I said before, Mr. Brown was

19   indicating to us that he was going to be somebody that was

20   willing to cooperate and we figured that if we could follow up

21   at a later point, also, coupled with the fact that we didn't

22   believe him to be truthful at that point in time.  If it was a

23   piece of information that we could have followed up on, again,

24   we would have printed pictures, shown it to him.  He had

25   concluded the interview.

E9TMCHA1                       Reynolds - direct

1          THE COURT:  When you said that you didn't believe him

2    to be truthful at that time, what caused you to think that he

3    wasn't being truthful?

4          THE WITNESS:  Again, like I had said earlier in the

5    interview, not even in reference to T, but, again, I don't know

6    what you are talking about; okay, I know a little bit what

7    you're talking about.  The T thing had progressed the same way.

8    The entire interview he had said there was somebody that he did

9    not know and, okay, I saw him -- maybe I've seen him before.

10   Okay.  I have seen him before.  Okay, maybe he goes by the name

11   T.  That's why.

12   Q.  Can you give us another example of a statement that Brown

13   made at the time that you did not believe to be truthful?

14   A.  Sure.  Even in the 302 references that he called

15   Mr. Glisson during the time frame of the robbery, a review of

16   Mr. Brown's phone records for that day indicate that not only

17   did he not call Mr. Glisson at the time of the robbery or that

18   day, at least the telephone number that we have for

19   Mr. Glisson, in fact, he was in contact with the phone number

20   that we believed to be Mr. Chambers's phone number.

21         THE COURT:  What did you know at the time you were

22   interviewing him about the truthfulness of the statement that

23   he called Glisson?

24         THE WITNESS:  At that time we didn't know that.  That

25   was a later -- we determined that later to be not truthful.

E9TMCHA1                        Reynolds - direct

1   Q.  Can you give us an example of something he said to you

2   during the interview that you believe knowing then not to be

3   true?

4   A.  Sure.  Like I had said before, he said Mr. Glisson was

5   coming there to buy crack from Mr. Barea, and then later on in

6   the interview he says, okay, I knew that they were coming to

7   rob Mr. Barea.  That's one example.

8   Q.  Just to be clear, initially he said that Glisson was coming

9   to purchase crack from Mr. Barea, the victim?

10  A.  Right.

11  Q.  What did he say later on during the interview?

12  A.  He said that he was coming -- that he knew that Mr. Glisson

13  was looking to rob Mr. Barea.

14  Q.  Now, in your training and experience, Special Agent, of

15  interviewing defendants, is it common for defendants to be

16  fully accurate during a postarrest interview?

17  A.  No, sir.  As a matter of fact, this is, I don't want to say

18  typical, but not uncommon.  Again, it starts --

19              MR. DRATEL:  Objection as to what's typical or common.

20              THE COURT:  Overruled.  The usual rules of evidence

21  don't apply.

22  A.  This was a case of minimization.  I'm sorry.  I don't like

23  to keep repeating myself.  I don't know anything; okay, I know

24  a little; I know a little bit more.

25  Q.  What does minimization mean?

E9TMCHA1                       Reynolds - direct

1  A.  Minimizing their knowledge or role of what you're asking

2  about.

3  Q.  During the course of an interview do you confront a

4  defendant with information?

5  A.  Sure.

6  Q.  And what is the result or what was the result when you

7  confronted Mr. Brown with information during his postarrest

8  interview?

9  A.  It would -- he would maybe admit like a little more --

10  again, he wouldn't identify Mr. Glisson, somebody that we knew

11  he knew.  He wouldn't even identify Mr. Glisson as Dee until we

12  confronted him with video from the cell phone that he was

13  hanging out with him.

14  Q.  Did you document all of the lies and inaccuracies that

15  Mr. Brown told you during the postarrest interview?

16  A.  No, sir.

17  Q.  Why not?

18  A.  For several reasons.  First of all, 302 never purports to

19  be a verbatim statement or transcript of the interview.  It

20  merely represents a summary of what's going on.  Also, the lies

21  become repetitive and we don't necessarily document all of

22  them.  I think this 302, for example, documents that Mr. Brown

23  was lying during the interview.  And then, also, documenting

24  every lie isn't necessarily fruitful in terms of investigative

25  leads.

1    Q.  Did there come a time when you interviewed Mr. Brown again?

2    A.  Yes.

3    Q.  When did that take place?

4    A.  I believe in May of 2013.

5    Q.  In what context?

6    A.  In a safety valve proffer.

7            MR. ARAVIND:  With the Court's permission I would like

8    to hand up Government's Exhibit 3501-39 and 3501-40.

9            THE COURT:  We will mark that as Court's Exhibit 3.

10           MR. ARAVIND:  These are two separate documents, your

11   Honor.

12           THE COURT:  And 4.  And the lowered number will be 3

13   and the higher numbered one will be 4.

14           While we are doing that, can you tell me what a safety

15   valve proffer is?

16           THE WITNESS:  Yes, ma'am.  If somebody is arrested on

17   federal drug charges and they don't have a prior drug

18   trafficking history, they are offered the opportunity to come

19   in and meet with the U.S. Attorney's Office and law enforcement

20   to go over their drug trafficking history.  If they are honest

21   at that proffer it allows their sentencing judge to give them

22   relief from the mandatory minimum sentences.

23   Q.  Do you have those documents in front of you?

24   A.  I do not.

25           MR. ARAVIND:  Judge, I think you have a set.  That was

E9TMCHA1                         Reynolds - direct

1   for the witness.  Thank you, Judge.

2   Q.  Just so the record is clear, what is 3501-39?

3   A.  39 is my 302 report of Mr. Brown's safety valve proffer.

4   Q.  And 3501-40?

5   A.  3501-40 are notes taken my partner, Special Agent Kim

6   Marcus, of that interview.

7              MR. ARAVIND:  Again, your Honor, we would offer these

8   for the purposes of the hearing.

9              THE COURT:  Okay.

10  Q.  Who was present during the safety valve proffer?

11  A.  At the safety valve proffer was Tyrone Brown, his defense

12  attorney, myself, Special Agent Kim Marcus from the FBI,

13  Detective Ellis Deloren from the New York City police

14  department and Amy Lester from the U.S. Attorney's Office.

15  Q.  What, if anything, did Brown say about Chambers, T, or

16  Twizzie during the safety valve proffer?

17  A.  We had asked Mr. Brown specifically about Mr. Chambers or

18  Twizzie, had he ever conducted any drug business with Twizzie.

19  He first tried to deny knowing somebody named Twizzie and then,

20  realizing that we had had his phones, he goes, oh, my phones,

21  and he said that Twizzie was somebody that he barely spoke to

22  and that he last saw in 2012, and that he had not conducted any

23  drug trafficking with him.

24  Q.  That incident, was that reflected in Special Agent Marcus'

25  notes and in your 302?

E9TMCHA1                          Reynolds - direct

1   A.  Yes.

2   Q.  Had you reviewed Brown's phone at the time?

3   A.  Yes.

4   Q.  Is there a contact for Twizzie in Mr. Brown's phone?

5   A.  Yes, there is.

6           THE COURT:  In the safety valve proffer Mr. Brown did

7   not identify Twizzie as being the second robber?

8           THE WITNESS:  No.  Because, if I may, any safety valve

9   proffer --

10          THE COURT:  That's not the point.

11          THE WITNESS:  Not just not the point.  We are not

12  allowed to ask about anything else other than drug trafficking

13  related stuff.  So we never asked him to identify or to --

14  about Mr. Chambers' or Twizzie's role in the robbery.

15          THE COURT:  Got it.  Thank you.

16  Q.  Was it your belief at the time that the statements made by

17  Mr. Brown at the safety valve proffer were consistent or

18  inconsistent with the statements made by Mr. Brown initially at

19  the postarrest statement?

20          MR. DRATEL:  Objection.  Relevance.

21          THE COURT:  I'll allow it.

22  A.  I'm sorry.  Could you repeat the question.

23  Q.  I'll ask it more broadly.  Were the statements that

24  Mr. Brown made at the safety valve proffer consistent or

25  inconsistent with the statements he made during his postarrest

1    interview?

2    A.   Inconsistent.

3    Q.   And how so?

4    A.   Again, he really wouldn't identify T.

5              THE COURT:  At which time or both?

6              THE WITNESS:  He is claiming that there is somebody

7    named T.  I wouldn't consider that an identification.  But I'm

8    a little confused by the question.

9    Q.   Let me take a step back.  In the initial interview,

10   postarrest interview on April 8, Tyrone Brown said he did not

11   know the individual, the second robber who was subsequently

12   identified as Antione Chambers?

13   A.   Yes.

14   Q.   Is that statement consistent or inconsistent, in your mind,

15   with the statement he made at the safety valve proffer?

16             MR. DRATEL:  Objection, again, for the record.

17             THE COURT:  I understand.

18   A.   Yes.  I believe it to be inconsistent.  Like I said, the

19   only person that Brown had telephone conversations with at the

20   time of the robbery was a 717 area code number that was listed

21   in his phone under the contact Twizzie.

22             THE COURT:  So I get it, during the postarrest

23   statement he said that the second robber was someone he had

24   seen before and he knows him as T and he had just seen him a

25   couple of times.  Is that right?

1          THE WITNESS:  Yes, ma'am.

2          THE COURT:  And then during the 302 proffer he said at

3     first that he didn't know Twizzie, someone he had barely spoken

4     to and he last saw him in 2012.  Did you have any reason to

5     believe that the Twizzie he was talking about during the

6     proffer was the same person as T that he was talking about

7     during his postarrest statement?

8          THE WITNESS:  Yes.

9          THE COURT:  And what was the basis for believing that?

10          THE WITNESS:  The telephone contact.  Again, looking

11     at Brown's phone records, the only person he spoke to at the

12     time of the robbery was the telephone number associated with

13     the Twizzie contact from his phone.

14          THE COURT:  Did he ever refer to the person you were

15     calling Twizzie in the proffer as T?

16          THE WITNESS:  No, ma'am.

17     Q.  Did you ever, Special Agent Reynolds, refer to Antione

18     Chambers as T in any reports that you prepared or documents

19     that you assisted in the preparation of?

20     A.  Yes.

21     Q.  And can you explain that to the judge?

22     A.  Yes.  Following the postarrest statement, I believe in

23     early June we sought a cell site order from the Court for

24     historical cell site records for a phone number that we

25     believed to be associated with Antione Chambers.  And in

E9TMCHA1                          Reynolds - direct

1    preparation of that order I notified Ms. Lester, the Assistant

2    United States Attorney that was working on the case at the

3    time, that Brown had referred to the second person in the

4    robbery as T.

5            MR. ARAVIND:  With the Court's permission I would like

6    to show the witness 3501-42.

7            THE COURT:  Do you have a copy for me?

8            MR. ARAVIND:  I do, your Honor.

9            THE COURT:  It's probably in this notebook.

10           MR. ARAVIND:  It's in the notebook.

11           THE COURT:  I will just look there.

12   Q.  What is this document, Special Agent Reynolds?

13   A.  It's an order.  It's a draft of the order requesting

14   historical cell site information prepared by Ms. Lester.

15   Q.  Did you have any role in drafting or providing information

16   about this cell site order?

17   A.  Yes.  Prior to her preparation, I had discussed the cell

18   site order with Ms. Lester.

19   Q.  I want to direct you to the fourth page of this document.

20   A.  Yes.

21   Q.  On paragraph 4B.

22           Do you see that?

23   A.  I do.

24   Q.  It says:  On or about April 8, 2013, resident 1 was

25   interviewed by law enforcement agents about the circumstances

1    of the May 25 robbery.

2              THE COURT:  March 25.

3              MR. ARAVIND:  I'm sorry.  March 25.  Thank you, your

4    Honor.

5    Q.  Who is resident 1?

6    A.  Mr. Brown.

7    Q.  Now, the last sentence of this paragraph, can you read that

8    for the judge?

9    A.  Yes.  Resident 1 also stated that the second robber was

10   known to him as T.

11             THE COURT:  That's the bottom of paragraph B, right?

12             THE WITNESS:  Yes, ma'am.

13   Q.  Just, again, what does that sentence refer to?

14   A.  That refers to the statements made by Mr. Brown and the

15   April 8, 2013 postarrest interview.

16             MR. ARAVIND:  Your Honor, may I have one moment?

17             THE COURT:  Sure.

18   Q.  Looking back on it, Special Agent Reynolds, is the

19   reference to T, is that something that should have been in your

20   notes?

21   A.  In hindsight, yes, sir.

22   Q.  And should that have been in your 302?

23   A.  Yes.

24             MR. ARAVIND:  No further questions, your Honor.

25             THE COURT:  Cross.

E9TMCHA1                          Reynolds - direct

1   CROSS-EXAMINATION

2   BY MR. DRATEL:

3   Q.  Good morning, Agent Reynolds.

4   A.  Good morning.

5   Q.  Let's go back to April 8, right, when you were called by

6   Detective Deloren?

7   A.  Yes, sir.

8   Q.  And why did he call you?

9   A.  Because he had informed us about the robbery and we had

10  agreed to help him.

11  Q.  When you say he had informed us about the robbery, we

12  agreed to help him, what did you mean by that?

13  A.  Detective Deloren, prior to the 8th, had called us to tell

14  us that he was investigating the home invasion and robbery that

15  had occurred on March 25 at 1338 Croes Avenue.  We have worked

16  cases before with the Bronx robbery squad and he asked for our

17  assistance and we agreed to help him.

18  Q.  You went to the Bronx to a police station, correct, Bronx

19  robbery?

20  A.  To their office, yes.

21  Q.  So that's an NYPD facility, right?

22  A.  Yes, sir.

23  Q.  And Brown was not under arrest by you at the time, was he?

24  A.  No, sir.

25  Q.  So when you talk about the FBI's taping policy, in fact,

E9TMCHA1                         Reynolds - cross

1   NYPD has a taping policy, right?

2   A.  I believe they have some sort of policy.  I don't know what

3   that policy is.

4   Q.  They have a policy of getting signed statements by people

5   who are interviewed, right?  You were a police officer,

6   correct?

7   A.  Yes.

8   Q.  How long were you a police officer?

9   A.  Six years.

10  Q.  And NYPD has a policy of getting signed statements by

11  persons who confess, correct?

12  A.  I am not sure if there is a policy about getting --

13  Q.  That's the intention, correct?  That's the objective?

14  A.  It's something --

15  Q.  It's not against policy like the FBI where you don't do it?

16  A.  Yes, sir.

17  Q.  This was a state interrogation in a state facility

18  basically under the auspices of the NYPD, not the FBI, correct?

19  A.  No, sir.  I was specifically there to interview him in

20  regards to the investigation that we had opened into the March

21  25 robbery.

22  Q.  But it was in the Bronx station house, right?

23  A.  Yes, sir.

24  Q.  And Detective Deloren did not participate at all in the

25  interview?

E9TMCHA1                         Reynolds - cross

1    A.  No, sir.  He participated.

2    Q.  He asked questions, too, right?

3    A.  Yes, sir.

4    Q.  He could have taped it, right?

5    A.  I am not sure as to their policy in regards to taping.

6    Q.  You don't know the NYPD policy with respect to taping?

7              MR. ARAVIND:  Objection.  Asked and answered.

8              THE COURT:  I'll allow it.  Go ahead.

9    A.  No, sir.

10   Q.  You know that the NYPD tapes interviews for now, right?

11   You know that?

12   A.  Do I know it's a policy for them to tape interviews?

13   Q.  You know they tape interviews?

14             MR. ARAVIND:  Objection.  If you could let the witness

15   answer the question.

