E9UMCHA1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA

        v.                           13 CR 345(LGS)

ANTIONE CHAMBERS,

          Defendant.

------------------------------x

                                New York, N.Y.
                                September 30, 2014
                                9:30 a.m.


Before:

                 HON. LORNA G. SCHOFIELD,

                              District Judge



                     APPEARANCES


PREET BHARARA
    United States Attorney for the
    Southern District of New York
SANTOSH ARAVIND
NEGAR TEEKEI
    Assistant United States Attorneys

JOSHUA L. DRATEL
WHITNEY SCHLIMBACH
    Attorneys for Defendant

ALSO PRESENT:  JOHN REYNOLDS, FBI
                JENNIFER HANSMA, Paralegal AUSA

E9UMCHA1

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning, counsel.  I'd like to take

3  care of a little bit of business now that we are on the record.

4  I'd like to supplement the record concerning my ruling

5  yesterday denying Mr. Chambers' motion for a Wade hearing

6  concerning the victim's positive identification of defendant

7  Chambers in the photo array.

8          First, I note that Mr. Chambers' counsel has made two

9  prior applications to suppress the identification of this

10  client, the first time regarding the showing of two photo

11  arrays to the victim; the second time, essentially at the

12  Court's invitation, after the government voluntarily disclosed

13  that the victim had been shown a photograph of Chambers

14  approximately a week before viewing the second photo array.

15          I would note that the request was made yesterday just

16  minutes before we began to pick a jury and the request was made

17  based on information disclosed in 3500 material, which has been

18  in the defendant's possession since September 19.  The

19  application was made at the 11th hour and was simply an oral

20  application, hence my desire to supplement the record today to

21  explain my reasoning more fully.

22          Identification evidence is subject to suppression only

23  if the procedure leading to the identification was "so

24  unnecessarily suggestive and conducive to irreparable mistaken

25  and identification that the defendant was denied due process of

E9UMCHA1

law."  Stovall v. Denno, 388 U.S. 293, 302 (1967), abrogated on

other grounds, Griffith V. Kentucky, 479 U.S. 314 (1987).  That

standard requires a very substantial likelihood of irreparable

misidentification."  Simmons v. U.S., 390 U.S. 377, 384 (1968).

Short of that, the jury is to evaluate the identification

evidence.  Mason v. Brathwaite, 432 U.S. 98, 116 (1977).

So the threshold question is whether the

identification was so unnecessarily suggestive and conducive to

irreparable mistaken identification that the defendant was

denied due process of law.  My previous holding was that there

was not a very substantial likelihood of irreparable

misidentification, and that was because of the fundamental

dissimilarity of the images shown to the victim.  Although she

was shown three images of Mr. Chambers, two in photo arrays and

the intervening one in a single photo, and although this

procedure in the abstract is suggestive, I found that the three

images were extremely dissimilar and, therefore, that the

procedure as employed in this case was not so suggestive as to

create a very substantial likelihood of irreparable

misidentification.

The 3500 material that I was directed to review

yesterday when the motion was renewed and namely what was read

by counsel to me and what I read into the record was 3507-3.

That material said in substance that the witness viewed the

photo, looked on the Internet and found the same photo, but no

E9UMCHA1

1   other photos.  Since the witness was looking again at the same

2   photo on the same day, that additional viewing did not seem to

3   me to materially change the analysis of my prior ruling.

4        Defense counsel has made clear for some time now that

5   the theory of his defense is that to speak colloquially they

6   have the wrong guy.

7        Given that, it seems to me more fair for the jury to

8   see the basis for the government's case against Mr. Chambers,

9   including the eyewitness identification and the nature of the

10  police work that led to those identifications and then let the

11  jury make its own determination.

12        As we repeatedly tell jurors, questions of fact are

13  for the jury and I'm reluctant to preempt their fact finding.

14  Because the defendant did not show a very substantial

15  likelihood of irreparable misidentification.  Issues about the

16  reliability of the identification are for the jury and go to

17  their evaluation of the weight of the evidence rather than my

18  evaluation of its admissibility.  See U.S. v. Maldonado-Rivera,

19  922 F.2d 934, 973 (2d Cir. 1990).

20        Moreover, as I ruled yesterday, provided that he

21  complies with the Daubert/Khumo requirements, Mr. Chambers will

22  be permitted to call an expert who can explain the potential

23  dangers of the types of procedures used here and provide a

24  factual basis for argument to the jury.  And the government, of

25  course, can counter with factors relating to the reliability of

E9UMCHA1

1   the identification and the minimal nature of the taint.

2          We still have six minutes.  Let me make another ruling

3   and this is about Brown's postarrest statements.

4          Having considered further the evidence from yesterday

5   morning's hearing, I'm prepared to rule on the admissibility of

6   Mr. Brown's postarrest statements.  I am admitting both 302 and

7   Officer Reynolds' testimony, with an appropriate limiting

8   instruction.

9          As an initial matter, Chambers seeks the admission of

10  Mr. Brown's postarrest statement which failed to identify

11  Chambers as one of the robbers and indeed did not mention

12  Chambers at all.  Brown, who was awaiting sentence, has

13  indicated his intention to assert his Fifth Amendment privilege

14  against self-incrimination and is there unavailable as a

15  witness to testify first hand that Mr. Chambers was not

16  involved in the robbery.  In his absence, defendant Chambers

17  seeks to admit Brown's failure to identify him through an FBI

18  302 report, which was prepared by Agent Reynolds.

19         The FBI 302, which is offered for the purpose of

20  showing that it does not identify or even mention Mr. Chambers,

21  does not constitute hearsay under Rule 801.  Rule 801 expressly

22  provides that hearsay is an out of court statement offered for

23  the truth of the matter asserted.  The 302 is not offered for

24  the truth of any matter asserted, but instead is offered for

25  the absence of a matter asserted.  So under the plain language

1    of Rule 801 this is not hearsay.

2              Chambers argues that the 302 report is admissible when

3    offered by a defendant under various exceptions to the hearsay

4    rule, including, among others, as a business record, citing

5    Judge Weinstein in United States v. Carneglia, 256 F.R.D. 384,

6    390-91 (E.D.N.Y. 2009)(citing United States v. Snyder, 787 F.2d

7    1429, 1434 (10th Cir. 1986), and United States v. Oates, 560

8    F.2d 45, 83-84 (2d Cir. 1977).

9              To the extent the 302 is a business record, the

10   applicable provision of Rule 803 is not subsection 6, since the

11   302 is not offered for the truth of the matter asserted, but

12   rather the next paragraph, subsection 7, which pertains to the

13   failure of a business record to mention the matter.  The

14   Advisory Committee notes to the rule clarify that the absence

15   of information is "probably not hearsay as defined in Rule

16   801."  The provision is included to resolve any doubt in favor

17   of admissibility.  Subsection 7 requires that neither the

18   source of the information nor the method or circumstance of

19   preparation indicate a lack of trustworthiness.

20             After hearing an assessing the testimony of Officer

21   Reynolds, and considering the fact that the defendant who seeks

22   to admit the statement, I find as a threshold matter that

23   neither the source of the information in the 302 and the

24   circumstances and methods surrounding its preparation indicate

25   a lack of trustworthiness.  A 302 is a standard investigative

E9UMCHA1

report routinely prepared and used by the FBI in criminal

investigations.  While the agent now asserts that his report is

incomplete on the critical point of identification of the

second robber, this claim, assuming it is true, is based on

circumstances created by the government's agent and only

recently disclosed to the Court in support of the government's

own motion to exclude the evidence of Brown's statement to law

enforcement agents.  Excluding the 302 in light of this recent

disclosure, in effect, would reward law enforcement practices

that make evidence less reliable.  Moreover, while the

government questions the reliability of the source of the

information, Mr. Brown, and the reliability of the 302, it did

not question this evidence previously when it sought to admit

the 302 when all three defendants were still in the case.  It

seems wrong now to grant the government's motion to exclude the

report on the ground that it is unreliable.

        In addition, it falls squarely within the jury's

province to determine, A, whether or not Officer Reynolds is

credible and, B, how much weight to accord Mr. Brown's

postarrest statement in light of Officer Reynolds's testimony.

Finally, even if Mr. Brown's postarrest statements could be

considered hearsay, to which no exception applies, the Supreme

Court has expressly stated that "where constitutional rights

directly affecting the ascertainment of guilt are implicated,

the hearsay rule may not be applied mechanistically.  Chambers

E9UMCHA1

1    v. Mississippi, 410 U.S. 284 at 302 (1972).  Were I to exclude

2    the evidence that may be critical to the defense of

3    Mr. Chambers on hearsay grounds, particularly when it is

4    Mr. Chambers and not the government, who seeks to admit the

5    statements of his codefendant, it would run afoul of the rule

6    enunciated in Chambers.

7            Accordingly, I will allow the 302 in evidence, and for

8    the sake of completeness and at the request of both parties, I

9    will also allow the testimony of Officer Reynolds about the

10   302.

11           I will be giving a limiting instruction that the 302

12   is not offered for the truth, but only for the fact that

13   Mr. Brown did not identify Mr. Chambers.  I will also be giving

14   a limiting instruction that Officer Reynolds's testimony is not

15   offered for the truth, but only to question the proposition

16   that Mr. Brown did not identify Mr. Chambers.

17           Thank you, counsel.  I think we still have five

18   minutes.  Let me ask a question.  I don't have any more rulings

19   this morning.

20           Mr. Dratel, if you have an answer, I had asked

21   yesterday if you were interested in presenting your further

22   Daubert information, either by giving me a list of scholarly

23   articles and essentially doing it in writing or whether you

24   wanted to have a Daubert hearing.  Have you given any more

25   thought to that?

E9UMCHA1

1          MR. DRATEL:  We have a request out to Dr. Strange for

2     that material.

3          THE COURT:  I'm sorry.  Could you speak into the mic.

4          MR. DRATEL:  We have made a request to Dr. Strange for

5     that material.  Obviously, we got back yesterday and we were --

6          THE COURT:  You plan to do it in writing?

7          MR. DRATEL:  Yes.  That would be our intention.  And I

8     believe the Court said by the end of the government's case.

9          THE COURT:  Yes.

10          MR. DRATEL:  This is my own calculation.  I'm thinking

11     that the government will rest no earlier than Thursday

12     afternoon, possibly Friday at some point.  I don't know if the

13     government agrees.  These are all internal calculations based

14     on -- we also have half day Thursday morning to kind of devote

15     some additional time to that.  I'm hoping that by that period,

16     by the time we will get here Thursday that we will have all

17     that stuff in hand.

18          THE COURT:  I think at the end of the day today we

19     will have a better idea how much longer the government's case

20     will take.

21          MS. TEEKEI:  Your Honor, if we may, if Dr. Strange is

22     able to pull together any scholarly articles, we are happy to

23     receive those in advance of Mr. Dratel's formal written

24     submission.  If we may ask that he do so, that would be very

25     helpful to us, given the timing.

E9UMCHA1

```
 1              THE COURT:  Mr. Dratel.

 2              MR. DRATEL:  I don't have a problem with providing --

 3    I don't think we will be giving the Court too much analysis --

 4              THE COURT:  I am assuming you are going to give me a

 5    list of articles and a statement that something has been peer

 6    reviewed and so forth.

 7              MR. DRATEL:  Right, in answer to the Court's

 8    questions.

 9              THE COURT:  Yes.  Thank you.

10              MR. ARAVIND:  Your Honor, one point of clarification.

11    The Court's ruling and just to add something for the record.

12              At the hearing yesterday there was some testimony

13    about the safety valve proffer notes.  And we think that that's

14    important in providing a context for Mr. Brown's statements

15    with respect to Mr. Chambers.  And we just want to get a ruling

16    ahead of time whether we can bring those in and elicit from

17    Special Agent Reynolds about the substance of Mr. Brown's

18    safety valve proffer statements.

19              THE COURT:  Is there any objection, Mr. Dratel?

20              MR. DRATEL:  Yes.  Safety valve proffer is completely

21    unrelated.  It has --

22              THE COURT:  He says it's inconsistent with the

23    statement that was made --

24              MR. DRATEL:  It's not inconsistent in this context, if

25    I may, Judge.  One is that the safety valve proffer was about
```

E9UMCHA1

1      drug dealing only.  It was about Mr. Chambers only in the

2      context of drug dealing and it was about that Mr. Brown knew

3      Mr. Chambers.  There is nothing inconsistent between that and

4      the account of the robbery.  Even if he talks about a T, even

5      if -- which is not in the 302, obviously, so it's not

6      inconsistent with the 302 at all.  I think the government wants

7      to put it in because it talks about Twizzie.  They want more

8      information that will connect Mr -- there is a really a

9      confrontation issue there because it's not about the Court's

10     ruling.

11          THE COURT:  It's a strange time to be talking about a

12     confrontation issue since all of this information about

13     Mr. Brown is coming in at your request.  Let me take it under

14     advisement.  I understand what your point is.  I think I also

15     understand what the government's point is unless you have

16     anything to add.

17          MR. ARAVIND:  Your Honor, I think it goes to the heart

18     of Mr. Brown's credibility.  And we have said that Mr. Brown

19     was unreliable during his postarrest statement.  I think that

20     the safety valve proffer informs that view.  And to the extent

21     that Mr. Dratel is going to stand up in his closing and say

22     that you heard from Special Agent Reynolds that Mr. Brown in

23     his initial postarrest said he didn't identify the second

24     robber, which we do think is actually for the truth of the

25     matter asserted, I think that the safety valve proffer notes

E9UMCHA1

1   and Special Agent Reynolds' testimony about Mr. Brown in toto

2   should be evaluated by the jury.

3          THE COURT:  Thank you.

4          I am sure I have it in my notes.  Could you remind me

5   the 3500 number for the safety valve proffer?

6          MR. ARAVIND:  Yes, your Honor.  3501-39 is the 302 and

7   then 3501-40 is the notes underlying the safety valve.

8          THE COURT:  Thank you.  And I assume that we don't

9   need a ruling on this until Agent Reynolds testifies, which is

10  not today, in any event?

11         MR. ARAVIND:  It will not be today, your Honor.

12         The second point, just for the record, and Mr. Dratel

13  and the government spoke about this last night, it is our

14  understanding now that Mr. Dratel does not intend to elicit

15  from Detective Deloren about the search or his entry into

16  Tyrone Brown's apartment at Croes Avenue.  We are not going to

17  elicit that on direct and it's my understanding, and I'll let

18  Mr. Dratel speak for himself, that he is not going to ask

19  questions on Detective Deloren on cross.

20         MR. DRATEL:  That's correct, your Honor.  Upon

21  reflection, and just looking at it, and I called the government

22  so we wouldn't have something hanging out there that didn't

23  make any sense in the case.  If he wasn't going to testify on

24  it on direct, I wasn't going to probe that on cross.

25         But to respond to the government's point with

E9UMCHA1

1   respect --

2              THE COURT:  I would really like to get started.  Can

3   you just hold that thought.  One sentence.  I could hear it

4   when we have our break or at lunch.  If it's a sentence, go

5   ahead and say it.

6              MR. DRATEL:  I know as a matter of law, but I think as

7   a matter of fact, the government should be foreclosed from

8   arguing Mr. Brown's unreliability.  And if the government does

9   so, then I am going to seek some portions of the government's

10  papers as an admission by a party opponent with respect to when

11  they sought to admit Mr. Brown's statement as an accurate

12  account of what happened.  And an instruction to that effect,

13  if they want to go that route, I am going to go back in the

14  opposite direction.  But I think they should be foreclosed for

15  the reasons in the Court's opinion.

16             THE COURT:  Thank you.

17             Mr. Street.

18             (Jury present)

19             THE COURT:  Good morning, ladies and gentlemen.  The

20  jury always seems to be mystified about the standing up, so let

21  me explain.  We stand up out of respect for you.  So when you

22  come in, we stand up.  When you go out, we stand up and that's

23  why everyone is standing up when you come in and when you go

24  out.  Just to let you know.

25             Thank you for being on time.  I'm looking forward to

E9UMCHA1

1     the trial today.  I think we are ready to begin.

2             Mr. Aravind.

3             MR. ARAVIND:  The government calls Ms. Emma Torruella.

4             Your Honor, does the Court want to give some

5     instructions to the jury about the binders that they just

6     received?

7             THE COURT:  Yes.  As I mentioned yesterday, please

8     don't look at the binders.  When it's time to do that, you'll

9     be instructed what exactly to look at.  The binders contain

10     documents that are likely to be admitted in evidence, but I'm

11     not actually sure that everything in them is already admitted

12     in evidence and until that time it's not properly before you.

13     So I'll let you know when you should look and what you should

14     look at.  Thank you.

15             MR. ARAVIND:  Your Honor, I think there are blank

16     pages in the front of each binder.

17             THE COURT:  Yesterday I also gave you instructions

18     about taking notes.  The fact that you may take notes.  I hope

19     you also have been given something to write with.  Is that

20     true, Mr. Street?

21             You don't have to take notes.  You may take notes.

22     You may not show your notes or discuss your notes with anyone.

23     But they are for your own purposes and to jog your own memory.

24     EMMA TORRUELLA,

25      called as a witness by the Government,

E9UMCHA1

1          having been duly sworn, testified as follows:

2     DIRECT EXAMINATION

3     BY MR. ARAVIND:

4     Q.  Good morning.

5     A.  Good morning.

6     Q.  How old are you, Ms. Torruella?

7     A.  Forty-two.

8     Q.  What do you do for a living?

9     A.  I work for the New York City Board of Education.

10    Q.  What do you do in the New York State board of education?

11    A.  I'm a school aide.

12    Q.  Where is your school?

13    A.  In the Bronx, New York.

14    Q.  Where were you born, Ms. Torruella?

15    A.  Bronx, New York.

16    Q.  Where did you grow up?

17    A.  In the Bronx.

18    Q.  What schools did you attend when you were growing up?

19    A.  P.S. 130, I.S. 52, and I went to August Community Center

20    for high school.

21    Q.  How far did you get in school?

22    A.  Tenth grade.

23    Q.  Where do you live now, Ms. Torruella?

24    A.  In the Bronx.

25    Q.  How long have you lived in your current location in the

1    Bronx?

2    A.   A year.

3    Q.   With whom do you live?

4    A.   With my husband David and my son Adam.

5    Q.   Are you legally married to David?

6    A.   No.

7    Q.   Do you have any children together, you and David?

8    A.   Yes.

9    Q.   How many?

10   A.   One.

11   Q.   Is that Adam?

12   A.   Yes.

13   Q.   How old is Adam?

14   A.   Ten years old.

15   Q.   Do you have any other children?

16   A.   Yes.  My daughter Demi.

17   Q.   How old is Demi?

18   A.   Twenty years old.

19   Q.   Does Demi live with you?

20   A.   No.

21   Q.   What does David do for a living?

22   A.   He's not working right now.

23   Q.   How long has he been not working?

24   A.   A year and a half, two years.  Two years.

25   Q.   What did he do before he was unemployed over the last one

```
1    and a half to two years?

2    A.  He was a truck driver.

3    Q.  What kind of truck driver?

4    A.  A meat company.

5    Q.  How long did David drive trucks for a meat company?

6    A.  Fifteen years.

7    Q.  What's David's last name?

8    A.  Barea.

9             THE COURT:  Could you spell that.

10            THE WITNESS:  B-a-r-e-a.

11   Q.  Did David do anything else to make a living?

12   A.  That I know of, no.

13   Q.  Did you have any suspicions about David doing anything else

14   to make a living?

15   A.  Yes.

16            MR. DRATEL:  Objection.

17            THE COURT:  I'll allow it.

18   Q.  And what were those suspicions?

19   A.  I thought he was cheating on me at one time, and I thought

20   he was selling drugs.

21   Q.  Does David have a nickname?

22   A.  Yes.

23   Q.  What is that nickname?

24   A.  Groovy.

25   Q.  I am going to show you what has been premarked for
```

E9UMCHA1                        Torruella - direct

1    identification as Government Exhibit 1.

2              MR. ARAVIND:  May I approach, your Honor?

3              THE COURT:  Yes.

4    A.  That's David.

5    Q.  Who is that?

6    A.  That's David.

7    Q.  What are you looking at?

8    A.  A picture of David.

9    Q.  Do you recognize him?

10   A.  Yes.

11   Q.  Is that a fair and accurate representation of your husband,

12   David Barea?

13   A.  Yes.

14             MR. ARAVIND:  The government offers Government Exhibit

15   1.

16             THE COURT:  Any objection?

17             MR. DRATEL:  No objection.

18             THE COURT:  Admitted in evidence.

19             (Government's Exhibit 1 received in evidence)

20             MR. ARAVIND:  May I publish, your Honor?

21             THE COURT:  Yes, you may.

22             Is this in the notebooks as well or just on the

23   screen?

24             MR. ARAVIND:  This is in the notebooks as well, your

25   Honor, and Ms. Torruella has a Redweld in front of her that has

1   all of the exhibits.

2             THE COURT:  Thank you.

3             MR. ARAVIND:  Your Honor, we would also offer

4   Government Exhibit 1A, which is the name plate David Barea.

5             MR. DRATEL:  No objection.

6             THE COURT:  Admitted.

7             (Government's Exhibit 1A received in evidence)

8             MR. ARAVIND:  And also 1B, which is the face plate.

9             MR. DRATEL:  No objection.

10            THE COURT:  Admitted.

11            (Government's Exhibit 1B received in evidence)

12  Q.  Ms. Torruella, directing your attention to March 25, 2013,

13  where were you living at the time?

14  A.  1403 Overing Street in the Bronx.

15  Q.  What type of address is that?

16  A.  It's a private house.

17  Q.  Did you have the entire house or part of the house?

18  A.  Renting an apartment.

19  Q.  Who were you living with?

20  A.  With David and Adam.

21  Q.  Back then, in March of last year, approximately how long

22  had you been living at 1403 Overing?

23  A.  It would have been three years.

24  Q.  I'm sorry.  I may have asked this.  Did you have part of

25  the house or the entire house?

1    A.  Part of the house.

2    Q.  What part?

3    A.  The first floor.

4    Q.  Now, at that time was Mr. Barea staying with you the entire

5    time at 1403 Overing?

6    A.  He stayed a couple of days with me out the week.

7    Q.  Where did he stay the other days?

8    A.  I don't know.

9    Q.  At that time how long had you been together?

10   A.  Twelve years.

11   Q.  Now, directing your attention to March 24 or 25, 2013, did

12   something happen to you?

13   A.  Yes.

14   Q.  What was that?

15   A.  I got robbed in my house.  They kidnapped me.

16   Q.  How many people robbed you and kidnapped you?

17   A.  Three.

18   Q.  At the time, Ms. Torruella, did you know who those three

19   people were?

20   A.  No.

21   Q.  Ms. Torruella, in front of you is an exhibit marked

22   Government Exhibit 62.  I can just hand it up to you.

23           Do you recognize that?

24   A.  Yes.

25   Q.  What is that?

1   A.  That's where I used to live.

2   Q.  Which address are you speaking about?

3   A.  1403 Overing Street.

4   Q.  Is that a photograph you are looking at?

5   A.  Yes.

6   Q.  Does that photograph fairly and accurately represent your

7   home at 1403?

8   A.  Yes.

9           MR. ARAVIND:  The government offers Government Exhibit

10  62.

11          MR. DRATEL:  No objection.

12          THE COURT:  Admitted.

13          (Government's Exhibit 62 received in evidence)

14          MR. ARAVIND:  May we publish, your Honor?

15          THE COURT:  Yes.

16  Q.  Ms. Torruella, in front of you there should be something

17  that looks like a pen.  It's a laser pointer.

18  A.  Do I have to press anything?

19  Q.  You have to press something --

20          MR. ARAVIND:  May I approach, your Honor?

21          THE WITNESS:  I am not sure how to use it.

22  Q.  Can you show the jury, using the laser pointer?

23          THE COURT:  You can stand up if you'd like.

24  Q.  Which is your address?

25  A.  Right there.

1    Q.  You're indicating the white door on the middle part of

2    Government Exhibit 62?

3    A.  Yes.

4    Q.  And that's on the right-hand side of Government Exhibit 62?

5    A.  Yes.

6    Q.  Thank you, Ms. Torruella.

7            Can you describe the layout of that apartment for the

8    jury, please?

9    A.  It's a railroad apartment.  I don't know if you know what

10   that is.  When you go in the house, there is a big living room.

11   The kitchen is attached to the living room.  And then when you

12   go into your left there is a long hallway and the two bedrooms

13   are in the back.  I have two bathrooms.  One is in the master

14   bedroom and one is in the middle of the hallway.

15   Q.  Directing your attention to that evening, March 24, 2013,

16   tell us what happened, in your own words.

17   A.  It was that night, Sunday night, after midnight, I was

18   sleeping, but I went out that night.  David brought me home.

19   And he left to his sister's house.  And I went to sleep and

20   then I heard someone calling me out my name, which they call me

21   Emmy and they kept saying David was calling me out through the

22   door.  When I got out, I saw the door open.  The door was open

23   about this wide.  And when I looked I saw David there.  And

24   there was a guy behind him.  And David is telling me to get the

25   keys out.  I didn't understand what he was saying at the time.

1   And I have a dog.  He's a pit bull.  I have my dog to the door.

2   They wanted me to remove the dog from the door to put him in

3   the bathroom.

4   Q.  Ms. Torruella, let's unpack that a little bit.

5        When you got up from your bed, were you dressed?

6   A.  No.

7   Q.  The dog that you described, can you explain to the jury

8   where the dog was in your apartment?

9   A.  He's at the front door of the house.  He is chained to the

10  door at the doorknob.

11  Q.  When you got to the door, what did you see?

12  A.  David was tied behind his hands.  He had blood on his face.

13  And one of the guys had a gun to his head with a potato on him.

14  Q.  How many people did you see next to your husband, David

15  Barea?

16  A.  Two.

17  Q.  Can you describe those people to the jury?

18  A.  One was big, he's heavyset, and the other one was tall.

19  Q.  Who had the gun pointing to Mr. Barea?

20  A.  The big guy.

21  Q.  Let's talk about the big guy first.

22  A.  Okay.

23        MR. DRATEL:  Objection, your Honor.  Big as in heavy?

24        THE COURT:  We have a heavy guy and a tall guy.  Which

25  one are we talking about?

1    Q.  Let's talk about the heavy guy.  Can you describe to the

2    jury what the heavy guy was wearing?

3    A.  He had a gray sweater, a black hat.  He's black African.

4    Q.  Was he wearing gloves?

5    A.  I don't remember.

6    Q.  Could you see the heavy guy's face?

7    A.  Say it again.  I'm sorry.

8    Q.  Can you see the heavy guy's face?

9    A.  Yes.

10   Q.  Let's turn to the tall guy.  What was he wearing?

11   A.  He had all black on.  He had a mask on his face and a hat,

12   which is called skully.

13   Q.  What's a skully?

14   A.  It's a winter hat.

15   Q.  Do you know if he had gloves on?

16   A.  Yes.

17   Q.  When you say he had a mask, what part of his face, if at

18   all, could you see?

19   A.  His eyes only at the time.

20   Q.  Now, when that door opened what did you think was happening

21   at the time?

22           MR. DRATEL:  Objection.

23           THE COURT:  You want to rephrase it.

24   Q.  What happened next after the door was opened?

25   A.  I put the dog in the bathroom.  They came in, all three of

1    them.  They wanted money.  They wanted David's money.  And I

2    didn't have the money there.  And then we talking back and

3    forth.  He is asking me where is the money.  And then -- give

4    me one moment.  I'm sorry.  And then we talking back and forth.

5    Q.  Take your time, Ms. Torruella.

6    A.  Then they are telling me they upset with David because the

7    money wasn't in the house.  I took the money to my mom's house.

8    Q.  Let's try and understand that a little bit.  When you say

9    they were talking, who was talking?

10   A.  Sorry.  The big guy, the heavyset guy.

11   Q.  Did there come a time when you used another name to

12   describe the heavyset person?

13   A.  At the time I call him the big guy.

14   Q.  At some other later point in time is there another name

15   that you used to describe that person, the heavyset person?

16   A.  They call him Dee.

17   Q.  Let's refer to him as Dee.

18   A.  Okay.

19            MR. DRATEL:  Objection as to they.

20            THE COURT:  Do you want to clarify who calls him Dee?

21            THE WITNESS:  His friends.  I don't know him.

22            MR. DRATEL:  I am going to object as hearsay.

23            THE COURT:  Did you ever call him Dee?

24            THE WITNESS:  No.  I don't know him.  I have never met

25   him before.

