Ea1gcha1                    TRIAL

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA

4            v.                          13 CR 345(LGS)

5  ANTIONE CHAMBERS,

6              Defendant.

7  ------------------------------x

8                                        New York, N.Y.
                                         October 1, 2014
9                                        9:30 a.m.

10

   Before:
11
                    HON. LORNA G. SCHOFIELD,
12
                                         District Judge
13

14                        APPEARANCES

15

   PREET BHARARA
16      United States Attorney for the
        Southern District of New York
17 SANTOSH ARAVIND
   NEGAR TEKEEI
18      Assistant United States Attorneys

19 JOSHUA L. DRATEL
   WHITNEY SCHLIMBACH
20      Attorneys for Defendant

21 ALSO PRESENT:  JOHN REYNOLDS, FBI
                  JENNIFER HANSMA, Paralegal AUSA
22

23

24

25

Ea1gcha1                          TRIAL

1          (In open court; jury not present)

2          THE COURT:  Good morning.  You may be seated.

3          I have just a few things that I want to address.  The

4     first thing is, yesterday there were objections to the

5     cross-examination of the first witness about her immunity

6     agreement and I upheld some of those objections, but I allowed

7     Mr. Dratel to inquire about the substance of the agreement and

8     put into evidence the fact of the agreement.

9          My question is, what was the basis for the objections

10    to that line of questioning beyond that?

11         MR. ARAVIND:  First, it was an objection to the

12    characterization of our proffer agreement as an immunity

13    agreement; unlike Mr. Barea, Ms. Torruella has not had any sort

14    of immunity agreement with the government, and we object to

15    that characterization.

16         As to the substance of those questions, I think we

17    were concerned about where Mr. Dratel was going with that, but

18    the main objection was to the --

19         THE COURT:  Characterization.

20         MR. ARAVIND:  -- characterization of that as an

21    immunity agreement as opposed to what Mr. Barea has with the

22    government.

23         THE COURT:  I just wanted to make sure I understood

24    before we encountered a similar situation with Mr. Barea.

25         Mr. Dratel.

Ea1gcha1                          TRIAL

1           MR. DRATEL:  I never said that she had an immunity

2    agreement; I said it was a proffer agreement.  I said that she

3    agreed she understood her limited immunity -- I don't even know

4    if she was allowed to answer those questions actually, but my

5    question was not do you have immunity, it was did you get a

6    limited immunity -- I know what a proffer agreement says so I

7    did not call it an immunity agreement.  I never said she had

8    immunity.  I was trying to circumscribe it.

9           My purpose was, at the time at the beginning of the

10   cross-examination, was to determine whether she had some fear

11   of prosecution that could color her testimony in some way

12   favorable to the government and that was the purpose of my

13   argument.

14           THE COURT:  Thank you.

15           So the second issue that I want to address is the

16   admissibility of the safety valve proffer by Mr. Brown through

17   the testimony of Agent Reynolds.

18           My understanding is that the request is to offer

19   testimony limited to essentially what we heard during the Rule

20   104 hearing about the extent of the grounds of acquaintance

21   with Twizzie.  Is that right?  Let me confirm that with the

22   government.

23           MR. ARAVIND:  Yes.  I think our position is that if

24   the postarrest statement is not being used to prove the truth

25   of the matter asserted but only to establish that Mr. Brown did

1        not know Antione Chambers, the defendant --

2                THE COURT:  Not that he didn't know, but that he

3        didn't say anything.

4                MR. ARAVIND:  That he didn't say anything; that's

5        correct, that we should be allowed to establish, to complete

6        the record, that, in fact, during his proffer statement, he the

7        admit to knowing an individual named Twizzie.

8                THE COURT:  I will allow that safety valve proffer to

9        come in to that limited extent pursuant to Federal Rule of

10       Evidence 806, but only to challenge the credibility of Brown

11       and also to challenge the substantive point that Mr. Dratel is

12       seeking to make, which is that -- no, I'm not going to do that

13       because I don't think it's inconsistent, sorry to be thinking

14       out loud -- only to challenge the credibility of Brown and only

15       when and if the defense puts Brown's credibility at issue by

16       offering the 302 of Brown's statement.  And I'll give a

17       limiting instruction that it's offered for the limited issue of

18       credibility and not for the truth.

19               Let me say a couple of things, first, about the

20       defense arguments and then about what that means as far as how

21       the evidence should come:  In the defense argues, first, that

22       it shouldn't come in at all because the Court has already ruled

23       Mr. Brown's postarrest statements reliable, but yesterday I

24       made only a threshold finding of reliability for admissibility

25       and it's for the jury to decide ultimately the weight and the

Ea1gcha1                          TRIAL

1    credibility of the evidence.

2              The defense also argues that the admission of the

3    safety valve proffer violates Mr. Chambers' confrontation

4    clause rights, but it's the defense that seeks to introduce the

5    302 of an unavailable witness, Mr. Brown.  So if the defense

6    has confrontation clause concerns, they shouldn't be

7    introducing the 302, but once the defense puts Brown's

8    credibility at issue by introducing the 302, it can't

9    cherrypick which of his statements come in and the government

10   is entitled to challenge the credibility of that out-of-court

11   declarant.

12             The import of this ruling for the order of evidence is

13   that, first, the defense must introduce the 302 before any of

14   this comes in either on its own case, if it wishes to wait

15   until then, or on cross, and only after the defense has put the

16   302 in can the government challenge Brown's credibility with

17   Agent Reynolds testimony about Brown's statement or with other

18   inconsistent statements by Brown.  In other words, you cannot

19   elicit it on Agent Reynolds' direct; you have to wait until the

20   defense puts it in.  That's the second issue I wanted to

21   discuss.

22             The third issue is what I think is the ethical issue

23   that arose yesterday when we heard Detective Deloren say that

24   he had disclosed the intervening display of the individual

25   photo of Mr. Chambers, that he had disclosed that fact to the

1   government at around the time it happened.  And I know from

2   submissions by counsel, which I commend you for making, by the

3   way, that I was informed that you were only told about that

4   individual photo at around the time you disclosed it to the

5   Court, which I think was earlier this year.  I think it was

6   February, but I could be wrong on the date.

7           Tell me what your thinking is on that.

8           MR. ARAVIND:  Our thinking, your Honor, is still a

9   little bit in process.  I just received a call from our

10  higher-ups because we have been in consultation with them about

11  any sort of ethical obligation that we have.

12          We drafted a letter last night; that is, the position

13  is being reviewed by our supervisors.  I expect by lunch we'll

14  be able to present that letter to the Court.  Just a preview of

15  the letter is, from our conversations with our supervisors, we

16  believe that as an initial matter, any further evidence

17  relating to the timing of when Detective Deloren presented or

18  informed the United States Attorney's Office when he showed

19  that single photograph we believe is a collateral matter, and

20  under Rule 608(b),  that any additional evidence would

21  constitute impeachment going to the credibility of Detective

22  Deloren through the admission of extrinsic evidence.  We'll put

23  in a short letter to that effect.

24          We are saying also in the letter should the Court find

25  that is not a collateral matter, that we will prepare a

Ea1gcha1                    TRIAL

1    testimonial stipulation after conferring with Mr. Dratel and

2    we'll present that to the Court.

3         If we do that, that requires, again, some levels of

4    speaking to the superiors in our office.  We have to go through

5    a process for providing testimonial stipulations from assistant

6    United States Attorneys, but we will make all arrangements to

7    do so.

8         THE COURT:  608(b), I presume you're referring to the

9    Rules of Evidence.  I'm thinking of the Rules of Professional

10   Conduct, which govern all lawyers who practice here in New York

11   and I'm not sure of the rule, I think it's 3.3.  But I believe

12   that if there is an incorrect statement by a witness, a lawyer

13   has to take remedial measures in disclosing it to the tribunal,

14   which I believe in this case would also be disclosing it to the

15   jury.

16        So I believe that you have an ethical obligation to

17   correct the mistaken in one way or another, but Mr. Dratel

18   wants to be heard so I'll hear him.

19        MR. DRATEL:  Just on a timing issue, in terms of this

20   chronology, just to fill it in for the record because it may

21   not get in in the context of the testimony, is that our review

22   of the 3500 material appears to establish, as far as we can

23   tell, is that the first interview of Ms. Torres, who is the

24   witness in question, was January 24, 2014, and the letter from

25   the government is within a reasonable time frame after that.

Ea1gcha1                    TRIAL

1    And that, I believe, is the first memorialized alert to

2    prosecutors in this case, and I'm only talking about

3    prosecutors, not Detective Deloren or anyone else involved in

4    the investigation.  But it's the first alert to prosecutors

5    that's memorialized that would establish knowledge of that

6    incident.  And that is, as I said, not necessarily

7    contemporaneous, but within a certain time frame of when the

8    Court is then advised of the issue.

9              THE COURT:  Thank you very much.

10             MR. ARAVIND:  We sent an email last night to our

11   ethics person and got a response.  A chief just spoke to that

12   same ethics person about this particular issue.  I think the

13   record is a little bit ambiguous.

14             If you look at Detective Deloren's testimony, he

15   doesn't say specifically the date that he advised the U.S.

16   Attorney's Office.  He said it was closer in time to when the

17   actual showing of the photograph happened as opposed to

18   February 2014.  I understand that the Court has some concerns

19   about that.  We believe that -- we stand by the letter that we

20   submitted to your Honor shortly in January of 2014.

21             THE COURT:  I haven't looked at it recently.  Will you

22   just tell me the facts of when you learned about this

23   individual photo, the showing of this individual photo to

24   Ms. Torres.

25             MR. ARAVIND:  My understanding from talking --

1          THE COURT:  I mean the government.

2          MR. ARAVIND:  Sure, but that's informed by

3   conversations that I had with the two prosecutors that were

4   handling this is that, yes, in fact, the first time that they

5   were made aware of the showing of the photograph was after Demi

6   Torres was interviewed by this office along with the FBI.

7          Again, whether or not Detective Deloren provided some

8   other notifications in some way or another, I don't know; I

9   think the record is a little bit ambiguous about that.  But we

10  are happy if the Court wants to, and given the Court's concerns

11  about ethical obligations, to work with Mr. Dratel and to speak

12  with at least one assistant who handled that, it was Ms. Tekeei

13  and Ms. Lester.  We can speak to Ms. Lester and prepare a

14  testimonial stipulation that we can then read into the record.

15  I don't want to push this issue.  I understand the Court's

16  concerns and we want to address those concerns.

17         THE COURT:  Thank you.  I appreciate it.

18         MR. DRATEL:  I don't think the record is ambiguous.

19  He -- maybe one answer was sometime closer; then he said knew

20  about it all along.

21         THE COURT:  I heard two answers.  After you pressed

22  him on the first answer, that's when he backed off a little bit

23  on the second answer, but I recall the testimony as well.

24         And I appreciate the government's approach to the

25  issue, so thank you.

1          That's all I have.  Our plan is to still have a

2     suppression hearing at our lunch break.  Let me ask this:  I

3     think we all know what is going to transpire.  How long do you

4     think your direct will be?  That's a question for the

5     government, either one of you, and then I'll ask Mr. Dratel how

6     long he thinks the cross will be so I'll know when to tell the

7     jury to come back.

8          MR. ARAVIND:  As your Honor previewed, I think the

9     direct examination is four to five minutes related to the

10    suppression hearing issues.

11         THE COURT:  Right.  Mr. Dratel, on cross, how long do

12    you think?

13         MR. DRATEL:  I think ten minutes is probably my guess.

14         THE COURT:  I'll give them an extra 20 minutes.

15         Is there anything else we need to deal with in the

16    next five minutes?

17         MS. TEKEEI:  Your Honor, Mr. Barea's attorney, Jill

18    Shellow, has requests to bring in a technology, an iPad today,

19    in connection with his being here and I have that here.  I

20    didn't get a chance to hand it up earlier.  I'll hand it to

21    Mr. Street.

22         THE COURT:  I confess, I know nothing about these

23    things and Mr. Street does.

24         I've never found it very effective for me to sign

25    something the same day that it's supposed to happen, but I'm

Ea1gcha1                          TRIAL

1    happy to sign it.

2              MS. TEKEEI:  I'm handing up the request on her behalf,

3    your Honor.

4              THE COURT:  Okay.  Could I look at it?

5              We have three minutes.  I don't want to bring the jury

6    in early, so you can do whatever you'd like.

7              MR. DRATEL:  Thank you, Judge.

8              (Recess)

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ea1gcha1                    TRIAL

1          (In open court; jury present)

2          THE COURT:  Good morning, ladies and gentlemen.  Thank

3    you for being prompt and being awake and being here so that

4    we're ready to start.

5          You may proceed.

6          MS. TEKEEI:  Thank you, your Honor.  The government

7    calls David Barea.

8     DAVID BAREA,

9       called as a witness by the Government,

10      having been duly sworn, testified as follows:

11   DIRECT EXAMINATION

12   BY MS. TEKEEI:

13   Q.  Good morning, Mr. Barea.

14   A.  Good morning.

15   Q.  How old are you?

16   A.  Forty-two.

17   Q.  Where were you born?

18   A.  In Manhattan.

19   Q.  Generally, where do you live now?

20   A.  In the Bronx.

21   Q.  Are you legally married?

22   A.  No.

23   Q.  Are you in a relationship?

24   A.  Yes, I am.

25   Q.  With whom?

Ea1gcha1                          Barea - direct

1   A.  Emma Torruella.

2   Q.  How long have you been in a relationship with

3   Ms. Torruella?

4   A.  Twelve years now.

5   Q.  Before your relationship with Ms. Torruella, were you

6   married?

7   A.  Yes.

8   Q.  And how long were you in that relationship?

9   A.  Fifteen years.

10  Q.  How did that relationship come to an end?

11  A.  My wife passed away.

12  Q.  Mr. Barea, do you have children?

13  A.  Yes, I do.

14  Q.  How many?

15  A.  Two.

16  Q.  And do you have any nick names?

17  A.  Myself?

18  Q.  Yes?

19  A.  Yes.

20  Q.  What is your nick name?

21  A.  Groovy.

22  Q.  What do you currently do for a living?

23  A.  I'm not working right now, but I'm a truck driver.

24  Q.  How long have you been unemployed?

25  A.  Since February of 2013.

Ea1gcha1                          Barea - direct

1    Q.  Prior to becoming unemployed, what did you do for a living?

2    A.  Same thing, I drove trucks.

3    Q.  Did you do anything else to make money?

4    A.  Yes.

5    Q.  What did you do?

6    A.  I sold drugs.

7    Q.  Sir, are you testifying here today pursuant to an immunity

8    order?

9    A.  Yes.

10   Q.  What is your understanding of what that means?

11   A.  Whatever I say can't be used against me.

12   Q.  Does the immunity order protect you from lying on the

13   stand?

14   A.  No.

15   Q.  What happens if you lie?

16   A.  They will charge me with perjury.

17   Q.  Are you getting any other benefit from the government for

18   your testimony?

19   A.  No.

20   Q.  Do you want to be testifying here today?

21   A.  Yes.

22   Q.  Why?

23   A.  Because I was a victim of a crime.

24   Q.  Mr. Barea, let me ask you some questions about your

25   background.  Where did you grow up?

Ea1gcha1                          Barea - direct

1   A.  In the Bronx.

2   Q.  What schools did you attend?

3   A.  IS162, PS27.

4   Q.  How far did you get in school?

5   A.  Ninth grade.

6   Q.  Have you ever been arrested?

7   A.  Yes.

8   Q.  When was the first time you were arrested?

9   A.  When I was 16.

10  Q.  Why?

11  A.  For a gun charge.

12  Q.  And what happened with that charge?

13  A.  It was sealed.

14  Q.  Did you do anything in connection with that charge?

15  A.  Yeah, they put me in, like, a special school, like, a

16  probation.

17  Q.  And after that arrest, were you ever arrested again?

18  A.  Yes.

19  Q.  When?

20  A.  In 2008.

21  Q.  Why?

22  A.  I was driving and I got pulled over for speeding.

23  Q.  What did you get arrested for?

24  A.  They found some cocaine in my pocket.

25  Q.  Sir, you mentioned earlier -- one other question.  What

 1  happened with that arrest?

 2  A.  I had some community service, they lowered it to a

 3  mis- -- to a disorderly conduct and I did, like, four days of

 4  community service.

 5  Q.  Sir, you mentioned earlier that you sold drugs as part of a

 6  way to make a living.  When did you first begin to sell drugs?

 7  A.  In 2008.

 8  Q.  And what were you selling in 2008?

 9  A.  Selling weed and cocaine.

10  Q.  How long did you sell weed and cocaine?

11  A.  Until 2013.

12  Q.  And when you say cocaine, during that time period from 2008

13  through 2013, were you selling powder, crack or both?

14  A.  Can you repeat that.

15  Q.  Sure.  During the time period -- in the time period during

16  which you were selling drugs, what types of drugs were you

17  selling?

18  A.  Weed, cocaine and crack.

19  Q.  Were you in school at that time?

20  A.  No.

21  Q.  Were you working?

22  A.  Yes.

23  Q.  How old were you when you first started selling drugs?

24  A.  2008.

25  Q.  And how old were you then?

Ea1gcha1                        Barea - direct

1   A.  Five years ago, I was approximately 38.

2   Q.  Who was supplying you during that time period from 2008

3   through 2013, who was supplying you with drugs?

4   A.  Different people.

5   Q.  And who were you selling to?

6   A.  Friends, friends of mine.

7   Q.  When did you first start selling cocaine?

8   A.  In 2008.

9   Q.  And when did you first start selling -- let me rephrase.

10          When did you first start selling powder cocaine?

11  A.  In 2008.

12  Q.  And when did you first start selling crack cocaine?

13  A.  In 2012.

14  Q.  Focusing on the time period between 2012 and 2013,

15  approximately how much money were you making and by making I

16  mean profiting, from your drug sales per week?

17  A.  About 2- to 3,000.

18  Q.  And how did people pay you?

19  A.  Cash or I would give them something.

20  Q.  What do you mean by that?

21  A.  Credit or on the arm.

22  Q.  Can you explain how that works, the credit?

23  A.  If I give it to you and you don't have the money then, you

24  know, you pay me back when you have it.

25  Q.  You mentioned earlier that you sold drugs in part to

1   friends.  Did you also sell to people who were reselling those

2   drugs?

3   A.  Yes.

4   Q.  And the cash that you obtained from your customers, what

5   did you do with that?

6   A.  I saved it.  I would put it -- I would save it or if I

7   would put some money in the bank.

8   Q.  Did you carry any weapons when you were selling drugs?

9   A.  Sometimes.

10  Q.  How many?

11  A.  Just one.

12  Q.  How many -- and when I say weapons, let me be specific,

13  firearms, how many firearms did you have during the time period

14  in which you sold drugs?

15  A.  Three.

16  Q.  What kind?

17  A.  Nine mill meter and two revolvers.

18  Q.  Where did you get them?

19  A.  I bought them from someone on the street.

20  Q.  Did you have any cars during the time period in which you

21  were selling drugs?

22  A.  Yes, I did.

23  Q.  How many?

24  A.  Approximately three.

25  Q.  Where did you store your drugs?

1   A.  In the -- I had a trap.

2   Q.  Can you describe for the jury what is a trap?

3   A.  A trap is like a secret compartment.

4   Q.  And where was the secret compartment?

5   A.  On the floor or on the dashboard.

6   Q.  And did you have a secret compartment in all of the three

7   cars?

8   A.  No.

9   Q.  How many of the cars that you had during that time period

10  had traps?

11  A.  Two.

12  Q.  And where did you store your firearms?

13  A.  In the trap.

14  Q.  Were you selling drugs while you were still employed as a

15  truck driver?

16  A.  Yes.

17  Q.  Why did you start selling drugs?

18  A.  After my wife passed away, I had a lot of bills, so I

19  decided to start selling drugs.

20  Q.  Why did you keep -- I'm sorry.  Why did you keep guns while

21  selling drugs?

22  A.  To protect myself.

23  Q.  When you say you had lots of bills, what do you mean by

24  that?

25  A.  To support my family, I had to pay my wife's -- her

Ea1gcha1                          Barea - direct

1    funeral, stuff like that.

2    Q.  After the stop in 2008 that you mentioned earlier, did you

3    get caught?

4    A.  Yes.

5    Q.  How did that happen?

6    A.  Also I was pulled over, I was driving.

7    Q.  Who stopped you?

8    A.  Detective Lennon.

9    Q.  What did you have in your car?

10   A.  There was drugs in the car.

11   Q.  What drugs were in the car?

12   A.  Crack and cocaine.

13   Q.  Did you also have cash?

14   A.  Yes.

15   Q.  What happened after Detective Lennon stopped you?

16   A.  They asked me a lot of questions that -- what I was doing,

17   where the guns and the drugs were at, if I knew where --

18   anything about drugs.

19   Q.  Did there come a time when you met with an assistant

20   district attorney in the Bronx?

21   A.  Yes.

22   Q.  What happened then?

23   A.  They wanted to speak to me and tell -- ask me if I wanted

24   to be a CI.

25   Q.  What's a CI?

Ea1gcha1                          Barea - direct

1  A.  It's when you sign up for -- to give them information,

2  confidential informant.

3  Q.  And did you enter into an agreement with the New York City

4  police department about becoming a confidential informant?

5  A.  Yes.

6  Q.  When was that?  Approximately when was that?

7  A.  That was in January, January 13th.  Well, I didn't sign the

8  papers 'til, like, a week later, so I figured by the end of

9  January.

10  Q.  Of 2013?

11  A.  Yes.

12  Q.  What was your understanding of your obligations under your

13  agreement with the NYPD?

14  A.  To give them information on whoever had guns or drugs.

15  Q.  And what benefit, if any, were you receiving from that?

16  A.  That I was out, I wasn't in jail.

17  Q.  Focusing on the time period after you became a confidential

18  informant, did you ever sell drugs without permission -- excuse

19  me.

20          Strike that.

21          Focusing on the time period after you became a

22  confidential informant, did you commit any crimes?

23  A.  Yes.

24  Q.  When?

25  A.  In 2013, like, after I signed about --

Ea1gcha1                              Barea - direct

1   Q.  And what did you do?

2   A.  I sold drugs again.

3   Q.  To whom?

4   A.  To Ty, Tyrone Brown.

5   Q.  How many times -- who is Tyrone Brown?

6   A.  He was a friend, a guy I knew.

7   Q.  Had you sold to Tyrone Brown prior to becoming a

8   confidential informant with the NYPD?

9   A.  Yes.

10  Q.  Approximately how long had you been selling to Tyrone

11  Brown?

12  A.  About a year.

13  Q.  How often did you sell drugs to him?

14  A.  Two to three times a week.

15  Q.  Approximately what were the quantities of drugs that you

16  sold to him?

17  A.  Five, ten grams, sometimes 15.

18  Q.  And when you say five or ten or 15, sometimes grams, are

19  you speaking of powder cocaine or crack cocaine or both?

20  A.  Both.

21  Q.  After you entered into an agreement with the NYPD, how many

22  times did you sell drugs to Tyrone Brown?

23  A.  About four times.

24  Q.  I'd like to show you what's been entered into evidence as

25  Government Exhibit 2.  Do you recognize that?

1   A.   Yes.

2   Q.   What is that?

3   A.   That's a picture of Tyrone Brown, Ty.

4            MS. TEKEEI:  Your Honor, may we publish it.

5            THE COURT:  Yes.

6            MS. TEKEEI:  Thank you Ms. Hansma.

7   Q.   Mr. Barea, how did you communicate with Tyrone Brown?

8   A.   By phone or text.

9   Q.   Did he call you or did you call him?

10  A.   Both.

11  Q.   I'd like to hand up what's been admitted as Government

12  Exhibits 3002 through 3006.  Can you take a moment to look

13  through those documents.  Do you recognize your initials on

14  those documents?

15  A.   Yes.

16  Q.   I'd like to play for you what's been admitted as Government

17  Exhibit 302 and you can follow along by looking at Government

18  Exhibit 302 -- I'm sorry, 3002 and you can follow along by look

19  at government exhibit 3002-T?

20           THE COURT:  Do you want to offer it in evidence?

21           MS. TEKEEI:  I believe they have been admitted already

22  through Detective Ayala.

23           THE COURT:  These are the ones that were on.

24           MS. TEKEEI:  These are phone calls they were admitted

25  through Detective Ayala yesterday.

1           THE COURT:  Thank you.

2           MS. TEKEEI:  For the jury's benefit, we have 3002-T,

3  the transcript of the calls or the first call that we're about

4  to play in their binders.

5           THE COURT:  Ladies and gentlemen, if you'd like to

6  look in your binders at Government Exhibit 3002-T.  Again,

7  please don't flip through your binders but please do look at

8  3002-T.

9           MS. TEKEEI:  Thank you, Ms. Hansma, can you please

10  play 3002.

11          (Audio recording played)

12  Q.  Mr. Barea, do you recognize the voices on that call?

13  A.  Yes.

14  Q.  Who is speaking on that phone call?

15  A.  Ty and myself.

16  Q.  And what is the purpose of this call?

17  A.  To go meet him and sell him drugs.

18  Q.  When Mr. Brown says you can meet me on the tenth floor,

19  what do you understand that to mean?

20  A.  Ten grams of Coke or crack cocaine -- crack.

21  Q.  Can you tell from this conversation whether it was cocaine

22  or -- powder cocaine or crack cocaine?

23  A.  No.

24  Q.  Did you always have powder cocaine or crack cocaine with

25  you?

1    A.  Sometimes.

2    Q.  And when you didn't, what would you do?

3    A.  When I did what.

4    Q.  When you did not have those substances with you for sale,

5    what would you do?

6    A.  I would try to get it for him or get it for the person.

7    Q.  I'd like you to look at Government Exhibit 3003-T.

8              Ms. Hansma, can you please play Government Exhibit

9    3003.

10             (Audio recording played)

11   Q.  Who is speaking, who are the people speaking on this call?

12   A.  Ty and myself.

13   Q.  What is the purpose of this call?

14   A.  To sell him drugs.

15   Q.  When you say I got some regular joints, but you know

16   they're not really the size that you like it, what does that

17   mean?

18   A.  That it's not the crack that he usually uses.

19   Q.  And when you say no, it's losing a little bit, what do you

20   mean by that?

21   A.  Meaning that if -- if you cook it you're going to lose

22   grams.

23   Q.  I'd like you to look at Government Exhibit 3004-T.

24   Ms. Hansma can you please play that.  Thank you.

25             (Audio recording played)

Ea1gcha1                    Barea - direct

1    Q.  Mr. Barea, who are the speakers on this call?

2    A.  Ty and myself.

3    Q.  And what is the purpose of this call?

4    A.  To sell him drugs.

5    Q.  When you say -- when you ask did you get any feedback, what

6    do you mean?

7    A.  Meaning that the cocaine was weak, that did he get anybody

8    complaining about it.

9    Q.  And when you say I know you ain't going to get stuck with

10   it anyway, what does that mean?

11   A.  Meaning that he'll sell it regardless.

12   Q.  Did you know whether Mr. Brown sold the narcotics that you

13   provided to him?

14   A.  Yes.

15   Q.  Looking at Government Exhibit 3005-T, Ms. Hansma, can you

16   please play it.  Thank you.

17           (Audio recording played)

18   Q.  Who is speaking on this call?

19   A.  Ty and myself.

20   Q.  And what's the purpose of this call?

21   A.  To sell him drugs.

22   Q.  When Mr. Brown says meet me on the tenth floor, what do you

23   understand that to mean?

24   A.  To bring him ten grams.

25   Q.  And when he says I got to call my man back, what do you

1    understand that to mean?

2    A.  That I guess he's going to get it for somebody or sell it

3    to somebody.

4            MR. DRATEL:  Objection he said guess.

5            JUROR:  Or he's going to sell it to somebody.

6    BY MS. TEKEEI:

7    Q.  Looking at 3006-T, the call on December 19, 2012.

8            (Audio recording played)

9            Who is speaking on this call, sir?

10   A.  Ty and myself.

11   Q.  What are you discussing?

12   A.  Drugs.

13   Q.  When Mr. Brown asks if you can meet him on the 20th floor,

14   what do you understand that to mean?

15   A.  Meaning if I had 20 grams available.

16   Q.  When you say so just hit me when you're ready, what do you

17   mean by that?

18   A.  For him to call me back.

19   Q.  Mr. Barea, where would you meet Mr. Brown to conduct your

20   narcotics transactions?

21   A.  In his house on Croes Avenue.

22   Q.  And where on Croes Avenue was his home?

23   A.  Between 174th.  I don't really know the address.

24   Q.  Earlier you described how some customers would pay you in

25   cash and other customers would have credit, how were your

1    dealings with Mr. Brown?

2    A.  Both cash and credit.

3    Q.  All right.  I'd like to direct your attention to March 24

4    and 25th of 2013.  Do you remember that time?

