EA2MCHA1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA

4              v.                        13 CR 345(LGS)

5    ANTIONE CHAMBERS,

6              Defendant.

7    ------------------------------x

8                                       New York, N.Y.
                                        October 2, 2014
9                                       12:45 p.m.

10

     Before:
11
                    HON. LORNA G. SCHOFIELD,
12
                                          District Judge
13

14                        APPEARANCES

15

     PREET BHARARA
16        United States Attorney for the
          Southern District of New York
17   SANTOSH ARAVIND
     NEGAR TEKEEI
18        Assistant United States Attorneys

19   JOSHUA L. DRATEL
     WHITNEY SCHLIMBACH
20        Attorneys for Defendant

21   ALSO PRESENT:  JOHN REYNOLDS, FBI
                    JENNIFER HANSMA, Paralegal AUSA
22

23

24

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

EA2MCHA1

1              (Trial resumed; jury not present)

2              THE COURT:  Good afternoon, counsel.  Thank you for

3      accommodating my schedule.

4              There is something someone wanted to raise?

5              MR. ARAVIND:  Your Honor, we have two things that we

6      want to raise with the Court.  One we ask that it be done

7      outside the presence of the defendant, so we could do that at

8      side bar and one can be done in the presence of the defendant.

9              THE COURT:  Mr. Aravind, you said one you wanted to do

10     at side bar and the other one --

11             MR. ARAVIND:  Can be done in open court.

12             THE COURT:  Let's do that one first.

13             MS. TEKEEI:  Your Honor, we received Mr. Dratel's

14     summary of Dr. Strange's testimony yesterday, this morning,

15     just after midnight, and we just wanted to discuss a few issues

16     with your Honor.

17             Our position remains the same, that Dr. Strange's

18     testimony should be precluded.  We have briefed this

19     extensively, as your Honor is aware, so we don't want to be

20     redundant, but we do want to say this.  From the day that we

21     first received Mr. Dratel's so-called notice letter, which

22     contained a bullet point list of potential topics in the CV, we

23     have asked for a summary of the testimony, the scientific bases

24     for any conclusions and studies and articles, any research,

25     anything at all so that in the middle of preparing for this

1    trial we could also prepare, if needed, for that witness in

2    order to not cause any delay.

3         We also asked repeatedly whether Dr. Strange had ever

4    been qualified as an expert on any of these topics before, and

5    we have still not received an answer to that.  And despite all

6    of these multiple requests we received nothing.

7         The defense has noticed an expert who could not

8    provide in a timely manner any scientific bases or summary

9    conclusions of the purported topics until just after midnight

10   today.  And what we received was a summary of meta analyses of

11   39 different empirical articles, another summary of meta

12   analyses of 11 studies, vague references to studies related

13   potentially to seeing names in articles and not a single

14   reference to any study or article that Dr. Strange herself has

15   authored.  And then we received a list of 17 articles, some

16   from obscure journals and one going back to 1885.  We have no

17   way of obtaining these articles today.  We have a full

18   afternoon in court today.  Mr. Dratel tells us at 12:11 that he

19   wants to call this witness to testify tomorrow morning.  And we

20   cannot find and read these articles and prepare for that to

21   cross-examine her about her qualifications, given this notice.

22   We don't know if we can challenge her qualifications yet

23   because we just haven't even had the time to review any of the

24   potential bases or purported bases.

25         The Second Circuit has stated that our district courts

1    have to be concerned about the special aura that surrounds

2    expert testimony and we believe that this evidence should be

3    precluded.

4           Now, we understand that what's good for the goose is

5    good for the gander, but that doesn't always apply in criminal

6    cases.  If we had ever tried to provide this type of Rule 16

7    disclosure at midnight a day before an expert testified, we

8    have little doubt your Honor would have excluded that

9    testimony.

10          Our position remains the same, that Dr. Strange's

11   testimony consists of common-sense principles that can be

12   explored through cross-examination, which Mr. Dratel has done

13   extensively and reinforced with jury instructions.  This

14   11th-hour disclosure in the manner that it was done is unfair

15   and should not be allowed.

16          THE COURT:  Mr. Dratel.

17          MR. DRATEL:  We received it last night.  I read it and

18   then I sent it along.  The Court gave me until the end of the

19   government's case and we got to them early.  Speaking of goose

20   and gander, I'm moving to preclude their cell site witness

21   because there is no report, nothing but a CV.  I have got

22   nothing except for a Power Point presentation.

23          They are not entitled to everything.  They have to do

24   their own research.  I don't have to give them what they are

25   asking for.  They are entitled to get what they have gotten.

1    They got an expert report of the type that is commonplace in

2    these situations.  They got much more that the Court directed,

3    which we provided yesterday in a timely fashion.  I'm not doing

4    their research.  I'm not preparing their cross for them.

5    That's up to them to do.  That is the way with every expert.

6    I've cross-examined experts who have written thousands of

7    documents, and I get two from the government and I'm not in a

8    position to complain because it's my business to get them.

9              MS. TEKEEI:  Your Honor, he never asked us for any

10    additional information after we provided the slides, which are

11    the basis for our cell site expert's testimony.  We would have

12    been happy to provide more.  We did not know he required more

13    or asked for more.

14              By contrast, we have asked and tried to seek in

15    advance some of these studies to see if we could get a sense of

16    these conclusions, one of which we can't seem to find anywhere

17    any reference to or any kind of study related to and that being

18    the name of the person in the article.  On our own research we

19    have spent our own time researching these things.  It is not as

20    if we sat and did nothing since we got the notice.

21              MR. DRATEL:  Your Honor, when they asked for this from

22    Dr. Strange I said I want it from the cell site person.  That

23    was about four days ago.

24              MS. TEKEEI:  That's not correct, your Honor.

25              THE COURT:  That's not what?

EA2MCHA1

1          MS. TEKEEI:  We provided the slides for the cell site

2     person.  We also said that the cell site person had been

3     qualified as an expert multiple times previously.  Since we

4     told Mr. Dratel that, he has not requested any further

5     information.

6          THE COURT:  Mr. Dratel, do you know if Dr. Strange has

7     been previously qualified in the expert for the areas in which

8     she is designated?

9          MR. DRATEL:  Yes, your Honor.

10          THE COURT:  How far are we from the cell site expert?

11          MR. ARAVIND:  Your Honor, Special Agent Perry is the

12     next witness after Special Agent Reynolds.

13          THE COURT:  I am going to deny Mr. Dratel's motion to

14     preclude the cell site expert as untimely.  I will address the

15     expert witness at the same time that I address the motion to

16     strike because I think the two are very closely related, and I

17     will do that later.

18          Let's go to the side bar and quickly try to deal with

19     that issue.

20          (At the side bar)

21          MR. ARAVIND:  Your Honor, as the Court is aware, the

22     initial round of 3500 material was produced to the defense on

23     September 19 of this year.  That was pursuant to a protective

24     order that had been entered by the parties.  We had had some

25     briefing about a motion for a protective order.  The parties

EA2MCHA1

1       came to an agreement and the protective order said in sum and

2       substance that the defense was not allowed to give the

3       defendant the 3500 material so that he could keep it in the

4       jail.

5               On Tuesday, following the testimony of Emma Torruella,

6       we learned from Ms. Torruella's counsel that during her

7       cross-examination Mr. Dratel showed a piece of 3500 material

8       that contained Ms. Torruella's current address.  That should

9       have been redacted.  That was a mistake on the government's

10      part.  But the document was shown to Ms. Torruella during the

11      cross-examination and she was extremely upset about it.

12              Then at the end of the trial day we called Mr. Dratel

13      and asked him.

14              THE COURT:  They who?

15              MR. ARAVIND:  We, myself and Ms. Tekeei, called Mr.

16      Dratel on Tuesday evening after the trial day to advise him of

17      that 3500 material.  We then sent him redacted versions of that

18      material and asked for confirmation at that point that that

19      material be substituted in and the material that contained

20      Ms. Torruella's address be taken out.  I did not receive

21      confirmation that day on Tuesday nor yesterday.

22              This morning I sent an e-mail with respect to other

23      things, asked for confirmation that that material had been in

24      fact substituted and the 3500 material containing

25      Ms. Torruella's address had been removed.  I learned from Ms.

EA2MCHA1

1    Schlimbach that at that time this morning that the defendant

2    had been in possession of a disk containing all of the 3500

3    material since Monday.

4              MR. DRATEL:  Or Tuesday.  I don't know.

5              MR. ARAVIND:  I spoke to both Ms. Schlimbach and Mr.

6    Dratel.  It's either Monday or Tuesday, which is in

7    contravention of the protective order that was entered by the

8    parties and was the substance of much of the motion practice

9    relating to the protective order.

10             I don't know what to do at this point.  We wanted to

11   make a record of it.  We are concerned, obviously, about the

12   safety of our witnesses.  Since learning of that fact this

13   morning, we have done a number of different things, that is,

14   prevented us from looking at expert reports that were provided,

15   including talking to our victim witness coordinator, speaking

16   to the NYPD precinct, and trying to address this issue, given

17   our concerns for the safety of our victims.  We wanted to make

18   a record of it, your Honor.  We may be trying to take some

19   measures with respect to Mr. Chambers in terms of e-mail

20   privileges, phone privileges.  We don't know.  We have not

21   really had the time to think about it because we have been

22   trying to rest our case today.  But we did want to make a

23   record of it.  I don't know what the Court wants to do about

24   that.  But I did want to make a record.

25             THE COURT:  Mr. Dratel.

1              MR. DRATEL:  100 percent my fault.  It was just a

2      lapse, not in judgment; in cognition.  When leaving the office

3      Wednesday, before the holiday, I just reflexively told Ms.

4      Schlimbach to prepare a disk for him.  I knew he would want to

5      see the 3500 before trial.  It was voluminous.  It was too much

6      for Ms. Schlimbach to carry.  And it was a failure of cognition

7      on my part.  That's all I can say.  I really have no other --

8      it's terrible, I agree.  Terrible.  That's my mistake.

9      Obviously I never want to put a witness in a fear.  I don't

10     think they are in jeopardy, for a variety of reasons which I

11     will discuss, to put a witness in fear.  Obviously I feel

12     terrible about that.

13              He doesn't have e-mail privileges.  He doesn't have

14     phone privileges yet.  That's not an issue.  He did not get the

15     disks until, at the earliest, Monday night.  In fact, he read

16     3500 material in large part in court Monday because he hadn't

17     received it.  And immediately after I spoke to Mr. Aravind --

18     some time I realized that it could be an issue.  I knew he

19     didn't get the disks on Monday, which is when I spoke to

20     Mr. Aravind when he called me.  But then first thing I did

21     Tuesday morning was asked Mr. Chambers if he had -- Wednesday

22     morning.  Mr. Aravind called me on Tuesday, called me Tuesday.

23     It was after Ms. Torruella's testimony, which was Tuesday.  He

24     called me Tuesday evening.  First thing Wednesday morning I

25     asked Mr. Chambers if he, in fact, had received the disks.  He

EA2MCHA1

1    said he had.  And I said:  You have to bring them back to me.

2    I didn't tell him why.  I said you have to bring them back to

3    me tomorrow.  And then we decided to send Ms. Schlimbach this

4    morning, but he had already been moved to the courthouse, even

5    though we had that half day.  We hoped he would be there.  She

6    is going to go right after court to get that.  That's where we

7    are at.

8              THE COURT:  Do you know if he has looked at the disks?

9              MR. DRATEL:  I think he has looked at some of the

10   disks.  What he said was, he didn't look at anything beyond

11   what he saw here in the court.  I did ask him that this

12   morning.

13             THE COURT:  You were about to say you didn't think

14   anyone was in jeopardy for a variety of reasons which you would

15   explain.

16             MR. DRATEL:  He doesn't know -- I didn't notice an

17   address looking at the 3500 material.  I don't think it's on a

18   typed document.  I think it's something handwritten.  I am not

19   sure that he knows at all what it is.  I did not tell him.

20   Again, they can look at all his e-mails.  I don't know if there

21   are e-mails.  Go ahead.  He hasn't had a phone call.  That's

22   why I say -- besides that, this is a witness who recanted on

23   redirect, not on cross, on redirect.

24             THE COURT:  I understand.

25             MR. DRATEL:  The person she lives with never

1    identified him.

2           MS. TEKEEI:  Your Honor, in terms of the victims and

3    the witnesses' jeopardy, at least one of the perpetrators is

4    still unidentified and at least one of Mr. Chambers'

5    codefendants has sent communications to that perpetrator

6    through friends from phone calls at the MCC or MDC.  So we have

7    very serious concerns.

8           In addition, the victim's addresses, at least one of

9    their current addresses, is one of the locations involving the

10   robbery and kidnapping.  For various reasons, they chose not to

11   move.  And so we have very serious concerns and are taking

12   steps to make sure that happens, but between now and when any

13   of that happens, our concerns remain very serious.

14          MR. DRATEL:  I would consent to withdrawing e-mail

15   privileges and visiting privileges until we get this resolved.

16   I'm okay with all of that.  I don't want this to be an issue,

17   particularly since I'm responsible, too.

18          THE COURT:  I understand the situation.  I share

19   everyone's concern.  I have not heard an application from the

20   government.  Everyone has not had a chance to fully think about

21   this.  What I suggest you try to do is talk to each other,

22   government and defense, and see if together you can agree on

23   anything that you think would help remedy this situation.  But

24   we need to get the jury because it's already --

25          MR. DRATEL:  Here is my off the top of my head

EA2MCHA1

1    proposal.  One is suspend the privileges I'm talking about.

2    Second is, I don't know exactly where the disks are.  I don't

3    believe they are in the cell.  I believe they are on the unit

4    or something.  I will have my office call Adam Johnson, who is

5    MCC counsel, tell him to get those disks.

6            MR. ARAVIND:  That's the most important thing.

7            MR. DRATEL:  I'm fine with that.

8            THE COURT:  Do you need a minute to do that?

9            MR. DRATEL:  Yeah.  I'll just call my office.  I can

10   text.

11           THE COURT:  Do you have your phone?

12           MR. DRATEL:  Yes.  Text your office.  We will get the

13   jury.

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

EA2MCHA1

1              (In open court; jury present)

2              THE COURT:  So thank you for being on time.  I'm sorry

3     we are starting just a little bit late.  There were some things

4     we had to discuss.  But we are done discussing them.  I hope

5     you used your mornings productively.  We can start now.

6              The government, would you like to call a witness?

7              MR. ARAVIND:  Special Agent Reynolds was on the stand.

8              Before we do that, your Honor, we would like to have

9     the Court read one stipulation.

10             THE COURT:  Ladies and gentlemen, I explained to you

11    yesterday what a stipulation is.  It's an agreement by the

12    parties and it is evidence.  It is marked as Government Exhibit

13    2001.  So it will be in your exhibit books when you go in the

14    jury room.  It is hereby stipulated and agreed by and among the

15    United States of America, by Preet Bharara, United States

16    Attorney for the Southern District of New York, Negar Tekeei,

17    and Santosh Aravind, Assistant United States Attorneys of

18    counsel, and Antione Chambers, the defendant, with the consent

19    of his attorney, Joshua Dratel that, and the heading is

20    telephone toll records:

21             1.  Government Exhibit 160A comprises the true and

22    correct telephone records for the cellular telephone assigned

23    to the call number 646-503-88904.  These records were obtained

24    from Sprint and cover April 6, 2013 through May 29, 2013, a

25    time period during which the cellular telephone assigned the

1    call number, 646-503-8904, was serviced by the Sprint network.

2         2.   Government Exhibit 160B comprises the true and

3    correct cell site records for the cellular telephone number

4    assigned the call number 717-743-6130.  These records were

5    obtained from Verizon Wireless and cover March 6, 2013 through

6    April 30, 2013, time periods during which the cellular

7    telephone was serviced by Verizon Wireless.

8         Government Exhibit 160C comprises the true and correct

9    telephone records for the cellular telephone assigned the call

10   number 717-743-6130.  These records were obtained from Verizon

11   Wireless.  The telephone records cover March 20, 2013 through

12   April 9, 2013, time periods during which the cellular telephone

13   assigned the call number 717-743-6130 was serviced by Verizon

14   Wireless.

15        Government Exhibit 160D comprises the true and correct

16   telephone records and cell site records for the cellular

17   telephone assigned the call number 917-213-4864.  These records

18   were obtained from T-Mobile.  The telephone records cover April

19   9, 2013 through June 5, 2013 and the cell site records cover

20   May 23, 2013 to June 7, 2013, time periods during which the

21   cellular telephone assigned the call number 917-213-4864 was

22   serviced by the T-Mobile network.

23        Government Exhibit 160F comprises the true and correct

24   telephone records for the telephone number assigned the call

25   number 917-370-9462.  These records were obtained from AT&T and

EA2MCHA1

cover March 23, 2013 through March 25, 2013, a time period

during which the cellular telephone assigned the call number

917-370-9462 was on the AT&T network.

Government Exhibit 160G comprises the true and correct

telephone records for the cellular telephone assigned the call

number 917-659-9696.  These records were obtained from Sprint

and cover March 17, 2013 through March 27, 2013, the time

period during which the cellular telephone assigned number

917-659-9696 was on the Sprint network.

The next heading is entitled toll record custodians.

If called to testify, a custodian of records at Sprint would

testify as follows:  He or she is familiar with the

recordkeeping practices of Sprint.  Sprint records times of

cellular telephone communications and toll records that reflect

the central time zone, and, this is now paragraph 8, if called

to testify, a custodian of records at AT&T would testify as

follows:  He or she is familiar with the recordkeeping

practices at AT&T, and AT&T records the times of cellular

telephone communications in toll records that reflect the time

zone in the geographic area where the call is placed.

9.  If called to testify, a custodian of records at

T-Mobile would testify as follows:  He or she is familiar with

the recordkeeping practices of T-Mobile.  T-Mobile records the

times of cellular telephone communications and toll records

that reflect the time zone in the geographic area where the

EA2MCHA1

1    call is placed.

2              10.  If called to testify, a custodian of records at

3    Verizon would testify as follows:  He or she is familiar with

4    the recordkeeping practices of Verizon and Verizon records the

5    times of cellular telephone communications and toll records

6    that reflect the time zone in the geographic area where the

7    call was placed.

8              Paragraph 11, New York City is in the eastern time

9    zone.

10             It is further stipulated and agreed that this

11   stipulation as Government Exhibit 2001 and Government Exhibits

12   160A, 160B, 160C, 160D, and 160F, 160G may be received in

13   evidence as government exhibits at the trial in the

14   above-referenced matter.

15             It's dated October 2 and signed by counsel.  Thank

16   you.

17             MR. ARAVIND:  May I proceed, your Honor.

18    JOHN REYNOLDS, resumed.

19   DIRECT EXAMINATION (cont'd)

20   BY MR. ARAVIND:

21   Q.  Special Agent Reynolds, when we left off yesterday we were

22   talking about the phone evidence in this case.  I am going to

23   ask you some more questions about your analysis of the phones

24   and your review of the surveillance video.

25             First, did you prepare any additional summary charts

1   as part of this case?