16             THE COURT:  Please let the witness answer.

17             MR. DRATEL:  Let me rephrase it.

18   Q.  You know that NYPD tapes interviews now and as of 2013,

19   April 2013, you knew that NYPD videotaped interviews, right?

20   A.  Do they have that capability, yes.

21   Q.  No.  You knew that they did it, right?

22   A.  I don't know what the NYPD's policy is --

23   Q.  I didn't ask about policy.  You listen to the question and

24   answer the question, which is, you knew that NYPD tapes

25   interviews of confessions, correct?

E9TMCHA1                          Reynolds - cross

1    A.  They can.

2    Q.  Do you know that it's done, right?

3    A.  Have they done it, yes.

4    Q.  And you know that?

5    A.  Yes.

6    Q.  That would have been the simplest answer right away?

7              MR. ARAVIND:  Objection.

8              THE COURT:  Go ahead.

9    Q.  What's your training of taking notes?

10   A.  I don't believe we have specific training regarding taking

11   notes.

12   Q.  What's your training on 302s?

13   A.  Training that you receive at the academy.

14   Q.  What is that?

15   A.  Just in general.  You take notes during an interview and

16   you prepare the report based on your memory of the notes of the

17   interview.

18   Q.  What does it say, leave out important stuff or put in

19   important stuff?

20   A.  Put in important stuff.

21   Q.  Put in detail?

22   A.  As much as you can.

23   Q.  If you got two perpetrators to a robbery, do you want to

24   put in whatever you know about each robber?

25   A.  Sure.

E9TMCHA1                        Reynolds - cross

1   Q.  Particularly the one you have not identified yet?

2   A.  Sure.  If I have been given a good identity of that person,

3   that would have been included.

4   Q.  Let's talk about the purposes of 302s.  One of the purposes

5   is to get down on paper contemporaneously what you've heard,

6   right?

7   A.  I'm sorry.  Could you repeat that?

8   Q.  Sure.  To get down on paper contemporaneously with the

9   interview as quickly as possible what you've heard so that you

10  have a record of it, right?

11  A.  Yes, sir.

12  Q.  Because right now we are what, 18 months after the

13  interview, right?

14  A.  Yes, sir.

15  Q.  And you got to know right then what it is because 18 months

16  you might not remember everything, right?

17  A.  Yes, sir.

18  Q.  And it's also to help the investigation, correct?

19  A.  Yes, sir.

20  Q.  Because someone else may be looking at this 302 for

21  purposes of assisting in your investigation and you, in fact,

22  furthering your own investigation, correct?

23  A.  A 302 never contains everything that was said in the

24  interview.

25  Q.  That's not my question.  It's supposed to help you further

1    the investigation, correct?

2    A.  Correct.

3    Q.  And at the time that you prepared this 302 there was one

4    outstanding issue in this robbery, right?

5    A.  No, sir.

6    Q.  You knew it was Glisson was one of the robbers?

7    A.  Yes, sir.

8    Q.  You knew Brown had some involvement in the robbery,

9    correct?

10   A.  Yes, sir.

11   Q.  And you knew who the victims were, right?

12   A.  Yes, sir.

13   Q.  There was one thing you didn't know, right, the identity of

14   the second robber?

15   A.  No, sir.

16   Q.  You knew the identity of the second robber when you did

17   this interview?

18   A.  No, sir.  We didn't know the identity of that robber --

19   there was a lot of outstanding questions, one being the

20   identity of that person that Mr. Brown was referring to.  Also,

21   there was another individual involved in the robbery that we

22   didn't know.  And at that point that's just what we knew based

23   on tapes and based on interviews.  There could have been other

24   people involved in the robbery that we didn't know about.

25   Q.  Let's talk about the outstanding issues beyond who the

E9TMCHA1                          Reynolds - cross

1    second robber was and who the guy in the car was.  What was

2    outstanding --

3              THE COURT:  Mr. Dratel, I get your point.  We are

4    getting sort of far afield and time is sort, if you don't mind.

5    I understand your point.

6    Q.  This is a collaborative process, the 302, to some extent.

7    It goes through layers, right?

8    A.  Yes, sir.

9    Q.  Who helped you with this 302?  Who reviewed it for you?

10   Anybody?

11   A.  No.

12   Q.  Is that normal?

13   A.  Just my supervisor signs it.

14   Q.  Did you ever go over it with Detective Deloren?

15   A.  No, I did not.

16   Q.  Now, you're doing the 302 two days later, right, April 10?

17   A.  Yes, sir.

18   Q.  And do you have that in front of you?  It's 3501-04, I

19   believe.

20   A.  Yes, sir.

21   Q.  Now, if you look at page 2, in fact, if you look at first

22   paragraph that continues from page 1 and then the second

23   paragraph, which is the first full paragraph on the page, there

24   are four instances where you say unidentified male, correct?

25   A.  Yes, sir.

E9TMCHA1                          Reynolds - cross

1    Q.   And each time you wrote that it never occurred to you to

2    say, oh, wait, he said it was T?

3    A.   No, sir.

4    Q.   Never occurred to you?

5    A.   No, sir.

6    Q.   This is two days later, right?

7    A.   Yes, sir.

8    Q.   When the identity of the second robber was still unknown,

9    right?

10   A.   Yes, sir.

11   Q.   Someone out on the street who had committed a robbery that

12   you are looking for, right, that NYPD is looking for and that

13   you are looking for, right?

14   A.   Yes, sir.

15   Q.   And then at the bottom Brown does not know the identity of

16   the other male who participated in the robbery?

17   A.   Yes, sir.

18   Q.   And at that time it never occurred to you that you had

19   heard that he was T?

20   A.   No, sir.  Like I said, it was not in my notes and, also --

21            MR. ARAVIND:  Objection.

22            MR. DRATEL:  Unresponsive.

23            THE COURT:  The objection is well taken.  I understand

24   your point, which is that it didn't occur to him to say that it

25   was T.  I heard that twice.  So you can proceed.

E9TMCHA1                          Reynolds - cross

1   Q.  This is two days later, correct?

2   A.  Yes, sir.

3   Q.  Did you put out any bulletins or anything to anyone looking

4   for T?

5   A.  As I previously stated, we didn't believe Mr. Brown to be

6   truthful, and we had planned to follow up with him at another

7   time.

8   Q.  That's not my question.  Please answer my questions.  It

9   will go a lot faster if you just answer the questions.

10          MR. ARAVIND:  Objection.

11          THE COURT:  Overruled.

12  A.  There wasn't enough information --

13  Q.  Did you put out anything asking about T, who T was?

14  A.  No, sir.

15  Q.  Now, you testified in the grand jury in this case, correct?

16  A.  Yes, sir.

17  Q.  Three times at least, right?

18  A.  Multiple times.

19  Q.  First was May 7, 2013.  If you don't remember the date, do

20  you have your 3500 entirely or just stuff that's been given to

21  you?

22  A.  Just stuff that was provided.

23  Q.  3501-32 --

24          THE COURT:  Mr. Dratel, just for the ease of

25  proceeding, if you want to just put the dates in the record and

1    say they are based on the 3500 material, I'm sure the

2    government will tell us if that's not right.

3            MR. DRATEL:  Thank you, your Honor.  3501-32, May 7,

4    2013; 3501-34, August 13, 2013; 3501-35, January 23, 2014.

5            THE COURT:  You may proceed.

6            MR. DRATEL:  If I may approach, your Honor, just so

7    the witness has it in case he needs to refer.

8    Q.  This is 3501-32, which is your initial appearance.  In

9    fact, that's a grand jury with respect to Mr. Brown, correct?

10   A.  Yes, sir.

11   Q.  And it's about the drug charges alone, correct?  If you

12   recall, you want to look through, go ahead.

13   A.  From what I recall, yes.

14   Q.  And you used his statement in front of the grand jury.  You

15   said, here is what he told me, right?

16   A.  Yes, sir.

17   Q.  And you took it and you presented it to the grand jury that

18   it was an accurate statement of Mr. Brown's culpability with

19   respect to the drug transactions, correct?

20   A.  Accurate in terms of what?  I'm sorry.

21   Q.  Accurate that he was guilty as a drug dealer, that he

22   admitted to dealing drugs.

23   A.  Yes.

24   Q.  Now, in August, if you look at 3501-34 -- by the way,

25   nothing about T, right.  If you want to look at that first

1   grand jury, you talk about the robbery a little bit, right, but

2   the robbery is not the focus of the charges, right?

3   A.   That's correct.

4   Q.   But there is nothing about T as the identity of a second

5   robber in that grand jury testimony, correct?

6   A.   Correct.

7   Q.   And there is nothing in there that says that Mr. Brown was

8   lying to us, we don't believe him, people minimize, nothing in

9   that grand jury.  You told the grand jury under oath, right?

10  A.   Did I talk to the grand jury under oath?

11  Q.   Yes.

12  A.   Yes.

13  Q.   You didn't say, we don't believe it, he is not telling the

14  truth.  You presented his statement as fact, correct?

15  A.   His entire statement as fact?

16  Q.   You presented his statement as fact.

17  A.   I told the grand jury what his statement was.

18  Q.   As accurate.  You didn't say don't believe it, don't take

19  that as probable cause to indict.  You said this is probable

20  cause to indict him.  He told me, right?

21  A.   I reported to the grand jury what he said.

22  Q.   That's not my question.  My question is, your purpose in

23  the grand jury was to convince the grand jury that because he

24  had confessed to you he should be indicted and there was

25  probable cause to indict him, correct?

1           MR. ARAVIND:  Objection.

2           THE COURT:  I'll allow it.

3  A.  I'm sorry.  Could you repeat the question.

4           MR. DRATEL:  If I could be read back.

5           THE COURT:  I can read it.  My question is:  Your

6  purpose in the grand jury was to convince the grand jury that

7  because he had confessed to you he should be indicted and there

8  was probable cause to indict him, correct?

9           THE WITNESS:  My grand jury presentation was based not

10 only on the confession, but on drugs that we had recovered from

11 his apartment.

12 Q.  That's not my question.  Could you please answer the

13 question as opposed to one that you prefer.

14          MR. ARAVIND:  Objection.

15          THE COURT:  Sustained.

16 Q.  Can you please answer my question, if we can have it read

17 back again, because that was not an answer.

18          THE COURT:  Why don't you rephrase your question.

19 Q.  You're in the grand jury, correct?  You're under oath,

20 correct?

21 A.  Yes.

22 Q.  And the reason you told the grand jury of Mr. Brown's

23 statement was additional evidence, regardless of whatever else

24 you had, was evidence that he was guilty of dealing drugs,

25 right?

1   A.  Yes.

2   Q.  His statement, right?

3   A.  Yes.

4   Q.  As true?

5   A.  Yes.

6   Q.  By the way, August 13, 2013, 3501-34, if you could look at

7   that, please.

8   A.  Yes, sir.

9   Q.  That included the robbery?

10  A.  Yes, sir.

11  Q.  And it included Mr. Chambers and Mr. Glisson as defendants,

12  right?

13  A.  Yes, sir.

14  Q.  And you used Mr. Brown's statement for the purpose, again,

15  of obtaining an indictment, correct?

16  A.  It was part of the evidence, yes.

17  Q.  That's not what I'm asking.  Did you use Mr. Brown's

18  statement to obtain an indictment?  It's a simple yes or no

19  answer.

20  A.  Yes.

21  Q.  And you used it as true, correct?

22  A.  I presented it as what Mr. Brown told us.

23  Q.  You didn't say to the grand jury, take this with a grain of

24  salt because all these guys lie all the time.  Take it with a

25  grain of salt.  You didn't say that, did you?

1    A.  No, sir.

2    Q.  You said, he identified Mr. Glisson, he talked about his

3    phone conversations with Mr. Glisson, he initially lied to us,

4    but then ultimately he told us what happened.

5           That's the way you presented it to the grand jury,

6    correct?

7    A.  I'm not sure of the exact way I presented it.

8    Q.  Let's go through it.

9           Initially, if you look at page 5 on 3501-34, your

10   testimony from the May 7 grand jury was read into the record,

11   right?

12   A.  Yes, sir.

13   Q.  If we go to page 10 and 11 --

14          THE COURT:  By the way, while we are going to pages 10

15   and 11, I am going to have marked as Court's Exhibit 6, 7, and

16   8 3500-32, 34, and 35 respectively.

17   Q.  You talked there about Mr. Brown acknowledging his drug

18   dealing, right?

19   A.  I'm sorry.  What page?

20   Q.  10 and 11.

21   A.  Yes, I'm reporting what Mr. Brown said about his drug

22   trafficking.

23   Q.  And if you look at the bottom of page 11, and this is,

24   again, quoting from your prior grand jury testimony, if you

25   look at line 22:  Did he make any statements, and he being

E9TMCHA1                         Reynolds - cross

1   Mr. Brown, right?

2   A.  Yes, sir.

3   Q.  Did he make any statements about the robbery that took

4   place on March 25.

5   "A.  Yes, he did.

6   "Q.  What did he say?

7   "A.  He said an individual known to him as Dee, who he later

8   identified as Steven Glisson, approached him the previous day,

9   which would be the 24th.  He approached him during the day of

10  the 24th and asked him if he was still talking to Groovy and

11  buying crack."

12          Just for purposes of identification here, since we are

13  not in the middle of trial, but before it, Groovy is David

14  Barea, correct?

15  A.  Yes, sir.

16  Q.  And Groovy is the person who initially was robbed, right?

17  A.  Yes, sir.

18  Q.  And if you're still talking to Groovy and buying crack --

19  I'm going back to the testimony -- Tyrone Brown acknowledged

20  that he was and told him he was supposed to get more crack from

21  him that night.  Dee told Tyrone Brown he wanted to rob him.

22  Tyrone Brown said he would let him know when Groovy was coming

23  to the apartment.

24          That's the part that's read back, correct?

25  A.  Yes, sir.

1   Q.  And nothing in there about Mr. Brown's statement about the

2   robbery being untrue, correct?

3   A.  I was reporting what Mr. Brown said.

4   Q.  I'll repeat it.  Nothing there about Mr. Brown's statement

5   not being accurate or true, right?

6   A.  No, sir.

7   Q.  You were asked, if you look at page 13 and 14, asked about

8   identification of another person, about the robbery suspects,

9   right?

10  A.  Yes.

11  Q.  And you had already talked about Mr. Glisson being

12  identified by Tyrone Brown, correct?

13  A.  Yes, sir.

14  Q.  And if you want to look back, you can, but you had already

15  talked about Mr. Glisson being identified by the victims,

16  right?

17  A.  Yes, sir.

18  Q.  Now, here you talk about Antione Chambers -- this is page

19  14, right?

20  A.  Yes, sir.

21  Q.  And how is he identified as a participant in the robbery.

22  You say:  The female victim and her daughter picked him out of

23  a photo array, right?

24  A.  Yes, sir.

25  Q.  Nothing about T there, right?

E9TMCHA1                          Reynolds - cross

1   A.  No, sir.

2   Q.  Nothing in this whole grand jury testimony about T, right?

3   A.  No, sir.

4   Q.  But there is about Twizzie, right?  If you look at the

5   bottom of page 15, you talk about Twizzie.  You talk about the

6   phone numbers, right?

7   A.  Yes, sir.

8   Q.  And the phone contacts?

9   A.  Yes, sir.

10  Q.  But you don't say nothing about Tyrone Brown or T?

11  A.  The grand jury does not include all the information I know

12  about the case.

13  Q.  How about answering that question again?

14          MR. ARAVIND:  Objection, your Honor.  We have done

15  this several times again.