E9UMCHA1                    Torruella - direct

1          THE COURT:  You just heard from somewhere that that's

2     what he was called?

3          THE WITNESS:  Yes.

4          THE COURT:  Objection sustained.

5     Q.  We can continue to call him the heavyset guy,

6     Ms. Torruella.

7          Were you able to see the heavyset guy's face?

8     A.  Yes.

9     Q.  And can you describe the lighting in your apartment when

10    you saw his face?

11    A.  Say it again.  I'm sorry.  Repeat that.

12    Q.  Can you describe the lighting in your apartment when you

13    saw his face?

14    A.  Yeah.  Because the lights were on.

15    Q.  I am going to show you what has been premarked for

16    identification as Government Exhibit 3.

17    A.  That's the heavyset guy.

18    Q.  What did the Court's deputy just hand you, Ms. Torruella?

19    A.  A picture.

20    Q.  And do you recognize that photograph?

21    A.  Yes.

22    Q.  And who is in that photograph?

23    A.  That's the heavyset guy.

24          MR. ARAVIND:  The government offers Government Exhibit

25    3.

1          MR. DRATEL:  No objection?

2          THE COURT:  Admitted.

3          (Government's Exhibit 3 received in evidence)

4          MR. ARAVIND:  May I publish, your Honor?

5          THE COURT:  You may.

6   Q.  Apart from the gun with the potato, did you see any other

7   weapons?

8   A.  Yes.

9   Q.  What did you see?

10  A.  The tall guy had a hammer in his hand.

11  Q.  What, if anything, did you see the tall guy do with the

12  hammer in his hand?

13  A.  He was hitting David with it in the back of the legs.

14  Q.  Can you tell the jury how the tall guy was hitting David

15  with the hammer in the back of his legs?

16  A.  He was grabbing him and they had him tied up with the tape

17  on his arms.  They kept hitting him in the back of the legs

18  because they was upset about the money that wasn't in the

19  house.

20  Q.  Now, between the tall guy and the heavyset guy who we just

21  saw in Government Exhibit 3, who was talking?

22  A.  Dee did most of the talking, the heavy guy.  Sorry.  The

23  heavy guy did most of the talking.

24  Q.  Do you remember if the tall guy said anything at that time?

25  A.  No.  He was just hitting him.

1    Q.   Hitting who?

2    A.   David.

3    Q.   Now, early on you mentioned that David was asking for keys.

4    A.   Right.

5    Q.   What was your understanding of what those keys were?

6    A.   I don't remember.  I don't know what keys he was talking

7    about.  I don't know if he was trying to stall them.  I didn't

8    know the keys they were talking about.

9    Q.   Now, at some point in time you just testified that they

10   were demanding money.  Did you have an understanding of what

11   the money was?

12   A.   Yes.

13   Q.   Can you explain to the jury what that understanding was?

14   A.   David had an incident in January, and he had took money out

15   the bank and brung it to the house.

16            MR. DRATEL:  I'm sorry, your Honor.  I didn't catch

17   all of that.

18            THE COURT:  David had an accident in January and he

19   took money you out of the bank and brought it to the house.

20            MR. DRATEL:  Thank you, your Honor.

21   Q.   How was the money brought to the house?

22   A.   He brung it in a backpack, black book bag.

23   Q.   Did you see the black book bag?

24   A.   Yes.

25            MR. DRATEL:  Objection.

1           THE COURT:  Did you say book bag?  I just didn't hear.

2     It was a book bag or backpack.

3           THE WITNESS:  It was a book bag, but it was a

4     backpack.

5     Q.  What did you say?

6           THE COURT:  What did you say?

7           THE WITNESS:  I said both.  I said book bag, but it's

8     a backpack.

9     Q.  You're just indicating that it's a backpack that you put on

10    your back?

11    A.  Yes.

12          MR. DRATEL:  Your Honor, can we get a time frame.

13          MR. ARAVIND:  I can rephrase.

14    Q.  At what point in time, Ms. Torruella, did you see the

15    backpack?

16    A.  When the incident happened in January, it was like in

17    February he brung the book bag home.

18    Q.  Did you look inside the book bag?

19    A.  No.

20    Q.  What, if anything, did you do with the book bag?

21    A.  I took the money to my mom's house.

22    Q.  When did you do that?

23    A.  I don't remember.

24    Q.  Was it after David's incident with the police in January?

25    A.  Yes.  After he brung the money home.

E9UMCHA1                       Torruella - direct

1    Q.  Was it before or after the robbery on March 25, 2013?

2    A.  Before.

3    Q.  Did you think it was weeks before or a month before?

4    A.  I don't remember.

5    Q.  Why did you take the book bag to your mom's house?

6    A.  Because I'm never home.  I work and I'm very busy, so I'm

7    never home.  I didn't want to leave it at home.

8    Q.  Where does your mother live?

9    A.  In the Bronx.

10   Q.  Where did you put it?

11   A.  In my mom's house under her bed.

12   Q.  Now, let's go back to March 25, 2013.  What, if anything,

13   did you say about the book bag or the money?  What, if

14   anything, did you say about the money?

15   A.  The day of the incident?

16   Q.  Yes.

17   A.  I don't understand.

18   Q.  When they demanded money, what, if anything, did you say in

19   response?

20   A.  I told him I'll get the money in my mom's house, but they

21   demanded to get the money.

22   Q.  What, if anything, did the tall guy or the heavyset guy say

23   after you said you would go get the money?

24   A.  They agree on it.  They agree that I go.  But at the time

25   they was going to go with David and I didn't want them to go

1    with David.  I agreed to go because I was afraid of him going

2    over there with David.

3    Q.  You were afraid of who going over --

4    A.  David with the two guys because he was tied up with duct

5    tape and he had blood all over his face.

6    Q.  So when you said that, what was decided?

7    A.  They decided that I go.

8    Q.  Were you going to go by yourself?

9    A.  No.  I went with the tall guy.

10   Q.  Can you tell us how, in your own words, you left the

11   apartment?

12   A.  The tall guy took me.  I put my boots on and left and the

13   tall guy took me.  He had me through my neck, holding me,

14   squeezing the back of my neck and we left the house to go to my

15   mom's house.

16          MR. ARAVIND:  Just for the record, indicating that the

17   witness is showing her neck and holding her neck.

18   Q.  Who left the apartment?

19   A.  The tall guy and I.

20   Q.  Did the tall guy say anything as he was leaving the

21   apartment?

22   A.  No.

23   Q.  Did the heavyset guy say anything as they were leaving the

24   apartment?

25   A.  He told the tall guy to call him when we get there.

1    Q.  Where did you go?

2    A.  To my mom's house.

3    Q.  How did you get there?

4    A.  As we left the house, there was a car which at the time I

5    know was the third guy at the car waiting.

6    Q.  Where was the car?

7    A.  Parked down the block from my house a couple of houses down

8    in front of the parking lot -- in front of the pump by a

9    parking lot.

10   Q.  Approximately how long were the tall guy and the heavyset

11   guy and David in the apartment before you and the tall guy left

12   your apartment?

13   A.  How long?

14   Q.  How long was that time.

15   A.  Like eight, 10 minutes.

16   Q.  I am going to show you what has been premarked for

17   identification as Government's Exhibit 63.

18           Do you recognize that item?

19   A.  Yes.

20   Q.  What is it?

21   A.  That is where I used to live at.

22   Q.  Are you looking at a photograph?

23   A.  Yes.

24   Q.  Does that photograph fairly and accurately represent the

25   area around your house at 1403 Overing?

1   A.   Yes.

2              MR. ARAVIND:   The government offers Government Exhibit

3   63.

4              THE COURT:   No objection.

5              MR. DRATEL:   No objection, your Honor.

6              THE COURT:   Exhibit 63 is admitted.

7              (Government's Exhibit 63 received in evidence)

8              MR. ARAVIND:   May I publish, your Honor?

9              THE COURT:   Yes.

10  Q.   Again, using that laser pointer, Ms. Torruella, can you

11  show us on Government Exhibit 63 approximately where the car

12  was located?

13  A.   Do you see where the white car is at?

14             THE COURT:   They are all white cars.

15  A.   There is the Jeep, that one.  You see this one, more down.

16  There is a parking lot there and the car was parked there.

17  There is a pump and it was double parked there.

18  Q.   You're indicating the right side of Government Exhibit 63.

19  Ms. Torruella, approximately how many car lengths from that

20  white minivan that's on the right-hand side of Government

21  Exhibit 63 was the car located?

22  A.   Like two cars down.

23  Q.   Thank you, Ms. Torruella.

24             MR. ARAVIND:   Thank you, Ms. Hansma.

25  Q.   What kind of car was it, Ms. Torruella?

1   A.  It was a black car.

2   Q.  A four-door or an SUV?

3   A.  Four-door.

4   Q.  What, if anything, did you notice about the car when you

5   approached it?

6   A.  I saw the license plates.  I remember the four last

7   numbers.

8   Q.  Do you remember the four last numbers?

9   A.  Yes.

10  Q.  What are they?

11  A.  7788.

12  Q.  What was the lighting outside as you approached that car?

13  A.  There was enough light.  There is light in all the houses.

14  Q.  Now, what happened when you got to that car?

15  A.  When we got there, the light-skinned guy, light eyes, he

16  was --

17  Q.  Let's talk about him for a second.  Where did you see that

18  person?

19  A.  He was out the car, standing in front of the car.

20  Q.  And what was that person wearing?

21  A.  He had all black on.  And he had a ski mask on his face,

22  and he had his hat on.

23          THE COURT:  Mask on his face and he had --

24          THE WITNESS:  A hat.

25  Q.  What part of his face, if at all, could you see?

1   A.  Only his eyes.

2   Q.  What did you notice about his eyes?

3   A.  His eyes were light.

4   Q.  What, if anything, did that person say as you were

5   approaching the car?

6   A.  He was upset.  He told the tall guy, why are you

7   bringing -- what's going on.  As I'm walking towards the car,

8   the tall guy had my neck squeezing, I am looking at the license

9   plates.  He's upset.  He is saying that she is being fucking

10  sneaky, looking at the license plate.

11  Q.  What, if anything, did the tall guy do?

12  A.  He just said not to worry about it.  We have to go get the

13  money.

14  Q.  Did there come a time when you got in the car?

15  A.  Yes.

16  Q.  What part of the car did you get into?

17  A.  The passenger's seat.

18  Q.  Can you describe to the jury how you got in the car, the

19  passenger's seat?

20  A.  The tall guy -- the whole time he's holding my neck tight.

21  He walked towards the passenger's seat.  He opens the door for

22  me and puts me inside.  At the same time I'm going in, the

23  light-skinned guy goes in through the other side to go in the

24  through the back seat, the driver's side, the back seat of the

25  driver.

E9UMCHA1                          Torruella - direct

1    Q.  What happened after you got in the car?

2    A.  We left and I gave him instructions how to get to my mom's

3    house.

4    Q.  Who drove?

5    A.  The tall guy.

6    Q.  How long is the drive approximately from your house on

7    Overing to your mom's house?

8    A.  Like six, seven minutes.

9    Q.  During the car ride what, if anything, did the tall guy

10   say?

11            THE COURT:  I'm sorry.  Where were you sitting in the

12   car?

13            THE WITNESS:  In the passenger.

14            THE COURT:  In the front seat?

15            THE WITNESS:  Yes.

16   Q.  What, if anything, did the tall guy say or do while you

17   were driving to your mother's house?

18   A.  He was telling me to shut up, to be quiet because I was

19   crying the whole time, and I'm giving him instructions how to

20   get there.  And then him and the light-skinned guy were talking

21   back and forth.

22   Q.  What, if anything, did they say?

23   A.  The light-skinned guy was talking about David, telling him

24   where they picked up David, that David was a little feisty one

25   because David tried to fight them back.  And I didn't

1   understand where they picked up David.  I had no idea at the

2   time.

3   Q.  What, if anything, did the tall guy say?

4   A.  He was telling him that.  And then at one point he took off

5   his mask.  He took off the mask and the light-skinned guy was

6   very upset, telling him why are you taking off the mask.  She

7   is going to see you now, see who you are.  And he kept saying:

8   I don't give a fuck because I'm from Brooklyn.  He repeatedly

9   said it a couple of times.

10  Q.  How long did he have his mask off?

11  A.  He never put it back on.

12  Q.  How far away were you when you saw the tall guy with his

13  mask off?

14  A.  I don't know how to explain.  He's right next to me.  It's

15  a small car.

16  Q.  What was the lighting like when he took his mask off?

17  A.  The light was enough light for me to see his face.

18  Q.  Ms. Torruella, do you think you would recognize the tall

19  guy if he was sitting in the courtroom today?

20  A.  Yes.

21  Q.  Can you look around the courtroom and see if you recognize

22  him?

23  A.  Yes.

24  Q.  Can you describe where he's sitting and an item of clothing

25  that he is wearing?

1   A.  Can I have a moment?

2   Q.  Yes.

3   A.  Can I step out?

4   Q.  Take your time, Ms. Torruella.

5        Ms. Torruella, can you describe the person who you

6   think is the tall guy, where he's sitting and an item of

7   clothing he is wearing?

8   A.  With the blue shirt.

9   Q.  And where is he sitting?

10  A.  Over there.

11  Q.  Is he sitting at one of these tables?  Is it the front

12  table?

13  A.  In the back.

14  Q.  And is he sitting the first person, the second person, or

15  the third person?

16  A.  The middle person.

17        MR. ARAVIND:  Your Honor, we would let the record

18  reflect that Ms. Torruella has identified the defendant.

19        MR. DRATEL:  Your Honor, I restate my prior

20  objections.

21        THE COURT:  I understand.  But it's after the

22  testimony, not before.

23  Q.  I am going to show you, Ms. Torruella, what has been marked

24  as Government Exhibit 4.

25        What is that that you're looking at?

 1    A.  It's a picture.

 2    Q.  Picture of who?

 3    A.  Of the tall guy.

 4    Q.  Is that a fair and accurate representation of the tall guy?

 5            THE COURT:  I'm sorry.  What exhibit is this?

 6            MR. ARAVIND:  This is Government Exhibit 4.  And I'm

 7    asking Ms. Torruella is that a fair and accurate representation

 8    of the tall guy?

 9    A.  Yes.

10            MR. DRATEL:  I am going to object, your Honor, on the

11    question based on he --

12            THE COURT:  Let me hear the rest of the questions.

13            I am going to excuse the witness for just a couple of

14    minutes.

15            MR. ARAVIND:  Your Honor, maybe we can take a quick

16    break.

17            THE COURT:  Ladies and gentlemen, I am going to excuse

18    you for just a couple of minutes.  You can go back in the jury

19    room.  I don't anticipate that it will be very long.  We will

20    bring you back as quickly as we can.

21            (Jury not present)

22            MR. DRATEL:  May we just know what the witness said to

23    the Court?

24            THE COURT:  Sure.  She said:  May I have a break?  And

25    I said:  Do you think you'll need very long?  And she said:

1    No.  Just a couple of minutes.  And I said okay.

2              MR. DRATEL:  Thank you.  I don't know if the Court

3    wants me to get up before every question, or I can have a

4    continuing objection to this line having to do with the

5    identifications.

6              THE COURT:  I will just note that I had not ever heard

7    an objection from you about an in-court identification and that

8    was what my comment meant.

9              MR. DRATEL:  But the whole purpose of an

10   identification suppression is, in fact, related to the

11   suggestiveness of all of the IDs and then it being used as an

12   in-court identification.  They are not independent of each

13   other, your Honor, at least --

14             THE COURT:  Each one is cumulative of the last one,

15   but each one is a separate identification, and I never heard an

16   objection to the in-court identification.

17             MR. DRATEL:  I'm objecting.  And I'm moving to strike

18   as well.

19             THE COURT:  Can I hear the government on that?

20             MR. ARAVIND:  Your Honor, we have not elicited any

21   testimony yet about any prior identification.  I think it was

22   very clear in the courtroom what just happened, which was this

23   witness took her time, she looked around the courtroom.  She

24   spent some moments thinking about it and this is a difficult

25   moment for her, facing a person during a very violent

1    situation.  She took her time and she identified the defendant

2    unequivocally.  We think that the record should stand and the

3    inquiry identification is appropriate.

4              THE COURT:  Here is the question.  The question is,

5    each identification becomes more suggestive than the last one.

6    We now have had an in-court identification which follows on all

7    the prior identifications with all of their history.  And then

8    on top of that we are about to have a photo identification as

9    she is looking at the defendant.

10             MR. ARAVIND:  I understand that, your Honor.  And I

11   think that this provides fodder for Mr. Dratel on

12   cross-examination.  But it does not mean that the in-court

13   identification should be struck.

14             THE COURT:  Here is my ruling.  I will not strike the

15   in-court identification because I was waiting for an objection.

16   I didn't hear one until afterwards.  It came out.  I am not

17   going to allow yet another identification of the photograph.

18   Let's move on and not deal with the photograph, which is

19   Exhibit 4.

20             MR. ARAVIND:  That's fine, your Honor.

21             THE COURT:  Mr. Street, you want to see how our

22   witness is doing?

23             THE DEPUTY CLERK:  Sure.

24             (Continued on next page)

25

1          MR. ARAVIND:  Your Honor?

2          THE COURT:  Yes.

3          MR. ARAVIND:  We do, at the end of the direct

4    testimony when Ms. Torruella is describing her conversations

5    with the detectives, we do intend to show the photograph, the

6    prior out-of-court identification which she made a positive

7    identification.

8          THE COURT:  The single photograph --

9          MR. ARAVIND:  This is --

10          THE COURT:  -- in the --

11          MR. ARAVIND:  No.  This is the photo array where she

12    made a --

13          THE COURT:  The second photo array.

14          MR. ARAVIND:  That's correct.

15          THE COURT:  Mr. Dratel, do you have any objection to

16    that?  I assume you're going to put that in front of her

17    yourself.

18          MR. DRATEL:  Excuse me?

19          THE COURT:  I assume you're going to put that in front

20    of her yourself.

21          MR. DRATEL:  Right.  If it's purely a -- if it's

22    purely a question of prior photographic identification, you

23    know, sort of as a narrative as opposed to again another ID,

24    then I'll get into it on cross.

25          THE COURT:  So you have no objection as long as we're

```
 1   talking about what the document is and is not another new ID.

 2             MR. DRATEL:  Right.

 3             THE COURT:  And Mr. Aravind is --

 4             MR. ARAVIND:  That's exactly what I was going to do.

 5             THE COURT:  Okay.  So there's no objection.

 6             Let's proceed.

 7             (Jury entering)

 8             (Witness resuming the witness stand)

 9             MR. ARAVIND:  Mr. Street, can you take the exhibits

10   back?

11             THE DEPUTY CLERK:  Sure.

12   BY MR. ARAVIND:

13   Q.  Ms. Torruella, we were, before the break, talking about

14   what was happening in the car.  Did the light-skinned guy or

15   the light-eyed guy, as you referred to, did he speak to you?

16   A.  Yes.

17   Q.  What language did he speak in?

18   A.  He spoke to me in Spanish and told me to relax, that

19   nothing was going to happen to me.

20   Q.  Did there come a time when you arrived at your mother's

21   house?

22   A.  Yes.

23   Q.  Could you describe, generally speaking, where your mother

24   lives for the jury?

25   A.  She lives in the housing projects.
```

E9uzcha2                        Torruella - direct

1     Q.  I'm going to show you what has been marked as government

2     exhibit 64 and 65.  Do you recognize those items?

3     A.  Yes.  That's my mom's building.

4     Q.  Is that a photograph you're looking at?

5     A.  Yes.

6     Q.  Let's turn to government exhibit 64 first, Ms. Torruella.

7     Could you describe for the jury what you're looking at?

8     A.  My mother's front building, the front entrance.

9     Q.  Is that a fair and accurate representation of your mother's

10    building?

11    A.  Yes.

12              MR. ARAVIND:  Government offers government exhibit 64?

13              MR. DRATEL:  No objection.

14              THE COURT:  Admitted.

15              (Government's Exhibit 64 received in evidence)

16              MR. ARAVIND:  Publish?

17              THE COURT:  Yes.

18    Q.  And again, Ms. Torruella, looking at government exhibit 64,

19    what is that?

20    A.  That's my mom's building, that's the front entrance.

21    Q.  Now, turning to what you have in front of you as government

22    exhibit 65, what is that?

23    A.  That's the parking lot where they park the cars.

24    Q.  Is that parking lost near your mother's house?

25    A.  Yes.

E9uzcha2                          Torruella - direct

1   Q.  Is that a fair and accurate representation of the parking

2   lot near your mother's house?

3   A.  Yes.

4           MR. ARAVIND:  Government offers government exhibit 65?

5           MR. DRATEL:  No objection.

6           THE COURT:  Admitted.

7           (Government's Exhibit 65 received in evidence)

8           MR. ARAVIND:  May we publish, your Honor?

9           THE COURT:  Yes, you may.

10  Q.  Okay, let's start with government exhibit 65, Ms.

11  Torruella.  Using the laser pointer in front of you, can you

12  describe or show to the jury where the car parked that evening?

13  A.  Right there.

14  Q.  So you're indicating where the mini van is in the center

15  right-hand side of government exhibit 65?

16  A.  Yes.

17  Q.  Is that correct?

18  A.  Yes.

19  Q.  What happened after you got out of the car?  Well, how did

20  you get out of the car?

21  A.  Well, the tall guy came out and opened the door for me and

22  again grabbed me through my neck, squeezing it hard.  And then

23  the light-skinned guy came out and we walked towards the

24  building.

25  Q.  Let's go now to government exhibit 64.  Can you show us,

1   Ms. Torruella, how, if at all, did you enter the building?

2   A.  We went all the way inside.

3   Q.  Did you go through that entrance --

4   A.  Yes.

5   Q.  -- in exhibit 64?

6   A.  Yes.

7   Q.  As you were walking to the entrance, what, if anything, did

8   the tall guy say?

9   A.  When we went inside we was waiting for the elevator.  And

10  he, they -- he was asking me what was David's nationality.  And

11  I told him that it was Puerto Rican.  And the light-skinned guy

12  laughed and said, well, we thought he was Mexican.

13          And then they looking at me and then he telling me

14  that I'm so pretty, that I'm a pretty young lady.  And I was

15  afraid 'cause I thought they was going to rape me, 'cause he

16  kept looking at me and, you know, squeezing my neck hard.

17          MR. DRATEL:  Objection, your Honor.  Move to strike.

18          THE COURT:  Sustained.

19          MR. ARAVIND:  Your Honor, may we approach for a

20  moment?

21          THE COURT:  No.

22          If you would just stick to what happened and describe

23  what happened, as opposed to what's going through your mind or

24  you think might happen.

25          THE WITNESS:  That's what I felt.

1          THE COURT:  I understand.  But in the court we're

2    focusing on what happened as opposed to your feelings -- not to

3    diminish your feelings.  I certainly understand.

4          MR. ARAVIND:  Your Honor, may we have a very brief

5    sidebar?

6          THE COURT:  No.

7    Q.  Ms. Torruella, did there come a time when you -- well,

8    stepping back.

9          Now, before March 25th, 2013, had you been to your

10   mother's house?

11   A.  Yes.

12   Q.  How many occasions?

13   A.  I go over every day.

14   Q.  Describe for the jury how you would typically go to your

15   mother's house?

16   A.  I go every day.  I do my laundry in my mom's house every

17   day.  So I take daily clothes to her house.

18   Q.  And describe to the jury how you would -- what steps you

19   would take to go to your mom's house?

20   A.  I call her before I go.  I always call my mom's before

21   going to her house so she could know I'm going over.

22   Q.  Do you have a key?

23   A.  Yes.

24   Q.  Now turning back to the early morning hours on March 25th,

25   2013, did you call that day?

1    A.  No.

2    Q.  Did you have your phone with you?

3    A.  No.

4    Q.  What happened when you got to the apartment?

5    A.  I knocked on the door and my daughter opened the door.

6    Q.  I'm going to show what you has been premarked for

7    identification as government exhibit 66.  Do you recognize that

8    item?

9    A.  Yes.  That's my mom's door.

10   Q.  Is that a fair and accurate photograph of your mom's door?

11   A.  Yes.

12          MR. ARAVIND:  Government offers government exhibit 66?

13          MR. DRATEL:  Your Honor, let me -- just one second?

14   May I have a brief voir dire, your Honor?

15          THE COURT:  You may.

16          MR. DRATEL:  Thank you.

17   VOIR DIRE

18   BY MR. DRATEL:

19   Q.  Good morning, Ms. Torruella.

20   A.  Good morning.

21   Q.  You see what's marked as government 66 in front of you?

22   A.  Yes.

23   Q.  Did you take that photograph?

24   A.  No.

25   Q.  Do you know what conditions existed for purposes of taking

E9uzcha2                           Torruella - direct

1   this photograph in terms of lighting, whether there is any

2   artificial lighting used or anything, flash, anything; do you

3   have any idea?

4   A.  Can you rephrase the question?

5   Q.  Sure.  Do you know when this photo was taken?

6   A.  No.

7   Q.  Do you know whether it was taken during the day or during

8   the evening?

9   A.  It's always light in my mom's --

10  Q.  My question is, do you know whether it's taken during the

11  day?

12  A.  No, no, I don't know.

13  Q.  Do you know whether any artificial lighting was used for

14  purposes of taking the photograph?

15  A.  No.

16          MR. DRATEL:  I would object to the photograph, your

17  Honor.

18          THE COURT:  Do you want to ask some questions about

19  the exhibit?

20          MR. ARAVIND:  Sure.

21  BY MR. ARAVIND:

22  Q.  Apart from the lighting, Ms. Torruella, do you recognize

23  what's in government exhibit 66 as your mother's door?

24  A.  Yes.

25  Q.  And how do you recognize that?

1    A.  That's my mom's door.

2            MR. ARAVIND:  Government offers government exhibit 66?

3            MR. DRATEL:  Objection.

4            THE COURT:  Ms. Torruella, you were about to say

5    something about the lighting.  What were you about to say?

6            THE WITNESS:  The hallways always have lights at all

7    times.

8            THE COURT:  And is what's depicted in the photo, is

9    that what it looks like when the hallway is -- the way it

10   always is?

11           THE WITNESS:  Yes.

12           THE COURT:  Okay.  It's admitted.

13           (Government's Exhibit 66 received in evidence)

14           MR. ARAVIND:  May we publish, your Honor?

15           THE COURT:  You may.

16   Q.  And again just for the jury, now that they can see it, Ms.

17   Torruella, what are we looking at in government exhibit 66?

18   A.  That's my mom's door.

19   Q.  Now, using the laser pointer in front of you, can you tell

20   us where you were standing, where the tall guy was standing,

21   and where the light-skinned or light-eyed guy was standing?

22   A.  I was here, the tall guy was here, and the light-skinned

23   guy was more, more over here.

24   Q.  So just for the record, you're indicating that you were

25   directly in front of the door?

1   A.  Yes.

2   Q.  To the left of you and further down in the picture was the

3   tall guy?

4   A.  Yes.

5   Q.  And then where was the light-skinned or light-eyed guy?

6   A.  He's more -- well, I'm here, so I'm right there.  He's

7   right next to me, 'cause he already let me go.

8               THE COURT:  Is he on your right?

9               THE WITNESS:  My left, my left.

10              THE COURT:  Okay.

11              THE WITNESS:  My left -- sorry.  Yes, my left.  I'm

12  here, my left is on this side, and then the light-skinned guy's

13  over here.

14  Q.  Okay.  Just so the light-skinned guy is more in the

15  foreground of government exhibit 66?

16  A.  Yes.

17  Q.  Did you use a key that day?

18  A.  No.

19  Q.  So what happened when you knocked on the door?

20  A.  My daughter opened the door.

21  Q.  And can you remind us who your daughter is?

22  A.  Demi Torres.

23  Q.  What, if anything, was your daughter wearing?

24  A.  Some little tiny shorts, little tank top; orange shorts

25  with a tank top.

1    Q.  What happened when your daughter opened the door?

2    A.  She stood looking at me staring in my eyes, and I told her

3    that I had to go in the room and get something.  And she just

4    stood there looking at me again.