5    A.  Yes.

6    Q.  Can you just generally describe for the jury what happened

7    to you that day?

8    A.  The 24th I'm not sure what I was doing, but the 25th I

9    remember.

10   Q.  And what happened generally?

11   A.  I got kidnapped and robbed.

12   Q.  Where were you?

13   A.  I went to Ty's house to go meet him.

14   Q.  Why?

15   A.  He owed me some money.

16   Q.  From what?

17   A.  From drugs that I had gave him.

18   Q.  What -- around what time of day did you go to meet

19   Mr. Brown?

20   A.  It was about 12, 12:30 in the morning meaning midnight,

21   just after midnight.

22   Q.  Just after midnight?

23   A.  Yes.

24   Q.  Prior to going to see him, did you tell him you were going

25   there?

Ea1gcha1                        Barea - direct

1    A.  Yeah, I had spoken to him during the day.

2    Q.  How?  How did you communicate with him?

3    A.  By phone or text.

4    Q.  Can you describe for the jury Mr. Brown's apartment

5    building from what you remember?

6    A.  It's a red house with a red gate.

7    Q.  And how did you -- what happened when you arrived at the

8    location?

9    A.  I would either call before I go or if not, if he knew I was

10   going, I would just go over there and knock on the door or

11   knock on the window.

12   Q.  And that day, how did you get in?

13   A.  I knocked on the window and he opened the door.

14   Q.  Can you describe the inside of his apartment?

15   A.  You have to go down, like, four steps to the basement.  He

16   lives in the basement.

17   Q.  What happened when you arrived inside of Mr. Brown's

18   apartment?

19   A.  When he opened the door and I went in, we spoke.  As soon

20   as you go down the four steps there's a kitchen area to your

21   right as soon as you go down.  We were speaking right there.

22   He gave me some money that he owed me and he asked me if I had

23   something for him.  I told him no.

24   Q.  Approximately how much money did he give you?

25   A.  $800.

1   Q.  When he asked you if you had something for him, what did

2   you understand that to mean?

3   A.  If I had any drugs for him.

4   Q.  Approximately how long were you at that time inside of

5   Mr. Brown's apartment?

6   A.  A couple of minutes.

7   Q.  What did you do next?

8   A.  I was going out the door to leave and you have to push the

9   door out to get out, so when I pushed the door, they just

10  rushed me, two guys attacked me.

11  Q.  Let me just ask you -- we'll unpack that a little bit.

12          When you say two guys rushed you, can you describe for

13  the jury what you mean by that?

14  A.  There was a tall guy that came in first.

15  Q.  And what was that individual wearing?

16  A.  He had, like, a scarf on his face from his nose down and he

17  was all dressed in black.

18  Q.  Did he have anything covering his hands?

19  A.  Yes, he had gloves.

20  Q.  Can you describe for the jury how his face was covered?

21  A.  With a black scarf and he had a black hat on, a skelly.

22  Q.  Was he carrying anything at that time?

23  A.  Yes.

24  Q.  What?

25  A.  He had a gun on his waist and he had a hammer also.

1    Q.  Can you describe the gun for the jury?

2    A.  It was an automatic.

3    Q.  How do you know that?

4    A.  I've had guns before, but it was like a rectangular shape.

5    Q.  And the other individual who came in, can you describe that

6    person for the jury?

7    A.  Yeah, he was heavy-set, he also had all black on, but he

8    had, like, a -- it was type of, like, a windbreaker rain jacket

9    and it was, like, charcoal gray.

10   Q.  And was that individual covered in any way?

11   A.  Yes, his face was covered also with a black mask.

12   Q.  And were his hands covered?

13   A.  He had, like, one of those snow masks.

14   Q.  Was that individual's hands covered?

15   A.  Yes.

16   Q.  So just for clarification, the first person who came in you

17   said he was the taller guy?

18   A.  Yes.

19   Q.  And by that, do you mean he was taller than you?

20   A.  Yes, he was taller than me.

21   Q.  So can we call him the tall guy?

22   A.  Yes.

23   Q.  And the second individual who came in you described

24   as -- I'm sorry, how would you describe his build?

25   A.  He was kind of heavy-set, he was about my height maybe.

1   Q.  Did there come a time when that individual, this heavy-set

2   person, took off his mask?

3   A.  Yes.

4   Q.  And at that time, did you recognize who that was?

5   A.  Yes, I did.

6   Q.  And how did you recognize that person?

7   A.  I had met him before through Ty.

8   Q.  Did you call him by anything?

9   A.  Ty called him by Dee, his name was Dee.

10  Q.  So we'll call him Dee then.

11  A.  Yes.

12  Q.  Was Dee carrying anything when he came in the door?

13  A.  Yes.

14  Q.  What was he carrying?

15  A.  He had a .38 revolver with a potato on the front.

16  Q.  So going back to the moment where these two individuals

17  come in.  What happened?

18  A.  The tall guy first came in, he's the one that when I was

19  pushing the door out, he pulled the door and just rushed me.

20  He attacked me.  As he was coming, I grabbed him by his jacket,

21  he grabbed me by my jacket and we were just tussling, slamming

22  each other on the wall and then we, like, tripped back into the

23  kitchen area in between the kitchen and there's a bathroom

24  there.

25  Q.  At any point that night, did the tall guy take off his mask

1   in front of you?

2   A.  No.  It was just from the bottom of the nose down.

3   Q.  So, before we go further, I'd like to show you what's been

4   admitted as Government Exhibit 3B.  Do you recognize that?

5   A.  Yes.

6   Q.  Who is that?

7   A.  That is Dee.

8            MS. TEKEEI:  Your Honor, we offer the nameplate Dee

9   which is marked as Government Exhibit 3B.

10           MR. DRATEL:  No objection.

11           THE COURT:  It's admitted.

12           (Government's Exhibit 3B received in evidence)

13  Q.  All right, sir, going back to the moment after the tall guy

14  and Dee rushed in, can you describe what happened to the jury?

15  A.  We were tussling for a couple of seconds, we were fighting,

16  I was slamming him on the wall, he slammed me, and then since

17  we were still struggling, Dee came in right after him and he

18  put the gun to my head and was -- stay the fuck still, stay the

19  fuck still.

20  Q.  When you say Dee put the gun to your head, can you describe

21  for the jury what you remember about that?

22  A.  The gun had a potato on it and he put the gun to my head

23  and basically was just telling me to stay still, to stop

24  fighting it.

25  Q.  Where was Ty when this was happening?

1    A.   Ty was about -- by the bathroom area.

2    Q.   What happened next?

3              THE COURT:  Do you mind if I ask, what's the potato?

4              JUROR:   The potato is, like, in case you're going to

5    shoot somebody to muffle the sound.

6              THE COURT:   Thank you.

7    BY MS. TEKEEI:

8    Q.   What happened after Dee pointed the gun at your head?

9    A.   I relaxed, you know, I stopped fighting.  The tall guy kept

10   beating on me.  He put my face to the wall and told me not to

11   look at him.  He was just beating on me.  He had a hammer in

12   his hand hitting me on my back, my shoulder blade, my legs.

13   Q.   What, if anything, did he say to you?

14   A.   That not to look at him, don't look at my fucking face,

15   don't look at me, don't look at me.

16   Q.   What happened after he had your face to the wall?

17   A.   They told me to get on the floor.

18   Q.   Who told you that?

19   A.   Dee and the tall guy, both of them.

20   Q.   And did you?

21   A.   Yes, I did.

22   Q.   What happened after you got on the floor?

23   A.   They searched me, they took everything out of my pockets.

24   I had money, I had my wallet, my car keys.

25   Q.   Approximately how much money did you have with you?

1   A.   Well, the money that Ty had just gave me and some money

2   that I had on me, maybe about 80, a hundred dollars, something

3   like that.

4   Q.   What happened after they searched your pockets?

5   A.   He was telling me where's the money, where is the money.

6   And I was, like, what money, what are you talking about.

7   Q.   Who said that?

8   A.   Dee.

9   Q.   What happened next?

10  A.   I was like what money what money, what you talking about

11  and then he put the gun to my head and was, like, don't fucking

12  play with me, I'll pop you right here, I'll leave you right

13  here.  And then I was, like, all right, take it easy, take it

14  easy.  And then after that, there was a chair by the kitchen

15  that had some gray tape and they tied me up.

16  Q.   Who tied you up?

17  A.   The tall guy that I can see, because he was the only one

18  that was over me besides Dee was standing there with the gun.

19  Q.   What did you say when you were asked about your money?

20  A.   I was asking, like, what money were they talking about.

21  Q.   Did you tell them anything about where your money might be?

22  A.   I told him, yeah, that I had -- after a while, done beating

23  me and tieing me up, I told them, yeah, I had money in the

24  house.

25  Q.   When you say money in the house, what location were you

1   referring to?

2   A.  I was living by Westchester Square.

3   Q.  And why did you tell them that?

4   A.  Just to tried to think what I was going to do next.

5   Q.  What do you mean by that?

6   A.  I knew there wasn't no money in the house, but I was just,

7   you know, trying to think if I was going to try to escape from

8   them.

9   Q.  What happened next?

10  A.  They still had me -- they tied -- the tall guy tied me up

11  on the floor.  I heard Dee, like, go towards the door.

12  Q.  And what did you observe next?

13  A.  I heard him scream to someone that was outside to bring the

14  car in, bring the car down.

15  Q.  What happened next?

16  A.  They picked me up.

17  Q.  Who is "they"?

18  A.  The tall guy and Dee.

19  Q.  And what happened next?

20  A.  They took me towards the door to go out and they stood me

21  by the door and they put my hood -- I had a hoody, they put the

22  hoody over my head all the way down over my head past my neck

23  so I couldn't see.

24  Q.  Where did they take you?  In that moment after you left

25  Mr. Brown's apartment, where did they take you next?

1   A.  Well, there was another guy outside in the car.  He pulled

2   the car into the driveway and then Dee and the tall guy started

3   to put me in the car.

4   Q.  Were your hands still bound?

5   A.  Yes.

6   Q.  And how did you get to the car?  You described that your

7   hood was over your face.  How did you get to the car?

8   A.  Well, they both grab me on each side and put me in the car

9   and then when they put me in the car, they put the passenger

10  seat down towards my hip.  They had me sideways, they had the

11  passenger seat all the way laid back.

12  Q.  Where were you seated in the car?

13  A.  In the back seat in the passenger side.

14  Q.  So describe again how they had the -- when you say they had

15  the passenger seat leaned down, what seat are you talking

16  about?

17  A.  The front passenger seat, they had it, like, all the way

18  leaning back on my hip so I couldn't move.

19  Q.  And this fourth person that you mentioned, how was he

20  dressed?

21  A.  I really don't know.  I saw his hands only when they put me

22  in the car.

23  Q.  What, if anything, did he say to you when you got in the

24  car?

25  A.  He really didn't say anything.  All I saw were his hands

Ea1gcha1                        Barea - direct

1   and, like, dark clothing.

2   Q.  Mr. Barea, I'd like to play for you what's been admitted as

3   Government Exhibits 200 and 201.  Ms. Hansma, can you play

4   Government Exhibit 201 at 1731.

5   A.  I can't hardly see.

6            (Audio recording played)

7            THE COURT:  You can stand up, if you'd like.

8            MS. TEKEEI:  Can you pause for a moment.

9            Mr. Street, would it be possible, so we can see it, to

10  dim the lights, just slightly.  Thank you, Mr. Street.

11  Q.  Mr. Barea, who is that?

12  A.  That's me.

13  Q.  And where are you?

14  A.  I'm in Ty's --

15  Q.  Can you speak up or point the microphone to you.  Thank

16  you, sir.

17  A.  That's me.  I'm in Ty's driveway.

18  Q.  How can you tell that's you?

19  A.  My clothing, the way I stand, my shape.

20  Q.  And what are you doing right now?  What do we see?

21  A.  Knocking on the door waiting for Ty to come and open the

22  door.

23            (Continued on next page)

24

25

1  Q.  Approximately how long did you wait for him to come to the

2  door?

3  A.  Couple of minutes.  Maybe like three minutes.  I was

4  knocking on the door.  He didn't answer, so I knocked on the

5  window.

6  Q.  What happened just now?

7  A.  He's letting me in.

8       MS. TEKEEI:  Ms. Hansma, can you play Government

9  Exhibit 200 at 1845.

10       (Video recording played)

11  Q.  What are we seeing here, Mr. Barea?

12  A.  That's Tyrone, Ty, opening the door and coming in.

13  Q.  What are you doing with the door?

14  A.  Holding the door, locking it.

15  Q.  Why?

16  A.  To be safe so no one can come behind us.

17       MS. TEKEEI:  Ms. Hansma, can you now please play

18  Government Exhibit 201 at 19:26.

19       (Video recording played)

20  Q.  Sir, what do you see occurring right now?

21  A.  What do I see?

22  Q.  Yes.

23  A.  Nothing right now.  Just the driveway to Ty's house.

24  Q.  Did you see a car pull up when I asked you what you were

25  seeing at that moment?

1   A.  Yeah.  I saw lights.  I really couldn't see the car pull

2   up.  I see two guys approaching, approaching the door where I

3   went into Ty's house.

4   Q.  What just happened there, the light that went on?

5   A.  There is like a light there, a light with a sensor.

6   Whoever comes in the driveway, the light goes on from the

7   sensor.

8   Q.  Do you recognize the two people we are looking at here?

9   A.  Yes.

10  Q.  Who is that?

11  A.  D is the guy with the hood when you are looking right now,

12  his back turned, and the tall guy is on the other side.

13          MS. TEKEEI:  Ms. Hansma, can you play Government

14  Exhibit 200 at 26:34.

15          (Video recording played)

16  Q.  What's happening here?

17  A.  That's me pushing the door to go out and then they attacked

18  me.  That's D.  He's closing the door, locking it.

19          MS. TEKEEI:  Ms. Hansma, can you play Government

20  Exhibit 201 at 26:39.

21          (Video recording played)

22  Q.  What are you seeing here?

23  A.  That's D.  He's going in.  And the tall guy.

24          MS. TEKEEI:  Ms. Hansma, Government Exhibit 200 at

25  34:05.

1              (Video recording played)

2     Q.  What's happening here?

3     A.  That's D pushing the door like to go out.  That's when I --

4     most likely I heard him say pull the car in.

5     Q.  Who just walked in?

6     A.  That's the tall guy pushing me out, shoving me by my head.

7              MS. TEKEEI:  Ms. Hansma, 201 at 34:12.  Thank you.

8              (Video recording played)

9     A.  That is D going to the end of the driveway and the tall guy

10    has me right there by the wall pulling the hood over my face

11    and hitting me.  Now he's walking me towards the car.

12    Q.  How is he doing that?

13    A.  He is grabbing me by my head.  I had the hood over my face.

14    I couldn't breathe.  I was bleeding from my nose.  Then they

15    stood right there and the other guy pulled the car in, the

16    light-skinned guy.  You can see the car pulling in.

17    Q.  What's happening?

18    A.  They are going to put me in the car, D and the tall guy put

19    me in the car, and the light-skinned guy is in the back seat.

20    Q.  What was Ty doing at that time?

21    A.  Ty was by the kitchen -- I mean, by the bathroom the whole

22    time.  Like when they first came in, he was like, who the fuck

23    is this.  I was like, I don't know.  You fucking tell me.

24    That's when they attacked me.

25    Q.  What are we seeing now?

1   A.  They took me in the car.

2           MS. TEKEEI:  Ms. Hansma, can you play Government

3   Exhibit 201 at 34:12.

4           (Video recording played)

5   Q.  Who is that?

6   A.  That's Ty.

7   Q.  What's he doing?

8   A.  He has like a gun in his hand locking the door.

9           MS. TEKEEI:  Ms. Hansma, can you play Government

10  Exhibit 200 at 36:05.

11          (Video recording played)

12  Q.  Who is that now?

13  A.  That's Ty.

14  Q.  What was he doing just then?

15  A.  He was going out.

16  Q.  How can you tell that was Ty?

17  A.  His body shape and the way he walks.

18          MS. TEKEEI:  Ms. Hansma, can you play Government

19  Exhibit 200 at 29:31.

20          (Video recording played)

21  A.  That's Ty.  He is locking the door and he is leaving.  You

22  see the way he walks.  He has like a duck walk.

23          MS. TEKEEI:  Mr. Street, we are done with the videos

24  for now.  Thank you.  You can turn the lights on.

25  Q.  Mr. Barea, after you got into the car and it pulled out of

1    the driveway, what happened next?

2    A.   There was still -- they was still beating me in the car.

3    Q.   Who?

4    A.   The guy who was in the back because I was like trying to

5    get my wrist loose, my hands loose from the tape.

6    Q.   Was Ty in the car?

7    A.   No.

8    Q.   And what happened while you were in the car?

9    A.   They were asking me, so where is the money.  I said, all

10   right.  I have money in the house.  And then he was like, okay.

11   So where you live.  And then I told him I lived by Westchester

12   Square.  And he was like all right.  So how we get there.

13   Q.   Who said that?

14   A.   D.

15   Q.   And what did you say?

16   A.   I told him that I lived by Westchester Square and he was

17   like, all right.  So how do we get there.  They were both

18   asking that, the tall guy and D.  All right.  So how are we

19   going to get there.  How we get there.  I told them take

20   Westchester Avenue straight down towards Westchester Square.

21   Q.   What, if anything, did they say in response to that?

22   A.   They was like, you think we are fucking stupid.  We ain't

23   taking Westchester Avenue.

24   Q.   Why?

25   A.   Because usually there is always cops under the train

1   pulling cars over.

2   Q.  Let me ask you, how did you get to Mr. Brown's apartment

3   that night?

4   A.  I drove there.  I drove -- I parked like two blocks away.

5   Q.  And what, if anything, did you tell the tall guy and D

6   about how you got to Mr. Brown's house?

7   A.  As we were leaving, as they put me in the car and all that,

8   I was like trying to make them think that someone was waiting

9   for me, so someone knew that something happened to me.  I told

10  them that my sister had just dropped me off and that she was

11  waiting for me by the gas station.

12  Q.  And what, if anything, happened after you told them that?

13  A.  Well, when we left, they stopped supposedly by the gas

14  station, and they was like, we are here by the gas station.

15  What car is she in?  She is in a blue car.  They was like, we

16  don't see no blue car here, we don't see no blue car, so I

17  guess she left.

18  Q.  And was your sister waiting for you?

19  A.  No, she wasn't.

20  Q.  Going back to when you provided the tall guy, D, and the

21  other individual in the car with your address, what, if

22  anything, happened then?

23  A.  After a couple of minutes, I don't know how many minutes it

24  was, we arrived by where I was standing, where I was living on

25  Overing Avenue.

1  Q.  Where is that?

2  A.  That's by Westchester Square.

3  Q.  What was the address?

4  A.  1403 Overing.

5  Q.  Did you, in fact, have money at that address?

6  A.  No, I didn't.

7  Q.  Did you know whether anyone was at that address?

8  A.  Yes.  My wife was there.

9  Q.  How do you know she was there?

10  A.  I had dropped her off earlier.  She said she was tired, to

11  take her home.

12  Q.  Approximately how long was the drive to 1403 Overing?

13  A.  Approximately like 10 minutes.

14  Q.  And what did you do during that drive?

15  A.  Just trying to think what I was going to do, just scared,

16  trying to think how can I get loose.

17  Q.  What, if anything, did the tall guy, D, or the fourth

18  individual say to you?

19  A.  Well, D was telling me, well, how much money you got, how

20  much money you got.  And I said, well, I don't know.  He was

21  like, it better be more than 20,000 because I already have

22  50,000.

23  Q.  And the tall guy, what, if anything, did he say to you?

24  A.  He wasn't saying nothing at the time.  So D was like, it

25  better be more than that, because I'm already wanted for two

1   murders.

2   Q.  And what, if anything, did any of those three individuals

3   do to you during the car ride?

4   A.  They was saying that it better be more than 20,000.  And

5   then they said to tell them where the money was at.  But they

6   put the gun to my leg and was like, there better be more than

7   20,000 there.  He -- at this time he put the revolver to my

8   leg, but it didn't have the potato on it.

9   Q.  Could you tell who put that to your leg?

10  A.  No.  All I saw was the gun and the glove.

11  Q.  Can you describe for the jury what, if anything, you could

12  see while you were inside of the car during that ride?

13  A.  I could see everything was dark.  Everybody had dark

14  clothes on.  But I could only see like from my knees down,

15  basically, because my hood was over my head.

16  Q.  Did there come a time when the car reached near 1403

17  Overing Street?

18  A.  Yes.

19  Q.  What happened then?

20  A.  They park like in the middle of the block.  There is a pump

21  there because sometimes, you know, depends on the time of

22  night, there is no parking.  There is a pump there where there

23  is a house with a parking lot.  And they just park there.

24  Q.  And what happened when they parked there?

25  A.  They were asking me that who was home, and I told them that

1   my wife was home, and they was like, all right, so call her.

2   Q.  Did you try to call her?

3   A.  I couldn't.  My hands were tied.  They had a phone.  I am

4   not sure if it was mine.  They were trying to call my other

5   phone that I had in the house.

6   Q.  How many phones did you have at that time?

7   A.  I had two.

8   Q.  Do you recall any of the numbers for those phones?

9   A.  Yes.

10  Q.  Can you tell us the last four digits of the phone that you

11  remember?

12  A.  2215.

13  Q.  Was anyone able to reach Ms. Torruella during those calls?

14  A.  They were asking me what was her number, and I didn't want

15  to give them her number because I figured, you know, after all

16  this -- I didn't know what was going to happen, but they would

17  still have her number, so I gave them my number.  They were

18  trying to call my telephone.  They called twice.  She didn't

19  answer the phone.  And then at this time they -- they were

20  telling me, nobody answers the phone.

21  Q.  Did there come a time when you exited the car?

22  A.  Yeah.  They was like, the tall guy and the guy in the back

23  seat, the light-skinned guy that was saying, come on, come on,

24  let's just take him.

25  Q.  What did you understand that to mean?

1   A.  That they were just going to take me to another location.

2   Q.  Did you leave the car?

3   A.  Yeah.

4   Q.  How?

5   A.  D was like, nah, nah, we came here.  We are going to get

6   this fucking money, we are going to get this money.  Then after

7   that they said, all right, how are we going to get in.  I said,

8   well, I have my house keys in my pocket.  And they was like,

9   where is the keys?  I was like, I don't know who the fuck has

10  the keys.  You are all the ones that took the stuff out of my

11  pocket.  They searched my pockets again, they found the house

12  key and they asked me which one it was.  And I pointed to it

13  with my lips.

14  Q.  Why?

15  A.  Because my hands were tied behind my back.  So I pointed

16  with my lips which keys they were, like this.

17          MS. TEEKEI:  Let the record reflect that the witness

18  is indicating the way he pointed with his lips.

19  Q.  Mr. Barea, can you describe anything about the car that you

20  were in that night?

21  A.  Yeah.  It was a black car, like a faded color, like a

22  primer black.

23  Q.  Was it a sedan or sports utility vehicle?

24  A.  It was a four-door car.

25  Q.  I would like to show you what's been admitted as

1   Government's Exhibit 63.

2            THE COURT:  Is that in the jury's binder?

3            MS. TEKEEI:  Yes, it is, your Honor.

4            THE COURT:  The jury may look at Government Exhibit

5   63.  Or are you going to publish it up there?

6            MS. TEKEEI:  We are going to publish it, your Honor.

7   Q.  Do you recognize that?

8   A.  Yes.

9   Q.  What is it?

10  A.  That's where I used to live.

11           MS. TEKEEI:  Your Honor, may we publish it?

12           THE COURT:  Yes.

13  Q.  And when you say, where I used to live, what address is

14  depicted there?

15  A.  1403 Overing.

16  Q.  You mentioned earlier that the car that you were taken to

17  that location in parked near a pump?

18  A.  Yes.

19  Q.  Do you see that anywhere in this exhibit?

20  A.  You don't see the pump, but it's on the left-hand side in

21  front of that dark minivan that's all the way to the right,

22  there is a pump in front of that.

23  Q.  You have a laser pointer.  I don't know if you can see it.

24  Can you stand up, sir, and indicate, using the pointer toward

25  the projection where -- approximately where?

1    A.  Right there.

2    Q.  So approximately in front of the white car at the very far

3    right end of that exhibit?

4    A.  Yes.  There is another car there parked, but in front of

5    that car.

6    Q.  In front of that other car.  Approximately how many car

7    lengths in front of the white car was the car parked?

8    A.  About one.

9    Q.  Thank you, sir.

10            After you got out of the car and pointed out the keys,

11   what happened next?

12   A.  After that, we got out the car.  We didn't get out the car.

13   I'm sorry.  While they were calling, after they called and they

14   said they were going to take me, they was like, are we here,

15   are we here.  Because I wasn't sure they were in the right

16   spot.  And I was like, I don't know if we are here.  And then

17   they lifted my hoodie for a second, they lifted my hoodie and

18   wiped the window on the driver's side, the back window, because

19   it was fogged up and they had tinted windows, to see if I knew

20   where I was at.

21   Q.  And did you know where you were?

22   A.  Yes, I did.

23   Q.  What happened next?

24   A.  That's when they said, okay -- D said, we are going to get

25   this money.  That's when we all got out the car and they pulled

1     me out the car from the back seat.

2     Q.  So then after you got out of the car, what happened next?

3     A.  They wanted to start walking towards the house, and I

4     stopped.  I was like, no, no.  Listen.  I was telling D,

5     because they put the hoodie up.  They put my hoodie up so I

6     could see where I was going now.  I told D, no, no, don't go

7     that way with your mask off, because he had his mask off.  I

8     said, I got cameras in front of the house.  Don't go that way

9     with the mask off.  Put your mask on.

10    Q.  Why did you tell him that?

11    A.  Trying to gain confidence, you know, leading him to believe

12    that I was going to do what I really said, and trying if they

13    would let me go inside the house by myself.

14    Q.  You mentioned cameras.  Were they working?

15    A.  No, they weren't working.

16    Q.  As you approached the building, was the tall guy still

17    wearing his mask?

18    A.  Yes, he was.

19    Q.  What happened next?

20    A.  The light-skinned guy stood with the car and the tall guy

21    and D stood on my two sides, and they walked me towards the

22    house, grabbing my arms.  We got to the front of the house and

23    then I told him that there was three doors to get in.  There is

24    like a storm door, the hallway door, and then the house door.

25    Q.  And what happened next?

1    A.  They took the keys that I picked out and they started

2    opening the doors to go in.

3    Q.  Did there come a time when you arrived at Ms. Torruella's

4    door?

5    A.  Yes.

6    Q.  What happened then?

7    A.  They started opening the door, and my dog was tied to the

8    door.

9    Q.  What kind of dog is that?

10   A.  A pit bull.

11   Q.  How old is the dog?

12   A.  He's 10 now.

13   Q.  What happened after they started to open the door?

14   A.  He was tied to the door, so I'm guessing that they heard

15   the chain.

16   Q.  Did the dog bark?

17   A.  No, he didn't bark.  He was just moving.  So I guess they

18   heard movement.  And they just opened the door.  They didn't

19   unlock it.  They cracked it like open and then they shut it

20   quick.  They only opened it about two inches.  He said, do you

21   got a dog?  I said, yeah, I got a dog.  He was like, call your

22   wife.

23   Q.  Who said that?

24   A.  D.

25   Q.  What did you do next?

1   A.  I started calling her through the crack of the door.

2   Q.  What do you mean by you started calling her?

3   A.  I'm like, Emmy, Emmy, come to the door.

4   Q.  What was D doing while you were at the door?

5   A.  He had the gun on me.

6   Q.  When you say he had the gun on you, can you describe --

7   A.  Well, the gun had the potato on it again.  He was pointing

8   it towards my head because I was leaning over calling her

9   through the crack of the door, and he had it to my head.

10  Q.  What was the tall guy doing?

11  A.  The tall guy was just standing there.  He was on my left

12  side.

13  Q.  And what happened next?

14  A.  I was calling her, calling her, and then she finally heard

15  me and I was telling her, Emma, come to the door, Emmy, come to

16  the door.  They got me.  She was like, what?  I said, come to

17  the door.  She was like, wait a minute because I'm not dressed.

18  Q.  What happened after that?

19  A.  She comes towards the door and then I told her, go get the

20  money, get the money that's in the safe in the room.

21  Q.  Why did you tell her that?

22  A.  So she could have knew that something was wrong, but for

23  her -- I was like stalling to see still, once again, what I was

24  going to do.

25  Q.  What, if anything, did she do in response to you telling

1    her that?

2    A.  She went back towards the room, like if she was looking for

3    the key, and then she came back towards the door, and she was

4    like, I don't find it, I don't find the key.  I'm like, look in

5    the drawer, the key is there.  And then she went back to the

6    room again.  And then he was like, she went to go get a gun,

7    she went to go get a gun?