2   A.  Yes, I did.

3   Q.  I am going to show you what has been premarked for

4   identification as Government Exhibit 5002.

5           Do you recognize this document?

6   A.  Yes, I do.

7   Q.  What is this?

8   A.  It's a summary chart that I prepared using Mr. Brown's call

9   records from his iPhone.

10  Q.  Is this chart based on the underlying phone records that

11  you received on that disk we looked at yesterday, Government

12  Exhibit 160?

13  A.  Yes.

14  Q.  Have you reviewed this chart for accuracy and compared it

15  to the records, the underlying phone records contained in

16  Government Exhibit 160?

17  A.  Yes.

18          MR. ARAVIND:  Your Honor, government offers 5002 as a

19  summary chart.

20          MR. DRATEL:  No objection, your Honor.

21          THE COURT:  It's admitted.

22          (Government's Exhibit 5002 received in evidence)

23          THE COURT:  You may publish it if you want.

24          MR. ARAVIND:  Thank you, your Honor.

25  Q.  Let's look at the first page, Special Agent Reynolds.

1    While we are waiting for that to come up, can you tell us what

2    that first line reads?

3    A.   Tyrone Brown call records, March 24 through the 26th, 2013.

4    Q.   Which Tyrone Brown phone are we talking about?

5    A.   That would be the iPhone with the telephone number ending

6    in 9696.

7    Q.   And just to be clear, this is the day before the robbery,

8    the day of the robbery, and the day after the robbery?

9    A.   Yes, sir.

10   Q.   Now, based on your review of the surveillance video,

11   approximately when did the robbery begin at the 1338 Croes

12   Avenue location?

13   A.   It began in the early 1:00 hour, 1:00 in the morning on the

14   25th.  I believe the video indicates that Mr. Barea arrived at

15   approximately 1:17.

16   Q.   Tell us what you did with respect to your analysis.

17   A.   Like I said, using that as a reference point, that 1:00

18   hour, I wanted to see first when was the last time Brown on

19   that phone had contact with Barea prior to that robbery.

20   Q.   Let's look at the calls immediately before the robbery.

21        MR. ARAVIND:  Ms. Hansma, can we look at the third

22   page, calls and communications before that robbery.  I'm sorry.

23   And let's look at the entry at 3/24/13 at 23:56.  If you can

24   zoom and highlight that for us.  Thank you.

25   Q.   Tell us what we are looking at here, Special Agent

1   Reynolds.

2   A.  Specifically in that --

3   Q.  Sorry.  There should be a laser pointer in front of you

4   that looks like a pen.  You've seen it before.  If you could

5   just orient the jury of what you are looking at.

6           THE WITNESS:  May I stand up, please?

7           THE COURT:  Yes, of course.

8   A.  Not the first column, or row, rather.  The second row, that

9   indicates who is placing the phone call.  So the 917-370-9462,

10  again, that's the Barea Groovy phone and that's placing an

11  outbound text message to the 9696 Brown iPhone.

12  Q.  Just to be clear, the 9462, is that the Groovy one or the

13  John 129 phone that you talked about yesterday in your

14  testimony?

15  A.  The John 129 phone.

16  Q.  That reads 11:56 and 42 seconds.  What's the significance

17  of the zero in the column to the right?

18  A.  The zero indicates to me that this is a text message.  So

19  with respect to that time, it's actually off because the Sprint

20  records this, their text messages, in central time.  You

21  actually have to add an hour to it to get the local time.  This

22  text message our time, New York time, didn't occur at 23:56.

23  It occurred at actually 12:56 a.m. on the 25th.

24  Q.  That was consistent with what we just heard on the

25  stipulation?

1   A.  Yes, sir.

2   Q.  And what happens a minute after this text message which,

3   according to the records, is one hour after that time?  What

4   happens then?  It's 12:56 is a text message.  What happens

5   right after that?

6   A.  The very next thing is an outbound call placed by Brown,

7   again, the 9696 number to the 6130 Twizzie phone.

8   Q.  Let's look at that.

9          MR. ARAVIND:  Ms. Hansma, can you go to the next page

10  and let's look and 12:57.  It should be 057 and it's the fifth

11  column from the top.

12  Q.  Can you now explain that to the jury again, Special Agent

13  Reynolds?

14  A.  Sure.  That highlighted row, again, the first column is the

15  outbound, so that indicates that that 9696 Brown phone is

16  placing an outbound call to the 6130 Twizzie phone and, again,

17  that's on the 25th at approximately 12:57 a.m., again, right

18  after that text message with the John 129 phone.  And the 33

19  seconds indicates that that's the duration in seconds.  That's

20  a telephone call.

21  Q.  And what happens after that?  Let's direct your attention

22  to two down.

23          MR. ARAVIND:  Ms. Hansma, let's highlight the next two

24  rows down, if you could.

25  Q.  Special Agent Reynolds, we are looking at two entries on

1   this summary chart, both dated March 25, 2013 at 1:02 a.m.

2            What do those two entries reflect?

3   A.  I am going to stand up and point.  The next two are, again,

4   outbound calls from 6130, the Twizzie phone, to Brown's phone.

5   Now, this telephone number there, this 646-242-2434, these next

6   two rows of a 6130 number, that's actually one phone call.

7   What it is is Sprint routed it through that number.  That

8   646-2434 is actually a Sprint routing number.  That's actually

9   only one call.  You have to look at the second call or the very

10  last one that's highlighted, the 6130.  In short, at

11  approximately 1:02 a.m., there is a call that Brown is

12  receiving from the 613 Twizzie phone.

13           THE COURT:  Just tell me again how you know that's one

14  call and not three.

15           THE WITNESS:  First of all, ma'am, the very first one

16  highlighted, that was -- Brown placed a call into the Twizzie

17  phone.  Following that at 1:02, those next two that are

18  highlighted is one phone call.  It's the way Sprints reflects

19  it.  It's coming through a switch.  It's like patched through.

20  It's actually just like one phone call and Sprint just reflects

21  that's the number that it came through.  One call.

22  Q.  Special Agent Reynolds, what happens three minutes later?

23  A.  Three minutes later, at approximately 1:05 a.m., again, the

24  Brown iPhone, the 9696, places another phone call to the 717 --

25  the 6130 Twizzie phone at 1:05 a.m.

1   Q.  And, again, this is in the minutes before the robbery takes

2   place at Croes Avenue?

3   A.  Yes.  Again, using the 1:17 as a rough time frame, it

4   indicates the call activity before that, Brown iPhone was in

5   contact with the 6130 Twizzie phone.

6   Q.  How long is that call?

7   A.  About 19 seconds.

8   Q.  Now, according to your review of the surveillance video at

9   1338 Croes Avenue, approximately when does that robbery take

10  place at that location?

11  A.  Again, Barea shows up, I believe, around 1:17, and then the

12  robbers and Barea leave, I believe, at approximately 1:36 the

13  video references.

14  Q.  What do you notice about Brown's iPhone call activity

15  during the time of the robbery?

16  A.  Again, looking at that last call that's highlighted, again,

17  that's the outbound call from Brown to the 6130 Twizzie phone.

18  You'll notice that there is a similar to the video frame, there

19  is a gap in activity.  So that last call is at 1:05 a.m.  The

20  phones -- I should say the phone's next outgoing activity is

21  approximately 1:35.

22  Q.  Let's look --

23  A.  I'm sorry.  If I may correct that.  The next outbound

24  activity looks like it's 1:32.

25  Q.  That's the 9696 Brown iPhone calling some number at 5941?

1    A.  Yes.

2    Q.  That would be a text message?

3    A.  Yes.

4    Q.  Let's go to some phone records using the Brown iPhone after

5    the robbery.

6              Ms. Hansma, if we could turn to page 4 at

7    approximately 3:21 a.m.  You see, Special Agent Reynolds, a

8    phone number 917-935-8485 calling the Brown phone.  What is the

9    significance of that phone number?

10   A.  That's one of the 8485 that's highlighted there placing the

11   outbound call.  That is one of the numbers that was listed in

12   Tyrone Brown's iPhone for Groovy.  That indicates to me that

13   Groovy contact is trying to reach Brown's iPhone.

14   Q.  Is this after the robbery takes place?

15   A.  I believe so.

16   Q.  Again, you have two calls that are at the exact same time,

17   seven seconds part, 3:21 at 45 and 3:21 at 52.  What does this

18   646-242-2863 reference?

19   A.  That was I was referencing early earlier.  That's one call.

20   It's being patched through.  That's another switch.

21             THE COURT:  Question.  So the total time in that phone

22   call is 120 plus 116 seconds?

23             THE WITNESS:  No, ma'am.  It's overlapping.  I

24   wouldn't know which one it tell you exactly to go with.  It's a

25   difference of four seconds.

1           THE COURT:  It's around 120 sounds.  You don't add

2     them.  It's one number for the other.

3           THE WITNESS:  Correct, ma'am.  I would go with the

4     actual 845 to the actual 9696.

5     Q.  How long would this call be, approximately?

6     A.  Excuse me?

7     Q.  How long would that call be approximately?

8     A.  It's almost two minutes.

9     Q.  And let's look at that 8485 number.

10          MR. ARAVIND:  Ms. Hansma, can we publish Government's

11    Exhibit 601B, please:  And we highlight that.

12    Q.  Can you remind us, Special Agent Reynolds, where we saw

13    this Groovy or Grovy number, 8485?

14    A.  That was from Tyrone Brown's iPhone.

15    Q.  Now, Special Agent Reynolds, were there other calls,

16    according to your review, between the Groovy 8485 number and

17    the Brown iPhone number that ends with 9696 that took place

18    later during the course of that morning on March 25, 2013?

19    A.  Yes.  There was numerous phone calls between those two

20    numbers.

21    Q.  I am now going to direct your attention to your analysis of

22    phone calls that took place during the robbery.  I am going to

23    show you what has been admitted into evidence as Government

24    Exhibit 160F.  It's admitted into evidence pursuant to that

25    stipulation.  Let's look at Government Exhibit 160F.

1              MR. ARAVIND:  Ms. Hansma, can we zoom in on the top

2      left-hand portion where it says voice usage for.

3      Q.  Can you tell us, what is that phone number, 917-370-9462?

4      A.  That's the John 129 contact.

5      Q.  And who was associated with the John 129 contact?

6      A.  Mr. Barea.

7      Q.  Who had that phone number associated with Mr. Barea?

8      A.  That was the number that I obtained from Zuleika Morales'

9      phone.

10     Q.  This is not a summary chart, correct?

11     A.  No.  This is the actual telephone records that I received

12     from AT&T.

13             MR. ARAVIND:  Can we zoom out, Ms. Hansma, just to let

14     the jury see that.  Zoom in on the top right-hand logo.

15     Q.  Special Agent Reynolds, I want to direct your attention to

16     entry number 28.

17             MR. ARAVIND:  Ms. Hansma, if we could zoom out and

18     zoom in and highlight entry 28.  Thank you.  Zoom out a little

19     bit and then extend your zoom to the right-hand side.  That's

20     fine.  Just highlight a little bit further on 28.  Thank you,

21     Ms. Hansma.  Perfect.

22     Q.  Special Agent Reynolds, what does this call represent?

23             THE WITNESS:  If I could stand up again.

24             THE COURT:  Sure.

25     A.  The first column, obviously, that's the date.  The next

1    column is the time.  That would be 1:43 a.m.  The second column

2    is the duration in seconds.  The first –– this is a telephone

3    number.  The first one is the originating number, so the number

4    making the outbound call.  The second number is the number

5    receiving the telephone call.

6    Q.  Are you familiar with the number 347–357–2215?

7    A.  Yes.

8    Q.  How are you familiar with that number?

9    A.  I have called it.

10   Q.  And who is associated with that number?

11   A.  Mr. Barea.

12         MR. ARAVIND:  Ms. Hansma, let's highlight entries 28

13   through 31.

14   Q.  Can you tell us, Special Agent Reynolds, according to your

15   analysis of the phone records, what do these calls represent?

16   A.  These are all outbound calls from that 9462 John 129

17   telephone to Mr. Barea's 2215 number.  So, in essence, it's one

18   of Mr. Barea's phones calling the other Mr. Barea's phone.

19   Q.  After the entry at item number 31, what do you see?

20   A.  The date, so that's March 25 of 2013, the date of the

21   robbery, and the times range from 1:43 a.m. to 1:44 a.m.

22   Q.  What happens ––

23         THE COURT:  I am going to interrupt for one second.  I

24   don't think I actually admitted 160A, B, C, D, F and G.  They

25   are admitted.

1          (Government's Exhibits 160A, B, C, D, F and G received

2     in evidence)

3     Q.  After the line 31, what is the next time that you see?

4     Item 32, what is the time that you have associated?

5     A.  2:17 a.m. in the morning.

6          MR. ARAVIND:  Ms. Hansma, can we now unhighlight what

7     you've already highlighted and let's look at entries 32 to 34.

8     Q.  What do these three phone calls represent?

9     A.  Those are outbound phone calls placed by the 8485 Groovy

10    number to the 9462 John 129 contact with the Barea phone.

11    Q.  Special Agent, have you seen this 8485 number before?

12    A.  Yes, I have.

13         MR. ARAVIND:  Ms. Hansma, can we publish Government

14    Exhibit 601B.

15    Q.  And what is this, Special Agent Reynolds?

16    A.  That is a contact, again, from Mr. Brown's iPhone for Grovy

17    or Groovy.  That's the 8485 number associated with it.

18    Q.  Now, Special Agent Reynolds, I want to direct you to phone

19    calls that occurred after the robbery on March 26, 2013.

20         MR. ARAVIND:  Ms. Hansma, can we go back to the

21    summary chart that Special Agent Reynolds created as Government

22    Exhibit 5002.  Let's turn to page 6, please.  Can we highlight

23    calls involving the 845-642-1507 number.

24    Q.  Let's look at the calls at 10:21 involving the 845-642-1507

25    number.

1          THE COURT:  What day is this?

2          MR. ARAVIND:  This is March 26, 2013 at 10:21.

3          THE COURT:  10:21 in the morning?

4          MR. ARAVIND:  Correct.

5          Ms. Hansma, can you highlight the other entries with

6     the 845 number.

7     Q.  Whose number is that, 845-642-1507?

8     A.  It was a phone number utilized by Detective Deloren.

9     Q.  And what do these phone calls represent?

10    A.  These are incoming calls to Tyrone Brown's iPhone from

11    Detective Deloren.

12    Q.  What happens approximately 30 minutes after this series of

13    calls?

14          Just to be clear, Special Agent Reynolds, what is the

15    significance of the time that we see, 7, 14, 4, 5, 4, 2, and 3?

16    A.  Duration of seconds, telephone calls.

17    Q.  Does that suggest a long conversation or what?

18          MR. DRATEL:  Objection.

19          THE COURT:  Sustained.

20    Q.  What, if anything, do those time numbers anywhere from two

21    seconds to 14 seconds signify to you?

22          MR. DRATEL:  Objection.

23          THE COURT:  I'll allow it.

24    A.  It's brief, so voice mail.

25          MR. DRATEL:  Objection.

1           THE COURT:  How can you tell?  Is this one call or two
2      calls?
3           THE WITNESS:  No, ma'am.  These are all separate phone
4      calls, ma'am.
5           THE COURT:  So between 10:21 and 10:23 there are six
6      calls?
7           THE WITNESS:  Correct, ma'am.
8           THE COURT:  From Deloren to Brown?
9           THE WITNESS:  Correct, ma'am.  If I may -- okay.
10     Q.  Would these be completed calls or calls where you attempt
11     to call someone?
12     A.  I believe it's -- it's not just based on the duration --
13          MR. DRATEL:  Objection.  He's not in the position to I
14     believe --
15     Q.  Special Agent Reynolds, do you know?
16     A.  There is no definitive answer.
17     Q.  Special Agent Reynolds, what happens approximately 30
18     minutes after this series of calls?
19          MR. ARAVIND:  Ms. Hansma, why don't we zoom out and
20     let's go to a call that's at 10:53:48 and then 10:53:56.
21          THE COURT:  Still on March 26.
22          MR. ARAVIND:  Still on March 26, the day after the
23     robbery.
24          Those two calls there with that 717 number, can we
25     highlight both of those, please.

1           Thank you, Ms. Hansma.

2   Q.  What does this reflect, Special Agent Reynolds?

3   A.  Brown's iPhone placing outbound calls to the 6130 Twizzie

4   number.

5   Q.  Based on your review of this chart, did you obtain cell

6   site records for the Twizzie phone ending in 6130?

7   A.  Yes, I did.

8   Q.  And can you tell the jury briefly what are cell site

9   records?

10  A.  In addition to cell phone companies logging the incoming

11  and outgoing calls, the time, the duration, they will also log

12  the information of the cell towers that are being utilized for

13  those phone calls.  With those towers, they will have the

14  location data for where those towers are.

15  Q.  Are you going to testify to cell site records?

16  A.  No, I am not.

17  Q.  What, if anything, did you do with the cell site records

18  that you obtained?

19  A.  After obtaining the records for the Twizzie 6130 phone, I

20  provided those records to our CAST unit, which stands for

21  cellular analysis survey team.  They specialize in tracking and

22  plotting cell site tower information.

23  Q.  I am going to show you now what was admitted into evidence

24  as Government Exhibit 5000.

25          We looked at this chart yesterday, Special Agent

1   Reynolds.  Can you remind the jury, what do these records

2   reflect?

3   A.   These records reflect a ten-day period beginning with March

4   17, 2013 to March 27, 2013, and what I did is, I filtered

5   Mr. Brown's phone records just to reflect the activity between

6   that Brown iPhone and the Barea telephone numbers of the Groovy

7   and the John 129 and the Twizzie phone numbers.  So this just

8   shows contact between the Brown iPhone, Twizzie, and the Barea.

9            MR. DRATEL:  Objection, your Honor, as to phone

10   numbers.

11            THE COURT:  Sustained.

12   Q.   Did you mean the Twizzie 6130 phone?

13            MR. DRATEL:  Objection.  It's not a Twizzie.  It's a

14   6130 number.  That's what these numbers --

15            THE COURT:  Sustained.  You can rephrase.

16   Q.   Special Agent Reynolds, let's read out the phone numbers

17   for the jury.  What phone numbers does this chart reflect?

18   A.   First Brown iPhone ending in 9696, and then the telephone

19   number, it's in contact with telephone number 717-743-6130, and

20   also 917-370-9462.  One more number.  917-935-8485.

21   Q.   Now, let's just start with March 17 and 18.  Based on your

22   review of these phone calls as indicated in this chart, what

23   did you find?

24   A.   So looking at the 17th going into the 18th, which was a

25   week prior to the 24th and the 25th, which was the robbery time

1    frame, that week prior, on the 17th and the 18th, the Brown

2    iPhone is in contact with the 6130 number, associated with the

3    Twizzie contact and the 9462 number; again, the John 129

4    contact.