16          THE COURT:  The objection is sustained.  But, Mr.

17  Dratel is right.  You should listen carefully to the question

18  and answer the question.  Thank you.

19  Q.  The question is, you didn't say anything about T, right?

20  You talked about the cell site info, you talked about the

21  photographic ID.  You never hooked up the T with Tyrone Brown,

22  right, in your testimony here?

23  A.  No, sir.

24  Q.  Were you instructed not to by the Assistant U.S. Attorney?

25  A.  No, sir.

E9TMCHA1                          Reynolds - cross

1  Q.  You testified again, right, January of this year, January

2  23, in the grand jury, 3501-35?

3  A.  Yes.

4  Q.  Nothing there about T either, right?

5  A.  Not that I recall.

6  Q.  Nothing there about Mr. Brown's statement not being true,

7  correct?

8  A.  No, sir.

9  Q.  Now, you talked about the cell site order, right?  By the

10  way, the proffer with Mr. Brown was June 11, correct, of 2013?

11  A.  Yes, sir.

12  Q.  If you need to refresh, I can show you.

13        And that was a safety valve proffer, right?

14  A.  Yes, sir.

15  Q.  That occurred after your first grand jury appearance but

16  before your next two grand jury appearances, right?  It was

17  before the August 13 and before the January 23, right?

18  A.  Yes, sir.

19  Q.  This case has been scheduled for trial several times,

20  right?

21  A.  Yes, sir.

22  Q.  And you've been involved the whole way through, right?

23  A.  Yes, sir.

24  Q.  And so you know that Mr. Brown was a defendant until about

25  a month ago, right?

1    A.  Yes, sir.

2    Q.  And you were prepared to testify about his statement to

3    you, correct, in front of a jury?

4              MR. ARAVIND:  Objection.

5              THE COURT:  I'll allow it.

6    A.  I'm sorry.  Could you repeat the question?

7    Q.  You were anticipating that you would be testifying at a

8    trial involving Mr. Brown, Mr. Glisson, Mr. Chambers, or some

9    combination of the three, right?

10   A.  Yes, sir.

11   Q.  And if Mr. Brown went to trial were you going to testify

12   that you took the statement from him, correct?  That would be

13   part of your role, right?

14   A.  I don't know if we actually prepared my testimony, but

15   sure.

16   Q.  You anticipated that?

17   A.  Sure.

18   Q.  And you were going to tell the jury that he told you all of

19   these things that are in the 302, right?

20   A.  Yes, sir.

21   Q.  And you weren't going to tell the jury that it wasn't true,

22   right?

23   A.  I am not sure if that was going to be asked of me.  I was

24   going to tell the jury what Mr. Brown said.

25   Q.  You talked about the cell site order.  Look, if you could,

1   at 3501-33, please.  It's in the book.

2            MR. DRATEL:  Your Honor, if we could move that,

3   whatever we are up to.

4            THE COURT:  Court's Exhibit 9.

5   Q.  That's an e-mail, correct?

6   A.  Yes, sir.

7   Q.  To Amy Lester, correct?

8   A.  Yes, sir.

9   Q.  And whose handwriting?  Do you know the handwriting?

10  A.  No, sir.

11  Q.  It's not your handwriting, correct?

12  A.  No, sir.

13  Q.  There is nothing in here about T, correct?

14  A.  No, sir.  That was in a later e-mail.

15  Q.  And do we have that e-mail?

16  A.  I believe the government has it.

17           MR. DRATEL:  I don't think I have gotten it.  He said

18  subsequent e-mail.  He just testified that he sent a subsequent

19  e-mail mentioning T that I don't think has been produced.

20  Q.  If you look at the handwritten notes, is that based on a

21  telephone conversation between you and Ms. Lester, if you

22  remember?

23           THE COURT:  The question is, if you look at the

24  handwritten notes, is that based on a telephone conversation

25  between you and Ms. Lester, if you remember?

E9TMCHA1                    Reynolds – cross

1          THE WITNESS:  I don't remember if it was a telephone

2    conversation or not.

3          (Continued on next page)

E9tgcha2                        Reynolds - cross

1   BY MR. DRATEL:

2   Q.  And there's nothing in there about T, though, is there?

3   A.  No, sir.  Like I said, that was in a later email a few days

4   later.

5   Q.  And that's 3501-44, I understand.  Is that an email?  If

6   you'd look at that.

7   A.  Yes, sir.

8           THE COURT:  Mr. Dratel, can I ask a question just to

9   sort of cut to the chase here.  Is there any document in here

10  that is Agent Reynolds' document that references T?

11          MR. DRATEL:  I beg your pardon.

12          THE COURT:  Is there a document in the 3500 material

13  for Agent Reynolds that references T to your knowledge?

14          MR. DRATEL:  Yes.  It's 3501-44.

15          THE COURT:  Thank you.

16          MR. DRATEL:  It's a June 7, 2013 email.  We might as

17  well mark that as the next Court exhibit.

18          THE COURT:  Okay.  It's 44?

19          MR. DRATEL:  Yes.

20          THE COURT:  All right.

21          (Court Exhibit 10 received in evidence)

22  Q.  It says -- it's a June 7th email.  It's from you to Amy

23  Lester and it says T as the second guy?

24          THE COURT:  We're on Court's Exhibit 10 now, 3501-44.

25  Q.  It says T as the second guy.

E9tgcha2                         Reynolds - cross

1   A.  I'm sorry.  Can you point to which page that's on?

2   Q.  It's the only page of 44.  It's a one page email.

3              THE COURT:  No, 44 is long.

4              MR. DRATEL:  It's actually the last page of it.

5   They're all numbered together, but it's the last page.

6              THE COURT:  It's the very last page of 3501-44:  T as

7   the second guy.

8              MR. DRATEL:  Yes.

9              THE WITNESS:  Okay.  I'm sorry.  Yes.

10  Q.  Is it June 7, 2013, correct?

11  A.  Yes, sir.

12  Q.  Two months after the interview with Mr. Brown?

13  A.  Yes, sir.

14  Q.  And a month after you've testified in the grand jury on

15  that, right?

16  A.  Yes, sir.

17  Q.  And two months essentially after you prepared your 302,

18  right?

19  A.  Yes, sir.

20  Q.  I mean, you never went back to revise your 302, did you, to

21  supplement it?

22  A.  No, sir.  In my experience, that's not something that I do.

23  Q.  I'm just asking the question:  Did you go back and revise

24  your 302?

25  A.  No, sir.

E9tgcha2                         Reynolds - cross

1   Q.   Did you create a supplemental 302 to say, by the way,

2   Mr. Brown also said T as the second robber?

3   A.   No, sir.

4   Q.   And then Ms. Lester asked you did Brown refer to the second

5   robber as T or did he say Dee, you referred to him as T?

6        Did you answer that question?

7   A.   Yes.

8   Q.   Did anybody ask you what the basis of T as the second guy

9   was?

10  A.   I think it's explained in the email.  I'm sorry.  If you

11  can repeat the question.

12  Q.   Yeah.  In other words, did anybody say where did you get

13  this T from?

14  A.   Ms. Lester and I discussed it on the phone.

15       MR. DRATEL:  But your Honor, I just ask the government

16  since we're in a situation where we don't have rules of

17  evidence, is this copy of the email from Ms. Lester, 3501-33?

18       THE COURT:  3501.

19       MR. DRATEL:  Whether this is a copy that the

20  government has from Ms. Lester, not from Agent Reynolds?

21       THE COURT:  In other words, whose possession was it

22  in?

23       MR. DRATEL:  Yes.

24       MR. ARAVIND:  I think those are Ms. Lester's

25  handwritten notes.

1              THE COURT:  Okay.

2    Q.  So T is not reflected there in her handwritten notes,

3    right?  So she also decided that that was not important enough

4    to write down what you had told her?

5    A.  I'm sorry.  You have to ask Ms. Lester.

6              THE COURT:  I think this question got lost somewhere,

7    but with respect to 3501-33, they're handwritten notes at the

8    bottom.  From looking at those notes, do those seem to be

9    Ms. Lester's notes of a conversation you had with her?

10             THE WITNESS:  It appears to be, yes.

11             THE COURT:  Okay.

12   Q.  Now, the next time this whole thing comes up is

13   September 26 of this year, right, last week?

14   A.  I'm sorry?

15   Q.  The next time the whole question of T comes up is

16   September 26, last week basically --

17   A.  I'm not sure.

18   Q.  -- or this year, this month, right?

19             And if you look at 3501-41, please, that's not your

20   notes, correct?

21   A.  No, sir.

22   Q.  But it's dated I believe --

23             MR. DRATEL:  If we can mark this again, your Honor, as

24   whatever the next -- I think we're up to 12, are we?

25             THE COURT:  I think it's 11, so 3501 --

1            MR. DRATEL:  Dash 41.

2            THE COURT:  Would be Court's Exhibit 11.

3            (Court Exhibit 11 received in evidence)

4   BY MR. DRATEL:

5   Q.  You were interviewed by the prosecutors, right?

6   A.  Interviewed?

7   Q.  Yeah, you had a conversation with them?

8   A.  Sure, I worked with them.

9   Q.  And it was about Brown's postarrest statement, right, and

10  the day he was arrested, correct?

11  A.  Yes, sir.

12  Q.  And you look at in the middle where it says IEG, right?

13            THE COURT:  Are we in the middle of the first page?

14            MR. DRATEL:  Yes, your Honor.  I'm sorry.

15            THE COURT:  Okay.

16  Q.  Right.  And then it says initially said didn't know other

17  guy, but then later said seen one guy, T.  Right?

18  A.  Yes, sir.

19  Q.  "Claim not to him that."  Well, there's a word missing

20  obviously as opposed to Glisson, right?

21  A.  Yes.

22  Q.  And that's you telling them that, right?

23  A.  I had a conversation with Ms. Teekei.

24  Q.  That's the first time you ever told these two prosecutors

25  anything, right?

E9tgcha2                            Reynolds - cross

1    A.  I don't recall.

2    Q.  Do you have any other piece of paper, any email, anything

3    where you've ever had this conversation with them before?

4    A.  Not that I know of.

5    Q.  And you knew -- well, withdrawn.

6             You know there was a lot of litigation in the case,

7    motions back and forth, right?

8    A.  Yes, sir.

9    Q.  And Mr. Brown moved to suppress his statement, right?

10   A.  Yes, sir.

11   Q.  There was a whole question about whether the statements

12   were coming in against the other defendants and redactions and

13   all of that, right?

14   A.  Yes, sir.

15   Q.  And there's nothing in writing anywhere during that whole

16   period of time where the government is moving to introduce that

17   statement in one form or another where you submit an affidavit

18   or anything that says -- or even an email to the government

19   during that period of time to these prosecutors that says Brown

20   was lying when he made those statements, right?

21   A.  What's the question?

22   Q.  There's nothing from you that says those statements are

23   untrue when the government was seeking to admit those

24   statements in all this motion practice that you're aware of you

25   never said hey, don't put that statement in, it's not accurate,

E9tgcha2                        Reynolds - cross

1   I don't vouch for that statement?

2   A.  I don't vouch for anything.  The report is Mr. Brown's

3   statement.

4   Q.  Did you ever say it's not accurate, it's not believable, it

5   shouldn't be putting it in as a truthful statement?

6   A.  No, sir.

7   Q.  Did you ever say that?

8   A.  No, sir.

9   Q.  Did you ever say -- by the way, going back to the grand

10  jury, did you say to the grand jury, you know, these 302s,

11  they're just based on notes, I don't take everything down and I

12  really leave stuff out all the time, don't take this as the

13  actual things he said; it's just sort of my record.

14          You didn't say that to the grand jury, did you?

15  A.  No, sir.

16  Q.  No.  Because the fact is, the purpose of it is to get as

17  much down as possible to be as comprehensive as possible,

18  right?

19  A.  Sure.

20  Q.  And how many times has this happened in your career?

21  A.  How many times what, sir?

22  Q.  When someone identifies a perpetrator and it's not in your

23  302?

24  A.  Calling a guy T is not identifying a perpetrator.

25  Q.  How many times has someone given you information about a

E9tgcha2                          Reynolds – cross

1    perpetrator that could be used at some point down the road to

2    help identify that perpetrator, whether it's a description,

3    whether it's an article of clothing, whether it's anything

4    about them, whether it's an accent, whether it's anything where

5    you left it out of your 302?

6    A.   None that I'm aware of.

7    Q.   And at the time that you were interviewing Tyrone Brown on

8    April 8, what in this case was more important than trying to

9    figure out who that second robber in the apartment was?

10   A.   Figuring out the other robbers was of the utmost

11   importance.

12              MR. DRATEL:  Nothing further.

13              THE COURT:  Thank you.

14              Any redirect?

15              MR. ARAVIND:  Yes.  Briefly.

16   REDIRECT EXAMINATION

17   BY MR. ARAVIND:

18   Q.   Special Agent Reynolds, you were asked questions about your

19   grand jury testimony.  Do you remember those questions?

20   A.   Yes, I do.

21   Q.   Did you provide your entire investigation and your

22   knowledge about your investigation in your presentation to the

23   grand jury?

24   A.   I've never gone into a grand jury and presented my entire

25   case.

1    Q.  And, in fact, are you asked questions about, Are you

2    testifying to the sum and substance of statements?

3    A.  Yes.

4    Q.  And you're only answering the questions that are posed to

5    you?

6    A.  That's correct.

7              THE COURT:  Sorry.  Was 302 an exhibit in front of the

8    grand jury?

9              THE WITNESS:  No, it was not.

10   Q.  Did you testify to all of the multiple hours of Tyrone

11   Brown's statements in the grand jury or just certain of those

12   statements?

13   A.  Just certain statements.

14   Q.  Now, going back to the postarrest interview, you mentioned

15   that he spoke for four hours.  Is that right?

16             MR. DRATEL:  Objection; I think he said three.

17             MR. ARAVIND:  Three hours.

18             THE WITNESS:  I said over three hours.

19   Q.  During those three hours, did you determine that certain

20   statements were reliable and credible?

21   A.  Yes.

22   Q.  Did you determine that certain statements were not reliable

23   and credible?

24   A.  Yes.

25   Q.  And how did you make that determination?

E9tgcha2                    Reynolds - redirect

A.  At that time, as I'm taking the 302, like I said, there was

obvious lies that he would later admit to.  I didn't know

anything, I do know something, I don't know who he is, I do

know who he is.

So, that's just -- those are examples.

Q.  You were asked questions about the alias T or the

identification as T.  What was the investigative value for you

of knowing that name, T?

A.  Well, I think like I said previously on direct, that

information that Mr. Brown gave us, again, we believed him to

be lying at the time based on the fact that he went from not

knowing the person at all to just giving us the letter T,

that's of little to no investigative value at that time.

Q.  What would have happened if you had put out a bulletin for

a person named T?

A.  I couldn't even imagine.

Q.  Try to explain to Judge Schofield what would have happened?

A.  I think I'd probably get no results.

Q.  Why is that?

A.  Because anybody with a perpetrator or suspect that starts

with the letter T could theoretically respond to your inquiry.

That's just one example.

THE COURT:  I understand.

MR. ARAVIND:  Nothing further.

THE COURT:  Okay.

E9tgcha2                       Reynolds - redirect

1    RECROSS EXAMINATION

2    BY MR. DRATEL:

3    Q.  So you said you made some sort of on-the-spot determination

4    as to what you thought was truthful and what you thought was

5    untruthful, right?

6    A.  Yes, sir.

7    Q.  So you wrote down the part that he said he couldn't

8    identify the second robber, which you put four times

9    unidentified male and then at the bottom you said could not

10   identify the second person; you wrote that down because it was

11   untrue?