5    Q.  What, if anything, Ms. Torruella, did you say about the

6    person who or people that you were with?

7    A.  I told her they were cops, 'cause I was scared that she

8    would react.

9    Q.  What happened next?

10   A.  I went inside.  The tall guy stood by the door, and I went

11   inside and I got the bag.  She walked away from me.  She stood

12   by my mom's door.  I went into my mom's room, my mom's and my

13   son was sleeping and I went under the bed and I got the bag and

14   I left.  I walked out and gave it to him, to the tall guy.

15   Q.  Where was the tall guy standing at the time?

16   A.  You see my daughter, the way the door opens in.  So he was

17   standing between my door, like inside.  He wasn't all the way

18   inside, and stood right there waiting.

19   Q.  Was the door opened or closed?

20   A.  It was open opened the whole time.

21   Q.  What happened next?

22   A.  And then I left.  I told her that I would call her later.

23   And she just kept looking at me.  I took two minutes to give

24   her a sign with the eyes, my eyes were watery, and I just

25   walked out, we left.

E9uzcha2                         Torruella - direct

1    Q.  How long were you in your mother's apartment?

2    A.  I say less than a minute, less than a minute.  It was in

3    and out.

4    Q.  Where did you go once you left the apartment?

5    A.  We went back to the house.

6    Q.  Tell us how you went back to the house?

7    A.  I'm sorry?

8    Q.  How did you get to the house?

9    A.  We went back in the car.

10   Q.  What, if anything, happened when you were -- well, how did

11   you get to the car?

12   A.  He had me through my neck again holding me tight, and then

13   we went, then we left.

14   Q.  Who did?

15   A.  The tall guy.

16   Q.  What, if anything, did you do with the bag?

17   A.  I gave it to him, and then when we got in the car.

18   Q.  What happened next?

19   A.  We went back to the house.  He called, big guy, he called

20   the heavy set guy and said he had the bag.

21   Q.  Who called?

22   A.  The tall guy.

23   Q.  What happened when you got to the apartment on -- well, did

24   there come a time when you got back to your apartment on

25   Overing?

E9uzcha2                        Torruella - direct

1    A.  Yes.

2    Q.  What happened when you got back to the apartment on

3    Overing?

4    A.  When we got there, the light-skinned guy never went inside.

5    He stood in the car.

6           We went inside.  They opened the door, the big guy

7    opened the door.  Um, he was upset that there wasn't enough

8    money in the bag.

9    Q.  Who was upset?

10   A.  Dee.

11          MR. DRATEL:  Objection.

12          THE COURT:  The heavy guy?

13          THE WITNESS:  Yes.

14   Q.  What happened?

15   A.  Then there was all arguing back and forth about the money.

16   He thought that David had more money.

17   Q.  Who thought that David had more money?

18   A.  Dee thought he had more money, and started hitting David

19   again in the back of the legs with a hammer.

20   Q.  What, if anything -- well, what did you do when you saw --

21   who hit -- strike that.

22          Who hit David with the hammer?

23   A.  The tall guy.

24   Q.  What, if anything, did you do or say after you saw the tall

25   guy hit David with a hammer?

E9uzcha2                           Torruella - direct

1   A.  I just, I was trying to hold -- I was trying to -- I was --

2   I kept putting my hands up not to hit him.

3   Q.  What, if anything, did the tall guy do next?

4   A.  I had my scarf on top of the table, and he took the scarf

5   and tied my hands.  He tied my hands like this, and told me to

6   kneel down.

7   Q.  What, if anything, did you do in response to that?

8   A.  I was crying.

9   Q.  Ms. Torruella, did you kneel down?

10  A.  Yes.

11  Q.  What happened when you knelt down?

12  A.  The big guy got upset and told the tall guy, why you tell

13  her to bend down, to kneel down.  And then he told me to get

14  back up.

15  Q.  Who told you to get back up?

16  A.  The big guy.

17  Q.  The heavy set guy?

18  A.  Yes.  He was very upset that the tall guy told me to kneel

19  down.

20  Q.  What happened next?

21  A.  Um, after I got back up they wanted to walk to the back of

22  the room.  And they had me first, the tall guy, we walking,

23  that he had David walking with David.  David tried to open the

24  bathroom door for the dog to come out.

25  Q.  What happened after that?

1   A.  Then they started hitting, you know, he's struggling with

2   David, then close the door, then the tall guy start hitting

3   David with the hammer in the back of the legs.

4   Q.  Did the dog get out?

5   A.  No, he never got out.

6   Q.  Where did you end up going?

7   A.  Huh, say again?

8   Q.  Where did you end up going?

9   A.  Into my bedroom.  They told me to go back to my bedroom.

10  And the tall guy told me to get on top of the bed.

11  Q.  Before you got in the bedroom, what, if anything, did you

12  notice about the bedroom?

13  A.  It was destroyed.  They took all my drawers, all my clothes

14  out of my drawers, everything, the whole closet was inside out.

15  The room was destroyed.

16  Q.  What happened when you got to the bedroom?

17  A.  The tall guy told me to get on top of the bed, and then to

18  look forward, not to look back.  And then the big guy grabbed

19  David before I got on top of the bed and threw him on the bed

20  and whispering something in his ear.  I don't know what he was

21  whispered.

22  Q.  What do you think was -- what were you thinking when you

23  got onto the bed?

24  A.  That they was going to kill me.

25  Q.  What happened next?

1   A.  Then the tall guy told me that they was leaving and not to
2   follow behind him.
3   Q.  What happened next?
4   A.  They both ran out.  And I came off the bed and I un --
5   tried to untie my, um, the scarf with my mouth.  I loosened it
6   enough.  And then I, when David got up, he untied me with the
7   scarf 'cause it was easier, and then I untied him.
8   Q.  What, if anything, happened to the book bag?
9   A.  They took it.
10  Q.  How was David's hands tied?
11  A.  In the back with duct tape.
12  Q.  After the duct tape was removed, what did you and David do
13  next?
14  A.  We left.
15  Q.  Where did you go?
16  A.  We went to the -- he parks the car in the garage, and we
17  walked to the garage because David didn't have the keys to the
18  car or his wallet, 'cause the incident happened, it stood
19  there.  So we went to the parking lot and he asked -- excuse
20  me -- he asked the guy to lend him $10 to go to the car to get
21  the, um, the key.  They leave a spare key at the parking lot.
22  So he got the $10, the key, and then we went to the car.
23  Q.  Was the car at the garage or somewhere else?
24  A.  The car was somewhere else.
25  Q.  How did you get to the car?

1   A.  We walked -- to the car?

2   Q.  How --

3   A.  We took a cab.  The guy lend us $10.

4   Q.  And what car are you referring to?

5   A.  The black car.

6   Q.  Which black car?

7   A.  David's black car.

8   Q.  Is that a jeep or is that a --

9   A.  It's a jeep.

10  Q.  What happened -- did there come time when you got to the

11  black jeep?

12  A.  Yes.

13  Q.  What happened inside the black jeep?

14  A.  We left, and David called Ty.

15          MR. DRATEL:  Objection.

16          THE COURT:  I'm not sure I even heard.

17          MR. ARAVIND:  I can rephrase.

18          MR. DRATEL:  Argumentative, Judge.

19  Q.  Ms. Torruella, while you're in the car, did David make

20  phone calls?

21  A.  Yes.  He called Ty.

22          MR. DRATEL:  Objection, hearsay.

23          MR. ARAVIND:  I can rephrase.

24          THE COURT:  Okay.

25  Q.  Could you hear the other person on the phone when David was

E9uzcha2                          Torruella - direct

1   speaking?

2   A.   No.

3   Q.   Okay.  How many phone calls did David make?

4   A.   Just one.

5   Q.   Did there come a time when -- well, where did you go from

6   when you got into the black jeep with David?

7   A.   We went to go see Ty.

8   Q.   Okay.  Was that before or after the phone call?

9   A.   Before the phone call.

10  Q.   So just to be clear, so you went to Ty first, and then?

11  A.   No, no, no.  He called Ty, he -- can I rephrase it?  He

12  called someone.

13          THE COURT:  What did you hear him same in the phone?

14          MR. DRATEL:  Object, your Honor.  That's hearsay as

15  well.

16          MR. ARAVIND:  I think we can --

17          THE COURT:  Okay.

18          MR. ARAVIND:  I think I can rephrase.

19          THE COURT:  All right, all right.  Go ahead.

20          MR. ARAVIND:  And with the Court's permission, I may

21  lead just --

22          THE COURT:  That's fine.

23  Q.   Did there come a time when David made a phone call to

24  someone?

25  A.   Yes.

1   Q.  Okay.  After that phone call, did you go somewhere?

2   A.  Yes.

3   Q.  Where did you go?

4   A.  To see Ty.

5   Q.  Okay.  Who is Ty?

6   A.  One of the guys, one of David's friends.

7   Q.  One of David's friends?

8   A.  My friends also.

9   Q.  I'm sorry?

10  A.  He's also my friend.

11  Q.  Okay.  How long had you known Ty?

12  A.  Couple of years, 15 years.

13  Q.  And can you describe your relationship with Ty?

14  A.  I know Ty from my mom's neighborhood.  My mom got 20 years

15  living there now, and that's where I know Ty from.

16  Q.  Can you describe him?

17  A.  Um, tall, little bit taller than me, black African.  I call

18  him pretty boy.  He's a handsome boy.

19  Q.  I'm going do to show you what has been marked for

20  identification as government Exhibit 2.  Do you recognize that

21  item?

22  A.  Yes.

23  Q.  What do you recognize that item as?

24  A.  That's Ty.

25  Q.  Is that a photograph of Ty?

E9uzcha2                          Torruella - direct

```
 1   A.  Yes.
 2             MR. ARAVIND:  The government offers government Exhibit
 3   2.
 4             MR. DRATEL:  No objection.
 5             THE COURT:  It's admitted.
 6             (Government's Exhibit 2 received in evidence)
 7   Q.  Do you know Ty's full name?
 8   A.  No.
 9   Q.  Okay.
10             MR. ARAVIND:  Government offers government Exhibit 2B,
11   which is the name plate Ty?
12             MR. DRATEL:  No objection.
13             THE COURT:  Admitted.
14             (Government's Exhibit 2B received in evidence)
15             MR. ARAVIND:  May we publish, your Honor?
16             THE COURT:  You may.
17   Q.  Where did you go see Ty, Ms. Torruella?
18   A.  His baby mother's house.
19   Q.  What happened, what did you observe when you got to -- when
20   you went to see Ty?
21   A.  David got out the car, he was very upset at Ty, and he
22   wanted his keys and his wallet.
23             MR. DRATEL:  Objection.
24             MR. ARAVIND:  Without -- I can rephrase, your Honor.
25             THE COURT:  Okay.
```

E9uzcha2                    Torruella - direct

1   Q.  Without saying what any person said, what happened?

2   A.  David got out the car.  I'm in the car.  I didn't hear what

3   they were saying.  They was talking, and he wanted his keys and

4   his wallet.

5   Q.  Did David get any items after he met with Ty?

6   A.  Yes.

7   Q.  What did he get?

8   A.  His wallet and his keys.

9           THE COURT:  From Ty?

10          THE WITNESS:  Yes.

11  Q.  Did there come a time when you heard Ty say something to

12  you?

13  A.  Yes.

14  Q.  What was that?

15  A.  I was in the passenger's seat and my window was a little

16  bit down, and he looked at me and said he was sorry for what

17  happened.

18          MR. DRATEL:  Objection.

19          THE COURT:  Is it offered for the truth?

20          MR. ARAVIND:  Your Honor, we would submit it's a

21  co-conspirator statement.  It's offered -- it's said in

22  furtherance of the conspiracy.

23          THE COURT:  Okay.  I'll admit it.  It's not a

24  statement offered for the truth of the matter asserted.

25          MR. DRATEL:  It's not a co-conspirator statement, your

1    Honor.  It's not to further the conspiracy.

2          THE COURT:  Ladies and gentlemen, ordinarily we don't

3    allow statements by other people.  It's called hearsay.  You're

4    entitled to hear most things firsthand, but if they're not

5    offered for the truth and few other circumstances, they can

6    come in.  So this is not being offered for the truth of his

7    saying he's sorry.  You're not being asked to determine if he's

8    sorry or not.  So it's not offered for the truth.

9          Go ahead.

10   Q.  How long, Ms. Torruella, did that encounter with you and

11   David and Ty, how long did that last?

12   A.  Like three, four minutes.  They didn't speak much.

13   Q.  Where did you go after that?

14   A.  We went to a hotel.

15   Q.  Why didn't you go back to your apartment on Overing?

16   A.  'Cause I was scared.  I didn't want to go back.  Um, the

17   guys -- I'm not sure if big -- I mean, the big guy or the tall

18   guy had the keys.  They still with the house keys.

19   Q.  What happened when you got to the hotel?

20   A.  David called.

21   Q.  He made a phone call?

22   A.  Yes.

23   Q.  Apart from the phone call, what else happened at the hotel?

24   A.  Nothing.  I took a shower and laid down.

25   Q.  Did you observe anything about David while you're at the

1    hotel?

2    A.   Yes.  After he came out the showers, all the back of his

3    legs were bruised up, his upper lip was, um, like cut from when

4    they hit him.

5    Q.   Did he go to a hospital?

6    A.   No.

7    Q.   Did there come a time, Ms. Torruella, when you met with law

8    enforcement officers?

9    A.   Yes.

10   Q.   When was that?

11   A.   The is next day.

12   Q.   So is that later in the day on the March 25th or the

13   following day on more March 26?

14   A.   No.  March 25th.

15   Q.   Okay.  Who did you meet with?

16   A.   Officer Ellis.

17   Q.   Is he with the NYPD?

18   A.   I -- yes.

19   Q.   Do you know or you don't know?

20   A.   He is, but it's the squad.  It's a different name.

21   Q.   Okay.  Generally speaking, what, if anything, did you say

22   to Officer Ellis?

23   A.   I explained to him the story what happened that night, but

24   I had to repeat everything.  And then they was checking the

25   house 'cause it was destroyed.

1   Q.   Did there come a time when you met with the police again?

2   A.   Yes.

3   Q.   Ms. Torruella, were you ever shown photographs in

4   connection with this case?

5   A.   Yes.

6   Q.   Did you recognize anyone in those photographs?

7   A.   Yes.

8   Q.   Did there come a time when you were shown additional

9   photographs?

10  A.   Yes.

11  Q.   And when did that happen?

12  A.   When did it happen?

13  Q.   Yes.

14  A.   Officer Ellis went to my job to show me the photos.

15  Q.   And, approximately, how long after you were robbed did that

16  take place?

17  A.   Couple of months.

18  Q.   I'm going to show what has been premarked for

19  identification as government exhibit 1000.  Do you recognize

20  that item?

21  A.   Yes.

22  Q.   What is that?

23  A.   I pointed out -- it's a photograph.

24  Q.   And do you recognize your signature on that photo array?

25  A.   Yes.

E9uzcha2                         Torruella - direct

1    Q.  Is that one of the photos --

2              MR. DRATEL:  Your Honor, I object just because I had

3    on previous objections.

4              THE COURT:  Okay.  Overruled, but -- overruled to the

5    extent we discussed at the sidebar.

6              MR. DRATEL:  Thank you, Judge.

7    Q.  Is that one of the photo arrays that Officer Ellis showed

8    you?

9    A.  Yes.

10   Q.  Did you circle and sign your name to one of the individuals

11   in that photo array?

12   A.  Yes.

13             MR. ARAVIND:  The government offers government exhibit

14   1000?

15             MR. DRATEL:  Subject to --

16             THE COURT:  Admitted.

17             (Government's Exhibit 1000 received in evidence)

18             MR. ARAVIND:  May we publish, your Honor?

19             THE COURT:  You may.

20   Q.  Okay, Ms. Torruella, using that laser pointer again, can

21   you show us which of the six individuals you identified?  And

22   can you show us where your signature is?  And at the bottom can

23   you read what the date of the identification, what is that?

24   A.  The date?

25   Q.  Yeah, at the very bottom?

E9uzcha2                         Torruella - direct

1    A.  It says June 6th.

2    Q.  June 6th, 2013?

3    A.  Yes.

4    Q.  Okay.  Thank you, Ms. Hansma.

5            May I have one moment, your Honor?

6            THE COURT:  Yes.

7            MR. ARAVIND:  No further questions, your Honor.

8            THE COURT:  Okay.

9            MR. DRATEL:  Take our morning break, your Honor?

10           THE COURT:  Yes.  Let's take a 15 minute break and

11   reconvene at 11:15.

12           To the jury, just a reminder not to talk about the

13   case)

14           (In open court; jury not present)

15           THE COURT:  Okay, we're adjourned for 15 minutes.

16           MR. DRATEL:  Thank you, your Honor.

17           MR. ARAVIND:  Thank you, Judge.

18           (Recess)

19           (Jury entering)

20           THE COURT:  Okay, thank you.  Welcome back.

21           CROSS-EXAMINATION.

22           THE DEPUTY CLERK:  I remind you you're oath.

23           THE COURT:  You're still under oath.  That's fine.

24   Thank you.

25           THE WITNESS:  Okay.

1              THE COURT:  Thanks.  You may proceed.

2              MR. DRATEL:  Thank you, your Honor.

3    CROSS EXAMINATION

4    BY MR. DRATEL:

5    Q.  Good morning again, Ms. Torruella.

6    A.  Yes.

7    Q.  We've never met before, right?

8    A.  No.

9    Q.  You met with the government, prosecutors or law enforcement

10   several times in preparation for your testimony, right?

11   A.  Yes.

12   Q.  And in fact in August of this year, August 15th, you met

13   with them, correct, and a couple of times thereafter.  Does

14   that sound about right?

15   A.  Yes.

16   Q.  If you need to, I can show you documents if you want to

17   check that if you have question about recollection or anything

18   like that.  I'd be happy to share documents with you.  So I

19   don't want you to just accept it.  If you feel that you don't

20   remember, you let me know.  Okay?

21   A.  Yes.

22   Q.  So August 15th, September 3rd, September 17th, you met with

23   the government?

24   A.  I don't remember the dates, if you can show me.

25              MR. DRATEL:  If I may approach, your Honor?

E9uzcha2                          Torruella - cross

1              THE COURT:  You may.  You can hand it to Mr. Street.

2              MR. DRATEL:  Yes.  Look at what's marked as 3506-05

3     and just -- if I may show it to the witness, if you could just

4     look at the parts --

5              MR. ARAVIND:  Your Honor, I think Mr. Street has been

6     the one to --

7              MR. DRATEL:  I'm sorry.

8              THE COURT:  That's fine.

9              MR. DRATEL:  I apologize.  Just if the witness.

10    Q.  If you could, Ms. Torruella, if you could read to yourself

11    the parts that I've highlighted on the page and then the

12    opposite pages it's double-sided.

13    A.  Yes.

14    Q.  And that refreshes your recollection as to those dates that

15    you met with the government, I think it's August 15th,

16    September 3rd, September 17th and of this year, right?

17    A.  Yes.

18    Q.  In preparation for your testimony?

19              And when you met with them, you went with a lawyer,

20    correct?

21    A.  Yes.

22    Q.  And you prepared -- those interviews were pursuant to

23    what's called a proffer agreement, right?

24    A.  Yes.

25    Q.  And that gives you a form of immunity for what you say

1   during that meeting, correct?

2   A.  Yes.

3   Q.  And why were you concerned that you needed immunity for

4   what you were going to say?

5               MR. ARAVIND:  Objection.

6               THE COURT:  Sustained.

7   Q.  Did you have a concern that you were going to say anything

8   incriminating about yourself at those meetings?

9               MR. ARAVIND:  Objection.

10              THE COURT:  Sustained.

11  Q.  Were you concerned that there was going to be a topic that

12  would come up that would potentially put you in trouble that

13  you needed to be protected through immunity?

14              MR. ARAVIND:  Objection.

15              THE COURT:  Sustained.

16              MR. DRATEL:  Your Honor, are you sustaining the whole

17  line or is this a question of the phrasing?

18              THE COURT:  I'm sustaining the line.

19  Q.  That proffer agreement protects you, in the sense that the

20  government cannot use against you, except in limited

21  circumstances, what you say at the meeting, right?

22              Do you want to read it to refresh your recollection,

23  read it to yourself?  Go ahead.

24  A.  Just, just -- can you just rephrase the question?

25  Q.  Sure.  The agreement that you signed before you met with

E9uzcha2                    Torruella - cross

1   the government those three times, what you said at those

2   meetings could not be used against you in a court by the

3   government, except in very limited circumstances; right?

4   A.  Yes.

5   Q.  Now, your relationship with -- David Barea and Groovy are

6   the same person, right?

7   A.  Yes.

8   Q.  It's been about 12 to 14 years, is that right?

9   A.  12 years.

10  Q.  12 years?  And you lived together for various periods

11  during that time period, right?

12  A.  On and off.

13  Q.  Yes.  And you have a child together who is about ten years

14  old you said?

15  A.  Yes.

16  Q.  And you know that -- withdrawn.

17          You know that he has a case pending in the Bronx,

18  right, a criminal case; correct?

19  A.  No.

20  Q.  You don't know that he has a case pending in the Bronx?

21  A.  No.

22  Q.  And you know that he's testifying here in this trial,

23  right?

24  A.  Yes, he's -- this trial.

25  Q.  And he'll have immunity for his testimony, right?

E9uzcha2                          Torruella - cross

1    A.  What do you mean?

2    Q.  Immunity; that he can't be prosecuted -- for things that he

3    says here can't be used against him by the government in a

4    prosecution, right?

5             MR. ARAVIND:  Objection, foundation and hearsay.

6             THE COURT:  I'll allow it.

7    A.  I don't know.

8    Q.  You don't know?  You don't know of any agreement he has

9    with the government about his testimony?

10   A.  He doesn't talk to me about that, what's going on.

11   Q.  You've never, you've never talked to him about this

12   incident?

13   A.  No.

14   Q.  Never?

15   A.  About the incident that happened to us?

16   Q.  Yes.

17   A.  I mean, I know what's going on.  But did we sat down and

18   spoke about it?  No.

19   Q.  I'm sorry, to be what?

20   A.  If we speak about it?  No.

21   Q.  You don't speak about it?

22   A.  No.

23   Q.  You never spoke about it?

24   A.  No.

25   Q.  You never spoke about the incident -- after it happened

E9uzcha2                         Torruella - cross

1    when they left your house when --

2    A.  After we reported it, and we was told we were not supposed

3    to talk to each other.

4    Q.  And you never have?

5    A.  No.

6    Q.  You've lived together that whole time?

7    A.  On and off.  We have a lot of problems going on.

8    Q.  Right.  But you have never spoken about it?

9    A.  No.

10   Q.  Now, you talked about an incident in January of 2013

11   involving Mr. Barea, right?

12   A.  Yes.

13   Q.  That incident was the police stopped you, right?

14   A.  Yes.

15   Q.  And they found crack in his car, right?

16   A.  I don't know what they found.

17   Q.  But they found drugs in his car?

18   A.  I don't know.

19   Q.  Well, when the police -- so the police stopped him and then

20   he comes up with $20,000 in cash, right, in a book bag?

21   A.  Yes.

22   Q.  Right?  And you knew that was illegal money, right?

23   A.  No.

24   Q.  You had no idea?

25   A.  No.

E9uzcha2                         Torruella - cross

1    Q.  You think that he got stopped by the police, all of a

2    sudden $20,000 in cash appears?

3    A.  He told me he took it out the bank.

4    Q.  How did it get into the bank?

5    A.  He used to work.

6    Q.  So you think?

7    A.  He saved money.

8    Q.  $20,000?

9    A.  He saved money.  Yes, he always saved money.

10   Q.  But you suspected he was a drug dealer that whole time?

11   A.  I suspected he was selling drugs because he was never home.

12   He was in and out.

13   Q.  Right.  So he couldn't come up with 20 -- so you suspected

14   he's a drug dealer, and he comes up with $20,000 in cash that

15   he claims he got out of the bank, and you don't have any

16   suspicion that that's drug money?

17   A.  No, 'cause he told me he took it out the bank.  I believed

18   him.

19   Q.  Now, let's talk about the night of the robbery.  A

20   harrowing experience, right?

21   A.  Excuse me?

22   Q.  A traumatic experience for you?

23   A.  Yes.

24   Q.  Adrenaline, fear; right?

25   A.  Yes.

E9uzcha2                    Torruella - cross

1   Q.  Now you had several interviews with the police after --

2   right around the time right afterwards, right?

3   A.  Yes.

4   Q.  And then you had a couple for the next couple of months,

5   right?

6   A.  Yes.

7   Q.  And one of those meetings was January 5th, 2014, correct?

8   A.  I don't remember the dates.  I know I saw several times I

9   met with them.

10  Q.  If I may just show the witness 3506-01.  Look at the first

11  one which is highlighted there, please.  And just does that

12  refresh your recollection that you had a meeting with the law

13  enforcement back on January 5th, 2014?  Does that refresh your

14  recollection?

15  A.  Yes.

16  Q.  Thank you.  If I may have that back, please?

17          (Returned)

18          MR. DRATEL:  May I have just a moment?  Thank you,

19  your Honor.

20  Q.  So the heavyset person, right -- and did you, didn't you

21  tell the law enforcement agents that day, January 5th, 2014,

22  that the heavyset person was not wearing anything to obstruct

23  his face?

24  A.  He wasn't.  When he came in the house, no.

25  Q.  And you also -- and the tall guy's face was covered during

E9uzcha2                        Torruella - cross

1    that period, correct?

2    A.  Yes.

3    Q.  And then you were taken out to the car?

4    A.  Yes.

5    Q.  Right?  And you studied the car as carefully as you could

6    for details, right?

7    A.  Yes.

8    Q.  And right after the incident, were you interviewed with Mr.

9    Barea by the police?

10   A.  Interviewed, yes.

11   Q.  And during that interview, didn't you say that it was a

12   yellow New York plate, 7788?

13   A.  I don't remember right now.

14   Q.  I show what's marked as 3505-14 -- I'm sorry -11.  I'm

15   sorry 3506-11, and ask you if you could look at 3506-11, and

16   top right corner, upper right corner, and ask you does it

17   refresh your recollection that you said it was a New York

18   yellow plate 7788?

19   A.  Yes.  It says that here.

20             (Continued on next page)

21

22

23

24

25

E9UMCHA3                              Torruella - cross

1   Q.  Also this morning you testified that it was the

2   light-skinned person who was waiting by the car who was

3   concerned about you seeing the car, right, studying the license

4   plate.  The tall guy said, don't worry, right?

5   A.  Yes.

6   Q.  In fact, you say the tall guy said several times he was

7   from Brooklyn, that he wasn't worried even about taking off his

8   mask, right?

9   A.  Yes.

10  Q.  Now, you also told the police that the tall guy had a

11  teardrop tattoo, right?

12  A.  Yes.

13  Q.  You said that several times, correct?

14  A.  Yes.

15  Q.  In fact, you were shown photo arrays of the series of

16  people with teardrop tattoos, right?

17  A.  Yes.

18  Q.  You said it was under the left eye even, right?

19  A.  Yes.

20  Q.  You said the tall guy was about six-three.  That was your

21  estimation?

22  A.  Yes.

23  Q.  Now, at the time that you said the money was at your

24  mother's house, you're on Overing.  The robbers are demanding

25  money, right?  And you're worried that they are going to do

1   something even more violent than what they were doing, correct?

2   A.  Yes.

3   Q.  You said the money is at your mother's house, right?

4   A.  Yes.

5   Q.  Did Mr. Barea, Groovy, know that the money was at your

6   mother's house?

7           MR. ARAVIND:  Objection.

8           THE COURT:  Sustained.

9   Q.  Had you told him that the money was at your mother's house?

10  A.  I don't remember.

11  Q.  But he didn't tell you to put the money at your mother's

12  house.  You took it there, yourself?

13          MR. ARAVIND:  Objection.

14          THE COURT:  The question is, did you take the money

15  there yourself?

16          THE WITNESS:  Yes, I took the money.

17  Q.  He did not direct you to take the money, Barea did not

18  direct you to take the money there?

19  A.  No.

20  Q.  Now, you testified this morning that you were in the front

21  passenger's seat with the tall guy, right?

22  A.  Yes.

23  Q.  And back on January 5 of 2014, when you met with law

24  enforcement, didn't you tell them that, in fact, you were in

25  the back seat with the light-skinned robber for the trip?