8    Q.  Was there money in the house that day?

9    A.  No.

10   Q.  And what happened next?

11   A.  She came back towards the door.  He told her to tie the dog

12   up, to put him in the bathroom.

13   Q.  What did she do?

14   A.  She grabbed the dog.

15   Q.  Who told her that?

16   A.  D.

17   Q.  How did he tell her to do that?

18   A.  He pointed the gun through the door and at this time, when

19   she was coming -- she was already by the door, she pointed --

20   he pointed the gun through the door and the potato fell off the

21   gun, and she kicked it, like she got scared, she got like

22   nervous, she kicked the potato, and then she grabbed the dog

23   off the doorknob and put him in the bathroom.

24   Q.  Why was the dog at the doorknob?

25   A.  He's already there so he won't make a mess.  Usually, we

1   put him by the door.

2   Q.  What do you mean, he won't make a mess?

3   A.  Sometimes he will grab loose clothes and he will put them

4   on the floor so he can lay down.

5   Q.  Did there come a time when you went inside the house with D

6   and the tall guy?

7   A.  After she put him in the bathroom, they were -- they had

8   the door cracked, so they saw when she put them in the

9   bathroom.  And then all three of us came in.

10  Q.  What happened when you got inside?

11  A.  We -- there is the living room when you come in.  We

12  started walking towards the room where I told them the safe was

13  at.

14  Q.  And where was the safe?

15  A.  There was no safe.

16  Q.  What happened next?

17  A.  They started walking me towards the room.  My wife was way

18  ahead.  They were behind me.  And they were walking into the

19  room.  They was like, where is the money, where is the safe.

20  Q.  And did you get to the room?

21  A.  Yes.

22  Q.  What happened there?

23  A.  The tall guy then stepped -- he stood by the doorway of the

24  room, and D was just like, where is the money, where is the

25  money.  I said, it's in the closet.  And he just had me by the

1   arm with the gun on me.

2   Q.  Who is he?

3   A.  D.  He was pulling me towards the closet was so I could

4   look for the safe that was there, but there was no safe.  He

5   was like, where is the money?  And I was like, Emmy, where is

6   the money?  And she was like, well, I took it to my mom's

7   house.  I said.  Oh, she took the money to her mom's house.

8   And he was like, what?  You lied to me?  Don't fucking play

9   games with me.  I told you, I'll kill you, I'll pop you right

10  here.

11  Q.  Who said that?

12  A.  D.

13  Q.  What happened next?

14  A.  Then he was really pissed off, D.  And he was like, so -- I

15  said, so, let me take a cab.  Let me go get the money.  He was

16  like, no.  No.  She is going to go with them and she is going

17  to go get the money.

18  Q.  Why did you say that?

19  A.  Because I didn't want to put her in any more danger.

20  Q.  Where was the tall guy while D was searching the closet and

21  parts of the room?

22  A.  He was by the doorway of the room.

23  Q.  What, if anything, was he doing?

24  A.  I really don't know because I was standing with D by the

25  closet.

1   Q.  What happened after you offered to go to your wife's

2   mother's home?

3   A.  They said they were going to take her, so they took her.

4   The tall guy left, took her with him.  And they went to her

5   mom's house to go get the money.

6   Q.  Where were you?

7   A.  I was still there in the room with D, but as they were

8   leaving, we were walking towards the front door.  So then after

9   they left he locked the door.  He locked the front door and

10  then we went back to the room.

11  Q.  What, if anything, did you do in the room?

12  A.  We went back to the room and he was searching the closet

13  like if I was lying.  He was trying to see if there was still

14  money there.  He looked in the drawers of the dresser.  I had a

15  watch and a ring there.  He was like, this is all you got?  I

16  said yeah.  He was like, where is the jewelry, where is the

17  jewelry?  I said, there ain't no jewelry.  That's all I have.

18  He started searching the closet, and everything he will grab I

19  will tell him what it was as soon as he grabbed it.

20  Q.  Why?

21  A.  To gain his confidence, to try to keep him calm.

22  Q.  How did it come about that your money was at

23  Ms. Torruella's mother's home?

24  A.  I had took money out the bank.

25  Q.  When?

1   A.  When I had got pulled over in January.

2   Q.  Why?

3   A.  I was going to use money for a lawyer and also so they

4   won't seize my account.

5   Q.  Approximately how much money had you taken out?

6   A.  50,000.

7   Q.  And where did you put that money?

8   A.  I had split it up.  I put some in my mother-in-law's house

9   and some in my sister's house.

10  Q.  Approximately how much did you have at Ms. Torruella's

11  mother's house?

12  A.  20,000.

13  Q.  Approximately how much at your sister's house?

14  A.  30,000.

15  Q.  Was that money from your legitimate work as a truck driver?

16  A.  Yes.  It was mixed though, because sometimes I used to put

17  cash money in the bank.

18  Q.  Where did that cash come from?

19  A.  From selling drugs.

20  Q.  Going back to while you were at 1403 Overing with D, after

21  D searched the room and the closets, what, if anything,

22  happened next?

23  A.  Some time had passed and I was getting nervous, getting

24  extra nervous because they were taking long to come back.  I

25  asked -- I was thirsty.  I asked D if he can give me some

1    water.  And he walked me towards the kitchen.

2    Q.  How did he do that?

3    A.  He had the gun on me.  I was still tied.  I was still taped

4    up.  My hands behind my back.  We walked to the kitchen, to the

5    refrigerator.  There was a bottle of water there.  He opened

6    the refrigerator there.  There was a bottle of water.  He

7    opened its water and he gave to it me.  He fed it to me.

8    Q.  How did he do that?

9    A.  I was tied like this, looking up.  And he would pour it

10   into my mouth.

11   Q.  What happened after you had some water?

12   A.  I asked him, you know, if he could please call the tall guy

13   because they were taking long.

14   Q.  Why?

15   A.  I was scared that was something was going to happen to my

16   wife, that they were going to do something worse to her, rape

17   her or something.

18   Q.  Did D make any phone calls?

19   A.  Yes.

20   Q.  And how did he do that?

21   A.  He used a phone that was on top of the table.  There was a

22   table by the kitchen in the hallway.

23   Q.  Whose phone --

24   A.  Like a coffee table.

25   Q.  Whose phone was that?

```
 1    A.   My phone.

 2    Q.   And did he talk to anybody?

 3    A.   He tried one time, and I think nobody answered.  And then

 4    after that he tried again.  And then he said, you know, like,

 5    okay.  That's all he was saying.  He didn't really say much.

 6    Q.   Was he speaking with some --

 7    A.   Yeah.  He was speaking with somebody.

 8    Q.   And what happened after this phone call?

 9    A.   We went towards the window.  He still had the gun on me.

10    We went towards the window.  He wanted to look out the window

11    in the front, I guess, to make sure that everything was okay,

12    make sure there wasn't no cops there.  And then he was taking

13    me back towards the room.  And I asked him for some more water,

14    so like we didn't have to go back to the room.

15              THE COURT:  At a good time could we break for our

16    midmorning break?

17              MS. TEKEEI:  Yes, your Honor.  This is a perfect time

18    to break.

19              THE COURT:  Thank you very much.

20              Ladies and gentlemen, we will break for 15 minutes.

21    Let's break for 10 minutes since we are taking a longer lunch

22    break today.  It's 11:03.  We will be back at 11:13.

23              (Jury excused)

24              THE COURT:  See you in 10 minutes.

25              (Recess)
```

1              (Jury present)

2              THE DEPUTY CLERK:  I just want to remind you that you

3    are still under oath.

4              THE WITNESS:  Yes.

5    Q.  Mr. Barea, before we took a break you mentioned that D had

6    received a phone call and spoke with someone by phone?

7    A.  Yes.

8    Q.  Did there come a time when the tall guy and Ms. Torruella

9    returned to Ms. Torruella's apartment?

10   A.  Yes.

11   Q.  And did that happen before or after the phone call that D

12   received?

13   A.  After the phone call.

14   Q.  Approximately how long after?

15   A.  Maybe like 10 minutes.

16   Q.  And can you tell the jury about what happened when

17   Ms. Torruella and the tall guy returned?

18   A.  D opened the door and she came in with the tall guy.  When

19   she came in, he told the -- D told the tall guy, you got the

20   money, you got the money.  And he was like, yeah, he got the

21   money in the car.  He is counting it.

22   Q.  Who said that?

23   A.  That's what the tall guy said.

24   Q.  What happened next?  Excuse me one question.  Where was

25   Ms. Torruella when they walked in?

1   A.  She was in front of the tall guy when they first walked in,

2   when they both walked in, she passed D and the tall guy.  She

3   was going towards like the kitchen.

4   Q.  What happened next?

5   A.  The tall guy whispered something in D's ear after D asked

6   him about the money, and he said yeah, that he was counting it

7   in the car.  He whispered something in his ear.  At that time

8   that's when they locked the door.  The tall guy locked the door

9   and D still had the gun in his hand and we both started -- all

10  three of us started walking towards the kitchen because my wife

11  was already by the kitchen.  And then the tall guy told my wife

12  to get on the floor, to get on her knees.

13  Q.  Did she?

14  A.  Yeah, she did.  She was about to.

15  Q.  What happened next?

16  A.  When she kneeled down, D said, yo, whatcha doing, whatcha

17  doing?  As she kneeled down, there was a scarf on the chair

18  that was on the table in the hallway.  He grabbed the scarf

19  there.  And when he told her to bend down, when he grabbed the

20  scarf from the chair, and he was going to tie her up with the

21  scarf.  And D told him, whatcha doing, get up, get up.  And he

22  told her to get up.

23  Q.  What happened after she got up?

24  A.  After she got up, we were going towards the room and my

25  last desperate attempt was to open the bathroom door to try to

EA1MCHA2                          Barea - direct

1   let the dog out.

2   Q.  How?

3   A.  With my hands tied behind my back I like leaned over to try

4   to open, try to open the doorknobs to let the dog out.

5   Q.  And what happened next?

6   A.  I wasn't able to turn the knob.  I turned it like maybe

7   halfway, but I didn't open the door.  And D got real pissed

8   off.  Oh, you try to open the bathroom door, you try to let the

9   dog out.  I was like, no, no.  And we just started walking

10  towards the bedroom.

11  Q.  How were you walking towards the bedroom?

12  A.  My wife was in front.  I was behind her.  And the tall guy

13  and D were behind both of us.

14  Q.  What happened next?

15  A.  They took us towards the room again, and D told me to lay

16  on the bed.  He told both of us to lay on the bed on our

17  chests.

18  Q.  And did you?

19  A.  Yes.

20  Q.  Where was the tall guy?

21  A.  The tall guy was standing behind D, like in the middle of

22  the hallway where the bathroom was at.

23  Q.  What, if anything, was he doing?

24  A.  I really don't know because D had the gun on us and told us

25  to lay down on our chests.

1   Q.  Did you lay down?

2   A.  Yes.

3   Q.  What happened next?

4   A.  He put us both on the bed.  At this time I thought he was

5   going to shoot both of us.  And then he flipped me over, like

6   he turned me over.

7   Q.  Who?

8   A.  D.  And then he leaned on me.  He put his knee on my chest.

9   And he was like, you only gave me 20,000.  I told you that I

10  needed more than that.  He was like, now I got to split it with

11  these guys.  I feel like killing them right now.

12  Q.  What, if anything, did you say?

13  A.  I said, well, that's all I had.  I told him if he takes my

14  phone and he calls me tomorrow that I would get him the rest of

15  the money.

16  Q.  What happened after that?

17  A.  He said, all right, I am going to call you.  He was like

18  how you got your money.  I said I work.  Because he's like, how

19  the money is in the bank.  I told him that I worked.

20  Q.  Were you working at that time?

21  A.  No.

22  Q.  And what happened next?

23  A.  He just closed -- turned the lights off and closed the room

24  door.

25  Q.  What did you do next?

1    A.  I just moved and like tried to sit up, and me and my wife
2    were just listening to see what we had heard to see if they had
3    left the house.
4    Q.  And did there come a time when you got out of the room?
5    A.  Yeah.  She wasn't tied up because he never got to tie her
6    up because, you know, of D.  She got some scissors.  I am not
7    sure if the scissors were in the room.  She cut the tape off
8    from my wrists.
9    Q.  And what happened next?
10   A.  We waited for a few minutes to see if we heard any
11   movement, and we didn't.  So then I opened the room door and I
12   went towards the kitchen, towards the house door to make sure
13   that they had left already.
14   Q.  Had they left?
15   A.  Yes.
16   Q.  What did you do next?
17   A.  I locked the door and put the chain and everything because
18   they had took my house keys.
19   Q.  Did you call the police at that time?
20   A.  No, I didn't.
21   Q.  Why not?
22   A.  I mean, I was dealing drugs still.  I just wanted to get
23   out of there, to be safe, because they had my house keys.
24   Q.  Did you leave the apartment?
25   A.  Yes.

1    Q.  Tell us how that happened.

2    A.  We both left.  We went walking.  I had a parking lot that

3    was on Parkchester.  They had a spare key to my car that was

4    parked by Ty's house because I didn't have the keys because

5    they had took everything out of my pockets.

6    Q.  Did you go to that parking garage?

7    A.  We went to the parking garage and I went to the parking

8    garage attendant and I told him if he could please give me my

9    keys.  And he gave me the spare key that I have for my car and

10   I asked him -- I told him that I had just got robbed, if he

11   could lend me some money.  He lent me $10 and we took a cab

12   from there to where my car was at, by Rosedale, as a gas

13   station.

14   Q.  How close was your car to Ty's house?

15   A.  A block and a half, two blocks.  It wasn't Rosedale.  It

16   was Cross Bronx and Rosedale.

17   Q.  Why would you go back there?

18   A.  My car was there.

19   Q.  Did you find your car?

20   A.  Yes.

21   Q.  What happened after you found your car?

22   A.  We got in the car and I started calling Ty from my phone.

23   Q.  Why?

24   A.  To see where he was at, to see if he had my stuff, the

25   stuff that they had took out of my pockets, my wallet, my

1  license, my car keys.  And that's it.

2  Q.  Did you connect with Ty?

3  A.  Yeah.  After a little while, after I called him a couple of

4  times, he answered.  And I was like, where are you at?  He was

5  like, well, I'm off that, I'm off that, meaning that he had

6  left his house.  And I told him, where are you at?  He told me

7  I'm on Claremont.

8  Q.  What did you do next?

9  A.  He told me I am up at 170th and Claremont.  From there I

10  drove towards Claremont.

11  Q.  Was anybody in the car with you?

12  A.  Yes.  My wife.

13  Q.  What happened when you arrived?

14  A.  We went to Claremont and when I got there I parked and I

15  just kept calling him because I called him.  He didn't answer.

16  So I kept calling and calling.  Then finally he answered and I

17  was like, where are you at?  I'm here.  I'm on Claremont.  He

18  was like, I'll be there in a few minutes.

19  Q.  Did you meet him that night?

20  A.  Yeah.  I waited a while longer and I kept calling him.

21  Then he finally answered.  He was like, yeah, I'm on the way.

22  Finally he showed up.

23  Q.  What happened when he showed up?

24  A.  When he showed up I got out the car and I approached him.

25  I was like, you set me up.  I was real pissed off.  I was going

1    to hit him.  I was like, you set me up, you set me up.  He was

2    like, I didn't set you up.  He said he didn't set me up.

3    Q.  What happened next?

4    A.  He gave me my stuff that he had.

5    Q.  And what did you do after you got your stuff back?

6    A.  Then after that he asked me if I could drop him off.

7    Q.  Where?

8    A.  By his house.

9    Q.  Did you give him a ride?

10   A.  Yes, I did.

11   Q.  Why?

12   A.  I wanted to try to get some information from him.

13   Q.  Like what?

14   A.  I wanted to try to see if I can get the video from his

15   house because I know they had cameras, and to find out

16   information about D, if he knew where he lived.

17   Q.  Did you drop Ty off that night?

18   A.  Yes.

19   Q.  What happened next?

20   A.  After that, me and my wife left, after I dropped him off.

21   We went to a hotel.

22   Q.  Why did you go to a hotel?

23   A.  Because they had took my house keys and we couldn't stay at

24   home.

25   Q.  Why couldn't you stay at home?

```
 1   A.  Scared that they were going to come back.

 2   Q.  What, if anything, did you do when you got to the hotel?

 3   A.  Just try to relax for a few, but I got on the phone quick

 4   and called the Officer Lennon.

 5   Q.  Why?

 6   A.  Because to let him know that I had got kidnapped.

 7   Q.  What was he at that time?

 8   A.  He was on vacation, but he was the handler of the CI, being

 9   the CI.

10   Q.  He was your handler?

11   A.  Yes.

12   Q.  What happened after you called him?

13   A.  He asked me if I called 911.  I told him no.  And then he

14   said that if I would like him to send me someone.

15   Q.  Did there come a time when you met with police officers

16   later that day?

17   A.  Yes.

18   Q.  Let me ask you, did you ever receive videotapes from Ty?

19   A.  No.

20   Q.  Did you speak with Ty again ever after you dropped him off?

21   A.  Yes.

22   Q.  When was that?

23   A.  I think it was a day or two later, when I was in the

24   precinct with Officer Ellis.

25   Q.  And what did you discuss?
```

1    A.   I tried to call him.  I was trying to call him.

2    Q.   Why?

3    A.   I don't think he picked up his phone, though.  I don't

4    remember.

5    Q.   You mentioned earlier that you did meet with police

6    officers later that day.  Can you tell us where you were when

7    that happened?

8    A.   Back at the house, 1403 Overing.

9    Q.   And who were you interviewed by?

10   A.   Different police officers that were there and also Officer

11   Ellis.

12   Q.   And after you were interviewed at 1403 Overing Street, what

13   happened next?

14   A.   From there we went to the precinct.

15   Q.   Did you make any stops along the way?

16   A.   Not that I remember.

17   Q.   Did there come a time when you identified the location

18   where you were that night when the robbery began?

19   A.   I'm sorry.  Tell me again.

20   Q.   Sure.  Did there come a time when you informed the police

21   of where the robbery had begun?

22   A.   Yes.

23   Q.   When was that?

24   A.   When I spoke to the officers.

25   Q.   And did you take anybody to near that location?

EA1MCHA2                         Barea - direct

1    A.  I don't think so, no.

2    Q.  Did you show anybody where that was?

3    A.  Yes.  I showed Officer Ellis.

4    Q.  At some point you went to the precinct.  What, if anything,

5    did you do while you were there?

6    A.  Looked at the computer and looked at pictures of different

7    guys.

8    Q.  Did you identify anyone?

9    A.  Yes, I did.

10   Q.  Who did you identify?

11   A.  D.

12   Q.  And did you identify anybody else?

13   A.  I am not sure.

14   Q.  Did you identify for the officers who Tyrone Brown was?

15   A.  Yes, I did.  Yes.

16   Q.  Sir, prior to the events of March 25, 2013, had you ever

17   been robbed before?

18   A.  Yes.

19   Q.  Had your house been burglarized?

20   A.  Yes.

21   Q.  When did that happen?

22   A.  That was in -- that was before I got pulled over.  I am not

23   sure what month it was.  It was in 2012.

24   Q.  Did you file a police report?

25   A.  Yes.

1    Q.  And did anybody find who had committed that burglary?

2    A.  No.

3    Q.  You mentioned earlier that you carried firearms in

4    connection with your drug dealing for protection.  Why did you

5    need protection?

6    A.  In case something happened, basically, because I was

7    selling drugs.

8    Q.  When you say in case something happened, what do you mean

9    by that?

10   A.  In case there was some type of situation to scare somebody

11   or if somebody tried to hurt me or my family.

12   Q.  Mr. Barea, are you familiar with an individual named

13   Zuleika Morales?

14   A.  Yes.

15   Q.  Who is she?

16   A.  A friend.

17   Q.  And how did you communicate with her?

18   A.  By phone.

19              (Continued on next page)

20

21

22

23

24

25

1   BY MS. TEKEEI:

2   Q.  And do you recall any of the numbers you used, any of your

3   numbers you used to communicate with her?

4   A.  I don't remember them.

5   Q.  Let me ask you, did there come a time when Detective

6   Deloren showed you any evidence -- let me rephrase that.

7           Did there come a time when Detective Deloren showed

8   you a hammer?

9   A.  Yes, he did.

10  Q.  Before I get to that, can you describe the hammer that the

11  tall guy used that night?

12  A.  It was, like, a beige color, like, a light-brown color and

13  silver head hammer.

14  Q.  And let me show you what's been admitted as Government

15  Exhibit 500.  You can open that and take it out.

16  A.  Open it?

17  Q.  Does that look like the hammer that Detective Deloren

18  showed you?

19  A.  Yes.

20  Q.  And do you believe that this is the hammer that the tall

21  guy used that night?

22          MR. DRATEL:  Objection.

23          THE COURT:  Sustained.

24          You may lay a foundation.

25  Q.  Do you recognize that hammer?

1    A.  Yes.  It looks like the one that they used that night, that

2    the tall guy used that night.

3    Q.  Sir, at the beginning of your testimony, you referenced an

4    immunity order pursuant to which you are testifying.

5            Is the Bronx District Attorney's Office a party to

6    that order?

7    A.  No.

8    Q.  To your knowledge, is the case in -- your case in the Bronx

9    still open?

10   A.  Yes.

11   Q.  What is your understanding of the status of that case?

12   A.  That they want to prosecute me.

13   Q.  Have you received any benefit from the Bronx District

14   Attorney's Office for your testimony today?

15   A.  No.

16   Q.  Before the robbery happened on March 25, when was the last

17   time you had seen Ty?

18   A.  Before the robbery?

19   Q.  Approximately?

20   A.  I don't know, maybe a week or two.

21   Q.  And describe the circumstances under which you saw him?

22   A.  I had saw him in a blue car, blue Impala, it was like a

23   dark blue, like a midnight blue.  It looked like a police car.

24   And the wheels, they were, like -- also they had hub caps, they

25   looked like a police car.

1   Q.  Was he alone?

2   A.  He was in the car with two other people.  It was a

3   light-skinned driver like with light blondish hair and the

4   other person, I wasn't too sure.  I know it was a black guy.

5   I'm not sure if it was Dee.  I don't remember that.

6            MS. TEKEEI:  Thank you.  No further questions at this

7   time.

8            THE COURT:  Cross-examination.

9   CROSS-EXAMINATION

10  BY MR. DRATEL:

11  Q.  Good morning, Mr. Barea.

12  A.  Good morning.

13  Q.  We've never met, correct?

14  A.  That's correct.

15  Q.  In preparation for your testimony today, you've met a

16  number of times either with law enforcement agents or

17  prosecutors, right?

18  A.  Yes.

19  Q.  In fact, in the last few months, you've met about a half

20  dozen times, right?

21  A.  Yes.

22  Q.  Now, after the robbery, is it true that you were

23  not -- withdrawn.

24            After the robbery, you didn't acknowledge to either to

25  Officer Lennon or anyone else as part of his group that you had

1   been dealing drugs until about a month later, until April,

2   right, April 25?

3   A.  I didn't tell them that I was selling drugs again.

4   Q.  Right.  You didn't tell them until late April that you had

5   been selling drugs while an informant, right?

6   A.  I don't remember the date.

7   Q.  But it was sometime after, right?  It wasn't right away?

8   A.  Sometime after, yes.

9   Q.  And you kept your informant status for NYPD until December

10  of 2013, correct?

11  A.  To my knowledge, it's still active.

12  Q.  It's still active even now.  Okay.

13          And by the way, just -- all the phone calls that we

14  heard this morning between you and Tyrone Brown were 2012,

15  correct?

16  A.  2000 -- yes.

17  Q.  Obviously at that time, you didn't know that you were the

18  subject of a wire tap and that those calls were being recorded?

19  A.  That's correct.

20  Q.  When you were an informant, did you tell the NYPD about

21  Tyrone Brown?

22  A.  No, I didn't.

23  Q.  Did you identify him on those telephone conversations with

24  NYPD before the robbery?

25  A.  They never asked me.

1   Q.  You made references to Officer Ellis.  Do you mean Ellis

2   Deloren?

3   A.  Yes.

4   Q.  How tall are you, Mr. Barea?

5   A.  5'6", 5'7".

6   Q.  And prior to the robbery on the 25th of March 2013, you

7   knew Tyrone Brown obviously, right?

8   A.  Yes.

9   Q.  And you had also met Dee before, correct?

10  A.  Yes, I met him once.

11  Q.  You met him at Tyrone's house, right?

12  A.  Yes, yes.

13  Q.  And he had been introduced to you as Dee?

14  A.  Yes.

15  Q.  Now, with respect to the tall guy we'll call him, not Dee,

16  but the other person who accosted you when you were trying to

17  leave Mr. Brown's house, --

18  A.  Yes.

19  Q.  -- he had a mask on the whole time you saw him, right?

20  A.  Yes, from the nose down.

21  Q.  But you were able to see a teardrop tattoo under his left

22  eye, correct?

23  A.  I've seen -- I saw a mark on his face.  I don't remember if

24  it was a tattoo or not.

25  Q.  Did you tell Officer Deloren that day that he had a

Ea1gcha3                        Barea - cross

1   teardrop tattoo after?

2   A.  Yes, I did.

3   Q.  So at the time you thought -- you said teardrop tattoo,

4   right?

5   A.  Um, Dee had a teardrop.

6   Q.  But the tall guy, you told Officer Deloren that the tall

7   guy also had a teardrop tattoo?

8   A.  That's correct.

9   Q.  And nothing's changed in terms of your opinion about that,

10  right?

11  A.  Right.

12  Q.  Now, the car that you were taken in from the driveway was a

13  black or dark green like midnight green or dark green four-door

14  Acura CL, right?

15  A.  I can't tell you what kind of car it was.  I know it was a

16  dark car.

17  Q.  Did you tell Officer Deloren that day, the 25th of March,

18  that it was an Acura CL, a four-door, dark green or black Acura

19  CL, '97, '98 for the year?  Did you tell him that?

20  A.  I told him that it looked, yes, similar to an Acura C --

21  Q.  And in fact you've owned a Honda, right?

22  A.  Yes.

23  Q.  You owned a Honda Civic, right?

24  A.  I owned a Honda Civic?

25  Q.  Did you drive a Honda Civic?

 1   A.  Yes.

 2   Q.  In 2012?

 3   A.  2012?  No.

 4   Q.  2011?

 5   A.  What you mean?  The year that I had the car?

 6   Q.  The year that you had the car.

 7   A.  Oh, yes.

 8   Q.  2012, right?

 9   A.  Yes.

10   Q.  So you drove a Honda Civic, a blue Honda Civic, a teal blue

11   Honda Civic in 2012, correct?

12   A.  Yes.

13   Q.  I think you told us on direct that you saw Tyrone Brown in

14   what you called a midnight blue Impala, right?

15   A.  Yes.

16        THE COURT:  We're going to stop for just a second and

17   all stretch.  Okay.  Why don't we all just get up.  I know it's

18   midmorning and hard to sit and listen, so let's just all

19   stretch.

20        Let's begin again.  Thank you.

21   Q.  Now, back when you told Officer Deloren that it was an

22   Acura CL '97 or '98 year, black to midnight green --

23        MS. TEKEEI:  Objection.

24        THE COURT:  Overruled.

25   Q.  -- that was the day of the robbery, right?

Ea1gcha3                      Barea - cross

1   A.   It was midafternoon and the day of the robbery was after

2   12, so yes, it was that day.

3   Q.   And your memory -- I'm sorry.  Now we are 18 months later,

4   right?

5   A.   Yes.

6   Q.   Would you say your memory was better the day that it

7   occurred than it is now?

8   A.   It's still the same.

9   Q.   So nothing's changed with respect to that, right?

10  A.   No, I mean.

11            MR. DRATEL:  Nothing further, your Honor.  Thank you.

12            THE COURT:  Any redirect?

13            MS. TEKEEI:  May I have one moment, your Honor.

14            THE COURT:  Sure.

15  REDIRECT EXAMINATION

16  BY MS. TEKEEI:

17  Q.   Mr. Barea, you were just asked on cross-examination about

18  an Acura CL.  What is your memory of how you described the car

19  to Detective Deloren when you were interviewed back at the time

20  of the robbery?

21  A.   I told him that it was a dark car, that it looked like a

22  primal color, like back, but I really couldn't see because it

23  was like -- it was, like, a midst in the air, like a drizzle

24  that day and I could only see from my knees down basically.

25  Q.   Did you tell Detective Deloren that it was an Acura CL or

1   similar to an Acura CL?

2   A.  I said yes, it was similar.

3           MS. TEKEEI:  Thank you.  No further questions.

4           THE COURT:  Any recross?

5           MR. DRATEL:  Yes.  If I may approach the witness

6   3505-09.