5    Q.  What about on the 23rd?

6    A.  Again, on the 23rd, the same, that day.  The Brown phone,

7    again, is in contact with the 9462 John 129 contact and the

8    Twizzie 6130 contact.

9              MR. DRATEL:  Objection, your Honor.  6130 number?

10             THE COURT:  6130 number which is associated with the

11   Twizzie contact.

12             MR. DRATEL:  If he wants to do the whole thing, that's

13   fine.

14             THE COURT:  If you want to say which is associated

15   with, that's fine.

16             THE WITNESS:  Yes, ma'am.

17             (Continued on next page)

18

19

20

21

22

23

24

25

1   BY MR. ARAVIND:

2   Q.  What about the 23rd?  Ms. Hansma, can we look at those.

3   Thank you.

4        What did you conclude about the pattern of calls

5   between the 6130 number and the other two numbers on this

6   chart?

7   A.  Again, the same, that Brown iPhone number is in contact

8   with both the 6130 number and the 9462 number.

9   Q.  And then finally, Ms. Hansma, let's look at March 26, 2013,

10  the day after the robbery.

11       And what do you -- what can you conclude about those

12  calls, that pattern of calls between those three phone numbers?

13  A.  Again, the same day, that March 26, that the Brown iPhone

14  9696 number calls the 613 number associated with the Twizzie

15  contact and the 8485 telephone number associated with the

16  Groovy contact.

17  Q.  Special Agent Reynolds, you testified a lot about the 6130

18  number that was associated with the Twizzie contact.  Did you

19  take any steps to identify the user of that 6130 number who was

20  listed as the Twizzie contact?

21  A.  Yes.  After seeing that telephone number in contact with

22  the Brown iPhone 9696 that he, you know, just prior and during

23  the robbery time frame, I attempted to identify the user of

24  that phone.  One of the things that I did was, I provided that

25  6130 number that was listed under the Twizzie contact with the

1    other telephone number that was listed under that contact.

2              I gave those numbers to the NYPD to see if it had ever

3    contacted the NYPD or had been listed on any various police

4    reports.

5    Q.  Let's look at that other number.  Ms. Hansma, can we

6    publish Government Exhibit 601-D.  Can you highlight the number

7    that we're referring to and the other one, Ms. Hansma.  Thank

8    you.

9              What did you do with respect to that 3425 number?

10   A.  That number, along with the other 6130, I gave both numbers

11   to the New York City Police Department.

12   Q.  Why were you doing this, Special Agent Reynolds?

13   A.  Again, in an attempt to ID the Twizzie contact who -- the

14   user of the cell phones.

15   Q.  Did you receive any information from the NYPD?

16   A.  Yes, I did.

17   Q.  Your Honor, we have a stipulation to read.

18             THE COURT:  Okay.

19   Q.  It's Government Exhibit 2005.

20             THE COURT:  It hereby stipulated and agreed by and

21   between the United States of America by Preet Bharara, United

22   States Attorney for the Southern District of New York, Negar

23   Tekeei and Santosh Aravind, Assistant United States Attorneys,

24   and Antione Chambers, the defendant, by and through the consent

25   of his attorney, Joshua Dratel that:

1          (1) If called to testify, a custodian of records from

2     the New York City Police Department would testify as follows:

3          (a) He or she is familiar with the recordkeeping

4     practices of the NYPD, in particular with respect to the 9-1-1

5     emergency call system and the method by which data regarding

6     9-1-1 calls are recorded by the NYPD.

7          (b) NYPD 9-1-1 emergency call system records reflect

8     that on February 2, 2013, a male caller who identified himself

9     as Antwan, spelled A-N-T-W-A-N, called 9-1-1 from a telephone

10    with a call number 717-379-3425 and identified his location as

11    4782 Barnes Avenue.  The 9-1-1 call was placed for an ambulance

12    and was not related to any criminal activity.

13         It is further stipulated and agreed that the

14    stipulation, this Government Exhibit 2005, is admissible in

15    evidence as a government exhibit at trial.

16         Therefore I will admit it.  It's signed by the

17    lawyers.

18         (Government's Exhibit 2005 received in evidence)

19    BY MR. ARAVIND:

20    Q.  Special Agent Reynolds, after you obtained a copy of the

21    9-1-1 records, what did you do next?

22    A.  I went to 4782 Barnes Avenue.

23    Q.  What day did you go?

24    A.  May 23, 2013.

25    Q.  Who did you go with?

Ea2gcha2                          Reynolds - direct

1    A.  Detective Deloren and Detective Angelo Tessitore.

2    Q.  Did you know the name Antione Chambers when you went to

3    4782 Barnes Avenue?

4    A.  No, I did not.

5    Q.  Did you know what Antione Chambers looked like?

6    A.  No, I did not.

7    Q.  Did you have a picture of Antione Chambers on that day?

8    A.  No, I did not.

9    Q.  Where is 4782 Barnes Avenue located?

10   A.  It's in the very northern part of the Bronx on the

11   Bronx/Mount Vernon border.

12   Q.  What kind of location is it?

13   A.  It's a house.

14   Q.  I'm showing you what has been premarked for identification

15   as Government Exhibit 1903.

16          Do you recognize this document, once it is handed to

17   you, Special Agent Reynolds?

18   A.  Yes.

19   Q.  What is it?

20   A.  It's a partial map of the northern part of the Bronx.

21   Q.  Does that map include any locations that we have been

22   talking about?

23   A.  Yes, it does.  Highlighted is the 4782 Barnes Avenue

24   address.

25   Q.  Does that map fairly and accurately reflect the vicinity of

1   4782 Barnes Avenue?

2   A.  Yes, it does.

3         MR. ARAVIND:  Government offers Government Exhibit

4   1903.

5         THE COURT:  Any objection?

6         MR. DRATEL:  No objection.

7         THE COURT:  Admitted.

8         (Government's Exhibit 1903 received in evidence)

9         MR. ARAVIND:  Can I publish.

10        THE COURT:  You may.

11  Q.  Show us on this map using a laser pointer, show us where

12  4782 Barnes Avenue is.

13  A.  Right where the red balloon is.

14  Q.  Is 4782 Barnes Avenue -- can we zoom in a little bit

15  Ms. Hansma.  Thank you.  This in the -- what part of the Bronx

16  is this in?

17  A.  Again, it's the northern part of the Bronx.

18  Q.  Thank you, Ms. Hansma.

19        I'm now going to show you what has been marked for

20  identification as Government Exhibit 61.

21        Thank you, Mr. Street.

22  A.  Thank you.

23  Q.  Do you recognize that document?

24  A.  Yes, I do.

25  Q.  What is it?

1    A.  It's a picture I took of 4782 Barnes Avenue.

2    Q.  Is that a photograph?

3    A.  Yes, it is.

4    Q.  Does that photograph fairly and accurately reflect 4782

5    Barnes Avenue?

6    A.  Yes, it does.

7            MR. ARAVIND:  The government offers Government Exhibit

8    61.

9            MR. DRATEL:  No objection.

10           THE COURT:  It's admitted.

11           (Government's Exhibit 61 received in evidence)

12           MR. ARAVIND:  May we publish.

13           THE COURT:  You may.

14   Q.  If you can zoom in Ms. Hansma.  Thank you.  Thanks.

15           Special Agent Reynolds, what happened when you got to

16   4782 Barnes Avenue?

17   A.  As we approached 4782 Barnes Avenue, I observed a car

18   parked in front on the street that matched the description of

19   the vehicle used in the robbery.

20   Q.  And you say matched the description, what do you mean by

21   that?

22   A.  It was a similar color, similar make, but it also had

23   license plate where six out of the seven digits or numbers

24   matched one previously provided by the victims.

25   Q.  And what was that, if you remember?

Ea2gcha2                          Reynolds - direct

1   A.  The numbers, the last four numbers were 7788, and I believe

2   the two letters were A as in Adam and K as in king.

3   Q.  Based on your training and experience in investigating

4   crimes of violence, what's your experience with descriptions

5   provided by victims about something like a car?

6            MR. DRATEL:  Objection.

7            THE COURT:  Lay more of a foundation.

8   Q.  Special Agent Reynolds, how long have you been

9   investigating crimes of violence?

10  A.  I've been an FBI agent for eight years.  And prior to that,

11  I was a police officer for six years.

12  Q.  Have you spoken to victims?

13  A.  Yes, I have.

14           THE COURT:  How many years of that 14 years were you

15  investigating crimes of violence?

16           THE WITNESS:  As a police officer -- as a police

17  officer, as an anticrime police officer, I -- we dealt with

18  robberies, firearms, possession.  And as an FBI agent, out of

19  the eight years, maybe four or more I've been investigating

20  violent crimes.

21           THE COURT:  What's the total number?

22           THE WITNESS:  Six years maybe approximately.

23  Q.  Have you interviewed victims of crimes of violence?

24  A.  Yes.

25  Q.  What has been your experience with descriptions about

1   vehicles when you have spoken to victims of crimes of violence?

2              MR. DRATEL:  Objection.

3              THE COURT:  Sustained.  You may ask more foundational

4   questions.

5   Q.  Approximately, how many victims of crimes of violence have

6   you spoken with during the course of your career?

7   A.  I would say at least 50.

8   Q.  And how many of those victims have spoken to you about

9   vehicles or description -- descriptions of vehicles or people?

10             MR. DRATEL:  Objection; irrelevant for all three.

11             MR. ARAVIND:  May we approach on this issue.

12             THE COURT:  No.  I'm going to allow him to answer that

13  question.

14             THE WITNESS:  I'm sorry.  Can you repeat it.

15             MR. DRATEL:  Also it gets into --

16             THE COURT:  I understand.

17             MR. DRATEL:  And also 702.

18             MR. ARAVIND:  Can we make an application about this at

19  side bar.

20             THE COURT:  I think -- did we get an answer to that?

21  I'm going to allow an answer to that question:

22             How many have you spoken to about descriptions of

23  vehicles?

24  BY MR. ARAVIND:

25  Q.  You can answer.

Ea2gcha2                      Reynolds - direct

1    A.   Numerous.

2    Q.   And how many of those descriptions have been a perfect

3    match with the vehicle that you found associated with that

4    crime of violence?

5              MR. DRATEL:  Objection.

6              THE COURT:  I will allow that question.

7              If you recall.

8              THE WITNESS:  I'm sorry.  The question one more time.

9              (Record read)

10             MR. DRATEL:  I'm also objecting against the form.  The

11   two questions don't match.

12             THE COURT:  There was a question:  How many victims

13   have you spoken to about vehicles or descriptions of people,

14   and we got an answer to that.

15             Then there was a question about how many have you

16   spoken to about descriptions of vehicles, so I think you said

17   about 50 descriptions of vehicles or people.

18             And how many of those were descriptions of vehicles?

19             THE WITNESS:  It's hard to tell, ma'am.  Numerous.

20             THE COURT:  Can you approximate.  If you can't, that's

21   fine, but can you?

22             THE WITNESS:  I'm sorry.  I can't.  It's a lot.

23   Q.   Let me try it this way.

24             THE COURT:  You may.

25   Q.   When you get a description of a vehicle from a victim, what

Ea2gcha2                          Reynolds - direct

1   do you do?

2               MR. DRATEL:  Objection.

3               THE COURT:  I'll allow this question.

4   A.  Attempt to locate -- attempt to locate it.

5   Q.  Attempt to locate what?

6   A.  The vehicle.

7   Q.  What parameters do you use when you're attempting to locate

8   a vehicle?

9               MR. DRATEL:  Objection.

10              THE COURT:  I'll allow it.

11  A.  Again, if somebody provides me with a description in this

12  case of a car, if they provide a make, a year, a color, I'm not

13  just going to look for that specific make or color or year, you

14  know.  I'm going to look for similar makes, similar styles,

15  similar colors, that sort of thing.

16  Q.  Did you do anything to investigate the car that you

17  observed in the vicinity of 4782 Barnes Avenue?

18  A.  Yes.  After observing the car, we decided to basically

19  conduct a surveillance, watch the vehicle.

20  Q.  Before doing that, did you do anything else?

21  A.  Yes, we also ran a license plate.

22              MR. ARAVIND:  We have another stipulation to read.

23              THE COURT:  Okay.  It is hereby stipulated and agreed

24  by and between the United States of America by Preet Bharara,

25  U.S. Attorney for the Southern District of New York, Negar

Tekeei and Santosh Aravind and Antione Chambers, the defendant,

by and through the consent of his attorney, Joshua Dratel that:

(1) If called to testify, a witness from the North Carolina

Division of Motor Vehicles or NCDMV would testify as follows:

          (a) That he is an employee of the NCDMV with

responsibilities for processing registration information.

          (b) He is familiar with the record-keeping practices

of the NCDMV as they pertain to registration information.

          (c) Government Exhibit 902 reflects registration

records for a 1995 Honda Accord bearing license plate sequence

AKW7788 registered to Zaporia DEAUAA Dunbar.

          (d) The records contained in Government Exhibits 902

are records of regularly conducted activity within the meaning

of Federal Rule of Evidence 803(6).

          It is further stipulated and agreed that the

stipulation is Government Exhibit 2003 and Government Exhibit

902 are admissible in evidence as government exhibits at trial.

          I will admit Exhibits 2003 and 902, and I will also

admit all of the stipulations that I have already read.  And

this is signed by counsel for the parties.

          (Government's Exhibits 902, 2003 received in evidence)

Q.  Special Agent Reynolds, when you say you were doing

surveillance, what does that mean?

A.  Sitting in our car, watching that car.

Q.  Did there come a time when you saw someone enter that car?

Ea2gcha2                          Reynolds - direct

1   A.  Yes.

2   Q.  Was it a man or a woman?

3   A.  Woman.

4   Q.  What did you do?

5   A.  The vehicle left, so we followed the vehicle.

6   Q.  What did you do?

7   A.  We observed the vehicle stop at a local school, pick up

8   children, and then we went back to the residence without

9   following the car and the car a short time later came back.

10  Q.  What happened when the car came back?

11  A.  When the car came back, we went to 4782 Barnes Avenue to

12  talk to that female.

13  Q.  Did there come a time when you took photographs of that

14  car?

15  A.  Yes.

16  Q.  I'm showing you what has been premarked for identification

17  as Government Exhibits 400-A, 400-B, 400-C and 400-D.

18  A.  Thank you.

19  Q.  Do you recognize those items?

20  A.  I do.

21  Q.  What are they?

22  A.  They are photographs of the vehicle that we -- I have been

23  talking about.

24  Q.  When were these photographs taken?

25  A.  On May 23rd, the day that I found it and was -- conducted

 1   the interview.

 2   Q.  Who took the photographs?

 3   A.  Detective Deloren.

 4   Q.  Were you present when these photographs were taken?

 5   A.  Yes, I was.

 6              MR. ARAVIND:  Government offers Government Exhibit

 7   400-A, 400-B, 400-C, 400-D.

 8              MR. DRATEL:  No objection.

 9              THE COURT:  They're admitted.

10              (Government's Exhibits 400-A, 400-B, 400-C, 400-D

11   received in evidence)

12              MR. ARAVIND:  May I publish.

13              THE COURT:  You may.

14   Q.  Let's go to 400-A, Ms. Hansma.

15              What is that, Special Agent Reynolds?

16   A.  That's the picture of the car from the front.

17   Q.  And approximately where in location are we to 4782 Barnes

18   Avenue?

19   A.  The first red brick house that you see back there.

20   Q.  You're indicating the top right-hand corner of Government

21   Exhibit 400-A.  Thank you.  Let's go to 400-B, please.

22              Again, what is that?

23   A.  A picture from the other side, from the front.

24   Q.  400-C?

25   A.  Side picture.

Ea2gcha2                              Reynolds - direct

1    Q.   And 400-D?

2    A.   The rear including the license plate.

3    Q.   Ms. Hansma, can we zoom in on the license plate, please.

4    Can you read that out for the jury?

5    A.   Sure.  It's a North Carolina license plate, A as in Adam, K

6    as in king, W as in William, 7788.

7    Q.   Thank you, Ms. Hansma.

8            Did there come a time when you spoke with anyone on

9    May 23, 2013?

10   A.   Yes.

11   Q.   Who did you speak with?

12   A.   Ms. Zaporia Dunbar.

13   Q.   Without telling us what she told you, what did you do?

14   A.   I spoke with Ms. Dunbar, I tried to ascertain if --

15           MR. DRATEL:  Objection, not during the conversation,

16   but what he did after I assume was the question.  It's hearsay.

17           THE COURT:  Right.

18           As Mr. Aravind said, don't say what she said.

19           THE WITNESS:  Correct.

20           THE COURT:  Then you may proceed.

21   Q.   Did you say anything to Ms. Dunbar?

22   A.   Yes, I did.

23           MR. DRATEL:  Objection, hearsay.

24           MR. ARAVIND:  Your Honor --

25           THE COURT:  It's not offered for the truth.  It's a

1    question.

2              First, did you say anything to Ms. Dunbar?

3              THE WITNESS:  Yes, I did.

4              THE COURT:  Were they statements of fact or were they

5    questions or what were they?  What did you say without telling

6    me the content.

7              THE WITNESS:  Sure.  Both.  I made some statements and

8    then I also asked some questions.

9              THE COURT:  Okay.  So you may proceed.

10   Q.  What questions did you ask?

11   A.  I asked her if there was any males living with her and who

12   the father of her children was, and I also told her that I

13   believed her vehicle had been used --

14             MR. DRATEL:  Objection.

15             THE COURT:  Yes.  That is sustained.

16   Q.  What did you do after you spoke with Ms. Dunbar?

17   A.  I attempted to ascertain who the father of her children

18   was.

19   Q.  Did you go inside of 4782 Barnes Avenue?

20   A.  Yes, I did.

21   Q.  And did you see Antione Chambers that day?

22   A.  No, I did not.

23   Q.  Did you conduct any other further investigation to identify

24   Antione Chambers that day?

25   A.  Yes, yes, I did.

1   Q.  Tell us what are the things that you did.

2   A.  Again, we tried to ascertain the father of her children by

3   contacting -- I'm sorry.  Could you repeat the question.

4   Q.  What else did you do to identify the father of -- strike

5   that.  Let me go back.

6          Did you ask any questions related to Twizzie when you

7   spoke to Ms. Dunbar?

8   A.  No.

9   Q.  Did there come a time when you obtained a birth certificate

10  as part of this case?

11  A.  Yes.

12  Q.  I'm showing you what's been marked for identification as

13  Government Exhibit 901.  Do you recognize this document?

14  A.  I do.

15  Q.  What is it?

16  A.  It's a birth certificate from the City of New York.

17  Q.  How did you obtain this birth certificate?

18  A.  Through a grand jury subpoena.

19  Q.  And from which agency?

20  A.  From the New York City Department of Health and Mental

21  Hygiene.

22  Q.  And who is the person for whom you obtained the birth

23  circuit?

24  A.  For Dante Chambers.

25          MR. ARAVIND:  Government offers Government Exhibit

Ea2gcha2                        Reynolds - direct

1   901.

2               MR. DRATEL:  No objection.

3               THE COURT:  It's admitted.

4               (Government's Exhibit 901 received in evidence)

5               MR. ARAVIND:  May I publish.

6               THE COURT:  You may.

7   Q.  Did you tell us the name of the child that is referenced in

8   the first line?