12   A.  No, sir.  I didn't write it down.  Like I said, it came at

13   the conclusion of the interview --

14   Q.  No, no, no, no, no.  We're not talking about T.  I said you

15   wrote down that he didn't -- you're saying -- so you wrote down

16   the part that you thought was untrue, which was that he

17   couldn't identify the second robber; that you wrote down.

18   A.  I wrote down a lot of the things that he said that I

19   believed turned out not to be true.

20   Q.  But the thing that he gave you, in addition when he finally

21   says oh, yeah, I do know the guy as T, that you decided not

22   write?

23   A.  Like I said, I did not write it down at that time because

24   we had concluded the interview.  I wasn't even taking notes at

25   that point.

E9tgcha2                        Reynolds - recross

1   Q.  So you couldn't take out your pad and write down something

2   that might identify the second person?

3   A.  That's my point:  If we had thought it would help us

4   identify the person, I would have gone out of my way, not only

5   to write it down, but attempt to locate pictures to show

6   Mr. Brown.  At that time that information, T, was not helpful

7   so as --

8   Q.  It was not helpful?

9           THE COURT:  I think this is getting a little

10  argumentive.

11  Q.  But I need to follow this true it's not helpful you used it

12  for the cell site, right?  You didn't think it was helpful?

13  You used it.

14  A.  At that point in time when I was interviewing him, I did

15  not believe it to be helpful.

16  Q.  But later on you used it?

17  A.  Correct, later on after realizing.

18  Q.  And by the way, let's say you say if you put out a bulletin

19  for T, you don't know what you would have gotten all these

20  things.  How about if you said T operating in the Bronx in a

21  certain neighborhood involved in robberies, do you think you

22  might have been able to narrow it down a little bit?

23          MR. ARAVIND:  Objection; relevance.

24          THE COURT:  I'll allow it, but I think this is sort of

25  gilding the lily.

1          MR. DRATEL:  Thank you, your Honor.  Nothing further.

2          THE COURT:  No further questions.

3          MR. ARAVIND:  No further questions.

4          THE COURT:  I'm going to reserve on this.  I suggest

5    you not open on it because I will decide as I hear more

6    evidence.

7          As I understand, the defense would not put this in in

8    any event until its case; and then if the government felt it

9    needed to put on Agent Reynolds, I assume he's going to be here

10   anyway so he'll be available, is that right?

11         MR. ARAVIND:  Agent Reynolds is going to be one of our

12   last witnesses.

13         THE COURT:  So he'll be here.

14         MR. ARAVIND:  He will certainly be here.

15         THE COURT:  Is he planning to sit at counsel table for

16   the trial?

17         MR. ARAVIND:  As is customary in this district, he

18   will be sitting here.

19         THE COURT:  I'm going to reserve on that.  The two

20   things I would like to do before we actually bring the jury in

21   are, one, to rule on the expert testimony issue, and two, to

22   get an allocution regarding the rejection of the guilty plea

23   offer.

24         Agent Reynolds, if you'd like to take your seat again,

25   that would be fine.  Let me address the motion concerning

1    expert testimony.

2              Mr. Chambers filed his motion to introduce expert

3    testimony on eyewitness identification, which I denied without

4    prejudice on September 22, 2014.  Mr. Chambers writes that the

5    proposed expert professor Deryn Strange would provide testimony

6    on the following subjects:  One, the impact of the immediate

7    conditions during the witness' initial viewing; two,

8    cross-racial identifications; three, weapon focus or weapon

9    distraction; four, the impact of exposure to serial photo

10   arrays and the reliability of an identification; five, the

11   impact of a single-photo identification procedure during which

12   the name of the photographed individual is revealed and the

13   reliability of an identification; six, possible contamination

14   resulting from a relationship between the witnesses; and seven,

15   the effect of the passage of time between the event and the

16   first identification procedure.

17             Based on the submissions before me, including Dr.

18   Strange's CV, I'm inclined to qualify -- is Dr. Strange is

19   female?

20             MR. DRATEL:  Yes.

21             THE COURT:  I'm inclined to qualify her as an expert

22   on these matters, but for reasons that I have explained, I'm

23   denying with prejudice Mr. Chambers' request for expert

24   testimony on Subjects 1, 3, 6 and 7.  I am also denying the

25   request without prejudice as to the remaining subjects, namely

E9tgcha2                         Reynolds - recross

1   Subjects 2, 4 and 5 regarding cross-racial identification,

2   reliability of identification from serial photo arrays, and

3   single-photo identification procedures in this case.

4           Let me explain what that ruling is about.

5           MR. DRATEL:  May I ask you to repeat which are in and

6   which are out?

7           THE COURT:  Nothing is in at the moment.

8           MR. DRATEL:  Right.

9           THE COURT:  Everything is denied, but denying without

10  prejudice as to two, four and five, and denying with prejudice

11  one, three, six and seven.  And now I will explain.

12          First let me explain why everything is denied at the

13  moment.  As I explained before, *Daubert v. Merrell Dow*

14  *Pharmaceuticals Inc.*, 509 U.S. 579, (1993), imposes a

15  "gatekeeping" function on the trial judge to "ensure that any

16  and all scientific testimony... is not only relevant, but

17  reliable."  The Supreme Court listed four factors in assessing

18  liability.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999),

19  requires that where use the same factors in evaluating the

20  reliability of nonscientific testimony.  Based on the current

21  submissions from Mr. Chambers, I'm unable to do so.  In order

22  to conclude that Dr. Strange's testimony satisfies the

23  *Daubert/Kumho* standard, I would need more information on, one,

24  what theories Dr. Strange's testimony will be based on, in

25  other words, what her opinions are with respect to Items 2, 4

E9tgcha2                      Reynolds - recross

1    and 5, and that may be just a matter of rewording Mr. Dratel,

2    Items 2, 4 and 5; two, whether those opinions have been

3    published by her or others or have been subject to peer review;

4    three, whether there is an error rate associated with the

5    opinions; and four, whether there is general acceptance within

6    the scientific or relevant academic community of the opinions,

7    and these are just the four factors from *Kumho Tires*.  Because

8    I don't have that information at the moment, I am denying the

9    request as to all of the proposed subjects of Dr. Strange's

10   testimony.

11            The request is denied with prejudice as to Subjects 1,

12   3, 6 and 7.  Quote "Expert testimony must be helpful to the

13   trier of fact in comprehending and deciding issues beyond the

14   understanding of a layperson." *Marvel Characters Inc. v.*

15   *Kirby*, 726 F.3d 119, 135 (2d Cir. 2013), (quoting *DiBella v.*

16   *Hopkins*, 403 F.3d 102, 121(2d Cir.2005)).  "Generally speaking,

17   it is need when the facts and concepts of a case are beyond a

18   layperson's understanding." *S.E.C. v. Ginder*, 752 F.3d 569,

19   575 (2d Cir. 2014).  I conclude that basic concepts such as the

20   effect of the passage of time between the event and the first

21   identification procedure and the impact of immediate conditions

22   during the witness' initial interviewing and basically the

23   topics that are outlined in subjects 1, 3, 6 and 7 are basic

24   concepts within a layperson's understanding, which defense

25   counsel may argue to the jury without preference to expert

E9tgcha2                        Reynolds - recross

testimony.  I'm therefore denying the request for expert

testimony regarding the subjects numbered 1, 3, 6 and 7 in

Mr. Chambers' letter with prejudice.

          Given the facts of the identification procedure in

this case, I conclude that appropriate expert testimony

regarding the reliability of cross-racial identification and

the impact of multiple photo arrays and single-photo

identification of eyewitness reliability would be helpful to if

jury.  I'm also mindful that the Second Circuit has cautioned

that expert testimony about the reliability of eyewitness

identification can, quote, "intrude[] too much on the

traditional province of the jury to assess witness

credibility." *United States v. Lumpkin*, 192 F.3d 280, 289 (2d

Cir. 1999).  Therefore, I will not allow any expert testimony

that directly opines on the particular facts, photos and

identification in this case, including the ultimate credibility

or reliability of the actual identifications made or to be made

of Mr. Chambers.  Rather, upon savings of the *Daubert* factors,

I am inclined to permit an expert to provide general opinions

that relate to Subjects 2, 4 and 5 so that defense counsel, and

perhaps the government through cross-examination, will have a

factual predicate to argue to the jury.

          Mr. Chambers may renew his motion as to those subjects

with information that satisfies the *Daubert* factors as soon as

possible, but in any event no later than the close of the

E9tgcha2                        Reynolds - recross

1    government's case, or if he prefers, we can hold a *Daubert*

2    hearing to ensure that the expert testimony satisfies the

3    requisite factors.

4            I also want to note that the government has pointed to

5    a First Circuit case, *United States v. Jones*, 689 F.3d 12 (1st

6    Cir.2012), in which the court upheld a district court's

7    decision to exclude expert testimony and eyewitness

8    identification in favor of jury instructions that covered

9    similar ground.

10           I received the proposed jury instructions submitted by

11   you, the parties, and the jury instructions from the *Jones*

12   case.  The proposed jury instructions here are not sufficiently

13   detailed to displace the need for an expert like the

14   instructions in *Jones*.

15           In *Jones*, the jury instructions made specific

16   reference to scientific studies and conclusions regarding

17   eyewitness identification, reliability and single-photo

18   identification.  In contrast, the proposed jury instructions

19   you have submitted are worded very generally and make no

20   reference to scientific studies.

21           If the government or the defense would like to propose

22   more expansive jury instructions or joint instructions or a

23   stipulation between the parties to be used in place of expert

24   testimony more along the lines of the instructions used in

25   Jones, I would be happy to consider that, along with any

1    briefing as to why such instructions are or are not appropriate

2    to replace expert testimony.

3           Given the proposed jury instructions you've submitted,

4    however, I'm inclined to allow Mr. Chambers' expert to testify

5    in general terms about scientific and/or academic conclusions

6    as to subjects two, four and five once I'm satisfied the expert

7    testimony meets *Daubert/Kumho* requirements.

8           So my ruling for the moment is to deny the defense

9    motion to introduce expert testimony about eyewitness

10   identification on *Daubert* grounds and it is denied in part with

11   prejudice and in part without prejudice to renewal as I have

12   just explained.

13          I know this is a little bit intricate so if there are

14   any questions about my ruling, not the basis for my ruling, but

15   what my ruling is, I'm happy to tell you or clarify.  And also,

16   if I can just ask my law clerk to give a copy of what I just

17   read to the court reporter.  Thank you.

18          Any questions?  All clear?

19          MR. DRATEL:  With respect to identification, based on

20   our review of the 3500 material, I would like to renew the

21   motion for a Wade hearing for a testimony outside the hearing

22   of the jury a hearing on the viability of the identification of

23   the photographic investigation based on the following factors

24   in addition to what we were able to present to the Court back

25   when we litigated this twice in terms s of initial motions and

E9tgcha2                        Reynolds - recross

  1    then a reconsideration motion, but other factors that I think

  2    go to the viability of the ID that would -- necessitate a

  3    hearing rather than just having a jury hear it outright.  There

  4    first should be a hearing.

  5             THE COURT:  That's what I need to have explained:  Why

  6    do we need to have a hearing outside the presence of a jury, as

  7    opposed to just having the jury hearing the evidence, hear the

  8    expert on the subjects that I said and then have both sides

  9    make their arguments?

 10             MR. DRATEL:  I think under way part of the Court's

 11    gait keeping function as a threshold matter whether the ID goes

 12    to the jury in the first place.

 13             THE COURT:  Speak into the mic.  Usually I can

 14    substitute the words I can't hear, but I will confess to you

 15    I'm not familiar with Wade hearings.  You need to explain.

 16             MR. DRATEL:  Sure.  On the hearing on identification

 17    on the viability of an identification whether it's

 18    impermissibly suggestive as a matter of law so it doesn't even

 19    get to the jury so that a witness would not be permitted to

 20    testify about it.

 21             THE COURT:  I thought we have done that twice already.

 22             MR. DRATEL:  That's correct, but that was based on

 23    what turns out to be an incomplete report record as to just how

 24    suggestive and how tainted the identification was and based on

 25    the 3500.

1            THE COURT:  Why not let the jury figure that out?

2   What does Wade say that takes it away from the jury?

3            MR. DRATEL:  If it's so impermissibly suggestive that

4   it doesn't pass muster to get to the standard of going to the

5   jury this Court should exclude it outright.

6            THE COURT:  Is Wade a Supreme Court case or Second

7   Circuit?

8            MR. DRATEL:  No.  It's a Supreme Court case.

9            THE COURT:  What's government's position on that?

10           MR. DRATEL:  May I just read into the record this.

11           THE COURT:  Absolutely.

12           MR. DRATEL:  One is, that when one of the people who

13  made the ID -- there are two IDs.  We'll call this -- actually,

14  we know the names, Ms. Torres, T-O-R-R-E-S.

15           THE COURT:  Okay.

16           MR. DRATEL:  When she was shown a photograph of a

17  newspaper article as part of a newspaper article, a photograph

18  of Mr. Chambers, she also saw his name in the caption.

19           THE COURT:  Right.

20           MR. DRATEL:  She also saw more than one photograph

21  from that newspaper article, there's a series of thumbnail

22  photographs on the URL from that article, so she clearly based

23  on her 3500 material saw more than one.

24           THE COURT:  Did she see the hard copy or did she see

25  it on the screen?

E9tgcha2                        Reynolds - recross

1          MR. DRATEL:  I don't know, your Honor, but she went

2     home and Googled him.

3          THE COURT:  Okay.

4          MR. DRATEL:  So, and then --

5          THE COURT:  What 3500 material are you referring to?

6          MR. DRATEL:  3507 and --

7          THE COURT:  And whose 3507?

8          MR. DRATEL:  This is Ms. Torres.

9          THE COURT:  Okay.

10         MR. DRATEL:  3507 and -- I'll be able to give you

11    specifics in one second.

12         THE COURT:  You're saying she was shown a photo and

13    then she went home and Googled him and saw a number of

14    photographs?

15         MR. DRATEL:  It's unclear as to what exactly she saw.

16    She said she went home and Googled him.

17         THE COURT:  Okay.  Is that the additional fact that

18    you're bringing to my attention or is there more?

19         MR. DRATEL:  Also, that initially she

20    identified -- that she identified someone else in a photograph

21    as someone she saw someone else she knew in the photos and I'm

22    not sure what the impact is on her ultimate identification, but

23    it's something we didn't know about before certainly.

24         THE COURT:  You're saying in the second photo array

25    she said she knew one of the other people.

1           MR. DRATEL:  Not in the array, in a series of arrays,

2     she saw a series of arrays.

3           THE COURT:  I see.

4           MR. DRATEL:  3507, 3507-01 which is basically the

5     bottom of the page one through page two.

6           THE COURT:  Wait.  3507-01.

7           MR. DRATEL:  Yes.

8           THE COURT:  Bottom of page two.

9           MR. DRATEL:  Bottom of page one, beginning of page

10    two.  That's just -- I'm telling you where it is in 3500 that

11    she refers to some of these things.  Also 3507-02 on page two

12    and then also 3507-3 at the bottom of page one.  So that's

13    where these additional facts about Ms. Torres' ID.

14          THE COURT:  Where does it say she Googled it?

15          MR. DRATEL:  That's 3507-03, at the bottom of the

16    page, it's handwritten notes.  It's remember saw photos at

17    precinct twice and once at white castle remember photo in

18    article saw name.