1   A.  No, I did not say that.

2   Q.  You did not say that the tall guy drove and that the

3   light-skinned person sat in the back seat with you?

4   A.  No.

5   Q.  You did not say that.

6           Didn't you also tell him that day, January 5, 2014,

7   that everyone sat in the same seats driving back to Overing

8   from your mother's house?

9   A.  Yes.  I sat in the front passenger's seat.

10  Q.  The same seats.  You told him that you are in the same

11  seats.

12  A.  You're confusing me with the dates.  You're saying January

13  5.  I'm confused with the dates.

14  Q.  I can refresh your recollection, if you would like.  Would

15  you prefer that?

16  A.  Yes.

17  Q.  Look at the first two lines of 3506-01.  If you want to

18  look at the front page just to get the date straight.

19  A.  What am I looking at?

20  Q.  Have you looked at it?

21  A.  Yes.

22  Q.  Does that refresh your recollection that you told him

23  January 5, 2014 that you were in the same seats on the way back

24  as you were on the way there?

25  A.  Yes.

1    Q.  Now, you testified this morning that the tall guy, when you

2    got to your mother's apartment, the tall guy stepped inside the

3    doorway, correct?

4    A.  Yes.

5    Q.  In fact, you had told the police previously, well back very

6    close to the time of the robbery itself, that he closed the

7    door, the tall guy?

8    A.  No, he did not close the door.  The door was open at all

9    times.

10   Q.  So you are saying you never said that to the police?

11   A.  I don't remember saying that.

12   Q.  If I may refresh your recollection, show you what's marked

13   as 3506-11, and just look at highlighted portion at the top,

14   please, and I'll ask you if that refreshes your recollection.

15   First read it and then I'll state the question again, whether

16   that refreshes your recollection whether you told the police

17   that your mother was sleeping and that the tall guy closed the

18   door.

19   A.  He left the door open.

20   Q.  That's not my question.

21   A.  I didn't say that.

22   Q.  You don't recall saying that?

23   A.  No.

24   Q.  You say you didn't say that?

25   A.  I don't recall saying that.

E9UMCHA3                          Torruella - cross

1  Q.  Now, with respect to the car, you said it was black.  You

2  testified this morning, right?

3  A.  Yes.

4  Q.  And, in fact, you said it was an Acura, right?  You told

5  the police it was an Acura?

6  A.  Yes.

7  Q.  More than once, right?

8  A.  Yes.

9  Q.  As far as you knew, it was an Acura until they told you

10  that they thought it was a Honda, right?

11         MR. ARAVIND:  Objection.

12         THE COURT:  Sustained.

13  Q.  You said it was a four-door black Acura?

14  A.  I said it had an A on it.

15  Q.  You said it was a four-door black Acura, right?

16  A.  Yes.

17  Q.  Now, after the robbery, David also called someone named

18  Charlie, right?

19  A.  Yes.

20  Q.  That's a police officer he knew, right?

21  A.  Yes.

22  Q.  And you knew that David was operating at the time as an

23  informant, right?

24         MR. ARAVIND:  Objection.  Foundation.

25         THE COURT:  Overruled.

1   Q.  You can answer.

2   A.  I knew that he knew him.

3   Q.  That wasn't my question.  You knew that David was operating

4   as an informant for the police, correct?

5   A.  I am not sure.

6   Q.  You are not sure.  What does that mean, you are not sure?

7   A.  David just say he knew officer Charlie.

8   Q.  Did you know that he was operating as an informant for the

9   two months after the incident in January?

10  A.  No.

11  Q.  Now, with respect to the teardrop, right?

12  A.  Yes.

13  Q.  You told that to the government as late as 12 days ago, 13

14  days ago, right?

15  A.  Yes.

16  Q.  The 17th of September 2014 you said you remember that both

17  the tall guy and the shorter guy had teardrop tattoos, right?

18  A.  Yes.

19  Q.  And you had told the police that the first time you spoke

20  to them, right?

21  A.  Yes.

22  Q.  And then thereafter as well, right?

23  A.  Yes.

24  Q.  And you believed that that person had a teardrop tattoo,

25  right?  Still to this day, correct?

1    A.  Yes.

2    Q.  You know Mr. Chambers doesn't have a teardrop tattoo.  Do

3    you know that?  Can't be the guy if he doesn't have a teardrop

4    tattoo, right?

5              MR. ARAVIND:  Objection.

6              THE COURT:  Sustained.

7    Q.  Let's talk about the ID, courtroom ID, the one you just

8    made.  You could have done it blindfolded, right?

9              MR. ARAVIND:  Objection.

10   Q.  You know where the defendant sits, right?

11             MR. ARAVIND:  Objection.

12             THE COURT:  Overruled.

13   Q.  You know where a defendant sits in the courtroom, right?

14   A.  Yes.

15   Q.  And he is the only African American male sitting at these

16   tables, right?

17             MR. ARAVIND:  Objection.

18             THE COURT:  Overruled.

19   Q.  Right?

20   A.  Yes.

21   Q.  That's a no-brainer, right?

22             MR. ARAVIND:  Objection.

23             THE COURT:  Overruled.

24   Q.  Right?  Right?

25   A.  Yes.

1   Q.  Now, on March 25, 2013, you were shown photographs of the

2   tall guy, of who they thought might be the tall guy, right?

3   A.  Yes.

4   Q.  And you did not make a positive ID, correct?  You couldn't

5   pick out the person?

6   A.  Yes.

7   Q.  And then on the 27th, two days later, you were also unable

8   to make a positive ID, right?

9   A.  Yes.

10  Q.  And then two months later -- did you look at photos in

11  between, by the way?

12  A.  I don't remember.  I went a couple of times.

13  Q.  And then in June, first week of June, Officer Deloren,

14  Ellis, as you call him, comes to your job, right?

15  A.  Yes.

16  Q.  To show you photos.  Where had you seen the photos

17  previously?

18  A.  I had went to the station.

19  Q.  Was it on a computer?

20  A.  No.  I went.  There was some many of them that I didn't

21  want to do no more.  I kept going back and forth.

22  Q.  So you saw a lot of photos?

23  A.  Yes.

24  Q.  Were they single photos or groups?

25  A.  No.  In groups.

1   Q.  And some of the groups, again, had the teardrops, right?

2   A.  Yes.

3   Q.  He comes to your job.  You knew it was important when he

4   came to your job, right?

5   A.  Yes.

6   Q.  You knew that he thought that he could get a positive ID

7   from you?

8           MR. ARAVIND:  Objection.

9           THE COURT:  Sustained.

10          MR. DRATEL:  Withdrawn.

11  Q.  You believed that him coming to your job showing you photos

12  meant that the second robber was in that array, right?

13          MR. ARAVIND:  Objection.

14          THE COURT:  I'll allow it.

15  Q.  Right?  That was your conclusion, right?

16  A.  No.

17  Q.  In fact, you had seen that photo before and hadn't picked

18  out the person as the robber, right?

19  A.  I don't remember.

20  Q.  I want to go back for a second.  You said that the tall guy

21  took his mask off even before you got in the car the first

22  time, right?

23  A.  When he got in the car.

24  Q.  Didn't you tell the police right away, within a day or two,

25  when you were first interviewed, did you tell the police that

1    you had convinced the tall guy and the light-skinned guy to

2    take off their masks when you were approaching your mother's

3    house because it would look suspicious if they were wearing

4    masks when you showed up at the house?

5    A.  I said that when I was going because the light-skinned guy

6    didn't take anything off.

7    Q.  But you said both of them, right?

8    A.  Just one of them.

9    Q.  What did you tell the police that day?

10   A.  I don't remember.

11   Q.  Let me show you what's marked as 3502-18, and we will call

12   it dash 6 because it's a multipage document.

13            MR. DRATEL:  I am going to write on it, if I may, your

14   Honor, just to separate it out.

15   Q.  I just ask you to look at it and I'll bracket the spot

16   where I would like you to read to yourself to see if that

17   refreshes your recollection about what you told the police on

18   March 25, 2013.  Had you told the police that both men had

19   taken off their mask.  Do you recall now saying that?

20   A.  I know, one he took never took it off, but I don't

21   remember.

22   Q.  I want to go back.  Your daughter, Demi, right, was at your

23   mother's house when you arrived that night, right?

24   A.  Yes.

25   Q.  You're close to her, right?

E9UMCHA3                       Torruella - cross

1   A.  Yes.

2   Q.  You go to your mother's house every day, right?

3   A.  Yes.

4   Q.  You see Demi there most of the time?

5   A.  I see her every day.

6   Q.  You know that she is a witness in this case as well, right?

7   A.  Yes.

8   Q.  And you talked to her about the case.  You talked to her

9   about the incident after it happened, right?

10  A.  No.

11  Q.  You never talked to your daughter --

12  A.  She don't talk to me about the case.  She won't talk to me.

13  Q.  Is she upset with you?

14  A.  We have our differences.

15  Q.  Is she upset because when you were worried about David

16  Barea you took the robbers to her and your mother's house?

17  A.  My mother is upset.  I don't know about her.

18  Q.  I want to go back to June 6, when you made a positive ID

19  from the photograph, according to your testimony earlier,

20  correct?  Isn't it a fact that you didn't say I'm sure that's

21  him?  Isn't that a fact?  Correct?

22  A.  I don't remember.

23  Q.  Didn't you say to Detective Deloren -- withdrawn.

24          So he came to you at your job.  What did he say to you

25  when he came to your job?

1    A.  I don't remember.  It was a long time ago.  I don't

2    remember.

3    Q.  You don't remember what he said to you that day?

4    A.  No.

5    Q.  Did he say something to the effect that I would like you to

6    look at some photos?

7    A.  Yes.  He said -- he called me.  He told me he was going to

8    be outside, that he has something to show me.

9    Q.  Isn't it a fact that you said it kind of looks like the

10   guy?

11   A.  I don't remember.

12   Q.  I would like to refresh your recollection then.  See if

13   this refreshes your recollection.  It's part of 3502 --

14            MR. DRATEL:  If I may have a moment, your Honor.

15            THE COURT:  Yes.

16            MR. DRATEL:  I am going to wait for Mr. Aravind to get

17   there.

18            MR. ARAVIND:  I'm fine.

19   Q.  I would like to show you what's marked as 3502-18.  I ask

20   you to look at the highlighted -- you can look at the page

21   before, too, if that helps you.  That you said to Detective

22   Deloren, it kind of looks like the guy, right?

23            Do you have Government's Exhibit 1000 with you still

24   or no, the photo array?

25            THE COURT:  The document with all the photos.

```
 1              THE WITNESS:  This one?

 2              THE COURT:  Yes.

 3   A.  I have it.

 4   Q.  Any teardrop in that photo on Mr. Chambers?

 5   A.  No.

 6   Q.  Any teardrop on any of the people in that array?

 7   A.  No.

 8   Q.  To this day you remember that the tall guy had a teardrop

 9   tattoo, right?

10   A.  Yes.

11              MR. DRATEL:  Nothing further.

12   REDIRECT EXAMINATION

13   BY MR. ARAVIND:

14   Q.  Ms. Torruella, you were asked questions on

15   cross-examination about the money that you took to your

16   mother's house.  Do you remember those questions?

17   A.  No.  Refresh my memory.

18   Q.  You were asked by Mr. Dratel about the money that you took

19   to your mom's house.

20              Do you remember that?

21   A.  Yes.

22   Q.  Did you ever look inside that bag and know the amount of

23   money that was in there?

24   A.  No.

25   Q.  Did you ever speak to David Barea about what was in that
```

1    bag?

2    A.  I asked him what was in the bag.  He said money from the

3    bank.

4    Q.  Did you ask him where that money came from?

5    A.  He said from the bank.

6    Q.  You were asked questions about the license plate of the car

7    that you went into when you went to your mom's house and back.

8    Do you remember those questions?

9    A.  Yes.

10   Q.  And you testified earlier that you remembered four digits.

11   Do you remember that?

12   A.  Yes.

13   Q.  When you were interviewed by the police, did you remember

14   four digits or more than four digits?

15   A.  I remember half of the letters of it, but as of now I don't

16   remember them.  At the time I did.  I just remember the four

17   numbers.

18   Q.  There were numbers and letters?

19   A.  Yes.

20   Q.  You remembered the numbers and some of the letters?

21   A.  Some of the letters.

22   Q.  When you were interviewed the afternoon and the evening of

23   the robbery, were you interviewed by yourself?  Was Mr. Barea

24   with you?

25   A.  I was by myself.  I was in the living room and David was in

1   the other room.

2   Q.  Do you remember the document that Mr. Dratel showed you

3   with those handwritten notes with the license plate?  Do you

4   remember that?

5   A.  No.

6   Q.  I am going to show you what has been marked 3506-11.  Just

7   take a quick look and give it back to Mr. Street.

8   A.  What am I looking at?

9   Q.  Look at those notes for a second.  You can give it back to

10  Mr. Street.

11          When you were speaking to law enforcement officers,

12  did you ever sign any statements that you made about the events

13  that night?

14  A.  I don't remember.  So much was so long ago, I don't

15  remember.

16  Q.  Did you speak to law enforcement officers on numerous

17  occasions?

18  A.  Yes.

19  Q.  Did you ever sign a statement with your description of what

20  happened that night?

21  A.  I don't remember.

22  Q.  Can you explain to the jury why you took the book bag back

23  to your mom's house?

24  A.  Because I was never home.

25  Q.  What do you mean by that?

1   A.  I work.  My son -- I'm always out with my son.  He's a

2   baseball player.  I'm in and out the house all day.  And then

3   the weekends, they don't stay with me.  And I'm barely home.  I

4   ate 9:00 at night.  And then I come back home and I leave in

5   the morning every day at 6, 7:00.  I have the same routine

6   every day.

7   Q.  You were asked questions on cross-examination about the

8   make of the car that day.

9           Do you remember that?

10  A.  Yes.

11  Q.  You said something about the car started with an A.  Can

12  you explain that to the jury?

13  A.  I don't know my cars that way.  My son is teaching me.  I

14  know the A is for the Acura.  So I told him that -- because it

15  had an A on it.

16  Q.  Now, you were asked questions about the photos that you

17  viewed.  Do you remember that?

18  A.  What photos?

19  Q.  The photos of different people.

20  A.  Yes.

21  Q.  For purposes of identification.  Do you remember that?

22  A.  Yes.

23  Q.  On how many occasions do you think that you saw photos

24  related to this investigation?

25  A.  I think only three or four times.

1   Q.  And during those three or four times, can you just give the

2   jury a sense of like how that process was?  What did that

3   process entail?

4   A.  It was a computer and they put like the description, what I

5   give the description of the person is and a bunch of pictures

6   pop up and then you got to go page by page.  It's a long

7   process.

8   Q.  Do you know exactly how many photographs you observed

9   during the course of this investigation?

10  A.  No.

11  Q.  If you could give an approximation.  I don't want you to

12  guess.  But just give an approximation.  Would it be over a

13  hundred?

14  A.  Yeah.  Yes.

15  Q.  Over 500?

16  A.  Maybe more.  It was a lot of pictures I saw.

17  Q.  You were asked questions about teardrops.  Do you remember

18  that?

19  A.  Yes.

20  Q.  Were the only photographs that you saw involving people

21  with teardrops or did you see other photos as well?

22  A.  They showed me other pictures because they are saying that

23  if the person had a case, it could have been from a long time

24  ago, so not to look at the tattoos, the hair, and the facial.

25  To look at other stuff, like the nose, the eyes, stuff like

1     that.

2     Q.  That's what you were instructed to do?

3     A.  Yes.

4     Q.  Did you follow those instructions?

5     A.  Yes.

6     Q.  And did some of the photographs that you looked at, did

7     some of them involve individuals without any teardrop tattoos?

8     A.  Yes.

9     Q.  You were asked questions by Mr. Dratel about the positive

10    identification you made.

11              Do you remember that?

12    A.  Yes.

13    Q.  Where you said it kind of looks like the guy, right?

14    A.  Yes.

15    Q.  Can you try to explain to the jury, when you made that

16    identification, what you were thinking about, how much time you

17    took, and what was going on through your mind?

18              MR. DRATEL:  Objection.

19              THE COURT:  Sustained.

20    Q.  Can you explain the process by which you made that

21    identification?

22    A.  The first thing I said when I saw the picture was that he

23    didn't have the teardrop here in the picture.  And Officer

24    Ellis said forget about the teardrop.  You have to look at the

25    face.

1    Q.  Then what did you do?

2    A.  I looked at the pictures and it looked like him.

3    Q.  You were asked questions about the in-court identification

4    that you made.  Do you remember those questions?

5    A.  No.

6    Q.  Do you remember the questions Mr. Dratel just asked you

7    about, that it was a no-brainer, that there was a black person

8    in one of these rows and it was a no-brainer.

9            Do you remember those questions, Ms. Torruella?

10           THE COURT:  Sorry.

11           For us to have a record, instead of nodding you have

12   to say yes.

13   A.  Can I have a moment?  I need a moment.

14   Q.  Take a moment.

15           THE COURT:  Mr. Street, could you escort the witness

16   out for just a minute.

17           THE DEPUTY CLERK:  Sure.

18           THE COURT:  Thank you.

19           (Pause)

20   Q.  Ms. Torruella, I have two more questions.

21           Do you want to be here today?

22   A.  Right now, no.

23   Q.  Ms. Torruella, sitting here today, do you believe that the

24   person sitting at the second table with the blue shirt is the

25   tall guy?

```
 1   A.  No.

 2   Q.  Why don't you believe that?

 3   A.  Features are different.  I can't.  I'm sorry.

 4   Q.  Ms. Torruella, can you please explain that answer.

 5   A.  It looks like him.  His eyes, but something is not -- I

 6   can't explain.

 7   Q.  I can't understand you.  I'm sorry.

 8   A.  I just kept looking.  It's not him.

 9           MR. ARAVIND:  Your Honor, may I have a moment?

10   Q.  Ms. Torruella, I don't want you to look at government

11   Exhibit 1000.  I want you to put that to the side.

12           MR. ARAVIND:  Your Honor, may I have just one moment?

13           THE COURT:  Yes.

14   Q.  Ms. Torruella, you said that something about the hair and

15   the facial part was different.  Can you explain?

16   A.  He had hair, I know that grows and you can cut it.  Just

17   looking at him from over there, it's not him.  He was more --

18   the features of the face was more in.

19           MR. ARAVIND:  Nothing further, your Honor.

20           MR. DRATEL:  No recross, your Honor.

21           THE COURT:  You may be excused.

22           (Witness excused)

23           THE COURT:  Let me ask counsel, would you like to take

24   your lunch break now or would you like to call your next

25   witness?
```

1          MS. TEEKEI:  Whatever the Court wants.

2          THE COURT:  Let's take the next witness.

3          MS. TEEKEI:  Thank you, your Honor.  The government

4    calls Detective Ellis Deloren with the NYPD.

5     ELLIS DELOREN,

6          called as a witness by the Government,

7          having been duly sworn, testified as follows:

8    DIRECT EXAMINATION

9    BY MS. TEEKEI:

10   Q.  Good afternoon.

11   A.  Good afternoon.

12   Q.  Where do you work?

13   A.  I currently work in the joint robbery task force.

14   Q.  Who is your employer?

15   A.  The New York City Police Department.

16   Q.  How long have you worked there?

17   A.  In the police department, total about 15 and a half years.

18   Q.  What is the joint robbery task force?

19   A.  Joint robbery task force is a task force comprised of NYPD

20   officers, detectives, like myself, agents from the Bureau of

21   Tobacco Alcohol and Firearms, and U.S. Marshals.

22   Q.  What does the task force do?

23   A.  We assist citywide investigations into very serious,

24   usually very violent armed robberies.

25   Q.  Prior to the task force, what squad were you assigned to?

1    A.  I was assigned to the Bronx robbery squad.

2    Q.  How long were you at the Bronx robbery?

3    A.  About six and a half years.

4    Q.  What types of crimes did Bronx robbery investigate?

5    A.  Bronx robbery investigates home invasion robberies and

6    pattern robberies in the Bronx.

7    Q.  What's a home invasion robbery?

8    A.  Home invasion robbery is a robbery that occurs inside

9    somebody's house, usually by way of a push-in where the

10   perpetrators force their way in through the door.

11   Q.  And you mentioned another type of robbery, a pattern

12   robbery.  What is that?

13   A.  Pattern robberies are when the same person or group of

14   individuals that we call crews are doing similar robberies,

15   either within one precinct or they are crossing precinct

16   boundaries or they are even crossing borough boundaries.

17   Q.  Detective, what are some of the investigative techniques

18   that you employed in your job at Bronx robbery?

19   A.  We employed a whole host of investigative techniques,

20   including interviews of witnesses, subpoenas, warrants, search

21   warrants, things like that.

22   Q.  Approximately how many investigations, robbery

23   investigations have you been involved with in your career?

24   A.  Hundreds.

25   Q.  And how many arrests have you made in your career?

E9UMCHA3                    DeLoren - direct

1   A.  I've been involved in thousands of arrests.  I've made

2   personally upwards of about 400.

3   Q.  In your experience at Bronx robbery, did it investigate its

4   cases on its own or were there occasions where it worked with

5   other law enforcement agencies?

6   A.  No.  It worked often with other law enforcement agencies.

7   Q.  What agencies?

8   A.  Well, in this particular case it was the FBI, but also with

9   the ATF, U.S. Marshals, also other local jurisdictions as well.

10  Q.  Approximately how many of your investigations involved

11  other agencies?

12  A.  Couple of dozen.

13  Q.  In the course of your duties as an NYPD detective, did you

14  participate in an investigation into a robbery that occurred on

15  March 25, 2013 in the Bronx?

16  A.  Yes.

17  Q.  When did you become involved?

18  A.  The morning of the 25th I became involved in that case.

19  Q.  How did you become involved?

20  A.  I was notified while I was in my office by a sergeant from

21  the Brooklyn firearms investigations unit that a home invasion

22  had occurred at a location in the Bronx.

23  Q.  What did you do after receiving that information?

24  A.  I responded to that location.

25  Q.  Where was that location?

1    A.   1403 Overing Street.

2    Q.   Did you go alone or with others?

3    A.   I went by myself, but other detectives met me there.

4    Q.   What, if anything, did you observe when you got there?

5    A.   When I got inside the apartment there were several

6    detectives, supervisor from the Brooklyn firearms investigation

7    unit as well as the two victims in this case, David and Emma.

8    Q.   What did you do when you first arrived?

9    A.   After I observed the scene I conferred with the detectives

10   who were already there, including the sergeant who called me on

11   the phone.  I then interviewed separately both victims.  And

12   then I surveyed the scene, noted any evidence that needed to be

13   collected.  I reached out to the NYPD's evidence collection

14   team and told -- and asked them to respond as well.

15   Q.   What's the evidence collection team?

16   A.   The evidence collection team is just a group of officers

17   who are specifically trained in the collection of evidence at

18   crime scenes.

19   Q.   And you mentioned that you interviewed the victims.  Can

20   you describe David Barea's appearance?

21   A.   David was -- it looked like he had been assaulted.  He had

22   several bruises on his legs and on his back that he had showed

23   me.

24   Q.   And you said you also interviewed Emma Torruella.  Did you

25   obtain a description of the car used during the robbery and

1   kidnapping?

2   A.  I did.

3   Q.  Without telling us what was said, what types of information

4   did you obtain about that car?

5   A.  She gave me a very detailed description of how the car

6   looked, including paint, as well as she gave me six of the

7   seven license plate digits.  She was absolutely positive about

8   the last four.  She was a little unsure about the position of

9   two in the front.  So she was absolutely certain about the four

10  at the end, but a little unsure about the two in the front.

11  Q.  And did you go inside of 1403 Overing?

12  A.  Yes.

13  Q.  What, if anything, did you observe inside of that location?

14  A.  The apartment was a mess.  It looked like it had been

15  searched.  Closets were pulled open.  Things were pulled out of

16  the closet.  Drawers were pulled open.

17  Q.  To your knowledge, was any evidence recovered from that

18  location?

19  A.  Yes.

20  Q.  What?

21  A.  Duct tape was recovered from the bed.

22  Q.  After interviewing the victims and observing 1403 Overing,

23  what did you do next?

24  A.  It was a -- I put the victims in my car and I drove them

25  back to my office.  But on the way we drove by a location so

1   that David, the male victim, could point out exactly where the

2   robbery started and where he was abducted.

3   Q.  And what location was that?

4   A.  1338 Croes Avenue.

5   Q.  What did you do after observing the location where the

6   robbery started?

7   A.  I took the victims back to my office.

8   Q.  What did you do back at your office?

9   A.  Back at my office we have a database called Photo Manager.

10  It's basically a database of mugshots of people arrested within

11  New York City.  I put them separately on separate machines.

12  Using some of the descriptions that they gave me, I was able to

13  come up with basically a list of possible photos for them to

14  look to to see if they can make an identification.

15  Q.  Did Mr. Barea identify anyone?

16  A.  Yes.  He identified two people.

17  Q.  Who?

18  A.  He identified Tyrone Brown and he also identified Steven

19  Glisson.

20  Q.  And what was Mr. Brown's status at that time?

21  A.  At that time he was a witness, as it was his house where

22  David was originally robbed and abducted.

23  Q.  And the second person who Mr. Barea identified, what was

24  his status?

25  A.  He was a suspect.

1        MS. TEEKEI:  Excuse me for one moment.

2   Q.  We will show you on the screen what's been entered into

3   evidence as Government Exhibit 2.

4        Do you recognize that?

5   A.  Yes.

6   Q.  Who is that?

7   A.  That's Tyrone Brown.

8   Q.  And showing you what's been marked as Government Exhibit 3,

9   do you recognize that individual?

10  A.  Yes.

11  Q.  Who is that?

12  A.  That's Steven Glisson.

13       MS. TEEKEI:  Your Honor, we just move to enter

14  Government Exhibit 2A, which is the name --

15       THE COURT:  Is that already in evidence, 2A,

16  Mr. Street?

17       THE DEPUTY CLERK:  No, it isn't.

18       THE COURT:  Any objection?

19       MR. DRATEL:  No objection, your Honor.

20       THE COURT:  Admitted.  You may publish it.

21       (Government's Exhibit 2A received in evidence)

22  Q.  Did you also mention that you showed photographs to

23  Ms. Torruella?  Did Ms. Torruella identify anyone?

24  A.  Yes.

25  Q.  Who?

1    A.   Steven Glisson.

2    Q.   After the photographs, what did you do next?

3    A.   I drove the victims home.

4    Q.   Did you do anything else with respect to the investigation

5    that day?

6    A.   I did a few reports that evening and then I went home

7    myself.

8    Q.   And the next day, what, if anything, did you do with

9    respect to the investigation?

10   A.   The next day, the first thing I did is I went to Tyrone

11   Brown's residence, 1338 Croes Avenue.

12   Q.   And why did you do that?

13   A.   To interview Tyrone Brown.

14   Q.   Can you describe for the jurors what's located at 1338

15   Croes Avenue?

16   A.   It's a side-by-side single-family house.

17   Q.   I'd like to show you what's been marked as Government

18   Exhibit 1901.

19          Do you recognize that?

20   A.   Yes.

21   Q.   What is it?

22   A.   It's a partial map of the Bronx.

23   Q.   And are there any locations marked on that map?

24   A.   Yes.   Three.

25   Q.   And what locations are marked there?

1    A.   The black dot represents 1338 Croes Avenue, the blue dot

2    represents 1403 Overing Street, and the red dot represents 1715

3    Bruckner Boulevard.

4    Q.   And do those dots represent fairly and accurately those

5    locations that you referenced?

6    A.   Yes.

7            MS. TEEKEI:   Your Honor, the government offers

8    Government Exhibit 1901.

9            MR. DRATEL:   No objection.

10           THE COURT:   It's admitted.

11           (Government's Exhibit 1901 received in evidence)

12           MS. TEEKEI:   May we publish it to the jury?

13           THE COURT:   You may.

14   Q.   Detective, can you just tell us, what's marked by that blue

15   dot on that map?

16   A.   Again, that's 1403 Overing Street.

17   Q.   And the black dot?

18   A.   The black dot is Croes Avenue, 1338 Croes Avenue.

19   Q.   And the red dot.

20   A.   1715 Bruckner Boulevard.

21   Q.   Going back to the investigation on March 26, 2013, why did

22   you want to interview Mr. Brown?