7           MS. TEKEEI:  Objection.  Improper impeachment.

8           THE COURT:  I don't know that he's going to impeach

9   him, but I'll hear the questions.

10  RECROSS EXAMINATION

11  BY MR. DRATEL:

12  Q.  Mr. Barea, did you tell Officer Deloren that it was in fact

13  an Acura four-door CL, you gave him a year, '97, '98, and you

14  said that it was color was black, right?  Is that what you told

15  him?

16  A.  I was guessing.

17  Q.  Did you say "guess" at the time?  Did you tell him that?

18  A.  I couldn't see the car.

19  Q.  Did you tell him that?

20  A.  I was guessing.

21  Q.  Did you tell him that?

22  A.  I was guessing.

23  Q.  Did you tell him that?

24          THE COURT:  All right.  Let's just stop.

25          He asked a question.  You have to answer the question

1    that he asks.  If the government has additional questions, they

2    will ask you the additional questions.

3              Mr. Dratel's question is, did you tell him that?

4              THE WITNESS:  I had told him that the car looked like

5    an Acura CL, the body shape.

6    Q.  And did you tell him the year as well, '97, '98, that that

7    was your guess, that that was your estimate?

8    A.  That was my estimate, yes.

9    Q.  And you told him the color was black, correct?

10   A.  Black or dark color I told him.

11   Q.  Now, look at that document.  And didn't you tell him it was

12   black not dark colored?

13             MS. TEKEEI:  Objection, your Honor.  He's not failing

14   to recall.

15             THE COURT:  I'll allow the question.

16             MR. DRATEL:  It's impeachment.  It's not a failure of

17   recollection.

18             THE COURT:  I understand.  Go ahead.

19   A.  This is not my handwriting.

20   Q.  I'm not saying it's not your handwriting.  I'm saying, did

21   you tell Officer Deloren that day that it was a black Acura CL,

22   black -- concentrate on the color now -- black, correct?

23   A.  I told him it was a black or green, a dark color.

24   Q.  Black or green dark color.

25             Now, you talked about your immunity agreement,

1   correct?

2               MS. TEKEEI:  Objection; scope.

3               MR. DRATEL:  Impeachment.

4               THE COURT:  Sustained.  Impeachment?

5               Go ahead.

6   BY MR. DRATEL:

7   Q.  You testified under immunity, so nothing you say can be

8   used here against you, right?

9   A.  As long as I tell the truth.

10  Q.  And you're a -- still a confidential informant working for

11  the District Attorney's Office of the Bronx, correct?

12              As you sit here now, you have that status?

13  A.  I'm not sure about that status.

14  Q.  Before you said you thought you still were active.

15  A.  I thought; I don't know for sure.

16  Q.  Something's changed in the last five minutes?

17  A.  No.  I don't have any paperwork to --

18  Q.  Also.  Okay.  Sorry.  Go ahead.

19  A.  I don't have any paperwork in front of me stating that I'm

20  still a CI because I had stopped talking to them, I had stopped

21  giving them information after I started talking to the

22  attorney, the U.S. Attorney's Office.

23  Q.  And you know that they could still prosecute you for the

24  drugs they caught you with back in January of 2013, correct?

25  A.  That's correct.

1  Q.  They could prosecute you for what you admitted to them as

2  your legal conduct between the time you became an informant and

3  the time you acknowledged to them sometime after the robbery

4  that you had continued selling drugs, right?

5  A.  That's correct.

6  Q.  And you're hoping that your testimony here will be looked

7  on favorably by them in terms of what they might do ultimately,

8  right?

9  A.  No.  That's not true.

10 Q.  You don't have any expectation that this could help you in

11 some way?

12 A.  No.  I don't know what's going to happen.  I know they're

13 saying they want to prosecute me in the state.

14 Q.  I didn't say that you know what's going to happen, but

15 aren't you hoping that by testifying here that it will put you

16 in the good graces of the Bronx, so when they exercise their

17 discretion, they will not charge you?

18          MS. TEKEEI:  Objection.  Asked and answered.

19          THE COURT:  I'll allow it.

20 A.  I'm hoping.  That don't mean I'm going to lie.

21 Q.  But you're hoping?

22 A.  Yes.

23          MR. DRATEL:  Nothing further.  Thank you.

24          MS. TEKEEI:  Just one question, your Honor.

25          THE COURT:  Okay.

 1   REDIRECT EXAMINATION

 2   BY MS. TEKEEI:

 3   Q.  Mr. Barea, Mr. Dratel showed you some notes.  Are those

     your notes?

 4   

 5   A.  No, they're not.

 6           MS. TEKEEI:  Thank you, your Honor.

 7           THE COURT:  You may be excused, Mr. Barea.

 8           (Witness excused)

 9           MS. TEKEEI:  We call Officer Michael Whelan.

10           MR. ARAVIND:  Can we just have one moment.

11           THE COURT:  Yes.

12           MS. TEKEEI:  There may have been a miscommunication

13   with our next witness.  He is nearby, although we don't see him

14   right out there.  May we have a couple of minutes to locate

15   him.

16           THE COURT:  Yes.

17           MS. TEKEEI:  Thank you, your Honor.

18           THE COURT:  Let's take a five-minute break or a short

19   break.

20           (Jury excused)

21           (Continued on next page)

22   

23   

24   

25

1           (In open court; jury not present)

2           THE COURT:  Let me ask the government.  Can you tell

3   me again what you know about where the witness is?

4           MS. TEKEEI:  Yes.  Our apologies.  He went to our

5   office instead of here and we're having somebody get him right

6   now.  There was a miscommunication, and we'll do our best to

7   make sure this doesn't happen again.

8           THE COURT:  He's walking over right now?

9           MS. TEKEEI:  Yes.

10          MR. ARAVIND:  After that is Sergeant DeRosa who has

11  just appeared, and so I think we have to have the brief

12  suppression hearing during the break, but he is our next

13  witness.

14          THE COURT:  Thank you.

15          Bring the jury in.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

1                    (In open court; jury present)

2                    THE DEPUTY CLERK:  Raise your right hand.

3      MICHAEL WHELAN,

4           called as a witness by the Government,

5           having been duly sworn, testified as follows:

6      DIRECT EXAMINATION

7      BY MS. TEKEEI:

8      Q.  Who is your employer?

9      A.  NYPD.

10     Q.  First of all, good afternoon.

11     A.  Good afternoon.

12     Q.  What is your title?

13     A.  Police officer.

14     Q.  How long have you worked at the NYPD?

15     A.  Five years.

16     Q.  What precinct are you assigned to?

17     A.  The 47th Precinct.

18     Q.  Are you assigned to a particular unit?

19     A.  The Anticrime Unit.

20     Q.  What does the Anticrime Unit do?

21     A.  It's a plain-clothes unit assigned to high-crime areas

22     consisting of high volumes of shootings, robberies, burglaries.

23     Q.  And how long have you been in the Anticrime Unit?

24     A.  Six months.

25     Q.  Prior to being in the Anticrime Unit, what unit were you

1  in?

2  A.  I was in a Conditions Unit.

3  Q.  Sorry --

4  A.  A Conditions Unit.

5  Q.  What is the Conditions Unit?

6  A.  It's very similar to the Anticrime Unit; it just covers a

7  lot of robbery areas, low-level crimes that people complain

8  about throughout the precinct.

9  Q.  And turning your attention to May 27, 2013, what unit were

10  you in at that time?

11  A.  I was in the Conditions Unit.

12  Q.  On that day, were you on patrol?

13  A.  Yes.

14  Q.  Were you alone or with another officer?

15  A.  I was with another officer.

16  Q.  And what type of car were you driving?

17  A.  I was in an unmarked RMP.

18  Q.  Did you come to learn about an accident that day?

19  A.  Yes.

20  Q.  What were you doing immediately before that accident?

21  A.  We were on routine patrol.  We were heading about

22  southbound -- I'm sorry -- northbound on White Plains Road

23  where we made a right-hand turn heading eastbound on 242

24  Street, we noticed a vehicle with traffic infractions.  We were

25  going to pull the car over.

Ea1gcha3                      Whelan - direct

1    Q.  I'd like to show you what's been marked as Government

2    Exhibit 1903.

3    A.  Okay.  Thank you.

4    Q.  Do you recognize that?

5    A.  Yes.

6    Q.  What is it?

7    A.  It's a map of the area I was just speaking about.

8    Q.  Is that a fair and accurate description of the area -- I'm

9    sorry -- depiction of the area that you have just described?

10   A.  Yes.

11            MS. TEKEEI:  Your Honor, we offer Government Exhibit

12   1903.

13            THE COURT:  Any objection?

14            MR. DRATEL:  No objection.

15            THE COURT:  It's admitted.

16            (Government's Exhibit 1903 received in evidence)

17            MS. TEKEEI:  Thank you.  May we publish it, your

18   Honor?

19            THE COURT:  Yes.

20   Q.  Officer, I think there's a laser pointer on your table.

21   Can you just stand up and show the jury, using your laser

22   pointer, approximately where you were when you noticed the car

23   that you just described?

24   A.  I'm going to have to get a little closer.

25            MS. TEKEEI:  Yes, of course.

1          THE DEPUTY CLERK:  Can you stand this way.  You're

2   blocking the jury.

3          THE WITNESS:  Sure.  Mind if I get closer?

4          THE DEPUTY CLERK:  Sure.

5   A.  So we were in this area right here traveling northbound and

6   we made a right-hand turn heading eastbound.

7   BY MS. TEKEEI:

8   Q.  If you can speak up a little bit.

9   A.  We were heading northbound on White Plains Road when we

10  made the right-hand turn to head eastbound towards Barnes

11  Avenue on East 242 Street.

12  Q.  What, if anything, did you observe?

13  A.  I observed a dark colored --

14         THE COURT:  Are we done with the pointer, because if

15  so, I'd love to have the witness in front of the microphone

16  again.

17         MS. TEKEEI:  Yes, your Honor.  Thank you.

18  Q.  What did you observe when you made that turn?

19  A.  I observed a dark-colored vehicle at the intersection, his

20  car was -- the car was facing the westbound direction on 242

21  Street.  The front left light was out and the driver of the

22  vehicle had no seatbelt on.

23  Q.  Was anybody else in that car?

24  A.  No.  It was just one driver.

25  Q.  And what happened after you made the stop, what, if

1    anything, after you made this observation?

2    A.  I saw the driver of the car.  He made eye contact with me.

3    It's kind of like what we call the deer in the headlights look.

4    He kind of looked at me and kind of -- he looked at me hard.  I

5    kept my eyes on him, but then I had to try to make a u-turn to

6    come back around on him, at which point, he accelerated at a

7    high rate of speed.  I lost sight of the car at that point.  He

8    had made a left to go southbound on to White Plains Road.  By

9    the time I u-turned, there was a good distance between us.

10   Q.  Did you see that car again at any point?

11   A.  Yes.  Approximately two blocks away on White Plains Road

12   and 241st Street, there was a vehicle accident that had

13   occurred.

14   Q.  And was that car in that accident?

15   A.  Yes.

16   Q.  What did you observe when you saw the car again?

17   A.  I observed the car in question unoccupied, at which point,

18   someone came up to us at the scene and said that the driver had

19   fled into the subway station.

20   Q.  What, if anything, did you do next?

21   A.  We went into the subway station to do a brief canvass,

22   which turned negative results.

23   Q.  So did you locate the driver?

24   A.  No.

25   Q.  What, if anything, did you do after attempting to locate

1    the driver?

2    A.   We called for an ambulance for the other person involved in

3    the accident.   I prepared a complaint report for a leaving the

4    scene of an accident and an accident report was prepared.

5    Q.   What, if anything, can you tell us about the description of

6    the driver?

7    A.   From what I saw with my own visual eyes was a male, black

8    dark skin with short hair.   In regards to the witnesses, the

9    witnesses said that it was a male black who went running up to

10   the stairs.   That's all we got from them.

11   Q.   What, if anything, happened to that car?

12   A.   The car was towed at the scene and a complaint report was

13   issued for the vehicle and the driver.

14   Q.   Do you recall the license plate numbers of that car?

15   A.   I don't recall at this moment.   If I saw my complaint

16   report, I'd probably be able to refresh my memory.

17   Q.   Let me show you what's been marked as 3503-1.   Do you

18   recognize that?

19   A.   Yes.

20           MR. DRATEL:   Your Honor, this is not proper.   I object

21   to that question about recognition.   This is for personal --

22   refreshing recollection.

23   Q.   Does reviewing that document refresh your recollection

24   about the license sequence of the car that you observed that

25   day?

1   A.  Yes.

2   Q.  And putting that aside, what were the license plate numbers

3   of that car?

4   A.  They are AKW7788.

5           MS. TEKEEI:  No further questions at this time.

6           THE COURT:  Any cross?

7           MR. DRATEL:  Yes.

8   CROSS-EXAMINATION

9   BY MR. DRATEL:

10  Q.  It's a North Carolina plate, right?

11  A.  Yes.

12  Q.  White?

13  A.  White with blue and red letters.

14  Q.  And the witnesses gave you a height of approximately 5'10",

15  correct?

16  A.  I don't recall that.

17  Q.  If you look at the document you have there, 3503-01, if you

18  look at page two, see if that refreshes your recollection.

19  A.  I don't have anything here on page two with height.

20  Q.  I'm sorry?

21  A.  Oh, it's on here.  I apologize.  It's on the back.

22  Q.  It's double-sided.

23  A.  I apologize.

24  Q.  Right?

25  A.  It is 5'10".  You're correct.

1          MR. DRATEL:  One second, your Honor.  Nothing further.

2     Thank you.

3          THE COURT:  Any redirect?

4          MS. TEKEEI:  No.  Thank you, your Honor.

5          THE COURT:  You may be excused.

6          (Witness excused)

7          THE COURT:  Ladies and gentlemen, we're going to take

8     a slightly longer lunch break today because there are some

9     things that we have to do to get ready for this afternoon so

10    things will go smoothly for you then.

11         Let's take an hour and-a-half lunch.  It's

12    approximately 12:15 now.  Let's reconvene at 1:45 back in here,

13    okay.  Thanks very much.

14         (Jury excused)

15         (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1              (In open court; jury not present)

2              THE COURT:  I assume that we'll reconvene in a half an

3     hour and do the suppression hearing, unless everybody wants to

4     do it now.

5              MR. ARAVIND:  Let's do it now.

6              THE COURT:  Let's do it now.  Good.  That way, we

7     won't be sitting around.

8              MR. ARAVIND:  The government calls Sergeant DeRosa.

9      THOMAS A. DEROSA,

10          called as a witness by the Government,

11          having been duly sworn, testified as follows:

12    DIRECT EXAMINATION

13    BY MR. ARAVIND:

14    Q.  Good afternoon, Mr. DeRosa.

15    A.  Good afternoon.

16              THE COURT:  Let me ask to make sure that the main door

17    to the courtroom is closed.

18              MR. ARAVIND:  Yes, it is.

19              THE DEPUTY CLERK:  Yes.

20              THE COURT:  Thank you.

21    Q.  Where do you work?  Mr. DeRosa?

22    A.  Clinton Township Police Department.

23    Q.  What is your title with the Clinton Township Police

24    Department?

25    A.  Right now, I'm a sergeant.

1   Q.  Where is Clinton Township?

2   A.  Roughly about an hour and ten minutes away from here in

3   West Jersey, Central West Jersey.

4   Q.  How long have you worked at the Clinton Township Police

5   Department?

6   A.  This December, I'll be going into my 18th year.

7   Q.  And how long have you been a sergeant at that department?

8   A.  Since October of 2005.

9   Q.  What are your duties and responsibilities as a sergeant

10  with the Clinton Township Police Department?

11  A.  Well, at the time, this was -- I was a patrol sergeant.

12  Q.  What does it mean to be a patrol sergeant?

13  A.  Basically I was in charge to supervise my squad, review the

14  reports, back them up on calls, stops, any incident, including

15  my own, you know, incidents involving traffic stops, arrests

16  and stuff like that.

17  Q.  How many people were you supervising as a sergeant?

18  A.  Four.

19  Q.  Now, during the course of your career as a law enforcement

20  officer, approximately how many traffic stops have you

21  conducted?

22  A.  Thousands.

23  Q.  Sergeant DeRosa, directing your attention to July 3, 2013,

24  were you working that day?

25  A.  Yes.

Ea1gcha3                          DeRosa - direct

1   Q.  What were you doing?

2   A.  Roving patrol.

3   Q.  What does that mean, roving patrol?

4   A.  As a supervisor I just rove around and kind of just float

5   around and see if anybody needs me or, you know, attend to my

6   own duties.

7   Q.  Are you in a car?

8   A.  Yes.

9   Q.  And is it a marked police car?

10  A.  Yes.

11  Q.  Were you by yourself or with other people?

12  A.  By myself.

13  Q.  Did there come a time when you stopped an individual that

14  you later identified as Antione Chambers?

15  A.  Yes.

16  Q.  Do you recognize Mr. Chambers in the courtroom today?

17  A.  Yes.

18  Q.  Can you describe what he's wearing by an article of

19  clothing and where he is sitting?

20  A.  Sitting in the middle of that young lady and that gentleman

21  there in the blue shirt and the tie.

22  Q.  On the second table?

23  A.  Yes.

24          MR. ARAVIND:  Let the record reflect that the witness

25  identified the defendant.

Ea1gcha3                          DeRosa - direct

1   Q.  Can you tell us in your own words, Sergeant DeRosa, how you

2   stopped the defendant that day?

3   A.  Yes.  I just stopped him for a traffic violation, which was

4   no lights with wipers on Route 22 westbound.

5   Q.  So were you stationary at the time or were you moving?

6   A.  I believe I was stationary.  I was going through a

7   cut-through at the time, so I could have been moving, do you

8   know what I mean, stopped and then moving because the

9   cut-throughs there are a little tricky.  You got to kind of

10  wean your way through them.

11  Q.  And what do you recall about seeing the defendant and the

12  car he was driving?

13  A.  I just remember that it was raining that day.  It had just,

14  you know, it was still I think a little light rain, and when

15  your wipers are on, you are required to have your lights in the

16  state of New Jersey.

17  Q.  And with respect to the car that the defendant was driving,

18  what was the particular traffic violation?

19  A.  No lights with wipers; I believe the statute is 39:3-47a.

20         MR. ARAVIND:  No further questions with respect to the

21  propriety of the stop.

22         THE COURT:  Cross-examination.

23         MR. DRATEL:  Thank you, your Honor.

24  CROSS-EXAMINATION

25  BY MR. DRATEL:

Ea1gcha3                    DeRosa - cross

1    Q.  You have a dashboard camera?

2    A.  Yes.

3    Q.  Good afternoon.  Sorry.

4    A.  Yes.

5    Q.  You have a dashboard camera, correct?

6    A.  Yes.

7    Q.  And when is that activated?

8    A.  It's activated when you throw your camera on, when you

9    throw your lights on, I mean.  Excuse me.

10   Q.  When you turn your lights on?

11   A.  Yes.

12   Q.  And when did you turn the camera on that day -- not that

13   day, during this incident?  We'll confine ourselves to the

14   specific stop.

15   A.  To be honest with you, I don't know when I turned the

16   camera on.  Usually, it goes on when the lights go on.  When

17   the lights are activated, that's when the camera gets

18   activated.

19   Q.  So, did you turn your lights on when you were following

20   Mr. Chambers' car?

21   A.  No, I don't believe so.

22   Q.  You had them on already?

23   A.  No.

24         THE COURT:  Excuse me.  When you say lights, do you

25   mean headlights?

1   THE WITNESS:  No, your emergency lights.

2   Q.  You mean --

3   A.  Your emergency lights, when you go to stop the car, that's

4   when your camera goes on.

5   Q.  When you stop the car?

6   A.  Yeah, when you stop the car, yeah, your camera goes on.

7   Q.  What about when you're moving?

8   A.  Well, depending on what kind of camera system you have and

9   the car, I think there's the hard drive and they go back, so it

10  goes back, like, 30 seconds.

11          In other words, when you stop the car, the hard drive

12  in the car will go back, like, 30 seconds before -- depending

13  on what -- depending on what it's timed for, it might be 30

14  seconds, it might be ten seconds.  I don't know.

15  Q.  So the hard drive captures everything but then only saves

16  ten to 20 seconds or 30 seconds back?

17  A.  No.  It only goes back -- it's whatever our IT guy sets it

18  for; it could be set for -- I'm not in charge of that.

19  Q.  I understand.

20          MR. ARAVIND:  Objection to the relevance of this

21  particular line of questioning.

22          THE COURT:  I'll allow it.  We saw the videotape, so

23  I'll allow it.

24          MR. DRATEL:  If we may have the video.  It's so short,

25  if we can play it in context.

1           THE COURT:  Let's not play the whole thing.

2           MR. DRATEL:  How long is it?  Just before the stop, I

3    mean.

4           THE COURT:  Okay.

5           MR. DRATEL:  Until we get to the stop part.

6           THE COURT:  If you want to stand up to see that,

7    that's fine.

8           THE WITNESS:  That would be great.  Okay.

9           (Video recording played)

10          THE COURT:  Why don't we watch the first five or seven

11   minutes.

12          MR. DRATEL:  This is fine.

13          THE COURT:  This is fine.  I'm just saying, let's keep

14   watching it through the relevant portion and then we don't have

15   to hear all the conversation.

16          MR. DRATEL:  No, this is fine.

17   Q.  So you didn't turn the --

18   A.  That's the hard drive.

19   Q.  What you're saying is that the hard drive captures material

20   before you've actually pressed on the -- you've actually turned

21   on lights to turn the camera on?

22   A.  Yeah, because if I would have hit record, it would have

23   said "record."  It goes -- I don't know what this is set for.

24   It's probably set to go back, when you hit your lights, 30

25   seconds to a minute.  I'm not sure.  That's -- I don't set --

Ea1gcha3                    DeRosa - cross

1          THE COURT:  What is the time?  Does it say?

2          MR. DRATEL:  How much time has expired?  One minute?

3          MS. HANSMA:  A minute.

4   Q.  One minute, ten seconds.  So maybe it's a minute if you've

5   obviously turned your lights on, but that's not an issue, but

6   okay.

7          Your IT guy set it differently, right?

8   A.  Some are set -- I don't set it.  I don't know what they set

9   it for.  This one probably was maybe set at a minute.  I don't

10  know.  But in other words, it's just -- when you hit your

11  lights, it goes back to, like, maybe 30 seconds.  I'm not

12  exactly sure and they only save for a certain amount of time.

13  Q.  When we pick it up, you're behind that car, right?

14  A.  Yes.

15  Q.  And did you know -- you can't see from the video whether

16  that car has its wipers on, correct?

17  A.  From this tape?

18  Q.  Yes.

19  A.  No, you can't see from the tape.

20  Q.  And you could have caught up to the car and gotten it on

21  the video that, in fact, the wipers were not working -- I mean,

22  the wipers, I'm sorry, were engaged and there were no lights,

23  correct?

24  A.  You can see the lights weren't on.

25  Q.  No, but you could have caught up and had, on the video, the

Ea1gcha3                         DeRosa - cross

1    wipers on, right?

2    A.   That's not something we do.

3    Q.   How do you know the wipers were still on when you stopped

4    him?

5    A.   I seen the wipers that weren't -- I seen that the wipers

6    were not -- and the lights were off.  Your lights have to be

7    on; that's the statute.  If your lights are on and those wipers

8    go, if they go once, they have to be on.  As you can see, the

9    ground was wet and it was raining; those wipers have to be on.

10                    (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.  But it starts raining during the video, right?

2   A.  But it was raining before, right before that.  You could

3   see how wet the ground is.

4   Q.  It's already raining at that point, right.  It just

5   started?

6   A.  No.  It started before that.

7   Q.  How do you know, though, that his use of the wipers was not

8   momentary?

9   A.  Because I saw that the wipers did not go visually.  Any

10  time that I was in view of him, not saying before, but times

11  that I viewed him, those wipers would go on.  What you see

12  visually and what you see on that camera is two totally

13  different things.  You might not be able to see on the camera,

14  but I visually seen that his wipers were not on.

15  Q.  From the position that you were driving on this video?

16  A.  When I observed him.  When he went by me the wipers were

17  not on.

18  Q.  What I'm saying is, what if a bug hits my window and I use

19  the wipers to clean it off, am I in violation unless I turn my

20  lights on?

21          MR. ARAVIND:  Objection.

22          THE COURT:  Overruled.

23  A.  I think that's a little different than if it's raining out.

24  If It was consistently raining, the ground was wet, the

25  windshield was getting hit, he should have been using his

1    wipers.  The lights should have been on.

2              THE COURT:  I'm just confused.  In other words, you

3    are saying you saw that the wipers were on, you saw that the

4    lights were off, and that's why you stopped him?

5              THE WITNESS:  Yes.  Exactly.  Lights have to be on

6    with the wipers.

7    Q.  There are other cars that we saw as well, right, on the

8    road?  Did you look for their wipers?

9              MR. ARAVIND:  Objection, relevance.

10             THE COURT:  Overruled.

11   A.  To be honest with you, I didn't notice any other cars.  I

12   can't speculate who was using their wipers or not.  I may have.

13   I may not have.  I don't know.

14   Q.  How many stops have you made in your career for that

15   particular violation?

16   A.  Quite a few.

17   Q.  There is nothing that prevented you from catching up to the

18   car and recording on the video to preserve that the wipers were

19   on and that the lights were off, correct?

20   A.  I don't think it would have been possible to do that.  I

21   don't know how I would have been able to record that unless I

22   got --

23   Q.  If you pulled right up next to him?

24   A.  It would have been awfully dangerous moving my camera and

25   zooming in.  Kind of awkward.

1    Q.   Don't you have him on a 45-degree angle already?

2    A.   No.  It's straight.  It wouldn't have been -- it's not

3    something -- to be honest with you, that's not something we are

4    required to do.

5    Q.   It's not something you are required to do?

6    A.   No.

7    Q.   If you know, is it possible for your IT guy or anybody else

8    to go back into that hard drive more than a minute?

9              MR. ARAVIND:  Objection, again, to the relevance of

10   that particular question for the purpose of this hearing.  We

11   have a record.  This witness has testified to his record.  I

12   don't understand how the hypothetical existence of the first 30

13   seconds of that video is somehow relevant to the particular

14   question before the Court, which is whether there was

15   justification to stop the car.

16             MR. DRATEL:  I think it's a spoliation issue,

17   actually.

18             THE COURT:  I'll allow it.

19   A.   If he could go back, I can't answer that.  I mean, I think

20   at this time period, no.  It's too long.

21             MR. DRATEL:  Nothing further.  Thank you.

22             THE COURT:  Okay.  You may be excused.  Thank you.

23             (Witness excused)

24             THE COURT:  We have just had this hearing based on the

25   government's motion in limine, most of which I had already

1    ruled on.  But the part I had reserved on was permission to

2    admit testimony of this sergeant concerning the traffic stop of

3    Mr. Chambers for the purpose of showing that Mr. Chambers

4    presented false identification documents and to use it as

5    evidence of flight.

6           I have read the papers that have been submitted by the

7    parties with regard to the motion.  I've also viewed the

8    videotape myself independently of our viewing it today.  And I

9    will allow the testimony to come in and the video, if desired.

10          First, the Second Circuit has unequivocally held that

11   "evidence of false identification is relevant and admissible to

12   show consciousness of guilt."  United States v. Rubirosa, 100

13   F.3d 943, 943 (2d Cir. 1996) (quoting United States v. Wilson,

14   11 F.3d 346, 353 (2d Cir. 1993).  Second, after carefully

15   reviewing the evidence, including hearing the testimony just

16   now, and reviewing the video of the stop, I'm rejecting

17   Mr. Chambers' argument that the stop itself was

18   unconstitutional and that the evidence of the false

19   identification was a fruit of the poisonous tree that should be

20   excluded.  Once a defendant has challenged the admissibility of

21   evidence under the Fourth Amendment, "the burden rests on the

22   government to prove, by a preponderance of the evidence, the

23   legality of the actions of its officers."  United States v.

24   Peterson, 2012 WL 4473298 at *6 (S.D.N.Y. Sept. 28, 2012).  "In

25   order to stop a car, the police must either have probable cause

EA1MCHA4

1    or reasonable suspicion, based on specific and articulable

2    facts of unlawful conduct."  United States v. Gaines, 457 F.3d

3    238, 243 (2d Cir. 2006).  "The decision to stop an automobile

4    is reasonable where the police have probable cause to believe

5    that a traffic violation has occurred."  Whren v. United

6    States, 517 U.S. 806, 810 (1996).

7             I find that the facts set forth by the government

8    established by a preponderance of the evidence that the police

9    had probable cause to stop Mr. Chambers.  The police stopped

10   Mr. Chambers on the ground that he had failed to turn on his

11   lights when he turned on his windshield wipers, a traffic

12   infraction under New Jersey law.  It's clear from the video

13   that the police officer pulled Mr. Chambers over after it began

14   raining.  The officer testified that he saw that the wipers

15   were on.  The video of the stop shows that Mr. Chambers' lights

16   are not on, but neither the windshield nor the wipers are

17   visible from the video.  The police officer also states on the

18   videotape no lights with wipers to himself immediately upon

19   pulling Mr. Chambers over.  Further, the video shows that

20   Mr. Chambers tacitly admitted the violation when he can be

21   heard to say in substance that he didn't know he had to have

22   his lights on when his windshield wipers are working.  Based on

23   this evidence, I find that the government has met its burden,

24   and I'm allowing the evidence in relating to the traffic stop.