9   A.  Yes.  That's Dante Chambers.

10  Q.  Can you tell us under 6A who the mother's name is?

11  A.  Yes.  Zaporia Dunbar.

12  Q.  And can you tell us who the father is on item 8A?

13  A.  Antione Chambers.

14  Q.  Your Honor, just returning this to the -- what is the

15  address associated on this birth certificate?

16  A.  The mother's residence is 4782 Barnes Avenue in the Bronx.

17  Q.  Thank you, Special Agent Reynolds.

18              MR. ARAVIND:  We have another stipulation your Honor

19  to read at this time.

20              THE COURT:  Okay.  If it's okay with everyone, I'm

21  going to skip the first paragraph that says it's hereby agreed

22  by everyone.

23              It reads:  If called to testify, a systems information

24  specialist officer from the Metropolitan Detention Center or

25  MDC, would testify that:

Ea2gcha2                         Reynolds - direct

1    (a) The MDC is a federal detention facility in

2    Brooklyn, New York, and is operated by the U.S. Bureau of

3    Prisons.

4    (b) The MDC permits inmates to use a monitored email

5    system, the inmates are advised that their email may be

6    monitored.

7    (c) The MDC maintains a digital recording system that

8    automatically records telephone calls made by inmates to

9    individuals other than their legal counsel.  Signs by the

10   telephones in the MDC indicate that such calls are recorded.

11   (d) Government Exhibit 125 contains a true and correct

12   recording of a telephone call by Antione Chambers on

13   November 25, 2013.

14   (e) From November 2, 2013 to January 12, 2014, there

15   were approximately 82 telephone calls involving Mr. Chambers

16   and all were recorded.

17   (f) Through the MDC email system, Antione Chambers

18   exchanged numerous emails with an individual referred to as

19   Zaporia with the email address zapdunbar@hotmail.com.

20   (g) From November 1, 2013 to December 22, 2013, there

21   were hundreds of emails to which he was a party, all of which

22   were preserved.

23   It is further stipulated and agreed that the

24   stipulation is Government Exhibit 2004 and Government Exhibit

25   125 are admissible in evidence as government exhibits at trial.

Ea2gcha2                        Reynolds - direct

1     Signed by the parties, dated October 1.

2               I will admit those exhibits, so Exhibits 2004 and 125

3     are admitted.

4               (Government's Exhibits 125, 2004 received in evidence)

5               MR. DRATEL:  Brief side bar.

6               MR. ARAVIND:  Or we can take a break.

7               THE COURT:  It may be a good break time.  No, it's not

8     a good break time.  We're going to have a side bar.

9               (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the side bar)

2          MR. DRATEL:  I apologize for needing a side bar for

3    this, but that stipulation I would ask for a limiting

4    instruction.

5          THE COURT:  What do you want it to be?

6          MR. DRATEL:  Just to say that the fact that he's in a

7    pretrial detention facility for this case, they should not

8    consider it, there's no evidentiary value, the presumption of

9    innocence applies.

10         MR. ARAVIND:  That's fine.

11         (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court; jury present)

2              THE COURT:  Ladies and gentlemen, apropos of the

3    stipulation I just read to you, the evidence that Mr. Chambers

4    was in the MDC, which is a pretrial detention center and the

5    fact that he was detained in the pretrial detention center is

6    not something you should consider or draw any conclusions from.

7    It's not evidence.  You should disregard that part of it

8    entirely.

9              MR. ARAVIND:  Thank you, Judge.

10   Q.  I'm going to show you what's been marked for identification

11   as Government Exhibit 125-T.  Thank you, Mr. Street.

12             Do you recognize that, Special Agent Reynolds?

13   A.  Yes, yes.

14   Q.  Is that a excerpt of -- a transcript of an excerpt of a

15   call that is referenced in Government Exhibit 125?

16   A.  Yes.

17             MR. ARAVIND:  Government offers Government Exhibit

18   125-T.

19             MR. DRATEL:  No objection.

20             MR. ARAVIND:  At this time, may we publish 125, which

21   is the call and then 125-T, which is in the jury binders.

22             THE COURT:  I'll admit 125-T and you may publish both.

23             (Government's Exhibit 125-T received in evidence)

24             MR. ARAVIND:  Thank you.  We'll just do the excerpt.

25             THE COURT:  Do the jurors have the transcript?

1           MR. ARAVIND:  It should be 125-T in the jury binders.

2           THE COURT:  Okay.

3           MR. ARAVIND:  I'm happy to publish it on the screen,

4    your Honor.  It's very short.

5           THE COURT:  It is very short.  Do you want to put it

6    on the screen.  That's probably easier than fishing around for

7    it.

8           (Audio recording played)

9    Q.  Thank you, Ms. Hansma.

10          Special Agent Reynolds, are you familiar with an

11   individual named Kentrell Ferguson?

12   A.  Yes, I am.

13   Q.  Have you spoken to Mr. Ferguson?

14   A.  Yes, I have.

15   Q.  Let's publish Government Exhibit 4000 as soon as Ms. Hansma

16   is ready.  What is this?  What is in Government Exhibit 4000

17   that's been admitted into evidence?

18   A.  It's a picture of a contact from Mr. Ferguson's phone.

19   Q.  What's the name at the top?

20   A.  Twizzie.

21          MR. ARAVIND:  At this time, we would offer Government

22   Exhibit 4C, which is the nameplate Twizzie.

23          THE COURT:  Any objection?

24          MR. DRATEL:  No objection.

25          THE COURT:  It's admitted.

1              (Government's Exhibit 4C received in evidence)

2              MR. ARAVIND:  And also Government Exhibit 4D, which is

3    the nameplate Twiz.

4              MR. DRATEL:  No objection.

5              THE COURT:  Admitted.

6              (Government's Exhibit 4D received in evidence)

7              THE COURT:  You may publish.

8    Q.  Special Agent Reynolds, did there come a time when you had

9    interviewed other people about Mr. Chambers' whereabouts?

10   A.  Yes.

11   Q.  When were those interviews conducted?

12   A.  On May 30th, 2013.

13   Q.  Approximately how long was that after your interview with

14   Ms. Dunbar?

15   A.  Seven days later.

16   Q.  Whom did you interview?

17   A.  I interviewed Mr. Chambers' mother and his sister.

18   Q.  Did you ask those people questions?

19   A.  Yes, I did.

20   Q.  What questions did you ask?

21   A.  Where Mr. Chambers -- if they knew where Mr. Chambers was.

22   Q.  Did you locate Mr. Chambers on May 30, 2013?

23   A.  I did not.

24   Q.  Did there come a time when you spoke to an individual named

25   Isaac Nelson?

1   A.  Yes.

2   Q.  Who is that?

3   A.  The landlord for 4782 Barnes Avenue.

4   Q.  When did you speak to Mr. Nelson?

5   A.  Also on the 30th.

6   Q.  What questions did you ask him?

7   A.  If he had seen Ms. Dunbar or Mr. Chambers.

8   Q.  Based on your conversations with the landlord, did you

9   learn the wheres about of Antione Chambers or Zaporia Dunbar?

10  A.  No, I did not.

11          MR. DRATEL:  Objection, your Honor.  Move to strike,

12  "Did he learn."

13          THE COURT:  I'll allow it.

14  Q.  Ms. Hansma, can we now publish Government Exhibit 160-A.

15  If we can highlight the very top where it says "call records."

16          What is that number, (646)503-8904?

17  A.  That's the telephone number for Ms. Dunbar.

18  Q.  How do you know that?

19  A.  I've called it.

20  Q.  Have you reviewed what's been admitted into evidence as

21  Government Exhibit 160-A?

22  A.  Yes.

23  Q.  And what is this document?

24  A.  It's call records that I had subpoenaed for her phone

25  number.

1   Q.  What did you learn based on your review of these phone

2   records?

3   A.  I spoke to Ms. Dunbar on the 23rd and after the 23rd, there

4   was no longer any outbound calls or activity on the telephone.

5   Q.  Ms. Hansma, let's look at page 81 of this PDF, which is

6   Government Exhibit 160-A.

7           Let's look at the last outbound call, which is

8   5/23 -- what's the date that you see there, Special Agent

9   Reynolds?

10  A.  May 23rd, 2013.

11  Q.  Is that the last outbound call on these records?

12  A.  Yes.

13  Q.  So what does that mean for the jury?

14  A.  The phone was stopped being used on the 23rd.

15          MR. DRATEL:  Objection.  These are no more outbound

16  calls --

17          THE COURT:  Sustained.

18  Q.  What does it mean about whether this phone was used with

19  respect to any outbound phone calls?

20  A.  It was no longer used for outbound phone calls.

21  Q.  Let's look at the inbound calls after this date.

22  Ms. Hansma, if you then zoom down.  Do you see any inbound

23  calls -- actually, let's go to the next page.  I'm sorry, page

24  82, and if you can go one more column over.

25          What do you see about the duration of these inbound

Ea2gcha2                          Reynolds - direct

1   calls?

2   A.  They're all two seconds long or one and zero.

3   Q.  And after -- do you have any records past May 29, 2013?

4   A.  I do not.

5   Q.  I want to show you now what's been premarked for

6   identification as government exhibit -- just one moment.

7          Special Agent Reynolds, did you ask for any phone

8   records beyond May 29, 2013 for this phone?

9   A.  I don't believe so.

10  Q.  Was this phone ever used to your knowledge after that date?

11         MR. DRATEL:  Objection.

12         THE COURT:  Sustained.

13  Q.  I'm going to show you what has been premarked for

14  identification as Government Exhibit 5003.

15         Do you recognize this item?

16  A.  I do.

17  Q.  What is this item?

18  A.  It's a summary of the numbers that I've talked about that I

19  helped prepare.

20  Q.  Did you assist in the preparation of this chart?

21  A.  Yes, I did.

22  Q.  Did you review it for accuracy and compare it to the

23  underlying phone records?

24  A.  Yes.

25         MR. ARAVIND:  Government offers Government Exhibit

1   5003 as a summary chart and an aid to the jury.

2              THE COURT:  Any objection?

3              MR. DRATEL:  No, your Honor.

4              THE COURT:  I'll allow it.  It's admitted.

5              You may publish.

6              (Government's Exhibit 5003 received in evidence)

7              MR. ARAVIND:  Thank you.

8   Q.  Can you zoom in.

9              Can you tell us what the description is for the column

10  all the way to the left.  What is that?

11  A.  That's the description that I gave it.

12  Q.  And phone number, what does that mean?

13  A.  That's the telephone number.

14  Q.  The name listed in the Brown iPhone, what does that mean?

15  A.  What that refers to is that's the contact that that phone

16  number was under in the Brown iPhone.

17  Q.  And, again, that's Government Exhibit 601?

18  A.  Yes, sir.

19  Q.  What's the next column?

20  A.  The next column is for how those names -- how the names and

21  phone numbers were listed in the Brown Pantech phone.

22  Q.  The next column?

23  A.  That is how -- describes how the contact and associated

24  phone number was listed in the Kentrell Ferguson phone.

25  Q.  The next column?

1   A.  That indicates toll records that we have for the phone

2   numbers.

3   Q.  If you have any, if you have any?

4   A.  If we have any, yes.

5   Q.  What about the last column?

6   A.  It indicates whether there is cell site records for that

7   telephone number.

8   Q.  Thank you, Ms. Hansma.

9        Special Agent Reynolds, did there come a time when you

10  obtained an arrest warrant for Mr. Chambers?

11  A.  Yes.

12  Q.  When was that?

13  A.  I believe it was June 20 of -- no, excuse me.  It was early

14  June of 2013, the 11th.

15  Q.  What did you have to do to obtain an arrest warrant?

16  A.  Swear out a complaint in front of a judge.

17  Q.  After you obtained an arrest warrant, what did you do with

18  respect to Mr. Chambers?

19  A.  I continued to try to locate Mr. Chambers and the other

20  thing that I did was, I entered the warrant into the NCIC

21  database.

22  Q.  What does that mean, the NCIC database?

23  A.  The NCIC database is a system that is oversaw by the FBI,

24  but it connects law enforcement computers across the country,

25  including the Department of Motor Vehicles.

Ea2gcha2                           Reynolds - direct

1   Q.  Were you looking for any targets in your investigation of

2   this home invasion robbery at this time?

3   A.  Yes.

4   Q.  Who?

5   A.  Mr. Glisson.

6   Q.  What was -- what was Mr. Glisson's first name?

7   A.  Steven.

8   Q.  And what's his nickname?

9   A.  Dee.

10   Q.  Did there come a time when you arrested Mr. Glisson?

11   A.  Yes.

12   Q.  When was that?

13   A.  June 20 of 2013.

14   Q.  Where did you arrest him?

15   A.  In Brentwood, New York, out in Long Island.

16   Q.  After arresting him, did you do anything else that day with

17   respect to that location?

18   A.  Yes.  I searched the bedroom where he was staying, which

19   was located at 123 Studley Street in Brentwood.

20   Q.  Did you seize any evidence during the course of that

21   search?

22   A.  Yes, I did.

23   Q.  What did you seize?

24   A.  Among other things, I recovered two magazines for a

25   semiautomatic pistol that was loaded with 9 millimeter

1    ammunition.

2    Q.  I'm going to show you what's been premarked for

3    identification as Government Exhibit 700.  Do you recognize

4    that item?

5    A.  I do.

6    Q.  What is it?

7    A.  It's the two magazines and the ammunition, the bullets.

8    Q.  Approximately how much ammunition did you find?

9    A.  There was 16 rounds in one magazine and four rounds in the

10   other magazine.

11            MR. ARAVIND:  Your Honor, the government offers

12   Government Exhibit 700.

13            MR. DRATEL:  No objection.

14            THE COURT:  It's admitted.

15            (Government's Exhibit 700 received in evidence)

16            MR. ARAVIND:  May I just publish it to the jury

17   without giving it to them or have Mr. Street do it.

18            THE COURT:  Mr. Street may.  Just show it to them.

19            MR. ARAVIND:  Thank you, Mr. Street.

20   Q.  Special Agent Reynolds, did there come a time when you were

21   able to locate Mr. Chambers?

22   A.  Yes.

23   Q.  When was that?

24   A.  July 3, 2013.

25   Q.  Did there come a time when you actually physically arrested

1    him?

2    A.  Yes.

3    Q.  And when was that?

4    A.  July 15, 2013.

5    Q.  Where did that happen?

6    A.  In Huntington, New Jersey.

7    Q.  What happened after you interviewed him -- what happened

8    after you arrested him?  Sorry.

9    A.  After arresting Mr. Chambers, again, that was out in New

10   Jersey, I had to drive him back to 26 Federal Plaza for arrest

11   processing.

12   Q.  And what happened then?

13   A.  During that time, I interviewed him.

14   Q.  Did you advise him of his Miranda rights?

15   A.  I did.

16   Q.  Did he make statements?

17   A.  He did?

18             MR. DRATEL:  Objection.

19             THE COURT:  Sustained.

20             MR. ARAVIND:  I'm sorry.

21             THE COURT:  I said sustained.  Please move on.

22             MR. ARAVIND:  Can we approach.

23             THE COURT:  Okay.

24             (Continued on next page)

25

1              (At the side bar)

2              MR. ARAVIND:  Your Honor, I am intending to elicit

3     certain of the defendant's postarrest statements.  The defense

4     has been on notice of these statements for over a year, I

5     believe.  There has not been a single motion to suppress those

6     statements.  I'm not sure why --

7              THE COURT:  What are we talking about?

8              MR. ARAVIND:  Postarrest statements made by

9     Mr. Chambers.

10             THE COURT:  You said Brown.

11             MR. DRATEL:  No.  He's talking about Chambers, but the

12    point is --

13             THE COURT:  Postarrest statements of Mr. Chambers?

14             MR. DRATEL:  I don't believe we got any of that.

15    There's no 302.

16             MR. ARAVIND:  Yes, there is; you have a 302.

17             MR. DRATEL:  It's 302 but I got it in 3500.  I don't

18    know because I got it in discovery.

19             MS. TEKEEI:  It was produced in August in 2013 in the

20    initial discovery.

21             MR. ARAVIND:  The defense has been on notice of these

22    statements for over a year.  I think it's a little bit late for

23    this motion to be happening.

24             THE COURT:  I agree.  I'm sorry.  I misheard.  I

25    thought you were talking about Brown.  You were talking about

Ea2gcha2                          Reynolds - direct

1    Chambers.

2              MR. ARAVIND:  We're not talking about Brown.

3              THE COURT:  You're talking about Chambers.

4              It's an admission against interest.  The defendant has

5    been on notice.  There was no motion.

6              MR. ARAVIND:  I'll be very brief.

7              MR. DRATEL:  As the Court is aware, I want to put on

8    the record, I was not the first lawyer in this case.  I was not

9    aware until I received the 3500 material that there was

10   anything about statements by Mr. Chambers.

11             THE COURT:  Okay.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                (In open court; jury present)

2    BY MR. ARAVIND:

3    Q.  Did Mr. Chambers make any statements after he was arrested?

4    A.  Yes.

5    Q.  What, if anything, did he say about Tyrone Brown?

6    A.  He said Tyrone Brown was somebody that he knew, but that he

7    didn't have much contact with.

8    Q.  What, if anything, did he say about Steven Glisson?

9    A.  Same thing.

10   Q.  What, if anything, did he say about Zaporia Dunbar?

11   A.  That he had a child with Ms. Dunbar and that he had called

12   9-1-1 in February of 2013 because she was having a child.

13   Q.  What did he say about any cars?

14   A.  He said that Zaporia Dunbar doesn't let him drive.

15           MR. DRATEL:  I'm sorry.  I didn't hear that.

16   "Zaporia."

17   A.  I'm sorry.  Ms. Dunbar doesn't let him drive the car.

18           THE COURT:  Does not.

19           THE WITNESS:  Does not.

20   Q.  And what, if anything, did he say about any items that you

21   searched in the car?

22   A.  He said the hammer in his car was one of the tools that he

23   uses to I believe work on houses.

24           MR. ARAVIND:  May I have just one moment.

25           THE COURT:  Yes.

1          MR. ARAVIND:  Nothing further, your Honor.

2          THE COURT:  Cross?

3          MR. DRATEL:  One moment, your Honor.

4   CROSS-EXAMINATION

5   BY MR. DRATEL:

6   Q.  Good afternoon, Agent Reynolds.

7   A.  Good afternoon.

8   Q.  Now, just to recap some things, you arrested Steven Glisson

9   June 20, 2013?

10  A.  Yes, sir.

11  Q.  In Brentwood, Long Island?

12  A.  Yes.

13  Q.  And you recovered ammunition, right?

14  A.  Yes, sir.

15  Q.  And Tyrone Brown arrested April 8, 2013, right?

16  A.  Yes, sir.

17  Q.  Recovered drugs and a scale, correct?

18  A.  Yes, sir.

19  Q.  And Tyrone Brown's height is about 5'6"?

20  A.  Yes.

21  Q.  And Mr. Chambers arrest, you first learned of his

22  whereabouts in terms of your attempts to locate him July 3rd,

23  2013, right?