19          THE COURT:  Remember photo in article saw name,

20    Googled name afterward and saw same photo in article, nothing

21    different than when saw it in VD office.

22          Based on what you told me, I don't think there's any

23    basis to revisit this again.  It seems to me that there are

24    certainly arguments you could make that the procedure was

25    suggestive.  I think the Second Circuit has established quite a

1   high standard from keeping it from the jury.  I think the jury

2   will be fully capable of evaluating the evidence, particularly

3   if both sides are permitted to make their both factual and

4   scientific arguments about why the identification is or is not

5   reliable.

6           MR. DRATEL:  Thank you, your Honor.

7           THE COURT:  Now, the last thing I would like to do

8   before we pick a jury, each though it feels like we've been on

9   trial for a while now, is an allocution.

10          I'd like to inquire about the government's offer of a

11  plea and communication of that offer to Mr. Chambers and I want

12  Mr. Chambers to listen very carefully to my questions and the

13  answers given by counsel because I'll have a question for you

14  when we're finished.

15          So if I could ask the government, did you extend a

16  plea offer to Mr. Chambers?

17          MS. TEEKEI:  Yes, we did.

18          THE COURT:  Was it in writing?

19          MS. TEEKEI:  Yes, it was.

20          THE COURT:  Is there a copy of the writing here in

21  court.

22          MS. TEEKEI:  Your Honor, however, we can bring it.  If

23  we have a break, we'll bring it to your Honor.

24          THE COURT:  Okay.  What were the terms of the offer?

25          MS. TEEKEI:  We offered Mr. Chambers a plea to Count

1    One of the indictment, the Hobbs Act robbery conspiracy.  Given

2    his prior criminal history, the various enhancements all

3    ultimately were not quite sure of the right word -- were taken

4    over by the career offender guidelines, so his career offender

5    guidelines are what drove the plea offer with acceptance of

6    responsibility, it was 151 to 188 months of imprisonment as the

7    guidelines range.

8               THE COURT:  Okay.

9               MS. TEEKEI:  With no mandatory minimum, which is what

10   would have happened with the 924(c) counts.

11              THE COURT:  In the government's view, what is the

12   defendant's sentencing exposure if he proceeds to trial and is

13   convicted on every count here?

14              MS. TEEKEI:  Your Honor, I don't have that calculation

15   right in front of me.  It's approximately 230 months to -- in

16   addition to the 84 months of the mandatory minimum, which would

17   be the 924C count.

18              THE COURT:  So 230 plus 84 would be --

19              MS. TEEKEI:  And that's the bottom end of that

20   guidelines range, your Honor.

21              THE COURT:  Okay.  And 314 months is at the bottom end

22   of the range.

23              MR. ARAVIND:  Something to that effect.

24              THE COURT:  Approximately.  But in any event, it's

25   very substantially more than the 151 to 188 that was offered,

1    is that right?

2              MS. TEEKEI:  Yes, your Honor.

3              THE COURT:  Mr. Dratel, did you give Mr. Chambers a

4    copy of the written plea offer and discuss it with him?

5              MR. DRATEL:  Yes, I did, your Honor.

6              THE COURT:  Did you discuss with him the sentencing

7    exposure under the plea offer versus if he went to trial?

8              MR. DRATEL:  Yes.

9              THE COURT:  Without telling me your recommendation,

10   did you make a recommendation to him about whether or not to

11   accept or reject the offer?

12             MR. DRATEL:  I can't say that I made a recommendation

13   specifically one way or the other.  We discussed --

14             THE COURT:  I don't really want to hear about the

15   communication; I just want to know that you thoroughly

16   discussed his options.

17             MR. DRATEL:  I did, your Honor.

18             THE COURT:  Mr. Chambers, I'd like to ask you a couple

19   of questions.  First, have you taken any drugs, medicine or

20   pills in the last 24 hours?

21             THE DEFENDANT:  No.

22             THE COURT:  Is your head clear today?

23             THE DEFENDANT:  Yes.

24             THE COURT:  I assume you've heard the questions I just

25   asked the government and I just asked your lawyer.

E9tgcha2                            Reynolds - recross

1           Is it correct that you had a thorough discussion with

2    your lawyer about your options and your rejection of the plea

3    offer by the government?

4           THE DEFENDANT:  Yes.

5           THE COURT:  Is it correct that you have rejected the

6    government's plea offer?

7           THE DEFENDANT:  Yes.

8           THE COURT:  Thank you very much.

9           Why don't we take a brief break and Mr. Street, with

10   any luck, we'll find jurors outside the door and what we're

11   going to do -- well, I'll let him orchestrate the logistics

12   here.  So we're adjourned briefly for ten minutes.

13          Thank you.

14          MR. DRATEL:  Your Honor, can we have a copy of the

15   Court's preliminary instructions based on some of the changes

16   that we made back last week, last Monday?

17          THE COURT:  I was not planning to distribute another

18   copy to counsel, but I did make the changes.

19          MR. DRATEL:  Thank you.

20          THE COURT:  Okay.

21          (Recess)

22          (In open court)

23          THE COURT:  Mr. Dratel, as you know, the defendant has

24   the right to be present at side bars.  What do you intend to do

25   about that?  What we'll do is probably huddle over there with

E9tgcha2                        Reynolds - recross

1    the white noise machine and have the court reporter drag her

2    machine over there.

3              MR. DRATEL:  Let me talk to Mr. Chambers about that.

4              THE COURT:  Okay.  Fine.

5              Let me ask the government:  Are there any witnesses

6    for whom we need to make special arrangements excusing the jury

7    while they come on or go off, anything like that?

8              MS. TEEKEI:  Yes.

9              THE COURT:  Will you give me notice and plenty of

10   time, like, the day before?

11             MS. TEEKEI:  We will.  In fact, one of the things I

12   meant to do during this break is run to my office and print out

13   a copy of an order from the Department of Justice.  I did not

14   have a chance to do that, but will do so at the next break and

15   present that to you.

16             THE COURT:  Okay.  Thank you.

17             MS. TEEKEI:  Your Honor, one additional issue.

18             THE COURT:  Speak into the mic.

19             MS. TEEKEI:  Yes.  Of course.

20             There are other what I think are potential witnesses

21   sitting in the courtroom.

22             THE COURT:  We need to not have any witnesses in the

23   courtroom.

24             Do you know who they are?

25             MS. TEEKEI:  I'm aware of one.  I'm aware of

E9tgcha2                         Reynolds - recross

1    Ms. Dunbar.  I don't know the names of the two other

2    individuals who are there, but I'm happy to, once I know their

3    names.

4              THE COURT:  Mr. Street, if you would work with

5    Ms. Teekei to figure out who the potential witnesses are and

6    excuse them.

7              My rule is that until a witness testifies, you can't

8    be present in the courtroom, but after that, you can be present

9    in the courtroom.

10             MR. ARAVIND:  For the record, to be clear, we don't

11   know the identity of certain people in the back.  I know we

12   issued a number of subpoenas in large part due to the Court's

13   ruling that we could not elicit testimony from the probation

14   officer.  There were a number of members of Mr. Chambers'

15   family that we did intend to call.  We have not met with these

16   witnesses yet.  They received a subpoena to arrive today.

17             THE COURT:  I understand.

18             MR. ARAVIND:  We want to meet with them first and

19   determine whether they are going to be witnesses.

20             THE COURT:  That's between you and them, but in the

21   meantime, we can exclude them from the courtroom.

22             Also, if I can ask counsel to keep an eye on the

23   courtroom.  It looks like more people who came in who may be

24   witnesses, let us know and we'll try to deal with that.

25             MR. ARAVIND:  To let Mr. Dratel and the Court know,

E9tgcha2                        Reynolds - recross

1   Special Agent Reynolds will try to speak to those individuals

2   at the lunch break.

3               THE COURT:  Okay.

4               MR. DRATEL:  I know one person who has been

5   subpoenaed, Mr. Chambers' sister.  She has representation

6   because I heard from that lawyer this morning, Ms. Tipograph.

7   So I know she's on duty today, but obviously I think if there's

8   any a tempt to interview her --

9               THE COURT:  So now the government is on notice that

10  she is represented.

11              MR. ARAVIND:  We received an email from Ms. Tipograph

12  as well.

13              THE COURT:  Thank you.

14              I wanted to mention to counsel that we will not be

15  sitting Thursday morning.  So we'll start at 1:00 that day and

16  go until 5:00 to let you know so you don't hear it for the

17  first time when I tell the jury.

18              MR. DRATEL:  Thank you, your Honor.

19              THE COURT:  What witness names did you want me to use

20  for people to ask them if they know any witnesses?

21              MR. ARAVIND:  We provided a list.

22              THE COURT:  When was that?

23              MR. ARAVIND:  We gave it to Mr. Street earlier this

24  morning.  He should have it.

25              MR. DRATEL:  Our only witness would be Dr. Strange.

E9tgcha2                          Reynolds - recross

1             THE COURT:  I'm not going to announce her until you

2    meet your *Daubert* requirements.

3             Thank you.

4             (Recess)

5             (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E9tgcha3                        Trial

1              (In open court; jury present)

2              (Jurors sworn)

3              (Alternate jurors sworn)

4              THE DEPUTY CLERK:  Please be seated.  The jurors are

5      sworn.

6              THE COURT:  Thank you.  So at this time, I will excuse

7      the remaining people in the courtroom, but I just wanted to

8      repeat my thanks.  You have been willing and patient and

9      participated in the process.  You have done your civic duty.

10     That's what makes our system work.

11             I want to thank you for participating for being here.

12     I'm sorry you won't be able to participate in the trial.  As I

13     said, I think it will be an interesting one, but perhaps you'll

14     be chosen for another one.  Thank you very much.

15             Mr. Street will give you your cards and tell you where

16     to report.

17             THE DEPUTY CLERK:  So everyone you can all stand.  I'm

18     going to give one of you the cards.  You're going to take it

19     back to the jury room.  The original place you first came to

20     and you're going to take the cards with you.

21             THE COURT:  Thank you all for your time.  Have a great

22     day.

23             (Prospective jurors excused)

24             THE COURT:  Ladies and gentlemen, from this point on

25     until you retire to deliberate on your verdict, it's your duty

1    not to discuss this case and not to remain in the presence of

2    other persons who may be discussing this case.

3           The rule about not discussing the case with others

4    includes discussions even with your family and friends.  So

5    please do not talk to your family and friends about the case

6    until after you have finished your duty as a juror and finished

7    your deliberations and returned your verdict.

8           If at any time during the course of the trial anyone

9    attempts to talk to you or communicate with you in any way

10   about the case, either in or out of the courthouse, you should

11   immediately report that attempt to me and you should not speak

12   with them.

13          In this regard, let me explain again that the

14   attorneys and the defendant in the case are not supposed to

15   talk to the jurors, even to offer a friendly greeting.  So if

16   you happen to see them outside the courtroom, they will and

17   they should ignore you.  Please don't take offense.  They'll

18   only be acting properly.

19          If anything should happen involving any of you that is

20   of an unusual nature or which you think is something that the

21   Court should be told about, do not discuss it with any other

22   juror, simply give my deputy, Mr. Street a note to the effect

23   that you want to speak with me about it and I can hear what it

24   is and I can hear what you have to say.  Of course, I don't

25   expect anything unusual or improper to happen.  I just give

E9tgcha3                        Trial

1    this instruction as a precaution.

2            Now that you have been sworn, I'll tell you about your

3    duties as jurors and give you instructions to help you

4    understand what will be presented during the trial.

5            At the end of the trial, I'll give you instructions

6    again and those instructions will control your deliberations.

7            At the end of the presentation of the evidence and

8    after my final charge to you, it will be your duty to decide

9    from the evidence what the facts are.  You and you alone are

10   the judges of the facts.  You will hear the evidence, decide

11   what the facts are and then apply the facts to the law which I

12   will give you.  That is how you will reach your verdict.

13           My duty is to instruct you on the law.  It is your

14   duty to accept the instructions of law and apply them to the

15   facts as you determine them.  On the legal issues, you must

16   take the law as I give it to you whether you agree or not and

17   if any attorney states a legal principle different from what I

18   state in my instructions, it's my instructions you must follow.

19           You must not take anything I say or do during the

20   trial as indicating a view on any issue, including what your

21   verdict should be.  I will not express or apply any opinions

22   about which witnesses you should believe, what facts are

23   established or what inferences should be drawn from the

24   evidence.  You are the sole judges of all of the questions of

25   fact submitted to you.

E9tgcha3                          Trial

1          As the sole judges of the facts, you must determine

2     which of the witnesses you will believe, what portion of their

3     testimony you accept and what weight you attach to it.

4          The burden is on the prosecution to prove guilt beyond

5     a reasonable doubt.  As I'll instruct you in more detail after

6     the lawyers have presented their cases, reasonable doubt is

7     based on reason and common sense.  It is a doubt that a

8     reasonable person has after carefully weighing all of the

9     evidence or a doubt that would make a reasonable person

10    hesitate to act in a manner of importance in his or her own

11    life.

12         The burden to prove guilt beyond a reasonable doubt

13    never shifts to the defendant because the law never imposes on

14    a defendant in a criminal case the burden or duty of calling

15    any witnesses or producing any evidence.  The law presumes the

16    defendant to be innocent of all of the charges against him.

17         If after careful consideration of all of the evidence

18    at the end of trial, and following the rules of law that I'll

19    explain, you have a reasonable doubt about the defendant's

20    guilt, you must acquit him; that is, you must find him not

21    guilty.

22         If however after careful consideration of all the

23    evidence presented and following the rules of law that I will

24    explain you have no reasonable doubt about the defendant's

25    guilt, you must convict him; that is, find him guilty.

E9tgcha3                        Trial

1          You'll decide what the facts are from the evidence

2    that will be presented in court.  That evidence will consist of

3    testimony of witnesses, documents and other things received

4    into evidence.  And any facts that the lawyers I to or admit or

5    that I may instruct you to find.

6          There are two kinds of evidence:  Direct and

7    circumstantial.  Direct evidence is testimony by a witness

8    about what that witness personally saw or heard or did.

9    Circumstantial evidence is indirect evidence.  It is proof of

10   one or more facts from which you can find another fact.

11   There's a simple example of circumstantial evidence that's

12   often used in the courthouse.  Assume when you came in this

13   morning the sun was shining and it was a nice day.  Assume that

14   the curtains were closed and you couldn't see outside and as

15   you're sitting here someone walked in with an umbrella that was

16   dripping wet and then a few minutes later someone else walked

17   in with a wet umbrella.  Now you can't look outside the

18   courtroom and you can't see whether or not it's raining so

19   there's no direct evidence of the fact, but on the combination

20   of facts I have asked you to assume, it would be reasonable and

21   logical for you to conclude that it had been raining.  That's

22   all there is to circumstantial evidence.  You infer on the

23   basis of your reason and experience and common sense from one

24   established fact the existence or nonexistence of some other

25   fact.

1          You may consider both direct and circumstantial

2     evidence in deciding this case.  The law permits you to give

3     equal weight to both or none.  It's up to you to decide how

4     much weight, if any, to give any evidence.  There's no magic

5     formula by which you should evaluate testimony or exhibits.  I

6     will however give you some guidelines for determining the

7     credibility of witnesses at the end of the case.

8          Right now, I'll just say that you bring with you to

9     the courtroom all the experience and background of your lives.

10    You don't have to leave your common sense outside the

11    courtroom.

12         During the trial, I may sustain objections to

13    questions that are asked.  When that happens, I will not permit

14    the witness to answer or, if the witness has already answered,

15    I will instruct that the answer be stricken from the record and

16    that you disregard it and dismiss it from your minds.