23   A.   Well, for obvious reasons.   He was a witness to the robbery

24   and abduction, and I also wanted to ascertain if he had any

25   role in it.

1    Q.  And why was that?

2             MR. DRATEL:  Objection.

3             MS. TEEKEI:  I'll move on, your Honor.

4             THE COURT:  Sustained.

5    Q.  Did you go alone?

6    A.  No.

7    Q.  Who did you go with?

8    A.  I was there with Detective Luis Perez from my office.

9    Q.  What did you do when you arrived at 1338 Croes Avenue?

10   A.  I went to the basement door where Tyrone Brown lived.  I

11   knocked on the basement door, an unknown female opened up the

12   door and directed me to Tyrone's Brown's room.

13   Q.  Can you just describe for the jury the layout of 1338 Croes

14   Avenue?

15   A.  The basement?

16   Q.  Yes.  Just generally the layout.

17   A.  The basement door is down the driveway.  You enter the

18   basement door.  There are several steps going down into the

19   basement which I would guess at one point was an apartment, but

20   it seemed at the time it was broken into single-room

21   occupancies.  So you walk down the stairs and you're in a

22   common kitchen area.  And then off to the left is a common

23   bathroom.  And then as you look to the right, there are several

24   bedrooms, and Tyrone's bedroom was the second door on the left.

25   Q.  I am going to show you what's been marked as Government's

1    Exhibits 50 through 60.  If you could just take a moment and

2    look through them.

3    A.   Okay.

4    Q.   Do you recognize those?

5    A.   Yes.

6    Q.   What are they?

7    A.   They are pictures of the exterior and the basement interior

8    of 1338 Croes Avenue.

9    Q.   Do those photographs fairly and accurately represent

10   certain areas outside of and inside the building at 1338 Croes

11   Avenue?

12   A.   Yes.

13             MS. TEEKEI:  Your Honor, the government offers

14   Government Exhibits 50 through 60 into evidence.

15             MR. DRATEL:  No objection.

16             THE COURT:  They are admitted.  You may publish them.

17             MS. TEEKEI:  Thank you, your Honor.

18             (Government's Exhibits 50-60 received in evidence)

19             MS. TEEKEI:  Ms. Hansma, can you please show

20   Government Exhibit 50.

21   Q.   Detective Deloren, can you describe what we are looking at?

22   A.   Yeah.  That's the front of 1338 Croes Avenue.  You could

23   also see the driveway that leads down towards the basement

24   door.

25             MS. TEEKEI:  So if you could flip to the next exhibit,

E9UMCHA3                        DeLoren – direct

1    Ms. Hansma, Government Exhibit 51.

2    Q.  And what does that depict?

3    A.  That's the driveway leading to the backyard and you can see

4    the gray door on the right.  That's the basement door that

5    leads into the apartment.

6    Q.  And Government Exhibit 52.

7    A.  That's the basement door.

8    Q.  And then 53, what does that depict?

9    A.  That's the driveway looking from the backyard out towards

10   the street.  And if you look closely atop the red paint on the

11   corner there is a small camera.

12   Q.  Detective, there should be a laser pointer.

13   A.  I see it.

14   Q.  Can you show us where that camera is located?

15   A.  Right there.

16   Q.  Government Exhibit 54.  What does that depict?

17   A.  So that's looking in from the basement door looking into

18   the basement.

19            (Continued on next page)

20

21

22

23

24

25

1    BY MS. TEEKEI:

2    Q.   And government exhibit 55, what does that depict?

3    A.   That's the common area of the kitchen.

4    Q.   Number 56, what does that depict?

5    A.   That's looking from the kitchen into the common bathroom

6    that everybody shares.

7    Q.   Number 57, what does that depict?

8    A.   That's looking back out at the basement door as if you were

9    to leave.

10   Q.   And number 58, can you describe what that depicts?

11   A.   That's also the driveway looking out towards the street.

12   Q.   Number 59, what does that depict?

13   A.   That's also the camera that I pointed out earlier.  This is

14   just looking at it from the front.

15   Q.   And the last one, government exhibit 60, what does that

16   depict?

17   A.   So that is after you step inside the basement door looking

18   up, I guess towards the main residence, those are stairs going

19   up to the main residence.  And if you look closely at the top

20   of the door in the corner, there is also another camera that is

21   pointed down.

22   Q.   You mentioned earlier, and you've now described the

23   cameras.  Did you see video surveillance that day when you went

24   to 1338 Croes Avenue?

25   A.   I did indeed.

1   Q.  Can you describe the video surveillance system as you

2   observed it?

3   A.  As you can see there, that's the leading into the I guess

4   the main corridors or main apartment of the house where the

5   owners live.  And that's where the surveillance system is

6   located.

7           In the master bedroom they have a DVR system as

8   opposed to a desk top computer.  And it's hooked up to a large

9   flat screen TV, and you can view it, you can view the camera

10  live right from the bedroom.

11  Q.  And did you see actual video that day when you went to the

12  1338 Croes Avenue?

13  A.  Yes.

14  Q.  And how did that come about?

15  A.  The landlord's son, he brought us into the bedroom and

16  allowed us to access the system.

17  Q.  Can you describe for the jury the video that you saw?

18  A.  Sure.  The video first depicts David Barea walking down the

19  driveway.  He gets to the basement door as I showed you in the

20  pictures.  He knocks on the door.  He stands outside the door

21  for a good 30 to 60 seconds waiting for Tyrone Brown to open

22  the door.  Eventually Tyrone let's him in.  They go in outside

23  of view of the camera.

24          Shortly after he goes in, two males come down the

25  driveway and they wait outside the basement door for several

1   minutes, for what appears to be waiting for them, waiting for

2   David Barea to leave.

3            The video shows David Barea leaving through the

4   basement door.  And as he opens up the door, he is accosted by

5   these two males, who then push him back inside the basement

6   apartment.

7   Q.  What, if anything, did you do -- I'm sorry, was that -- did

8   you observe anything else with the video?

9   A.  Yes.  A short while after they were pushing back in,

10  outside of the view of the camera you see then David Barea with

11  a hood pulled up over his head and his hands behind his back

12  being escorted out of the basement into the driveway -- up the

13  driveway to a waiting car.

14  Q.  What, if anything, did you do while viewing the video

15  surveillance?

16  A.  I recorded it using my iPhone.

17  Q.  Why?

18  A.  I wasn't in a position already to make a copy.  I didn't

19  have anything with me to make a copy.  So I wanted to get -- I

20  wanted to preserve it in case, you know, from that time and the

21  time I came back to actually make a copy, the system breaks or

22  it gets erased.  So I just wanted to make sure that I had a

23  copy of the video.

24  Q.  Did there come a time when you obtained a copy of what was

25  on the system at the landlord's house?

1    A.  Yes.

2    Q.  Tell the jury how you did that?

3    A.  A day or two after my initial viewing of the video, I went

4    back to the location with a zip drive.  I plugged it into the

5    DVR system and I -- there is a function on the system that

6    allows you to play it back and record it at the same time onto

7    that zip drive, and I did that.

8    Q.  And what did you do with that copy?

9    A.  It was transposed to a disk and given to the U.S.

10   Attorney's Office.

11   Q.  I'm showing you what's been marked as government exhibit

12   exhibits 200 and 201.  Do you recognize those exhibits?

13   A.  Yes.

14   Q.  Have you had a chance to review the contents of those

15   exhibits?

16   A.  Yes, I have.

17   Q.  And are your initials on there?

18   A.  Yes, they are.

19   Q.  What are those exhibits?

20   A.  This disk is the video from inside the basement of the

21   stairway.

22   Q.  You say --

23            THE COURT:  You say this, which exhibit?

24            THE WITNESS:  I'm sorry.  Exhibit 200.

25            THE COURT:  Thank you.

1          THE WITNESS:  And Exhibit 201 is from the driveway.

2          MS. TEEKEI:  Your Honor, the government moves to enter

3    into evidence government exhibits 200 and 201?

4          MR. DRATEL:  No objection.

5          THE COURT:  They're admitted.

6          (Government's Exhibits 200 and 201 received in

7    evidence)

8    Q.  Detective, were you able to obtain video -- you mentioned

9    several other robbery, several other locations associated with

10   the incident of March 25th, 2013.  Were you ever able to obtain

11   surveillance video from any of those other locations?

12   A.  No.

13   Q.  Why is that?

14   A.  There were cameras at 1403 Overing Street, but they were

15   not working.  And there were no cameras at 1750 Bruckner

16   Boulevard.

17   Q.  Going back to your investigation on March 26, 2013, did you

18   contact Tyrone Brown that day?

19   A.  I'm sorry, what was the date?

20   Q.  On March 26, 2013?

21   A.  Yes, I did.

22   Q.  How did you do that?

23   A.  I called him on my cell phone.

24   Q.  Whose cell phone did you use?

25   A.  I used mine.

E9UZCHA4                          Deloren - direct

1   Q.  And what are the last four digits of your cell phone?

2   A.  1507.

3   Q.  Did you speak with him by phone that day?

4   A.  Yes.

5   Q.  What, if any, instructions did you give him?

6   A.  I told him to meet me back at my office on Simpson Street.

7   Q.  Did he meet you?

8   A.  No.

9   Q.  What, if anything, did you do after that day to locate

10  Tyrone Brown?

11  A.  Um, I interviewed a couple of his relatives, including the

12  mother of his child.  She provided me I guess more up to date,

13  more recent cell phone number that she had been communicating

14  with him on.  And with that information I was able to obtain

15  what we call a trap and trace warrant, which allows us to

16  locate a cell phone using GPS.

17  Q.  And what is GPS?

18  A.  Coordinates that computers and satellites can use to

19  pinpoint locations.

20  Q.  What is a track trap and trace warrant?

21  A.  It's a warrant that gives us permission, through the

22  courts, the ability to do that tracking that I just described.

23  Q.  Were you able to locate Tyrone Brown?

24  A.  Yes.

25  Q.  When did that happen?

E9UZCHA4                         Deloren – direct

1   A.  April 6, 2013 -- I'm sorry -- April 8th, 2013.

2   Q.  And where did you locate him?

3   A.  He was staying at a friend's house 1810 Watson Avenue in

4   the Bronx.

5   Q.  And was anyone there with you when you located him?

6   A.  Other officers.

7   Q.  Was anyone there when you located him?

8   A.  Well, yes.  There were other people in the apartment, and

9   there were also other officers with me when I went there.

10  Q.  What happened when you got to 1810 Watson Avenue?

11  A.  Tyrone Brown was placed under arrest.

12  Q.  What for?

13  A.  Narcotics possession.

14  Q.  Did you collect any evidence in connection with that

15  arrest?

16  A.  I did.

17  Q.  What?

18  A.  Crack.

19  Q.  I'd like to show you what's been marked as government

20  Exhibit 600.  Do you recognize that exhibit?

21  A.  Yes.

22  Q.  What is that?

23  A.  These are the items that were recovered inside the

24  apartment that Tyrone Brown was in.

25          MS. TEEKEI:  Your Honor, we move to admit government

1  Exhibit 600 into evidence?

2          MR. DRATEL:  Just my previous objection, your Honor.

3          THE COURT:  Okay.  It's admitted.

4          (Government's Exhibit 600 received in evidence)

5          MS. TEEKEI:  Your Honor, may we publish it to the

6  jury?

7          THE COURT:  You may.

8          MS. TEEKEI:  Thank you.

9          THE COURT:  Just to be clear to the jury, this is

10  crack that was found at the location where Brown was, and for

11  which Brown was placed under arrest; is that right?

12          THE WITNESS:  Yes, ma'am.

13          THE COURT:  Okay.

14          MS. TEEKEI:  Your Honor, may I approach the witness?

15          THE COURT:  Yes.

16          MS. TEEKEI:  Thank you.

17          THE COURT:  Actually, Mr. Street.

18          MS. TEEKEI:  Thank you, Mr. Street.

19          THE DEPUTY CLERK:  You're welcome.

20  Q.  Detective, are there other materials in government Exhibit

21  600?

22  A.  Yes.

23  Q.  What else is here?

24  A.  The large area there, that's marijuana on the lower left

25  side.  And there's also a scale in there that's used for

1   weighing crack or marijuana even, I guess.

2   Q.   Detective, did there come a time when you located a car

3   that matched the description of the car that was provided by

4   Ms. Torruella when you interviewed her?

5   A.   Yes.

6   Q.   Where were you when you first located that car?

7   A.   In front of Zaporia Dunbar's apartment or house.

8   Q.   And what was that location?

9   A.   Um, I'm sorry, the address escapes me.  It's on Barnes

10  Avenue within the confines of the 47th Precinct.

11  Q.   What's the 47th Precinct?

12  A.   That's the north end of the Bronx, north of Gun Hill Road.

13  Q.   Is there anything to show you to refresh your recollection

14  as to the address you were at when you first observed that

15  vehicle?

16  A.   One of my DD5s perhaps, or one of the photographs of the

17  location.

18              MS. TEEKEI:  Your Honor, may I?

19              THE COURT:  Yes.

20              MS. TEEKEI:  Thank you.

21              THE COURT:  About how much longer do you have for the

22  direct of this witness?

23              MS. TEEKEI:  Your Honor, I have approximate another 20

24  minutes.

25              THE COURT:  Okay.  When you reach a convenient

1    stopping point, perhaps the end of this topic, I'd like to take

2    the lunch break.

3              MS. TEEKEI:  Your Honor, we can take that break now if

4    you would like, as we're looking for --

5              THE COURT:  Okay.

6              MS. TEEKEI:  -- notes.

7              THE COURT:  Why don't we break for lunch, ladies and

8    gentlemen.  We have an hour.  It's 12:42.  Why don't we meet at

9    1:45 and we'll begin again.

10             Remember not to talk about the case.  Enjoy your

11   lunch.  Thank you.

12             (In open court; jury not present)

13             THE COURT:  Okay, we're adjourned to 1:45.

14             MS. TEEKEI:  Thank you, your Honor.

15             MR. DRATEL:  Thank you, your Honor.

16             (Luncheon recess)

17             A F T E R N O O N   S E S S I O N

18             (In open court; jury not present)

19             1:45 p.m.

20             THE COURT:  Yes.

21             MR. ARAVIND:  Before we're on the record, your

22   Honor --

23             THE COURT:  Before or.

24             MR. ARAVIND:  When we're on the record.

25             THE COURT:  Okay.  We are on the record.  Go ahead.

1              MR. ARAVIND:  Just to let the Court and defense

2      counsel know that one of our witnesses accidentally walked into

3      the jury room just now, this is detective Rodrigo Ayala.  My

4      understanding is that he did not say anything and he promptly

5      walked back out.  I just wanted to let the parties know that.

6              THE COURT:  Okay.  Thank you.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury entering)

2           THE COURT:  Okay, you can all be seated.

3           THE DEPUTY CLERK:  We're missing two people.

4           THE COURT:  We're missing three.

5           THE DEPUTY CLERK:  No, one is here.

6           (Jury present)

7           THE COURT:  Okay, let's proceed.

8           THE DEPUTY CLERK:  I want to remind you, you're still

9     under oath.

10          THE WITNESS:  Okay.

11    BY MS. TEEKEI:

12    Q.  Detective Deloren, earlier in your testimony I asked you to

13    look at what was government Exhibit 3.  Do you still have that

14    in front of you?

15    A.  No, I do not, no.  I was never handed the actual photo.  It

16    was put up on the screen.

17    Q.  I'm sorry.  If you could look at the screen, thank you.

18    Who is that person?

19    A.  That's Steven Glisson.

20          MS. TEEKEI:  And, your Honor, the government offers

21    government Exhibit 3A, which is just the name plate?

22          THE COURT:  Any objection?

23          MR. DRATEL:  No objection.

24          THE COURT:  Admitted.

25          (Government's Exhibit 3A received in evidence)

1          MS. TEEKEI:  Thank you, your Honor.

2     Q.  Detective, before we broke for lunch, we were -- I asked

3     you whether there came a time when you located a car that

4     matched the description of the car that was provided by Ms.

5     Torruella when you first interviewed her.  Do you recall that

6     testimony?

7     A.  Yes.

8     Q.  And I asked you where you were when you first located that

9     car, and you had -- and then I asked you if there was something

10    that could refresh your recollection.  And I'm going to hand

11    you what's been marked as 3502-16, page 34.

12          Could we take a look at that?  Okay.  If you just put

13    that to the side.

14          Does that refresh your recollection as to the location

15    where you were when you first located the car that you

16    described earlier?

17    A.  Yes.

18    Q.  And where were you when you first located that car?

19    A.  In front of 4782 Barnes Avenue in the Bronx.

20    Q.  Were you alone or with others?

21    A.  I was with others.

22    Q.  What, if anything, did you observe when you arrived at that

23    location?

24    A.  I observed the car parked directly in front.

25    Q.  What is that location?

1    A.   That's Zaporia Dunbar's residence.

2    Q.   What type of residence is that?

3    A.   A multi-family house.

4    Q.   And after you observed that car, what, if anything, did you

5    do?

6    A.   I observed Zaporia Dunbar get in the car.  She drove to a

7    school, and then she drove back home, and then I interviewed

8    her at her residence.

9    Q.   Was anyone else present during that interview?

10   A.   Yes.

11   Q.   Who?

12   A.   Detective Angelo Tessitore and Special Agent John Reynolds.

13   Q.   Other than Detective Tessitore and Special Agent Reynolds,

14   was anybody else present?

15   A.   Zaporia Dunbar and her infant son.

16   Q.   And what was her son's name?

17   A.   Dante.

18   Q.   Did there come a time when you obtained her son's full

19   name?

20   A.   Yes.

21   Q.   And what is that?

22   A.   Dante Chambers.

23   Q.   After you interviewed Ms. Dunbar that day, did you

24   interview her again?

25   A.   Um --

E9UZCHA4                         Deloren - direct

1   Q.  In 2013 after you -- let me just rephrase.

2           In 2013, after you interviewed Ms. Dunbar, did you

3   interview her again?

4   A.  No.

5   Q.  Did you try to?

6   A.  Yes.

7   Q.  What did you do?

8   A.  I went to her residence on Barnes Avenue several times.  I

9   even went to her kid's school to try and contact her there,

10  but, you know, obviously during, during the school day when the

11  kids were there, when students were there, not her kids.

12  Q.  When you went to her home, were you able to locate her?

13  A.  No.

14  Q.  And when you went to her children's school, was she there?

15  A.  No.

16  Q.  Were any of her children there?

17  A.  No.

18  Q.  And was it a school day?

19  A.  Yes.

20  Q.  During school hours?

21  A.  Yes, it was.

22  Q.  Going back to that car and that you testified about

23  earlier, what, if anything -- let me rephrase.

24          What day did you interview Ms. Dunbar?

25  A.  The date?

1    Q.  Yes.

2    A.  If I can refer to the same?

3    Q.  Yes, you may.

4    A.  It was May 23rd, 2013.

5    Q.  And did there come a time when you saw that car again?

6    A.  Yes.

7    Q.  And when was that?

8    A.  It was on or about June 6th, 2013.  It was in an auto

9    collision lot.  It had been in a motor vehicle accident.

10   Q.  How were you able to locate the car?

11   A.  In between that time, I had done what we call a license

12   plate reader check on the car.  We can put a license plate into

13   a car and NYPD has numerous data bases where if a car goes

14   through a city owned camera, or any of our numerous license

15   plate readers, or if it gets a ticket, or if it gets into an

16   accident, it will come up on this inquiry that I did.

17   Q.  And what did -- after you did that inquiry, what is the

18   next thing you did?

19   A.  I went to that auto collision lot pound or whatever,

20   storage facility.

21   Q.  And why was the car at that facility?

22   A.  Because it was in fact in a motor vehicle accident.

23   Q.  When?

24   A.  I don't know the exact date.  Sometime in between when I

25   interviewed -- when I first saw the car and I interviewed

1    Ms. Dunbar and that day.  So somewhere over the previous two

2    weeks.

3    Q.  When you went to the tow facility, what, if anything, did

4    you observe about the car that day?

5    A.  It was a wreck.  It had obvious damage to it from, looked

6    like a pretty severe serious accident.

7    Q.  Did you search that vehicle?

8    A.  Yes.

9    Q.  What, if anything, did you find?

10   A.  On the floor in the back seat I recovered a hammer.

11   Q.  Detective, I'm going to show you what's been marked as

12   government exhibit 500.  You can take a moment and look at it

13   and --

14   A.  Okay.

15   Q.  What is that?

16   A.  This is the hammer that I recovered from the back seat from

17   the floor of that car.

18           MS. TEEKEI:  Your Honor, the government offers

19   government exhibit 500?

20           MR. DRATEL:  No objection.

21           THE COURT:  It's admitted.

22           (Government's Exhibit 500 received in evidence)

23   A.  Sorry.

24           THE COURT:  Do you mind if I ask a question?  How do

25   you know that's the hammer you found?  Did you initial it or

 1    did you put something on it, or it's just from the evidence

 2    bag?

 3              THE WITNESS:  From the evidence bag.  I also remember

 4    what it looked like.

 5              THE COURT:  Okay, thank you.

 6    Q.   Can you describe the hammer, government exhibit 500?

 7    A.   Describe it?

 8    Q.   Yes.

 9    A.   It's a hammer.  It has a light colored handle with a metal

10    top.

11    Q.   Did you find anything else in the car?

12    A.   No.

13    Q.   Any other tools?

14    A.   No.

15    Q.   Detective, did there come a time when you obtained a

16    photograph of Antione Chambers?

17    A.   Yes.

18    Q.   And describe the photograph that you obtained?

19    A.   The photograph was provided by the FBI.  It was an old

20    photograph from I believe 2003 or 2004.  It was also on the

21    grainy side, fuzzy.

22    Q.   Did you show that photograph to anyone?

23    A.   Yes.

24    Q.   Describe the procedure that you used?

25    A.   I used the NYPD's photo array procedure.  So the photo was

E9UZCHA4                    Deloren - direct

1   placed into what we commonly refer to as a six pack where it's

2   a photo and five other fillers on the same page, and it is

3   presented to the, to the witness to see if they can identify

4   the subject.

5   Q.  What is a filler?

6   A.  Fillers are pictures that we pull from photo management

7   system, that data base that I talked about earlier we use.  I

8   go through it personally and I try to pull pictures that

9   somewhat resemble, as best I can, the subject.

10  Q.  And what is the law enforcement purpose of a photo array?

11  A.  To make an identification, a positive identification.

12  Q.  And, just generally, what, if any, instructions do you give

13  to a witness before showing him or her a photo array?

14           MR. DRATEL:  Objection.

15           THE COURT:  I'll allow it.

16  A.  Generally, I will instruct the witness to view the photo

17  array, take as much time as they like; don't assume that I know

18  who the suspect is; and the suspect, the person who committed

19  the crime may or may not be in the photo array.

20  Q.  The older photograph that you just described, who did you

21  show -- who, if anyone, did you show that array to?

22  A.  I showed it to Emma Torruella and Demi Torres.

23  Q.  Together or separately?

24  A.  Separately.  Different times, different locations.

25  Q.  And did you provide them with the instructions that you

1    just described?

2    A.  Yes, I did.

3    Q.  Did either of them sign or circle a picture from that

4    array?

5    A.  No.

6    Q.  Did either of them indicate that they recognized the

7    defendant?

8    A.  Yes.

9    Q.  Who?

10   A.  Demi Torres, when I showed her the photo array, indicated

11   that she in fact recognized Antione Chambers.

12   Q.  Did you show any other photos of Mr. Chambers to Ms.

13   Torruella the day that you showed her the photo array with the

14   older photograph?

15   A.  No.

16   Q.  On the day that you showed the photo array with the old

17   photograph to Ms. Torres, did you show her any photographs of

18   Mr. Chambers?

19   A.  Yes.

20   Q.  What?

21   A.  We were at my office.  After she recognized Mr. Chambers in

22   the photo array, we were able to locate pictures or a picture

23   of Antione Chambers on the internet from a newspaper article.

24   Q.  And did you show her a picture from that article?

25   A.  Yes.

1    Q.   Why?

2    A.   One, it was to -- well, to determine, one, if that was

3    actually Antione Chambers in that picture.  I couldn't tell

4    myself.  Also, to confirm her recognition in the photo array.

5    Q.   And why did you want to do that?

6    A.   Well, again, the photo that we used in the photo array was

7    very old and fuzzy.  So I felt that as the investigation was

8    going on, to get a positive identification of Mr. Chambers

9    would be necessary.

10   Q.   And why did you -- let me rephrase.

11          What was the purpose of trying to identify Mr.

12   Chambers?

13   A.   So that we could arrest him, so that we could arrest him

14   and charge him with this crime.

15   Q.   The photograph that Ms. Torres -- that you showed

16   Ms. Torres from the article, did she sign and circle it?

17   A.   No.

18   Q.   Did there come a time when Ms. Torruella circled and signed

19   any pictures of the man who kidnapped her the night of the

20   robbery?

21   A.   Yes.

22   Q.   When was that?

23   A.   That was on or about June 6th, 2013.

24   Q.   Where were you?

25   A.   In front of her place of business or work.

E9UZCHA4                          Deloren - direct

1    Q.   How did that come about?

2    A.   The photograph or the photo array?  I'm not sure what

3    you're asking me.

4    Q.   Fair enough.  I'll rephrase.

5          Let me ask you first, was anybody else present when

6    you showed her the photo array?

7    A.   No.

8    Q.   And whose picture did she circle and sign?

9    A.   Antione Chambers.

10   Q.   Did there come a time when Ms. Torres circled and signed

11   any pictures of a man who was in her apartment with her mother

12   on March 25th, 2013?

13   A.   Yes.

14   Q.   When was that?

15   A.   Same day, about an hour later, at a separate location.

16   Q.   And where were you when you showed Ms. Torres the pictures?

17   A.   It was in front of a pizza shop on Westchester Square.

18   Q.   Was anybody else present?

19   A.   No.

20   Q.   Whose picture did Ms. Torres circle and sign?

21   A.   She signed an updated newer photo that we obtained of

22   Antione Chambers, also in a photo array.

23   Q.   Detective, did there come a time when you participated in

24   an arrest of Antione Chambers?

25   A.   Yes.

1  Q.  And when did that happen?

2  A.  July 15th, 2013.

3  Q.  I'd like to show you what's been marked as government

4  Exhibit 4.  Do you recognize that?

5  A.  Yes.

6  Q.  What is that?

7  A.  That's a photo of Antione Chambers.

8         MS. TEEKEI:  Your Honor, the government offers

9  government Exhibit 4?

10        MR. DRATEL:  No objection.

11        THE COURT:  Admitted.

12        (Government's Exhibit 4 received in evidence)

13        MS. TEEKEI:  Thank you.  May we publish it to the

14  jury?

15        THE COURT:  You may.

16  Q.  Detective Deloren, does that picture fairly and accurately

17  depict Mr. Chambers when he was arrested?

18  A.  No.

19  Q.  Detective Deloren, are you familiar with an individual

20  named Kentrell Ferguson?

21  A.  Yes.

22  Q.  How do you know him?

23  A.  Through interviews during this investigation.

24  Q.  When was the last time that you spoke with him, most

25  recently?

E9UZCHA4                          Deloren - direct

1   A.   10 minutes ago in the witness room.

2   Q.   Before that, when was the last time you spoke with him?

3   A.   Yesterday.

4   Q.   And apart from your discussion with him, what, if anything,

5   did he show you?

6   A.   He showed me a phone contact in his cell phone that listed

7   four --

8            MR. DRATEL:   Objection, hearsay.

9            THE COURT:   He's describing what --

10            MR. DRATEL:   Hearsay.

11            THE COURT:   You're describing what you saw?

12            THE WITNESS:   Yes, ma'am.

13            THE COURT:   You saw something in writing and it was

14   numbers?

15            THE WITNESS:   And letters as well.   There was also a

16   name.

17            THE COURT:   I'll allow it.

18            MR. DRATEL:   It's still hearsay.   That's my objection.

19            THE COURT:   Okay, I'll allow it.

20   Q.   What, if anything, did you observe when you interviewed

21   Mr. Ferguson?

22   A.   I observed this phone contact in his phone that listed

23   several phone numbers, and the name Twizzie.

24   Q.   I'd like to show you what's been marked as government

25   Exhibit 4000.   Do you recognize that?

1    A.  Yes.

2    Q.  What is that?

3    A.  It's a printout of the picture that I took of that phone

4    contact.