25             See you after lunch.

EA1MCHA4

                          AFTERNOON SESSION

                             1:45 p.m.

 1          THE COURT:  Good afternoon.  What's our order of

 2     witnesses this afternoon?

 3          MR. ARAVIND:  Your Honor, what we had like to do is

 4     put in two stipulations and then return to Sergeant DeRosa.

 5     Then we will have two civilian witnesses, Isaac Nelson and Demi

 6     Torres, and then, if we get to it, Special Agent Reynolds.

 7          THE COURT:  I suspect we won't.  But who knows.

 8          MR. ARAVIND:  Your Honor, apropos of our conversation

 9     earlier about the stipulation, we had another conversation with

10     our higher-ups and we are prepared to enter a stipulation.

11     I've spoken to Mr. Dratel about the substance of what that

12     stipulation would look like.  I don't know whether the Court

13     has any preference.  But we would say something to the extent

14     of:  Members of the United States Attorney's Office, we are not

15     aware that an Internet photograph of Antione Chambers was shown

16     by Detective Deloren to Demi Torres until on or about January

17     24, 2014, when Demi Torres told members of the United States

18     Attorney's Office.

19          THE COURT:  And that stipulation is agreeable to you,

20     Mr. Dratel?

21          MR. DRATEL:  Yes.  I think the Court should read that.

22          THE COURT:  I'll need a copy of it, if you want me to

23     read it.  What's the other stipulation?

EA1MCHA4

1          MR. ARAVIND:  The other stipulations, there is a

2     stipulation about narcotics that was seized at location that

3     Tyrone Brown was found at, and there is a stipulation relating

4     to forensic testing on the duct tape and the hammer, and that

5     stipulation also states that the duct tape, which is Government

6     Exhibit 300, is admissible in evidence at trial.

7          Those are the two stipulations that we have.  I don't

8     know what the Court's preference is, whether you would like to

9     read it or whether the government can read it.

10          THE COURT:  I'll read both stipulations, if that's all

11     right.  You'd like to do that first thing?

12          MR. ARAVIND:  We would like to do the narcotics and

13     the duct tape stipulation first thing.  And then I'm happy to

14     write out more legibly the testimonial stipulation.

15          THE COURT:  You want to do that one later?

16          MR. ARAVIND:  We can do that.

17          THE COURT:  Later, probably.

18          MR. ARAVIND:  We can do that later.  That's fine.

19          THE COURT:  If you just want to hand that up then.

20          (Jury present)

21          THE COURT:  Good afternoon, ladies and gentlemen.  You

22     can nod your heads, but is it raining outside?  No.  That's

23     good to hear.

24          Before we get started with the next witness I'd like

25     to read to you two stipulations.  And when I first read you the

EA1MCHA4

instructions I explained to you that the things that are

evidence are the testimony you hear from the witnesses' mouths,

exhibits that are actually admitted into evidence, as well as

stipulations by the parties.

A stipulation is really just an agreement by the

parties and it is evidence, so what I'm about to read to you is

evidence.  And at the conclusion of the trial you'll have

copies of the stipulations in your exhibit books.

One stipulation reads as follows:  It's hereby

stipulated and agreed by and between the United States of

America, by Preet Bharara, United States Attorney for the

Southern District of New York, Negar Tekeei, and Santos

Aravind, Assistant United States Attorneys, and Antione

Chambers, the defendant, by and through the consent of his

attorney, Joshua Dratel, that:

If called to testify, criminalist Aline Barron of the

New York City Police Department, police laboratory controlled

substance analysis section would testify that:  On January 28,

2014, criminalist Barron received the contents of Government

Exhibit 600 which previously had been seized from 1810 Watson

Avenue, apartment 6A, Bronx, New York on April 10, 2013.  Among

the items she received in Government Exhibit 600 were several

plastic bags containing a green vegetative substance.

Criminalist Barron analyzed the green vegetative substance

contained in the bags and concluded that they contained a

1    detectable amount of marijuana and had a total aggregate weight

2    of approximately 80.325 grams.

3         B.  On or about February 1, 2014, criminalist baron

4    received clear plastic bags containing a white rock-like

5    substance that were contained in Government Exhibit 600 which

6    previously had been seized from 1810 Watson Avenue, apartment

7    6A, Bronx, New York on April 10, 2013.  Criminalist baron

8    analyzed the white rock-like substance found in these exhibits

9    and concluded that the substances contained a detectable amount

10   of cocaine base and had a total aggregate weight of

11   approximately 6.765 grams.

12        2.  It is further stipulated and agreed that

13   Government Exhibit 600 referenced in the stipulation has been

14   in the continual study of the NYPD or the United States

15   Attorney's Office for the Southern District of New York and is

16   in substantially the same condition today as when it was

17   obtained by law enforcement agents.

18        3.  If called to testify, a law enforcement agent with

19   the Drug Enforcement Administration would testify that cocaine

20   is not grown in New York State and must be imported from out of

21   New York State and that cocaine base, commonly known as crack

22   cocaine, is made from cocaine.

23        That's the first stipulation, which deals with the

24   narcotics.

25        The second stipulation is the following:  It is hereby

EA1MCHA4

stipulated and agreed, by and between the United States of America, by Preet Bharara, United States Attorney for the Southern District of New York, Negar Tekeei, and Santosh Aravind, Assistant United States Attorneys, and Antione Chambers, the defendant, by through and through the consent of his attorney, Joshua Dratel, that:

1.  On March 25, 2013, NYPD officer Christopher Torres collected evidence from a crime scene that he examined at 1403 Overing Street, apartment 1A in the Bronx, New York.  During that examination Officer Torres collected duct tape which is marked as Government Exhibit 300.  Government Exhibit 300 was sent to the office of the chief medical examiner for forensic testing.  Subsequent forensic testing by OCME personnel and by independent forensic laboratory revealed that:

A.  A DNA sample taken from Government Exhibit 300 revealed a mixture of at least two DNA profiles.  On September 23, 2014, Antione Chambers was excluded as a contributor to the DNA sample taken from Government Exhibit 300.

B.  DNA elimination samples were taken from David Barea and Emma Torruella on March 25, 2013.  No further testing was done with regard to these samples.

Paragraph 2:  On or about June 6, 2013, NYPD detective Ellis Deloren collected a hammer that was found inside a black Honda sedan with North Carolina license plate AKW-7788 that had been involved in a car accident on May 27, 2013 in the vicinity

1    of White Plains Road and 241st Street.  The hammer is marked as

2    Government Exhibit 500.  Government Exhibit 500 was sent to the

3    OCME for forensic testing.  Subsequent forensic testing by OCME

4    personnel revealed that no DNA evidence suitable for testing

5    was found on this item.

6              It is further stipulated and agreed that this

7    stipulation, as Government Exhibit 2006, and Government Exhibit

8    300 are admissible in evidence as government exhibits at trial.

9              These two stipulations are exhibits.  They will be

10   included in your witness binders some time before you

11   deliberate.

12             (Government's Exhibits 2006 and 300 received in

13   evidence)

14             THE COURT:  You may proceed.

15             MR. ARAVIND:  Your Honor, may we formally offer the

16   duct tape that was referenced?

17             THE COURT:  Yes.

18             No objection?

19             MR. DRATEL:  No.

20             THE COURT:  It's admitted and you may publish it.

21             MR. ARAVIND:  I noticed it has a biohazard sticker, so

22   we are not going to open it.  It's Government Exhibit 300.

23             The government calls Thomas DeRosa.

24    THOMAS A. DeROSA,

25        called as a witness by the Government,

EA1MCHA4

1          having been duly sworn, testified as follows:

2     DIRECT EXAMINATION

3     BY MR. ARAVIND:

4     Q.   Good afternoon.

5     A.   Good afternoon.

6     Q.   Where do you work?

7     A.   Clinton Township Police Department.

8     Q.   Can you please just speak into the microphone.

9     A.   Clinton Township Police Department.

10    Q.   Where is Clinton Township?

11    A.   Roughly about an hour 10 minutes away, west Jersey, located

12    in the vicinity of Route 22, 78, and Route 31.

13    Q.   What is your title?

14    A.   Sergeant.

15    Q.   How long have you worked at Clinton Township Police

16    Department?

17    A.   This December will be 18 years.

18    Q.   How long have you been a sergeant?

19    A.   Since October 2005.

20    Q.   And what are your duties and responsibilities as a sergeant

21    now with the Clinton Township police department?

22    A.   My duties at this present time, I'm in charge of our

23    investigative unit, but at the time of this I was a patrol

24    sergeant, this encounter.

25    Q.   Let's talk about your duties now.  What does it mean to be

1   an investigative sergeant?

2   A.  I'm in charge of the detective bureau.  I supervise guys in

3   the unit.  Also investigate crimes and things of that nature.

4   Q.  Back in July of 2013, what were your duties and

5   responsibilities as a sergeant?

6   A.  I was a patrol sergeant.  I was in charge of three other

7   guys on my shift.  Basically, I would be roving, supervising

8   them on stops, calls, I would be in charge of reviewing their

9   reports, just procedural stuff.

10  Q.  Approximately how many traffic stops have you conducted in

11  the course of your career as a law enforcement officer?

12  A.  Thousands.

13  Q.  Now, directing your attention to July 3, 2013, sergeant

14  DeRosa, were you working that day?

15  A.  Yes.

16  Q.  And what were you doing?

17  A.  I was in the vicinity of Route 22 West, which runs parallel

18  to Interstate 78.

19  Q.  What were you doing there?

20  A.  Just driving around.

21  Q.  Were you by yourself or with others?

22  A.  At the time I was by myself.

23  Q.  And were you in a marked police vehicle or a plain vehicle?

24  A.  No.  It's marked.

25  Q.  Did there come a time where you stopped an individual that

1    you subsequently found out was named Antione Chambers?

2    A.  Yes.

3    Q.  Do you recognize Mr. Chambers in the courtroom today?

4    A.  Yes, I do.

5    Q.  Can you describe an article of clothing he is wearing and

6    where he is sitting?

7    A.  He's sitting between that young lady and that gentleman

8    right there, his attorney.  Blue shirt, dark tie.

9              MR. ARAVIND:  Let the record reflect that the witness

10   has identified the defendant.

11   Q.  What happened that day?

12   A.  I stopped him on 22 westbound for a traffic infraction,

13   which was no lights on with his wipers, which is an infraction

14   in our state.

15   Q.  Can you explain what the infraction is?

16   A.  Basically, if you have your windshield wipers on, you are

17   required to have your lights on.

18   Q.  That's a traffic violation in New Jersey?

19   A.  Yes.  The statute, as I said before, is 39:3-47a.

20   Q.  When you observed that infraction, where were you and where

21   was the defendant?

22   A.  Exactly, the exact point of where I was, I know I was

23   facing westbound, but I did -- that white Dodge vehicle of his,

24   his lights were clearly not on, and at the time I observed him

25   using his wipers.

1   Q.  Did you follow the defendant at all before you stopped him?

2   A.  Yes.

3   Q.  Did you activate your lights and sirens?

4   A.  Yes.

5   Q.  Where did you stop the defendant?

6   A.  Route 22 West, I believe, in the area of the Round Valley

7   access road.

8   Q.  You described a car that the defendant was found in.  Can

9   you tell us about that car?

10  A.  I believe it was a white Dodge.  Turned out to be a rental

11  car.

12  Q.  What happened when you stopped the defendant?

13  A.  I spoke to him, asked him for his credentials, explained

14  why he was stopped.

15  Q.  Can you describe the defendant as you approached the car?

16  A.  He wasn't uncooperative or anything like that.  I did take

17  notes.  He was speaking very low, which was kind of strange.

18  He provided me with a driver's license and a registration.

19  Could not provide me with the rental agreement for the car or

20  the insurance card.

21  Q.  Was there anyone else in the car?

22  A.  Yes.

23  Q.  Who was in the car?

24  A.  A female named Zaporia Dunbar and I believe two children in

25  the back seat.

EA1MCHA4                        DeRosa - direct

1    Q.  I am going to show you what has been marked for

2    identification as Government Exhibit 801.

3            Do you recognize that item?

4    A.  Yes, I do.

5    Q.  What is it?

6    A.  It's a driver's license in the name of Jerome Adams.  This

7    is what he handed me when I stopped him.

8            MR. ARAVIND:  The government offers Government Exhibit

9    801.

10           MR. DRATEL:  No objection, your Honor.

11           THE COURT:  Admitted.

12           (Government's Exhibit 801 received in evidence)

13           MR. ARAVIND:  Your Honor, may we publish it?

14           THE COURT:  Yes.

15   Q.  Sergeant DeRosa, can you read the name associated with the

16   driver's license that is Government Exhibit 801?

17   A.  Yes.  Jerome Adams.

18   Q.  What is the address that you read there?

19   A.  1005 Darter Lane, North Wales, PA.  19454 is the zip code.

20   Q.  What state that driver's license, for the record?

21   A.  Pennsylvania.

22   Q.  Now, what, if anything, did you notice about that license

23   when you observed it?

24   A.  When I first observed it, you know, I wasn't 100 percent,

25   but it didn't look right to me.  It looked very light,

1   especially in the area of his face.  I -- we see a lot of

2   Pennsylvania driver's license because we are 15 minutes from

3   the Pennsylvania border, so I see a lot of them.  And it just

4   struck me as a little peculiar.

5   Q.  What, if anything, did you do next when you obtained that

6   driver's license?

7   A.  When I obtained it -- when I went back to the car, as I

8   wrote my report, we have a computer system, it's called

9   Info-Cop which requires us, we can run registrations, vehicle

10  registrations, driver's license numbers.  It was broken that

11  day.  I couldn't physically do it myself.  So I wouldn't be

12  able to see what the picture came back on the driver's license.

13  Therefore, I had to call my dispatch who ran the driver's

14  license number for me.

15  Q.  What happened when you spoke to dispatch?

16  A.  I didn't ask them for much.  I just said to run the

17  driver's license, and they told me the number that I provided

18  was valid.

19              MR. DRATEL:  Objection.

20              THE COURT:  Sustained.  I am going to just strike the

21  last answer.  You should not pay any attention to it because

22  it's hearsay.  I told you about hearsay, how you have to hear

23  things firsthand.  So disregard the last answer.

24  Q.  After you spoke with dispatch, did you learn that that

25  driver's license number was associated with that name, Jerome

1    Adams, or some other name?

2              MR. DRATEL:  Objection as to foundation.

3              THE COURT:  You may lay the foundation.

4    Q.  Did you speak to someone at dispatch?

5    A.  Actually, I spoke -- I found out --

6              THE COURT:  Just answer yes or no.

7    A.  On the radio, yes, dispatch got back to me.

8    Q.  Were you able to determine that the name associated with

9    that driver's license number was the same Jerome Adams that is

10   on Government Exhibit 801?

11   A.  No.

12             MR. DRATEL:  Objection as to the basis for knowledge,

13   hearsay.

14             THE COURT:  Overruled.  The answer.

15   Q.  What was the answer?

16   A.  I was not able to determine that.

17   Q.  Did you determine that it was someone else?

18   A.  Yes.

19             MR. DRATEL:  Object, your Honor.  Different kind of

20   answer, different question.  Hearsay.

21             THE COURT:  Could you lay a foundation so it's clear

22   to me that it doesn't have a hearsay basis.

23             Ladies and gentlemen, you should disregard that last

24   answer and listen for new answers.

25   Q.  I'll ask it this way.

1          Sergeant DeRosa, what did you do after you spoke to

2     dispatch?

3     A.   Once I spoke to dispatch, I contacted my headquarters.

4     Q.   And what happened when you contacted headquarters?

5     A.   I spoke to my lieutenant at headquarters and asked him -- I

6     had everything faxed down because I couldn't see everything in

7     front of me because our computer was down, and asked him to run

8     a criminal history check on that person, that driver's license.

9     He in turn got back to me --

10          MR. DRATEL:  Objection.

11          THE COURT:  You asked him to run a criminal history

12    check on the name of Jerome Adams.  And don't tell us anything

13    he said.  Let's wait for the next question.

14    Q.   What did you do after you contacted your headquarters?

15    A.   He requested --

16          THE COURT:  Without telling us what he said, what did

17    you do next?

18          THE WITNESS:  I realized that that driver's license

19    number did not belong to Jerome Adams.

20    Q.   What did you do?

21    A.   I then, in turn, contacted my dispatch again and wanted to

22    verify that that number -- who the number belonged to.  That

23    driver's number belonged to a totally different --

24          MR. DRATEL:  Objection.

25          THE COURT:  Just stop.  Contacted dispatch to find out

EA1MCHA4                          DeRosa – direct

1    who that driver's license number belonged to.

2              THE WITNESS:  Yes.

3              THE COURT:  Let's just stop right there.

4    Q.  Did you verify, based on the conversations with dispatch,

5    that that driver's license was not associated with the name

6    Jerome Adams?

7              MR. DRATEL:  Objection.

8              THE COURT:  Sustained.

9              MR. ARAVIND:  Your Honor, may I approach just briefly.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At the side bar)

2              THE COURT:  There must be a way to do this.  Even from

3    what we saw on the video it was very clear what was happening.

4              MR. ARAVIND:  We are happy to show the video.

5              THE COURT:  It's kind of long.  Is there some way you

6    can ask some questions without asking essentially what someone

7    told him?

8              MR. ARAVIND:  Your Honor, I'm trying to elicit the

9    testimony not for the purpose of proving the truth, but for the

10   purpose of what he did next.  He obtains a driver's license

11   that he determines is fake.  That is not in and of itself

12   hearsay and it's for what he does next, which is he then places

13   him under arrest.

14             THE COURT:  Why don't we move to that.

15             MR. ARAVIND:  I don't know whether it's been

16   established that he has determined --

17             THE COURT:  Doesn't matter.  You can tell him, what

18   did you do?  I placed him under arrest.  For what?  Say what.

19   And did you have a good-faith basis to believe that it was

20   proper.

21             MR. DRATEL:  So it's clear, my objections are not

22   trying to get to the part that they are going to get to.  I

23   don't know what he is going to say in response to what he heard

24   back.

25             THE COURT:  I understand.

```
 1              (In open court)
 2              THE COURT:  Mr. Aravind, if you want to lead to get to
 3    the appropriate place, that's fine.
 4              MR. ARAVIND:  Thank you, your Honor.
 5    Q.  Did there come a time when you placed the defendant under
 6    arrest?
 7    A.  Yes.
 8    Q.  And what was he arrested for?
 9    A.  Providing false identification and hindering his
10    apprehension.
11    Q.  Did you have a good-faith basis to believe that the
12    defendant had presented a false identification?
13    A.  Yes, I did.
14    Q.  Now, did you speak to the rental car company during the
15    course of the traffic stop?
16    A.  Yes, I did.
17    Q.  And without telling us what the rental company did, did you
18    determine whether either Jerome Adams or the defendant was
19    listed as the person who rented the car that day?
20    A.  They were not.
21    Q.  And after speaking with the rental car company, what was
22    your intention with respect to the rental car that you stopped
23    that day?
24    A.  Impound it.
25    Q.  Did you later speak with other law enforcement agents with
```

EA1MCHA4                         DeRosa – direct

 1   respect to the defendant?

 2   A.  Yes.

 3   Q.  During the traffic stop did the defendant ever tell you his

 4   name was Antione Chambers?

 5   A.  No.

 6   Q.  Can you tell the jury a little bit about that part of the

 7   stop?

 8   A.  He -- once he was placed under arrest he got agitated

 9   because I was trying to speak to Ms. Dunbar, trying to

10   identify --

11            MR. DRATEL:  Your Honor, I think we need to have

12   another side bar, please.

13            THE COURT:  I really don't want to have another side

14   bar.

15            MR. DRATEL:  I know.

16            THE COURT:  Okay.

17            (Continued on next page)

18

19

20

21

22

23

24

25

1          (At the side bar)

2          MR. DRATEL:  I don't know how well this witness is

3    prepared and what he is going to say.  If he starts talking

4    about statements that Mr. Chambers made --

5          THE COURT:  There are admissions against interests.

6          MR. DRATEL:  We had no notice of it.  If they are

7    going to put in the fact -- I went over this with the

8    government this morning, that he was going to put in that he

9    did not tell his name and then presented a false license.

10   There are other statements that we only got in 3500 material

11   that we never had notice of before.

12         THE COURT:  Even with the video?  You had the video.

13         MR. DRATEL:  We had the video in September, yes.  They

14   didn't say in their motion that they were going to put in

15   statements by him.  They said they were going to put in

16   consciousness of guilt with respect to false license and --

17         THE COURT:  I see what you are saying.

18         MR. ARAVIND:  Your Honor, this witness was about to

19   answer that I think when he begins to speak to Ms. Dunbar, the

20   defendant gets agitated and repeatedly does not admit his true

21   identity.  I think that's what he was about to say.

22         THE COURT:  There were other statements.  Why don't

23   you just lead and we will all be good.

24         (Continued on next page)

25

1              (In open court)

2    Q.  Sergeant DeRosa, did you repeatedly ask the defendant for

3    his identity, his true identity?

4    A.  I asked him for his identity, yeah, a few times.

5    Q.  And did he ever acknowledge that his name was Antione

6    Chambers?

7    A.  No.

8    Q.  Did you subsequently learn the defendant's real name?

9    A.  Yes.

10   Q.  And did you speak with other law enforcement officers?

11   A.  Yes.

12   Q.  Who did you speak with?

13   A.  Once --

14              THE COURT:  Who did you speak with?

15              THE WITNESS:  I spoke with Special Agent Reynolds.

16   Q.  From the FBI that's sitting at the front table?

17   A.  Yes.

18              MR. ARAVIND:  Your Honor, may I just have one moment?

19              THE COURT:  Yes.

20   Q.  Did there come a time when you met with Special Agent

21   Reynolds?

22   A.  Yes.

23   Q.  And what happened to the defendant's charges in New Jersey?

24   A.  As far as Mr. Chambers, I am not sure what happened to him.

25   Q.  Has Mr. Chambers been in state custody or was he

1    transferred at some point in time to federal custody?

2    A.  I believe he was transferred to federal custody.

3    Q.  Have you had any other further dealings with Antione

4    Chambers other than the facts that you have described to us

5    today?

6    A.  No.

7              MR. ARAVIND:  No further questions.

8              THE COURT:  Cross-examination.

9              MR. DRATEL:  Thank you, your Honor.

10   CROSS-EXAMINATION

11   BY MR. DRATEL:

12   Q.  Good afternoon, Sergeant DeRosa.

13   A.  How are you, sir?

14   Q.  Good.

15        That was July 3, 2013, correct?

16   A.  Yes.

17   Q.  And when that license was presented to you, the Jerome

18   Adams license that we see up there, is there any way to tell

19   when it was obtained; in other words, how long he had it for?

20   A.  No.  I don't know that.

21   Q.  This was an hour, hour and 10 minutes outside of New York

22   City?

23   A.  Give a little, take a little.

24             MR. DRATEL:  Thank you.  I have nothing further.

25             THE COURT:  Redirect?

1          MR. ARAVIND:  No, your Honor.

2          THE COURT:  You may be excused.  Thank you.

3          THE WITNESS:  Thanks, your Honor.

4          (Witness excused)

5          MS. TEKEEI:  Your Honor, the government calls Isaac

6   Nelson.

7    ISAAC NELSON,

8          called as a witness by the Government,

9          having been duly sworn, testified as follows:

10  DIRECT EXAMINATION

11  BY MS. TEKEEI:

12  Q.  Good afternoon, Mr. Nelson.

13  A.  Hi.

14  Q.  How old are you?

15  A.  I'm 50.

16  Q.  What do you do for a living?

17  A.  I work with New York City Transit, station agent.

18  Q.  Where do you live now, generally?

19  A.  In the Bronx.

20  Q.  Are you a landlord?

21  A.  Yes.

22  Q.  What is the address of your building?

23  A.  4782 Barnes Avenue, Bronx, New York.

24  Q.  Sir, if you could pull the microphone closer to you.  Thank

25  you, sir.

1   A.  You're welcome.

2   Q.  Did there come a time when you rented an apartment to

3   Zaporia Dunbar?

4   A.  Yes.

5   Q.  Approximately when was that?

6   A.  That would be exactly August -- between August and

7   September 2012.

8   Q.  And for approximately how long did you rent an apartment to

9   Ms. Dunbar?

10  A.  She was there until May, June 2013.

11  Q.  Did anyone else stay with Ms. Dunbar?

12  A.  Her daughter and her boyfriend.

13  Q.  What was his name?

14  A.  She said his name is --

15          THE COURT:  What was his name?

16          THE WITNESS:  Chambers.

17          MR. DRATEL:  Objection.

18  Q.  Did there come a time when law enforcement agents with the

19  FBI came to speak with you about Ms. Dunbar or Mr. Chambers?

20  A.  Yes.

21  Q.  Approximately when was that?

22  A.  Around the same time.  I think June 2013.

23  Q.  Approximately when was the last time you saw Ms. Dunbar?

24  A.  Also would be the same, around that time.  When the FBI

25  came, I haven't heard from her again.  She left and I didn't

 1   hear from her again.

 2   Q.  When she left did you try to contact her?

 3   A.  Yes, I did.

 4   Q.  Were you successful?

 5   A.  No.  I call her and she didn't answer her phone.  It wasn't

 6   working.

 7   Q.  Had she paid rent?

 8   A.  Before she left?

 9   Q.  Did she owe any rent?

10   A.  Yes.  I kept the apartment for some time before I thought

11   she would come back.  That time she didn't pay rent.

12   Q.  Did she ever come back?

13   A.  No, she never came back.

14          MS. TEKEEI:  No further questions at this time.

15          THE COURT:  Cross?

16   CROSS-EXAMINATION

17   BY MR. DRATEL:

18   Q.  Good afternoon, Mr. Nelson.

19   A.  Good afternoon.

20   Q.  She paid on a weekly basis rent, correct?

21   A.  Yes.

22   Q.  You charged her on a weekly basis.

23          And you don't know why she left, right?

24   A.  No, I don't.

25          MR. DRATEL:  Nothing further.  Thank you.

1              THE COURT:  Redirect?

2              MS. TEKEEI:  No, your Honor.

3              THE COURT:  You may be excused.  Thank you for coming.

4              (Witness excused)

5              MS. TEKEEI:  The government calls Demi Torres.

6      DEMI TORRES,

7           called as a witness by the Government,

8           having been duly sworn, testified as follows:

9      DIRECT EXAMINATION

10     BY MS. TEKEEI:

11     Q.  Good afternoon, Ms. Torres.

12              How old are you?

13     A.  Twenty.

14     Q.  What do you do for a living?

15     A.  I work and I go to school.

16     Q.  Where were you born?

17     A.  In the Bronx.

18     Q.  Where did you grow up?

19     A.  In the Bronx.

20     Q.  How far did you get in school?

21     A.  College.

22     Q.  Where do you live now, generally?

23     A.  In the Bronx.

24     Q.  With whom?

25     A.  My grandmother.

1  Q.  Do you have any siblings?

2  A.  Yes.

3  Q.  How many?

4  A.  I'm the oldest of five.

5  Q.  Do you know Emma Torruella?

6  A.  Yes.

7  Q.  Who is she?

8  A.  My mother.

9  Q.  How would you describe your relationship with your mother?

10 A.  Distant, but it's there.

11 Q.  What do you mean by distant?

12 A.  Like I see --

13            MR. DRATEL:  Your Honor, there is howling in here.

14            THE COURT:  That's the wind howling.  The acoustics

15 are bad.

16            Do you mind keeping your voice up because we have to

17 hear you over all the other noise.  Thank you.

18 Q.  What do you mean by distant?

19 A.  I see her mostly on weekends and sometimes she stops by my

20 job.

21 Q.  Do you know David Barea?

22 A.  Yes.

23 Q.  Who is he?

24 A.  My stepfather.

25 Q.  How would you describe your relationship with Mr. Barea?

1   A.  I see him once or twice a month.

2   Q.  Directing your attention to March of 2013, did anything out

3   of the ordinary occur?

4   A.  Yes.

5   Q.  Tell us generally what happened.

6   A.  My mom came to the house.  She had no keys.  And she didn't

7   call.  I was in my room.  And she was banging on the door.  And

8   someone was with her that was unknown.  I didn't know him.