24  A.  Yes, sir.

25  Q.  And that was from the New Jersey authorities?

Ea2gcha2                        Reynolds - cross

1    A.  Yes, sir.

2    Q.  And Government Exhibit 4, do you know what I'm talking

3    about.  It's the photo of Mr. Chambers.  I think it's the one

4    up there actually.

5    A.  Okay.

6    Q.  Is that photo taken at his processing?

7    A.  I'm sorry.  Our processing or the New Jersey processing?

8    Q.  No.  Your processing?

9    A.  I'm not sure.  I actually believe that that's the New

10   Jersey --

11   Q.  But you think -- okay.  So that's the New Jersey photo?

12   A.  I believe so.

13   Q.  Okay.  But that's a contemporaneous photo at the time,

14   right, from July 2013, to your knowledge?

15   A.  To my knowledge.

16   Q.  And you said that you swore out a complaint against

17   Mr. Chambers, correct?

18   A.  Yes, sir.

19   Q.  And the complaint was made public after your arrest of

20   Mr. Chambers, your federal arrest of Mr. Chambers, July 15,

21   right?

22   A.  Yes, sir.

23   Q.  And in the complaint, there's a section about Twizzie,

24   right, about trying to connect these phone numbers and things

25   like that, right?

Ea2gcha2                        Reynolds - cross

1    A.  I believe so.

2    Q.  Do you need to be sure or -- if I may approach, your Honor.

3           THE COURT:  You may.

4    Q.  Let me show you what's marked 3501-12.  I ask you to look

5    at the first full paragraph on the page and you can look at the

6    front of the document to get context.

7    A.  Sure.  Yes.

8    Q.  So that's in the complaint about the allegation of

9    Mr. Chambers and Twizzie, right?

10   A.  Yes.

11   Q.  Now, so you're familiar with the investigative file, right?

12   A.  Yes, sir.

13   Q.  And there are no reports by any NYPD or other persons

14   reflecting an interview with Demi Torres and we know who we're

15   talking about Demi Torres, she testified yesterday?

16           MR. ARAVIND:  Objection to hearsay, foundation.

17           THE COURT:  Overruled.

18   Q.  With respect to Ms. Torres, just so we know who we're

19   talking about, right, Ms. Torres, she testified yesterday, the

20   daughter of Ms. Torruella, right?

21   A.  Yes.

22   Q.  And there are no notes or memoranda of any interview of her

23   by NYPD or by anyone, there are no reflected notes of

24   interviews of her before January 24th, 2014; is that correct?

25   A.  Not that I recall.

Ea2gcha2                    Reynolds - cross

1   Q.  Right.  So you don't recall any other memorialization or

2   memos or anything like that?

3   A.  Yes, sir.

4   Q.  Right.  You don't recall.  Okay.  Thank you.

5          And if you had spoken to her, you would have prepared

6   a 302 on that, correct?

7          MR. ARAVIND:  Objection; calls for speculation.

8          THE COURT:  I'll allow it.

9   A.  Depending on the nature of the -- if it's an interview,

10  yes.

11  Q.  You prepared 302s on all these other interviews you did,

12  right?

13  A.  Yes.

14  Q.  All the ones you talked about, everyone is accompanied by a

15  302?

16  A.  I believe so.

17  Q.  You talked a little bit about cars, and vehicle

18  descriptions.  You had a conversation with assistant U.S.

19  Attorney Amy Lester, right, back towards the beginning of the

20  case, correct, the beginning of the investigation, right?

21  A.  I had multiple conversations with Ms. Lester.

22  Q.  And did you tell her during one of the conversations that

23  you were looking for a black Acura 1997/1998?

24  A.  I don't recall.

25  Q.  Let me show you what's marked 3501-36.  I just ask you to

1   look -- I'll highlight the spot where I'd like you to look.

2   Let me know when you're ready.

3           If that refreshes your recollection that you told

4   Ms. Lester, Assistant United States Attorney Ms. Lester, that

5   you were looking for a black Acura 1997/1998?

6   A.  No, sir.  These aren't notes in regards to a conversation I

7   had with Ms. Lester.

8   Q.  Did you have a conversation with anyone in the U.S.

9   Attorney's Office or anyone with respect to saying that you

10  were looking for a black Acura 1997/1998?

11  A.  Not that I recall.

12  Q.  Even looking at that document, you don't recall?

13  A.  I don't believe these are notes regarding a conversation

14  that I had.

15  Q.  By the way, you got that information about the black Acura

16  from -- withdrawn.  You got information about a black Acura,

17  correct?

18  A.  Yes, sir.

19  Q.  You got it from Detective Deloren, right?

20  A.  Yes, sir.

21  Q.  And that was 1997/98 year, that's -- you got that from him

22  as well, right?

23  A.  The description of the vehicle?

24  Q.  Yes.

25  A.  Yes, sir.

1  Q.  Now, with respect to Zaporia Dunbar, right, you did some

2  additional investigation, right?

3  A.  In terms of what?

4  Q.  Trying to find her?

5  A.  Find her?

6  Q.  Yeah.

7  A.  Yes, sir.

8  Q.  In fact, you learned that the school that her children had

9  been in in the Bronx received a request from a school in North

10  Carolina for records because she had requested to enroll them

11  in the school in North Carolina, correct?

12          MR. ARAVIND:  Objection, calls for hearsay.

13          THE COURT:  I'll allow it.

14  A.  Can you repeat that, sir?

15  Q.  Sure.  You learned that school officials in the Bronx where

16  Ms. Dunbar's older child was attending or had been attending

17  received a request from an elementary school in North Carolina

18  for Dunbar's eldest child's school records, and the records

19  requested indicated she was going to enroll at the North

20  Carolina elementary school, right?

21  A.  Yes, sir.

22  Q.  So you learned that.  And you also learned and you knew

23  that Ms. Dunbar's mother lived in North Carolina, right?

24  A.  Yes, sir.

25  Q.  And that she used to live in North Carolina with her mother

1   and that's where her car is registered, correct --

2   A.  Yes, sir.

3   Q.  -- to, in fact, her mother's address?

4   A.  I believe so.

5   Q.  And that's the Honda we're talking about, right?

6   A.  Yes, sir.

7   Q.  And that the North Carolina school that made the request of

8   the Bronx school is in the vicinity of Ms. Dunbar's mother,

9   right?

10  A.  Yes, sir.

11  Q.  So you learned all that during the course of your

12  investigation, right?

13  A.  Yes, sir.

14  Q.  Now, you went through a lot of the phone records.  Now, you

15  talked -- I think the first answer you gave on direct was about

16  investigative techniques and one you mentioned was wiretaps,

17  right?

18  A.  Yes, sir.

19  Q.  No wiretaps in this investigation, correct?

20  A.  No, sir.

21  Q.  The only wiretaps we have seen were of a separate

22  investigation of David Barea done by New York State

23  authorities, right?

24  A.  Yes, sir.

25  Q.  And that wiretap included January of 2013, right?

1    A.  I believe so, yes.

2    Q.  So you have no content of any of the communications,

3    whether text or phone that we went through, right?

4    A.  No, sir.

5    Q.  You have no specific identity of who was on which side of

6    which call, right?

7    A.  Correct.

8    Q.  You don't know when those contacts were entered into the

9    phones, correct?

10   A.  No, I do not.

11   Q.  By the way, on the issue of how phone calls are logged on

12   toll records, you weren't sure whether in four seconds or two

13   seconds included completed calls or uncompleted calls.

14          Have you ever seen an uncompleted call on a toll

15   record?  In other words, someone rings and then hangs up before

16   someone answers?

17   A.  I believe you're correct.

18   Q.  So that's a completed call; in other words, where someone

19   picks up or -- either picks up or it goes to voicemail or

20   whatever, but there's a connection to the other phone, correct?

21   A.  I believe so, yes.

22          MR. DRATEL:  Nothing further.  Thank you.

23          MR. ARAVIND:  No further questions, your Honor.

24          THE COURT:  You may be excused.

25          THE WITNESS:  Thank you.

Ea2gcha2                         Reynolds - cross

1          (Witness excused)

2          THE COURT:  My plan is to go about 3:00 and take a

3    break at 3:00.

4          MR. ARAVIND:  The government calls Special Agent Eric

5    Perry.

6     ERIC PERRY,

7          called as a witness by the Government,

8          having been duly sworn, testified as follows:

9    DIRECT EXAMINATION

10   BY MR. ARAVIND:

11   Q.  Where do you work?

12   A.  Currently employed by the Federal Bureau of Investigation.

13   Q.  What is your title with the FBI?

14   A.  I'm a special agent.

15   Q.  How long have you worked as a special agent with the FBI?

16   A.  A little over five years.

17   Q.  Before that, Special Agent perry, what did you do for a

18   living?

19   A.  I was employed by the Colorado State Patrol as a state

20   trooper.

21   Q.  For how many years were you a state trooper?

22   A.  Close to 11 years.

23   Q.  Are you currently assigned to any section or unit within

24   the FBI?

25   A.  Currently, I am a full-time member of our cellular analysis

```
 1   survey team.  We are based out of our criminal investigation

 2   division out of Washington, D.C.

 3   Q.  What is the cellular analysis survey team?

 4   A.  It is a member -- I think to date we have 32 members of

 5   agents and analysts that have received a substantial amount of

 6   specialized training with regard to cellular technology and

 7   cellular analysis.

 8   Q.  How long have you been doing what you describe as cellular

 9   analysis?

10   A.  Since 2007.

11   Q.  Did you do that when you were a state trooper as well?

12   A.  Yes.  I was actually an investigator assigned to the FBI's

13   violent crime task force in Denver at that time and that's when

14   I got into the cellular analysis.

15   Q.  Do you have training in the area of cellular analysis?

16   A.  Yes, I do.

17   Q.  Can you explain what that training is for the jury.

18   A.  To date, I have well over 400 hours of specialized training

19   in which we receive direct training from the major providers

20   such as AT&T, Verizon, Sprint, Metro-PCS, T-Mobile.  That

21   training was conducted by members of their subpoena compliance

22   group which handles the call detail records.

23          In addition to that, we met with and received training

24   from their network engineers who are in charge of maintaining,

25   designing and constructing in some cases their cellular
```

1    networks.

2           On top of that, I received about six weeks of training

3    from third-party contractor called ETS, which is Emerging

4    Technology Solutions.  They're a contractor that provides

5    training to federal entities, as well as the Department of

6    Defense.  That training consisted of training specifically

7    dealing with cellular technology, as well as call detail record

8    analysis.

9    Q.  Can you explain what cell site data is?

10   A.  Cell site data is the information that is collected by the

11   cell phone providers any time your phone is engaged in a voice

12   call, text message or a data connection with their network.

13   Q.  How does cell site differ, if any, from GPS data?

14   A.  Cell site data -- sorry.  Cell site analysis is used in a

15   historical context.  This information is already taken place

16   and those are the records that are generated through the use of

17   a cell phone.

18          GPS is predominantly used for a real-time location

19   information; such as, say, a 9-1-1 capacity if you're trying to

20   locate a lost hiker or a -- an individual who is in a motor

21   vehicle, and it utilizes satellites in the sky, whereas call

22   detail records are system-based, network-based.

23   Q.  Can you make any determination of what is more accurate,

24   cell site or GPS data?

25   A.  It depends on the coverage area, but predominantly the

Ea2gcha2                          Perry - direct

1    satellite GPS systems will provide for much more accurate

2    location information.

3    Q.  How, generally speaking, do you get that cell site data

4    that you've talked about?

5    A.  It's through a legal request from the law enforcement,

6    whether it be from our agency or local agency or a prosecutor's

7    office, such as the Attorney General or the United States

8    Attorney's Office.

9            It can be gained by a Court order, which is

10   predominantly in the federal system and a search warrant, which

11   is most commonly found in the state system; and then, of

12   course, we have the exigent circumstances where we can request

13   those records in such cases like the Boston bombing case or a

14   kidnapping case or a life-threatening situation.

15            (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1    Q.   Where do you send that request, either a subpoena or search

2    warrant to?

3    A.   It's going to go to the provider.  If you know the phone

4    number you need the records on, you are going to send it to the

5    provider that has that service or has that number, such as

6    Verizon or T-Mobile number.  It's going to go to either Verizon

7    or T-Mobile.

8    Q.   When you obtained those records back from Verizon or

9    T-Mobile, what do the records look like?

10   A.   They are most commonly found in two different formats.  One

11   will be an Excel spreadsheet or AT&T will provide them in a PDF

12   or text file.

13   Q.   Do you also get information about the cell site towers?

14   A.   Yes, we do.  Those are referred to as a cell site key or a

15   cell site location information.

16   Q.   Is there anything that you do as part of a member of CAST

17   to verify coverages with respect to cell towers?

18   A.   Yes.  We actually conduct what's called a drive test when

19   appropriate, when the timeliness of our investigation allows us

20   to.  What a drive test is is, it's the same procedure that the

21   major providers conduct to determine the actual coverage area

22   of a particular tower and sector.  The networks utilize it to

23   determine their coverage areas to make sure their antennas are

24   aligned in an area to provide service to you as a customer as

25   well as to identify dead zones, especially if they receive a

1    lot of complaints for calls being dropped.  And where we use

2    it, we utilize the same software that they use.

3            And what it is is, you have a GPS and your GPS is

4    receiving your location every second.  Utilizing the

5    carrier-specific phone and the software, the drive test

6    software, which is JDSU, which is the vendor that we use, every

7    second I'm getting my location and every second my phone in the

8    software is collecting what my location is and what cell tower

9    my phone is communicating with so I can specifically identify a

10   spot on earth and know exactly what cell tower and sector my

11   phone is in contact with.

12   Q.  Based on your training and experience and your application

13   of these drive tests and any other information, is cell site

14   data reliable?

15   A.  Absolutely.

16   Q.  Can you explain that to the jury?

17   A.  I've been utilizing this technique since 2007 to develop a

18   pattern of life based on somebody's phone use and to physically

19   go out and locate fugitives.  Just the other day we had a case

20   out of New York where the individual was thought to be in New

21   Jersey.  We were able to map out his call usage and, sure

22   enough, we found him in the towering sector of the footprint

23   that we identified.  And actually the next day we identified

24   another individual in that case.  We went back out utilizing

25   the same technique for his phone, located him as well.  That's

1    just two instances of thousands in which we have utilized this

2    technique to identify people.  We have actually used this

3    technique to locate victims of suicide, victims of car

4    accidents.  And we have actually -- I'm a member of 32

5    individuals on my team and we utilize this on a daily basis.  I

6    made reference to the Boston bombing case.  This technique was

7    used in that and proved extremely valuable.

8    Q.  When you get cell site data from one of those service

9    providers, Verizon, T-Mobile that's associated with a

10   particular phone, what do you do with those records to analyze

11   them?

12   A.  To analyze the records I need to have something to compare

13   them to, working with the investigators and the prosecutors,

14   and I'm often provided the dates and times of alleged crimes or

15   incidents.  Once I have that information, I then review the

16   records to see if there is any phone usage during those time

17   frames.  If there is none, then I really can't identify where

18   the phone was.  If there is records in and around that time

19   frame, I can identify the cell tower that was used and the

20   sector that was used and offer an opinion of general location

21   of where the phone was at.

22   Q.  Do you do anything to visualize the location of a

23   particular phone when you are doing your analysis?

24   A.  Yes.  Most of our analysis involve a mapping of those calls

25   in creating exhibits.  It is for interview purposes.  We create

1   exhibits for that.  But most predominantly it's for testimonial

2   purposes.

3   Q.  Can you briefly describe to the jury what you do step by

4   step when you get those records and create those visual

5   representations?

6   A.  If I have calls that cover the time frame of an alleged

7   crime, I identify the cell tower, what region of the country

8   the phone was being utilized.  I then can identify the specific

9   cell tower that the phone was connected to, and I can take it a

10  step further and identify the particular face or sector on that

11  tower that was utilized.  Comparing that to the list of

12  locations of the cell towers, I can map those locations of cell

13  towers out.

14          And then we are also provided information from the

15  providers that will tell you what direction a particular sector

16  faces.  If you think of a compass, zero degrees being due

17  north, 90 degrees being due east, 180 degrees being due south

18  and then 270 being due west, if I knew my sector of use was

19  oriented at zero degrees, that phone had to have been to the

20  north of the tower, and we are able to visually depict that

21  into a format which makes sense.

22  Q.  What's the software program where you create those maps?

23  A.  They are publicly available.  Most commonly Google Earth

24  and Microsoft Map Point, which is a $200 program that anybody

25  can buy.

EA2MCHA3                          Perry - direct

1  Q.  Did you perform cell site analysis in this case?

2  A.  Yes, I did.

3  Q.  Did you assist in the preparation of slides and maps in

4  connection with that analysis?

5  A.  Yes, I did.

6  Q.  Special Agent Perry, have you worked on this case in any

7  other capacity other than the preparation of those slides and

8  maps?

9  A.  No, I did not.

10 Q.  I'm showing you what has been marked for identification as

11 Government Exhibit 150.

12          Do you recognize that item?

13 A.  Yes, I do.

14 Q.  What is it?

15 A.  These are the results of our analysis.  I say our.  This

16 case was originally assigned to Special Agent Wendell Consenza

17 out of our Norfolk office, but he had a medical emergency come

18 up with his family.

19 Q.  Did you prepare some of these slides or all of these

20 slides?

21 A.  I reviewed and prepared the slides.

22 Q.  When you say reviewed, did you review certain slides that

23 were prepared by Special Agent Consenza?

24 A.  Yes, I did.

25 Q.  And did you prepare the slides to the underlying cell site

1  data?

2  A.  Yes, I did.

3          MR. ARAVIND:  The government offers Government Exhibit

4  150.

5          MR. DRATEL:  No objection.

6          THE COURT:  It's admitted.

7          (Government's Exhibit 150 received in evidence)

8          THE COURT:  You may publish.

9          MR. ARAVIND:  Thank you, your Honor.

10 Q.  I am also going to show you, Special Agent Perry,

11 Government Exhibit 160, which has been admitted into evidence.

12         Did you review certain of the underlying phone records

13 that are contained in Government Exhibit 160?

14 A.  Yes, I did.

15 Q.  How do you know that?

16 A.  My initials are on the CD after reviewing it.

17 Q.  Let's turn to the analysis.  Special Agent Perry, let's go

18 to page 2.

19         And tell us what we are looking at here?

20 A.  This is -- these are two photographs actually of the same

21 tower -- one is far away.  One is more zoomed in -- to just

22 demonstrate to the jury what a typical cell tower looks like.

23 The actual tower is the structures is the metal pole, that's

24 vertical.  And the right-hand photo, if you look closely,

25 you'll see the white antennas and that's what your phone will

1   communicate with.  If you'll also notice, there are triangle

2   shapes and there is three sides to the triangle.  Those are

3   your three different sectors on that tower to provide a service

4   of 360 degrees.

5   Q.  Let's stay here.  Does every single cell tower have the

6   same range, Special Agent Perry?