17         In reaching your decision, you may not draw any

18    inference from an unanswered question nor may you consider

19    testimony that I have ordered stricken from the record.

20         You should not show any bias against an attorney or an

21    attorney's client because the attorney objected to the

22    admissibility of evidence or asked for a conference outside the

23    hearing of the jury or asked the Court for a ruling of law.  It

24    is the lawyers' duty to do all of these things.

25         You should also understand what is not evidence.  What

1    the attorneys say in their opening statements, which you'll

2    hear in a minute, closing argument, objections or questions is

3    not evidence, neither is the testimony that I instruct you to

4    disregard.  Moreover, anything that I say is not evidence.  The

5    only oral testimony that is evidence comes from witnesses.

6    What the lawyers say in their are arguments is not evidence.

7    Their arguments are commentary to help you understand the

8    evidence.

9            For example, in just a minute, the lawyers may make

10   opening statements and tell you what they expect the evidence

11   to show, but what they say to you is not evidence and it's only

12   what's actually introduced into evidence through the mouths of

13   the witnesses or through exhibits or any stipulations that you

14   may consider in reaching your verdict.

15           If in the course of your deliberations your

16   recollection of the facts differs from what the lawyers say in

17   their arguments, it is your recollection that controls.

18   Further, anything you may see or hear while the Court is not in

19   session, even if it's done or said by one of the parties or one

20   of the witnesses is not evidence.  Only what is admitted into

21   evidence here when the Court is in session and all the parties

22   and all the jurors are present may be considered by you as

23   evidence.

24           This is a criminal case.  It's brought in the name of

25   the United States against Antione Chambers.  The fact that the

1    prosecution is brought in the name of the United States does

2    not entitle the government to any greater consideration than

3    that accorded to Mr. Chambers.  All parties stand as equals

4    here in court.  The government alleges that Mr. Chambers and

5    others who are not a part of this trial agreed to commit and

6    then did commit a robbery of a victim on or about March 25,

7    2013.  The victim was believed to be in possession of narcotics

8    proceeds, meaning money from drugs.  The government also

9    alleges that Mr. Chambers and others kidnapped two victims and

10   that Mr. Chambers used a firearm to carry out the agreement to

11   commit a robbery and to carry out the kidnapping.  Each crime

12   is charged separately and there are four charges.

13          Mr. Chambers has pleaded not guilty to all four of the

14   charges, and you should remember that he is presumed innocent

15   unless proven guilty.

16          I'm now going to tell you about some of the law that

17   you'll have to apply to the facts as you find them.  These are

18   only preliminary and summary instructions.  They're to help you

19   evaluate the evidence in light of what you'll be asked to do

20   after you've heard all of the evidence.  The final instructions

21   that I give you at the end of the trial will contain more

22   detail about the law.

23          To the extent there are any differences between what I

24   tell you now and the final instructions, the final instructions

25   will be controlling, meaning the final instructions are the

1    ones you must follow when you deliberate.

2              Now, I'll briefly summarize what the government must

3    prove beyond a reasonable doubt for each of the four crimes

4    charged against Mr. Chambers.  You will be asked to return a

5    separate verdict on each of the four alleged crimes.  So the

6    first one is conspiracy to commit armed robbery.  To prove this

7    charge, the prosecution must prove the following two elements

8    beyond a reasonable doubt.  First, that a robbery conspiracy

9    existed; in other words, the prosecution must prove that two or

10   more people agreed, either in a spoken or unspoken way to join

11   together to commit a robbery.  Second, the prosecution must

12   prove that Mr. Chambers knowingly and unlawfully, meaning with

13   a purpose to violate the law, became a member of the

14   conspiracy.

15             The prosecution must prove beyond a reasonable doubt

16   that Mr. Chambers, with an understanding of the unlawful

17   character of the conspiracy knowingly engaged, advised or

18   assisted in the conspiracy for the purpose of committing a

19   robbery.  That's the first charge.

20             The second charge is robbery, and it is that

21   Mr. Chambers and others committed a robbery.  To prove the

22   charge, the prosecution must prove the following four elements

23   beyond a reasonable doubt:  First, the government must prove

24   that Mr. Chambers knowingly took the personal property of

25   another or from the presence of another.  Here the property

1    Mr. Chambers is accused of taking is the victim's money from

2    the sale of narcotics.

3            Second, the government must prove that Mr. Chambers

4    took the property against the victim's will by force, violence

5    or fear or threatened force, violence or fear.

6            Third, the government must prove that the taking of

7    property had an effect or potential effect on interstate

8    commerce, meaning commerce between two or more states of the

9    United States or commerce between a state of the United States

10   and a foreign country.

11           Fourth, the government must prove that Mr. Chambers

12   acted knowingly and unlawfully.

13           Finally, Mr. Chambers is also charged with aiding and

14   abetting a robbery.  Aiding and abetting is a theory of

15   criminal law that permits a defendant to be convicted of a

16   crime if he helped someone else commit the crime, even though

17   he did not himself commit the crime.

18           Here, even if you find that Mr. Chambers did not

19   commit the robbery, you must consider whether he willfully and

20   knowingly associated himself with the crime and willfully and

21   knowingly took some action to help the crime be committed.

22           The third charge is kidnapping.  To prove this charge,

23   the prosecution must prove the following four elements beyond a

24   reasonable doubt:  First, the government must prove that

25   Mr. Chambers kidnapped or carried away the victim.

E9tgcha3                         Trial

1          Second, the government must prove that Mr. Chambers

2     held the victim for ransom, reward or another reason.

3          Third, the government must prove that the victim was

4     transported in interstate or foreign commerce or the defendant

5     traveled in interstate or foreign commerce or used means,

6     facility or instrumentality of interstate or foreign commerce

7     in committing the crime or in furtherance of committing the

8     crime.  An example of means, facility or instrumentality of

9     interstate of foreign commerce is the telephone.

10         Fourth, the government must prove that the defendant

11    acted unlawfully and knowingly.

12         Mr. Chambers is also charged with aiding and abetting

13    kidnapping.  Even if you find that Mr. Chambers did not commit

14    the kidnapping, you must consider whether he willfully and

15    knowingly associated himself with the kidnapping and knowingly

16    and unlawfully took some action to help the kidnapping be

17    committed.

18         The fourth charge and the final charge is possession

19    of a firearm during and in relation to a crime of violence.  To

20    prove this charge, the prosecution must prove the following

21    three elements beyond a reasonable doubt.  First, that on

22    March 25, 2013, Mr. Chambers used or carried or possessed a

23    firearm or aided and abetted someone else in the use, carrying

24    or possession of a firearm, and a gun is a type of firearm.

25         Second, the government must prove that Mr. Chambers

1    used or carried the firearm or aided and abetted the use and

2    carrying of the firearm during and in relation to a crime of

3    violence.  Here, the crimes of violence alleged are the

4    conspiracy to commit robbery charged in Count One and the

5    kidnapping charge in Count Three.

6          Third, you must find that Mr. Chambers knowingly used,

7    carried or possessed a firearm or that he knowingly aided and

8    abetted another in using, carrying or possessing a firearm.

9          Finally, in addition to the charges I have just

10   described, you must consider whether for each of the crimes

11   charged, the government has proved by a preponderance of the

12   evidence that the crime or an act in furtherance of the crime

13   took place here in this judicial district called the Southern

14   District of New York, and the Southern District includes

15   Manhattan, the Bronx and Westchester.

16         So let me tell you a little bit about your own conduct

17   during the trial.  Each of you will be provided with a binder

18   containing most of the documents that may be referenced during

19   the trial.  Please don't look at the binders unless and until

20   you are asked to do so.

21         At the front of each binder will be several blank

22   pages on which you may take notes.  You do not have to take

23   notes, but you may take notes if you want.  Please be sure,

24   though, that any note-taking does not interfere with your

25   listening or considering all of the evidence.

1          Also, if you do take notes, you must not show them to

2     or discuss them with any other juror or anyone else at any time

3     either before or even during your deliberations.  Any notes you

4     take are to be used only to assist you and your notes are not a

5     substitute of your recollection of the evidence.  The fact that

6     a particular juror takes notes entitles that juror's views to

7     no greater weight than those of any other juror.

8          If during your deliberations you have any doubt as to

9     any of the testimony, you'll be permitted to request that the

10    official transcript, which is being taken down by the court

11    reporter, be read to you.

12         Mr. Street my deputy clerk will collect your binders

13    at the end of each day and secure them.  They'll have a number

14    on each one so you'll know it's yours and you'll always get

15    your same binder back.  No one will be permitted to review your

16    notes and after the trial is finished, the binders and your

17    notes will be collected and destroyed.

18         So I should caution you about certain general

19    principles about your conduct as jurors and I already gave some

20    instructions like this before our break, but let me elaborate a

21    little bit now.  First, do not talk to each other about this

22    case or about anyone who has anything to do with it until the

23    end of the case when you go to the jury room to decide on your

24    verdict.

25         Second, do not talk with anyone else about the case or

1   about anyone who has anything to do with it until the trial has

2   ended and you have been discharged as jurors; that means

3   members of your family, your friends.  Certainly, you may tell

4   them you're a juror in the case, but don't tell them anything

5   else about it until the end after you have been discharged by

6   me.

7           Third, do not let anyone talk to you about the case or

8   about anyone who has anything to do with it.  If someone should

9   try to do that, please report it to me immediately through

10  Mr. Street, my deputy clerk.  You should not however discuss

11  with your fellow jurors either that fact or any other fact that

12  you feel is necessary to bring to the attention of the Court.

13          Fourth, do not converse, whether in or out of the

14  courtroom, with any of the parties or the attorneys or any

15  witnesses.  By this I mean not only don't talk about the case,

16  but don't talk at all, even to ask the time of day.

17          In no other way can all parties be assured of the

18  absolute impartiality they're entitled to expect of you as

19  jurors.  I have instructed the lawyers and parties not to speak

20  to you or even acknowledge you with a hello or good morning

21  outside the courtroom.  So don't hold it against them if they

22  ignore you or leave an area that you're in; they're only

23  following my instructions.  Someone watching from a distance

24  might not hear what is said between an attorney and a juror,

25  and even a pleasantry can create a misimpression.

E9tgcha3                          Trial

1            Fifth, don't read any news stories or articles or

2     listen to any radio or television reports about the case or

3     anyone else who has anything to do with it.

4            Sixth, do not research or do any investigation about

5     the case on your own.  As jurors, you must decide the case

6     based solely on the evidence presented here within the four

7     walls of the courtroom.  That means during the trial, you must

8     not conduct any independent research about the case, the

9     matters in the case, the parties involved, the attorneys

10    involved.  In other words, you should not consult dictionaries

11    or reference materials, you should not consult the Internet,

12    websites, blogs or any other electronic or other tools to

13    obtain information about the case or to help you decide it.  Do

14    not visit any place you may hear described during the trial.

15    Please do not try to find out information from any source

16    outside the confines of the courtroom.

17           Seventh, don't communicate about the case or research

18    the case using cell phones, iPhones, Blackberrys, text

19    messages, email the Internet websites, blogs, Twitter,

20    Facebook, LinkedIn, YouTube, any other social media or

21    networking sites or any other tools of technology.  Until you

22    retire you may not discuss the case with anyone, even your

23    fellow jurors.

24           After you retire to deliberate, you may then begin

25    discussing the case with your fellow jurors, but you cannot

1    discuss it with anyone else until you have returned a verdict

2    and the case has ended.

3           The parties are entitled to have you personally render

4    a verdict in this case on the basis of your independent

5    evaluation of the evidence presented here in the courtroom.

6           Obviously, speaking to others about the case including

7    your family before you deliberate or exposing yourself to

8    evidence outside the courtroom would compromise your service

9    and fairness to the parties.  If you become aware that any

10   other juror is violating my instructions, you should bring it

11   to my attention through Mr. Street, but please don't make it

12   known to any other jurors.

13          Finally, I'd like to summarize the stages of the trial

14   for you.  First, there would be opening statements.  The

15   government would make an opening statement.  After that,

16   defense counsel may, but does not have to make an opening

17   statement.  And remember, an opening statement is not evidence

18   or argument; it is simply an outline of what the party intends

19   to prove and it's offered to help you follow the evidence.

20          After the opening statements, the government will

21   present its case.  The government will cause its witnesses and

22   after each witness testifies on direct examination, defense

23   counsel will have an opportunity to cross-examine.

24          Following the government's case, the defense may

25   present a case.  Because of the presumption of innocence, the

1    defendant is not required to provide any proof.  You may not

2    draw any negative inference or hold it against the defendant in

3    any way if the defense decides not to put on a case.  The sole

4    issue is whether the government has proved its case beyond a

5    reasonable doubt.

6            After the evidence is completed, the attorneys will

7    give their closing arguments and this is the opportunity for

8    the lawyers to summarize the evidence.

9            After the closing arguments, I'll give you some final

10   instructions and you'll retire to deliberate on your verdict.

11           Please don't make up your mind about what the verdict

12   should be until after I have instructed you on the law at the

13   end of the case and you have gone to the jury room and you and

14   your fellow jurors have discussed the evidence.  Keep an open

15   mind until then the parties deserve and the law requires that

16   you give them an opportunity to be fully heard.

17           The hours that we'll be keeping are these:  You should

18   be here at 9:30 a.m. each morning, except Thursday morning and

19   we'll have separate instructions for Thursday, and we will

20   begin sharply at 9:45; that means I will bring the jury out at

21   9:45.  If someone is not here, we will all sit in our chairs

22   and wait.  So it is best to be here by 9:30 so you can come out

23   with everyone at 9:45.

24           We will break around 4:15 or 4:30, usually 4:30.

25   There may be an occasion where we go a little bit over, for

1    example, to finish up a witness, but there may be days where we

2    finish up a little early if that seems to be the right breaking

3    time.

4         We'll take a one-hour lunch break around 12:30, but

5    again, it depends on where we are in the trial.  It may be

6    earlier or later.  And we'll take a ten-minute break

7    mid-morning and mid-afternoon.  We won't take other breaks, so

8    please plan accordingly.

9         Please be here early and always on time.  The lawyers

10   and I will be here no later than 9:30 a.m. to be sure we can

11   start on time as well.  If we have issues to discuss we will

12   arrive at 9:15 or 9:00 or whenever we have to arrive in order

13   to finish our business before it's time for you to come out.

14        Having said that, it's time for us to begin with the

15   trial and we have time now for the opening statements and the

16   government may make its opening statement.

17        MS. TEEKEI:  Thank you, your Honor.

18        MS. TEEKEI:  It was after midnight on March 25, 2013,

19   and Emma Torruella was at home alone and asleep.  She woke up

20   to the sound of her name being called from outside.

21        She went to the door.  She saw David Barea, her son's

22   father, standing there.  But something wasn't right because

23   almost immediately she saw that David's hands were tied behind

24   his back and there were two men standing next to him wearing

25   gloves and hooded sweat shirts, one of them was wearing a mask.

1    She could see the other one had a gun in his hand.

2              Emma Torruella's nightmare was about to begin because

3    those two men wanted money, they wanted David's money, and that

4    night they used two guns, they beat David with a hammer, they

5    threatened to kill David and Emma until they got David's money.

6    This man, Antione Chambers, the defendant, was one of the men

7    at Emma's door step that night.

8              You will hear that during the night, the defendant

9    kidnapped Emma, he forced her into a car and drove her to her

10   mother's apartment where some of David's money was stashed.  He

11   forced her to take him inside of that apartment where her

12   children were staying that night, where her 19-year-old

13   daughter opened the door.