5            MS. TEEKEI:  Your Honor, the government offers

6    government Exhibit 4000.

7            MR. DRATEL:  Objection.

8            THE COURT:  May I see it?

9            THE WITNESS:  Yes, ma'am.

10           THE COURT:  I'll allow it.

11           (Government's Exhibit 4000 received in evidence)

12           MS. TEEKEI:  Thank you, your Honor.  May we publish it

13   to the jury?

14           THE COURT:  You may.

15   Q.  Detective Deloren, can you just describe what we're -- what

16   this image depicts, since it appears to be a little bit fuzzy?

17   A.  Okay.  So that basically is a picture of Kentrell

18   Ferguson's phone.  The fuzziness that you described are

19   actually cracks in the glass on his phone.  And that's the

20   contact with the name Twizzie on top, and the numbers that are

21   associated with it.

22   Q.  Thank you, Detective.

23           MS. TEEKEI:  Thank you, Ms. Hansma.

24   Q.  Detective, earlier when we showed you government Exhibit 4,

25   I asked you if that picture fairly and accurately depicted the

1    defendant when he was arrested and you indicated it did not.

2    How, what were the differences?

3    A.  Well, especially it was his hair.  His hair was much longer

4    and in braids when we arrested him.

5    Q.  Any other differences?

6    A.  I can't, I can't tell.  I'm sorry.

7              MS. TEEKEI:  No further questions -- yes, your Honor,

8    one other.  We offer government Exhibit 4A, which is the name

9    that goes with government Exhibit 4?

10             THE COURT:  Any objection?

11             MR. DRATEL:  No objection.

12             THE COURT:  Admitted.  You may publish it.

13             (Government's Exhibit 4A received in evidence)

14             MS. TEEKEI:  Thank you, your Honor.  No further

15   questions at this time.

16             MR. DRATEL:  Just one moment, your Honor, if I may.

17   CROSS EXAMINATION

18   BY MR. DRATEL:

19   Q.  Good afternoon, Detective Deloren.

20   A.  Good afternoon, counsel.

21   Q.  Now, you just talked about that in between photo arrays

22   with Demi Torres -- and just to place it again Demi Torres is

23   Ms. Torruella's daughter, correct?

24   A.  Yes.

25   Q.  And in between showing her photo arrays, one when, in March

Deloren - cross

1   of 2013?

2   A.  No.

3   Q.  When did you show her the first photo array?

4   A.  Of the defendant?

5   Q.  Yes.

6   A.  First photo array was the last week of May.  We didn't

7   get -- we didn't have the defendant's name or identification

8   until --

9   Q.  That was the one where she said she recognized him, but

10  didn't positively identify him as the person as the robber,

11  correct?

12  A.  That is correct.  She definitely recognized him, though,

13  as --

14  Q.  Please answer my questions.  She didn't -- she said he was

15  not the robber.  She couldn't positively identify him as the

16  second robber, correct?

17  A.  She did not say he was not the robber.

18  Q.  I'm asking you questions.  She did not positively identify

19  him -- please listen to my question.

20          MS. TEEKEI:  Objection, your Honor, argumentative.

21          THE COURT:  Overruled.

22  Q.  She did not positively identify him as the robber, correct?

23  A.  Correct.

24  Q.  Now, by the way, you never wrote a report -- withdrawn.

25          And then you showed her a photo from the internet,

Deloren – cross

1   correct?

2   A.  Yes.

3   Q.  There is no report of that, is there?

4   A.  No.  No, sir.

5   Q.  You never wrote a report, right?

6   A.  Right.

7   Q.  In fact, you never told the prosecutors in this case until

8   February of this year that you had done that, correct?

9   A.  That's not true.

10  Q.  When did you tell the Prosecutors that you had done that?

11  A.  As far as I remember, the U.S. Attorney's Office was aware

12  of those, those photos from the beginning.

13  Q.  From the very beginning?

14  A.  Yes.

15  Q.  They knew that you took a photo off the internet to show,

16  to show this person a single photo of him alone basically,

17  right?

18  A.  Someone that I thought was him.  I wasn't sure if it was

19  him.

20  Q.  You showed her a photo -- you looked him up on the

21  internet, right?

22  A.  Yes.

23  Q.  See what did you put in, Antione Chambers, right?  And you

24  found a photo with the caption that said Antione Chambers,

25  right?

1    A.  Yes.

2    Q.  And you're claiming now that you didn't know whether it was

3    him or not; is that what you're claiming?

4    A.  What I'm claiming, sir, is that --

5    Q.  No, I'm asking you.  Are you claiming that you didn't think

6    it was him when you showed her the photo?

7            MS. TEEKEI:  Objection.

8    Q.  That's a yes or no?

9            MS. TEEKEI:  Let him finish.

10           THE COURT:  Overruled.  Do let him finish the answer.

11   A.  My claim is even at the time I was not 100 percent certain

12   that the person that I was looking at was in fact the

13   defendant.

14   Q.  You say the person you're looking at.  In the photo array?

15   A.  No.  On the internet.

16   Q.  It said Antione Chambers, right?

17   A.  Yes.

18   Q.  Okay.

19           MR. DRATEL:  Your Honor, I would like to -- well, I'd

20   like to approach the witness and show him what we marked as

21   3502-18-1.

22           THE COURT:  You may approach.

23           MR. DRATEL:  Thank you, your Honor.

24           MS. TEEKEI:  Your Honor, I just have an objection

25   based on what the witness's failure to remember.

1          MR. DRATEL:  It's not about failure to remember.

2          THE COURT:  Let's just continue questioning.

3          MR. DRATEL:  Tell you what, I'm going to put in a

4    better version of this.  Mark this as defendant's A, your

5    Honor.

6    Q.  Tell me, Detective Deloren, do you recognize that?

7    A.  Yes.

8    Q.  You recognize that?

9    A.  Yes, I do.

10   Q.  What is it?

11   A.  That's the picture from the internet.

12   Q.  Right.  That you downloaded and showed to Demi Torres,

13   correct?

14   A.  Yes.

15   Q.  In May of 2013, correct?

16   A.  Yes.

17          MR. DRATEL:  I move it as defendant's A, your Honor?

18          THE COURT:  Any objection?

19          MS. TEEKEI:  Objection, hearsay, your Honor.

20          THE COURT:  Overruled.

21          (Defendant's Exhibit A received in evidence)

22   Q.  Now, again, you never wrote a report of that event, right?

23   A.  Correct.

24   Q.  And now where in, by the way, in the manual for the NYPD

25   does it say when you have a photo array and you don't get a

Deloren - cross

1    positive ID, that you then show the witness a single photo of

2    the defendant, where does it say that?

3    A.  It doesn't.

4    Q.  Right.  Because you're not allowed, right?

5    A.  No.

6    Q.  Withdrawn.  You're not supposed to do that, correct?

7    A.  In most cases, yes.

8    Q.  No.  How but you're not supposed to do that, ever?

9    A.  In most cases.

10          MS. TEEKEI:  Objection, your Honor.

11          THE COURT:  Overruled.

12   Q.  You do that on a regular basis?

13   A.  Again not on a regular basis, but in some of the cases,

14   yes.

15   Q.  When you really want a positive ID, right?

16   A.  No.

17   Q.  That's what you said before, you wanted someone to ID

18   Chambers so you could arrest him, right?

19   A.  Well, that -- no, no.  I said that's the purpose of

20   identification.

21   Q.  That was your objective when you had Ms. Torruella circle

22   and sign.  You don't -- you didn't testify to that just before?

23   A.  Repeat your question, please.

24   Q.  You didn't testify that one of the -- that the reason --

25   you were asked why did you show those multiple photos to

Deloren - cross

```
 1   Ms. Torres.  You said to get a positive ID of Mr. Chambers,
 2   right?
 3   A.  Yes.  The purpose of showing any photos is to get a
 4   positive identification.
 5   Q.  No. I'm asking you that photo.
 6   A.  Yes.
 7            MS. TEEKEI:  Objection, your Honor.
 8   Q.  And you know that you show someone a photo over and over
 9   again from a police officer, you know from your experience, you
10   know that the more often you show the same photo, the more
11   likely they're going to catch on that you think he's the guy
12   who did it, right?
13            MS. TEEKEI:  Your Honor --
14            THE COURT:  Just wait one second for the answer.
15            MS. TEEKEI:  If Mr. Dratel could just let the witness
16   finish his answers.
17            THE COURT:  We don't need speaking objections, but
18   thank you.
19            Did you get the question?
20            THE WITNESS:  I did.
21            THE COURT:  All right, you could answer the question.
22   A.  I would agree with you, except I wasn't showing the same
23   photo over and over again.  In fact, it was three different
24   photos, one of which was over ten years old.
25   Q.  Of the same person --
```

Deloren - cross

1    A.   Yes.

2    Q.   -- right?

3    A.   That is correct.

4    Q.   One of which had a caption with his name on it, right?

5    A.   Yes.

6    Q.   And you didn't try to hide that from the witness, correct?

7    A.   No.

8    Q.   So that was good, because two weeks later you go back and

9    get her to look at it a third time and say that's the guy;

10   right?

11   A.   Look at -- when you say it, what are you referring to, sir?

12   Q.   I'm sorry?

13   A.   You said I go back two weeks later and show --

14   Q.   To Demi Torres June 6th?

15   A.   Sir, please, please.

16        THE COURT:  Wait, wait.  Okay, one person at a time.

17   You asked the question, you answer the question.  You wait for

18   the answer.

19   A.   I was just looking for clarification of his question.

20        THE COURT:  That's fine.

21        (Continued on next page)

22

23

24

25

1    Q.  Now, I want to go back to, again, you said the U.S.

2    Attorney always knew.  You say that the U.S. Attorney knew from

3    May of 2013, knew that you had shown an Internet photo to Demi

4    Torres in between the two-week period that you showed her photo

5    arrays.  You're claiming that the U.S. Attorney's Office knew

6    that?

7    A.  I don't know if it was in May of 2013.

8    Q.  Here is a question.

9           THE COURT:  Let him answer the question.

10   A.  I don't know if it was in May of 2013, but it was certainly

11   prior to February of 2014.

12   Q.  January 2014.  When?  When was it?

13   A.  Much closer to May of 2013.  I don't know exactly when.

14   Q.  How did you memorialize that?

15   A.  Memorialize what?

16   Q.  In a police report.  In some DD5.  In anything.

17   A.  Memorialize what?

18   Q.  That you had done that and that you had told him that.

19   A.  I do not.

20   Q.  You wanted that one to be off the books, that Internet

21   photo?

22          MS. TEEKEI:  Objection, your Honor.

23          THE COURT:  Overruled.

24   Q.  You didn't make a report of showing Demi Torres at the

25   time, in May of 2013, you made no report, you have no

1   memorialization of showing her that Internet photo anywhere in

2   your file anywhere, right?

3   A.  Correct.

4   Q.  And you did that because you wanted that one to be off the

5   books, right?

6   A.  Absolutely not.  I made the FBI aware of it right away, as

7   well as the U.S. Attorney's Office.  I don't remember exactly

8   when.  But shortly thereafter they were aware of it.

9   Q.  Now, in pursuing your investigation, initially you had some

10  information that one of the defendants was known as D as in

11  David D, one of the suspects?  One of the suspects was known as

12  D, right?

13  A.  You are saying David?

14  Q.  D as in David.  I don't want it to be confused with any

15  other letter.

16  A.  The letter D.

17  Q.  D as in Deloren.

18  A.  Sure.  That works.

19  Q.  And Ty?

20  A.  Yes.

21  Q.  So you conferred with other police officers who took a look

22  into those nicknames and checked back with you if they come up

23  with anything that might be a lead, right?

24  A.  Actually, D --

25  Q.  It's a question.  Did you do that?

1   A.  I'm giving the answer.  D was identified --

2   Q.  Did you talk to other police officers?  This is the

3   question, not a narrative by you.  This is the question.  Did

4   you talk to other police officers about those two nicknames,

5   asking if they could help you with them?

6   A.  I don't think so.  I don't remember.

7   Q.  You don't remember?

8         May I show you what's marked as 3516-9.  Look at the

9   highlighted portion.  Right?

10  A.  Yes.

11  Q.  The first day you got involved in the robbery, March 25,

12  2013, you asked the Police Officer Ford to help you out with D

13  and Ty, right?

14  A.  Yes.

15  Q.  Now, you talked about the car.  You say the car matched the

16  description that Zaporia Dunbar's car matched the description

17  you have been given by Ms. Torruella and Mr. Barea, right?

18  A.  Closely matched, yes.

19  Q.  No.  You said matched, right?  You think closely matched.

20  They both told you it was an Acura, right?

21  A.  That's not true.

22  Q.  They didn't tell you.  You didn't write that down that it

23  was an Acura?

24  A.  I did.  They did not say for certainty that it was an

25  Acura.

E9UMCHA5                         Deloren - cross

1   Q.  I said they told you it was an Acura.  I said did they tell

2   you it was an Acura and you wrote it down.

3            MS. TEEKEI:  Objection, your Honor.

4            THE COURT:  There is a question.  I said they told you

5   that that was an Acura.  I said they told you it was an Acura.

6   Did they tell you it was an Acura?

7            THE WITNESS:  Your Honor, they mentioned that it could

8   be.

9   Q.  They didn't say it could be an Acura.  They said an Acura,

10  right?

11  A.  They said it could be.

12  Q.  Let me ask you this.  How long have you been a police

13  officer?

14  A.  Fifteen and a half years.

15  Q.  You trained, right?

16  A.  Yes.

17  Q.  Your memo book is part of your training?

18  A.  Yes.

19  Q.  Memo book is supposed to be accurate, correct?

20  A.  Yes, sir.

21  Q.  And complete?

22  A.  Yes.

23  Q.  And precise as possible, correct?

24  A.  Yes, sir.

25  Q.  Because you don't want to get wrong information out there

1    because you may not remember something a couple of months

2    later, some detail, right?

3    A.   That's right.

4    Q.   Let's look at what's marked as 3502-15.

5            Let's look at page 2 your memo book, right?  Right?

6    A.   They are not numbered.

7    Q.   It's your memo book?

8    A.   Yes.  This is my memo book, yes.  Or copies of it.

9    Q.   If you see, 3502-15, the second page, you see on top it

10   says where is the money in quotes?

11   A.   Okay.

12   Q.   Look at the fourth line.  Look at the end of the third

13   line.  BK green/black, four-door Acura --

14           MS. TEEKEI:  Objection, your Honor.

15           MR. DRATEL:  Not for the truth.  Credibility.

16           THE COURT:  You want to rephrase it.

17           MR. DRATEL:  Sure.

18   Q.   Did you write down, because they told you, dark green/black

19   four-door Acura CL, '97/'98, right?

20   A.   Yes.

21   Q.   And that was from Mr. Barea, correct?

22   A.   Yes.

23   Q.   And separately, if you go a few pages later, if you go to a

24   page where it's right after -- there someone named Starley

25   Sandez there.  You go to the next page where there is a 347

E9UMCHA5                        Deloren - cross

1    number at the top, right?

2    A.  Yes.

3    Q.  Go to the next page.  And that's Torruella, your interview

4    of her, correct, right?

5    A.  Yes.

6    Q.  It says:  BK Acura four-door, black Acura four-door prime,

7    right?  That's what it says?

8    A.  Yes.

9    Q.  You were talking about primer paint, right?

10   A.  Correct.

11   Q.  Then it has the last digits of the license, right, 7788?

12   A.  Yes.

13   Q.  So they told you it was an Acura.  It doesn't say could

14   anywhere there.  It doesn't say could be.  It says, an Acura of

15   a particular color and even a particular year, correct?  That's

16   what it says, right?  That's what they told you, that's what

17   you wrote down that night?

18   A.  I'm not writing what they say verbatim, but, yes, that is

19   what they told me.

20   Q.  Now, you do a lot of paperwork in the course of this,

21   right?

22   A.  Yes.

23   Q.  Now, one of the things is, you follow up on the complaints,

24   right?  You provide paperwork, complaint follow-up report.  Are

25   you familiar with that?

E9UMCHA5                           Deloren - cross

1    A.  Yes.

2    Q.  And did you write in one of them, on March 25, 2013:  And

3    then the perps fled in a black late-model Acura?

4    A.  Which one are you referring to?

5    Q.  You want me to show you?

6    A.  I have them here.  Tell me which page.

7    Q.  Page 11 of 56, of 3502-16, last line.

8    A.  I see that.

9    Q.  That's what you wrote, right?

10   A.  Yes.

11   Q.  That reflected what you were told, correct?

12   A.  Yes.

13   Q.  Now, you took steps to try to find that vehicle, correct?

14   A.  Yes.

15   Q.  And, in fact, April 21 of 2013 you put out a photo of a car

16   that you said was similar, right?

17   A.  Yes.  In body style, yes.

18   Q.  And you said it's been described as a primer paint 1997,

19   1998 Acura with a possible partial New York plate of 7788,

20   correct?

21   A.  That is correct, sir.

22   Q.  That's an Acura in the photo, right?

23   A.  Yes.

24   Q.  This is April 21, 2013, right?

25   A.  Yes.

1    Q.  So when you say that Zaporia Dunbar's car closely matched,

2    different make, right, Honda, not an Acura, right?

3    A.  Made by the same company.

4    Q.  Honda, not an Acura, correct?  You are going back to the

5    manufacturer.  Is that what you are saying?

6    A.  I'm telling you that Acura and Honda are similar looking

7    vehicles.

8    Q.  I'll withdraw my question.

9         She drives a Honda, right?  She has a Honda.  They

10   said Acura, right?

11   A.  Possible Acura is what they actually said, but yes.

12   Q.  What does your note say again?  Do we have to go over this

13   again, what you looked at?  Did you ever say possible once?

14        THE COURT:  Sustained.

15   Q.  In any of your notes, any moralization written down by you

16   anywhere that says possible Acura?

17   A.  No.

18   Q.  Different color, right?  Her car is blue.  They never said

19   blue, right?  They said black, green, dark green, midnight

20   green.  They never said, blue, right?

21   A.  I was operating under the assumption that the car was dark.

22        MR. DRATEL:  Move to strike.  I would like him to be

23   to be responsive.

24   Q.  Did they ever tell you that it was a blue car that they

25   were taking?

1          THE COURT:  Excuse me.  Can you just answer the

2    question.  The government will have a chance to ask you other

3    questions.

4    A.   Specifically blue, no.

5    Q.   But they did specifically say black and dark green, right?

6    A.   As well as dark in color, yes.

7    Q.   And Zaporia Dunbar's car is blue, correct?

8    A.   Dark blue.

9    Q.   But it's blue, correct?

10   A.   Dark blue, yes.

11   Q.   It's a '95, right?

12   A.   You -- to be honest, I don't know what year it is.

13   Q.   That's fine.  This was a '97/'98 that they told you.  So

14   different make, different color, different year.  And her car

15   has a North Carolina plate on it, right?

16   A.   Yes.

17   Q.   And you said partial New York plate 7788, possible partial

18   New York plate.  You didn't say plate.  You said New York

19   plate, right.  Because that's what they told you?

20   A.   That it was a possible New York plate, yes.

21   Q.   That's closely matched to you?

22   A.   Absolutely.

23   Q.   Different make, different color, different year, different

24   license plate?

25   A.   When I saw that car parked in front of her house, I nearly

1   jumped out of my seat.

2   Q.  And you had never seen it before?

3   A.  That's right.  When I saw the car parked in front of her

4   house -- excuse me -- based on a description that was given to

5   me by the victims in this case, when I first saw that car

6   parked in front of Zaporia Dunbar's house, I literally nearly

7   jumped out of my seat.

8   Q.  Because you wanted it to be the car, right?

9   A.  No.  Because it is the car.

10  Q.  You wanted it so bad, you couldn't help yourself?

11  A.  No.

12  Q.  Did you ever hear of confirmation bias?  Do you know what

13  that is?

14          MS. TEEKEI:  Objection.

15          THE COURT:  Overruled.

16  Q.  Did you ever hear of confirmation bias?

17  A.  No.

18  Q.  Did you ever show that car to the victims?

19  A.  The car, no.

20  Q.  You knew for yourself, because you had never seen the car,

21  but you know the car when you see it even though they were in

22  it and saw it and had a chance to study it.  But you wouldn't

23  show it to them.  That would be a mistake, right?  Because you

24  might not like your answer?

25          MS. TEEKEI:  Objection to form.

```
 1              THE COURT:  Overruled.  You can answer.
 2   A.  I don't even know what the question was.
 3   Q.  The question is, you didn't show them the car because you
 4   didn't want their answer, correct?
 5   A.  No, that's not correct.
 6   Q.  You weren't there the night that they were taken.  You
 7   weren't there when they were taken, correct?
 8   A.  Correct.
 9   Q.  There are only two witnesses who could tell you which car
10   it was, correct?
11   A.  Correct.
12   Q.  And you never showed them the car that you claim was
13   involved, right?
14   A.  Correct.
15   Q.  The one that you saw on the street you had an epiphany,
16   that must be the car?
17   A.  I wouldn't call it an epiphany.  Based on the evidence that
18   I had.
19   Q.  You jumped out of your seat, you said.
20   A.  Based on the evidence that I had about the plate number,
21   the description of the auto, and the link to Zaporia Dunbar,
22   yes.  I liked that car at the time, yes.
23   Q.  You liked that car.  That's the word.  You liked the car.
24   I get it.
25   A.  I certainly wouldn't call it --
```

1   Q.  We all get it.

2                MS. TEEKEI:  Objection, your Honor.

3                THE COURT:  There is no question pending.

4   Q.  Now, the hammer.  Can we see the hammer again.  Do we know

5   where the hammer is?

6   A.  It's still here.

7   Q.  Now, there is no description of a specific type of hammer

8   anywhere in your notes or anything from the victim, right?

9   A.  An actual description?

10  Q.  Yeah.

11  A.  You just said a hammer?

12  Q.  Right.

13  A.  Yes.

14  Q.  You found a hammer in the back seat.  And you said, when

15  you found this hammer, you wrote a report saying it matched the

16  description, correct?  You wrote that report that said that?

17  A.  Of a hammer, yes.

18  Q.  Well, you said it matched the description, right?  Didn't

19  you say that in your report?

20  A.  You can refer me to the report.

21  Q.  I will.  This is 3502-16 at page 45.

22  A.  Would you like me to read what I said.

23  Q.  I'll ask the question.  You said the hammer was similar to

24  the one used during the commission of the robbery, correct?

25  A.  That's different from saying it matched the description.

1   Q.  But you said similar, right?

2   A.  Yes.

3   Q.  You had no idea what the hammer looked like because no one

4   told you, right?

5   A.  A hammer is a hammer.

6   Q.  How many hammers do you think are out there in the world

7   that look like this?  How many hardware stores do you think I

8   can get this from right now?

9   A.  Most.  I don't know.

10  Q.  Maybe all?

11  A.  Perhaps.

12  Q.  But first you knew what car it was, even though it was a

13  different make, model, year, color, license plate than the one

14  that both victims told you.  But you know that this hammer,

15  which is about as generic a hammer as can be, you immediately

16  said this is the hammer, right?

17  A.  That's not what I said, no.

18  Q.  But you thought that to yourself.

19          MS. TEEKEI:  Objection, your Honor.

20          THE COURT:  Overruled.

21  A.  Can you repeat the question.

22  Q.  You thought it to yourself.  You said, aha, I have the

23  hammer.

24  A.  I thought that it could very well be the hammer, yes.

25  Q.  Now, with respect to David Barea, when you spoke to him he

1    told you that the second -- let's separate the robbers.  One is

2    Glisson, right?

3    A.   Yes.

4    Q.   Then there is a second unidentified one at the time, right?

5    A.   At the time, yes.

6    Q.   We are talking about the second one.  David Barea told you

7    he had a teardrop tattoo, right?

8    A.   He did.

9    Q.   He did.  That's the answer.  He did.

10   A.   That's not all he told me.

11   Q.   I didn't ask you what else he told you.  I said, he told

12   you he had a teardrop tattoo?

13   A.   He said he thought he did, yes.

14   Q.   Let's go to your memo book again.  Look at the first page.

15   You there?

16   A.   Not yet.

17   Q.   That's David Barea, right?

18   A.   I'm not there yet.

19   Q.   3502-15.

20   A.   Okay.

21   Q.   It says two guys, right?

22   A.   Yes.

23   Q.   First one it says M/B.  That's male black, right?

24   A.   Yes.

25   Q.   Six-one, medium as in build, right?

1    A.  Yes.

2           MS. TEEKEI:  Objection.  Hearsay.

3           THE COURT:  You can rephrase.

4    Q.  He told you that it was male black six-one medium?

5           MS. TEEKEI:  Objection.

6    Q.  With a black teardrop?

7           THE COURT:  I'll allow it.

8    Q.  Right?

9    A.  Yes.

10   Q.  It doesn't say possible, could have, maybe.  It says black

11   teardrop, correct?

12   A.  Correct.

13   Q.  And, in fact, you showed Ms. Torruella a number of arrays

14   with only people with teardrops in them, right?

15   A.  In addition --

16   Q.  This is a yes or no.  Did you show her a number of arrays

17   that only had photos with teardrop tattoos?

18   A.  Yes.

19   Q.  By the way, the photo array of Mr. Glisson that you showed,

20   he was the only one with a teardrop tattoo, right?

21   A.  That was not a photo array, sir.

22   Q.  You didn't have a photo array with Mr. Glisson, with

23   anyone?

24   A.  No.

25   Q.  I am going to show you what's 3502-18.  It doesn't have a

1    page number.  We will call it 2-2.  I am going to ask you to

2    look at that.  Is that on a photo array with Mr. Glisson on the

3    top left?

4    A.  It is not a photo array in the common sense of photo arrays

5    that we prepare.  What this is is an actual screen shot of the

6    computer system, Photo Management, where I entered height,

7    weight, and build information according to what that Emma

8    Torruella and David Barea told me into the system.  What it

9    does is, it spits out six images at a time for them to look at

10   it.  They look at page 1.  There are six images.  They look at

11   page 2.  There are six images.  Until they get to a suspect

12   where they say aha, that's the guy.  In that particular

13   instance I did not include teardrop tattoo.

14   Q.  I'm just asking if that is something that the witnesses

15   identified Glisson from.

16   A.  No.  This is the screen shot of them looking at Photo

17   Manager when they identify Glisson.

18   Q.  It is what they identified him from?

19   A.  But it's not a photo array.

20   Q.  I'm just asking whether they identified him from that.

21   A.  Counsel, original question was, did I prepare a photo

22   array --

23        THE COURT:  Let's stop.  Ask a question.  You answer

24   the question.

25        MR. DRATEL:  Consider all of the previous questions on

1   this line withdrawn.

2   Q.  Is that what the witnesses, Emma Torruella and David Barea,

3   were looking at when they identified Mr. Glisson?

4   A.  Yes.

5   Q.  He is the only person in that six-person screen shot that

6   has a teardrop tattoo, correct?

7   A.  Yes.

8   Q.  And you were told initially by both of them that both of

9   the robbers, including Mr. Glisson, had a teardrop tattoo,

10  correct?

11  A.  Yes.

12  Q.  When you put into the system, the Photo Manager system, you

13  didn't put teardrop tattoo, right, because you got people

14  without it?

15  A.  I would not do that, actually.  That would not make sense.

16  Q.  To you?

17  A.  To anybody who knows the system.

18  Q.  And with respect to the Photo Manager system, that's

19  supposed to be done in a computerized electronic way, correct?

20  A.  Yes.

21  Q.  Not taking a photo of someone off the Internet and showing

22  it to them separately from a photo array, right?  It's exactly

23  what it's supposed to avoid, right?

24          Now, Mr. Barea also told you that he went to Tyrone

25  Brown's house to collect money that was owed, right?  This is

1   3502-16.

2   A.  Yes.

3   Q.  He didn't tell you anything about doing a drug deal there,

4   that he was there for any illicit purpose, right?

5             MS. TEEKEI:  Objection.  Hearsay.

6             THE COURT:  I'll allow it.

7   A.  I'm trying to remember exactly what he said.  It was more

8   along the lines of him picking up money from a past drug

9   transaction or drug debt.

10  Q.  That's not in your report, though, is it?  If you want to

11  look at this, page 5 of 3502-16, page 5.