9   Q.  Approximately what time was this?

10  A.  Around 1, 2:00 in the morning.

11  Q.  What were you doing?

12  A.  I was in my room on the phone and watching television.

13  Q.  Was your grandmother at home?

14  A.  Yes.

15  Q.  Where was she?

16  A.  She was in her room.

17  Q.  Was there anybody else at home?

18  A.  My little brother.

19  Q.  Where was he?

20  A.  He was in her room.

21  Q.  What did you do when you heard the knocking on the door?

22  A.  I went to check who it was.

23  Q.  And what did you observe?

24  A.  I looked through the peephole and it was my mom and a guy.

25  Q.  Can you describe your mom's demeanor?

1    A.  She looked nervous, and I hesitated to open the door.

2    Q.  Was it typical for your mom to show up in that way?

3    A.  No.

4    Q.  How did she typically arrive?

5    A.  She would call if she had to come when Adam was there, and

6    she had a pair of keys.

7    Q.  Initially what did you think was happening?

8    A.  I was unsure at first.

9    Q.  Can you describe the physique of the person with your mom

10   when you were looking through that peephole?

11   A.  It looked like one of the guys from the neighborhood.  He

12   just had a regular hat on and a bubble jacket.

13   Q.  What happened after you looked through the peephole?

14   A.  I seen it was her and I asked her who it was.

15   Q.  And what happened next?

16   A.  She told me it was Groovy's friend.

17   Q.  After that --

18           MR. DRATEL:  I didn't hear.

19           THE COURT:  She told me it was --

20           THE WITNESS:  Groovy's friend.  That's a nickname for

21   my stepfather.

22   Q.  What happened next?

23   A.  I opened the door a little bit.

24   Q.  And what, if anything, did you see?

25   A.  The guy wasn't really looking at me, but I told her who it

EA1MCHA4                        Torres - direct

1    was again, and he told me it was Groovy's friend, and I let her

2    in.

3    Q.  How were you dressed?

4    A.  I had a sleeveless T-shirt and some short shorts.

5    Q.  And what happened after you let your mom in?

6    A.  She asked me where was my grandmother.  I told her in the

7    room and I let her in, and the guy and I went to my room to

8    change.

9    Q.  Can you describe the layout of your apartment?

10   A.  When you walk into the left is the kitchen, to the right is

11   the living room, and then down the hall, the first room is my

12   grandmother's room, the second is the bathroom, and the last

13   room is mine.

14   Q.  And when you let your mother in, where did the man who was

15   with her stand?

16   A.  He was standing in the living room next to the table.

17   Q.  Can you describe the lighting that day?

18   A.  The stove light was on and the hallway light was on.

19   Q.  And after you went to your room, what did you do next?

20   A.  I was on the phone.  I just told him to give me a second.

21   And then I tried to put on under clothing and then I went back

22   to the --

23            THE COURT:  Can you try to slow down a little bit and

24   enunciate.  The acoustics are really bad in here.  So it's very

25   hard to understand.

EA1MCHA4                    Torres - direct

1    A.  I went to the room first and then I went to put on under

2    garments.  And then I went back out to the living room to speak

3    to -- hallway to speak to her.

4    Q.  What, if anything, did you observe when you went back out

5    to the living room?

6    A.  She was really nervous and she wasn't talking to me right

7    away.  She was looking for grandma.  She was looking for my

8    grandmother.

9    Q.  Where were you standing?

10   A.  In front of my grandmother's room, the doorway there.

11   Q.  Where was the man who came in with your mother?

12   A.  The whole time he stood by the dining table in the living

13   room.

14   Q.  Approximately how far away were you from him?

15   A.  I can say like from here to you.

16   Q.  Could you see him?

17   A.  Yes.

18   Q.  Tell us what you saw.

19   A.  He had a black skully and a black bubble jacket with

20   leather patches on the top with black gloves, boots, and black

21   jeans.

22   Q.  Did you see his face?

23   A.  Yes.

24   Q.  Approximately how long did you look at him?

25   A.  He kept looking away from me, I kept looking at him the

1   majority of the time that they were there.

2   Q.  Ms. Torres, do you see the person who was in your apartment

3   that night in the courtroom today?

4          MR. DRATEL:  Objection, your Honor.

5          THE COURT:  Overruled.

6   A.  Yes.

7   Q.  Can you point him out and describe an article of clothing

8   he is wearing?

9   A.  Sitting in the back table with the blue shirt.

10         MS. TEKEEI:  Let the record reflect that the witness

11  has identified the defendant.

12         (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

BY MS. TEKEEI:

Q.  What was his demeanor when you saw him?

A.  A little nervous that I kept looking at him, but he didn't say nothing and he was just waiting.

Q.  Why did you keep looking at him?

A.  The point that he was avoiding my contact.

THE COURT:  Could you say that again.

THE WITNESS:  The point that he was avoiding eye contact, it came off a little weird to me.

Q.  Earlier you said that when he was at the door, you thought he might have been from the neighborhood.  Can you explain that?

A.  The way he was dressed and if he was Groovy's friend, Groovy knows a lot of people, so I just figured it's just one of the guys from the neighborhood.

Q.  What, if anything, did your mother and that man, the defendant, leave the apartment that night?

A.  Yes.

Q.  Was your mother carrying anything when she left?

A.  She got a book bag from my grandmother's room.

Q.  What, if anything, did you do after they left the apartment?

A.  Once they left, I went back to my room.

Q.  Did you see your mother again later that day?

A.  Yes.

Ea1gcha5                         Torres - direct

1    Q.  When?

2    A.  It was in the middle of the night.  She woke me up to tell

3    me what happened, but I really wasn't waking up.

4    Q.  Did you -- when you thought he looked familiar, did you do

5    anything?

6    A.  Oh, before I went to bed I was, like, on social media

7    because I -- to see if I knew him from somewhere or a friend of

8    a friend.

9    Q.  And did you find him?

10   A.  No.

11   Q.  What do you mean by social media?

12   A.  Facebook.

13   Q.  Did you ever speak with law enforcement officers about that

14   day?

15   A.  Yes.

16   Q.  When?

17   A.  It was a day or two after that night.

18   Q.  And who did you speak with?

19   A.  Detective Ellis.

20   Q.  Did you look at any photographs?

21   A.  Yes.

22   Q.  Did you ever pick out the man in your apartment out of a

23   photographic array?

24   A.  The first time, no.

25   Q.  Did you, at any time, pick him out of an array?

1   A.   Yes.

2   Q.   I'm going to show you what's been entered as Government

3   Exhibit -- excuse me -- what's been marked for identification

4   as Government Exhibit 1001.  If you could just look at the

5   first page of that exhibit.

6            What is that?

7   A.   It's the photo that I circled and signed.

8   Q.   And approximately when did you first review that, see that?

9   A.   I don't remember exactly, but I remember Detective Ellis

10  bringing it to me.

11           MS. TEKEEI:  The government offers Government Exhibit

12  1001.

13           MR. DRATEL:  Objection.

14           THE COURT:  Overruled.

15           It's admitted.

16           MS. TEKEEI:  May we publish it to the jury.

17           THE COURT:  You may.

18           (Government's Exhibit 1001 received in evidence)

19  Q.   Ms. Torres, can you tell us which picture you circled?

20  A.   The first row, the second picture.

21  Q.   And whose signature appears below that?

22  A.   Mine.

23  Q.   When you identified this photograph, had anyone indicated

24  to you which photograph you should identify?

25  A.   No.

Ea1gcha5                          Torres - direct

1   Q.  What were you asked to do?

2   A.  Identify the man, the man who was inside of my house.

3   Q.  Before you saw this photo array, had you seen any others?

4   A.  Yes.

5   Q.  And did you sign your name under any other pictures?

6   A.  No.

7   Q.  Were you shown any other photographs before you saw this

8   photo array?

9   A.  Yes.

10  Q.  And can you describe for the jury what that was?

11  A.  It was an article online that I've seen in the precinct

12  with Detective Ellis.

13  Q.  And what -- when did that happen?

14  A.  It was a few months after the first time I was in the

15  precinct.

16  Q.  When -- where were you -- strike that.

17          Other than the picture, did you notice anything else

18  about that photograph?

19  A.  The article itself?

20  Q.  Yes.

21  A.  The name.

22  Q.  And what, if anything, did you do with that information?

23  A.  I went home and looked it up.

24  Q.  What do you mean you looked it up?

25  A.  I looked up the article on Google.

Ea1gcha5                          Torres - direct

1   Q.   And did that change your impression of what you had thought

2   about the picture?

3   A.   No.

4   Q.   Going back to Government Exhibit 1001, after you identified

5   the person in this photo array, did you talk to anyone about

6   it?

7   A.   No.

8   Q.   Did you talk to your mother about it?

9   A.   She asked me if I was brought photos.

10          MR. DRATEL:  I couldn't hear the response.

11  A.   Sorry.  She asked me if I was brought photos because she

12  knew Ellis wanted to speak to me.

13  Q.   And did you tell her whether you had signed and circled any

14  of the photos?

15  A.   No.

16  Q.   You mentioned that after seeing that picture from an

17  article, you Googled the name that you saw, after you saw that

18  article.  Why did you do that?

19  A.   Because I was interested in reading it and seeing the

20  article.

21          MS. TEKEEI:  No further questions at this time.

22          THE COURT:  Cross-examination?

23          MR. DRATEL:  Yes, your Honor.

24  CROSS-EXAMINATION

25  BY MR. DRATEL:

1   Q.  Good afternoon, Ms. Torres.

2   A.  Good afternoon.

3   Q.  We've never met before, right?  Now, that night or early in

4   the morning as it was, you were on the phone, right?

5   A.  Yes.

6   Q.  And watching television?

7   A.  Yes.

8   Q.  And your room is all the way in the back?

9   A.  Yes.

10  Q.  Now, the lights that were on was the stove light?

11  A.  Yes.

12  Q.  And when you say the hall light, do you mean the hall to

13  the outside, you mean in the hall?

14  A.  No, my hallway in the inside.

15  Q.  Your hallway, and your hallway runs how long?

16  A.  From my room, the bathroom, up to the living room.

17  Q.  And by the way, did police officers ever come to the

18  apartment to take photographs of what the apartment looked

19  like?

20  A.  No.

21  Q.  Saw how far places are?  No?  Nobody ever came to

22  photograph?

23  A.  No.

24  Q.  Now, when your mother came in, you thought she looked

25  nervous, right?

1    A.  Yes.

2    Q.  So you were looking at her, trying to get a signal from her

3    as to what was going on, right?

4    A.  Yes.

5    Q.  Did she speak to you?

6    A.  Not really.  I asked her if she was okay.  She said she has

7    asthma.

8    Q.  And she said she has asthma?

9    A.  Uh-huh.

10   Q.  So you're still trying to get clues from her, right?

11   A.  Yes.

12   Q.  And she's the most important person in the room to you at

13   that point, right?

14            MS. TEKEEI:  Objection.

15            THE COURT:  Overruled.

16   A.  Well, I would say my grandmother is.

17   Q.  I'm sorry?

18   A.  I would say my grandmother is.

19   Q.  But she wasn't there.  Your grandmother is in her room,

20   right?

21   A.  Uh-huh, yes.

22   Q.  In terms of right in front of you, your mother is the most

23   important person, right?

24   A.  Yes.

25   Q.  You're trying to figure out from her what's going on?

1   A.  Yes.

2   Q.  And you were concerned because you thought something was

3   wrong?

4   A.  Yes.

5   Q.  Now, the first thing you did was go back to your room --

6   after that, was go back to your room and put on clothes,

7   correct?

8   A.  Yes.

9   Q.  You also said that you had been on the phone, so you

10  actually spoke to the person you were on the phone with?

11  A.  Yes.

12  Q.  And you said what?

13  A.  I said hold on, that my mom is here.

14  Q.  And what did they say?

15  A.  They said okay.

16  Q.  Did you hang up?  Did you put the phone down?  What

17  happened?

18  A.  I put the phone down; I didn't hang up.

19  Q.  And you went out and the person who you were looking at did

20  not make eye contact with you, right?

21  A.  No.

22  Q.  And they're about as far away as I am from you, right?

23  A.  Yes.

24  Q.  And you claim they were standing by the dining room table?

25  A.  Yes.

1    Q.   Is that inside the apartment?

2    A.   Yes.

3    Q.   Now, you thought he looked like someone you knew, right?

4    A.   Yes.

5    Q.   He looked like a boyfriend of a friend of yours, correct?

6    A.   Yes.

7    Q.   And what kind of research did you do on Facebook that night

8    afterwards?

9    A.   I looked at the friends that I had from the neighborhood.

10   Q.   I'm sorry, from?

11   A.   The neighborhood.

12   Q.   And?

13   A.   I just went through photos that I thought that they would

14   know.

15   Q.   Did you look at the photo of the person you thought he was?

16   A.   No.

17   Q.   Now, you were interviewed a couple of days later by

18   Detective Deloren Ellis, right?

19   A.   Yes.

20   Q.   That's the same person, right?  And where was that

21   interview?

22   A.   In the precinct.

23   Q.   And what happened during that interview?

24   A.   He asked me the same thing of what happened that night and

25   then put me to look at the mugshot photos on the Internet -- on

1    the computer.

2    Q.  On the computer?

3    A.  Uh-huh.

4    Q.  And did he take notes?

5    A.  I don't remember.

6    Q.  Were you looking at single shots or photo arrays of

7    multiple people at the same time?

8    A.  Yeah, multiple people at the same time.

9    Q.  And was there anyone there that -- were you able to make an

10   identification from that?

11   A.  No.

12   Q.  When was the next time that you were -- that you discussed

13   this case with anyone, discussed this issue that night?  When

14   was the next time you discussed it?

15   A.  The second time I went to the precinct.

16   Q.  And when was that?

17   A.  A few months after that night.

18   Q.  And why did you go to the precinct?

19   A.  Because they had photos for me to look at.

20   Q.  But did you go on your own accord?  Did someone call you

21   and ask you to come down?

22   A.  No.  They asked me to come down.

23   Q.  Who called you?

24   A.  Ellis.

25   Q.  And what did he say?

```
 1    A.  That they had more photos for me to look at.

 2    Q.  He said he had more photos for you to look at?

 3    A.  Yes.

 4    Q.  And you took that to mean that perhaps they had someone who

 5    you could identify, right?

 6    A.  Yes.

 7    Q.  Now, the in-court identification you just made, you know

 8    where a defendant sits at a courtroom, right?

 9    A.  Yes.

10    Q.  There's really no other person you could have identified

11    but Mr. Chambers, right?

12    A.  Yes.

13    Q.  Right?  Is there any other person in the room who remotely

14    resembles, who is sitting at this table or even this table, who

15    remotely resembles anyone who could be that person from that

16    night?

17    A.  No.  Just him.

18    Q.  He's the only person, right?  There's no other black male

19    here, right?

20    A.  That's not true.

21    Q.  There's a black male sitting at the defense table?

22    A.  At the table, yes.

23    Q.  You know that's where he is, right?

24    A.  Yes.

25    Q.  So that was a foregone conclusion before you got here that
```

Ea1gcha5                          Torres - cross

1    he was going to be sitting here and you were going to identify

2    him, right?

3    A.   No.

4    Q.   Did you even look at him before you made the

5    identification?

6    A.   Yes.

7    Q.   So you're saying that you looked around the room to see if

8    there are any other black males here who might be the person

9    before you picked him out, you looked right there because you

10   knew that's where he was going to be sitting, right?

11   A.   Yes.

12   Q.   Now, Government Exhibit 1001, which you were shown, do you

13   still have it?

14   A.   Yes.

15   Q.   How many times have you seen that in preparation for your

16   testimony?

17   A.   The -- once.  Well, twice when I circled it and when I

18   spoke to Negar.

19   Q.   Just today?

20   A.   Today?  No.

21   Q.   I'm sorry.  When was the second time you saw it?

22   A.   When I spoke to -- when I met with Negar.

23   Q.   So you've seen it already twice, Mr. Chambers' photo,

24   right, before you even got to court?

25            When did you meet with Ms. Tekeei that you saw the

Ea1gcha5                         Torres - cross

1   photo again?

2   A.  It was last week.

3   Q.  Now, the first time you went to the police station and saw

4   photos, you actually saw someone you knew, right?

5   A.  I seen a couple of people I recognized.

6   Q.  And one was the person who you thought it was that night,

7   right, Hillary's boyfriend?

8   A.  Yes, yes.

9   Q.  Correct?

10  A.  Yes.

11  Q.  Did you tell the police that?

12  A.  Yes.

13  Q.  Now, when you saw a photo array, and you couldn't pick

14  out -- withdrawn.

15          Let's go a couple of months after the incident, right?

16  A couple months after the incident, Detective Deloren calls you

17  back, right?

18  A.  Yes.

19  Q.  You go to the precinct.  You meet with him, right?

20  A.  Yes.

21  Q.  What does he say to you in preparation for your viewing

22  those photos?

23  A.  That they just found an updated photo.

24  Q.  I'm sorry?

25  A.  He just found updated photos.

1    Q.  He found updated photos?

2    A.  Uh-huh.

3    Q.  Of whom?

4    A.  They didn't say specifically, just photos for me to look

5    at.

6    Q.  You saw an array where you thought you recognized someone,

7    right?

8    A.  On the computer?

9    Q.  Yes.

10   A.  Yes.

11   Q.  Right.  And Detective Deloren then later on said we have an

12   updated photo of that person, right?

13   A.  He told me --

14   Q.  He told you that photo was old, right?

15   A.  Yes.

16   Q.  That's what he told you; that that was an old photo of that

17   person; he had an updated version of that person?

18   A.  I told him that it looked like a younger version of the

19   person that I seen in my house.

20   Q.  And then he told you that they had an updated photo, right?

21   A.  Yes.

22   Q.  So he told you that this was a current photo of the person

23   or a more current photo of the person, right?

24   A.  Yes, an updated photo.

25   Q.  Of the person that you thought you had seen the first time,

Ea1gcha5                          Torres - cross

1    right?

2    A.   Yes.

3    Q.   So you knew you'd be looking at the same person who you may

4    have recognized the first time, right?

5    A.   What do you mean?

6    Q.   You knew that -- well, let me ask you how old the photo

7    was?

8    A.   Years, a couple of years.

9    Q.   When you say younger, are you talking about a couple years?

10   You can tell a year or two younger?

11   A.   No, not a year or two.

12   Q.   You're saying -- you first said a year or two younger, the

13   photo.  The first photo you saw, how much younger do you think

14   the person was?

15   A.   Teens, 18, 19.

16   Q.   The person was 18 or 19 in the first photo.  What kind of

17   hair did that person have?

18   A.   Braids.

19   Q.   Braids how?

20   A.   Braids going back, I mean --

21   Q.   Like 1001?

22   A.   Yes.

23   Q.   So it really looked the same in terms of the hairstyle,

24   right?

25   A.   Well, the hairstyle, yes.

1   Q.  So that was easy to recognize, right, as the same?

2   A.  No.

3   Q.  Right?

4   A.  Not by the hairstyle.

5   Q.  Let me show you what's been marked as Exhibit B,

6   Defendant's B.  Is that the array you saw initially?

7   A.  On the computer or in person?

8   Q.  What do you mean "in person"?

9   A.  When I first got the -- this one, because it was -- it

10  wasn't as much as this, but it was --

11  Q.  I don't understand what you're saying.  Defendant's

12  B -- withdrawn.

13          There was an array that you thought you may recognize

14  someone, but you weren't sure, right?

15  A.  No.  I went to the precinct the first time.  I didn't

16  recognize anybody from my house.  I recognized other people.

17  Q.  Right.

18  A.  And I've seen Hillary's boyfriend, but I knew it wasn't

19  Hillary's boyfriend.  Then when I went back to the precinct and

20  I had different photos, like the first time they put in a

21  search by my description, but that was the first time.  The

22  second time --

23  Q.  What was your description?

24  A.  The height I described it as Ellis' height and the dark

25  skin and the braids the facial hair here.

1   Q.  The facial hair here?

2   A.  Yeah.

3   Q.  And dark skin?

4   A.  Yes.

5   Q.  What was the height?

6           THE COURT:  Can we have the record reflect that "here"

7   means right below the lip.

8           MR. DRATEL:  I'm sorry.

9           THE COURT:  Right?

10          THE WITNESS:  Yes, facial hair below the lip.

11  Q.  Right below the lip.  Okay.

12          The height?

13  A.  A little bit taller than me.

14  Q.  A little bit taller than you.  How tall are you?

15  A.  5'7".

16  Q.  And you can tell because you were standing and he was

17  standing, right?

18  A.  Yes.

19  Q.  So he was a little bit taller than you, and you're 5'7"?

20  A.  Yes.

21  Q.  So look at -- so let's do the chronology through -- so

22  okay, that's the first time, right?

23  A.  Yes.

24  Q.  And then they put -- you give the description.  And then

25  you're looking on the computer at a series of photos at the

1   same time, six photos at the same time, right?

2   A.   Yes.

3   Q.   That was the first time you were there or the months later?

4   A.   That was the first time that I was there.

5   Q.   Okay.  So nothing that first time, right?

6   A.   No.

7   Q.   Okay.  Let's go to the second time and in between the first

8   time and the second time, did any police officers speak to you

9   about the case?

10  A.   No.

11  Q.   So you get the call from Detective Deloren, you go back to

12  the precinct, right?

13  A.   Yes.

14  Q.   And is this on the computer or not?

15  A.   It was on the computer.

16  Q.   Okay.  What happens then?

17  A.   They had different photos.

18  Q.   Right.

19  A.   And I said that the person looked like him, but it just

20  looked younger.

21  Q.   Okay.  Which looked younger?  The photo?

22  A.   Not the one from the article.  It was a different photo.

23  Yes, it was a photo.

24  Q.   It was that photo?

25  A.   No.

Ea1gcha5                        Torres - cross

1  Q.  You saw a completely different photo?

2  A.  Yes.

3  Q.  Not that photo, not the article, but another photo you were

4  shown by Detective Deloren?

5  A.  Yes, on the -- the same base, you know how it was by six

6  pictures, but this time, it was pulled up as one.

7  Q.  Pulled up as one?

8  A.  Yes.

9  Q.  Just him?

10  A.  Yes.

11  Q.  And you said oh, that looks like the guy?

12  A.  I said yes, it looked like him but just younger.

13  Q.  But just younger.

14      But that's a totally separate photo than anything you

15  have in front of you?

16  A.  Yes.

17  Q.  And different from the Internet?

18  A.  Yes.

19  Q.  So that's a fourth photo you've seen of him, right?

20  A.  What do you mean by fourth photo?

21  Q.  Well, that was the first photo you'd seen of him, right?

22  A.  Uh-huh.

23  Q.  And if you looked at Defendant Exhibit B, weren't you shown

24  that array?

25  A.  This one?

Ea1gcha5                          Torres - cross

1  Q.  B, yes, Defendant's B; you were shown that array, right, at

2  some point?

3  A.  Yes.

4  Q.  I'm sorry?

5  A.  Yes, I was shown this.

6  Q.  Then you saw him on the Internet, right?  Actually, not on

7  the Internet.  First you saw him when Detective Deloren showed

8  you the article from the Internet, correct?

9  A.  No.  It was the photo I'm talking about that looks younger.

10  Q.  That's from the Internet?

11  A.  No, it's from -- where -- I don't know what it's called,

12  but where the six photos are on the computer from where I put a

13  description, it was from, I guess, that base, that window.

14  Q.  Yeah, but you saw it in a separate photo --

15  A.  Yes.

16  Q.  -- that he pulled it out for you separately or you saw it

17  separately, just one by one by one?

18  A.  No, that time it was, like, when you click one of those

19  photos, how it pulls up the picture bigger, it zooms it in, it

20  was like that.

21  Q.  So you got to see it for the one shot, big screen, right?

22  A.  Yes.

23  Q.  And then was it at that point, during that session, that he

24  showed you the photo from the Internet?

25  A.  No.

1   Q.  When did he show you the photo from the Internet?

2   A.  That was another time I went.

3   Q.  That was another time you went?

4   A.  Uh-huh.

5   Q.  Okay.  When was that?

6   A.  I don't remember.  I don't remember the time difference

7   between the times I went.

8   Q.  But then you went home -- and by the way, just so we're

9   sure, the first photo you saw of him is none of these photos

10  that we have here, right, it's a different photo?

11  A.  Yes.

12  Q.  So you went home -- first, Detective Deloren -- you go back

13  to the precinct, this Internet photo, how does that happen?

14  Does he call you back to the precinct again?

15  A.  Well, all the meet-ups was through my mom because that's

16  how she -- she kept in contact with him and then if I had to

17  go, she told me I had to go.

18  Q.  So your mother tells you have to go, right?

19  A.  Yes.

20  Q.  You go to the precinct?

21  A.  Yes.

22  Q.  You meet with Detective Deloren, right?

23  A.  Yes.

24  Q.  And tell us about what happens that he shows you the

25  article from the Internet with the photograph.

1   A.  From the article -- he was pulling up the photo from the

2   article.

3   Q.  Right, but what did he say to you in advance of that?

4   A.  That he just had another photo.

5   Q.  Another photo of the same guy?

6   A.  Uh-huh.

7   Q.  The guy he thought might be the guy, right?

8   A.  Yes.

9   Q.  What else did he say?

10  A.  That -- that was it and he was pulling up the photo from

11  the article.

12  Q.  At this point, you're encouraged --

13  A.  No.

14  Q.  You have to hear my question first.

15  A.  Okay.

16  Q.  At this point, you think that there's something to your

17  preliminary identification, right, that there's something

18  there, right?

19  A.  Explain, please.

20  Q.  I'm sorry?

21  A.  Can you explain that better, please.

22  Q.  Sure.  You think that -- withdrawn.

23          You looked at the photo and say that may be the guy

24  but he looks younger.  Then you see this array; you don't pick

25  him out.  Then he calls you back for an Internet photo of the

1    same guy.  At this point you're thinking they think it's the

2    guy, right?

3    A.  No.

4    Q.  You don't think that at all?  You think it's just a random

5    person they're picking out?

6    A.  No, but once I saw that photo, I said that's a better photo

7    and that's him.

8    Q.  Which?  On the Internet?

9    A.  Yes.

10   Q.  So it was the Internet photo that convinced you that it was

11   him?

12   A.  Because it was a clearer photo at this time.  He had a hat

13   on.  So when I was first looking at the photos, I would put my

14   hand there to cover his forehead because that's how I had seen

15   him with a hat, but I just said he looked younger.

16   Q.  So the Internet photo is the one that did it for you?

17   A.  And then this one, the one --

18   Q.  But the Internet photo -- you just said the Internet photo

19   is the one that really convinced you, right?

20   A.  Because it was a clearer photo, yes.

21   Q.  And he didn't show you 1001 that day, though, did he?

22   A.  No.

23   Q.  You went home and you Googled him, Mr. Chambers, right?

24   Withdrawn.

25        You saw Mr. Chambers' name in the caption of the

1    article, right, of the photo?

2    A.   Yes.

3    Q.   So you went home and you looked him up, right?

4    A.   Yes.

5    Q.   And you had a chance to look at that photo again, right?

6    A.   Yes.

7    Q.   And other photos that were connected to the article?

8    A.   Yes.

9    Q.   There were about four photos total, aren't they?

10   A.   Yes.

11   Q.   And you got to look at all of them?

12   A.   Yes.

13   Q.   Let me show you what's Defense Exhibit C.  I guess it's C.

14   Yes.  If you'd look at Defendant's C.

15           That's what you see when you Googled Mr. Chambers and

16   find that article on the Internet, you find those photographs,

17   right?

18   A.   Yes.

19           MR. DRATEL:  I move them as Defendant's C.

20           THE COURT:  Any objection?

21           MS. TEKEEI:  No objection, your Honor.

22           THE COURT:  I'll admit it.

23           (Defendant's Exhibit C received in evidence)

24   Q.   So is that the updated photo that he said he had, that

25   Mr. Deloren said that he had?  Was it the Internet photo that

1  he said was updated?

2  A.  Yes.

3  Q.  So you went there and then a couple of weeks later, your

4  mom calls you again and says Detective Deloren wants to speak

5  to you again?

6  A.  Yes.

7  Q.  What did she say exactly?  Did she say does he need to

8  speak to you because he's got something to show you?

9       What did he say?

10  A.  That he just wanted to speak to me.

11  Q.  And did you go to precinct?

12  A.  No.  He met with me in the parking lot of the White Castle

13  across the street from my house because he wouldn't be allowed

14  upstairs.

15  Q.  My point is, you didn't go to the precinct.  He came to

16  you?