7   A.  No.

8   Q.  And how do you know that?

9   A.  One, I've conducted hundreds of drive tests in which we

10  determined the actual range of cell towers.  But also every --

11  the range of each individual tower varies on a couple of

12  things.  It varies on the adjacent towers, as well as

13  topography and geography and, such as we have here in New York

14  City, we have concrete structures 50 stories tall.  They tend

15  to impede this and limit the range of a cell tower.

16           MR. ARAVIND:  Let's go to the next page, Ms. Hansma.

17  Q.  What does this document or this slide reflect, Special

18  Agent Perry?

19  A.  These are all of the Verizon cell towers within the greater

20  Bronx borough as well as northern Manhattan as well as parts of

21  New Jersey.  And those are indicated by the red dots.

22  Q.  In your experience, when a call is made, is it necessarily

23  routed to the closest cell tower?

24  A.  Most commonly, yes.  Again, here in New York City we do

25  have a lot of structures that will limit that potential.  What

1   we see often here in New York City is, you might have a cell

2   tower two blocks to your east, but you have two blocks worth of

3   concrete jungle between the tower and your phone.  But if four

4   blocks up the street it is clear and unobstructed and you have

5   a cell tower, you are most often going to connect to the tower

6   that's clear and visible.

7   Q.  How do you know that?

8   A.  Again, from the drive testing that we conduct as well as

9   just my several years of working in cell phones here in New

10  York.

11  Q.  Special Agent Perry, let's go to the next slide.

12          What does this slide reflect?

13  A.  This is -- highlighted in that red box is a number 2 with a

14  red dot.  That's the location of tower 61 and that's located at

15  1306 Fteley Avenue in the Bronx.  That is a tower that we are

16  going to discuss in my ongoing analysis results.

17          MR. ARAVIND:  Let's go to the next page, Ms. Hansma.

18  Q.  What does this slide reflect?

19  A.  This actually shows that there is actually a tower that

20  exists where tower 61 does.  And this is a Google Earth street

21  view of the actual tower.  These are the antennas fixed to the

22  side of the building and that is tower 61.

23  Q.  What's the service provider for that tower?

24  A.  Verizon.

25          MR. ARAVIND:  Let's go to the next page, Ms. Hansma.

1   Q.   What is does this slide represent?

2   A.   This is an excerpt or a portion of the actual call detail

3   records belonging to phone number area code 717-743-6130.   This

4   is actually for a time frame of March 25, 2013 in the very

5   early morning hours.

6   Q.   Is that the phone that you analyzed or phone records that

7   you analyzed?

8   A.   Yes, it is.

9   Q.   Let's go through this slide in some detail.

10            What is the first column to the left?   What does that

11   represent?

12   A.   The title is network element name.   This is going to be a

13   group of cell towers that resides within a specific geographic

14   location in the United States.   That's often referred to as a

15   switch, which contain up to anywhere from 50 to 300 cell

16   towers.   The next column is called the mobile directory number.

17   That is the target number or the number that these records

18   belong to.   The next one is the dialed digits numbers.

19   Depending on whether that's an outbound or inbound call, that

20   will identify what number is calling the other number.

21   Q.   Call direction?

22   A.   Call direction is actually going to have inbound or

23   outbound call.

24   Q.   What does the next column reflect?

25   A.   The seizure date and time is the specific date and time

1    that the connection occurred.

2    Q.  Duration?

3    A.  The duration is in seconds.  That's going to be the

4    duration of the event.

5    Q.  What about the next two highlighted columns, what does that

6    reflect?

7    A.  This is the information that allows us to locate what cell

8    tower was utilized.  So using this in conjunction of the first

9    column, the network element name, I know that the network

10   element name is a group of several cell towers within the

11   Bronx, New York area.

12          The next column here, going back to the highlighted

13   column, first serving cell site, that's the actual tower that

14   that call occurred on.  The first serving cell face is going --

15   mostly is going to identify three different sectors.  You'll

16   have sectors 1, 2, and 3 that a call could occur on.  In this

17   particular instance this call occurred on sector 2 for this

18   particular -- once I can identify what direction sector 2

19   faces, then I can determine where in relation to the tower the

20   phone call is.

21          One thing about Verizon I need to clarify is that

22   Verizon uses a type of technology called lucent switches.  The

23   CDRs, when they run the CDR --

24   Q.  What's a CDR?

25   A.  Call detail record.  The CDRs, when they are populated,

1   will reflect sectors 2, 3, and 4 when they are in a lucent

2   market.  In essence -- but this still pertains to sectors 1, 2,

3   and 3.  It's just the way the records are recorded through a

4   lucent switch.  Where it says sector 2, in reality, that's

5   sector 1 on your tower list.  That's a unique situation for

6   Verizon and Sprint.

7   Q.  The next two columns, last serving cell site and last

8   serving cell face, what does that reflect?

9   A.  That identifies in which cell tower and sector that the

10   call ended on.

11   Q.  I notice here that all of the last serving cell sites are

12   the same as the first serving cell site.  What does that mean?

13   A.  In this case it means that the call started and ended

14   utilizing the same sector on the same tower, which in this case

15   was sector 1 in tower 61.

16   Q.  If those two numbers are different, the cell towers, what

17   does that mean?

18   A.  It means a couple of things.  It means that the individual

19   may have moved.  In a case where I -- I started a phone call

20   here at the courthouse today and I drove to Westchester, you

21   would see the beginning tower here.  And when I resided --

22   wherever I ended the call, you would see a change in cell

23   tower.  That's most indicative involving movement.  That would

24   also mean that you're stationary in an area where two sectors

25   provided service or overlapping coverage to the same area.

1  Q.  Let's do the last column.  What does that mean?

2  A.  That just identifies which individual phone is making the

3  phone call.

4           THE COURT:  Would now be a good time for a break?

5           MR. ARAVIND:  Yes.

6           THE COURT:  Let's take a 15-minute break.  Please

7  don't talk about the case.  We will see you then.

8           (Jury excused)

9           THE COURT:  We are adjourned for 15 minutes.

10          (Recess)

11          THE COURT:  I have this additional stipulation.  I'm

12  sorry.  I was just imagining that we read it, but I guess we

13  did not.  Does it need an exhibit tag on it, or are you

14  planning to type it between now and tomorrow and put an exhibit

15  tag on it?

16          MR. ARAVIND:  We can do that, your Honor.

17          We also have one more.  The duct tape that was seized,

18  we are not able to open it.  It says biohazard.  We have a

19  photograph of the duct tape from that day.  We would just ask

20  that that be admitted.  And I think Mr. Dratel doesn't have an

21  objection.

22          MR. DRATEL:  No problem.

23          THE COURT:  That's fine.

24          I understand tomorrow at sundown begins a Jewish

25  holiday.  What does that mean in terms of timing?  I don't know

1    if there is anyone Jewish on the jury.  I have not really

2    looked at that.

3              MR. DRATEL:  For me it actually doesn't matter because

4    I'm so close by.  If we break at 5, I'll be fine.

5              THE COURT:  I would probably break at 4:30.  We will

6    try to go to 4:30 unless somebody really screams and yells.

7              MR. DRATEL:  In terms of scheduling, let's say the

8    government rests today.

9              MR. ARAVIND:  Should we have this conversation with

10   the witness here?

11             MR. DRATEL:  I don't think it matters.

12             THE COURT:  If no one cares, I don't mind.

13             MR. ARAVIND:  I don't care.

14             MR. DRATEL:  If the government rests today -- and we

15   don't know the contours of the defense case yet between the

16   Court's rulings and whether we put on a case at all.  But

17   assuming that Dr. Strange goes on tomorrow and assuming she

18   takes up, given the nature --

19             THE COURT:  Let's just back up.  We have this witness.

20   Do we have anyone else?

21             MR. ARAVIND:  No, your Honor.

22             THE COURT:  You are going to rest after this witness?

23             MR. ARAVIND:  Correct.

24             THE COURT:  How much more direct is there of this

25   witness?

1            MR. ARAVIND:  I think about 20 minutes.

2            THE COURT:  The government is going to rest very soon.

3            Do you have any witnesses to put on besides

4    Dr. Strange?

5            MR. DRATEL:  I was going to recall Detective Deloren,

6    who I saw outside who is here.

7            THE COURT:  We can use some time today doing that.

8            MR. DRATEL:  Correct.

9            THE COURT:  And then we need to have a charging

10   conference.  We might be able to do that today.  I have

11   conferences starting at 5:15.  We might.  And then tomorrow,

12   hypothetically, you would put on Dr. Strange and then we would

13   charge the jury and then you would sum up.

14           MR. DRATEL:  The Court charges before summations?

15           THE COURT:  Yes.  I'm strange.

16           MR. DRATEL:  It goes in a variety of different ways.

17           If time permits, the Court would have sum up tomorrow?

18           THE COURT:  If time permits.

19           MR. DRATEL:  That's sort of where I was going with my

20   initial question.

21           THE COURT:  Let's get the jury.

22           (Jury present)

23   Q.  Good afternoon again, Special Agent Perry.  When we left

24   off we were looking at the CDR report.  You explained each of

25   the columns.  Let's now turn to the maps that you prepared.

1          MR. ARAVIND:  Ms. Hansma, let's go to the next slide,

2     please.

3          THE COURT:  Can you identify this by exhibit number?

4          MR. ARAVIND:  Sure.  I apologize.  Government Exhibit

5     150.

6     Q.  Special Agent Perry, who provided you with records in this

7     case?

8     A.  The records were provided to me by Agent Consenza.

9     Q.  And did he or the prosecutors or Special Agent Reynolds

10    provide you with any other information?

11    A.  Yes.  I was provided with two addresses to compare and to

12    determine if the phone was being utilized in the vicinity of

13    those two addresses.

14    Q.  Other than addresses, what about dates and times?

15    A.  Yes.  I was provided several different date and time rages

16    as well.

17    Q.  Were you provided any other information?

18    A.  Not that I recall.

19    Q.  Do you know the facts of this case?

20    A.  No.  I just know I believe there is alleged robbery.

21    Q.  So once you had the data from those records, tell us what

22    you did with them to create something like this page.

23    A.  This particular map reflects a total of six calls that

24    occurred on the early morning hours of March 25, 2013.  Once I

25    identified that there were calls that were within the time

1    frame identified by Agent Reynolds, I then mapped those out.  I

2    then determined if any of the addresses that were provided to

3    me fall within the location of cell tower 61, and I also mapped

4    that out, which is reflected here.

5    Q.  Let's take a little bit of time with this map.

6            The address in green in the middle of the page, what

7    does that represent?

8    A.  That's the label which is 1338 Croes Avenue in the Bronx,

9    New York.  That title belongs to the red balloon to the left of

10   it with an A in it.  And that identifies the location of that

11   address.

12   Q.  The red dot below that on East 172nd Street, what does that

13   represent?

14   A.  That's the actual cell tower location.

15   Q.  And let's go to the text box to the left.  At the top line,

16   what does that represent, the 717?

17   A.  That's the phone number in which these records belonged to.

18   Q.  And then date and time, what does that reflect?

19   A.  That's the date and time that these six voice calls were

20   initiated.

21   Q.  And in which cell tower were these calls initiated or

22   located in?

23   A.  Tower 61.

24   Q.  And is that in the vicinity of 1338 Croes Avenue?

25   A.  It looks like a block away from that address.

1   Q.  The text box now on the bottom right-hand side, what does

2   that reflect?

3   A.  That's just a disclaimer.

4              THE COURT:  Where is it?

5              MR. ARAVIND:  There it is.

6   Q.  What does that text box --

7   A.  That's a disclaimer just to make it clear that the yellow

8   shaded area or the piece of the pie-like shape is not the

9   actual coverage area of that tower.  That was placed in that

10  manner to identify the direction in which the radio frequency

11  is transmitted on that sector.

12  Q.  Explain to us, using this map, how the different sectors

13  work.  Are we looking at a particular sector or multiple

14  sectors?

15  A.  This is one sector of a three-sector -- this is one sector

16  on tower 61.

17  Q.  And those calls that are referenced in the text box, those

18  six calls, are they all found in that one sector?

19  A.  Yes.  They use the same sector on tower 61.

20             THE COURT:  Can I ask a question.  There is another

21  red dot off to the right.  What is that?

22             THE WITNESS:  That's the adjacent tower, your Honor.

23  That's tower 120 for Verizon.  Same thing with the upper

24  right-hand corner, your Honor.  There is another red dot.

25  That's another cell tower.

1   Q.  Let's go to the next slide, Special Agent Perry.  Tell us,

2   generally speaking, what we are looking at in this particular

3   side.

4   A.  This is several voice calls that occurred on phone number

5   6130 in the early morning hours of March 25, 2013, starting at

6   12:02 a.m. and extending all the way through 10:19 a.m.  On the

7   left-hand side are the date and time that the calls were

8   placed.  In the right-hand column, where you see the WNWK2 120

9   2, that's the specific network element, the cell tower and the

10  sector that was used.  The map to the right, you'd have several

11  red dots, which are the Verizon cell towers.  I identified the

12  specific cell towers that correlate to the column to the left,

13  and in those text boxes you'll see the cell number of the

14  tower.

15  Q.  Let's go through this step by step.  The first call at 002,

16  is that just after midnight on March 25?

17  A.  Yes, it is.

18  Q.  And using the laser pointer that's in front of you, can you

19  show us on the map what is the location of the cell tower that

20  that call is hitting?

21          THE WITNESS:  Your Honor, is it all right if I stand

22  up?

23          THE COURT:  Yes, of course.

24  A.  That particular call occurred on tower 120 right in the

25  lower right-hand corner.

1         THE COURT:  How do you know?

2         THE WITNESS:  Your Honor, if you look up here in the

3  top row right here, March 25, 2013, at 12:02, that particular

4  call occurred on this switch in tower 120, sector 2.  That is

5  the information directly from the call detail records.

6  Q.  Can you show us how this phone travels in the minutes after

7  that first --

8  A.  The first call occurred at 12:02 a.m. and was utilizing

9  tower 120.  If you are going from top to bottom, if you look

10 you'll see that there is several calls that occurred on tower

11 61.  Tower 61 is to the west of tower 120, as indicated by the

12 text box 61.

13 Q.  There is a notation there with something in red.  What does

14 that reflect?

15 A.  That's just an icon of the approximate location of 1338

16 Croes Avenue.

17 Q.  And these are the six calls that we looked at in the

18 previous slide?

19 A.  Yes, they are.  They extend from 12:13 a.m. through 12:16

20 a.m.  And all those calls in between were using the same tower

21 and sector.

22 Q.  What's the next call that you are able to map?

23 A.  This call occurred at 4:40 a.m. on March 25, 2013.  This

24 particular call occurred on tower 275.  This tower is located

25 just west of the Bronx River Parkway and it was utilizing

1    sector 3, which is oriented to the north.

2    Q.  How does this phone travel after 4:40 a.m.?

3    A.  The remainder of the phone calls from 4:55 a.m. through

4    10:19 a.m. utilize cell tower 90 in sector 1.  That tower is

5    located in the upper right-hand corner of the map as identified

6    by the 90 next to it.

7    Q.  Did you look at any addresses in the vicinity of where

8    tower 90 is?

9    A.  I did.

10   Q.  And what location was that?

11   A.  I can't remember the exact numerics, but I know it was on

12   Barnes Avenue.  I do know the address was located in the

13   vicinity of tower 90.

14   Q.  Can you just explain to the jury, Special Agent Perry, if

15   you do not have a record of a phone call, can you prepare some

16   sort of mapping based on that, absent a phone call?

17   A.  I would have no idea where the phone was located without

18   that.

19   Q.  What about text messages, are you able to map text

20   messages?

21   A.  Unfortunately, Verizon only maintains their voice calls

22   only.  Different providers collect different information.  Like

23   AT&T will provide data connection, text message, and voice.

24   But Verizon only provides voice calls.

25   Q.  Did you analyze any other dates as part of your analysis in

1   this case?

2   A.  Yes, I did.

3          MR. ARAVIND:  Let's go to the next slide, Ms. Hansma.

4   Q.  Special Agent Perry, what are we looking at in this slide?

5   A.  These are call activities for the evening of March 17,

6   2013, starting at 7:22 p.m.  And it's mapped several phone

7   calls throughout the night and into the early morning hours of

8   March 18, 2013.  I believe the last call was at 12:10 a.m.  To

9   the right are, again, those are the cell towers that were used

10  and they correlate to the column to the left.

11  Q.  Can you, generally speaking, explain to the jury how this

12  6130 phone number travels during the course of that day.  And

13  the following day on March 18?

14  A.  Again, looking at this column to the right, under true cell

15  name, this is the first call I mapped at 7:22 p.m. on March 17,

16  2013.  It was utilizing tower 90 in the upper right-hand corner

17  of the map.

18         The next call occurred at approximately 7:50 p.m. on

19  the night of March 17.  So this is actually military time.  I'm

20  referring to it in regular civilian time.  But this is actually

21  7:50 p.m., and the phone was utilizing a tower located in the

22  vicinity of Webster Avenue and the Cross Bronx Expressway.

23         The next call the phone was utilizing tower 61, sector

24  1, which is the tower down here in the vicinity of 172nd Street

25  and the Bronx River Parkway.  There are two calls that occurred

EA2MCHA3                          Perry - direct

1    on that tower.  The phone then makes a call utilizing tower

2    327, sector 1, which is this tower just south of Bruckner

3    Boulevard where it intersects with the Bronx River Parkway.

4    And then you are going to have -- pretty much the remainder of

5    the calls are going to occur back onto the same tower as it did

6    on the 25th, sector 1 of tower 61.  All the calls all the way

7    down except the last call on the bottom here.  And that occurs

8    at 12:10 a.m.  You have a call at 12:30 a.m., which is used in

9    tower 61, sector 1 down here.  The next call at 12:10 -- I'm

10   sorry.  That's going to be 12:10 p.m., since this is military

11   time.  The phone is back up here on tower 90 in the northern

12   part of the Bronx.

13            MR. ARAVIND:  Let's go to the next slide, Ms. Hansma.

14   Q.  Can you tell us what we are looking at in this particular

15   slide?

16   A.  Yes.  This is a call activity that occurred on March 23,

17   2013 in the late evening hours, getting into the early morning

18   hours and even into the next day on the 24th of March.

19   Q.  Again, do the same thing.  Explain to the jury how this

20   phone travels during the course of that day and entering into

21   the early morning hours of the 24th.

22   A.  Yes, I can.  The beginning -- if you can look, starting at

23   the top, these are the same towers that we were talking about

24   before.  Tower 235 is at Webster Avenue at the Cross Bronx

25   Expressway.  This particular phone was utilized in the same

1    cell tower for four calls.  It started at 8:31 p.m. through

2    8:32 p.m.  The phone then traveled back into the vicinity of

3    tower 61 and where it was utilizing sector 1, tower 61 for a

4    call.