14             He forced Emma to get a bag filled with $20,000 of

15   cash out of the apartment.  He then forced her back to her home

16   where the other robber was guarding David and there, the

17   defendant tied Emma's hands with a scarf, he demanded more

18   money and threatened Emma and David with more violence and then

19   he forced her to kneel to the floor, and finally, he left her

20   home with the other robber, all for $20,000.

21             Ladies and gentlemen, Antione Chambers, the defendant,

22   is a robber.  He is a kidnapper and he is being prosecuted in

23   this case for robbing and kidnapping David and Emma and using a

24   gun during that robbery and kidnapping.  That is why we are

25   here today.

1          Here is what the evidence will show:  Over the course

2     of this trial, you will learn why the defendant and his robbery

3     crew targeted David Barea.  You will learn that David was a

4     drug dealer and like many drug dealers he had cash that came

5     from his drug-dealing that made him a target for other

6     criminals.  Some time after mid-night on March 25, 2013, David

7     went to an apartment in the Bronx to pick up money from a prior

8     drug deal.  He called Tyrone Brown, another drug-dealer from

9     the neighborhood and agreed to meet at Brown's apartment.

10          But what David didn't know is that shortly after that

11    call, Brown called the defendant and as David was inside of

12    Brown's apartment, the defendant and his partner-in-crime were

13    standing outside, faces covered wearing hooded sweat shirts,

14    jackets and gloves.

15          And as David was leaving Brown's apartment, the

16    defendant and another robber pushed David inside, beat him,

17    pointed their guns at him and threatened to kill him for his

18    money.  You will learn that after the robbers took

19    approximately $800 from David's pockets, they forced David into

20    a car where another robber was waiting, a fourth member of the

21    robbery crew, a man who wore his mask the whole night.  You

22    will learn that the defendant and two other robbers took David

23    to where Emma lived.  Why?  Because David had told them he had

24    money stashed there, but there wasn't money in that apartment.

25    They ransacked Emma's bedroom, a closet, a safe.

E9tgcha3                          Opening - Ms. Teekei

1          When the defendant and one of the robbers couldn't

2     find the money, they beat David more.  They hit him with a

3     hammer on his legs.  They threatened him.  They threatened Emma

4     until finally David and Emma told the men where the money was:

5     Hidden at Emma's mother's house.

6          You'll learn that while another robber guarded David,

7     the defendant forced Emma into a car where a fourth robber was

8     waiting.  He drove to Emma's mother's apartment.  During that

9     car ride, the defendant uncovered his face and Emma saw exactly

10    who her kidnapper was.

11         The defendant, face still uncovered, walked with Emma

12    to her mother's door.  She knocked, and Emma's daughter came to

13    the door.  Emma asked her daughter to open the door trying to

14    reassure her and Emma's daughter didn't know what was going on

15    at that moment, but she got a good look at the defendant that

16    night.

17         You will learn that Emma then got a backpack of

18    $20,000 in cash, David's cash from her mother's apartment and

19    fearful for her life, she gave the bag to the defendant.  He

20    grabbed her by the neck and forced her back into the car.  He

21    drove her back to her home where the other robber was still

22    guarding David.

23         And Emma thought her nightmare might be over now that

24    the robbers had gotten their money, but the defendant and the

25    other robber were upset.  They wanted more:  $20,000 in cash

E9tgcha3                         Opening - Ms. Teekei

1    was not enough.  So again, they threatened their victims and

2    again, they hit David with a hammer and again, they pointed

3    guns.

4           The defendant then tied up Emma's hands with her

5    scarf.  He made her kneel to the floor and finally, he forced

6    her to lay face-down on her bed.  You will learn that Emma

7    thought in that moment she was going to die, and in that moment

8    of terror, the defendant and the other robber left.  That is

9    what the evidence will show, that Antione Chambers, the

10   defendant, armed with a gun, robbed and kidnapped Emma and

11   David that night.

12          How will we prove all of this to you?  You will hear

13   from the victims Emma Torruella and David Barea.  They will

14   describe to you what happened to them that night.  They will

15   walk you through their nightmare.  In addition, you will hear

16   how Emma described the car that was used during the robbery and

17   kidnapping.  In fact, she remembered several digits of the

18   license plate of that car.

19          David Barea will tell you that he is a drug dealer and

20   that is the reason why he was targeted.  He's going to tell you

21   all of that himself on the witness stand and you will hear that

22   after the robbers left, he was spared.  He didn't call the

23   police immediately and David will tell you why, because at the

24   time of the robbery, he was working as a confidential informant

25   for the New York City Police Department after being arrested a

1    few months earlier.  So he called the detective he was working

2    with at the NYPD.

3            Let me pause here for a moment to say something about

4    David Barea, a victim in this case.  As you heard earlier,

5    Mr. Barea was a drug dealer and he continued to deal drugs even

6    after he became a confidential informant.  He will be

7    testifying in this case pursuant to an immunity order which

8    means he cannot be charged for what he says on the witness

9    stand, so please keep all of this in mind and scrutinize his

10   testimony closely.  And when you do that, you'll see that his

11   testimony is consistent with the rest of the evidence in this

12   case.

13           Ladies and gentlemen, you will also hear from Emma's

14   daughter.  She will tell you about the defendant who was

15   waiting in her living room that night.  She will tell you that

16   the defendant tried to look away, but that she stared at him,

17   trying to figure out who he was or whether she had seen him

18   before.  She will tell you how she later picked out a picture

19   of that man from a photo array and you will learn that the

20   person she picked was the defendant.

21           Ladies and gentlemen, this trial is not going to be

22   like some of the shows that you have seen on television.  You

23   aren't going to hear about any DNA evidence linking the

24   defendant to the scene of the crime because the defendant was

25   wearing gloves during the crimes.  He was a professional, but

E9tgcha3                    Opening - Ms. Teekei

1    you will hear about the police work done in this case that led

2    to the defendant's arrest.  You will also here from the police

3    officers who responded to the scene and began the investigation

4    and were able to identify the members of the robbery crew.

5         You will hear from the FBI agent who eventually found

6    the defendant using phone evidence, interviews of other people

7    and following leads.  You will see the duct tape that the

8    defendant and the other robber used to tie up David Barea.  You

9    will see the hammer that was recovered from the car the robbers

10   used the night of the robbery.  You will also see video

11   surveillance of the robbery from the apartment when David was

12   first kidnapped and beaten.

13        You'll see exactly when two masked men, the defendant

14   and the other robber pushed into the apartment and grabbed

15   David.  You'll see how minutes later, David is led out from the

16   apartment by the defendant with his hands tied behind his back

17   and shoved into a car.

18        You are going to hear and see phone evidence that

19   shows how members of this robbery crew kept in touch with each

20   other during the robbery.  You'll hear from an FBI agent who

21   will track the defendant's phone on the night of the robbery to

22   the location of the robbery at the time of the robbery and then

23   back to the defendant's house in the Bronx.

24        You will also see records that show that David Barea

25   and Tyrone Brown, the tipster, were in contact with each other

1   just before they met up at Brown's apartment and the phone call

2   where Brown tipped off the defendant about robbing David.

3          And you will learn about how law enforcement agents

4   tried to find the defendant and place him under arrest.  You'll

5   learn that the defendant fled.  He went underground.  While

6   they were looking for him, the agents found the car the

7   defendant had been driving the night of the robbery and

8   kidnapping.  The car that Emma had described with the license

9   plate numbers that Emma had described, the car that was

10  registered to the defendant's girlfriend.  And when he was

11  finally captured, the defendant was carrying a fake driver's

12  license in someone else's name.

13         Ladies and gentlemen, this is not going to be a long

14  trial and it's not going to be a complicated trial, that's

15  because the evidence is straightforward.  It shows beyond

16  reasonable doubt that the defendant, armed with a gun, robbed

17  and kidnapped David and Emma.

18         At the end of this trial, we will have the chance to

19  speak with you again about the evidence that has been presented

20  and explain why it establishes the defendant's guilt.  Between

21  now and then, I'm going to ask you to do just three things:

22  First, listen to Judge Schofield's instructions on the law and

23  follow them carefully.  Second, pay close attention to all the

24  evidence.  Third, use your good judgment and common sense, the

25  same common sense that you use in your every day lives as New

E9tgcha3                     Opening - Ms. Teekei

1  Yorkers.

2          When you do these three things, we are confident that

3  the government will get a fair trial, that the defendant will

4  get a fair trial and that you will return the only verdict that

5  is consistent with the evidence in this case, that the

6  defendant is guilty.

7          THE COURT:  Thank you.

8          Mr. Dratel.

9          MR. DRATEL:  Thank you, your Honor.

10          Good afternoon, ladies and gentlemen.  My name is

11  Joshua Dratel.  I represent Antione Chambers, the defendant in

12  this case.

13          The opening statement is a little bit of a preview.  I

14  don't even have to give one.  We don't have to do anything.  I

15  could not ask a single question during the trial.  The

16  government would still have the burden of proof beyond a

17  reasonable doubt.  The presumption of innocence rests with

18  Mr. Chambers now and I submit to you it will never be overcome.

19          You have to keep an open mind because that presumption

20  of innocence is a critical issue in the context of criminal

21  trials in this country.  And the reason I mention that is, you

22  hear one side; maybe you think, wow, that sounds pretty

23  compelling or not.  You just have to wait for cross-examination

24  to understand what the full story may be.

25          So just to give you one example about

E9tgcha3                    Opening – Mr. Dratel

1    cross-examination, about making up your mind too early, not

2    keeping an open mind, not using your common sense, how you can

3    run into problems that way, let's talk about that eyewitness

4    identification.

5            One of the eyewitness identifications of Mr. Chambers

6    was on the third try.  First photo array, no positive ID.  Then

7    what happened?  They showed him a photo of Mr.  -- they showed

8    the witness a photo of Mr. Chambers alone, only Mr. Chambers.

9    The witness knew his name from the photo, Googled him.  Then on

10   the third try, wow, positive ID.  That's what you'll hear.  Let

11   me tell you what that means:  As you listen to the evidence, as

12   you take it in, and you'll see that video, that security video,

13   you won't be able to tell who is who or anything.  You won't be

14   able to identify Mr. Chambers because he wasn't there.

15           There's really no dispute about some of the

16   fundamental issues in the case, which is that there was a

17   robbery and Mr. Barea was taken from Mr. Brown's house to his

18   home and then Mr. Torruella was taken from their home to her

19   mother's home; there's no dispute about that.  The problem with

20   the case is that he wasn't there.

21           You will not hear anything except tainted IDs and weak

22   circumstantial evidence, and the reason there will be so much

23   circumstantial evidence is because there will be no real

24   evidence connecting Mr. Chambers to the crime.

25           Witness credibility it's very important in

E9tgcha3                         Opening - Mr. Dratel

1   cross-examination and even on direct, but on cross-examination

2   in particular to listen for the material inconsistencies with

3   respect to what happened that night, that you will not be able

4   to conclude beyond a reasonable doubt that it's Mr. Chambers as

5   the second perpetrator in the apartment, in her mother's

6   apartment.  And the account of the events and the description

7   of that person can't be the same person.  That's what the

8   evidence will show you:  Can't be him.

9            Now, other ways to judge credibility, not just

10  inconsistencies, but also incentives.  What are the incentives

11  for the witnesses to testify in the manner that they testify

12  for the prosecution in their own mind, not what the government

13  wans but what they perceive is to their advantage?

14           The prosecutor already told you about Mr. Barea.  What

15  kind of person he is, the life he leads?  This is a guy who is

16  working for the NYPD as an informant, unbeknownst to them,

17  fooling police officers every day, dealing drugs, continuing

18  his drug operation while he's an informant.  What do you think

19  he has at stake in this case as you listen to the evidence?

20           Ms. Torruella, his girlfriend, I'll tell you one

21  thing:  When we come back for summation, when we talk about

22  her, you'll find this is a woman who hides her boyfriend's drug

23  proceeds in the amount of $20,000 under her mother's bed.

24           Circumstantial evidence, the judge gave you one

25  example.  There are other examples of circumstantial evidence

E9tgcha3                    Opening - Mr. Dratel

1    that have alternatives beyond just the obvious one that if you

2    come in and it's sunny and then you see somebody with an

3    umbrella, it's been raining outside.  There may not be any

4    other explanation.

5          Circumstantial evidence goes well beyond that.  There

6    are examples of circumstantial evidence you'll see in this

7    case, there are other alternatives and you won't be able to

8    conclude beyond a reasonable doubt that those alternatives

9    match what the government is going to want you to believe about

10   phone records, about phones, about timing, about a lot of

11   different things.

12         It's not just the evidence, it's also the lack of

13   evidence; that's an important aspect of this case as well.  And

14   in that context, circumstantial evidence goes both ways.  DNA,

15   the government brought out DNA, but they don't have DNA, even

16   though they tested Mr. Chambers for the DNA on the duct tape.

17   Negative.  Circumstantial evidence goes both ways.

18         There will be no one, other than these tainted IDs,

19   these contrived IDs, these repeated attempts at an ID and even

20   still, you'll see such material differences that it cannot be

21   Antione Chambers.  No one else puts Mr. Chambers there.

22   There's been nothing else to connect, nothing found on him when

23   he was arrested that connects him to this crime in any way.

24         I'm confident that when you've heard all the evidence

25   and, again, I'll get to speak to you again and we'll talk about

E9tgcha3                       Opening - Mr. Dratel

1    the evidence and I'll give you the defense position on it, go

2    over it, but I'm confident there will be only one conclusion

3    that you can draw, that Mr. Chambers -- and this is consistent

4    with your common sense, consistent with the evidence,

5    consistent with the judge's instructions -- only one

6    conclusion:  Mr. Chambers is not guilty of all the charges

7    against him.

8              Thank you very much.

9              THE COURT:  Thank you, Mr. Dratel.

10             Ladies and gentlemen, that is a preview of our trial.

11   We'll see you all hear at 9:30 tomorrow morning.  Remember,

12   don't talk to anyone about the case.  Don't look at anything

13   about the case and we'll see you tomorrow.

14             I'm not sure about what the temperature in the

15   courtroom will be.  Sometimes people are happier if they have

16   sweaters just as an option.  I also allow people to have water

17   in the courtroom, so if you want to bring in a bottle of water

18   with you, that's not a bad idea either.  Thank you very much.

19             (Jury excused)

20             (Open court; jury not present)

21             THE COURT:  Let's be seated.  So, let me ask the

22   government what's the plan for tomorrow?

23             MR. ARAVIND:  Your Honor, we have several witnesses

24   tomorrow.  We're going to start with Ms. Emma Torruella.  She

25   will be our first witness, followed by Detective Ellis Deloren

E9tgcha3                          Trial

1    with the NYPD.  There is a possibility of another individual

2    who was subpoenaed today and met with law enforcement agents.

3    If he comes tomorrow we intend to put him on, Cantrell

4    Ferguson.

5             THE COURT:  I'm sorry.  If he comes tomorrow, you

6    intend to put him on and his name is?

7             MR. ARAVIND:  Kentrell Ferguson.

8             THE COURT:  Who is he?

9             MR. ARAVIND:  He's a an individual that knows

10   Mr. Chambers.

11            THE COURT:  Okay.

12            MR. ARAVIND:  He received a subpoena.  We have not had

13   a chance to meet with him.  I understand he met with other law

14   enforcement agents.  Can you give us one moment.  And then

15   Officer Whelan with the NYPD and then we believe we'll get to

16   David Barea tomorrow as well.  There's also a possibility that

17   Isaac Nelson, who is another civilian witness, will be

18   appearing tomorrow, and if he does and we have a chance to meet

19   with him, we'll put him on tomorrow.