12  A.  Page 5?

13  Q.  Yes.

14  A.  Okay.

15  Q.  He told you that he went to his friend's house Ty to

16  collect money that was owed to him, correct?

17  A.  Yes.

18  Q.  And nothing about a drug deal.  Withdrawn.

19            If he had told you that it was part of a debt for a

20  drug deal, would you put that in the complaint?

21  A.  I don't know.

22  Q.  You get to decide, right, what facts are important and what

23  facts aren't?  Did you know he was an informant at the time?

24  A.  Yes, I did.

25  Q.  Is that why you didn't put it in there?

1   A.  No.

2   Q.  The complaint.  As a matter of fact, Barea told the

3   officers -- did you prepare the complaint?

4   A.  I can't hear your question, sir.

5   Q.  I'll rephrase it.

6   A.  Please.

7   Q.  I will just get the document first.

8            The complaint that was filled out was based in part on

9   your information, correct?

10  A.  Actually, no.

11  Q.  Who did the complaint?

12  A.  I believe his name is at the bottom there, the officer.

13  Q.  I'm sorry?

14  A.  I believe his name is on the bottom there.  That's not my

15  name.  I didn't do the report.

16  Q.  You didn't contribute to it.  You did not discuss it with

17  him?

18  A.  No I did not.

19  Q.  And Mr. Barea spoke to him separately?

20  A.  I don't know.

21  Q.  Now, the array that you showed, there was not a positive ID

22  of Mr. Chambers, right?  When did you show that to Emma

23  Torruella?

24  A.  Some time in the last week of May.

25  Q.  Emma Torruella even?

1   A.  Yes.  It was on the same day.

2   Q.  And I want to show you what we will mark as Defendant's B.

3           Do you recognize that?

4   A.  Yes.

5   Q.  That's the first array, correct?

6   A.  Yes.

7   Q.  And Mr. Chambers is in position 4, correct?

8   A.  Yes.

9           THE COURT:  That's not in evidence.

10          MR. DRATEL:  I move it in, your Honor.

11          THE COURT:  Any objection?

12          MS. TEEKEI:  No, your Honor.

13          THE COURT:  It's admitted.

14          MR. DRATEL:  May I publish it, your Honor?

15          THE COURT:  You may.

16          (Defendant's Exhibit B received in evidence)

17  Q.  Mr. Chambers is in position 4, correct?

18  A.  Yes.

19  Q.  Now, you still have Defendant's A with you, the Internet

20  photograph?

21          MR. DRATEL:  I would like to publish that as well,

22  your Honor.  May I?

23          THE COURT:  Okay.

24  Q.  That's what you showed, correct?

25  A.  Yes.

1    Q.  Obviously, Mr. Chambers is not the person on the right,

2    correct?

3    A.  Correct.

4    Q.  That's what you showed to Demi Torres?

5    A.  I'm sorry, sir?

6    Q.  That's what you showed to Demi Torres in between the -- you

7    also have 1000, the array that there was a positive

8    identification made.  Do you have that?

9    A.  I do not.

10           MR. DRATEL:  If we could have that one published.  The

11   government can publish that one.

12   Q.  Mr. Chambers is in position 2, correct?

13   A.  Yes.

14           MR. DRATEL:  We can take it down.

15   Q.  Now, the initial photo arrays that you showed were in your

16   offices or in some police facility, correct?

17   A.  The first photo array?

18   Q.  Yes.

19   A.  For Demi Torres was in my office, yes.

20   Q.  For Emma Torruella?

21   A.  I believe that was at her house on Overing.  I don't

22   remember where that was.  But it was not in my office.

23   Q.  Third time you went to her job, you called her up, right?

24   A.  Yes.

25   Q.  You said, I've got something to show you?

1   A.  Not quite like that.

2   Q.  What did you say exactly?

3   A.  I'd like to come see you and show you some more

4   photographs, sum and substance, something like that.

5   Q.  Sum and substance.  Did you say, I've got something to show

6   you, maybe?

7   A.  I don't remember exactly what I said.

8   Q.  And then you showed her Government's Exhibit 1000, right?

9   A.  You are referring to the second photo array?

10  Q.  Yes.

11  A.  Yes.

12  Q.  And she said to you, what about the teardrop, right?

13  A.  No.

14  Q.  Did you say to her, forget about the teardrop?

15  A.  No.

16  Q.  Never?

17  A.  No.

18  Q.  You would never say something like that, right?  Because

19  it's improper, right?

20  A.  I wouldn't say it's improper, but I don't recall saying

21  that to her.

22  Q.  Is it now that you don't recall saying it?  There was a

23  declarative no that I heard before that you didn't say it.

24  A.  To the first thing.

25  Q.  No.

1    A.  Repeat your question and I'll answer it.

2    Q.  Tell you what.  The question was, did you say to her,

3    forget about the teardrop?

4    A.  No.

5    Q.  Now, you showed it to Demi Torres right way, right

6    afterwards, right?

7    A.  It was actually an hour later.

8    Q.  Again, not in the police offices, but you went to her.

9    What was that phone conversation?

10   A.  I don't recall the phone conversation.

11   Q.  You met her at a White Castle essentially.  Is that where

12   it was?

13   A.  No.

14   Q.  Did you ever show her photos at a White Castle?

15   A.  I don't remember.

16   Q.  And you got a positive ID of Mr. Chambers from her?

17   A.  Yes, I did.

18   Q.  Mission accomplished, right?

19           MS. TEEKEI:  Objection.

20           THE COURT:  Overruled.

21   A.  I wouldn't categorize it as mission accomplished.

22   Q.  What is your purpose going out there?

23   A.  I'm sorry?

24   Q.  Never mind.  It's in the record.

25           You fill out a form with respect to the ID, correct?

1   A.  Yes.

2   Q.  And with respect to Demi Torres' identification, I think

3   you may have it, where Defendant's B came from.  All the

4   arrays.  Did I take that back?

5   A.  No.  I have it here.

6   Q.  Thank you.

7            There is a form to record the words and gestures of

8   the witness, right?

9   A.  Yes.

10  Q.  And you record her as saying, now I see him.  That's the

11  guy, right?

12  A.  Yes.

13  Q.  Now, did she say now I see him?  Because you made some

14  suggestion.

15  A.  No.

16  Q.  Did you tell her anything?

17  A.  Only the instructions that I had outlined for the jury

18  earlier.

19  Q.  And that's all you ever told Emma Torruella as well?

20  A.  Yes.

21  Q.  You've testified a lot, right, in your career?

22  A.  I've testified before many times.

23  Q.  In fact, in 2006, you testified at a hearing, right, at a

24  pretrial hearing in the case of United States v. Cooper,

25  correct?

E9UMCHA5                        Deloren - cross

1    A.   Yes.

2    Q.   And the federal judge found that you were not credible,

3    correct?

4    A.   Absolutely not true.

5    Q.   I will read from the record then from 3502 --

6              MS. TEEKEI:   Objection.

7              THE COURT:   Overruled.

8    Q.   -- from the transcript.  Ask you if this is what your

9    understanding is, credible or not credible.  It is not clear to

10   the Court that Officer Deloren from his own --

11             MS. TEEKEI:   Objection.

12             THE COURT:   Wait.

13             MS. TEEKEI:   Your Honor, may we approach.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1              (At the side bar)

2              MR. ARAVIND:  Your Honor, we have an objection.  I

3     know I understand the Court has overruled many of the

4     government's objections on hearsay grounds.  But we are now, I

5     think, going very, very far afield of the rules of evidence.

6     What Mr. Dratel is doing is trying to attack the credibility of

7     the witness and claiming it was a credible finding from Judge

8     Batts.  There was not a credibility finding by Judge Batts.

9     Your Honor has the materials.  We have the briefing.

10             THE COURT:  I thought there was an in limine motion in

11    which I ruled.  And the problem I'm having is, I don't think

12    that it's proper for you to simply read from what the judge

13    said.  I think you can ask the question in a different way.

14             MR. DRATEL:  Let's do it now.  What I was going to do,

15    as I said, for the purpose of him to say, the Court says -- I

16    can use another one that's actually better.  She says:  It is

17    not credible to the Court that Mr. Cooper would just

18    voluntarily say as he's getting out of the car to be searched

19    anyway, I have a gun, even if he did not say that until after

20    he was being patted down.  And all I want to say is, I want to

21    ask him, are you denying that that's a finding that you are not

22    credible?  He said he denied that there was an adverse

23    credibility finding.  We all know there was an adverse

24    credibility finding and the Court has ruled that.

25             THE COURT:  I'll hear from the government.

1          MS. TEEKEI:  Your Honor, our point is that he asked

2     the question.  He got an answer.  Reading that into the record

3     is hearsay.  As Mr. Aravind said, it's way out of the rules of

4     what's acceptable in terms of what Judge Batts said.  And that

5     was in our briefing as well, although your Honor didn't get to

6     the portion of whether he could read into the record Judge

7     Batts' out-of-court statement.  It is clearly hearsay.

8          And the way these things are typically done is defense

9     counsel asks the question and they take whatever answer and

10    they have made their point and then they move on.

11         And Mr. Dratel is pushing.  What he is doing is trying

12    to enter into evidence, as he has, out-of-court statements by

13    others and is continuing to do that and that is our objection.

14         MR. DRATEL:  Your Honor, there is really no point in

15    allowing us to explore this if he is going to deny something

16    that's patented in a document.  Do I have to call the court

17    reporter, Judge Batts?

18         THE COURT:  No.  There are two problems.

19         One is, you can certainly, I think, ask him about it.

20    You have asked him about this prior incident.  I don't think

21    that you can read from this document.  And I also don't think

22    you want to be in the position where you're suggesting to the

23    jury that they should substitute Judge Batts' credibility

24    finding in that case with a credibility finding in this case.

25         But I think that you're certainly entitled to say, if

1   in fact you testified on this thing, is it a fact that as a

2   result of that testimony -- I don't know exactly -- the judge

3   suppressed or the judge found, or whatever the answer is.  He

4   could say I don't know or I don't remember and we can move on.

5           MR. DRATEL:  I don't think that was the character of

6   the Court's ruling, that we weren't going to get stuck with him

7   lying about it.

8           THE COURT:  I don't think we can put this document --

9           MS. TEEKEI:  His understanding.

10          MR. DRATEL:  That's the Second Circuit law.

11          THE COURT:  The second Circuit law is ambiguous.

12          MS. TEEKEI:  In his understanding of those statements

13  is what he is testifying to.

14          THE COURT:  It's enough.

15          MR. DRATEL:  His understanding.

16          THE COURT:  You understand my ruling.

17          MR. DRATEL:  So can I rephrase it so I can try to do

18  it that way.

19          THE COURT:  I don't know what this Court did.  I don't

20  know if she suppressed.  You can say found for the defendant,

21  if that's what is accurate.  Isn't it a fact that, after your

22  testimony, she rejected that testimony and found for the

23  defendant.

24          MR. DRATEL:  Okay.

25          (Continued on next page)

```
1              (In open court)
2    Q.  Isn't it a fact that in United States v. Cooper, after
3    hearing your testimony and the testimony of the defendant, the
4    Court rejected your testimony and ruled in favor of the
5    defendant on the issue?
6    A.  I can say that the Court did rule in favor of the
7    defendant.  I don't know if or how the Court came to that
8    conclusion.  However, I can say that in that case, as well as
9    in this case today, I testified truthfully and fully as much as
10   possible.
11   Q.  You've had a chance to review the transcript of that
12   hearing, correct?
13   A.  I've had a chance to, but I didn't.
14   Q.  You were told about it, right?
15   A.  Yes, of course.
16   Q.  In fact, you informed the government about it in
17   preparation for your testimony here, correct?
18   A.  No, not quite, no.
19   Q.  But you know that the government was informed about it and
20   turned it over to the defense, correct?  You know that,
21   correct?
22   A.  Yes.
23   Q.  When you're dancing around this you know the judge said she
24   did not find it credible?
25              MS. TEEKEI:  Objection.
```

1          THE COURT:  It's been asked and answered.

2          MR. DRATEL:  Thank you, your Honor.  Nothing further.

3          THE COURT:  What I would really like to do is take a

4    break, but tell me how long you think redirect is going to be.

5          MS. TEEKEI:  Approximately five minutes, four minutes,

6    your Honor.

7          THE COURT:  Why don't we do the four minutes and then

8    we will take or break.

9          MS. TEEKEI:  Your Honor, may I have one moment?

10         THE COURT:  Yes.

11         MS. TEEKEI:  Thank you, your Honor.

12   REDIRECT EXAMINATION

13   BY MS. TEEKEI:

14   Q.  Detective Deloren, approximately how many times have you

15   testified in your career as a law enforcement officer?

16   A.  Hundreds.

17   Q.  Most recently when was the last time you testified in your

18   career as a law enforcement officer?

19   A.  Just recently this month I testified in a trial here in

20   federal district court.

21   Q.  Detective Deloren, why did you want to find the second

22   robber who was at 1403 Overing Street on March 25?

23   A.  I am not sure I understand.  Why -- that's my job.

24   Q.  You said earlier that you were investigating Mr. Chambers.

25   Were you trying to identify Mr. Chambers or were you trying to

1    identify the robber who was there that evening?

2    A.  My goal in this investigation and in any other

3    investigation is to identify the robber, the right person, no

4    matter who that is.

5    Q.  Mr. Dratel asked you some questions about your memo book.

6    Can you describe for the jurors what a memo book is?

7    A.  A memo book is just a small pad that officers, detectives,

8    carry to detail your daily movements.

9    Q.  And how large is that memo book?  Can you just describe --

10   A.  If I can show this box of tissue, the pad that you write on

11   is approximately that big.

12   Q.  Do you memorialize everything in your memo book?

13   A.  No.

14   Q.  On cross-examination Mr. Dratel asked you some questions

15   about the vehicle, Ms. Dunbar's vehicle.  Why didn't you show

16   that vehicle, once you had located it the second time, to any

17   of the victims?

18   A.  It was smashed up in an auto collision lot.

19   Q.  And the hammer that you found in that car, did you show

20   that hammer to any of the victims?

21   A.  I did.

22   Q.  Who?

23   A.  David Barea.

24          MS. TEEKEI:  Your Honor, one moment, please.

25          THE COURT:  Yes.

1    Q.  You testified earlier about the description of the car that

2    you had obtained.  When you asked for a description of a car,

3    what types of things are you looking for?

4    A.  Obviously, we are looking for makes or possible makes

5    because some cars look like each other, especially Hondas and

6    Acuras.  We are looking for colors.  And we are also looking

7    for, obviously, plate numbers, most importantly.  But also

8    sometimes there are other identifying marks on cars that we

9    will ask about.

10   Q.  And when you ask for a description of a person, what types

11   of things are you looking for?

12   A.  Well, with people, you're looking mostly for height,

13   weight, hair, skin color, obviously, age.  Age is also very

14   important.  And also any distinct marks.

15          MS. TEEKEI:  Thank you, Detective.  No further

16   questions at this time.

17          THE COURT:  Mr. Dratel.

18          MR. DRATEL:  Thank you, your Honor.

19   RECROSS EXAMINATION

20   BY MR. DRATEL:

21   Q.  Detective Deloren, you said that you couldn't show the car

22   to victims because it was smashed up, right?

23          MS. TEEKEI:  Objection, your Honor.  That's not what

24   he said.

25          THE COURT:  Overruled.

1   Q.  In fact, you had already taken a photo of the car, correct?

2   A.  Yes.

3   Q.  Outside the house, when you had this moment of realization

4   that a car had a different color, different plate, different

5   make, it was the car that you were looking for?  You took a

6   photo of it outside the house that very first time you saw it,

7   correct?

8   A.  Yes.

9   Q.  And then you followed Zaporia Dunbar around in the car,

10  correct?

11  A.  I don't know what the order was, but, yes, something like

12  that.

13  Q.  You could have showed that photo to the victims, right?

14  A.  I suppose, yes.

15  Q.  And the car wasn't obliterated.  It was just front end

16  damage.

17          You could have put Emma Torruella in that passenger

18  seat and said, is this where you were?  You could have done

19  that, right?

20  A.  I don't think so, no.

21  Q.  The car was obliterated, though, front-end damage.  That's

22  what you described, correct?

23  A.  It was totaled.

24  Q.  Now you say totaled.

25  A.  It was classified as totaled.  I don't know if I would call

1    it obliterated.  It had heavy damage.

2    Q.  Did you take a photo of it then?

3    A.  No.

4    Q.  Nothing to corroborate your statement today that there was

5    nothing you could have shown the victims even then, right?  You

6    have nothing to corroborate that?

7             MS. TEEKEI:  Objection.

8             THE COURT:  Overruled.

9    Q.  Right.

10   A.  I don't understand the question.  Nothing to corroborate

11   what?

12   Q.  Your description of the condition of the car when you saw

13   it at the collision lot.  You don't have anything.  You didn't

14   take a photo with your iPhone?

15   A.  No, sir, I did not.

16   Q.  Like you did with the video, when you wanted to make sure

17   that you'd have something preserved, right?

18   A.  Yes.

19   Q.  But you still had that photo you could have shown at any

20   time, right?

21   A.  I suppose so.

22   Q.  Before it was in any collision, right?

23   A.  Yes.

24            MR. DRATEL:  Nothing further.  Thanks.

25            THE COURT:  You may be excused.  Thank you.

 1            (Witness excused)

 2            THE COURT:  Ladies and gentlemen, we will take a

 3   15-minute break.  It's 3:23.  So I think we will reconvene at

 4   about 20 til.

 5            (Jury excused)

 6            THE COURT:  Mr. Dratel.

 7            MR. DRATEL:  Yes, your Honor.  Document number 66 on

 8   ECF filed February 24, 2014.  It's a letter from the

 9   government, Ms. Lester, Ms. Teekei to me.  I'm sorry.  To the

10   Court.  It's to the Court.  It that says, beginning of the

11   second paragraph:  In the course of pretrial preparation for

12   this matter, the government has learned that:  On or about May

13   29, 2013, the ID witness was shown, after the first photo array

14   attached here to as Exhibit A, a separate photograph depicting

15   Chambers and two other individuals (a copy of which is attached

16   as Exhibit C) for investigative purposes.

17            My question for the government, for purposes of a

18   stipulation, is when the government, when the prosecutors

19   learned of that fact.

20            THE COURT:  What I was going to ask the government is

21   whether they have an ethical obligation to correct testimony

22   that is incorrect.

23            MS. TEEKEI:  Your Honor, I don't think he can testify

24   as to when the government was aware.  I'm not sure what the

25   sequence of events was.

1          MR. ARAVIND:  Your Honor, I think the best way to

2     proceed from here is we can have a conversation with Mr. Dratel

3     outside the presence of the Court as to an appropriate

4     stipulation, if one is necessary, and then we can report back

5     to the Court.  But we would obviously need to review the

6     record, need to review the letter, and then propose something.

7          THE COURT:  Can you make sure that Detective Deloren

8     is available then in case you need him.  And I would ask you,

9     also, to review the ethical rules that govern any lawyer's

10    conduct in this situation.

11         MR. ARAVIND:  Thank you, your Honor.

12         THE COURT:  Let's take a break.

13         Shall I let Detective Deloren go or keep him around

14    for a moment?

15         MR. ARAVIND:  He can go.

16         THE COURT:  He can go.  Thank you.

17         (Recess)

18

19

20

21

22

23

24

25

E9UZCHA6                          Ferguson - direct

 1                (In open court; jury not present)

 2                THE COURT:  Who is the next witness.

 3                MR. ARAVIND:  Kentrell Ferguson, your Honor.

 4                (Jury entering)

 5                3:42 p.m.

 6                THE COURT:  Okay, you may be seated.

 7                MR. ARAVIND:  Your Honor, may we call our next

 8     witness?

 9                THE COURT:  Yes.

10                MR. ARAVIND:  The government calls Kentrell Ferguson.

11                THE COURT:  Thank you.

12                THE DEPUTY CLERK:  Would you raise your right hand?

13      KENTRELL FERGUSON,

14          called as a witness by the government,

15          having been duly sworn, testified as follows:

16     DIRECT EXAMINATION

17     BY MR. ARAVIND:

18                THE COURT:  Would you mind pulling your chair up to

19     the mic just so we can hear you?  Thank you.

20     BY MR. ARAVIND:

21     Q.  Good afternoon.  How old are you, Mr. Ferguson?

22     A.  I'm 26.

23     Q.  Where do you work?

24     A.  Lincoln Medical.

25     Q.  What do you do at Lincoln Medical?

```
1    A.  I work in the food and nutrition department.

2    Q.  Please try and speak into the microphone.

3    A.  I work in the food and nutrition department.

4    Q.  How long have you worked there?

5    A.  For about seven months now.

6    Q.  What did you do before that?

7    A.  I worked for UPS.

8    Q.  Are you familiar with an individual named Antione Chambers?

9    A.  Yes.

10   Q.  How do you know him?

11   A.  Around the way, we went to school together.

12   Q.  What year was that that you first met Mr. Chambers?

13   A.  I don't know.  About 8th grade, something like that.

14   Q.  What school?

15   A.  Flags 98.

16   Q.  When is the last time you saw Mr. Chambers?

17   A.  At his baby shower.

18   Q.  Do you remember when that was?

19   A.  No.  I believe it was maybe a year or two ago.  I'm not

20   really sure.  It was sometime in December.

21   Q.  Sometime in what month?

22   A.  Sometime I think in December.

23   Q.  Do you know Mr. Chambers by any other name?

24   A.  Not really.

25   Q.  Does he have a nickname?
```

 1   A.  I call him twin.

 2   Q.  You call him what?

 3   A.  Twin.

 4   Q.  What's the name, I'm sorry?

 5   A.  I said I call him twin.  That's it.

 6              THE COURT:  Did you say twin?

 7              THE WITNESS:  Yeah.

 8              THE COURT:  Okay.

 9   Q.  Do you have a contact for Mr. Chambers in your phone?

10   A.  Not currently at this time.

11   Q.  Did you have a contact for Mr. Chambers in the phone you

12   had yesterday?

13   A.  Um, a very old contact, yeah.

14   Q.  I'm sorry, what kind of contact?

15   A.  A very old contact, yes.

16   Q.  And what name did you have for Mr. Twizzie in your phone

17   that you had yesterday?

18              THE COURT:  Sorry, I think you misspoke.

19   A.  Who?

20              THE COURT:  Rephrase the question.

21              MR. ARAVIND:  Let me rephrase, your Honor.

22   A.  For who?

23              MR. ARAVIND:  Your Honor, I apologize.

24   Q.  The very old contact that you had for Mr. Chambers, what

25   was the name that you had in that contact?

1    A.  Um, twin, I believe.

2    Q.  I'm going to show you what has been admitted into evidence

3    as government Exhibit 4000.

4              MR. ARAVIND:  May we publish?  Thank you, Ms. Hansma.

5    Q.  Do you recognize this photograph, Mr. Ferguson?

6              THE COURT:  You could stand up if that would help.

7    A.  Yes.

8    Q.  What is this?

9    A.  It's a photograph of my phone.

10   Q.  Okay.  And what's the name at the top under contacts?

11   A.  Twizzie.

12   Q.  What's the name, I'm sorry?

13   A.  Twizzie.

14   Q.  And who is Twizzie?

15   A.  Antione.

16   Q.  And do you see Mr. Chambers in the courtroom today?

17   A.  Yeah.

18   Q.  Can you say where he's wearing and -- an article of

19   clothing that he's wearing, where he's sitting and article of

20   clothing he's wearing?

21   A.  Sitting right there.

22   Q.  What is he wearing?

23   A.  With a blue shirt.

24             MR. ARAVIND:  Your Honor, let the record reflect that

25   the witness has identified the defendant.

1              Your Honor, just one moment?  No further questions.

2              THE COURT:  Any cross?

3              MR. DRATEL:  No questions, your Honor.

4              THE COURT:  Okay, you may be excused.

5              (Witness excused)

6              MR. ARAVIND:  Your Honor, the government calls Rodrigo

7     Ayala.

8              THE COURT:  Okay.  I think you may need to wait for

9     Mr. Street for that to happen.

10             MR. ARAVIND:  Sure.  Thank you, your Honor.

11             THE COURT:  Call the next witness, Mr. Ayala.

12             THE DEPUTY CLERK:  Would you raise your right hand?

13     RODRIGO AYALA,

14         called as a witness by the government,

15         having been duly sworn, testified as follows:

16     DIRECT EXAMINATION

17     BY MR. ARAVIND:

18     Q.  Why don't you spell your first name for the record as well?

19     A.  R-o-d-r-i-g-o.

20     Q.  Where do you work, Mr. Ayala?

21     A.  New York City Police Department.

22     Q.  What is your title with the NYPD?

23     A.  Detective Investigator.

24     Q.  How long have you worked with the NYPD?

25     A.  Approximately 15 years.

1   Q.  Are you assigned to a particular unit?

2   A.  Yes, I am.

3   Q.  What unit is that?

4   A.  Firearms Suppression Division, Firearms Investigations.

5   Q.  Where is that unit located?

6   A.  The main office is located on 107th and Park Avenue in East

7   Harlem, and there is another office in Brooklyn.

8   Q.  Which office do you work in?

9   A.  Presently I work in the Manhattan office.

10  Q.  How long have you been with the Firearms Suppression

11  Division?

12  A.  I've been in this unit for approximately eight years.

13  Q.  And what are your duties and responsibilities as a

14  detective in that division?

15  A.  Investigate illegal possession of firearms, illegal sale,

16  illegal trafficking of firearms in and out of the state.

17  Q.  Prior to joining that particular unit, where did you work

18  in the NYPD?

19  A.  I worked for narcotics division, worked approximately two

20  and a half years before that in the Bronx.

21  Q.  And before that?

22  A.  I was patrol in the 46 Precinct.

23  Q.  Where is the 46 Precinct?

24  A.  46 Precinct is on Ryer Avenue at East 181st Street.

25  Q.  In the Bronx?

1    A.   In the Bronx.

2    Q.   Detective Ayala, are you familiar with an individual named

3    David Barea?

4    A.   Yes, I am.

5    Q.   How are you familiar with him?

6    A.   During the course of the wiretap case that I conducted in

7    the Bronx approximately a year ago, I intercepted a call with

8    him and my main subject, who was trafficking illegal firearms.

9    In the process of intercepting that call, that's where I was

10   able to become known to Mr. Barea.

11   Q.   You mentioned a wiretap investigation, or yo.

12   U mentioned that you intercepted calls.  How do you do that,

13   how do you intercept calls?

14   A.   We have the individual we're investigating.  We'll apply

15   for an eaves dropping warrant, which means we'll have full

16   access of his phone calls, text messages and photos as well.

17        If the Judge signs off on it, we start the wiretap

18   case and hear all the calls.  Of course calls have to be

19   pertinent.  The warrant either has to be for whatever

20   illegality it is.  If the warrant is for firearms, then we can

21   only listen in on firearm-related talk.  If it's for drugs,

22   then we have to go and reapply for another warrant and for that

23   specific criminality again.  So guns and/or drugs.

24   Q.   So this investigation that Mr. Barea was intercepted on was

25   that a gun investigation or narcotics investigation, or both?

1    A.   At the time I intercepted Mr. Barea's call, it was both

2    firearms and illegal drugs.

3    Q.   Now, from who do you obtain authorization to intercept

4    phones pursuant to a wiretap?

5    A.   Whatever District Attorney for that county is.  At this

6    point it was Bronx D.A.'s Office.

7    Q.   And do you have to get sign off from a state court judge?

8    A.   Yes.

9    Q.   The investigation you worked on, was that a state

10   investigation or federal investigation?

11   A.   It was a state investigation.

12   Q.   What was your role in the investigation?

13   A.   My role was to lead the operation as far as being in the

14   wiretap room, plant manager.

15   Q.   What does that mean to be a plant manager?

16   A.   It means, basically, I run the room; any calls that come in

17   there as per what the Bronx DA's Office says, we'll listen to

18   what particular calls we're allowed to and what calls we're not

19   allowed to.

20           Also transcribing those calls.  Once those calls come

21   in, they're recorded, they're put on a disk.  It was my

22   responsibility to also type those calls up word for word

23   verbatim and forward therm to the State District Attorney's

24   Office.

25   Q.   Approximately how many phones did you intercept as a part

1   of this investigation?