17  A.  Yes.

18  Q.  He came to you at the White Castle.  And what did he have?

19  Not a computer, right?

20  A.  No.

21  Q.  He had a piece of paper, right?

22  A.  Yes.

23  Q.  And a piece of paper with six photos on it, right?

24  A.  Yes.

25  Q.  And this -- so by this time, you had seen someone in a

1   photo who you said might be the guy, right?

2   A.  Yes.

3   Q.  Then -- I'm sorry.  First he looked like someone you knew,

4   right?

5   A.  In my home, yes.

6   Q.  So -- oh, in your home, he looked like someone you knew,

7   but in the photos, he doesn't?

8   A.  What do you mean?

9   Q.  Well, you said in your home -- you said in your home, he

10  looked like someone you knew, but in the photos, he doesn't

11  look like someone you know?

12  A.  Because when I had already seen the --

13  Q.  No.  I'm just asking you, in those photos, does he look

14  like the same person you thought he looked like in your home?

15  A.  In my home, yes.

16  Q.  So he looks like -- so you see a photo of someone who looks

17  like someone you know and you see the photo; then you see

18  another photo in Defendant's B, right?  Then you're shown an

19  Internet photo.  And then you go home and you look at several

20  photos, right?

21  A.  Yes.

22  Q.  And then he comes to you with a piece of paper with that

23  same person's photo in it, right?

24  A.  Yes.

25  Q.  You get the message by then, right?

1   A.  No.  I said that's him.

2   Q.  You got the -- you didn't think he was trying to get you to

3   focus on that guy?

4   A.  No.

5           MS. TEKEEI:  Objection.

6           THE COURT:  Overruled.

7   Q.  That never entered your mind?

8   A.  No.

9   Q.  You thought that this is completely random; that he shows

10  you a picture off the Internet, then you go look at the photos,

11  and then he comes back with a piece of paper, not on a

12  computer, not in the police station, but he comes to you --

13  A.  Uh-huh.

14  Q.  -- with his photo right in the center, right, not on the

15  bottom left, right there, right in front, right?

16  A.  Yes.

17  Q.  In fact, you said now I see him.  Isn't that what you said?

18  A.  "Now I see him"?

19  Q.  Yes.

20  A.  No.

21  Q.  Isn't that what you said?

22  A.  No.

23  Q.  You deny saying that?

24  A.  To the photo array that I circled?

25  Q.  The one you circled, that when you saw it, you said now I

1   see him.

2   A.  I didn't -- I don't remember saying now I see him, but I

3   said now this is a clear photo I recognize.

4   Q.  The others aren't clear?

5   A.  Pardon?

6   Q.  The others aren't clear?

7   A.  The first one that I seen younger, I told you, it wasn't

8   clear.

9   Q.  No, the one in B, it's not clear?

10  A.  B is this one?

11  Q.  Yeah.  Not clear?  You saw it in color on the computer,

12  right?

13  A.  No.

14  Q.  You saw it in black and white on a computer?

15  A.  Oh, no.  It was in color, yes.

16  Q.  Yes, it was in color.  And the ones on the Internet are the

17  ones that you said convinced you.  Those were clearest to you,

18  right?

19  A.  Yes.

20  Q.  You're 20 years old, right?

21  A.  Yes.

22  Q.  Your mother had a very traumatic experience that evening,

23  right?

24  A.  Yes.

25  Q.  So did you, to a certain extent, right?

1   A.   No.

2   Q.   You weren't traumatized by it at all?  It meant nothing?

3   A.   Yes.

4   Q.   You were worried about your mother that night trying to

5   figure out from her what's going on, right?

6   A.   Yes.

7   Q.   Now, when she comes out of the room, what happens?  When

8   she comes out of your grandmother's room, you make eye contact

9   with her?

10  A.   No.

11  Q.   What happens?  You watch her come out of the room, right?

12  A.   Yes.

13  Q.   And what happens then?

14  A.   She told me she was leaving and that she'll call me later

15  and she had a bag in her hand.

16  Q.   When she told you she was leaving and that she had a bag in

17  her hand and that she would call you later, is she looking?

18  Are you looking at her?

19  A.   She's not looking at me.

20  Q.   Where is she?

21  A.   She was in front of me because I was walking with her to

22  the door, but she's not looking at me.

23  Q.   She's right on the side of you?

24  A.   What happened?

25  Q.   What, are you walking to the door side by side?

Ea1gcha5                         Torres - cross

1    A.   No.  She was in front of me.

2    Q.   So you see her in front of you?

3    A.   Yes.

4    Q.   That's what you see --

5    A.   Yes.

6    Q.   -- as she walks to the door?

7    A.   Yes.

8    Q.   There was another person, too, right?

9    A.   Not in my home.

10   Q.   There was a third person, a second person in addition

11   to -- there were two people with your mother, right, who came

12   in?

13   A.   No, only one person.

14   Q.   I want you to look at B again, right, Defense B, right,

15   braids in the photo, right?

16   A.   Yeah.  It's the fourth photo.

17   Q.   And C has braids, too, right?

18   A.   Yes.

19   Q.   In fact, in B, you can actually see the braids in the back,

20   right?

21   A.   Yes.

22   Q.   You can't see braids in the back on C, right?

23   A.   Yes.

24   Q.   Just on that piece of paper that Detective Deloren had, do

25   you think the person in position two looks like any of the

1   other people?

2              THE COURT:  You're talking about Defendant Exhibit

3   what?

4              MR. DRATEL:  I'm sorry.  Government's 1001.

5              THE COURT:  Okay.

6   Q.  Do you think that he looks like any of the other people?

7   A.  No.

8              MR. DRATEL:  Nothing further.  Thank you.

9              THE COURT:  Redirect.

10             MS. TEKEEI:  Briefly, your Honor.

11  REDIRECT EXAMINATION

12  BY MS. TEKEEI:

13  Q.  Ms. Torres, you mentioned that you saw a six-person array

14  on a computer while at Detective Deloren's office; and then you

15  saw a full screen picture of at some point in connection with

16  that six-person array, is that right?

17  A.  Yes.

18  Q.  And are you able to click -- were you able to click on the

19  pictures in that six-person array on the computer?

20  A.  No.

21  Q.  Did you sign and circle -- did you circle any other

22  pictures in connection with the pictures that were shown to

23  you?

24  A.  No, just the one that I've signed and circled.

25             MR. DRATEL:  I did not hear that.

1  A.  Just this one that I've signed and circled on 1001.

2  Q.  Did you see the website photograph before or after, just to

3  be clear, you signed and circled what's marked as Government

4  Exhibit 1001?

5  A.  That was before.  No, I don't remember the timing, I don't

6  remember the days, the times, the months, I don't remember

7  that.

8  Q.  Can you explain that?

9  A.  Like the -- like, say, a few weeks or a few months because

10  I don't remember exactly when I seen it, but this was the last

11  thing I've seen.

12          THE COURT:  When you say "this," which one are you

13  holding in your hand?

14          THE WITNESS:  Exhibit 1001.

15          MS. TEKEEI:  No further questions, your Honor.

16  RECROSS EXAMINATION

17  BY MR. DRATEL:

18  Q.  Now, you said in response to the question by Ms. Tekeei

19  that you couldn't yourself click on any of the six photos on

20  the computer and get the single shot, right?

21  A.  No.

22  Q.  So who did that for you?

23  A.  He didn't click -- I didn't pick one and he clicked it.  It

24  was already opened, that one.

25  Q.  I don't understand.  When you say "he," you mean Detective

1    Deloren?

2    A.   Yes, Detective Deloren.

3    Q.   So he provided you with a single screen shot of

4    Mr. Chambers, right?

5    A.   Yes, that was the second time I went there.

6    Q.   He did that for you?

7    A.   It was already there.

8    Q.   It was already there?

9    A.   Yes.

10   Q.   He had it waiting for you?

11   A.   I guess.  Yes.

12   Q.   So that was the first thing you saw?

13              THE COURT:  I'm not clear.  The first thing you saw

14   was six pictures including Mr. Chambers' or one picture of

15   Mr. Chambers?

16              THE WITNESS:  When -- the time I've seen six photos,

17   that was the first time I was there, and that was a bunch of

18   them; the second time I went there, they had photos.

19   Q.   Of him alone, just Mr. Chambers?

20   A.   Yes.

21   Q.   Single shot, single screen?

22   A.   Yes.

23   Q.   By the way, those Internet photos, that's the only time

24   you've ever seen anyone in any photo with a hat, correct?

25   A.   Yes.

Ea1gcha5                         Torres - recross

1   Q.  So there's no way to compare that to any other photo that

2   you saw in terms of recognizing someone; that's the only time

3   you saw any photo with a hat?

4   A.  Yes.

5            MR. DRATEL:  Nothing further.  Thank you.

6            THE COURT:  Any redirect?

7            MS. TEKEEI:  May I have one moment, your Honor.

8            THE COURT:  Sure.

9            MS. TEKEEI:  No further questions, your Honor.

10           THE COURT:  Thank you very much, Ms. Torres.  You may

11  be excused.

12           (Witness excused)

13           THE COURT:  Ladies and gentlemen, we'll take our

14  afternoon break now.  Let's take a 15-minute break.

15           (Jury excused)

16           (Continued on next page)

17

18

19

20

21

22

23

24

25

1            (In open court; jury not present)

2            THE COURT:  You can be seated.

3            MR. DRATEL:  I can't move for a mistrial because I

4    have no idea of the evidence that's going to come in.  It's not

5    fair to Mr. Chambers to have a mistrial, but her testimony

6    should be stricken.  This is really beyond a pale, what this

7    detective did.  And I think it's even worse because I think he

8    created this lineup himself.  And I could give the

9    Court -- because it struck me last night, I didn't ask him

10   about it because I wasn't sure what it meant, but last night

11   reflecting, I think I know what it is.  There's another person.

12           Let me show the Court what I'm talking about so the

13   Court has context, because I don't know what the solution is.

14   The case should really be dismissed.  This is an outrage.

15           I'll show the Court what I'm talking about because I

16   think it's demonstrative.  It's 3502-18.

17           THE COURT:  I have 3500 material, so tell me.

18           MR. DRATEL:  3502-18.  Let me tell the Court which

19   one it is because some of these are numbered, and then there's

20   a significant number of paperwork inside that's not.

21           This is 3502-18, but there are two 3502-18s.  It's the

22   large one with all the photos.  It's not the single handwritten

23   notes that comes after it.

24           THE COURT:  Give me a minute.  I have a 3502-18 with a

25   lot of photos.

1          MR. DRATEL:  Right.  If you go to the end and work

2     backward --

3          THE COURT:  Go to the end of the exhibit.

4          MR. DRATEL:  Work backward to the forms, the case

5     information and witness instruction forms.

6          THE COURT:  Okay.  So if I go to the last page that

7     says at the top "This form must not be shown to the witness"

8     and it's dated.

9          MR. DRATEL:  Correct.

10          If you look there, this is the one for this witness,

11     this is the one for -- I believe this is the one for

12     Ms. Torres.  Yeah, because "Now I see him," so that's her.

13          But anyway, if you look at that last page --

14          THE COURT:  Wait.  Where does it say "Now I see him"?

15          MR. DRATEL:  That's two pages earlier.  If you look

16     two pages earlier, you'll see report words and gestures of the

17     witness, "Now I see him."  It says part A, showing the photo

18     array.

19          THE COURT:  Part A showing the photo array.

20          MR. DRATEL:  About halfway down.

21          THE COURT:  Halfway down, he's the one that came to

22     the house with my mother, now I see him, that's the guy.

23          MR. DRATEL:  Right.  And that's written by Detective

24     Deloren.  That's his writing.

25          THE COURT:  Yes.

1          MR. DRATEL:  But if you go back two pages later, the

2     second-to-last page, and mine is double-sided, so obviously

3     it's the last page, but you know, if you see, if you look at

4     this array, it has names.

5          THE COURT:  Show me what you're doing.

6          MR. DRATEL:  Sorry.  This page.

7          THE COURT:  Yes.

8          MR. DRATEL:  If you look, there are names:  Truvon

9     Shim is crossed out and Antione Chambers is put in.

10         THE COURT:  Yes.

11         MR. DRATEL:  This detective created this array

12    manually; that's why it's not on the computer; that's why he

13    didn't bring it into the precinct.

14         THE COURT:  What you're saying is there was an array

15    that came up with six names and he replaced Truvon Shim with

16    Antione Chambers?  That's what you're suggesting?

17         MR. DRATEL:  Right.  Yes, because if you put in a

18    description into the photo manager, the computerized one is

19    supposed to be similar and he deliberately put Chambers in

20    disimilar to the right, and he did it with the other one, too.

21         THE COURT:  Wait.  It says filler's name remains in

22    number two section not removed by photo unit and replaced by

23    suspect, number two should read Antione Chambers.

24         MR. DRATEL:  That's Detective Deloren's --

25         THE COURT:  Wait.

Ea1gcha5                        Torres - recross

1              Filler's name remains in number two section not

2       removed by photo unit and replaced by suspect.

3              MR. DRATEL:  But I don't know how that happens on a

4       computer.

5              THE COURT:  I don't even know what that means.  What

6       does it mean?

7              MR. DRATEL:  I think it's just his excuse as to why he

8       has crossed out Truvon Shim and put in Antione Chambers.  It's

9       just a comment about him.

10             THE COURT:  But I don't understand the purported

11      meaning of the comment.

12             MR. DRATEL:  The purported meaning is to explain

13      why -- I'm not saying he's articulate.

14             THE COURT:  What is he saying?

15             MR. DRATEL:  I'm not saying it's articulate.

16             THE COURT:  I understand.  I just want to know --

17             MR. DRATEL:  What he's saying, he's trying to explain

18      the cross-out in two.

19             THE COURT:  I understand that.

20             MR. DRATEL:  It says filler's names.  We know who the

21      fillers are.

22             THE COURT:  Yes.

23             MR. DRATEL:  I don't know what he means by remain in

24      number two section either, but I guess he meant it's not

25      supposed to be there, it should be Antione Chambers.  That's

1    what he means, that Truvon Shim shouldn't be there but Antione

2    Chambers should, and I don't know how a computer does that.

3            So my application is either strike her testimony,

4    strike her testimony or dismiss, frankly.

5            The conduct, I don't attribute it to the prosecutors

6    because, I mean, he never gave them a fourth photo.  There's a

7    photo that nobody has seen that he's shown her, that he's shown

8    her a single photograph upon her arrival.

9            THE COURT:  I will confess to you that this is not

10   entirely clear to me.

11           What do you think she said?

12           MR. DRATEL:  Okay.  She said that she went there, she

13   saw her friend's boyfriend, she then saw a --

14           THE COURT:  Whoa.  She went where?

15           MR. DRATEL:  She went to the precinct the first time,

16   saw her friend's boyfriend.

17           THE COURT:  Right.

18           MR. DRATEL:  So that's not a positive ID.

19           THE COURT:  Right.

20           MR. DRATEL:  But then she goes back a couple of

21   months --

22           THE COURT:  And when she went to the precinct and saw

23   her friend's boyfriend in the photo array, is that the photo

24   array we know as the first one?

25           MR. DRATEL:  No, no, no.  We don't know what that is

1    exactly.  So then she's called back at the end of May I think

2    is really basically the time frame, even though she says a

3    couple months later, I think that's correct, I think it's the

4    end of May.

5           She's called back.  She sees a photo.  She says I'm

6    not sure.  Mr. Chambers is number four in that array, but we

7    don't know whether or not -- and this is unclear to me, too,

8    because she was unclear about it -- as to whether or not she

9    saw a single photograph of him before because she said it was

10   an older photo, right, she said there's an older photo.

11          THE COURT:  Yes.

12          MR. DRATEL:  That photo, I'm sorry, is not an older

13   photo.

14          THE COURT:  Yes, it is.  He looks younger.

15          MR. DRATEL:  In B?  We're talking about two years ago.

16   We're not talking about now.

17          THE COURT:  No.  I thought what she was saying was

18   that photo in the array that she talked about, as what we're

19   now talking about as the second array and what we know before

20   today as the first array, that picture of Mr. Chambers I

21   thought she was saying looked like a younger version of

22   Mr. Chambers.

23          MR. DRATEL:  Yes.

24          THE COURT:  Which it does.

25          MR. DRATEL:  Okay, but at the same time, she also said

1    that she -- no, she said it was not that photo.  She just

2    testified that the photo that she saw that she said he was

3    younger was not that photo.  If you want the reporter to get

4    it -- she said -- I asked her, is that the photo in Defendant's

5    B.  She said no.

6          Then in addition to the additional photo that she was

7    shown, we also have a single shot when she comes in again

8    and --

9          THE COURT:  That's a shot we didn't know about before

10   today, right?

11         MR. DRATEL:  Single shot, no, no one has talked about

12   that.  And then my own review of this --

13         THE COURT:  Then there's the time at the White Castle.

14         MR. DRATEL:  Yeah.  By the way, he does the same thing

15   with Ms. Torruella.  If you look back, Truvon Shim is replaced

16   by Antione Chambers, same thing crossed out, same comments on

17   the bottom.

18         THE COURT:  Let me hear from the government.

19         MR. ARAVIND:  My preliminary thoughts are that

20   Mr. Dratel had an opportunity to cross Detective Deloren about

21   this theory that he has.  He chose not to do so or he came up

22   with this idea today.

23         THE COURT:  Or last night is what he said.

24         MR. ARAVIND:  Or last night.

25         I confess that I think it's a little bit difficult to

 1   understand the sequence of events.  This certainly happened

 2   some time ago and there may be differing recollections as to

 3   what Detective Deloren did and what this witness did.

 4           I'm not sure exactly what Mr. Dratel's application is,

 5   but certainly we believe that to dismiss this case

 6   out-of-hand --

 7           THE COURT:  Let me interrupt for a second and then you

 8   can proceed.

 9           What I'm hearing Mr. Dratel say, at least, is that

10   there were photos shown that we didn't know about before today,

11   and that included single photos of Mr. Chambers that we did not

12   know about today; and in addition, that he has a theory about

13   this document that the array was created.

14           Give me just a minute.

15           So, my law clerk just handed me the document from, I

16   assume, the 3500 material, it is from the 3500 material that

17   shows Mr. Chambers circled in position number two.

18           MR. DRATEL:  Yes.

19           THE COURT:  On the back, it says photo unit adult

20   photo array editing report and explains what editing was done

21   to the photographs to create the photo array.

22           And number four says -- and, remember, image two is

23   Mr. Chambers -- it says image two had earrings removed using

24   Photoshop; and then number four says image of suspect supplied

25   by Detective Ellis Deloren, Bronx Robbery Squad, and placed in

Ea1gcha5                         Torres - recross

1    position two using pages.

2            So, it's not just a theory, it's actually what

3    happened.

4            I understand everyone's position.  I think we should

5    take a break.  I will consider your application, but I frankly

6    doubt that ten minutes is going to be long enough for me to

7    arrive at a conclusion, but I understand your application.

8            MR. DRATEL:  Thank you, your Honor.

9            (Recess)

10           (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            MS. TEKEEI:  Your Honor, if I may, we had a brief

2      conversation with Detective Deloren and I think have an

3      understanding of how this array was created, if your Honor

4      would like to hear from us about that.

5            THE COURT:  Sure.

6            MS. TEKEEI:  We disagree with the theory that Mr.

7      Dratel is proposing.  We understand that Detective Deloren

8      obtained this photograph of Mr. Chambers from federal

9      probation, which is an outside agency.  And when that happens,

10     he has to provide that to 1 Police Plaza to put into a photo

11     array.  He provided this photograph of Mr. Chambers that was

12     the updated photograph from federal probation, along with the

13     five other photographs.

14            THE COURT:  What did you say about the other five

15     photographs?

16            MS. TEKEEI:  That he also provided --

17            THE COURT:  He provided all the photographs for the

18     array.

19            MS. TEKEEI:  And he provided it to 1 Police Plaza.

20     There is a photo unit.  And they did the editing for the

21     texture and tone that's described behind here.  And then they

22     e-mailed it to him in this form, this final stage.

23            As for the names that are depicted, I guess, on the

24     last sheet, we tried to send him a picture to see if we could

25     figure out why Truvon Shin is listed here, but we understand

1       that this photo array was provided by 1 Police Plaza after they

2       put it together and did the editing that's described on the

3       back of the photo array in the 3500 material.

4               And so the name was wrong because they had to change

5       it.  And as for the photographs that Ms. Torres explained, we

6       think that she may have been confused.  As you can tell from

7       our notes from our prior meetings from her, we knew of the

8       first photo array with the older picture of Mr. Chambers where

9       he appears younger in the article photo and the second photo

10      array that she signed.  And so we are not clear what the

11      recollection is today.

12              THE COURT:  Mr. Dratel.

13              MR. DRATEL:  I think Detective Deloren created this

14      array.  It is not a Photo Manager computerized created array.

15      He took five other photos --

16              THE COURT:  What I'm hearing, though, is that he had

17      to create the array.  I'm just telling you.  What I'm hearing

18      is that he had to create the array because he was provided the

19      photo by --

20              MR. DRATEL:  An outside agency.

21              THE COURT:  -- by an outside agency.  Therefore, it

22      wasn't in the database to create the random photo array.

23              MR. DRATEL:  The question we don't know is --

24              THE COURT:  But it's also very clear that he did

25      create the entire photo array.

EA1MCHA6

1              MR. DRATEL:  And I don't know.

2              THE COURT:  Pick the pictures and put Mr. Chambers in

3     the middle.

4              MR. DRATEL:  It's hard to believe that every photo in

5     that database is an NYPD photo.  It's hard for me to believe

6     that.  So getting a photo into that database, I'm not sure how

7     long it takes or what it takes.  The credibility issue with him

8     is just of such magnitude that I just don't take anything with

9     him as face value anymore.

10             The second part is with respect to his recollection

11    versus Ms. Torres.  Well, fine.  He testified the way he

12    testified, she testified the way she testified, Ms. Torruella

13    the way she testified.  In that context, that's not an issue.

14    But the other thing is an issue.  Maybe you'll came him on our

15    case to talk about this, if that's necessary.  I don't think it

16    should be necessary.  I think that this is, again -- first of

17    all, I don't like the idea of private conversations and

18    reporting them back to what he says as opposed to getting him

19    here and finding out what the truth is or at least get at the

20    truth through proper examination.

21             THE COURT:  They certainly are entitled to talk to

22    him.  He's not on the witness stand.  I think they are trying

23    to be helpful.  I'm not excusing anything because I don't think

24    there is anything that needs excusing.  But I certainly want to

25    think about this.

EA1MCHA6

1           What I propose is, we have the jury here.  I have your

2     application.  We have one more hour.  I am going to bring them

3     back.  Let the government go on with its case and then ponder

4     all of this tonight and more, if I need to, and take it from

5     there.

6           MR. DRATEL:  I just wanted one thing, which is I don't

7     think what the government said about recollections disturbs in

8     any way -- very, very clear recollection by Ms. Torres that she

9     saw a single shot on the computer when she got there that day.

10          THE COURT:  Tell me what your understanding of that

11    testimony was.  Which day do you think that was?

12          MR. DRATEL:  That was --

13          THE COURT:  We are talking about four days, as I

14    understand it, four different times she looked at photos.

15    Which number do you think it is?

16          MR. DRATEL:  Three.

17          THE COURT:  You think it's three.  I think of it as

18    the newspaper article photo.  There is no question that was a

19    single photo.  I heard her say --

20          MR. DRATEL:  Two.  Then it would be two.

21          THE COURT:  Two meaning the photo array that had the

22    old picture of Mr. Chambers?

23          MR. DRATEL:  I think it's two or three.

24          THE COURT:  I can look back at the transcript, just

25    like we all can.  Let's just get the jury.

EA1MCHA6

 1              (Jury present)

 2              THE COURT:  The government may proceed.

 3              MR. ARAVIND:  The government calls Special Agent John

 4    Reynolds.

 5     JOHN REYNOLDS,

 6         called as a witness by the Government,

 7         having been duly sworn, testified as follows:

 8    DIRECT EXAMINATION

 9    BY MR. ARAVIND:

10    Q.  Special Agent Reynolds, for the record, what do you do for

11    a living?

12    A.  I'm a special agent with the Federal Bureau of

13    Investigation.

14    Q.  How long have you been with the FBI?

15    A.  Approximately eight years.

16    Q.  What field office are you assigned to?

17    A.  I'm assigned to the New York field office.

18    Q.  What squad are you in?

19    A.  Squad C11.

20    Q.  What are your duties and responsibilities as a special

21    agent in C11?

22    A.  My squad investigates drug trafficking crimes and crimes of

23    violence related to drug trafficking, as well as crimes that

24    occur to American citizens in Africa and western Europe.

25    Q.  What did you do before joining the FBI?

1    A.  I was a New York City police officer.

2    Q.  For how many years?

3    A.  Six years.

4    Q.  What did you do as a New York City police officer?

5    A.  I was a uniformed police officer and then anticrime police

6    officer.

7    Q.  Where were you assigned?

8    A.  Originally, I was assigned to the 46th Precinct in the

9    Bronx, and after that I was assigned to the Bronx anticrime

10   unit.  So the whole Bronx.

11   Q.  What does the Bronx anticrime unit do?

12   A.  The Bronx anticrime unit is a plain-clothes unit that's

13   assigned to areas in the Bronx that are experiencing spikes in

14   shootings and robberies and other crimes of violence, and you

15   are supposed to target those type of crimes.

16   Q.  Approximately how many robbery investigations have you

17   participated in as a member of C11?

18   A.  Three or four.

19   Q.  And what about as a member of the NYPD?

20   A.  I responded to numerous robberies, but at that point it's

21   not really an investigative role.  You kind of do a field

22   investigation, but a robbery investigation ends up with

23   detectives.

24   Q.  What are some of the investigative techniques that you used

25   as a special agent with the FBI in C11?

1   A.  Everything from serving subpoenas, search warrants, making

2   arrests, wiretaps, that type of thing.

3   Q.  Are you familiar with an investigation of Antione Chambers?

4   A.  Yes, I am.

5   Q.  And what is your role in that investigation?

6   A.  I was the case agent for the investigation into the March

7   25 robbery that had occurred where David Barea and Emma

8   Torruella were the victims on March 25, 2013.

9   Q.  What does it mean to be the FBI case agent?

10  A.  As a case agent you do everything that a normal

11  investigator would do; again, many of the techniques that I had

12  mentioned.  But also as the case agent you're sort of the

13  manager of the case, which entails the normal investigative

14  activities, but also liaisoning and working with the other law

15  enforcement agencies, like in this case the New York City

16  Police Department, and then working with the U.S. Attorney's

17  Office to prosecute the case.

18  Q.  Turning to this investigation, did there come a time when

19  you participated in an arrest of Tyrone Brown?

20  A.  Yes, sir.

21  Q.  What date was that?

22  A.  That was April 8, 2013.

23  Q.  At the time was Mr. Brown arrested on state or federal

24  charges?

25  A.  State charges.

1    Q.  What were those state charges?

2    A.  He was arrested for drug-related crimes.

3    Q.  What did you do that day?

4    A.  It was actually the evening.  I received a telephone call

5    from Ellis Deloren of the Bronx robbery squad notifying me that

6    he had arrested Mr. Brown for, again, drug charges, and that he

7    was -- Mr. Brown was at their office on Simpson Street in the

8    Bronx.  So I responded to that location.

9    Q.  What did you do at Simpson Street?

10   A.  Once I arrived at Simpson Street, I briefly spoke with

11   Detective Deloren, and myself and Detective Deloren interviewed

12   Tyrone Brown.

13            MR. DRATEL:  Objection.

14            THE COURT:  There is nothing objectionable yet.

15            MR. ARAVIND:  Your Honor, may we approach for just a

16   moment?

17            THE COURT:  Yes.

18            (Continued on next page)

19

20

21

22

23

24

25

1          (At the side bar)

2          MR. DRATEL:  I think it's objectionable to put in a

3    jury's mind that there was an interview with a particular

4    defendant and then he went out and did certain things.  That's

5    hearsay.

6          THE COURT:  Certain things like what?

7          MR. DRATEL:  I don't know.

8          THE COURT:  What's coming next?  I thought the whole

9    idea is you are not supposed to go into the interview until

10   after the 302 goes in.

11         MR. ARAVIND:  I am not going into the interview.  I'm

12   just establishing that there was an interview taken and then he

13   was able to seize some evidence.  I think there is certainly a

14   gaping hole here if we don't even mention the fact of the

15   interview and that the first time the jury hears about it is

16   when Mr. Dratel stands up in cross-examination and then talks

17   about it.  My understanding of the Court's ruling --

18         THE COURT:  Just wait.  You've asked the question.  It

19   was answered.  And what comes next?

20         MR. ARAVIND:  The next question is, was any evidence

21   seized during the course of that arrest.

22         THE COURT:  Okay.  What's the answer?

23         MR. ARAVIND:  The answer will be that he seized two

24   cell phones.