5              Then it goes to tower 120, which is on the lower

6    right-hand corner, the furthest tower to the east and it makes

7    a phone call there.  There are several phone calls where it's

8    kind of utilizing these three different towers.  Tower 61,

9    tower 237 on the bottom by the Bruckner Boulevard, tower on the

10   bottom of the slide.  And then it bounces back and forth

11   between tower 61 and then tower 237.  And then, of course, the

12   last call that I mapped out occurred at 2:22 a.m. on that

13   morning of the 23rd -- the morning of the 24th.  That's back up

14   in the vicinity of tower 90.  So 90 up in the northern part of

15   the Bronx.

16   Q.  Special Agent Perry, let's turn to the next slide.  Can you

17   explain what this slide represents?

18   A.  This is a slide for all of the cell towers that were

19   utilized by phone number ending in 6130 for the time frame of

20   March 6, 2013 through April 18, 2013.  And every red dot is a

21   cell tower that this phone connected to at one particular time

22   during this time frame.

23   Q.  The text at the bottom, what does it mean?

24   A.  It says most commonly-used tower, tower 405.  That's the

25   cell tower where you can see the blue arrow.  That points

 1  north.  That's that cell tower there and this is in the

 2  Harrisburg switch or the Harrisburg group of cell towers.

 3  Q.  Special Agent Perry, let's go to the next slide.

 4          What does this slide reflect?  You can refer to the

 5  text box you drafted at the top.

 6  A.  This is actually the phone activity for the evening of

 7  March 26, 2013.  I was able to determine that the phone was

 8  utilizing cell towers in the vicinity of the George Washington

 9  Bridge in the Manhattan borough around 6:28 p.m.  And as the

10  time progressed throughout the day, the phone then traveled

11  throughout New Jersey into Pennsylvania.  The last call that I

12  was able to identify occurred on March 26, 2013 at 11:52 p.m.,

13  and it was utilizing the cell tower in the vicinity of Lebanon,

14  Pennsylvania.

15  Q.  Let's go to the next slide, Ms. Hansma.

16          What does this slide reflect, Special Agent Perry?

17  A.  This identifies that call that occurred at 6:28 p.m. that

18  was just in the left-hand side of the slide.  It's just on the

19  New York side of the George Washington Bridge.

20  Q.  There is another text box at the top.  The smaller text box

21  at the top, what does that reflect?

22  A.  I wanted to identify when the phone was being utilized

23  prior to the movement out to Pennsylvania in the vicinity of

24  cell tower 90.  That's what that indicates.  That's a call that

25  occurred at cell tower 90 at 3:35 p.m. on the 26th.

1    Q.  Let's go to the next slide.

2            What does this slide reflect, Special Agent Perry?

3    A.  This is just a zoomed-in exhibit of the cell tower that was

4    utilized at 11:52 p.m. on March 26, 2013 in the Lebanon or

5    North Cornwall area of Pennsylvania.

6    Q.  This is just a closeup of the slide that you just showed

7    two slides ago?

8    A.  Yes.  With more detail in the local region.

9    Q.  Based on your experience as a CAST agent, Special Agent

10   Perry, do you know if the wireless communication networks that

11   you analyzed can make calls or use networks that are capable of

12   replacing calls between states?

13   A.  That's the whole reason why they have cellular networks,

14   and absolutely they can.  Cell towers are located throughout

15   the entire United States and you can make phone calls from New

16   York and hit every state.

17           MR. ARAVIND:  Your Honor, may I have one moment?

18   Q.  Where is the Verizon headquarters, to your knowledge?

19   A.  They have offices predominantly in Basking Ridge, New

20   Jersey, as well as Bedminster, New Jersey.

21           MR. ARAVIND:  No further questions, your Honor.

22           THE COURT:  Cross-examination.

23           MR. DRATEL:  Yes.  Thank you, your Honor.

24           (Continued on next page)

25

1              THE COURT:  Cross.

2    CROSS-EXAMINATION

3    BY MR. DRATEL:

4    Q.  Good afternoon, Agent Perry.

5    A.  Good afternoon, counsel.

6    Q.  So, you've never served as an independent expert on cell

7    site tower, right?

8    A.  Not to date, sir.

9    Q.  And you've never worked for a provider, right?

10   A.  No, I have not.

11   Q.  And your work has been basically government investigations?

12   A.  A good -- that and I mean, in essence, we've done some

13   search and rescue work, but that's, again, government entity.

14   Q.  Yes.  And just to go over again the materials that you

15   reviewed, some materials that you said you received from the

16   prosecutors and also the materials that were received from

17   Verizon, right?

18   A.  Yes.

19   Q.  You didn't do any independent investigation on your own?

20   A.  No, I did not.

21   Q.  Now, just some sort of fundamentals of cell site

22   technology, it doesn't track a person, right?

23   A.  No.  It pertains to a cell phone.

24   Q.  It tracks a device?

25   A.  That is correct.

ea2gcha4                           Perry - cross

1    Q.  And it doesn't identify the person on the phone or the

2    content of any communication in that, correct?

3    A.  That's correct, yes.

4    Q.  And it's not a GPS system.  So it doesn't put you exactly

5    time and place in a real-time way that a GPS does?

6    A.  That is correct, yes.

7    Q.  And some of the locating -- you talked about the use of

8    cell site technology to do some locating of fugitives, right,

9    and you say that's been available since 2007?

10   A.  It was actually before.  I started utilizing it in 2007.

11   Yes.

12   Q.  To your knowledge, was that used in this case at all?

13   A.  I don't know.  I don't have any information on how he was

14   located.

15   Q.  Now, with respect to cell site as opposed to GPS, cell site

16   just tells you essentially the tower that the cell phone finds

17   to transmit a signal, correct?

18   A.  It takes it one step further, sir.  It will give you the

19   direction and the sector that was use.

20   Q.  Right.  The way you have it now in the call detail records,

21   you know which of the three panels essentially it found on the

22   tower?

23   A.  Yes, sir, that's true.

24   Q.  And so that will give you direction, right, but it won't

25   tell you -- but -- withdrawn.

1              It could be anywhere within the range of that panel,

2    though, right?

3    A.   Yes, it has to be within the coverage area, sir.

4    Q.   And these tower ranges vary depending on where they are in

5    their proximity to other towers, right?

6    A.   Yes, they do.

7    Q.   So it depends on -- withdrawn.

8              Some of them are overlapping to a certain extent,

9    correct?

10   A.   A majority of them are overlapping and that's, again, if

11   they're not overlapping, that's where you're going to drop your

12   calls.

13   Q.   And in a densely populated area like New York, you have a

14   lot of overlap because you have a lot of cell towers?

15   A.   That's fair, yes.

16   Q.   And so a range that any particular tower or any

17   particular -- what shall we call them, panel, is that fine?

18   A.   We refer to it as sector but panel, I think that's an

19   accurate statement, too.

20   Q.   I'll use sector to keep it consistent.  So for any

21   particular sector, the range can depend on a variety of things,

22   right?

23   A.   Again, I stated a range will depend on topography,

24   geography and the adjacent towers.

25   Q.   But also buildings?

1   A.  Yes.

2   Q.  And topography, you mean essentially whether it's hilly or

3   not or whether there are any natural obstructions in the way,

4   right?

5   A.  Yes, that is my definition of topography.

6   Q.  And composition of buildings could also have an impact in

7   some way, glass versus brick or concrete?

8   A.  Yes, it can.

9   Q.  And radio frequencies have an element in there as well?

10  A.  No, the cellular networks are defined to eliminate the

11  interference.  The only interference occurs -- if they have

12  interference, cell networks are not going to work.  They are

13  specifically set up to be a robust and durable system.

14  Q.  Certainly the heights of buildings can matter, right?

15  A.  Yes, it can.

16  Q.  And weather can sometimes have an impact?

17  A.  The only time weather is going to have an impact is if the

18  tower is struck by lightning and even then, the cell towers

19  have battery backup.

20  Q.  And you got into it a little bit with Mr. Aravind, but it's

21  not necessarily the closest tower that the cell phone finds,

22  right?

23  A.  I believe I stated generally it is, but here in New York

24  City, we do have those building composites made of concrete.

25  So what I've often seen here in New York is that it's most

1  often the clearest line of sight, but we're talking blocks,

2  we're not talking miles here.

3  Q.  Right.  The line of sight can be very different in New York

4  where if you have a very tall building between you and the

5  closest tower or any building between you and the closest

6  tower, than perhaps the strongest signal -- withdrawn.

7          It's not about proximity.  It's more about strong

8  signal, right?  The cell phone will find the strongest signal?

9  A.  Well, there are two different things I think we're talking

10 about here.  We're talking about the cell phone communicating

11 with the tower but then you're talking about the design of the

12 network.

13         For example, the cell phone is going to seek out the

14 strongest, clearest signal.  The design on the network is going

15 to be designed so they're not overshooting a bunch of towers to

16 cover an area miles away.  So the height, there's also you get

17 to take down tilt.  The way that -- the direction, like your

18 satellite dishes, you can kind of vector -- you can kind of

19 direct your signal.

20 Q.  You can direct, like an antennae?

21 A.  You can also tilt it down.

22 Q.  Right.

23 A.  Or up.

24 Q.  Does water have an effect?

25 A.  It does.  If you'd like me to explain.

1    Q.  Sure.

2    A.  One thing that we commonly see is, like, if you're driving

3    on the West Side Highway, most often your phone is going to be

4    using cell towers in New Jersey.  Again, the reason for that is

5    clear, unobstructed line of sight from New Jersey towers across

6    the Hudson, which will cause a reflection to the signal into

7    the phone which is on the West Side Highway.  That's a

8    very -- most commonly seen example.

9    Q.  And even foliage can have an impact, right?

10   A.  Height -- if you're in a canyon setting, yes, the foliage

11   can.

12   Q.  Obviously, anything that's going on with a particular tower

13   at a particular time can have an impact such as maintenance or

14   repairs or anything like that, malfunctions, right?

15   A.  Yeah, it definitely would, but the network -- there's some

16   high penalties for towers that go down.  This is a

17   billion-dollar business.  If a company allows a tower to stay

18   down for two hours, I believe there's some substantial fines

19   levied against the maintenance.

20   Q.  You didn't check any of the records on that in terms of

21   what the status was at the time of this particular part that

22   you looked at?

23   A.  I can tell you that the tower 61, tower 120, which were the

24   two towers in that area were working because the phone

25   communicated with it.

ea2gcha4                       Perry - cross

1    Q.  You don't know if it's working at every moment that we're

2    looking at these records, right?

3    A.  I can only determine at the time it communicated --

4    Q.  Right.

5    A.  Yes, that is true, yes.

6    Q.  And also is there another -- withdrawn.

7           Doesn't the number of calls -- and I'm going to use

8    the term that could have two meanings, but I want it relay the

9    number of calls I don't mean -- call volume, I don't mean loud

10   or soft, I mean call volume as in number of calls.  So the

11   number of calls that a particular tower gets might result in

12   something getting directed to a different tower, right?

13   A.  You're talking about the call capacity?

14   Q.  Yes.

15   A.  As the call capacity increases, there's -- each individual

16   tower will have carriers as the call capacity is, you know,

17   reached, it will then bump up to the next carrier.

18          Networks are designed to provide a maximum amount.  In

19   cases such as the unfortunate Twin Towers attack, as well as

20   the Boston marathon bombing, you had a massive amount of users.

21   And what happened there is that you would get a busy tone or

22   you'd get that dead air.

23          In CDMA technology, there is a limited -- if you're on

24   the outskirts of the coverage area, there could be a

25   possibility that your phone would bounce to the next closest

1   tower.

2   Q.  You had a diagram with the vectors and -- but the coverage

3   area is not a perfect circle, it's more like a kidney bean, it

4   has a certain area of dissipation?

5   A.  It often looks like an amoeba if you remember from science

6   class.  It's not a clear-cut piece of pie.

7   Q.  And the strength of the configuration sometimes depends on

8   how close to another tower because they don't necessarily all

9   want to interfere with each other at the same time, right?

10  A.  That's exactly -- they want to provide an efficient network

11  so they're going to identify -- they're not going to waste

12  their signal when the area is already covered by a tower almost

13  like if you had a sprinkler system or I know we don't have much

14  grass in New York, but maybe like a baseball field.  You're not

15  going to have the shortstop covering right field.  So everybody

16  has their positions to maintain and responsibility, but yes,

17  the towers will cover certain areas.

18  Q.  And basically, you can't say for any particular call why a

19  particular -- I'm sorry -- why a cell phone chose a particular

20  tower just based on this call detail records?

21        In other words, you know that it did, but you don't

22  know precisely why that one as opposed to a different one

23  within the same general area?

24  A.  Again, I stated that I can't pinpoint the location of the

25  phone, but I could offer an opinion on why, as you look at the

1   layout of the streets, you know, as far as, again, in positions

2   of clear line of sight, it would be -- you would have to be in

3   a position to see that tower.  Of course, proximity to the

4   tower, if you're a block away, a lot of times that will remove

5   the -- you can still have the structures in between, especially

6   up here in the Bronx where you don't have to tall, multistorey

7   buildings.

8   Q.   In terms of a particular call, you can't say why a cell

9   phone found that tower to be the strongest signal for a

10  particular call?

11  A.   Other than saying it has to be within the vicinity of it,

12  yes.

13  Q.   And you were asked sometime about phone -- about a device

14  traveling, you know, based on that.  But isn't it true that

15  between 90 and 120, I'm sorry, 61 and 120, some of those calls

16  that go between, you know, from those two towers, that someone

17  can actually be in the same place for all of those calls and

18  yet one call or two calls in the middle could be 120 instead of

19  61?

20  A.   Again, that's true, but majority of those calls occurred on

21  tower 61.  You want to look at the consistency in the pattern,

22  the number.  Where you can often make it a lot more clearer,

23  sir, is when you see that constantly bouncing between tower 61

24  then 120, then tower 61 then 120.  There is a couple occasions

25  where it utilized sector 120 -- I'm sorry -- tower 120, but

1    predominantly it's on tower 61.

2    Q.   What I'm saying, it doesn't mean the phone was moving?

3    A.   That's correct, it does not mean that; yes.

4    Q.   Can we have the slide with the shaded area for a second,

5    please.   The pages aren't numbered.

6    A.   I think it's page seven.

7    Q.   So, that box on the bottom, the yellow shaded area does not

8    reflect the actual coverage area but reflects the direction in

9    which the signal is transmitted, right?

10   A.   Yes, sir.

11   Q.   That's pretty -- but anyway, so what you are saying is that

12   yellow area is not the full coverage of that tower, right?

13   A.   No, sir.

14   Q.   That's a tiny -- not tiny, but that's a smaller area.

15   We're really talking about a larger area that tower covers?

16   A.   Based on my experience of the network, we use a 70 percent

17   rule; that that signal would actually project out from that

18   tower 61 towards 120 70 percent of the distance.   I believe

19   that distance between the two towers is I believe between .6

20   and .7 miles, so 70 percent of the distance between that.

21   Q.   You're not saying it's those calls all -- that there's any

22   evidence that those calls all occurred within the shaded area,

23   right, I just want to make sure we have agreement on that.

24   A.   Yes.

25   Q.   And that we agree on that; that's not what you're saying.

1    A.  Yeah.

2    Q.  And it could be anywhere in that coverage area, either in

3    the same place or moving to various places within the coverage

4    area?

5    A.  Yes, that's correct.

6    Q.  Now, I'm going to, if I may, your Honor, this is a printout

7    of 160B and I believe the government would agree with that,

8    right?

9              MR. ARAVIND:  Yes.

10             MR. DRATEL:  Let me give you 160B.

11             THE WITNESS:  Yes.

12   Q.  Which it's already in evidence.

13   A.  Yes.

14   Q.  That's what's on that disk.  It's the printout of the call

15   detail records.

16   A.  Yes, this looks accurate, sir.

17   Q.  And it's the full printout as opposed to some of the

18   excerpts that we have seen so far today, right?  And this

19   covers again a wider range of days, right?

20   A.  I believe from March 6 through 2013 through April 18 or

21   April -- again, the records go through April 30th, but it looks

22   like the use of the phones kind of diminished.

23   Q.  Just to go back on the texts, I think what you're saying is

24   that the texts don't reflect where they are because they all go

25   to a message center, right?

1   A.  They're routed, yes, to a different switch, yes.

2   Q.  And you've looked through these records, right?  If you

3   need to look through them --  a question is fine, but if you

4   know from your review of them, that's fine, but most of the

5   texts are for the Harrisburg location, right?

6   A.  Yes.  And that's actually -- I have a slide the most

7   commonly used tower that was in Harrisburg.

8   Q.  And there was one also -- there's a text for Pittstown?

9   A.  Pittston?

10  Q.  Pittston?

11  A.  Yes.

12  Q.  Do you know why that would be different?

13  A.  Again, I didn't focus on the Pittston area but that would

14  be a different switch or a different geographic area, group of

15  towers.  I don't know where that is off the top of my head.

16  Q.  If you look for March 6, 2013.

17  A.  Okay.  I'm with you.

18  Q.  And there are towers -- we'll try to short circuit rather

19  than be too technical if that's okay with you and if the

20  government doesn't object, that's fine, which is, I'll just

21  talk about geographical areas rather than tower numbers, that

22  there are calls from this number, right, from the 6130 number

23  either incoming or outgoing -- I'm sorry -- outgoing, that are

24  transmitted through towers in one that says Wilmington, you see

25  March 6?

1   A.  If you can -- I do have that, yes, I have Wilmington.

2   Q.  There's also Philadelphia, right?

3   A.  Yes.

4   Q.  And the Wilmington, do we know whether it's Delaware, North

5   Carolina?

6   A.  The Wilmington switch in this particular case is in

7   Delaware.

8   Q.  Then if you look to March 13, 2013.

9   A.  Is there a particular time frame?

10  Q.  If I could look over his -- 21:13, military time, okay?

11  A.  Yes.

12  Q.  You see a couple for Plymouth Meeting?

13  A.  Yes, I do.

14  Q.  Do you know where that is?

15  A.  You know, I can't remember.  I believe it is in the

16  northeast, though.

17  Q.  Not the Bronx, right?

18  A.  No, not a switch -- I want to say it's in either

19  Pennsylvania or near the Philadelphia area.

20  Q.  Would it be along that corridor somewhere where you mapped

21  out all of the --

22  A.  That's a great point, yes, it would be.  That would have

23  had -- those are all of the --

24  Q.  Right, that's the limits of what this phone transmitted to,

25  right?

1   A.  Yes.

2   Q.  It would be somewhere along that corridor?

3           And March 16, I'll try to give you a time, 13:18, it's

4   the top of page 16.

5   A.  Okay.  I'm there.

6   Q.  So you see Philadelphia, right?

7   A.  Yes, I do.

8   Q.  And then a little bit lower, Maple Shade?

9   A.  Yes, I do.

10  Q.  Okay.  And then back to West Nyack, which is essentially

11  the Bronx we're talking about?

12  A.  Yes.

13  Q.  Because it's the same Bronx towers, cell towers, that we're

14  talking about, right?

15  A.  Yes, West Nyack, yes.

16  Q.  And so that indicates that the device is moving just like

17  the March 13 and just like March 6 really; it indicates the

18  device is moving in corridors in the northeast between

19  somewhere between Philadelphia and New York or Plymouth Meeting

20  New York and/or Maple Shade and New York, right?

21  A.  Definitely because of the great distance between these,

22  yes.