20            (Continued on next page)

21

22

23

24

25

E9TMCHA4

1          THE COURT:  With respect to exhibits, I have your

2     witness list which I received through Mr. Street and I have the

3     government exhibit list.

4          Let me ask this.  Mr. Dratel, are there exhibits that

5     you can stipulate to as far as admissibility?

6          MR. DRATEL:  We have stipulated to certain things,

7     your Honor, and I'll review it again this evening to make sure

8     as to whether I have objections to a particular exhibit.

9          THE COURT:  What exhibits are we anticipating

10     tomorrow?  Because I'd love to not spend time dancing around

11     introducing exhibits if there is really no need to do that.

12          MR. ARAVIND:  It will be mostly for Ms. Torruella.

13     It's going to be a bunch of photographs which I don't think

14     should pose a problem.  There will be the initial positive

15     photo identification that we do intend to bring in.

16          With respect to Mr. Barea, same thing.  I think it's

17     going to be mostly photographs.  There was a hammer seized that

18     Detective Deloren will testify to, as well as drugs that were

19     seized from the apartment that Mr. Brown was eventually found

20     in.

21          I was remiss.  We also may be calling Detective Ayala,

22     depending on his timing.  He is one of the NYPD detectives who

23     was responsible for the investigation of Mr. Barea.  And his

24     purpose would be to talk about that stop in January when

25     Mr. Barea was stopped and then became a CI, as well as the

E9TMCHA4

1  wiretap on Mr. Barea's phone.  And we intend to put in five

2  calls that involve Mr. Barea and Tyrone Brown in the months

3  leading up to January, which is when the wire ended and March

4  again is when the robbery took place.

5       THE COURT:  If counsel could confer with each other

6  either after we adjourn this evening or in the morning and try

7  to stipulate to the admissibility of as many of those as you

8  can and let me know in the morning, we can admit them into

9  evidence before the jury comes out.  Obviously, if you have

10  objections, then we can deal with them as they come up.

11       MR. DRATEL:  We have stipulated to some of that.  Some

12  of that we have stipulated to avoiding the necessity of having

13  foundation witnesses and things like that.  Other things may

14  involve some relevance questions; for example, these phone

15  conversations with Mr. Brown and Mr. Barea that occur in 2012.

16  I don't know the relevance.  I don't know the relevance of the

17  drugs found in Mr. Brown's apartment either.

18       THE COURT:  Here is the thing.  We are not going to

19  have side bars.  If there are issues that you anticipate, we

20  should talk about them now.

21       MR. DRATEL:  I object to the relevance of the

22  Brown/Barea conversations and the drugs found in Mr. Brown's

23  apartment.  I don't see what they have to do with this case.

24  Pretty discrete robbery.

25       THE COURT:  I obviously don't know what's in the

1  Brown/Barea conversations, but I'll hear from the government on

2  those issues.

3         MS. TEEKEI:  Thank you, your Honor.  They are five

4  relatively short wire intercepts when Mr. Barea was being

5  investigated by the NYPD.  They establish the relationship of

6  Mr. Barea and Mr. Brown as Mr. Barea will be the one who sold

7  the drugs to Mr. Brown and in that way corroborate the

8  relationship between Mr. Barea and Mr. Brown that Mr. Barea

9  will be testifying to.  So it is for that reason and because

10  Mr. Brown was part of this conspiracy, for that reason, we

11  intended to introduce them through Mr. Barea.

12         THE COURT:  It's basically to prove that Mr. Barea

13  sold drugs to Mr. Brown?

14         MS. TEEKEI:  Yes, your Honor.  And it's important to

15  the narrative of their relationship why Mr. Barea was at

16  Mr. Brown's apartment the night of the robbery and why the

17  robbers were there, their ongoing continuing relationship.

18         THE COURT:  So that sounds relevant to me, Mr. Dratel.

19  To the extent there is an objection on relevance grounds, I

20  reject it.  And what about the drugs in Mr. Brown's apartment?

21  What is the relevance of that?

22         MS. TEEKEI:  Similarly, your Honor, when Mr. Brown was

23  arrested, 1810 Watson Avenue, he had in his possession cocaine.

24  It just confirms that he was a drug dealer.  And while we don't

25  know the source of the cocaine that was in the apartment when

E9TMCHA4

1   he was arrested, still, his relationship as a drug dealer and

2   his relationship as a drug dealer who received his supply from

3   Mr. Barea, among maybe other people, is the relevance of that

4   evidence.

5           THE COURT:  I guess what I'm not clear on is why you

6   have to introduce the drugs to make that point.  I see

7   Mr. Barea is going to talk about it.  Are we going to have a

8   bag of cocaine that the jury passes around and looks at?

9           MS. TEEKEI:  Sure, your Honor.  It goes to the

10  narrative of Mr. Barea's relationship with Mr. Brown and

11  corroborates Mr. Barea's statements about Mr. Brown's role as a

12  drug dealer.  And we would consent to a limiting instruction,

13  your Honor, as to those drugs.

14          MR. ARAVIND:  Mr. Chambers is not charged in the

15  narcotics conspiracy.

16          MS. TEEKEI:  Right.  Exactly.

17          THE COURT:  Mr. Dratel, is there anything you want to

18  say or add?

19          MR. DRATEL:  No, your Honor.

20          THE COURT:  To the extent there is an objection to the

21  drugs on relevance grounds, I'll allow the drugs.  And I will

22  plan to give a limiting instruction.

23          Are there other issues that you envision right now,

24  Mr. Dratel?

25          MR. DRATEL:  Not particularly in terms of specific

E9TMCHA4

1    evidence, but I will probe the government.

2              One other thing is a limiting instruction also in the

3    context of a stipulation about communications that Mr. Chambers

4    had from MDC.  In other words, they are putting in a telephone

5    call from MDC and something about e-mails from MDC.

6              THE COURT:  Are those coming in tomorrow?

7              MR. DRATEL:  I am not sure they are coming in

8    tomorrow.  You are just asking about the evidence in general.

9              THE COURT:  I know nothing about them.  Do you want to

10   comment on them?

11             MR. ARAVIND:  Sure, your Honor.  There is a

12   stipulation that the parties have agreed to in which there is a

13   call.  Mr. Chambers is receiving a call or making a call from

14   the MDC, and there is a reference to Twizzie.  One of the key

15   issues at trial is establishing Mr. Chambers' identity and how

16   the agents eventually get to Mr. Chambers is through Tyrone

17   Brown's phone that has a contact named Twizzie.  So the issue

18   of who is Twizzie is of the utmost importance at this trial.

19   That call is significant.  We agreed to a stipulation.

20             THE COURT:  And the stipulation is that --

21             MR. DRATEL:  It's not a relevance objection.  It's

22   about a limiting instruction because it shows that he's in

23   custody.  That's what it's about.

24             MR. ARAVIND:  We are happy.  If Mr. Dratel wants to

25   propose something and it's acceptable, we will be happy with a

E9TMCHA4

1    limiting instruction.

2              THE COURT:  If you could propose a limiting

3    instruction for the government to look at it, it would make my

4    life easier because I am not sure exactly what it is you want

5    me to say.

6              MR. ARAVIND:  Your Honor, since we are on the topic of

7    evidentiary issues that are going to come up tomorrow, we had a

8    conversation with Mr. Dratel yesterday about the scope of

9    Detective Deloren's testimony.  And in particular we were not

10   intending to elicit from Detective Deloren about the search of

11   Brown's apartment at 1338 Croes Avenue.  As the Court is well

12   aware, that evidence was suppressed.  In speaking to Mr.

13   Dratel, he indicates that he does want to bring that up in

14   cross-examination.  And we have two very significant objections

15   to that, your Honor.  First is on hearsay grounds and, second,

16   is on 403 grounds.

17             With the Court's permission, I can sort of explain

18   what our objections are.

19             THE COURT:  Sure.

20             MR. ARAVIND:  I expect that Mr. Dratel, and he can

21   tell me or tell the Court what he is going to do, but he is

22   going to make some reference to the fact that that evidence was

23   suppressed, the fact that the evidence was suppressed.

24             THE COURT:  Why don't we take turns here.

25             Mr. Dratel, what is your plan for this evidence?  And

E9TMCHA4

1    then I'll hear what the government's objection is to that.

2            MR. DRATEL:  It's about credibility.

3            THE COURT:  It's about credibility and you propose to

4    say what?

5            MR. DRATEL:  I'm trying not to forecast the

6    cross-examination.  It's about the way --

7            THE COURT:  It's about credibility and that search.

8            MR. DRATEL:  That's correct.  It's not about the

9    Court's ruling.  It's about his representations.

10           THE COURT:  You are not going to allude to the Court's

11   ruling?

12           MR. DRATEL:  No.

13           MR. ARAVIND:  Your Honor, I think we have a problem of

14   sort of going down the rabbit hole here.  We are trying to

15   limit our testimony of the direct.  I think opening up this

16   line of testimony and having Mr. Dratel on the first instance

17   talk about a possible search where we have not elicited

18   anything from Detective Deloren about that search, consistent

19   with your Honor's ruling that that evidence is suppressed, is

20   problematic.  So the objection, I think, from the government's

21   perspective is, first, that area is very much a Rule 403 issue.

22   It is a side show.  It is going to be a mini trial.

23           THE COURT:  The problem is, it's hard to tell if it's

24   a 403 issue without knowing exactly what it is.

25           MR. DRATEL:  I would be happy after direct to preview

E9TMCHA4

1     it for you.  I don't want to see him weasel out from under it

2     before we have had a chance.

3             MR. ARAVIND:  He is not going to talk about it.

4             THE COURT:  But he is going to be crossed about it

5     possibly.  I think that's what Mr. Dratel is concerned about.

6             MR. ARAVIND:  I think there is a problem from the

7     government's perspective, if he is going to get crossed about

8     it, Detective Deloren is our witness.  We think we should be

9     able to front part of that and we don't know what the cross is

10    going to be.  I understand that Mr. Dratel is holding his cards

11    close to his chest, but we are put in a very difficult position

12    because I think there is a real danger of jury confusion if we

13    go through a direct examination, explain sort of investigative

14    steps that Detective Deloren has taken, and then Mr. Dratel

15    starts talking about a search at 1338 Croes Avenue, which is a

16    very important location, and actually the initial crime scene

17    in this case.  And so I think there is a real concern about

18    jury confusion here.  And in the absence of some additional

19    proffer from Mr. Dratel as to what his cross-examination is

20    going to be, it's problematic.

21            THE COURT:  You and I can both imagine what his

22    cross-examination would be.  He is going to ask about what

23    prompted Detective Deloren to do what he did on the day of the

24    search, I presume.  And I need to think about this a little bit

25    more because this is all coming at me sort of quickly.  But it

E9TMCHA4

1    seems to me that you're entitled to front that if he intends to

2    cross on it and that you can do that without knowing precisely

3    what it is he is going to ask.

4            MR. ARAVIND:  Then that's how we will operate, your

5    Honor.  We will elicit the fact that he responded to that

6    location.  I know your Honor did not permit a suppression

7    hearing on this issue many, many months back.  We respect that

8    ruling.  But what we intend to elicit is that Detective Deloren

9    went to that location, he believed that someone was inside, and

10   that's why he entered.

11           THE COURT:  As I recall, I had an affidavit to that

12   effect, so I understood that.

13           MR. ARAVIND:  You had an affidavit not from anyone

14   from the government.  You had an affidavit from Mr. Brown.

15           THE COURT:  I think, though, that there was -- I don't

16   remember exactly what it was, but there was something that

17   explained the reasoning and the basis for his exigent

18   circumstance explanation.

19           MR. ARAVIND:  I confess I wasn't the prosecutor

20   handling this case at that time.  But my understanding was that

21   the Court made a ruling based on the papers and without having

22   testimony from Detective Deloren.

23           And so the government is a little bit concerned about

24   Mr. Dratel making arguments about Detective Deloren's

25   credibility without any sort of record as to Detective

1   Deloren's view about that particular stop and search.

2          THE COURT:  As I understand it, Mr. Dratel is not

3   going to make any comment about the Court's suppression or

4   about any findings by the Court, but he is going to ask him, I

5   presume, about the search to get at matters of credibility, and

6   you can certainly ask about the search to front that.

7          Do I have that right, Mr. Dratel?

8          MR. DRATEL:  Yes, your Honor.

9          THE COURT:  Just so it's clear, there were papers

10  before me that explained the basis and the reasoning for

11  Officer Deloren's entering the apartment in the first instance

12  and then obtaining a search warrant afterwards.  And I believe

13  there was no hearing because the government said several times

14  that they didn't need or want a hearing.  So based on that, I

15  ruled on the papers.

16         MR. ARAVIND:  In retrospect, that was probably a poor

17  decision.  But at the time I think we relied on the complaint

18  and some of the arrest paperwork.

19         THE COURT:  But I presume none of that will be in

20  front of the jury.  The only things that could be in front of

21  the jury are the facts of what happened and the facts of what

22  were in his head.

23         MR. ARAVIND:  I guess the final question that we have

24  on this issue for the Court is, can we make some reference to

25  items that were found in that apartment.  Again, it completes

E9TMCHA4

1    the narrative of that search which Mr. Dratel wants to bring

2    out on cross.

3         MR. DRATEL:  It's only for credibility.  It's

4    extrinsic evidence at that point.  I don't know why it would

5    come in.  It's about credibility.  It's not really about the

6    search itself.  It's really about the preliminaries that led up

7    to the search.  It's not about the actual search.  I'm not

8    going to talk about the execution of the search.

9         THE COURT:  How about when he entered the house.  As I

10   recall, he entered the house, saw some things, left and got the

11   warrant.

12        MR. DRATEL:  It's probably going to predate that, but

13   it also depends -- there are a lot of things it depends on.

14        THE COURT:  Let's do this.  Let's not talk about

15   anything that he saw or found.  But if Mr. Dratel opens the

16   door to that, then, obviously, you can follow up on it.

17        MR. ARAVIND:  Very good, your Honor.

18        MR. DRATEL:  Very good, your Honor.

19        THE COURT:  Anything else of an evidentiary nature or

20   anything else that is going to require a ruling that I need to

21   hear about outside the presence of the jury?

22        MR. ARAVIND:  No, your Honor.  The final note from us

23   is that some of our witnesses, because they received subpoenas

24   to arrive today, it's a little bit a makeshift process.  But we

25   are happy to provide Mr. Dratel with a list of our witnesses

E9TMCHA4

1    once we sure that up this evening, and we are happy to provide

2    that notice to the Court as well.

3              THE COURT:  That would be great.  Thank you.

4              Mr. Dratel, anything else?

5              MR. DRATEL:  No.  That's it, your Honor.

6              THE COURT:  We are adjourned.  I don't expect other

7    issues for us to talk about tomorrow.  But if you think of

8    anything that we must talk about, I don't want to talk about it

9    on the jury's time, so please send an e-mail to all of us.  And

10   absent an e-mail like that, we will meet at 9:30.

11             Thank you.  We are adjourned.

12             (Adjourned to Tuesday, September 30, 2014, at 9:30

13   a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                    INDEX OF EXAMINATION

 2   Examination of:                        Page

 3   JOHN REYNOLDS

 4   Direct By Mr. Aravind  . . . . . . . . . . . . 3

 5   Cross By Mr. Dratel  . . . . . . . . . . . .24

 6   Redirect By Mr. Aravind  . . . . . . . . . .52

 7   Recross By Mr. Dratel  . . . . . . . . . . .55

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
</pre>