2   A.   Approximately seven phone lines in this investigation over

3   the course of about a year.

4   Q.   Was Mr. Barea's phone intercepted at all as part of this

5   investigation?

6   A.   Yes, it was.

7   Q.   How many phones and for what period of time was Mr. Barea's

8   phone intercepted?

9   A.   Mr. Barea had a total of two different phone numbers.

10             At one point we were on both of them.  We have a

11   warrant, eaves drop warrant is only valid for 30 days.  After

12   30 days we have to go in front of a judge and request a judge

13   to extend it.  If we have no evidence during that 30 days, then

14   the judge will not extend.

15             In this case we lost one of his lines because he had

16   no use for it or wasn't active on that line.  But sequentially

17   we were able to keep his line, which he kept on with his

18   illegal activity for that warrant for.

19   Q.   Try and keep your mic, your --

20   A.   Yes.

21   Q.   -- mouth in front of the microphone.

22             Now, in addition to the wiretap, what other law

23   enforcement techniques did you use?

24   A.   I'm sorry, I don't understand your question.

25   Q.   So you were sitting in the plant, the wire room?

1   A.   Yes.

2   Q.   Correct?  What was other, what were other members of your

3   team doing while you're doing that?

4   A.   Yes.  As part of wiretap we have access GPS wherever the

5   call is coming from within probably couple hundred feet, I can

6   pinpoint exactly where that individual is located.

7           We also had teams out there surveilling the subjects

8   of those seven lines that we had up.  Surveillance started in

9   the morning, all the way up to the evening.  We were able to

10  get everyone's habits, did they work, where they worked at,

11  obviously where they lived, where they hung out at, and of

12  course their illegal activity.

13  Q.   Did there come a time in 2012 where you and your team

14  developed a plan with respect to Mr. Barea?

15  A.   Yes, we did.

16  Q.   And what was that plan?

17  A.   The plan was to surveil Mr. Barea, and based on a probable

18  cause we had on the previous calls and his drug dealing, was to

19  place him under arrest.

20  Q.   For what purpose?

21  A.   Purpose of selling cocaine and crack.

22  Q.   Did you have a plan after you were going to arrest

23  Mr. Barea?

24  A.   Yes, we did have a plan.  Our plan was as per the D.A.'s

25  office, see if he would cooperate and become an informant and

1    work for us to see where we can open up into another criminal

2    association, organization into illegal drugs and/or firearms.

3    Q.  Did you intercept phone calls involving Mr. Barea during

4    the course of your investigation?

5    A.  Yes, I did.

6    Q.  In preparation for your testimony in this case, have you

7    reviewed some of those calls that were intercepted on wiretaps

8    of Mr. Barea's phone?

9    A.  Yes, I did.

10   Q.  And just to be clear, did you review all the calls or just

11   a subset of those calls?

12   A.  Just a subset of those calls.

13   Q.  I'm showing you what has been premarked for identification

14   as government Exhibit 3,000.  Do you recognize that item?

15   A.  Yes, I do.

16   Q.  What is that?

17   A.  This is the disk which actually holds those calls on here,

18   the calls that -- from the wiretap, pertinent phone calls.

19   Q.  And, approximately, how many calls have you reviewed as

20   part of this particular case?

21   A.  Approximately five to six calls.

22   Q.  Do you recognize your signature on the CD?

23   A.  Yes, I do.

24   Q.  And did you review the contents of that CD?

25   A.  Yes, I have.

E9UZCHA6                      Ayala - direct

1           MR. ARAVIND:  Government offers government Exhibit

2    3,000?

3           MR. DRATEL:  No objection, your Honor.

4           THE COURT:  It's admitted.

5           (Government's Exhibit 3,000 received in evidence)

6    Q.  Have you reviewed transcripts of those calls, Detective

7    Ayala?

8    A.  Yes, I have.

9    Q.  And have you reviewed those transcripts while you listened

10   to the calls?

11   A.  Yes, I did.

12   Q.  And did you review them for accuracy?

13   A.  Yes.

14   Q.  Did you recognize at least one voice on those calls?

15   A.  Yes, I did.

16   Q.  Whose voice was that?

17   A.  Mr. David Barea.

18   Q.  I'm going to show you what has been premarked for

19   identification as 3,002 through 3,000 to -- sorry 3002-T,

20   3003-T, 3004-T, 3005-T, and 3006-T.

21          (Pause)

22   Q.  Have you reviewed those?

23   A.  Yes, I have.

24   Q.  Did you initialize those transcripts in some way?

25   A.  Yes, I did.

1    Q.  And are those the draft transcripts you reviewed when you

2    were reviewing the telephone calls that were intercepted on

3    Mr. Barea's phone?

4    A.  Yes, they are.

5              MR. ARAVIND:  The government offers 3002-T through

6    3006-T?

7              MR. DRATEL:  No objection.

8              THE COURT:  They're admitted.

9              (Government's Exhibits 3002-T through 3006-T received

10   in evidence)

11   Q.  If you could put those to the side, Detective.

12             Did there come a time when you participated in a

13   traffic stop of David Barea?

14   A.  Yes, there was.

15   Q.  Approximately, when was that?

16   A.  That was approximately on January 15th of 2013.

17   Q.  Can you tell the jury how that traffic stop came about?

18   A.  After surveilling Mr. Barea for approximately three to four

19   hours, we were able to locate him, had a team on him, didn't

20   lose visibility of him.  We followed him on the highway to

21   Third Avenue Cross Bronx, proceeded to box him in safely,

22   forced him to stop his vehicle, and immediately placed him

23   under arrest.

24   Q.  Where did you take him?

25   A.  We took him to the 43 Precinct Station parking lot.

1    Q.   What, if anything, happened in the parking lot of 43

2    Precinct?

3    A.   In the parking lot of 43 Precinct we continued to search

4    his vehicle.  I found approximately 180 grams of crack cocaine

5    in his vehicle, after being on the phone back and forth with

6    the Bronx District Attorney's Office.

7    Q.   Where was that crack cocaine -- was it crack cocaine or

8    mixture of crack cocaine and cocaine?

9    A.   It was a mixture of both.

10   Q.   And where was that, where was that item found?

11   A.   That was found in a secret compartment in the vehicle, a

12   trap box that he had on the center console of Taurus car that

13   he was driving.

14   Q.   Can you explain to the jury what a secret compartment is?

15   A.   A secret compartment is sort of a metal box that you'll

16   find underneath the dashboard, underneath the seat; basically

17   anywhere where there's space in a vehicle you could fit illegal

18   firearms, drugs.

19        It won't open with just a touch of a button.  Maybe

20   put the radio on 95.2, push the left signal light, that box

21   will open up; lower the window all the way down, put the radio

22   on a different frequency, or turn the head lights on, flick

23   them.  I mean, it's very very complex.  But only the driver of

24   that said vehicle would know how to open that secret

25   compartment box.  That's the way they get to --

1   Q.  Detective Ayala, was Mr. Barea processed that day?

2   A.  No, he was not.

3   Q.  Did he begin to cooperate?

4   A.  The agreement was that he would cooperate as per the Bronx

5   District State Office was for him to come in voluntarily that

6   Friday to -- with an attorney and see if he could become an

7   informant and help us in, again, finding out who his, his

8   dealers were, where he was getting his drugs from.

9   Q.  To your knowledge, did Mr. Barea provide information

10  when -- well, to your knowledge, did Mr. Barea become an

11  informant?

12  A.  To my knowledge, he did become an informant, but he didn't

13  produce.  He didn't do what was asked of him.

14  Q.  Did you have any further dealings, personal dealings with

15  Mr. Barea after January 15th, 2013?

16  A.  No.

17          MR. ARAVIND:  May I have one moment, your Honor?

18          THE COURT:  Yes.

19          MR. ARAVIND:  No further questions.

20          THE COURT:  Any cross?

21          MR. DRATEL:  Yes, your Honor.

22  CROSS EXAMINATION

23  BY MR. DRATEL:

24  Q.  Good afternoon, Detective Ayala.

25  A.  Good afternoon, sir.

1    Q.  And when you're talking about the wiretap before, just so

2    we're clear, you're talking about New York State wiretap,

3    right?

4    A.  Yes, sir.

5    Q.  Authorized by New York State courts, run through the NYPD,

6    and the Bronx District Attorney's Office?

7    A.  Yes, sir.

8    Q.  And as a basis for those, as basis for the wiretap on

9    Mr. Barea's phones, that required some preliminary

10   investigation, correct?

11   A.  Yes, that's correct.

12   Q.  You have to have sufficient information to convince a judge

13   that someone is involved in illegal activity before you can get

14   a wiretap, right?

15   A.  Yes.

16   Q.  And among the evidence that you had, was information that

17   on some of the other -- well, withdrawn.

18           You had already had a wiretap on some other phones,

19   correct?

20   A.  That's correct, sir.

21   Q.  And he was overheard talking to those people about illegal

22   conduct, guns and drugs?

23   A.  Yes, drugs.

24   Q.  What you do then is look at the phone number that he's

25   using and then you go to court and get a wiretap on that phone

1    to expand your investigation?

2    A.  It's more of a process.  We have to make sure, we have to

3    make sure we identified the individual.  We just can't get a

4    warrant just based on photo.  We have to identify that

5    individual on that line.

6    Q.  But I mean you have information about someone who is on a

7    set of phone calls.  And then if you have sufficient evidence

8    they're engaged in criminal conduct and it's good for the

9    investigation, you then can try to expand the wiretap to

10   include that other phone call that's coming into the one you're

11   already wiretapping?

12   A.  Yes, absolutely.

13   Q.  That's how you found Mr. Barea initially?

14   A.  Yes.

15   Q.  And among the -- once you're up on his phone -- I think

16   that's the term, right?

17   A.  Yes.

18   Q.  Once you're up on his phone, then you would extend it for a

19   couple of months, right?

20   A.  We have to extend it every 30 days.

21   Q.  Right.  So in Mr. Barea's case, not just one 30 day period.

22   I think there were several 30 day periods, correct?

23   A.  Yes, that's correct.

24   Q.  And among the things that you intercepted were calls where

25   he was selling a weapon, correct?

1    A.  He was selling crack cocaine to one of our main subjects.

2    Q.  Right.

3    A.  He was one of my main subject's supplier who was selling

4    firearms.

5    Q.  Sorry?

6    A.  Who was selling firearms.

7    Q.  And you considered Mr. Barea a supplier, essentially, of

8    drugs as well, correct?

9    A.  Based on the calls that I intercepted with him, yes.

10   Q.  And 180 grams of crack or mixture that you seized from him

11   at the time of his arrest is not a personal use quantity, in

12   your opinion?

13   A.  No.

14   Q.  And at that time on January 15th, 2013 or shortly

15   thereafter, he also surrendered three guns to NYPD, correct?

16   A.  I was told that by the lead investigator, Detective Lennon,

17   yes.

18   Q.  Now, that was a major opportunity that you gave Mr. Barea,

19   correct; in other words, not be arrested, and instead work as a

20   confidential informant for your unit to develop cases for you?

21   A.  Yes.

22   Q.  Because otherwise he could have gone to prison and been

23   charged and convicted and sentenced, right?

24   A.  Yes.

25   Q.  And you got some information from Mr. Barea about his drug

1    contacts, right?

2    A.  To the best of my knowledge, again the lead investigator

3    did get some information, but I don't think it was valid.

4    Q.  And some information about gun trafficking, but not enough

5    to produce other arrests?

6    A.  Yes, that's correct.

7    Q.  And he could still be charged for the crack cocaine that

8    you recovered from him in January of 2013, correct?

9    A.  Yes, he could.

10   Q.  Statute hasn't run yet, statute of limitations hasn't run.

11   He could be charged, correct?

12   A.  That's correct.

13   Q.  And at the time that he became an informant, was he

14   instructed that any illegal activity that he was engaged in had

15   to stop?

16            MR. ARAVIND:  Objection, hearsay and foundation.

17            THE COURT:  Well, why don't you lay the foundation,

18   then I'll allow it.

19            MR. DRATEL:  Thank you, your Honor.

20   Q.  Now, when someone is working as a confidential informant,

21   they're not supposed to continue to commit crimes, correct?

22   A.  That's correct.

23   Q.  And in order that that is made clear, is it standard for

24   police officers, such as yourself, or people in your unit to

25   instruct the confidential informant that very fact?

1    A.  Yes, that's correct.

2    Q.  And, to your knowledge, was Mr. Barea instructed of that

3    restriction as well?

4           MR. ARAVIND:  Again, objection to hearsay.

5           THE COURT:  I'll allow it.

6    A.  Yes, he was.

7    Q.  And were you, during the period between January 15th and

8    the end of March 2013, were you aware whether or not Mr. Barea

9    was continuing to sell drugs -- I mean at the time, at that

10   time during that two month period between January and

11   March 25th, did you have any knowledge that he was selling

12   drugs?

13   A.  No, I did not.

14   Q.  And if you had knowledge of that, would you have terminated

15   him as a confidential informant?

16   A.  Mr. Barea never worked for me as an informant per se.  He

17   worked for another investigator that I worked with.

18   Q.  And did Mr. Barea -- was a confidential informant --

19   withdrawn.

20          Does he still have a status as a confidential

21   informant for NYPD or Bronx D.A. Office, do you know?

22   A.  I do not know.

23          MR. DRATEL:  Nothing further, your Honor.  Thank you.

24   REDIRECT EXAMINATION

25   BY MR. ARAVIND:

1   Q.  Detective Ayala, when is the last time you intercepted a

2   call involving David Barea?

3   A.  The day before I placed him under -- detained him at the

4   precinct, which was January 14th, 2013.

5   Q.  And from January 14 through March of 2014 or, sorry, 2013,

6   were you personally involved in any investigation of Mr. Barea?

7   A.  No, I was not.

8   Q.  To your knowledge, Detective, is there still an open

9   investigation of Mr. Barea in the Bronx?

10  A.  Yes, there is.

11          MR. ARAVIND:  No further questions.

12          THE COURT:  Any more cross?

13          MR. DRATEL:  No.  Thank you.

14          THE COURT:  Okay, you may be excused.

15          THE WITNESS:  Thank you, your Honor.

16          (Witness excused)

17          MS. TEEKEI:  Your Honor, may we have a quick sidebar

18  with respect to our next witness, David Barea?

19          As the Court is aware, there is an issue that needs to

20  be addressed.

21          (Continued on next page)

22

23

24

25

E9UZCHA6

```
 1               (At the sidebar)

 2               THE COURT:  Okay.  In the future, I prefer that we

 3      have our discussions like this during the break so we don't

 4      have to take the jury time, but go heed.

 5               MS. TEEKEI:  Mr. Barea, as you know, will be

 6      testifying pursuant to an immunity agreement.

 7               THE COURT:  Right.

 8               MS. TEEKEI:  There are some questions outside of the

 9      jury's hearing that we typically ask in this situation; for

10      example, is he testifying pursuant to an immunity order, and we

11      elicit these types of questions we ask before outside the

12      presence of the jury, and that's all we would intend to do

13      prior to the jury's hearing that.

14               THE COURT:  Do you mind starting with him on questions

15      that they could hear, and then ask those questions when we

16      excuse the jury in 15 minutes?

17               MS. TEEKEI:  We get very quickly to the heart of the

18      matter.

19               THE COURT:  Oh, okay.  So, those questions have to be

20      asked first?

21               MS. TEEKEI:  Yes, your Honor.

22               THE COURT:  So I guess I will excuse the jury.  How

23      long will those questions take?

24               MS. TEEKEI:  Five minutes, not --

25               THE COURT:  And how long is his direct?
```

E9UZCHA6

1          MS. TEEKEI:  It's quite long, your Honor.  It's about

2     an hour and a half to two hours.

3          MR. ARAVIND:  So we could start the entire proceeding

4     tomorrow.

5          THE COURT:  What I'll do is, why don't we do the

6     preliminary questions today, and then we'll start his direct

7     tomorrow.

8          MS. TEEKEI:  Sure.

9          THE COURT:  Is that okay?

10          MR. DRATEL:  Thank you.

11          MS. TEEKEI:  Thank you, your Honor.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

E9UZCHA6

1              (In open court)

2              THE COURT:  Okay.

3              Ladies and gentlemen, there are matters that we need

4    to deal with that don't concern you, and so I'm prepared to

5    excuse you for the day and I'll see you at 9:30 tomorrow

6    morning.  And please remember my instructions, don't talk about

7    the case with anyone, don't look anything up, and please be

8    here by 9:30.  Okay?  Thank you very much.

9              You could leave the binders on the chairs.

10             JUROR:  Could I leave my notes in here?

11             THE COURT:  Yes.

12             (In open court; jury not present)

13             THE COURT:  Okay, you may be seated.  Do you want to

14   call your witness?

15             MS. TEEKEI:  Yes, your Honor.  The government calls

16   David Barea.

17    DAVID BAREA,

18        called as a witness by the government,

19        having been duly sworn, testified as follows:

20   DIRECT EXAMINATION

21   BY MS. TEEKEI:

22             THE COURT:  Please pull your chair all the way in so

23   you're close to the mic.  Thank you.

24             You may proceed.

25             MS. TEEKEI:  Thank you, your Honor.

E9UZCHA6                          Barea - direct

1    Q.  Mr. Barea, based upon conversations that you've had with

2    your counsel, is it your intention to assert your Fifth

3    Amendment right against self-incrimination in answering certain

4    questions in the matter before the Court today?

5    A.  Yes.

6    Q.  Have you been informed, through your counsel, that the

7    government intends to seek an order of immunity which would

8    allow you to testify about any questions that are posed to you

9    today?

10   A.  Yes.

11   Q.  Just to be clear, if you are asked certain questions on the

12   stand today or tomorrow about your conduct, including illegal

13   narcotics distribution and possession of weapons and purchase

14   of weapons, would you assert your Fifth Amendment right not to

15   testify?

16   A.  Yes.

17            MS. TEEKEI:  Your Honor, the government asserts, for

18   reasons stated in its application, that the testimony of this

19   witness is important and that this witness possesses

20   information that's important to the matter at issue before the

21   Court, and we would ask that your Honor grant the witness

22   immunity to testify today and for the length of his testimony,

23   as it will likely take up through part of tomorrow.

24            THE COURT:  The application is granted.

25            MS. TEEKEI:  Thank you, your Honor.

 1              THE COURT:  Okay.  So, Mr. Barea, we'll be starting

 2      again tomorrow.  So if you could be here at or before 9:30, and

 3      we'll begin with your testimony in front of the jury then.

 4              THE WITNESS:  Yes.

 5              THE COURT:  Thank you.

 6              THE WITNESS:  Thank you.

 7              (Witness excused)

 8              THE COURT:  So I have just a little bit of

 9      housekeeping, and I'll hear anything you all have.

10              Is there anything in the binders that should come out

11      or anything that should be added?  I remember we did not admit

12      Exhibit 4, but I think you may have admitted it through another

13      witness.

14              MS. TEEKEI:  Your Honor, that's correct.  If we may

15      just, we'll review the binders and we'll take out anything and

16      put in anything extra before tomorrow.

17              THE COURT:  Okay.  It's actually better if Mr. Street

18      does it because there are juror notes in the binders.

19              MS. TEEKEI:  Sure.  That's right, your Honor.  We'll

20      provide Mr. Street with the list of any replacements and any

21      supplements, whether they're taking out or putting in.

22              THE COURT:  Okay, that's good.  Thank you.

23              Mr. Dratel, anything?

24              MR. DRATEL:  We put in two exhibits.  We'll make

25      copies of them.

E9UZCHA6

1        THE COURT:  That would be good.  Then we'll add those

2   to the binders as well.

3        MR. ARAVIND:  Your Honor, there is a birth certificate

4   for a Dante Chambers that we chose for reasons not to include

5   in the binder.  It will be -- we are going to offer that

6   exhibit later during the trial, but we thought it didn't make

7   sense to include it in the binders.  So that's one exhibit that

8   will not be included.

9        THE COURT:  Okay.

10        Is there anything else we need to deal with?

11        MR. DRATEL:  Just get an order of tomorrow.

12        THE COURT:  Yes, what are we expecting tomorrow?

13        MR. ARAVIND:  Just one moment, your Honor?

14        MS. TEEKEI:  Your Honor, we intend to call David

15   Barea, Officer Michael Whelan, Sergeant Thomas Derosa.

16        THE COURT:  Wait, the second, sorry -- who was the

17   third one, Derosa?  Got it.

18        MR. ARAVIND:  Derosa.

19        THE COURT:  Thank you.

20        MS. TEEKEI:  Demi Torres, Isaac Nelson, and Starley

21   Sandez.

22        THE COURT:  Okay.  And exhibits, are there any

23   exhibits for which there are not stipulations, Mr. Dratel, that

24   you plan to object to?

25        MR. DRATEL:  Well, just the New Jersey stuff.  That's

1    Sergeant Derosa.  I thought we're going to have a hearing about

2    that at some point.

3            THE COURT:  We are going to have a hearing about that

4    at some point.

5            MR. DRATEL:  Keep them till the end.  I think if we

6    have Barea, Whelan and Torres will probably get through most of

7    the day there, I think.

8            MR. ARAVIND:  Your Honor --

9            THE COURT:  Yes.

10           MR. ARAVIND:  Officer Derosa is coming in from New

11   Jersey.  He's unavailable -- I think my understanding he's

12   unavailable on Thursday, so we really would like to get him on.

13           THE COURT:  Tomorrow afternoon.

14           MR. ARAVIND:  And I think as the --

15           THE COURT:  Maybe what we can do is have an extended

16   lunch, do the hearing --

17           MR. DRATEL:  Fine.

18           THE COURT:  -- for half an hour after lunch.

19           MR. DRATEL:  Okay.

20           THE COURT:  Then proceed with the jury.  I'm sure they

21   won't mind having a little extra time for lunch.

22           MR. ARAVIND:  That would be fine.

23           MR. DRATEL:  At least one juror.

24           THE COURT:  Yes.  Well, he'll figure out the security

25   line.

E9UZCHA6

```
 1                 All right, yes.
 2                 MR. DRATEL:  Oh, nothing.  I can just talk about it
 3      with the government.  I think we maybe able to dispense with a
 4      witness.
 5                 THE COURT:  Okay.  No other evidentiary issues that
 6      you envision?
 7                 MR. DRATEL:  I don't envision.
 8                 THE COURT:  Okay.
 9                 MR. DRATEL:  Oh, other than obviously the in-court
10      identification of Ms. Torres, I will object to that, so.
11                 THE COURT:  Okay, so let me hear what you have to say.
12                 MR. DRATEL:  Oh, well, I hate to sound like a broken
13      record, but --
14                 THE COURT:  Okay.  Let's just back up.
15                 My understanding of the past motions is that they all
16      related to what I thought of as victim two, who I now
17      understand is Ms. Torruella.  And I don't recall any motions
18      with respect to victim one.  I don't swear I have a good
19      memory, so you can tell me all about it.
20                 MR. DRATEL:  Victim three, it's actually the witness,
21      not described as a victim, but it's Ms. Torres who is --
22                 THE COURT:  Okay.  The daughter of course.
23                 MR. DRATEL:  Daughter.
24                 THE COURT:  I don't remember motions relating to her.
25                 MR. DRATEL:  Well, she's the one who saw the internet
```

E9UZCHA6

1   photo.  It wasn't Ms. Torruella, it was her.

2              THE COURT:  I'm sorry, I didn't understand that.

3              MR. DRATEL:  Yeah.  She's shown an array where

4   Detective Deloren said she recognized, but didn't make a

5   positive ID.  Then we have the internet photo, and then we have

6   the second array with positive ID.

7              With Ms. Torruella we have a non-ID of the first array

8   and then a positive ID of the second one, and we have the trial

9   testimony.

10             THE COURT:  Okay.  And just as I'm readjusting this

11  all in my mind.  So when you made your original motion long

12  long ago to suppress identification evidence because there were

13  two arrays, who was that?

14             MR. DRATEL:  But the reconsideration motion was

15  about --

16             THE COURT:  Okay.

17             MR. DRATEL:  -- Ms. Torres, and to the extent that she

18  had conferred with her mother and they somehow knew more

19  information.

20             THE COURT:  Right.

21             MR. DRATEL:  So we're asking for both, again.  But the

22  reconsideration was directed principally at Ms. Torres, because

23  she's the one who is shown those internet photos in between the

24  arrays.

25             THE COURT:  Okay.  And so now what's your position?  I

E9UZCHA6

1    mean, there was a motion to reconsider with respect to her

2    based on the newspaper.

3              MR. DRATEL:  Right.

4              THE COURT:  I ruled on that long ago.

5              MR. DRATEL:  Right.

6              THE COURT:  And that's where we stand.

7              MR. DRATEL:  But I'm just objecting to any attempt at

8    in court identification as being augmented and, essentially, a

9    product of the other photographic ID and not independent.

10             THE COURT:  Okay.

11             MR. DRATEL:  That's my --

12             THE COURT:  And what is the government's position?

13             MS. TEEKEI:  As your Honor stated earlier, that is all

14   area for cross examination by Mr. Dratel.  We believe that type

15   of identification is proper and appropriate, if such an

16   identification is made, and Mr. Dratel will be able to cross

17   examine the witness on that.

18             THE COURT:  Okay.  So I will leave things as they are

19   for the moment, and if I have any more thoughts on the subject,

20   I'll tell you in the morning.

21             MR. DRATEL:  Okay.  Thank you, your Honor.

22             THE COURT:  Okay, thank you.  We're excused.

23             THE DEPUTY CLERK:  All rise.

24             (Adjourned to October 1, 2014 at 9:30 a.m.)

25

```
 1                        INDEX OF EXAMINATION

 2   Examination of:                          Page

 3   EMMA TORRUELLA

 4   Direct By Mr. Aravind . . . . . . . . . . . 134

 5   Cross By Mr. Dratel . . . . . . . . . . . 187

 6   Redirect By Mr. Aravind . . . . . . . . . 208

 7   ELLIS DELOREN

 8   Direct By Ms. Teekei . . . . . . . . . . . 216

 9   Cross By Mr. Dratel . . . . . . . . . . . 253

10   Redirect By Ms. Teekei . . . . . . . . . . 290

11   Recross By Mr. Dratel . . . . . . . . . . 292

12   KENTRELL FERGUSON

13   Direct By Mr. Aravind . . . . . . . . . . . 297

14   RODRIGO AYALA

15   Direct By Mr. Aravind . . . . . . . . . . 301

16   Cross By Mr. Dratel . . . . . . . . . . . 311

17   Redirect By Mr. Aravind . . . . . . . . . 316

18   DAVID BAREA

19   Direct By Ms. Teekei . . . . . . . . . . . 320

20                        GOVERNMENT EXHIBITS

21   Exhibit No.                          Received

22    1   . . . . . . . . . . . . . . . . . . . 137

23    1A   . . . . . . . . . . . . . . . . . . 138

24    1B   . . . . . . . . . . . . . . . . . . 138

25    62   . . . . . . . . . . . . . . . . . . 140
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
 1    3  . . . . . . . . . . . . . . . . . 146

 2    63  . . . . . . . . . . . . . . . . . 152

 3    64  . . . . . . . . . . . . . . . . . 163

 4    65  . . . . . . . . . . . . . . . . . 164

 5    66  . . . . . . . . . . . . . . . . . 169

 6    2  . . . . . . . . . . . . . . . . . 180

 7    2B  . . . . . . . . . . . . . . . . . 180

 8    1000  . . . . . . . . . . . . . . . . 185

 9    2A  . . . . . . . . . . . . . . . . . 222

10    1901  . . . . . . . . . . . . . . . . 224

11    50-60  . . . . . . . . . . . . . . . . 226

12    200 and 201  . . . . . . . . . . . . . 232

13    600  . . . . . . . . . . . . . . . . . 235

14    3A  . . . . . . . . . . . . . . . . . 239

15    500  . . . . . . . . . . . . . . . . . 244

16    4  . . . . . . . . . . . . . . . . . 250

17    4000  . . . . . . . . . . . . . . . . 252

18    4A  . . . . . . . . . . . . . . . . . 253

19    3,000  . . . . . . . . . . . . . . . . 308

20    3002-T through 3006-T  . . . . . . . . . . 309

21                    DEFENDANT EXHIBITS

22    Exhibit No.                          Received

23    A  . . . . . . . . . . . . . . . . . 257

24    B  . . . . . . . . . . . . . . . . . 280

25
```