25         THE COURT:  And that's the other --

1          MR. DRATEL:  I think it should be stricken because I
2     don't want in the jury's head that somehow this interview is
3     related to some other information that they get down the road,
4     whether they get it from Tyrone Brown.
5          THE COURT:  You are not going to put the 302s?
6          MR. DRATEL:  I am not.  It was not my choice.  You
7     left it up to me.
8          MR. ARAVIND:  I am wholly confused now.  I thought we
9     went through a long protracted hearing about this on Monday as
10    to Mr. Brown's postarrest statements.  If Mr. Brown's
11    postarrest statements are off the table, I'm happy to move on.
12    I just need to have assurance from Mr. Dratel that he is not
13    going to elicit any sort of false exculpatory statements from
14    Mr. Brown.  We just spent a lot of time on this.
15         MR. DRATEL:  The point was the Court ruled that you
16    weren't allowed to bring it up until I did, and you did just
17    now.  Not substance.  The interview.  You were not allowed to
18    go into the interview and you did and that's what I object to.
19         MR. ARAVIND:  Thankfully, we have a judge here that
20    can rule on that.  I'm happy to move on.  I really need to have
21    some sense from Mr. Dratel as to what he intends to do on
22    cross-examination.
23         THE COURT:  I think he just said that he does not
24    intend to introduce the 302 at all, is what I hear.
25         MR. ARAVIND:  Is he going to reference any postarrest

1   statements made by Mr. Brown?

2          MR. DRATEL:  Number one, the answer is no.  Number two

3   is, the ruling was that you didn't have a right to know that

4   before I started.  You didn't have a right to examine him on

5   that way before it started and so --

6          THE COURT:  Stop.  Here is the question.  Do you want

7   me to strike that and remind them what he just said or just

8   move on?

9          MR. DRATEL:  Let's move on.

10          (Continued on next page)

1              (In open court)

2    Q.   Special Agent Reynolds, was Mr. Brown arrested for any

3    other charges that day?

4    A.   Yes.  He was later arrested federally for drug charges.

5    Q.   Did you recover any evidence from Mr. Brown on the day of

6    his arrest?

7    A.   Yes.

8    Q.   What evidence did you recover?

9    A.   Two cell phones.  One is an iPhone and the other one is a

10   Pantech cell phone.

11   Q.   I am going to show you what has been premarked for

12   identification as Government Exhibits 601 and 602.

13             THE COURT:  I'm sorry.  You said one was an iPhone and

14   one was a what?

15             THE WITNESS:  Pantech.

16             THE COURT:  Is that a brand?

17             THE WITNESS:  Yes, ma'am.

18   Q.   Do you recognize Government Exhibit 601 and 602?

19   A.   Yes, I do.

20   Q.   How do you recognize them?

21   A.   They are inside of the evidence bags that I put them in and

22   on the iPhone itself I put my initials and the date that I took

23   the phone.  I believe I did the same thing for the Pantech

24   phone, too.

25             THE WITNESS:  May I?

1          THE COURT:  You may.

2    A.  Yes.  That has my initials and the date on top of it as

3    well.

4          MR. ARAVIND:  The government offers Government Exhibit

5    601 and 602.

6          THE COURT:  Any objection?

7          MR. DRATEL:  No, your Honor.

8          THE COURT:  Admitted.

9          (Government's Exhibits 601 and 602 received in

10   evidence)

11         MR. ARAVIND:  May I publish or have Mr. Street publish

12   those exhibits?

13         THE COURT:  You may.

14   Q.  Government Exhibit 601, was that the iPhone?

15   A.  Yes, sir.

16   Q.  And 602 is the Pantech?

17   A.  Yes, sir.

18   Q.  Let's first start with Government Exhibit 601.  Did you

19   search that iPhone?

20   A.  Yes, I did.

21   Q.  Were you able to review the contents of that iPhone?

22   A.  Yes.

23   Q.  Was anything that you found of evidentiary significance?

24   A.  Yes, sir.

25   Q.  Can you tell us what that was?

EA1MCHA6                          Reynolds - direct

1   A.  I reviewed the phone and one of the things I found of an

2   evidentiary nature was the phone number associated with that

3   phone, and then also certain contacts were also of an

4   evidentiary value to us, certain contacts with the phone

5   numbers and the names associated with that contact.

6   Q.  And where did you see these contacts?

7   A.  On the iPhone itself.

8   Q.  In the contact list?

9   A.  Yes, sir.

10  Q.  What did you do with respect to those contact lists?

11  A.  I took photographs of those contacts.

12  Q.  I am going to show you what has been premarked for

13  identification as Government Exhibits 601A, 601B, 601C, and

14  601D.

15          Can you tell us what you are looking at in Government

16  Exhibit 601A through D?  Do you recognize them?

17  A.  Yes, I do.

18  Q.  What are they?

19  A.  They are the pictures of the contacts that I took from

20  Tyrone Brown's cell phone -- iPhone.  Sorry.

21  Q.  Are these pictures that you yourself took?

22  A.  Yes.

23  Q.  Do those pictures fairly and accurately represent certain

24  of the contacts that you searched on the iPhone from Tyrone

25  Brown?

1    A.  Yes, sir.

2              MR. ARAVIND:  The government offers Government

3    Exhibits 601A through 601D.

4              MR. DRATEL:  No objection, your Honor.

5              THE COURT:  Admitted.

6              (Government's Exhibits 601A through 601D received in

7    evidence)

8              MR. ARAVIND:  Your Honor, may we publish Exhibits 601A

9    through D?

10             THE COURT:  Yes.

11             MR. ARAVIND:  Ms. Hansma, can we start with 601A.

12             If you can zoom in, Ms. Hansma, just the stop part.

13   Thank you.

14   Q.  What are we looking at here, Special Agent?

15   A.  If you notice, the top says my number and then followed by

16   917-659-9696.  That indicates to me that that is the number for

17   that actual phone for Tyrone Brown's iPhone.

18             MR. ARAVIND:  601B, Ms. Hansma, if we can highlight

19   the top half and maybe zoom in, please.  Thank you.

20   Q.  What do you recognize that to be, Special Agent?

21   A.  This is a contact saved in that phone.  The name associated

22   with this contact is Groovy, which I knew to be an alias for

23   Mr. Barea.  And the phone number associated with that contact

24   is 917-935-8485.

25             MR. ARAVIND:  Let's turn to Government Exhibit 601C,

1   Ms. Hansma.  Again, the same thing, zoom into the top portion.

2   Q.  Can you tell us what we are looking at here?

3   A.  Yes.  This is another contact.  This one is for -- the name

4   associated with it is John 129.  There is two telephone numbers

5   associated with that contact, the first being 347-638-6653 and

6   the second telephone number associated with that contact is

7   917-370-9462.

8            MR. ARAVIND:  Ms. Hansma, 601D.

9   Q.  Can you tell us what we are looking at here?

10  A.  Yes.  Other contacts.  The name associated with this

11  contact is Twizzie.  Again, there is two telephone numbers

12  associated with this contact, the first being 717-379-3425 and

13  the second telephone number being 717-743-6130.

14  Q.  All the phone numbers we have looked at, those have come

15  from the iPhone that you seized from Tyrone Brown?

16  A.  Yes, sir.

17  Q.  Did you also search the Pantech phone?

18  A.  Yes, I did.

19  Q.  Were you able to review the contents of the Pantech phone?

20  A.  Yes, sir.

21  Q.  And what, if anything, did you find on that phone?

22  A.  More contacts and the telephone number associated with that

23  phone.

24  Q.  I am going to show you what has been premarked for

25  identification as Government Exhibit 602A.

1            Do you recognize that document?

2    A.  I do.

3    Q.  What is it?

4    A.  This is one of the contacts from Tyrone Brown's Pantech

5    phone.

6    Q.  Where did you find those contacts?

7    A.  On the Pantech phone.

8    Q.  What part of phone?

9    A.  In the address book.

10           MR. ARAVIND:  The government offers Government Exhibit

11   602A.

12           MR. DRATEL:  No objection.

13           THE COURT:  It's admitted.

14           (Government's Exhibit 602A received in evidence)

15           THE COURT:  You may publish it.

16   Q.  Did you take pictures of those contacts?

17   A.  Yes, I did.

18   Q.  Does Government Exhibit 602A fairly and accurately

19   represent a photograph that you took of the Pantech contacts?

20   A.  Yes, it does.

21   Q.  Can you tell us what we are looking at here in Government

22   Exhibit 602A?

23   A.  The contact -- the name associated with this contact,

24   again, is Twizzie.  Two cellular telephone numbers associated

25   with it, the first being area code 631-377-6204, the second one

1  being 717-379-3425.

2  Q.  The first number you reference is what's under a mobile

3  listing and the second one is a work mobile.  Is that correct?

4  A.  Yes, sir.

5  Q.  Special Agent, did you analyze phone records relating to

6  the numerous phone numbers that we just looked at?

7  A.  Yes, sir.

8  Q.  What, if anything, did you find about contacts between the

9  Brown iPhone and the John 129 iPhone with the number

10  917-370-9462 with respect to the day of the robbery?

11  A.  The 917 number had been in contact with Tyrone Brown's cell

12  phone on the 24th, prior to the robbery.

13          MR. ARAVIND:  Your Honor, can I just have one moment?

14          THE COURT:  Yes.

15  Q.  Special Agent Reynolds, can you tell us, just generally

16  speaking, what you did to obtain the phone records?

17  A.  Sure.  I obtained a subpoena, a grand jury subpoena from

18  the U.S. Attorney's Office requesting subscriber information

19  and toll records for that cellular telephone number or for

20  telephone numbers.

21  Q.  I am going to show you what has been marked --

22          MR. ARAVIND:  Your Honor, can I have one moment to

23  confer with defense counsel?

24          THE COURT:  You may.

25  Q.  I am going to show you what has been premarked for

1    identification as Government Exhibit 160.

2              Do you recognize that document?

3    A.  Yes, sir.

4    Q.  Does that contain all of the phone records that you

5    obtained as part of this investigation?

6    A.  Yes.

7              MR. ARAVIND:  The government offers Government Exhibit

8    160, subject to connection.

9              MR. DRATEL:  On consent of the defense, subject to

10   connection, we consent to the admission.  We have no objection

11   to the admission.

12             THE COURT:  It is admitted, subject to connection.

13             (Government's Exhibit 160 received in evidence)

14   Q.  Did you prepare summary charts with respect to the phone

15   records that's been admitted subject to connection in

16   Government Exhibit 160?

17   A.  Yes.  For some of the records, yes.

18   Q.  I am going to show you what has been premarked for

19   identification as Government Exhibit 5000.

20             THE COURT:  What was the number?

21             MR. ARAVIND:  Government Exhibit 5000, your Honor.

22   Q.  Do you recognize that document?

23   A.  Yes, I do.

24   Q.  What is it?

25   A.  When you receive results from a telephone company for toll

1   records, again, incoming and outgoing phone calls, it's usually

2   provided in electronic format and usually a spreadsheet.  It

3   shows you the telephone number that placed the call, the

4   telephone number that received the call, date, time, duration

5   of the call, and some of the records show a little more, like

6   the switch that the telephone call was routed through by the

7   telephone company.

8            What I did here, to make it a little easier to read

9   and to follow, was, I took out some of the columns, one being

10  like the switch and in this particular document -- in the

11  original records there is a start time and an end time.  I

12  subtracted that column and just left the start time along with

13  the duration.  I shrunk it a little bit.

14  Q.  What's depicted in Government 5000 is a summary of phone

15  records that you reviewed in Government Exhibit 160?

16  A.  Yes.

17  Q.  Just to be clear, the records you reviewed in Government

18  160 are voluminous and does this represent a summary of those

19  records?

20  A.  Yes.

21            MR. ARAVIND:  Your Honor, the government offers

22  Government Exhibit 5000 as a summary chart.

23            MR. DRATEL:  No objection.

24            THE COURT:  Admitted.

25            (Government's Exhibit 5000 received in evidence)

1             MR. ARAVIND:  May we publish?

2             THE COURT:  Yes.

3             MR. ARAVIND:  We may have to use the Elmo, your Honor.

4             Let's go to the top.  Thank you, Ms. Tekeei.

5    Q.   What is the top line?  Can you read that for the jury?

6    A.   Sure.  It says Brown telephone contact with Twizzie and

7    Barea.

8    Q.   Which Brown phone is this?  Is this the iPhone or the

9    Pantech?

10   A.   This is the iPhone.

11   Q.   Tell us what a summary of what this chart shows.

12   A.   Sure.  This chart shows all the contact that the Brown

13   iPhone had with the 717-743-6130 telephone number that was

14   listed under the Twizzie contact and with two numbers that

15   belong to David Barea.  And it's for a time period of

16   approximately ten days, I believe:  3/17/2013, March 17, 2013

17   to March 27 of 2013.

18            MR. ARAVIND:  If it's possible, Ms. Hansma, can we go

19   back to Government Exhibit 601D.

20   Q.   Let's use the last four digits.  The number 6130, whose

21   phone is that associated with that phone number?

22   A.   Twizzie.

23            MR. ARAVIND:  Ms. Hansma, can we then go to 601A,

24   please.

25   Q.   The last four digits of that number?

1    A.  9696.

2              MR. ARAVIND:  And then, finally, can we go to 601C,

3    and if you could just highlight the number for the iPhone.

4    It's already in evidence, Ms. Hansma.  Thank you.  The one

5    below that.  I'm sorry.

6    Q.  And the last four digits of that number?

7    A.  9462.

8    Q.  Now, let's go back to the summary chart that you prepared,

9    which is Government Exhibit 5000.  If we can go to the top

10   line, if you can just try to explain what the different columns

11   mean, using the phone numbers that we just talked about.

12             THE COURT:  I'm sorry.  If I could just interrupt for

13   a moment, and I apologize if I missed it.  Did you already put

14   in evidence about the identity of John 129?

15             MR. ARAVIND:  No.

16             THE COURT:  I just wanted to make sure that I wasn't

17   missing something.

18             MR. ARAVIND:  We are in the process, your Honor.

19             THE COURT:  Thank you.

20   Q.  Tell us what this first line shows.

21   A.  Sure.  The first line, the originating number.  Is that the

22   line you are referring to?

23   Q.  Correct.

24   A.  Those are the titles of the column.  The originating number

25   means the number that's placing the call.  It's making the

1  outbound call.  The terminating number, which is the next

2  column, is the number receiving the telephone call.  The start

3  date, that column reflects the day, the date, and the time that

4  the call was placed and this is from Sprint, so they are

5  actually showing military time.  The last column is duration in

6  seconds.  So that's showing the duration of the phone call in

7  seconds.

8  Q.  If the duration is zero, what does that represent to you?

9  A.  Text message.

10 Q.  What time period did you create this summary chart for?

11 A.  Again, I believe it was a ten-day period:  March 17, 2013

12 to March 27, 2013.

13 Q.  Can you remind us what are the dates of the robbery?

14 A.  The robbery started on March 25, in the early morning

15 hours.

16 Q.  Before we talk about particular calls, if you could just

17 explain to the jury, what is the significance of these calls in

18 terms of your investigation?

19 A.  Well, actually, this just shows contacts between certain

20 phone numbers.  To be able to explain the analyzation work I

21 did with regards to the robbery, I would need another summary

22 chart that I provided.

23 Q.  I am going to show you what I believe it is you're asking

24 for, Government Exhibit 5001.

25          Is that the summary chart that you are referring to?

1   A.  Yes.  This is another summary chart that I prepared in

2   regards to the phone records.

3   Q.  And what does this summary chart show?

4   A.  This summary chart is of phone records from the Tyrone

5   Brown iPhone, so the 9696 number.  And it's all of his

6   telephone calls starting on March 17 of 2013 through the 27th

7   of 2013, March.

8           THE COURT:  Did you say all of his calls or just to

9   certain people, or just with certain people?

10          THE WITNESS:  No, ma'am.  These are all his calls.

11          THE COURT:  Thank you.

12  Q.  Going back to the question I was asking you, what, if

13  anything, was the significance of these calls around the time

14  of the robbery?

15  A.  Based on my review of the video, I used the video to

16  determine a rough estimate of when the robbery began.  For

17  instance, the video -- the time stamp on the video, I believe,

18  says that Mr. Barea showed up around 1:17 a.m. in the morning.

19  Recognizing that that time might not be exact, I used that as a

20  rough estimate as to when the robbery started.  One of the

21  things that I wanted to look at was is who Mr. Brown was in

22  telephone contact with during the robbery time frame, little

23  before the robbery time frame and then after the robbery time

24  frame.

25  Q.  Why were you doing that?

1  A.  Based on the interviews of the victims as well as viewing

2  of the video and based on my interview of Mr. Brown, I believed

3  him to be involved in the robbery.

4           THE COURT:  Just a moment, please.

5           MR. DRATEL:  Move to strike.  Objection.

6           THE COURT:  Okay.  I am going to strike the last

7  answer.  Would you like me to read it back or not?

8           MR. DRATEL:  No.

9           THE COURT:  Ladies and gentlemen, the last answer you

10  heard, just put it out of your minds.  They contained

11  information that wasn't proper and so we will have a new

12  question and a new answer.

13           MR. ARAVIND:  With the Court's permission, may I lead

14  just a little bit?

15           THE COURT:  You may.

16  Q.  Special Agent Reynolds, had you spoken to the victims or

17  spoken to officers who had spoken to the victims in the

18  aftermath of the robbery?

19  A.  Yes, sir.

20  Q.  And had you reviewed the video surveillance at that time?

21  A.  Yes, sir.

22  Q.  Let's go this way.  Was the Tyrone Brown phone in contact

23  with any other numbers of significance for you apart from the

24  Twizzie number that we are going to talk about in a little bit?

25  A.  Yes.

1   Q.  What number was that?

2   A.  Prior to the robbery, the Brown telephone had been in

3   contact with the John 129 contact, the number that was 9462.

4   Q.  Did you take any steps to identify the person who used the

5   John 129 phone?

6   A.  Yes.

7   Q.  And tell the jury what you did.

8   A.  I subpoenaed the toll records, the incoming and outgoing

9   call activity for that John 129 contact ending in 9462 in an

10  attempt to identify the user of that telephone.

11  Q.  And after you obtained the records, what did you do next?

12  A.  I reviewed the records looking to see what other telephone

13  numbers that the John 129 contact was in frequent contact with,

14  and I was able to ascertain one of those numbers and to

15  interview a person who used that telephone number.

16  Q.  Who did you interview?

17  A.  Zuleika Morales.

18  Q.  When approximately did you interview Zuleika Morales?

19  A.  I believe it was May 1 of 2013.

20  Q.  What, if anything, did you ask her?

21  A.  I asked her if she knew David Barea, what the nature of her

22  relationship was with Mr. Barea, and then I requested her

23  consent to search her phone.

24  Q.  Did there come a time when you searched her phones?

25  A.  Yes.

1    Q.  What, if anything, did you find in her phones?

2    A.  I found contacts for Groovy, multiple contacts with Groovy

3    and telephone numbers associated with that contact.

4    Q.  Do you remember sitting here today the numbers that you saw

5    in Ms. Morales' phone?

6    A.  No, sir.

7    Q.  Did you make any record of those phone numbers?

8    A.  Yes.  I documented my interview and the results of my

9    search in an FBI report, 302.

10   Q.  When did you make that list?

11   A.  I made notes while I was talking to her.

12   Q.  When you made the list were you being as accurate and

13   complete as possible?

14   A.  Yes, sir.

15   Q.  Would that report refresh your recollection as to what

16   those numbers are?

17   A.  Yes.  I'm sorry.  No.

18   Q.  I am going to show you what has been premarked for

19   identification as Government Exhibit 3501-7.

20          Do you recognize that document?

21   A.  Yes, I do.

22   Q.  What is it?

23   A.  It's the 302 that I prepared after interviewing

24   Ms. Morales.

25   Q.  Does that contain the numbers that you took down that day

1    of your interview?

2    A.  Yes.

3    Q.  Does that report refresh your recollection as to what those

4    numbers are?

5    A.  No.

6           MR. ARAVIND:  Your Honor, we would offer the contents

7    of 3501-07 as evidence of a past recollection recorded under

8    Rule 803(5).

9           THE COURT:  Any objection?

10          MR. DRATEL:  No.

11          THE COURT:  It's admitted.

12          (Government's Exhibit 3501-07 received in evidence)

13          MR. ARAVIND:  Your Honor, we would ask permission to

14   read a portion of this exhibit to the jury.

15          THE COURT:  It's in evidence.  You may.

16   Q.  You can read, Special Agent.  What do you see there in

17   terms of the numbers?

18   A.  Well, one of the contacts was Groovy, spelled G-r-o-o-v-e.

19   Under that contact was listed three telephone numbers, two full

20   telephone numbers, one incomplete telephone number.  The

21   incomplete telephone number was 347-740-302.  The other

22   telephone number was 917-370-9462.  The last phone number was

23   347-638-6653.

24   Q.  What about the next one?

25   A.  The next line was another contact that had the name Groovy,

1    separate letter D with one telephone number which was

2    347-435-8432.  There is another contact which is -- the name

3    associated with that contact was Groovy Old and that was

4    347-669-6173.

5    Q.  Of these five numbers, can you tell us which was the number

6    that had the most evidentiary significance to you?

7    A.  The one of most interest to me was the one listed under the

8    first Groovy contact, and that was the 917-370-9462.  That was

9    the phone number that was listed under the contract John 129 in

10   the Tyrone Brown iPhone.

11             MR. ARAVIND:  Your Honor, this may be a good place to

12   break.

13             THE COURT:  Okay.  That's fine.  We are close to our

14   break time.

15             Ladies and gentlemen, I think I mentioned on the first

16   day, it seems a long time ago, that we would have different

17   hours on Thursday, and that is tomorrow.  We will be beginning

18   at 1 and we will go until 5 tomorrow.  Please have your lunch

19   before you get here and we will start promptly at 1.

20             Please don't talk to anyone about the case.  See you

21   tomorrow.

22             (Jury excused)

23             THE COURT:  My plan is to come out on the bench

24   tomorrow at quarter of 1.  And if you could just all be there

25   by then.

EA1MCHA6

1          MR. DRATEL:  Two things, your Honor.  One is, just to

2     clarify, I don't think Mr. Aravind disagrees with this, but the

3     entire 302 is not meant to be admitted.  It's just a past

4     recollection recorded.  It was just the numbers that Special

5     Agent Reynolds read into the record.

6          THE COURT:  Okay.  Is that accurate, Mr. Aravind?

7          MR. ARAVIND:  That's correct.  That's why I didn't

8     want to publish that to the jury.

9          THE COURT:  Thank you.

10          MR. DRATEL:  By the process of elimination, we are

11     coming down to sort of being able to determine whose tomorrow's

12     witnesses are.  I want to make sure because I know there are

13     some other people out there --

14          THE COURT:  And also whether anybody has been dropped.

15     Who are tomorrow's witnesses?

16          MR. ARAVIND:  Your Honor, may we have just one moment?

17          THE COURT:  Sure.

18          MS. TEKEEI:  Your Honor, we intend to finish with

19     Special Agent Reynolds' testimony yesterday and also call

20     Special Agent Eric Perry with the FBI.

21          THE COURT:  I'm sorry.  What's his last name?

22          MS. TEKEEI:  Perry.

23          And, your Honor, we subpoenaed Ms. Dunbar.  She came

24     today and we understand she was appointed counsel.  She we will

25     make inquiries about that this evening after we leave.

EA1MCHA6

```
 1              THE COURT:  Your plan is to call Ms. Dunbar tomorrow,
 2    if you can work it out.
 3              MS. TEKEEI:  We will make inquiries with her counsel
 4    and go from there.
 5              THE COURT:  Thank you.
 6              That means that Starley Sandez is not to be a witness,
 7    Christopher Torres is not to be a witness.  Is that right?
 8              MS. TEKEEI:  Yes, your Honor.  And, in addition, I'm
 9    not clear if Mr. Dratel intends to call Dr. Strange tomorrow or
10    the next day.
11              THE COURT:  We need a submission before Dr. Strange is
12    permitted.  When would that be arriving?
13              MR. DRATEL:  We will find out when we get back, but if
14    it's all here tonight, we will try to get it out tonight to
15    everybody.  We will get it out as soon as we have it.
16    Hopefully, it will be in a form --
17              THE COURT:  Hopefully it will be an e-mail.  If it's
18    in an e-mail, just hit forward, if you can, and you can send it
19    to chambers, the chambers e-mail address.  You don't have to
20    put it on ECF.
21              MR. DRATEL:  Thank you, your Honor.
22              THE COURT:  But, obviously, copy the government.
23              MR. DRATEL:  Yes.
24              Also, since the government looks like it's -- I think
25    will get through -- I don't know what the cell site --
```

EA1MCHA6

1           THE COURT:  Who introduces that?

2           MR. DRATEL:  Agent Perry.  I don't know how long that

3    direct is going to be or cross.  It sounds like we are going to

4    finish the government's case tomorrow one way or the other.  I

5    may want to call Detective Deloren.  And so --

6           THE COURT:  I am going to let you talk to the

7    government and work out whether and how to arrange his

8    appearance.

9           MR. DRATEL:  I think that's it, whether we call

10   Dr. Strange or not.  Obviously, depends on the Court's ruling.

11          THE COURT:  I understand.

12          We should plan on having a charging conference

13   tomorrow, if that is what comes next.

14          MR. DRATEL:  I should tell the Court that based on the

15   usual evaluations of how things are going back a day or two

16   ago, maybe even earlier, we told Dr. Strange that we thought

17   either Friday or Monday.  If we could have the charging

18   conference after court tomorrow.  I don't know what the

19   schedule is.  We have told her to leave Friday available.  We

20   can start with her first thing Friday since she is not able

21   tomorrow.  Maybe the charge conference tomorrow afternoon --

22          THE COURT:  I would have the charging conference after

23   our full day, but we will accommodate you if Dr. Strange isn't

24   available until Friday morning.

25          MR. DRATEL:  Thank you.

544

EA1MCHA6

1          THE COURT:  If you are bringing Detective Deloren

2     back, I would prefer to use the time than not use the time.

3          MR. DRATEL:  Absolutely.  We can do that tomorrow

4     afternoon.  No question.

5          THE COURT:  I will see you all tomorrow at 12:45.

6     Thank you.

7          (Adjourned to Thursday, October 2, 2014, at 12:45

8     p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2   Examination of:                         Page

 3   DAVID BAREA

 4   Direct By Ms. Tekeei . . . . . . . . . . . 341

 5   Cross By Mr. Dratel  . . . . . . . . . . . 404

 6   Redirect By Ms. Tekeei . . . . . . . . . . 409

 7   Recross By Mr. Dratel  . . . . . . . . . . 410

 8   Redirect By Ms. Tekeei . . . . . . . . . . 414

 9   MICHAEL WHELAN

10   Direct By Ms. Tekeei . . . . . . . . . . . 416

11   Cross By Mr. Dratel  . . . . . . . . . . . 422

12   THOMAS A. DEROSA

13   Direct By Mr. Aravind  . . . . . . . . . . 424

14   Cross By Mr. Dratel  . . . . . . . . . . . 427

15   THOMAS A. DeROSA

16   Direct By Mr. Aravind  . . . . . . . . . . 444

17   Cross By Mr. Dratel  . . . . . . . . . . . 458

18   ISAAC NELSON

19   Direct By Ms. Tekeei . . . . . . . . . . . 459

20   Cross By Mr. Dratel  . . . . . . . . . . . 461

21   DEMI TORRES

22   Direct By Ms. Tekeei . . . . . . . . . . . 462

23   Cross By Mr. Dratel  . . . . . . . . . . . 473

24   Redirect By Ms. Tekeei . . . . . . . . . . 499

25   Recross By Mr. Dratel  . . . . . . . . . . 500
```

1   JOHN REYNOLDS

2   Direct By Mr. Aravind . . . . . . . . . . . . 516

3                    GOVERNMENT EXHIBITS

4   Exhibit No.                                Received

5    3B   . . . . . . . . . . . . . . . . . . . 362

6    1903   . . . . . . . . . . . . . . . . . . 418

7    2006 and 300 . . . . . . . . . . . . . . . 443

8    801 . . . . . . . . . . . . . . . . . . . 448

9    1001 . . . . . . . . . . . . . . . . . . . 471

10   601 and 602 . . . . . . . . . . . . . . . 524

11   601A through 601D . . . . . . . . . . . . 526

12   602A . . . . . . . . . . . . . . . . . . . 528

13   160 . . . . . . . . . . . . . . . . . . . 530

14   5000 . . . . . . . . . . . . . . . . . . . 531

15   3501-07 . . . . . . . . . . . . . . . . . 539

16                    DEFENDANT EXHIBITS

17  Exhibit No.                                Received

18   C   . . . . . . . . . . . . . . . . . . . 492

19

20

21

22

23

24

25