23  Q.  And so -- and then March 16, by the way, if you look in the

24  evening, that would be the 23:24 and then on the 17th, that's

25  also tower 61, right?

ea2gcha4                         Perry - cross

1    A.  Yes, and that's on the 16th, yes.

2    Q.  Now, if you go to the 18th of March 2013, starting at 18:53

3    which is 6:53 p.m., right?

4    A.  Yes, sir.

5    Q.  And then you have Jersey City?

6    A.  Yes.

7    Q.  You have a little further down you have Wayne and there is

8    a Wayne, New Jersey, right?

9    A.  Yes.

10   Q.  And then Plymouth Meeting again, right?

11   A.  Yes.  That's what we have; yes.

12   Q.  Let's go to March 21, 2013.  Start at 22:04 which is 10:04

13   p.m., right, you see that one?  I'm sorry.  That's on the

14   evening of the 20th?

15   A.  2-0, the 20th?

16   Q.  2-0, right.

17   A.  Okay.

18   Q.  The last one on the 20th, 22:04, the time.

19   A.  I'm sorry.

20   Q.  It's Wilmington?

21   A.  Right, I see that, yes.

22   Q.  And then a couple -- then you have Philadelphia, right?

23   A.  Yes.

24   Q.  And then back to the Bronx?

25   A.  Yes.  You got the Yonkers and then into the West Nyack

1   switch.

2   Q.   March 23, 2013, if you look at 9:16 a.m., right, there are

3   a bunch of calls transmitted off of towers in Branchburg?

4   A.   Yes.

5   Q.   And then Plymouth Meeting again, right?

6   A.   Yes, sir.

7   Q.   Then Wayne again, then Jersey City?

8   A.   On the 23rd?

9   Q.   Yes.

10   A.   Yes.

11   Q.   And then back to the Bronx?

12   A.   Yes.

13   Q.   And during these days for all these calls, you have no idea

14   who is using this phone, correct?

15   A.   No, I don't.

16   Q.   You don't know if it's shared, right?

17   A.   No, I don't.

18   Q.   You don't know if it's borrowed, right?

19   A.   No, I don't.

20   Q.   You don't know if it's borrowed or shared for a week,

21   right?

22   A.   I don't know.

23   Q.   For a day, for a month, right, you don't know any of that?

24   A.   Correct.

25   Q.   Let's go to March 26, this is the one on your slide, right?

ea2gcha4                         Perry - cross

1    A.  Starting at the --

2    Q.  At 6:48 p.m., right?

3    A.  6:20.

4    Q.  6:20.  And then it goes to Jersey City, Wayne, Branchburg,

5    Plymouth Meeting, right?

6    A.  Yes.

7    Q.  And that's the one from your slide?

8    A.  Yes, it is.

9    Q.  Now, March 27, the phone's back in the Bronx, right?

10   A.  Yes, it is.

11   Q.  March 28, still in the Bronx, right?

12   A.  Yes, it's still using this --

13   Q.  March 29, still in the Bronx, right?

14   A.  Yes, sir.

15   Q.  March 31, Plymouth Meeting again?

16   A.  March 31.

17   Q.  Yes.

18   A.  No, I believe that it looks like it just arrived there at

19   10:48 p.m.

20   Q.  Then April first back in the Bronx?

21   A.  Yes.

22   Q.  April 3 back in Plymouth Meeting?

23   A.  Yes.

24   Q.  Branchburg, right?

25   A.  Branchburg.

1   Q.  April 3, right?

2   A.  Yes.

3   Q.  And then back in the Bronx later on that day?

4   A.  Yes.

5   Q.  Just one more, April 8 -- withdrawn.

6           Basically what this shows, the device is moving back

7   and forth and back and forth that whole period, right, in the

8   northeast corridor?

9   A.  For several -- for those days we spoke of.

10  Q.  So not just the one day of your slide, correct?

11  A.  No, just the one day of the -- the one day of the slide,

12  yeah.  There's other days besides that.

13  Q.  That was the only day you were asked to prepare a slide

14  for?

15  A.  Yes.

16  Q.  Not for any of these other days where the same corridor is

17  traveled by this device over and over again, right?

18  A.  Correct.

19          MR. DRATEL:  Just one second, your Honor.

20  Q.  Thank you, Special Agent Perry.  Nothing further.

21          THE WITNESS:  Thank you, counsel.  Redirect

22  examination?

23  REDIRECT EXAMINATION

24  BY MR. ARAVIND:

25  Q.  Special Agent perry, using defense exhibit -- the printout

1   that you have in front of you, after March 26, 2013, when is

2   the next time the phone returns to the New York area?

3              THE COURT:  The phone returns to where?

4              MR. ARAVIND:  The New York area.

5   A.  The first call was actually on March 27, 2013 at 7:42 a.m.

6   Q.  And then when is the last call according to these records

7   in front of you that's from the New York area or the call where

8   the phone is placed in the New York area?

9   A.  The last call?

10  Q.  Yes, in this chart that you have.

11  A.  It's going to take me a while to find that.

12  Q.  You can start from the back, and go back.

13  A.  I found -- this could would have occurred on April 4th of

14  2013 at 2:00 a.m.

15  Q.  What's the last entry you have on this chart?

16  A.  The last row was actually April 30 of 2013.

17  Q.  Do you see any records from April 4 to April 30th

18  referencing a cell tower in New York?

19  A.  I do not.

20             MR. ARAVIND:  Nothing further.

21             MR. DRATEL:  No recross.

22             THE COURT:  You may be excused.

23             THE WITNESS:  Thank you, your Honor.

24             (Witness excused)

25             THE COURT:  Would now be a good time for me to read

1   the stipulation.

2          MR. ARAVIND:  Yes.

3          THE COURT:  Ladies and gentlemen, I have another

4   stipulation to read between the parties.  I will omit the first

5   paragraph which basically says the parties agree with each

6   other and here is the stipulation:

7          Members of the United States Attorney's Office were

8   not aware that an internet photograph of Antione Chambers was

9   shown by Detective Deloren to Demi Torres until on or about

10  January 24, 2014 when Demi Torres told members of the United

11  States Attorney's Office.  And it's signed by counsel for the

12  party.  It will be marked as a government exhibit.

13         Do we know the next in the series of numbers for

14  stipulations?

15         MR. ARAVIND:  2007.

16         THE COURT:  2007.  And I will admit it, and we can

17  replace the handwritten one.

18         Mr. Street, may I give it to you.

19         Anything else?

20         (Government's Exhibit 2007 received in evidence)

21         MR. ARAVIND:  Apart from the photograph of the duct

22  tape that we asked -- we talked about at the side bar, we can

23  publish it or formally admit Government Exhibit 300-A.

24         MR. DRATEL:  No objection.

25         THE COURT:  It's admitted.  What's the exhibit number?

1                (Government's Exhibit 300-A received in evidence)

2                MR. ARAVIND:  May I publish it.

3                THE COURT:  Yes.

4                MR. ARAVIND:  Thank you.  The government rests, your

5     Honor.

6                THE COURT:  Thank you.

7                Defense counsel, are there any motions?

8                MR. DRATEL:  Yes.

9                THE COURT:  I will reserve.

10               Do you have any witnesses?

11               MR. DRATEL:  Yes.  We call Detective Ellis Deloren,

12    your Honor.

13               MR. ARAVIND:  May we have a moment to confer with

14    defense counsel.

15               May we have a side bar.

16               THE COURT:  Yes.

17               (Continued on next page)

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

 1                (At the side bar)

 2                THE COURT:  Could I say something first.  I have not

 3     yet ruled on the expert and on the motion to strike.  And I am

 4     not going to do that right here at our side bar, but I want to

 5     make sure the ruling doesn't affect what you want to ask

 6     Detective Deloren.

 7                What I want to tell you is that right now my

 8     inclination is to give you a choice:  Either I will strike the

 9     testimony but there will be no expert or I will not strike the

10     testimony and you may call your expert.  This is not a ruling.

11     I'm just telling you what I'm thinking.

12                MR. DRATEL:  It would affect my --

13                THE COURT:  It would affect cross.

14                MR. DRATEL:  I probably wouldn't call him at all if I

15     didn't have to.  If Ms. Torres testimony was stricken, I

16     wouldn't have called --

17                MR. ARAVIND:  I think we would like to be heard on the

18     motion to strike and, if possible, submit some briefing to your

19     Honor this evening.  Obviously, I don't know whether the Court

20     intends to strike her entire testimony.

21                THE COURT:  I would just strike the portion of it,

22     basically the identification testimony is what I'm thinking at

23     the moment.

24                MR. ARAVIND:  I think we would very much appreciate an

25     opportunity to make an application your Honor with regard to

1     that in writing.

2               THE COURT:  I guess my hesitation is, this is the

3     fourth time now that we're revisiting the issue, and I have

4     lots of briefing from everybody on the issue.  And the one

5     thing that is different seems to me are the facts as I

6     understand them.  And so I'm not sure what it is you would tell

7     me.

8               Do you have a sense of what you would tell me.

9               MR. ARAVIND:  Yes, your Honor.

10              THE COURT:  That would be helpful.

11              MR. ARAVIND:  We just handed Mr. Dratel a copy of her

12    3500 material.  What we believe that contains is Detective

13    Deloren's belief as to the sequence and the number of

14    identifications, the number of photographs that he showed to

15    Ms. Torres.  And I think that there's certainly grounds for

16    Mr. Dratel to recall this witness and recall him given that

17    testimony, but I think what will end up happening is there are

18    different recollections.

19              We believe this is an issue that should be resolved

20    through cross-examination and the jury -- it should be resolved

21    by the jury during cross-examination.  I think Mr. Dratel can

22    make his arguments during cross-examination, but I think to

23    strike Ms. Torres' in-court identification and her discussion

24    of the identification procedures during her direct testimony is

25    extremely beyond the pale at this point, your Honor.  And I

1    think I don't think there's authority to do that.  I think we

2    would have to, again, submit paperwork to your Honor and be

3    able to brief the issue.

4            MS. TEKEEI:  If I may also add to what Mr. Aravind

5    said, to the extent the concern or any questions might be about

6    the way the second photo array was created, we spoke with

7    Detective Deloren as is reflected in our notes about the method

8    he used to create that.  And I think he could explain on

9    Mr. Dratel's direct examination how that happened, where he got

10   the photo, how the array was created by the photo unit with his

11   assistance, all of which is reflected in the 3500 material step

12   by step and documented by the photo unit.

13           So to the extent your Honor is concerned about the way

14   that that particular second array was created, he could explain

15   those procedures.

16           THE COURT:  Just so you understand my thinking, it's

17   not at all, and what I find beyond the pale are all the

18   procedures that led up to the final so-called positive

19   identification by the witness, and I think that rises to the

20   level, not ruling, just telling you my thinking at the moment,

21   but it seems to me at the moment that it rises to the level of

22   a depravation of Constitutional rights.

23           I heard both witnesses.  I heard the cross of both

24   witnesses and that's where my thinking is.  So I know it is a

25   significant act to take, and I don't want to do it without

1    giving you a chance to put something in writing, but I find it

2    unlikely that I would come out another way, but I have not

3    ruled.  I will keep an open mind until I see what you have to

4    say.

5              MR. DRATEL:  I would like to defer putting him on

6    then.

7              THE COURT:  Absolutely.  I understand.

8              MR. DRATEL:  I guess we'll wait to see what the

9    government says.  My only response is, they resisted hearing I

10   don't know how many times.  They -- well, never mind.

11             THE COURT:  Okay.  So I guess there's nothing left to

12   do but to excuse the jury, I suppose.

13             MR. DRATEL:  The reason I actually wanted a side bar

14   was that I had asked the government for a 615 embargo with

15   respect to Detective Deloren.  I would like to amend that in

16   one respect.  If he is called that he not say that it was from

17   the U.S. Probation Department that he got the photograph.  Just

18   say, you know, that he received a photo outside of the database

19   and that would be sufficient.  I would try to lead him so that

20   he wouldn't, but you never know what people are going to do.

21             THE COURT:  Is that agreeable?  I assume you could

22   prep him so he would say that.

23             MR. ARAVIND:  We can definitely do that.

24             THE COURT:  I will excuse the jury and I'll ask them

25   to be back here at the usual time.  I'll come on the bench and

Ea2gcha4                        Perry - redirect

1    make a ruling at 9:30.  We'll start at 9:45 and I will read and

2    consider whatever you get me tonight.

3              MR. DRATEL:  We can be summing up.  You charge first

4    and then we can be summing up tomorrow morning.

5              THE COURT:  That could happen.

6              MR. DRATEL:  All right.  Thank you.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               (In open court; jury present)

2               THE COURT:  I apologize for the side bars.  I don't

3       like to have them, but the good thing is we're going to end

4       today.  We will start again tomorrow at our usual time.  Be

5       here at 9:30.  We'll resume again at 9:45.  As you know, the

6       government has rested, so it's the turn of the defense if they

7       wish to put on a case.

8               And it is very likely that we will end the evidence

9       tomorrow and that you will be given your final charge of the

10      law and if there is time, you may even hear closing statements

11      tomorrow.

12              My guess is that you probably won't have time to

13      deliberate tomorrow, but it's possible, but the case will be

14      yours after the closing statements and some final instructions.

15      So we're getting very close to the end of trial.

16              Thank you for your attention and I'm sorry for a short

17      day today.  We'll see you again tomorrow.  I plan to sit a full

18      day tomorrow, so we'll sit until 4:30.  Thank you.

19              Please leave your notebooks and don't talk about the

20      case.

21              (Jury excused)

22              (Continued on next page)

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1              (In open court; jury not present)

2              THE COURT:  As long as we have a little bit of time, I

3      want to do two things.  First, I'm going to rule on the defense

4      motion.  And I will deny the motion for a judgment of

5      acquittal.  Do you want to make any argument, Mr. Dratel?

6              MR. DRATEL:  It may be more, so not to spend time on

7      it when it's not in the right context, but it may depend on the

8      Court's ultimate ruling.

9              THE COURT:  Okay.  So I'll just give a brief

10     explanation of my ruling denying your motion and that is, I

11     don't credit the identifications that I heard.  I don't credit

12     the car description.  And I don't credit the evidence of flight

13     of consciousness of guilt.

14             MR. ARAVIND:  Can we just close the door.

15             THE COURT:  In terms of consciousness of guilt, I am

16     mindful that flight and false identification can be powerful

17     evidence of consciousness of guilt, but the connection I don't

18     see in this case is a connection to consciousness of guilt

19     about this particular crime.  There may be other things or

20     other reasons that prompted the defendant to want to hide his

21     identity and/or flee.

22             I do credit the cell site information.  I do credit

23     the evidence about the hammer in the car and Mr. Chambers'

24     statement about the hammer in the car.  I also credit the

25     testimony about the license plate number and the fact that it

1    matches.  And I believe that that evidence is sufficient that a

2    reasonable jury could convict.  So that is the basis for my

3    denial of the motion.

4             What I'd like to do, I think, is take -- I don't know.

5    Have you had a chance to look at the charge that I sent around.

6    It's very similar to what you sent me, only a little shorter

7    and a little more informal.

8             MR. ARAVIND:  We have not, from the government's

9    perspective.

10            THE COURT:  When do you all want to have this charging

11   conference?  You can look at it now.  I think I sent you a

12   blackline.  I don't think it's very controversial and maybe the

13   best thing to do is -- any suggestions?  I can't stay beyond

14   6:30 tonight.  I know you all have work to do tonight.

15            MR. ARAVIND:  We would propose first thing in the

16   morning, your Honor.

17            THE COURT:  Our jury is showing up at 9:30.  I guess

18   we should have our conference at 9:00.  Is that good?

19            MR. DRATEL:  Yes.

20            MR. ARAVIND:  Yes.

21            THE COURT:  We'll have our charging conference at 9:00

22   and I don't think there are any other loose ends hanging.

23            Anything else we have to deal with now?

24            MR. DRATEL:  No.

25            MR. ARAVIND:  Nothing.

1          THE COURT:  Thank you very much.

2          MR. ARAVIND:  Side bar.

3          (Continued on next page)

1              (At the side bar)

2              MR. DRATEL:  My office was able to contact the

3    counsel's office at MCC.  I authorized them to remove from

4    Mr. Chambers' cell two CDs and they have done so.  And then the

5    office of the, I think an assistant to the counsel -- and I

6    don't know if the government sent someone, but they said they

7    would be locked in the office if no one could get there by

8    4:00 p.m., so they're safe and secure.

9              THE COURT:  Thank you very much.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2              THE COURT:  As a matter of housekeeping, we need to be

3     sure that all the jurors' binders are complete.  We need to

4     make sure that everything that belongs in them is in them and

5     anything that doesn't belong is not in them.  In addition, I

6     don't have copies of the defense exhibits and I have never seen

7     some of them.

8              MR. DRATEL:  I'll give you a copy right now.

9              THE COURT:  You can do what?

10             MR. DRATEL:  I think we can give you copies right now.

11             THE COURT:  Copies right now of all three, it's three,

12    right?

13             MR. DRATEL:  Three.

14             THE COURT:  If I could get copies, that would be

15    great.

16             Thank you.

17             (Adjourned to October 3, 2014 at 9:00 a.m.)

18                                  * * *

19

20

21

22

23

24

25

```
 1                    INDEX OF EXAMINATION

 2   Examination of:                        Page

 3   JOHN REYNOLDS

 4   Direct By Mr. Aravind . . . . . . . . . . . 562

 5   Cross By Mr. Dratel . . . . . . . . . . . . 613

 6   ERIC PERRY

 7   Direct By Mr. Aravind . . . . . . . . . . . 621

 8   Cross By Mr. Dratel . . . . . . . . . . . . 650

 9   Redirect By Mr. Aravind . . . . . . . . . . 667

10                    GOVERNMENT EXHIBITS

11   Exhibit No.                          Received

12   5002  . . . . . . . . . . . . . . . . . . . 563

13   160A, B, C, D, F and G . . . . . . . . . . 573

14   2005  . . . . . . . . . . . . . . . . . . . 581

15   1903  . . . . . . . . . . . . . . . . . . . 583

16   61  . . . . . . . . . . . . . . . . . . . . 584

17   902, 2003 . . . . . . . . . . . . . . . . . 589

18   400-A, 400-B, 400-C, 400-D . . . . . . . . 591

19   901 . . . . . . . . . . . . . . . . . . . . 595

20   125, 2004 . . . . . . . . . . . . . . . . . 597

21   125-T . . . . . . . . . . . . . . . . . . . 599

22   4C  . . . . . . . . . . . . . . . . . . . . 601

23   4D  . . . . . . . . . . . . . . . . . . . . 601

24   5003  . . . . . . . . . . . . . . . . . . . 605

25   700 . . . . . . . . . . . . . . . . . . . . 608
```

150      . . . . . . . . . . . . . . . . . 630

2007     . . . . . . . . . . . . . . . . . 669

300-A    . . . . . . . . . . . . . . . . . 670