Ea3gcha1                    TRIAL

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA

4          v.                              13 CR 345(LGS)

5   ANTIONE CHAMBERS,

6              Defendant.

7   ------------------------------x

8                                        New York, N.Y.
                                         October 3, 2014
9                                        9:00 a.m.

10

    Before:
11
                        HON. LORNA G. SCHOFIELD,
12
                                            District Judge
13

14                          APPEARANCES

15

    PREET BHARARA
16       United States Attorney for the
         Southern District of New York
17  SANTOSH ARAVIND
    NEGAR TEKEEI
18       Assistant United States Attorneys

19  JOSHUA L. DRATEL
    WHITNEY SCHLIMBACH
20       Attorneys for Defendant

21  ALSO PRESENT:  JOHN REYNOLDS, FBI
                   JENNIFER HANSMA, Paralegal AUSA
22                 SONIA FARBER, Law Clerk

23

24

25

1          (Trial resumed; jury not present)

2          THE COURT:  I'm going to ask my law clerk to get the

3     charge and we'll do the charging conference first.

4     I sent you both a blackline and a clean copy of the jury

5     instructions.  Let's go page by page.  Shall we use the

6     blackline?

7          MR. DRATEL:  I think, your Honor.

8          THE COURT:  Of course, the blackline does have page

9     numbers.  Anything on page one?  Let me ask the government.

10         What page is your first comment on?

11         MR. ARAVIND:  My first comment is -- there's not many.

12    I just noticed a typo on page 12 of the actual charge, I'm

13    trying to find out where that is.

14         THE COURT:  That's all right.  I have the actual one

15    as well.  Where is the typo?  It's under the heading "an

16    agreement."

17         MR. ARAVIND:  Above that, second line at the top of

18    the page.  It's "the commission of a robbery."

19         THE COURT:  Okay.  Ms. Farber, if you search

20    "commission a robbery" it will come up.  It should be

21    "commission of a robbery."

22         Is that your first page of comments?

23         MR. ARAVIND:  Yes, your Honor.

24         THE COURT:  That is under the elements of the offense

25    for robbery conspiracy, so in the draft --

1              MR. DRATEL:  Page 23, 24.

2              THE COURT:  Where is the next comment after that?

3              Yes, Mr. Dratel.

4              MR. DRATEL:  We're preserving what we have already

5     done in terms of -- in other words, things that the Court has

6     eliminated or deleted, are they considered preserved so we

7     don't have to go through --

8              THE COURT:  Yes.

9              MR. DRATEL:  Thank you.  I'm just talking about things

10    as they stand right now -- sorry.

11             THE COURT:  In other words, we obtained from the

12    government a proposed charge.  We got from you a track changes

13    showing your proposed changes.  Some of those were rejected.

14    Those objections are preserved.

15             MR. DRATEL:  Thank you.  So I'm just working on the

16    charge as it is?

17             THE COURT:  As it is now.

18             MR. DRATEL:  Correct.

19             THE COURT:  Correct.

20             MR. ARAVIND:  Your Honor, the next change I have is on

21    the blackline.  It would be page 35.  And this is the same

22    issue that we raised before related to the kidnapping, your

23    Honor.  Since I think the evidence showed that both Mr. Barea

24    and Ms. Torruella were kidnapped, we would make a reference

25    there to individual or individuals or just individuals

Ea3gcha1                          TRIAL

 1     described in Count Three.

 2               THE COURT:  Actually, I don't think we need to

 3     reference -- why don't we go to the kidnapping charge, Count

 4     Three kidnapping charges the defendant with engaging in

 5     kidnapping.  The following four elements:  First --

 6               MR. DRATEL:  Which section are you in?

 7               THE COURT:  It's Count Three, kidnapping.

 8               MR. DRATEL:  Right.

 9               THE COURT:  It looks like -- it's impossible to tell

10     the page numbers on the blackline.

11               MR. DRATEL:  Tell me what section.

12               THE COURT:  Sure.  It's E, it says E, Count Three

13     kidnapping.

14               MR. DRATEL:  Okay.

15               THE COURT:  We're going through the elements.

16               MR. DRATEL:  Right.

17               THE COURT:  What does the indictment -- actually I

18     have the indictment, as well, but what does Count Three say?

19     Did you intend that we give the jury a copy of the indictment?

20               MR. ARAVIND:  We can certainly.  I know we have done

21     that in other cases.  We would have to do a redacted version.

22               THE COURT:  Let's not, unless you can have it redacted

23     and done between now and then.

24               MR. ARAVIND:  Of course, it depends on when the jury

25     gets it, but we'll obviously work to get that done.

Ea3gcha1                    TRIAL

 1          THE COURT:  If it's ready, I will give it to them.  If

 2   it's not, then I won't, but they have a very detailed

 3   description of the charges in the charge.

 4          MR. ARAVIND:  Right.

 5          THE COURT:  It seems to me that that is sufficient.

 6   But in any event, Mr. Dratel.

 7          MR. DRATEL:  The indictment is not evidence and an

 8   instruction to that without giving it to them --

 9          THE COURT:  The model jury instructions include a

10   reference to giving them the indictment.  I didn't see an

11   objection to that.

12          You can object to that if you want.

13          MR. DRATEL:  We object.

14          THE COURT:  Okay.

15          MR. ARAVIND:  Your Honor, the indictment does not

16   reference -- it just says Glisson and Chambers kidnapped an

17   individual, and that's in the "to wit" clause.  I think the

18   evidence here is that two individuals were kidnapped.

19          THE COURT:  I think we can make this easier.

20          MR. ARAVIND:  Sure.

21          THE COURT:  In the indictment, there's no individual

22   named.

23          MR. ARAVIND:  There's no individual named.

24          THE COURT:  So let's say, first, the government must

25   prove the defendant seized or confined or kidnapped or inducted

Ea3gcha1                     TRIAL

1     or carried away an individual.

2            MR. ARAVIND:  Sure.  That makes sense, your Honor.

3            THE COURT:  Second, the government must prove that the

4     defendant held an individual for ransom, reward or for reason.

5     We can say "the."  Let's make it "an."  Third, the government

6     must prove the individual was transported in interstate or

7     foreign commerce.  Let's keep that the same.  Second, I think

8     it should state "the" not "an."

9            Second, "the government must prove the defendant held

10    the individual," and that just references what's in the prior

11    sentence, which says "First, the government must prove the

12    defendant seized or confined or kidnapped or an individual."

13           So the only change in that section is in the sentence

14    that begins "first."

15           MR. ARAVIND:  Yes.  Of course, those changes should be

16    then made to the rest of the substantive charges for

17    kidnapping.  I see the next change, it has to be in --

18           THE COURT:  The first element.

19           MR. ARAVIND:  Under first element, I would just say

20    carried away "a" victim instead of "the" victim.

21           THE COURT:  Yes.

22           MR. ARAVIND:  The next one, under two, I think should

23    be under two, the second element the government must prove

24    beyond a reasonable doubt is the defendant held an individual

25    for ransom or for some other reason.  And then the next

1    sentence it should read --

2            THE COURT:  I would leave it as "the" in the next

3    sentence so they know it's a reference to the preceding

4    sentence.

5            MR. ARAVIND:  That's fine.  And then we can keep the

6    "the" for the next line, the last line on that page.

7            THE COURT:  Then in the last paragraph, "if you find

8    that the defendant did not hold an individual," what about "for

9    the reasons charged"?

10            MR. ARAVIND:  I think it could read "for the purpose

11    of carrying out a robbery of narcotics proceeds."  I think

12    that's what the indictment says.

13            So if we want to substitute that language, it's

14    probably more specific, especially if the jury doesn't end up

15    getting a copy of the indictment.

16            THE COURT:  If you find that the defendant did not

17    hold an individual and then delete described in three and then

18    say four, what language did you want to insert?

19            MR. ARAVIND:  For the purpose of carrying out a

20    robbery of narcotics proceeds.

21            MR. DRATEL:  Robbery of --

22            THE COURT:  Narcotics proceeds.

23            MR. DRATEL:  Which would be what's really referenced

24    in Count Two as opposed to generic.

25            THE COURT:  If we're not giving them the indictment.

1          MR. DRATEL:  Okay.

2          THE COURT:  If you find that the defendant did not

3    hold an individual for the purpose of carrying out the robbery

4    of narcotics proceeds or if you have reasonable doubt as to

5    this element, then it is your duty to acquit on this count.

6          MR. ARAVIND:  Then I think in the next -- under number

7    three, the third element, I would suggest changing the first

8    sentence to read the third element the government must prove

9    beyond a reasonable doubt is that -- I think probably maybe a

10   victim was transported in interstate commerce or a victim of

11   the kidnapping was transported in interstate commerce.

12         THE COURT:  Any objection?

13         MR. DRATEL:  No, your Honor.

14         MR. ARAVIND:  Then in paragraph four, your Honor, the

15   third paragraph, again, we would take out the reference to the

16   individual described in Count Three and just say the defendant

17   knew that a victim of the kidnapping was not with him

18   voluntarily, but, rather, was forced or made to go with him.

19         THE COURT:  Ms. Farber, I'll assume you'll tell me if

20   it's not okay.

21         MS. FARBER:  Yes, Judge.

22         THE COURT:  Thank you.

23         Other comments?

24         MR. ARAVIND:  Our next comment, your Honor, is in

25   Count Four.

Ea3gcha1                      TRIAL

 1          THE COURT:  Yes.

 2          MR. ARAVIND:  The last line, it just says "or is

 3     guilty of the kidnapping conspiracy."  Count Three does not

 4     charge a kidnapping conspiracy.  It charges a substantive

 5     kidnapping.  So I would just take out the in the conspiracy or

 6     just the conspiracy, yes.

 7          THE COURT:  We had a paragraph that starts "Count Four

 8     is a firearms count connected," is that right?

 9          MR. ARAVIND:  Yes.  It should read connected to the

10     robbery conspiracy charged in Count One and the kidnapping

11     charged in Count Three.  That means you cannot consider Count

12     Four unless you first determine that the defendant is guilty of

13     either the robbery conspiracy charged in Count One or is guilty

14     of the kidnapping charged in Count Three.

15          THE COURT:  So we're just deleting the word

16     "conspiracy" there.

17          MR. ARAVIND:  Correct.

18          THE COURT:  All right.  Other comments?

19          MR. ARAVIND:  Your Honor, this may just be me trying

20     to take out extraneous language, but I don't know whether you

21     need to instruct them that a hammer is not a firearm.

22          THE COURT:  That a hammer is not a firearm.

23          MR. ARAVIND:  On 2A1.

24          THE COURT:  There's language there that says, but a

25     hammer is not a firearm.

1          Do you have any objection to taking that out?

2          MR. DRATEL:  No.

3          THE COURT:  Ready for any other comments.

4          MR. ARAVIND:  I don't think the government has any

5     other comments.

6          THE COURT:  Mr. Dratel, anything else?

7          MR. DRATEL:  Your Honor, my first comment is in the

8     identification instruction on the eyewitness identification

9     instruction, page 29.

10          THE COURT:  Are you in the clean copy?

11          MR. DRATEL:  No.  I'm working off of the redline, the

12     blackline.

13          THE COURT:  It says page nine.

14          MR. DRATEL:  Twenty-nine.  I'll look for it.  I think

15     it's about 40 or 41 -- page 40 in the --

16          THE COURT:  In the clean copy.

17          MR. DRATEL:  Yes.  I think paragraph three, you have

18     heard the arguments.  I think "you will hear."

19          THE COURT:  Yes.

20          MR. DRATEL:  Obviously, depending on the Court's

21     ruling on some of the other issues, I think there should be

22     additional information there of the type that's in the *Jones*

23     opinion and about cross-racial identification, which

24     complements the other types of factors this Court talked about

25     back before.

Ea3gcha1                    TRIAL

1          THE COURT:  I asked the parties to give me a joint

2     proposal of a possible charge on that and I haven't received

3     anything.  So, I'm not adverse to doing that, but I need

4     something specific.

5          MR. DRATEL:  I'll have something.

6          THE COURT:  Anything else?

7          MR. ARAVIND:  Of course, we would have to look at that

8     proposed instruction.

9          THE COURT:  Of course.

10         MR. ARAVIND:  By my account, I think there's been one

11    or two references to any sort of cross-racial identification,

12    so we just want to look at what Mr. Dratel has.

13         THE COURT:  Yes.

14         MR. DRATEL:  My next comment is the blackline at 34

15    and the clean copy at 43 Section D, that first paragraph.

16         THE COURT:  Okay.

17         MR. DRATEL:  I think that the order should be

18    reversed.  I think that "if you find that the government has

19    failed to meet its burden" should be before "you find that the

20    government has met its burden."

21         THE COURT:  Any objection?

22         MR. ARAVIND:  We do object.  It's our burden.  I think

23    that's our burden and that's why the sentence that talks about

24    us meeting the burden should be first.

25         THE COURT:  I agree with the government.  I'll leave

1    it the way it is.

2            MR. DRATEL:  Then at the bottom of that -- at the very

3    end of that -- well, actually the paragraph that goes over to

4    page 44, "then your good conscience appears to be in accordance

5    with the truth," I'm not sure that that's the actual standard.

6    I don't think that's the standard.  I think really it's about

7    the Court's instructions about what the law is, applying the

8    facts to the law.  They're supposed to --

9            THE COURT:  I'm looking for the reference to

10   conscience.  I can't find it.

11           MR. DRATEL:  If you look at page 44 of the clean copy,

12   the paragraph that begins the page, the very last.

13           THE COURT:  The runover paragraph.

14           MR. DRATEL:  Yes, about the first full paragraph, the

15   paragraph that carries over to 43, the last two lines.

16           THE COURT:  Prejudice or favor of either party, and

17   adopts the conclusion that in your good conscience appears to

18   be in accordance with the truth.

19           MR. DRATEL:  I think that undermines the burden of

20   reasonable doubt as opposed to what's the truth, as opposed to

21   holding the government to its burden.

22           MR. ARAVIND:  There's a reference to the burden.  We

23   just spoke about the reference, which was in the first

24   paragraph of that section.

25           I think one of the first things your Honor said to

1   this jury was that this is a trial and it's a search for the

2   truth, and I think that's true.  So we believe that the Court's

3   instructions is appropriate.

4           THE COURT:  I agree with the government, so I'll keep

5   it the way it is.

6           MR. DRATEL:  And in the conclusion --

7           THE COURT:  The closing comment.

8           MR. DRATEL:  I'm just looking to see if it's

9   actually -- the oath part, second line, "solely upon the

10  evidence," I would just add "or lack of evidence."

11          THE COURT:  I think that's argument.  I'm going to

12  leave it the way it is.

13          MR. DRATEL:  Thank you, your Honor.

14          THE COURT:  With respect to the charge, Ms. Farber, if

15  you email it to me, I can begin to charge them off of my iPad

16  and then we can have copies made for the jury as I'm charging

17  them.  And as soon as they get here, we'll just catch them up

18  to where it is.

19          Let's take a very brief recess so I can get some

20  material out of the robing room.

21          I did have one question.  There was a reference in one

22  of the letters to counsel bringing a copy of the thumbnail

23  picture today.

24          MR. DRATEL:  Yes.

25          THE COURT:  I was wondering where that is.  I gathered

Ea3gcha1                    TRIAL

1    it was in the 3500 material.

2              MR. DRATEL:  Correct, but it was not identified in any

3    way.

4              THE COURT:  Ms. Farber, would you mind taking that

5    from Mr. Dratel.  I have 3500 material, and is it this picture?

6              MR. DRATEL:  Yes, your Honor.

7              THE COURT:  It's the reverse side of the single

8    photograph that was used in the photo array that's Defense

9    Exhibit B, is that right?

10             MR. DRATEL:  Okay.

11             THE COURT:  Yes.

12             MR. DRATEL:  Yes, that's right.

13             MS. TEKEEI:  Yes.

14             MR. DRATEL:  Oh, I see.  Yes.

15             MS. FARBER:  On page 40, a point of clarification.  We

16   struck "you have heard the argument by counsel on the subject",

17   so to say "you will hear the arguments of counsel on the

18   subject," it no longer makes sense to say "and I will not

19   repeat them all here."

20             MR. DRATEL:  Right.

21             THE COURT:  I have your copy of this, I'll give it

22   back.  I understand now what it is.

23             What is the government's understanding of when that

24   was shown to Ms. Torres?

25             MS. TEKEEI:  We don't know that it was.  When looking

1  at this in the 3500, we actually didn't think that this was

2  Mr. Chambers.

3         THE COURT:  Let me ask this question.  I'll ask a

4  different question.

5         MS. TEKEEI:  Sure.

6         THE COURT:  When the witness talked about a single

7  photo that was shown on the computer enlarged, which occasion

8  did you think that was?  Which photo and when in the sequence?

9         MS. TEKEEI:  Honestly, we were completely confused by

10 it and were not sure and still remain unsure.  And we have

11 spent a bulk of last night looking through the materials to see

12 what it could possibly have been.  We really don't know.  It

13 was the very first time that we heard anything like that.  We

14 looked through the 3500 materials just to verify that in case

15 for some reason something had slipped.  Of course, we would

16 have notified Mr. Dratel and the Court had we known.

17        At this moment, we remain confused by that testimony.

18 We're not sure.

19        THE COURT:  I understand.  I accept your

20 representation.

21        Let me ask Mr. Dratel what he thinks when in the

22 sequence the single photograph was displayed to the witness, or

23 do you agree that it's somewhat unclear that it was certainly

24 before the Internet photo?

25        MR. DRATEL:  If there's any lack of clarity is because

1    Detective Deloren never memorialized that, he never told the

2    government.

3           THE COURT:  I understand that.  I had a simple

4    question what your theory was.  I think the evidence is

5    ambiguous on that question, but I was just curious what your

6    theory, is if you have one.  Your theory may be it's ambiguous.

7           MR. DRATEL:  I think that the first photo she saw was

8    a single photo of him and maybe that thumbnail, that he

9    describes as a thumbnail in his 3500 from two days ago, not

10   never before, that that's the younger photo that she talks

11   about.  And then the array --

12          THE COURT:  I'm going to interrupt you because I think

13   all this is sort of academic in a sense because we're now

14   trying to interpret the testimony.  The testimony is what it

15   is.  So excuse me just a moment, I'll be back.

16          (Recess)

17          THE COURT:  You may be seated.

18          MR. DRATEL:  One other thing has come to my attention

19   just now.

20          THE COURT:  Speak into the mic.

21          MR. DRATEL:  Sorry.  Respectfully, that photo that I

22   just gave to the Court this morning was on Agent Reynold's

23   phone at the time he arrested Mr. Chambers and showed it to

24   Mr. Chambers on the car ride on the way back from New Jersey.

25          THE COURT:  I'm sorry to be obtuse, but the

Ea3gcha1                    TRIAL

1   significance of that is?

2          MR. DRATEL:  Detective Deloren said he had no idea

3   where the photo came from.

4          THE COURT:  I see.  I hadn't realized that Detective

5   Deloren had said that.

6          MR. DRATEL:  But also that's a photo that's out there,

7   being used.

8          THE COURT:  All right.  So, I'm prepared to rule on

9   the motion to strike Ms. Torres' testimony.

10         Let me read the ruling.

11         This is the fourth time I've been asked to rule on

12  whether or not the identification procedures used to identify

13  Mr. Chambers were unduly suggestive.  Unlike the first three

14  times, and based on Ms. Torres' testimony, I'm granting

15  Mr. Chambers' motion to strike.  I intend to ask the jury to

16  disregard all of Ms. Torres' testimony identifying

17  Mr. Chambers, including her in-court identification.

18         Let me briefly review the history of this motion.

19  Initially, Mr. Chambers made a motion to suppress the

20  identification testimony on the ground that the victims were

21  shown two photo arrays, both containing a photo of

22  Mr. Chambers, the second of which resulted in a positive

23  identification.  I held that while the procedure was

24  suggestive, it did not rise to a constitutional violation and

25  denied the motion.  Second, several months later, the

1    government wrote to advise that they had just learned that one

2    of the victims, whom we now know to be Ms. Torres, was also

3    shown a single candid photo of the defendant from the Patriot

4    News website Mr. Chambers' full name under the picture, that

5    she had been unable to identify Mr. Chambers as the perpetrator

6    from this candid photo, and was only able to identify him from

7    a second photo array.  I again denied the motion on the same

8    grounds.

9           Third, on the Monday the beginning of trial, I deny

10   Mr. Chambers' motion for a Wade hearing based on another

11   revelation, this time in the 3500 materials, that Ms. Torres

12   had Googled Mr. Chambers after Detective Deloren showed her the

13   online picture and, quote, "saw same photo in article – nothing

14   different than when saw it" at the precinct.  The basis for my

15   ruling as I explained on Tuesday, was that quote "[s]ince the

16   witness was looking again at the same photo on the same day,

17   that additional viewing did not...materially change the

18   analysis of my prior ruling."  Over the course of Detective

19   Deloren and Ms. Torres' testimony, it's become clear to me that

20   the facts are yet again different from what had been

21   represented to the Court, and apparently to the prosecutors as

22   well.

23          With regard to Ms. Torres' testimony, which I found to

24   be credible, my understanding of the timeline for the

25   identification of Mr. Chambers is as follows, but the precise

sequence admittedly is not entirely clear.  Ms. Torres met with

Detective Deloren on four different occasions to identify the

person she saw in her grandmother's living room on the night of

the robbery.  She first met with Detective Deloren "a day or

two after the night" (135,11).   Detective Deloren showed her

mug shot photos on the computer at the precinct (142,22).  No

identifications resulted from this first visit.

The second time Ms. Torres met with Detective Deloren,

a few months later, he showed her a single photo of

Mr. Chambers on his computer screen at the precinct.

Ms. Torres told Detective Deloren that the person in the

picture looked a little younger and could be the person from

the night of the robbery.  Ms. Torres testified that this

picture was not the same as any of the other pictures entered

as exhibits by either side in the trial.  She said about her

identification, her viewing of the photo at the time in the

precinct, quote, "I didn't pick one and he clicked it.  It was

already opened that one."  [166:5-6]

Ms. Torres also testified that she failed to identify

Mr. Chambers from the same array that her mother Ms. Torruella

had failed to identify him from.  Based on my review of the

testimony, however, it remains unclear whether this happened

before or after she was shown the single photo on the screen.

The third time Detective Deloren called Ms. Torres

into the precinct to show her what he called, quote, "an

1   updated picture" of the same person.  He showed her the picture

2   from the Patriot News website, which included the name "Antione

3   Chambers" under the photo.  In the picture, Mr. Chambers is

4   shown wearing a hat.  Ms. Torres, who testified that the

5   perpetrator had been wearing a hat at the time of her initial

6   viewing, stated that the single photo convinced her that

7   Mr. Chambers was person she saw the night of the robbery.

8        When Ms. Torres returned home, she went online and

9   found the same news article on her computer.  She then saw not

10  just one picture of Mr. Chambers, the one that Detective

11  Deloren had shown her, but three additional pictures of him

12  associated with the same news story.  In each picture,

13  Mr. Chambers is shown wearing a hat.

14        Finally, Detective Deloren met with Ms. Torres a

15  fourth time, which is when she identified Mr. Chambers from the

16  array that is now Government Exhibit 1001.  Based on this

17  sequence of events, Ms. Torres identified Mr. Chambers in

18  court.

19        With regard to Detective Deloren to the extent that

20  his account differs, I do not find it credible.  This is for

21  several reasons.  First, the facts of the identification

22  procedure had been constantly evolving, resulting in now four

23  separate motions to quash the identification testimony.

24  Second, Detective Deloren failed to make any kind of record of

25  the two most suggestive occasions when he showed Ms. Torres

1    photos of Mr. Chambers – when he showed her the single photo I

2    did not learn about until the testimony; and when he showed her

3    the Internet candid photo.  Third, when on cross, it was

4    suggested that Detective Deloren had intended to conceal that

5    he had shown Ms. Torres the Internet photo, he insisted the

6    that he had told the prosecutors and FBI about showing

7    Ms. Torres the Internet photo Mr. Chambers around the time she

8    viewed it, and in any event, much closer to May 2013 than

9    January 2013.  This statement is directly contrary to the

10   government's written representation to the Court in

11   February 2014 that they had just learned about the online

12   newspaper photo.  The government, as it is ethically required

13   to do, corrected Detective Deloren's testimony by stipulation

14   now in evidence, stating that they did not know about the

15   Internet photo until January 24, 2014.  It appears that they

16   first learned about the Internet photo, not from Detective

17   Deloren, but rather from when they interviewed Ms. Torres.

18           With regard to the facts underlying my ruling, there

19   are significant differences between the factual account which

20   were the basis for my prior rulings and the current evidence.

21           First, Ms. Torres met with Detective Deloren on four

22   or five occasion and not three.  Second, she was shown another

23   single photo of Mr. Chambers that we learned about during her

24   testimony.  Third, she was not shown the photo from the news

25   article on the same day that she was shown the initial array.

1    Fourth, she first identified Mr. Chambers from the single

2    photograph from the online article, rather than from the final

3    array.  And fifth, she saw three additional pictures of

4    Mr. Chambers online before the final array and the, quote,

5    "official" positive identification.

6            The government argues that I should hold a *Wade*

7    hearing to assess whether the identification techniques were

8    unduly suggestive.  I reject this suggestion.  Quote, "The

9    purpose of a *Wade* hearing is to determine *before* trial whether

10   pretrial identification procedures had been so improperly

11   suggestive as to taint an in-court identification."  *Lynn v.*

12   *Bliden*, 443 F.3d 238, 248, (2d Cir. 2006), *as amended* (May 19,

13   2006).  There is no need for a *Wade* hearing as I have already

14   heard testimony and seen evidence about the identification

15   procedures at trial and considered the "totality of

16   circumstances."  I have determined that Detective Deloren has

17   not given a credible account and that Ms. Torres has.  All

18   parties were on notice that the identity of the defendant is

19   the single material issue at this trial, and the government had

20   and took the opportunity to put on its evidence on that issue.

21   Moreover, the government opposed a *Wade* hearing earlier this

22   week when defense counsel requested it.  Finally, the

23   government has not pointed to any case, and I have not found

24   any, where a *Wade* hearing is held about the evidence *after* it

25   has been presented at trial, indeed after the government has

Ea3gcha1                    TRIAL

1    rested.

2          So with regard to my ruling about striking the

3    testimony, as I have explained, due process requires that in

4    order to protect a defendant's fundamental right to a fair

5    trial, identification procedures employed by law enforcement

6    must not be "so impermissibly suggestive as to give rise to a

7    very substantial likelihood of irreparable misidentification."

8    *Simmons v. United States*, 390 U.S. 377, 384 (1968).

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EA3MCHA2

1          THE COURT:  Further, single-photo identifications are

2     generally disfavored as unduly suggestive.  See United States

3     v. Concepcion, 983 F.2d 369, 377 (2d Cir. 1992).

4          In determining whether the procedures in this case

5     were impermissibly suggested, I first have to decide whether or

6     not the identification was so unnecessarily suggestive and

7     conducive to mistaken identification that Mr. Chambers was

8     denied due process.  Stoval v. Denno, 388 U.S. 293, 302 (1967).

9     I am required to "examine the procedures employed in light of

10    the particular facts of the case and the totality of the

11    surrounding circumstances."  United States v. Thai, 29 F.3d

12    785, 808 (2d Cir. 1994).

13         Having reviewed the identification process in light of

14    the particular facts and the totality of the circumstances, I

15    find that the photo identifications and surrounding

16    circumstances were unduly suggestive and conducive to

17    misidentification.  Ms. Torres was shown single photos of

18    Mr. Chambers on two separate occasions, and in each case the

19    detective made clear that the subject of the photograph was his

20    target.  There seems to be little other reason to show a

21    "updated" photograph rather than an array.  My initial rulings

22    were predicated on the belief that we were dealing with two

23    arrays and an intervening single photograph.  Now I find that

24    we are actually dealing with only one final array preceded by

25    at least five individual photographs and the detective's, at

1    the very least, implicit encouragement.  Further, the only

2    photographs in which she viewed anyone wearing a hat were the

3    ones of the defendant that came from the online article that

4    Detective Deloren had shown her.  Ms. Torres testified that the

5    perpetrator had worn a hat and that when she viewed any photo,

6    she covered the hairline with her hand.  I also conclude that

7    the various photos of Mr. Chambers from the online article more

8    closely resemble his picture in the final array than the single

9    photo in the multiple arrays.  In the words of Judge Vincent

10   Broderick of this district, "this evidence leads me to find

11   that the procedures, to put it most charitably, were

12   'impermissibly suggestive.'"  Jackson v. Fogg, 465 F.Supp. 177,

13   185 (S.D.N.Y. 1978) aff'd 589 F.2d 108 (2d Cir. 1978).

14        Even "if the pretrial procedures have been unduly

15   suggestive, an in-court identification may still be permitted

16   if the Court determines that the identification is

17   independently reliable.  The factors to be considered in

18   assessing reliability include the opportunity of the witness to

19   view the criminal at the time of the crime, the witness' degree

20   of attention, the accuracy of the witness' prior description of

21   the criminal, the level of certainty demonstrated by the

22   witness at the confrontation, and the length of time between

23   the crime and the confrontation.  Thai, 29 F.3d at 808.

24   Further, "the factors must be evaluated in light of the

25   totality of the circumstances, recognizing that the linchpin of

EA3MCHA2

admissibility is reliability," _id._ and a "good or poor rating

with respect to any of these factors will generally not be

dispositive, _Raheem v. Kelly_, 257 F.3d 122, 135 (2d Cir. 2001).

Evaluating the facts in light of the totality of the

circumstances, I do not find that Ms. Torres' identifications

were independently reliable.  She testified that at the time of

her initial viewing the perpetrator was standing in the living

room, while she stood in the hallway at the door.  The only

light came from the stove light of the kitchen, which was on

low, and the hallway light.  No lights were on in the living

room.  She stated that the distance between her and the

perpetrator was about the length of the entire jury box.  She

also testified that the perpetrator kept looking away.

Finally, her viewing lasted no more than a few minutes.  Even

if I were to credit Ms. Torres' degree of attention, I cannot

conclude that such attention aided her identification, given

the circumstances of the viewing.

It is true that "a suggestive procedure does not in

itself intrude upon a constitutionally protected interest if it

did not contribute significantly to the identification of the

defendant."  _Raheem_, 275 F.3d at 135.  In this case, however, I

find that the suggestive procedures did significantly

contribute to the identification of the defendant.  I am

therefore unable to conclude that any indicia of independent

reliability in Ms. Torres' identification are sufficient to

EA3MCHA2

1     outweigh the "corrupting effect of the suggestiveness."

2            "A witness who makes an out-of-court identification in

3     unduly suggestive circumstances may perform an in-court

4     identification only if the government demonstrates by clear and

5     convincing evidence that the in-court identification rests on

6     an independent source."  United States v. Ghayth, 990 F.Supp.2d

7     427, 432 (S.D.N.Y. 2014).  In making the determination as to

8     whether the in-court identification "rested on an independent

9     recollection of the victim's initial encounter with the

10    assailant, uninfluenced by the pretrial identifications, courts

11    consider the following factors:  1, the victim's prior

12    opportunity to observe the alleged criminal act; (2) any

13    discrepancy between any pre-lineup description and the

14    defendant's actual description; (3) any identification prior to

15    the procedure of another person; (4) a photographic

16    identification of the defendant prior to the illegal procedure;

17    (5) the victim's failure to identify the defendant on a prior

18    occasion; and (6) the lapse of time between the alleged act and

19    the tainted identification.  Young v. Conway, 698 F.3d 69, 78

20    (2d Cir. 2012).

21            Here, based on the evidence presented at trial, the

22    government has failed to meet its burden.  As I have discussed,

23    Ms. Torres' prior opportunity to observe the perpetrator was

24    brief and in bad light.  In addition to the factors I have

25    already discussed, Ms. Torres initially thought that the

EA3MCHA2

1    perpetrator looked like her friend's boyfriend.  Further, she

2    described a mark on the perpetrator's face, one Mr. Chambers

3    does not have.  In addition, Ms. Torres failed to identify at

4    least one photo of Mr. Chambers and explain that he looked

5    younger.  Ms. Torres has never identified Mr. Chambers without

6    the taint of impermissible suggestiveness.  Consequently, her

7    in-court identification cannot stand.

8            In sum, I grant Mr. Chambers' motion to strike.  The

9    Second Circuit "generally presumes the juries limiting

10   instructions."  United States v. Gomez, 617 F.3d 88, 96 (2d

11   Cir. 2010).  The presumption is dropped where there is an

12   overwhelming probability that the jury will be unable to follow

13   the Court's instruction and the evidence is devastating to the

14   defense.  I do not find that the eyewitness evidence that

15   Ms. Torres offered was so devastating that the jury will be

16   unable to follow a curative instruction.  Therefore, I find

17   that a curative instruction to the jury to disregard

18   Ms. Torres' identification evidence is an appropriate remedy,

19   and that a mistrial is not warranted.

20           After striking Ms. Torres' eyewitness testimony and

21   given that I based my decision to allow expert testimony on the

22   matter based on the procedures used in Ms. Torres' case, any

23   expert testimony on eyewitness identification should not be

24   admitted.

25           That's my ruling.  I intend to give a simple

EA3MCHA2

1    instruction to strike.  I will also ask that the government

2    exhibit, which is the final photo array, be struck from the

3    evidence.  And my question to the defense is whether or not you

4    would like to withdraw Exhibits B and C.

5           MR. DRATEL:  And I think A as well.  Because I think

6    that's the article itself.

7           THE COURT:  A.

8           MR. DRATEL:  A is the article, B is the array, C is

9    the other photographs from the Internet article.

10          THE COURT:  And the government exhibit is 1000 or

11   1001?

12          MS. TEKEEI:  1001, your Honor.

13          THE COURT:  We will need to get those out of the

14   jury's notebooks, Mr. Street.

15          Yes, Mr. Dratel.

16          MR. DRATEL:  Given the Court's ruling, defense would

17   rest and renew our Rule 29 motions.

18          THE COURT:  The motion is denied for the same reasons

19   that I discussed yesterday, as I did not take into account, as

20   I said, the identifications in making my ruling.

21          I think you may want to rest when the jury comes out.

22          MR. ARAVIND:  Before we do that, your Honor, just two

23   issues related to the stipulations.

24          The first is we do have now a typed-up version of the

25   Internet photo stip related to the testimony, the showing of

EA3MCHA2

1    the photograph, Internet photograph of Mr. Chambers by

2    Detective Deloren to Ms. Torres which we will hand up once it's

3    signed by Mr. Dratel.

4         And then we noticed yesterday that one of the parties'

5    stipulations that related to the cell site evidence had a typo

6    in paragraph 7 and so we would ask that this amended

7    stipulation be substituted in for that stipulation, and Mr.

8    Dratel has signed it.

9         THE COURT:  How do the logistics of the notebook work

10   with these changes?  I don't have any problem with our doing

11   it.

12        MR. ARAVIND:  We will scan it in and send it to them

13   or bring it to court as soon --

14        THE COURT:  Okay.

15        Mr. Dratel.

16        MR. DRATEL:  Just before the jury comes out,

17   Dr. Strange is in the hall.  I would like to let her go.  I

18   think Detective Deloren is out there, too.

19        One question with respect -- I don't know the

20   government's position because I just realized it.  The expert

21   testimony instruction.  I don't think the government ever

22   qualified Agent Perry as an expert.  I don't know that there is

23   any expert testimony in the case.  I am not going to challenge

24   his testimony in terms of competence because just as a person

25   of knowledge and training, he was able to testify.

EA3MCHA2

1          THE COURT:  I think his testimony was in the nature of

2     expert testimony.  And the instruction, as I recall it,

3     basically says, you know, don't give extra --

4          MR. DRATEL:  I think your Honor is right.

5          MR. ARAVIND:  Your Honor, can we just have one moment

6     to just cover with our chief?

7          THE COURT:  Sure.

8          MR. ARAVIND:  Your Honor, just for the record, we are

9     obviously abiding by the Court's ruling.  We just wanted to

10    note that it's the government's view that the Court does have

11    discretion to reopen a hearing on the issue about the pretrial

12    identification procedures and to permit Detective Deloren to

13    testify to achieve the totality of the circumstances that I

14    think the Second Circuit says this Court should be looking at

15    in evaluating this issue.  But we obviously are abiding by the

16    ruling and we will tailor our arguments in summation

17    accordingly.

18          THE COURT:  Thank you.

19          And just as a note, I did not mention in my ruling Mr.

20    Dratel's argument about Detective Deloren selecting the photos

21    for the photo array.  It seemed to me that that was not really

22    one of the big issues in my own mind, and so I didn't think

23    that having additional testimony on that would necessarily be

24    helpful or instructive.

25          MR. ARAVIND:  We do have a very quick question for

1   your Honor.

2           THE COURT:  Yes.

3           MR. ARAVIND:  This ruling, we understand it is about

4   Ms. Torres' eyewitness identification.  There hasn't been any

5   statement with respect to Ms. Torruella's.  And I believe the

6   photo array that was shown to her that was admitted into

7   evidence remains in evidence, and we can make reference to it

8   in summation, as I expect Mr. Dratel would make references to

9   the identification and lack of identification in his

10  submission.

11          THE COURT:  Mr. Dratel.

12          MR. DRATEL:  Yes, your Honor.

13          Also, I'll withdraw my request to amend the

14  identification instruction.

15          THE COURT:  I think where we are is that I will give

16  the instruction to strike and I will then give the charge.

17  Then we will have closing arguments.  My guess is closing

18  arguments will be after lunch.  The charge is long.

19          MR. DRATEL:  Even if the Court's charge ends, my guess

20  is at this point probably end somewhere around noon, if we

21  break early and come back and do the summations.

22          THE COURT:  I would do that.  I will not begin

23  summations and have a little bit of one and then break or even

24  have one and then break.  I'll do them in a piece.

25          MR. ARAVIND:  Your Honor, because my review of the

EA3MCHA2

1   transcript yesterday -- this is about the phone stipulation.

2   So the issue was the reference to the Sprint records.  The

3   stipulation that was read into the record indicated that I

4   believe all voice communications are recorded in the central

5   time zone.  The actual stipulation should read that Sprint

6   reports times of voice calls in the local time zone in which

7   the voice is placed and records text messages in the central

8   time zone.  That's consistent with what Special Agent Reynolds

9   and Special Agent Perry testified to.  We would ask that the

10   Court just read that paragraph to correct the record, which is

11   paragraph 7 of Government Exhibit 2001.

12          THE COURT:  If you put a sticky next to it to avoid

13   any possible error on my part, I appreciate that.

14          MR. ARAVIND:  Your Honor, if we could just get a

15   preview of what instruction you are going to give.

16          THE COURT:  I am trying to get it to give you.

17          MR. ARAVIND:  Thank you, Judge.

18          THE COURT:  Let me read to you what I intend to say.

19   If you have any comments, I welcome them.

20          Ladies and gentlemen of the jury, as I informed you at

21   the beginning of the trial, you must disregard any evidence

22   that I strike from the record.  I will now instruct you that

23   I'm striking the testimony of Ms. Torres that relates to her

24   identification of the defendant, including her in-court

25   identification that you witnessed.

EA3MCHA2

```
 1              I'm also striking exhibits relating to that
 2     identification which are Government Exhibits 1001 and
 3     Defendant's Exhibits A, B, and C.
 4              It is your duty to disregard the evidence I have just
 5     spoken about in your deliberations.  That means you are not to
 6     discuss the evidence and you are to deliberate as though the
 7     testimony of Ms. Torres relating to the identification of the
 8     defendant did not occur.  It should not play any role in your
 9     verdict.
10              MR. ARAVIND:  That's fine with the government.
11              MR. DRATEL:  That's fine.
12              THE COURT:  Mr. Street, as soon as you are done doing
13     that, if you can bring the jury in.
14              Mr. Dratel, the first thing I'll do when they come out
15     is look at you and you can say the defense rests.
16              MR. DRATEL:  Yes.
17              THE COURT:  Let me strike the testimony and then you
18     can rest.
19              MR. DRATEL:  Thank you.
20              THE COURT:  Counsel, we have copies of the jury
21     instructions for you, but they are printing.  The jury does
22     have theirs.  As soon as they are done, I will give them to
23     you.
24              MS. TEKEEI:  Thank you.
25              MR. DRATEL:  Thank you.
```

1              THE COURT:  Mr. Street, I think we are ready.

2              (Jury present)

3              THE COURT:  Good morning, ladies and gentlemen.  My

4     sincere apologies for the delay.  But I promise you that that

5     will not happen again.  I'm confident.

6              Here is what I would like to do.  The first thing is

7     that there is an amended stipulation that's Government Exhibit

8     2001.  It's the stipulation that dealt with the phone records.

9     And one paragraph is amended.  And so I will just read that

10    amended paragraph and I'll read it in its entirety.  It's

11    paragraph 7 and it has to do with toll record custodians.

12             It says:  If called to testify, a custodian of records

13    from Sprint would testify as follows:  A.  He or she is

14    familiar with the recording keeping practices of Sprint;  B.

15    In the toll records Sprint records times of voice calls in the

16    local time zone in which the voice call is placed; and C.

17    Sprint records text messages in the central time zone.

18             I will give this to Mr. Street.

19             I also have an instruction for you.

20             Ladies and gentlemen, as I informed you at the

21    beginning of trial, you must disregard any evidence that I

22    strike from the record.  I will now instruct you that I am

23    striking the testimony of Ms. Torres.  That's Ms. Torruella's

24    daughter who you heard testify a couple of days ago that

25    relates to her identification of the defendant, including her

1    in-court identification that you witnessed.

2            I'm also striking exhibits relating to that

3    identification, which are Government Exhibit 1001 and

4    Defendant's Exhibits A, B, and C.  It is your duty to disregard

5    the evidence that I have just spoken about in your

6    deliberations.  This means that you are not to discuss the

7    evidence and you are to deliberate as though the testimony of

8    Ms. Torres relating to identification of the defendant did not

9    occur.  It should not play any role in your verdict.

10           Now I think we were headed to the defense case.  As I

11   told you, the defense is not required to present a case.   The

12   defendant is presumed innocent.  The burden of proof is on the

13   government to prove its case.

14           Having said that, Mr. Dratel, would you like to put on

15   any witnesses or evidence?

16           MR. DRATEL:  No.  Thank you, your Honor.  The defense

17   rests.

18           THE COURT:  Ladies and gentlemen, at this time I'm now

19   going to give you the final substantive instructions for what

20   you need to do when you deliberate.  After I give you the

21   instructions you'll hear final arguments from the lawyers.  And

22   after that I'll have a few closing remarks and then you'll go

23   off to the jury room to deliberate.

24           You have copies of the jury instructions in front of

25   you.  You will be allowed to take them into the jury room with

EA3MCHA2

you.  If you wish to follow along while I read, you may.  If
you prefer just to listen, you may do that as well.

Members of the jury, you've now heard all of the
evidence in the case, as well as the final arguments of the
parties.  We have reached the point where you are about to
undertake your final function as jurors.  You have paid careful
attention to the evidence and I am confident that you will act
together, with fairness and impartiality, to reach a just
verdict in this case.

My duty at this point is to instruct you as to the
law.  It is your duty to accept these instructions of law and
apply them to the facts as you determine them, just as it has
been my duty to preside over the trial and decide what
testimony and evidence was proper under the law for your
consideration.

On these legal matters, you must take the law as I
give it to you.  If any attorney or witness has stated a
different principle different from what I state to you in my
instructions, it is my instructions you must follow.

You are to consider these instructions together as a
whole, in other words, you are not to isolate or give undue
weight to any particular instruction.

So the heading I'm at is role of the jury, in case you
are trying to follow along.

As members of the jury you are the sole and exclusive

EA3MCHA2

judges of the facts.  You pass upon the evidence, you determine

the credibility of witnesses, you resolve the conflicts as

there may be in the testimony, you draw whatever reasonable

inferences you decide to draw from the facts as you have

determined them, and you determine the weight of the evidence

or lack of evidence.

It is your sworn duty and you have taken the oath as

jurors to determine the facts and to follow the law as I give

it to you.  You must not substitute your own notions or

opinions of what the law is or ought to be.

I remind you that in reaching your verdict you are to

perform your duty of finding the facts without bias or

prejudice as to any party.  You must remember that all parties

stand as equals before a jury in the courts of the United

States.  You must also remember that it would be improper for

you to allow any feelings you might have about the nature of

the crimes charged to interfere with your decision making

process.

The fact that the prosecution is brought in the name

of the United States does not entitle the government or its

witnesses to any greater consideration than that accorded to

any other party.  By the same token, the government is entitled

to no less consideration.  The government and the defendant

stand as equals at the bar of justice.  Your verdict must be

based solely on the evidence or the lack of evidence.

EA3MCHA2

1          Now I will instruct you on the presumption of

2     innocence and the government's burden of proof in this case.

3     The defendant has pleaded not guilty.  In so doing he has

4     denied every allegation against him.  As a result of the

5     defendant's plea of not guilty, the burden is on the

6     prosecution to prove the defendant's guilt beyond a reasonable

7     doubt.  This burden never shifts to the defendant for the

8     simple reason that the law never imposes upon a defendant in a

9     criminal case the burden or duty of calling any witness or

10    producing any evidence.

11         The law presumes the defendant to be innocent of all

12    charges against him.  I, therefore, instruct you that the

13    defendant is to be presumed by you to be innocent throughout

14    your deliberations.

15         The defendant began the trial here with a clean slate.

16    This presumption of innocence alone is sufficient to acquit the

17    defendant unless you as jurors are unanimously convinced beyond

18    a reasonable doubt of the defendant's guilt, after a careful

19    and impartial consideration of all of the evidence in the case.

20    If the prosecution fails to sustain its burden as to the

21    defendant, then you must find the defendant not guilty.  This

22    presumption was with the defendant when the trial began,

23    remains with him even now as I speak to you, and will continue

24    with him during your deliberations unless and until you are

25    convinced that the prosecution has proven him guilty beyond a

reasonable doubt.

Now, the next question is, what is reasonable doubt? It is doubt that a reasonable person has after carefully weighing all of the evidence or doubt that would cause a reasonable person to hesitate to act in a matter of importance in his or her own personal life.  Proof beyond a reasonable doubt is proof of such a convincing character that a reasonable person would not hesitate to rely and act upon it in the most important of his or her own affairs.

In a criminal case, the burden is at all times upon the prosecution to prove guilt beyond a reasonable doubt.  The law does not require that the prosecution prove guilt beyond all possible doubt; rather, proof beyond a reasonable doubt is sufficient to convict.  The burden never shifts to the defendant, which means that it is always the prosecution's burden to prove each of the elements of the crimes charged against the defendant beyond a reasonable doubt.

If, after a fair and impartial consideration of all the evidence, or the lack of evidence, you have a reasonable doubt as to the count you are considering as to the defendant, then you must acquit the defendant on that count.  On the other hand, if after fair and impartial consideration of all the evidence you are satisfied of the guilt of the defendant beyond a reasonable doubt, it is your duty to convict the defendant.

In determining the facts, you must rely upon your own

recollection of the evidence.  Evidence consists of the

testimony of witnesses, the exhibits that have been received,

and the stipulations of the parties that I've read to you.

        The statements and arguments made by the lawyers are

not evidence.  Their arguments are intended to convince you

what conclusions you should draw from the evidence or lack of

evidence.  You should weigh and evaluate the lawyers' argument

carefully, but you must not confuse them with the evidence.  As

to the evidence presented at trial, it is your recollection

that governs, not the statements of the lawyers.

        You should also bear in mind that a question put to a

witness is never evidence.  It is the answer to the question

that is evidence.  However, if a witness affirms the facts in a

question by answering yes, you may consider the facts in that

question to be evidence.  Another exception to this is you may

not consider any answer that I directed you to disregard or

that I ordered to be stricken from the record.

        Next I'll talk about direct and circumstantial

evidence.

        There are two types of evidence that you may properly

use in deciding whether the defendant is guilty or not guilty

of the crimes with which he is charged.  One type of evidence

is called direct evidence.  Direct evidence of a fact in issue

is presented when a witness testifies to that fact based on

what he or she personally saw, heard, or observed.  In other

words, what a witness testifies about a fact in issue on the

basis of that witness' own knowledge by virtue of what he or

she feels, sees, touches, or hears, that is direct evidence.

The second type of evidence is circumstantial

evidence.  Circumstantial evidence is evidence that tends to

prove a disputed fact indirectly by proof of other facts.

There is a simple example of circumstantial evidence that I

gave you on the first day of trial and I'll repeat it now.

Assume that when you came into the courtroom this

morning the sun was shining and it was a nice day outdoors.

Assume that the courtroom shades were drawn and you could not

look outside.  Assume further that as you were sitting here

someone walked in with an umbrella that was dripping wet and

then a few minutes later somebody else walked in with a

raincoat that was also dripping wet.

Now, because you could not look outside the courtroom

and you could not see whether it was raining, you would have no

direct evidence of that fact.  But on the combination of facts

that I have asked you to assume it would be reasonable and

logical for you to conclude that it was raining.  That's all

there is to circumstantial evidence.  You infer on the basis of

your reason, experience, and common sense from one established

fact the existence or nonexistence of some other fact.

Drawing inferences is not the same as guesswork or

speculation.  An inference is a logical, factual conclusion

EA3MCHA2

1    that you might reasonably draw from other facts that have been

2    proven.  It is sometimes difficult to prove material facts such

3    as state of mind by direct evidence.  Usually such facts are

4    established by circumstantial evidence and the reasonable

5    inferences you draw.  Circumstantial evidence may be given as

6    much weight as direct evidence.

7         You should draw no inference or conclusion for or

8    against any party on the basis of the lawyers' objections or my

9    rulings on any objections.  Counsel have a right and duty to

10   make legal objections.  Nothing I say is evidence.  If I

11   commented on the evidence at any time, do not accept any

12   statements in place of your recollection or your

13   interpretation.  It is your recollection and interpretation

14   that govern.

15        Also, do not draw any inference from any of my rulings

16   which do not indicate any view on my part.  You should not

17   speculate on what I may think.

18        Further, do not concern yourself with what was said at

19   side bar conferences or during my discussions with counsel.

20   Those discussions related to rulings of law.

21        At times I may have admonished a witness or directed a

22   witness to be responsive to questions or to keep his or her

23   voice up.  At times I asked a question myself.  Any questions

24   that I asked, or instructions that I gave, were intended only

25   to clarify the presentation of the evidence.  You should draw

1    no inference or conclusion of any kind, favorable or

2    unfavorable, with respect to any comment, question, or

3    instruction of mine.  Nor should you infer that I have any

4    views as to the credibility of any witness, the weight of the

5    evidence, or how you should decide any issue that is before

6    you.  That is your role.

7           Finally, the personalities and conduct of counsel are

8    not in any way at issue.  If you formed conclusions of any kind

9    about any lawyer in the case, favorable or unfavorable, those

10   opinions should not enter into your deliberations.

11          I am going to give you a few general instructions as

12   to how you may determine whether witnesses are credible and

13   reliable and whether the witness has told the truth at this

14   trial.  It's really just a matter of using your common sense,

15   your judgment, and your experience.  First, consider how well

16   the witness was able to observe or hear what he or she

17   testified about.  The witness may be honest but mistaken.  How

18   did the witness' testimony impress you?  Did the witness appear

19   to be testifying honestly or candidly?  Were the witness'

20   answers direct or were they evasive?  Consider the way the

21   witness acted, his or her way of testifying, and the strength

22   and accuracy of his or her recollection.  Consider whether any

23   outside factors might have affected a witness' ability to

24   perceive events.

25          Consider the substance of the testimony.  How does the

EA3MCHA2

witness' testimony compare with other proof in the case?  Is it

corroborated or is it contradicted by other evidence?  If there

is a conflict, does any version appear reliable, and, if so,

which version seems more reliable?

          In addition, you may consider whether a witness had

any possible bias or relationship with a party or any possible

interest in the outcome of the case.  Such a bias or

relationship does not necessarily make the witness unworthy of

belief.  These are simply factors that you may consider.

          If a witness made statements in the past that are

inconsistent with his or her testimony during the trial

concerning facts that are at issue here, you may consider that

fact in deciding how much of the testimony, if any, to believe.

In making this determination, you may consider whether the

witness purposely made a false statement or whether it was an

innocent mistake.  You may also consider whether the

inconsistency concerns an important fact or merely a small

detail, as well as whether the witness had an explanation for

the inconsistency and, if so, whether that explanation appealed

to your common sense.

          If you find that a witness has testified falsely as to

any material fact or if you find that a witness has been

previously untruthful when testifying under oath or otherwise,

you may reject that witness' testimony in its entirety or you

may accept only those parts that you believe to be truthful or

EA3MCHA2

1      that are corroborated by other independent evidence in the

2      case.

3              Under your oath as jurors you are not to be swayed by

4      sympathy.  You are to be guided solely by the evidence in this

5      case in determining whether the prosecution has proved the

6      defendant's guilt beyond a reasonable doubt.

7              It is for you, and you alone, to decide whether the

8      prosecution has proved beyond a reasonable doubt that the

9      defendant is guilty of the crimes charged solely on the basis

10     of the evidence and subject to the law as I have instructed

11     you.  It must be clear to you that if you let fear, prejudice,

12     bias, or sympathy interfere with your thinking, there is a risk

13     that you will not arrive at a true and just verdict.

14             If you have a reasonable doubt as to the defendant's

15     guilt on a charge, then you must render a verdict of acquittal

16     on that charge against the defendant.  On the other hand, if

17     you find that the prosecution has met its burden of proving the

18     guilt of the defendant beyond a reasonable doubt with respect

19     to a particular count, then you should not hesitate because of

20     sympathy or any other reason to render a verdict of guilty on

21     that charge.

22             I also caution you that under your oath as jurors you

23     cannot consider as part of your deliberations the punishment

24     that may be imposed upon the defendant if he is convicted.  The

25     duty of imposing punishment rests exclusively upon the Court.

1          Your verdict must be unanimous with respect to each

2     count.  Each juror is entitled to his or her opinion, but you

3     are required to exchange views with your fellow jurors and

4     discuss the evidence.  If you have a point of view and your

5     discussion with other jurors changes your mind on a particular

6     point, you may change your mind if you are convinced that the

7     opposite point of view is really one that satisfies your

8     judgment and conscience.  You must not change your mind simply

9     reply because you are outnumbered or outweighed.  You should

10    vote with the others only if you are convinced on the evidence,

11    facts, and the law that it is the correct way to decide the

12    case.

13         Remember at all times, you are not partisans.  You are

14    judges, judges of the facts.  Your sole interest is to seek the

15    truth from the evidence in the case.  I will say a little bit

16    more about your duties in deliberating after the closing

17    arguments.

18         Let me turn now to the substantive instructions.  The

19    defendant is formally charged in an indictment.  The indictment

20    is merely a charge or accusation.  It is not evidence and it

21    does not prove or even indicate guilt.  As a result, you are to

22    give it no weight in deciding the defendant's guilt or

23    nonguilt.  What matters is the evidence you've heard at trial.

24    The defendant is presumed innocent and it is the prosecution's

25    burden to prove the defendant's guilt beyond a reasonable

EA3MCHA2

1    doubt.

2           The indictment in this case contains four counts.

3    Each count charges a separate offense or crime.  You must,

4    therefore, consider each count separately and you must return a

5    separate verdict on each count.

6           Count One of the indictment charges that in or about

7    March 2013, Antione Chambers conspired or agreed with others to

8    commit a robbery of an individual believed to be in possession

9    of money from drugs in the Bronx, New York.

10          Count Two of the indictment charges that on or about

11   March 25, 2013, Antione Chambers committed a robbery of an

12   individual believed to be in possession of money from drugs in

13   the Bronx, New York.

14          Count Three of the indictment charges that on or about

15   March 25, 2013, Antione Chambers and others kidnapped an

16   individual for the purpose of carrying out a robbery of money

17   for drugs.

18          Count Four of the indictment charges that on March 25,

19   2013, Antione Chambers, during and in relation to a conspiracy

20   to commit robbery or kidnapping, knowingly did use and carry a

21   firearm and in furtherance of such crime did possess a firearm

22   and did aid and abet the use, carrying, and possession of a

23   firearm which was brandished.

24          Count One:  Robbery conspiracy.

25          The first count of the indictment charges that the

EA3MCHA2

1    defendant violated Section 1951 of Title 18 of the United

2    States Code.  That section provides:  Whoever in any way or

3    degree obstructs, delays, or affects commerce for the movement

4    of any article or commodity in commerce by robbery or extortion

5    or attempts or conspires so to do, or commits or threatens

6    physical violence to any person or property in furtherance of a

7    plan or purpose to do anything in violation of this section

8    shall be guilty of a crime.

9         Specifically, Count One charges a conspiracy to commit

10   armed robbery.  A conspiracy is a kind of criminal partnership,

11   an agreement of two or more persons to join together to

12   accomplish some unlawful purpose.

13        The crime of conspiracy to commit robbery is an

14   independent offense, separate and distinct from an actual

15   robbery.  You may find the defendant guilty of the crime of

16   conspiracy to commit robbery, even if the conspiracy was not

17   successful and there was no actual robbery committed.

18        To meet the burden of proving the robbery conspiracy

19   charged in Count One, the prosecution must prove two elements

20   beyond a reasonable doubt:

21        First, the prosecution must prove the existence of the

22   robbery conspiracy charged in Count One; and

23        Second, the prosecution must prove that the defendant

24   knowingly and unlawfully became a member of the conspiracy.

25   I'll talk about each of these elements in depth now.

EA3MCHA2

```
 1              The first element is the existence of a conspiracy
 2      that had as its object the illegal purpose charged in the
 3      indictment.  A conspiracy is a combination, agreement, or
 4      understanding of two or more persons to accomplish by concerted
 5      action a criminal or unlawful purpose.  The unlawful purpose
 6      alleged to have been the object of the conspiracy charged in
 7      Count One is the commission of a robbery.
 8              The gist of the crime of conspiracy is an unlawful
 9      agreement between two or more people to violate the law.  The
10      first element of the crime of conspiracy has two parts:  (1) an
11      agreement and (2) an illegal object of the conspiracy.  I am
12      now going to describe both parties of this element to you.
13              First, an agreement.
14              First, to meet its burden of proof on this element,
15      the prosecution must prove that there was an agreement, meaning
16      that two or more people in some way or manner came to an
17      understanding, either spoken or unspoken, to violate the law.
18      However, the prosecution is not required to show that two or
19      more people sat down around a table and entered into a solemn
20      pact, stating that they had formed a conspiracy to violate the
21      law and spelling out all the details of the plan, or the part
22      that each of the persons who was a party to the conspiracy was
23      going to play.
24              Common sense will tell you that when people, in fact,
25      undertake to enter into a criminal conspiracy, much is left to
```

the unexpressed understanding.  By its very nature, a

conspiracy is almost always secret.

When people enter into a conspiracy to accomplish an

unlawful end, they become agents or partners of one another in

carrying out the conspiracy.  In determining the factual issues

before you, you may take into account against the defendant any

acts done or statements made by any of the alleged

coconspirators during the course of the conspiracy.  And any

inferences that can be drawn from those acts or statements,

even though such acts or statements were not made in the

presence of the defendant or were made without his knowledge.

Sometimes, the only evidence that is available is that of

disconnected acts that, when taken together in connection with

one another, show a conspiracy or an agreement to secure a

particular result just as satisfactorily and conclusively as

more direct proof.

It is sufficient to establish the existence of the

conspiracy if, after considering all of the relevant evidence,

you find beyond a reasonable doubt that the minds of at least

two alleged conspirators met in an understanding way, and that

they agreed, as I've explained, to work together to accomplish

the object or objective of the conspiracy charged in Count One.

The second part of the first element relates to the

object or objective of the conspiracy.  Count One of the

indictment charges that the object of the conspiracy was to

EA3MCHA2

commit robbery and specifically a robbery that would and did

obstruct, delay, and affect commerce and the movement of

articles and commodities in commerce.

Later, when I explain Count Two, which is the

substantive crime corresponding to the objective of conspiracy

charged in Count One, I will explain the elements of the

robbery charge.

Turning now to the second element, if you conclude

that the prosecution has proven beyond a reasonable doubt that

the conspiracy charged in the indictment existed and that the

conspiracy had as its object the illegal purpose charged in the

indictment, then you must next determine the second question,

whether the defendant participated in the conspiracy with

knowledge of its unlawful purpose and in furtherance of its

unlawful objective.

The prosecution must prove beyond a reasonable doubt

that the defendant unlawfully and knowingly entered into the

conspiracy, that is, with a purpose to violate the law, and

that the defendant agreed to take part in the conspiracy to

promote and cooperate in its unlawful objective.

The terms unlawfully and knowingly are used because,

if you find that the defendant did join the conspiracy, you

must also consider whether the prosecution has proven beyond a

reasonable doubt that in doing so the defendant knew what he

was doing.  In other words, the government must prove beyond a

EA3MCHA2

reasonable doubt that the defendant joined the conspiracy deliberately and voluntarily.

Unlawfully simply means contrary to law.  The defendant need not have known that he was breaking any particular law, but he must have been aware of the generally unlawful nature of his acts.

An act is done knowingly is it is done deliberately and purposely, that is, the defendant's acts must have been the product of defendant's conscious objective, rather than the product of a mistake or accident, or mere negligence, or some other innocent reason.

Knowledge, of course, is a matter of inference from the proven facts, since you cannot read someone's mind.  You have before you the evidence of acts alleged to have taken place by or with the defendant or in his presence.  The government contends that these acts show beyond a reasonable doubt the defendant's knowledge of the unlawful purpose of the conspiracy.

The defendant denies that he was a member of a conspiracy.  Specifically, the defendant denies that he committed the acts alleged by the prosecution to be sufficient to establish that he knowingly joined the charged conspiracy. It is for you to determine whether the prosecution has established beyond a reasonable doubt that the defendant possessed such knowledge and intent.

1          It is not necessary for the prosecution to show that

2      the defendant was fully informed as to all the details of the

3      conspiracy in order for you to infer knowledge on the part of

4      the defendant.  Similarly, it's not necessary for the defendant

5      to have known every member of the conspiracy, nor is it

6      necessary for the defendant to have received any monetary

7      benefit from his participation in the conspiracy, or to have a

8      financial stake in the outcome of the alleged joint venture.

9      It's enough if the defendant participated in the conspiracy

10     unlawfully and knowingly as I have defined those terms.

11         The duration and extent of the defendant's

12     participation has no bearing on the issue of the defendant's

13     guilt.  If you find that the defendant joined the conspiracy at

14     any time in its progress, then the defendant is held

15     responsible for all that was done before he joined and all that

16     was done during the conspiracy's existence while he was a

17     member.  Each member of a conspiracy may perform separate and

18     distinct acts.  Some conspirators play major roles, while

19     others play minor roles in the scheme.  An equal law is not

20     what the law requires.  In fact, even a single act may be

21     sufficient to draw the defendant within the scope of the

22     conspiracy.

23         However, a person's mere association with members of a

24     conspiracy does not make that person a member of the

25     conspiracy, even when that association is coupled with

knowledge that a conspiracy is taking place.  Mere presence at

the scene of the crime, even coupled with knowledge that a

crime is taking place, is not sufficient to support a

conviction.  In other words, knowledge without agreement and

participation is not sufficient.  What is necessary is proof

beyond a reasonable doubt that the defendant joined in the

conspiracy with knowledge of its unlawful purpose and with an

intent to aid the accomplishment of its unlawful objectives.

          In sum, the prosecution must prove beyond a reasonable

doubt that the defendant, with an understanding of the unlawful

character of the conspiracy, knowingly engaged advised, or

assisted in the conspiracy for the purpose of committing a

robbery.  The defendant thereby became a knowing and willful

participant in the unlawful agreement, that is to say, he

became a conspirator.  Once a conspiracy is formed, it is

presumed to continue until either its objective is accomplished

or there is no affirmative act of termination by its members.

Once a person is found to be a member of a conspiracy, he is

presumed to be a member of the conspiracy until te conspiracy

is terminated, unless it's shown by some affirmative proof that

the person withdrew and disassociated himself from it.

          The indictment charges that the alleged conspiracy

existed in or about March 2013.  It's not essential that the

prosecution prove that the conspiracy alleged started and ended

on any specific dates.  Indeed, it's sufficient if you find

EA3MCHA2

1     that the conspiracy was formed and that it existed for some

2     time within or around the dates set forth in the indictment,

3     which is in or around March 2013.  It does not matter if a

4     specific event or transaction is alleged to have occurred on or

5     about a certain date, and the evidence indicates that, in fact,

6     it occurred on another date.  The law only requires a

7     substantial similarity between the dates alleged in the

8     indictment and the dates established by the testimony and other

9     evidence.

10          That is Count One.

11          I will now turn to Count Two of the indictment which

12    alleges robbery.

13          The allegations contained in Count Two are brought not

14    only under the law that prohibits robbery, but also under a

15    provision of the federal criminal code that makes it a crime

16    for anyone to aid, abet, counsel, command, induce, or procure

17    the commission of another crime.  I will provide instructions

18    on these concepts in a few minutes.

19          To sustain its burden of proof on Count Two, the

20    government must prove beyond a reasonable doubt each of the

21    following elements:

22          First, the government must prove that the defendant

23    knowingly obtained or took the personal property of another or

24    from the presence of another.

25          Second, the government must prove that the defendant

EA3MCHA2

1    took the property against the victim's will by actual or

2    threatened force, violence or fear of injury, whether immediate

3    or in the future.

4            Third, the government must prove that such actions

5    actually or potentially in any way or degree obstructed,

6    delayed, or affected interstate or foreign commerce.

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  The first element the government must

2     prove beyond a reasonable doubt is that the defendant knowingly

3     obtained the personal property of another or from the presence

4     of another.  The term property includes tangible and intangible

5     things of value.  In this case, the government alleges that the

6     object of the robbery charged in Count Two was narcotics

7     proceeds or money from drugs.

8          The second element the government must prove beyond a

9     reasonable doubt is that the defendant unlawfully took the

10     personal property against the victim's will, by actual or

11     threatened force, violence, or fear of injury, whether

12     immediate or in the future.

13          It is not necessary that the government prove that

14     force, violence and fear were all used or threatened.  The

15     government satisfies its burden if it proves beyond a

16     reasonable doubt that any of these methods were employed.

17     However, there must be some nexus between the threat of use of

18     force and the taking of property.

19          In considering whether the defendant used, or

20     threatened to use, violence or fear, you should give those

21     words their common, ordinary meaning, and understand them as

22     you normally would.  The violence does not have to be directed

23     at the person whose property was taken.  The use of a threat of

24     force or violence might be aimed at a third person, or at

25     causing financial rather than physical injury.  A threat may be

1    made verbally or by physical gesture.  Whether a statement or

2    physical gesture by the defendant actually was a threat depends

3    upon the surrounding facts.

4         Fear exists if at least one victim experiences

5    anxiety, concern, or worry over expected personal harm or

6    business loss, or over financial or job security.  The

7    existence of fear must be determined by the facts existing at

8    the time of the defendant's actions.

9         Your decision whether the defendant used or threatened

10   fear of injury involves a decision about the victim's state of

11   mind at the time of the defendant's actions.  You must

12   determine, after careful consideration the circumstances and

13   the evidence, whether fear would reasonably have been the

14   victim's state of mind.

15        Looking at the situation and the actions of people

16   involved may help you determine what their state of mind was.

17   You can consider this kind of evidence, which is technically

18   called circumstantial evidence, in deciding whether property

19   was obtained by a defendant through the use of threat of fear.

20        You've also heard the testimony of some witnesses

21   describing their state of mind – that is, how they felt – in

22   giving up the property.  This testimony was allowed to help you

23   in deciding whether the property was obtained by fear.  You

24   should consider this testimony for that purpose only, and for

25   no other purpose in that case.  You are not bound by the

1    statements of the witnesses in determining their states of

2    mind, but you may consider all the facts and circumstances or

3    lack of evidence in determining the state of mind of each

4    witness at the time the alleged crimes occurred.

5            It is not necessary that the fear be a consequence of

6    a direct threat; it is sufficient that the surrounding

7    circumstances render the victim's fear reasonable.  You must

8    find beyond a reasonable doubt that a reasonable person would

9    have been fearful under the circumstances.

10           If you decide that the defendant obtained another's

11   property, against his will, by the use or threat of force,

12   violence, or fear of injury, you must then decide whether this

13   action would affect interstate or foreign commerce in any way

14   or degree.  You must determine whether there is an actual or

15   potential effect on commerce between any two or more states, or

16   on commerce within one state that goes to another state or

17   foreign country.

18           The requirement of showing an effect on commerce

19   involves only a minimal burden of proving a connection to

20   interstate or foreign commerce and is satisfied by conduct that

21   affects commerce in any way or degree.  The requirement may be

22   satisfied by a showing of a very slight or potential effect on

23   interstate or foreign commerce.  For example, if a successful

24   robbery of money would prevent the use of those funds to

25   purchase articles which travel through interstate commerce,

Ea3gcha3                    Charge

 1  that would be a sufficient effect on interstate commerce.

 2          If you decide that interstate or foreign commerce

 3  would potentially or probably be affected if the defendant had

 4  successfully and fully completed his actions, then the element

 5  of affecting interstate commerce is satisfied.  You do not have

 6  to find that interstate or foreign commerce is actually

 7  affected.

 8          The defendant need not have intended or anticipated an

 9  effect on interstate or foreign commerce.  You may find that

10  the effect is a natural consequence of his actions.  If you

11  find that the defendant intended to take certain actions – that

12  is, he did the acts charged in the indictment in order to

13  obtain property – and you find those actions have either

14  caused, or would probably cause, an effect on interstate or

15  foreign commerce, then you may find the requirements of this

16  element have been satisfied.

17          Nor do you have to decide whether the effect on

18  interstate or international commerce was or would have been

19  harmful or beneficial to a particular business, or to commerce

20  in general.  The government satisfies its burden of proving an

21  effect on commerce if it proves beyond a reasonable doubt any

22  effect, whether harmful or not.

23          If you find beyond a reasonable doubt that the target

24  of the robbery purchased or sold items that flowed in

25  interstate or foreign commerce, and that the money or items

1    that the defendant conspired to take belonged to the target,

2    then this element will have been met.

3         Moreover, if you find beyond a reasonable doubt that

4    the defendant believed that the target of the robbery purchased

5    or sold items that flowed in interstate or foreign commerce,

6    then this element will be satisfied, even if the defendant's

7    belief ultimately proved incorrect.  In other words, even if

8    the target of the robbery was not in fact engaged in interstate

9    or foreign commerce, this element will be satisfied if, at the

10   time of the robbery, you find beyond a reasonable doubt that

11   the defendant intended to commit a robbery that would have, or

12   potentially could have, affected interstate or foreign

13   commerce.

14        When considering this element, it's important for you

15   to know that commerce affected or potentially affected need not

16   be lawful.  Activities affecting or potentially affecting

17   unlawful interstate activity, such as drug dealing and

18   trafficking, fall under the statute.  Therefore, if you find

19   beyond a reasonable doubt that the defendant intended, for

20   example, to rob drugs, and you find those drugs traveled in

21   interstate or foreign commerce, this element has been

22   satisfied.

23        The fourth element the government must establish

24   beyond a reasonable doubt with respect to the robbery charge is

25   that the defendant acted unlawfully and knowingly.  I already

1    explained these concepts to you, and you should follow my

2    previous instructions on that point.

3            The defendant is also charged with aiding and abetting

4    with respect to this charge; accordingly, it would be

5    sufficient for this element if the defendant aided and abetted

6    another person in the robbery charge.

7            Aiding and abetting liability is its own theory of

8    criminal liability.  In effect, it is a theory of liability

9    that permits the defendant to be convicted of a specified

10   crime, if the defendant, while not himself committing the

11   crime, assisted another person or persons in committing the

12   crime.

13           Under the federal aiding and abetting statute, whoever

14   aids, abets, counsels, commands, induces or procures the

15   commission of an offense is punishable as a principal.  In

16   other words, it is not necessary for the government to show

17   that the defendant physically committed a crime in order for

18   you to find the defendant guilty.  If you do not find beyond a

19   reasonable doubt that the defendant physically committed a

20   crime, you may, under certain circumstances, still find him

21   guilty of the crime as an aider or abettor.

22           A person who aids and abets another to commit an

23   offense is just as guilty of that offense as if he personally

24   had committed it.  You may find the defendant guilty of the

25   substantive crime, therefore, if you find beyond a reasonable

Ea3gcha3                          Charge

doubt that the government has proven that another person

actually committed the crime and that the defendant aided and

abetted that person in the commission of the offense.

As you can see, the first requirement is that another

person has committed the crime charged.  Obviously, no one can

be convicted of aiding and abetting the criminal acts of

another if no crime is committed by the other person.  But if

you do find that a crime was committed, then you must consider

whether the defendant aided or abetted the commission of the

crime.

To aid and abet another to commit a crime, it is

necessary that the defendant willfully and knowingly associate

himself in some way with the crime, and that the defendant

willfully and knowingly seek by some act to help make the crime

succeed.

Participation in a crime is willful if action is taken

voluntarily and intentionally, or in the case of a failure to

act, with the specific intent to fail to do something the law

requires to be done – that is to say, with a bad purpose either

to disobey or ot disregard the law.

However, I must caution you that the mere presence of

the defendant where a crime is being committed, even coupled

with knowledge by the defendant that the crime was being

committed, or the mere acquiescence by the defendant in the

criminal conduct with others, even with guilty knowledge, is

1    not sufficient to establish aiding and abetting.  An aider and

2    abettor must have some interest in the criminal act or acts.

3           To determine whether the defendant aided and abetted

4    the commission of a crime, ask yourself these questions:  Did

5    the defendant participate in the crime charged as something he

6    wished to bring about?  Did the defendant associate himself

7    with the criminal venture knowingly and willfully?  Did the

8    defendant seek by his actions to make the criminal venture

9    succeed?

10          If the answer to all three is "yes" beyond a

11   reasonable doubt, then the defendant is an aider and abettor

12   and therefore guilty of the offense charged in Count Two.

13          If the answer to any of the three is "no," then the

14   defendant is not an aider and abettor and is not guilty of that

15   offense.

16          So now we turn to the third charge, which is

17   kidnapping.  Count Three charges the substantive crime of

18   kidnapping.  Specifically, Count Three charges the defendant

19   with engaging in kidnapping on or about March 25, 2013.  In

20   order to sustain its burden of proof with respect to the

21   allegation of kidnapping charged in Count Three, the government

22   must prove beyond a reasonable doubt the following four

23   elements:

24          First, the government must prove that the defendant

25   seized, or confined, or kidnapped, or abducted, or carried away

1    an individual as described in Count Three;

2            Second, the government must prove that the defendant

3    held the individual for ransom, reward, or for any other

4    reason;

5            Third, the government must prove that the individual

6    was transported in interstate or foreign commerce and that the

7    defendant traveled in interstate or foreign commerce, or used

8    any means, facility, instrumentality of interstate or foreign

9    commerce in committing and in furtherance of the offense;

10           Fourth, the government must prove the defendant acted

11   unlawfully, knowingly and willfully.

12           The defendant is also charged with aiding and abetting

13   in the kidnapping; accordingly, it would be sufficient for this

14   element if the defendant aid and abetted another person in the

15   kidnapping.

16           I have already instructed about the law of aiding and

17   abetting in detail and you should use those instructions here.

18   Now, I will go through each of these elements in more detail.

19           The first element the government must prove beyond a

20   reasonable doubt is that the defendant seized, confined,

21   kidnapped, abducted, or carried away a victim.

22           Kidnap means take and carry away a person by force and

23   against his or her will.  Seize, confine, abduct or carry away

24   all mean the physical and bodily taking and carrying away of a

25   person, or the holding or restriction of someone by force or

1    without that person's consent.

2              A second element the government must prove beyond a

3    reasonable doubt is that the defendant took the individual for

4    reward or financial gain.  It is sufficient to satisfy this

5    element if the government proves that at the time the defendant

6    kidnapped the individual, he did so for some purpose.  If you

7    find the defendant did not hold an individual for the purpose

8    of carrying out a robbery of narcotics proceeds, or if you have

9    reasonable doubt as to this element, then it's your duty to

10   acquit on this count.

11             The third element the government must prove beyond a

12   reasonable doubt is that a victim of the kidnapping was

13   transported in interstate commerce, or that the defendant

14   traveled in interstate commerce or used the mail or any means,

15   facility, or instrumentality of interstate commerce in

16   committing or in furtherance of the commission of the offense.

17             The government may satisfy this element by proving

18   beyond a reasonable doubt that the defendant used the United

19   States mail or any means, facility or instrumentality of

20   interstate or foreign commerce in committing or in furtherance

21   of the commission of the offense.  The term "means, facility,

22   or instrumentality of interstate or foreign commerce" includes

23   the use of a telephone in furtherance of committing the

24   offense.

25             The final elements the government must prove beyond a

1    reasonable doubt is that the defendant acted unlawfully and

2    knowingly.  I've already defined these terms.  The same

3    definitions apply with respect to Count Three.

4            In order to satisfy this element, the government must

5    show beyond a reasonable doubt that the defendant knew that a

6    victim of the kidnapping was not with him voluntarily but,

7    rather, was forced or made to go with him.

8            The defendant is also charged with aiding and abetting

9    with respect to this charge; accordingly, it would be

10   sufficient for this element if the defendant aided and abetted

11   another person in the kidnapping.  You should rely on the

12   instructions I have given you about aiding and abetting

13   liability.

14           Count Four is use of a firearm in connection with

15   robbery and kidnapping.  So, I have completed my instructions

16   on Counts One, Two and Three.  I'll instruct you now on the

17   elements of Count Four.

18           Count Four alleges a violation of Section 924(c) of

19   the Federal Criminal Code.  That provision makes it is a crime

20   for any person, "during and in relation to any crime of

21   violence...for which the person may be prosecuted in a court of

22   the United States [to] use[] or carr[y] a firearm," or, "in

23   furtherance of any such crime, [to] possess[] a firearm."

24           Count Four is a firearms count connected to the

25   robbery conspiracy charged in Count One and the kidnapping

1    charged in Count Three.  This means that you cannot consider

2    Count Four unless you first determine that the defendant is

3    guilty of either the robbery conspiracy charged in Count One *or*

4    is guilty of the kidnapping charged in Count Three.

5            To sustain its burden of proof on Count Four, charging

6    the defendant with possession of a firearm during and in

7    relation to a crime of violence, the prosecution must prove the

8    following three elements beyond a reasonable doubt:

9            First, that on or about the dates alleged in Count

10   Four of the indictment, the defendant used or carried or

11   possessed a firearm, or any combination of those acts, or aided

12   and abetted the use, carrying or possession of a firearm by

13   another; and

14           Second, that the defendant used or carried the

15   firearm, or aided and abetted the use and carrying of the

16   firearm, during and in relation to the specified crime of

17   violence, or that the defendant possessed a firearm, or aided

18   and abetted the possession of a firearm, in furtherance of that

19   same crime; and

20           Third, that the defendant acted knowingly.

21           I'll now discuss each element in further detail.

22           The first element the government must prove beyond a

23   reasonable doubt in Count Four is that on or about March 25,

24   2013, the date in the indictment, the defendant used, carried,

25   or possessed a firearm.

Ea3gcha3                    Charge

1          As used in the statute, the term "firearm" means "any

2     weapon...which will or is designed to or may readily be

3     converted to expel a projectile by the action of an explosive."

4     I instruct you that a gun is a firearm.

5          In considering the specific element of whether the

6     defendant used, carried, or possessed a firearm, it does not

7     matter whether the weapon was loaded or operable – meaning

8     useable at the time of the crime.  Operability is not relevant

9     to your determination of whether a weapon is a firearm.

10         In order to prove that the defendant "used" the

11    firearm, the prosecution must prove beyond a reasonable doubt

12    that there was "an active employment" of the firearm by the

13    defendant during and in relation to the commission of the crime

14    of violence.  This does not mean that the defendant must have

15    actually fired or tried to fire the weapon, although each of

16    these actions will obviously be considered a use of the weapon.

17         Brandishing or even referring to the weapon so that

18    others present knew that the defendant has the firearm

19    available, if needed, all constitute uses of a firearm.

20         "Brandishing" means displaying all or part of the

21    firearm, or otherwise making the presence of the firearm known

22    to another person in order to intimidate that person.  The mere

23    possession of a firearm at or near the site of the crime

24    without active employment is not enough to count as use of a

25    firearm.

1          In order to prove that the defendant "carried" a

2    firearm, the prosecution must prove beyond a reasonable doubt

3    that the defendant had a weapon within his control so that it

4    was available in such a way that it furthered the commission of

5    the crime.  The defendant need not have held the firearm

6    physically or have had actual possession of it on his person.

7          If you find that the defendant had control over the

8    place where the firearm was located, and had the power and

9    intention to exercise control over the firearm, and that the

10   firearm was immediately available to him in such a way that it

11   furthered the commission of a crime of violence, you may find

12   that the prosecution has proven that the defendant carried a

13   firearm.

14         The legal concept of possession may differ from the

15   everyday usage of the term, so let me explain it.  Most of us

16   think of possession as having physical custody or control of an

17   object.  However, a person does not need to have actual,

18   physical possession, that is, physical custody of an object, in

19   order to be in legal possession of it.  If an individual has

20   the ability to exercise substantial control over an object that

21   he does not have in his physical custody, and the intent to

22   exercise such control, then he is in possession of that

23   article.  This is called constructive possession.

24         Control over an object may be demonstrated by the

25   existence of a working relationship between the person having

such control and the person with actual physical custody.  The

person having control possesses an object because he has an

effective working relationship with the people who have actual

physical custody of the object, and because he can direct the

movement or transfer of that object.

          As an example, I possess law books in my chambers,

even though I'm here in my courtroom, which is on a different

floor.  I have control of those books.

          More than one person can have control over the same

firearm.  The law recognizes that possession may be sole or

joint.  If one person alone has actual or constructive

possession of a thing, possession is sole.  If more than one

person has possession of it, as I have defined possession for

you, then possession is joint.  That is what is meant by

"possession."

          Possession of a firearm in furtherance of a crime of

violence requires that the defendant possess a firearm and that

the possession move the crime forward.  The mere presence of a

firearm is not enough.  Possession in furtherance requires that

the possession is in relation to and an essential part of the

crime.  The firearm must have played some part in furthering

the crime in order for this element to be satisfied.

          The defendant is also charged with aiding and abetting

with respect to this charge; accordingly, it would be

sufficient for this element if the defendant aided and abetted

1    another person in the use, carrying, or possession of a

2    firearm.  You should rely on the instructions I have given you

3    about aiding and abetting liability.  However, some additional

4    instructions apply to this charge.

5            In order to convict the defendant of aiding and

6    abetting another's use or carrying of a firearm, or possession

7    of a firearm in furtherance of a crime of violence, the

8    government must establish (1) that the defendant actively

9    participated in the underlying crime of violence, here, (a) the

10   robbery conspiracy charged in Count One of the indictment (b)

11   the kidnapping charged in Count Three; and (2) that the

12   defendant did so with advance knowledge that another

13   participant in the robbery conspiracy charged in Count One or

14   the kidnapping charged in Count Three would use or carry a

15   firearm, or possess a firearm in furtherance of the charged

16   crimes of violence.

17           As to the first part, "active participation" does not

18   require that the defendant participated in each and every

19   element of the underlying crime of violence.  Instead, the

20   defendant's participation may be limited to only one or some of

21   the elements of the underlying crimes of violence.

22           As to the second part, in order for a defendant to

23   have had "advanced knowledge" of another participant's use or

24   carrying of a firearm, or possession of a firearm in

25   furtherance of the crime of violence, the defendant needs to

have had that knowledge at a point before or even during the

commission of the crime when the defendant still had the

opportunity to walk away from participating in the offense if

he chose to do so.

        If a defendant who has the opportunity to walk away

from participating in an offense chooses to continue to

participate in the offense after learning that another

participant will use or carry a firearm, or possess a firearm

in furtherance of a crime of violence, or is currently using or

carrying a firearm, or possessing a firearm in furtherance of a

crime of violence, that defendant has the requisite advance

knowledge to make him an aider or abettor of the other

participant's use or carrying of a firearm, or possession of a

firearm in furtherance of a crime of violence.  If the

government has not proved the requisite advanced knowledge

beyond a reasonable doubt, you must acquit the defendant of

that charge.

        The second element that the government must prove

beyond a reasonable doubt is that the defendant used or carried

a firearm during and in relation to a crime of violence, or

possessed a firearm in furtherance of such a crime.  Possession

in furtherance, as I indicated, requires that the possession be

incident to and an essential part of the crime.  The firearm

must have played some part in furthering the crime in order for

this element to be satisfied.

1          This means that, for example, unless you find that the

2     defendant participated in the crime of violence charged in

3     Count One or Count Three described in the indictment, you must

4     find him not guilty of Count Four.

5          You are instructed that kidnapping and robbery each

6     qualify as crimes of violence.  I've already instructed you on

7     the law relevant to those crimes, and you should follow those

8     instructions here.

9          The third element that the government must prove

10    beyond a reasonable doubt is that the defendant knew that he

11    was using, carrying, or possessing a firearm, or aiding and

12    abetting the use, carry, or possession of a firearm, and that

13    he was acting knowingly in doing so.  I have already instructed

14    you on what "knowingly" means in this context.

15         If, and only if, you find the defendant guilty on

16    Count Four, you will have to answer an additional question:

17    whether one or more firearms were brandished in the course of

18    the commission of the crime, whether by the defendant or

19    another.

20         Please note that whether the defendant or another

21    brandished a firearm in the course of the commission of the

22    crime does not affect your determination of whether the

23    government has met its burden of proof regarding the underlying

24    crime; instead, it is an additional question you must answer

25    only if you have already found that the government has proved

1    the defendant guilty of the underlying crime beyond a

2    reasonable doubt.

3            In order to prove that the defendant or another

4    "brandished" the firearm, the government must prove that the

5    defendant or another displayed all or part of the firearm, or

6    otherwise made the presence of the firearm known to another

7    person, in order to intimidate that person.  This does not mean

8    that the defendant or another must have actually fired or

9    attempted to fire the weapon, although each of those actions

10   would obviously involve brandishing the weapon.

11           In addition to the elements of each of the charges

12   that I have already described, for each crime charged in the

13   indictment, you must also consider whether any act in further

14   of the unlawful activity occurred within the Southern District

15   of New York.  The place where such acts took place is called

16   venue.

17           The Southern District of New York includes all of

18   Manhattan, the Bronx and Westchester.  It also includes all of

19   the waters surrounding Manhattan, Brooklyn, Staten Island, and

20   Long Island, and the air and bridges over those waters.

21           I should note that on this issue – and this issue

22   alone – the government need not prove venue beyond a reasonable

23   doubt, but only by a preponderance of the evidence.  A

24   "preponderance" means that the evidence shows it is more likely

25   than not that something occurred.  The government has satisfied

1   its burden under the venue element if you conclude that it is

2   more likely than not that the crime charged or any act in

3   furtherance of the crime occurred in the Southern District of

4   New York.

5         If, on the other hand, you find that the government

6   has failed to prove the venue requirement by a preponderance of

7   the evidence for a particular count, then you must acquit the

8   defendant on that count.

9         Those are the substantive charges.  I have a few final

10  general instructions that I'll give you at this point.

11        The indictment in this case refers to various dates.

12  The evidence might have established different dates.  The law

13  only requires a substantial similarity between the dates

14  alleged and the dates established by the evidence.

15        Stipulations:  In this case, you've heard evidence in

16  the form of stipulations.  A stipulation is an agreement

17  between the parties.  Some of the stipulations that you heard

18  contained facts that were agreed to be true, and others

19  describe testimony that a witness, if called, would have given.

20  You must accept as true the facts contained in these

21  stipulations, including that a witness would have given certain

22  testimony.  However, it is for you to determine the weight, if

23  any, to be given that testimony or fact.

24        You have heard references to certain investigative

25  techniques that were used or not used by law enforcement

1   authorities in the case.  There is no legal requirement that

2   the government prove its case through any particular means.

3        Your concern is to determine whether or not, based on

4   the evidence or lack of evidence, the guilt of the defendant

5   has been proven beyond a reasonable doubt.

6        Consciousness of guilt:  You have heard testimony that

7   the defendant fled after he believed that he was about to be

8   charged with committing the crime for which he is now on trial,

9   and he was stopped in New Jersey.

10       If you find that the defendant attempted to evade

11   arrest by fleeing, you may, but are not required to, infer that

12   the defendant believed that he was guilty of the crimes for

13   which he is here today.

14       Evidence of flight may not be used by you as a

15   substitute for proof of guilt.  Flight does not create a

16   presumption of guilt.  Flight alone, or consciousness of guilt

17   alone, are not sufficient to convict, and do not constitute

18   evidence beyond a reasonable doubt.  Whether or not evidence of

19   flight shows that the defendant believed that he was guilty of

20   the crime for which he is now charged and the significance, if

21   any, to be given to such evidence, is for you, the jury, to

22   decide.

23       Persons not on trial:  Some of the people who may have

24   been involved in the events leading to this trial are not on

25   trial.  This does not matter.  There is no requirement that all

members of a conspiracy be charged and prosecuted, or tried

together, in the same proceeding.  You may not draw any

inference, favorable or unfavorable, towards the government or

the defendant from the fact that certain people other than the

defendant are not named in the indictment.  You may not

consider the absence of other people at trial in any way in

reaching your verdict.

Preparation of witnesses:  You have heard that

witnesses have discussed the facts of the case and their

testimony with the lawyers before the witnesses appeared in

Court.

Although you may consider that fact when you are

evaluating a witness' credibility, there is nothing unusual or

improper about a witness meeting with lawyers before testifying

so the witness can be aware of the subjects he or she will be

questioned about.

Uncalled witnesses:  There are persons whose names you

heard during the course of the trial, but did not appear to

testify.  I instruct you that each party had an equal

opportunity or lack of opportunity to call any of these

witnesses.  Therefore, you should not draw any inference or

reach any conclusions as to what they would have testified to

had they been called.  Their absence should not affect your

judgment in any way.  You should remember my instruction,

however, that the law does not impose on any defendant in a

criminal case the burden or duty of calling any witnesses or

producing any evidence, and that it is the government's burden

to prove beyond a reasonable doubt each count in the indictment

as to the defendant.

         The defendant's right not to testify:  The defendant

did not testify in this case.  Under our Constitution, a

defendant has no obligation to testify or to present any

evidence, because it is the government's burden to prove the

defendant's guilt beyond a reasonable doubt.  That burden

remains with the government throughout the entire trial and

never shifts to the defendant.  A defendant is never required

to prove that he is innocent.

         You may not attach any significance to the fact that

the defendant did not testify.  No adverse inference against

the defendant may be drawn by you because he did not take the

witness stand and you may not consider the fact that the

defendant did not take the stand at all in your deliberations

in the jury room.

         Law enforcement witnesses:  You have heard the

testimony of law enforcement witnesses.  The fact that a

witness may be employed as a law enforcement official or

employee does not mean that his or her testimony is deserving

of more or less consideration, or greater or lesser weight,

than that of an ordinary witness.

         In this context, defense counsel are allowed to try to

1    attack the credibility of such a witness on the ground that his

2    or her testimony may be colored by a personal or professional

3    interest in the outcome of the case.

4         It's for you to decide, after reviewing all of the

5    evidence or lack of evidence, whether to accept the testimony

6    of law enforcement witnesses, as it is with every other type of

7    witnesses, and to give that testimony the weight you find it

8    deserves.

9         Expert witnesses:  You've heard testimony from what we

10   call expert witnesses.  Expert witnesses are witnesses who, by

11   education or experience, have acquired learning in a science or

12   a specialized area of knowledge.  Such witnesses are permitted

13   to give their opinions as to relevant matters in which they

14   profess to be experts and give their reasons for their

15   opinions.  Expert testimony is presented to you on the theory

16   that someone who is experienced in the field can assist you in

17   understanding the evidence or in reaching an independent

18   decision on the facts.

19        Your role in judging credibility applies to experts as

20   well as other witnesses.  You should consider the expert

21   opinions that were received in evidence in the case and give

22   them as much or as little weight as you think they deserve.  If

23   you should decide that the opinion of an expert was not based

24   on sufficient education, experience, or data, or if you should

25   conclude that the trustworthiness or credibility of an expert

1   is questionable for any reason, or if the opinion of the expert

2   was outweighed, in your judgment, by other evidence in the

3   case, then you might disregard the opinion of the expert

4   entirely or in part.

5           On the other hand, if you find the opinion of an

6   expert is based on sufficient data, education, and experience,

7   and the other evidence does not give you reason to doubt his or

8   her conclusions, you would be justified in placing reliance on

9   the expert's testimony, but the extent of such reliance is your

10  choice.

11          You have heard the testimony of a witness who has

12  testified under a grant of immunity from this court.  What that

13  means is that the testimony of the witness may not be used

14  against him in any criminal case, except a prosecution for

15  perjury, giving a false statement, or otherwise failing to

16  comply with an immunity order of this court.

17          You are instructed that the government is entitled to

18  call, as a witness, a person who has been granted immunity and

19  that you may convict a defendant on the basis of such a

20  witness' testimony alone, if you find the testimony proves the

21  defendant guilty beyond a reasonable doubt.

22          However, the testimony of a witness who has been

23  granted immunity should be examined by you with greater care

24  than the testimony of an ordinary witness.  You should

25  scrutinize it closely to determine whether or not it is colored

Ea3gcha3                        Charge

in such a way as to place guilt upon the defendant in order to

further the witness' own interests; for, such a witness,

confronted with the realization that he can win his own freedom

by helping to convict another, has a motive to falsify his

testimony.

Such testimony should be scrutinized by you with great

care and you should act upon it with caution.  If you believe

it to be true, and determine to accept the testimony, you may

give it such weight, if any, as you believe it deserves.

Use of evidence obtained pursuant to search:  You have

heard testimony about evidence seized during searches.

Evidence obtained from the searches was properly admitted in

this case and may be properly considered by you.

Whether you approve or disapprove of how it was

obtained should not enter into your deliberations because I now

instruct you that the government's use of this evidence is

lawful.

Charts and tables:  Some of the exhibits admitted into

evidence were charts.  These charts were introduced basically

as summaries.  They are summaries of the evidence and are not

direct evidence of proof.  They are a visual representation of

information or data that is in evidence.  They are intended to

be of assistance to you in your deliberations.

In presenting the evidence which you have heard, it

can be easier to use summary charts than to place all of the

1    relevant documents in front of you.  It is up to you to decide

2    whether those charts fairly and correctly present the

3    information in the testimony and the documents.

4            To the extent that the charts conform with what you

5    determine the underlying evidence to be, you may accept them.

6    But one way or the other, realize that the charts are not in

7    and of themselves direct evidence, and the weight you give

8    them, if any, is your choice.

9            There may be some documents or audio recordings in

10   evidence that are redacted.  "Redacted" means that part of the

11   document or audio recording was taken out.  You are to concern

12   yourself only with the part of the item that has been admitted

13   into evidence.  You should not consider any possible reason why

14   other parts of it have been deleted.

15           Certain recordings have been admitted into evidence.

16   Whether you approve or disapprove of the recordings of these

17   conversations may not enter your deliberations.  These

18   recordings were made in a lawful manner and the government's

19   use of this evidence is lawful.

20           You must, therefore, regardless of any personal

21   opinions, give this evidence full consideration along with all

22   the other evidence in the case in determining whether the

23   government has proved the defendant's guilt beyond a reasonable

24   doubt.

25           The transcripts of the recordings were provided to you

1    to assist you in listening to the recordings.  However, it is

2    the tape recorded conversations, not the transcripts, that are

3    the evidence in this case.

4         One of the most important issues in this case is the

5    identification of the defendant as the perpetrator of the

6    crimes.  The government has the burden of proof of proving

7    identity, beyond a reasonable doubt.  It is not essential that

8    a witness be free from doubt as to the correctness of his or

9    her identification of the defendant.  However, you, the jury,

10   must be satisfied beyond a reasonable doubt of the accuracy of

11   the identification of the defendant before you may convict him.

12   If you are not convinced beyond a reasonable doubt that the

13   defendant was the person who committed a particular crime, you

14   must find the defendant not guilty of that crime.

15        Identification testimony is an expression of belief on

16   the part of the witness.  Its value depends on the opportunity

17   the witness had to observe the offender at the time of the

18   offense and later to make a reliable identification of the

19   offender.

20        You will hear arguments of counsel on the subject.  I

21   will only suggest to you that you should consider the following

22   matters:  Did a witness have the ability and adequate

23   opportunity to see the offender at the time of the offense?

24   Has a witness' identification of the defendant as the offender

25   been influenced in any way?  Has his or her identification been

1    unfairly suggested by events that occurred since the time of

2    the offense or by the circumstances under which the

3    identification was made?  Is his or her recollection accurate?

4           In addition, you should consider the credibility of an

5    identification witness just as you would any other witness.

6    Let me repeat, the burden is on the prosecution to prove every

7    element of each crime charged, including the identity of the

8    defendant as the offender.  Therefore, if, after examining all

9    of the evidence, you find that a crime was committed, but you

10   have reasonable doubt about whether it was the defendant who

11   committed the crime, you must find him not guilty of that

12   crime.

13          Alternate jurors:  There are two alternate jurors.

14   The alternate jurors will not join in deliberations unless a

15   member of the jury is discharged.  The alternate jurors will be

16   taken to a separate room by Mr. Street where they'll remain

17   until a verdict is reached, unless called to replace a juror.

18   The alternate jurors are not to discuss the case with each

19   other or anyone else until and unless they're asked to replace

20   a juror who is discharged.  If an alternate juror replaces a

21   member of the jury, I'll instruct the jury to begin its

22   deliberations over.

23          With these instructions in mind, it says you will now

24   here from the lawyers, actually, we will now take a lunch

25   break.  But after the lunch break, you'll hear from the lawyers

1    who will give their closing arguments.

2         I remind you that arguments by lawyers are not

3    evidence because the lawyers are not witnesses.  However, what

4    they say to you in their closing arguments is intended to help

5    you understand the evidence and reach your verdict.  So please

6    pay careful attention to the arguments.

7         We'll have our lunch break, we'll come back, we'll

8    hear the closing arguments.  Then I'll give you the final

9    instructions, and then you'll retire to deliberate.  Enjoy your

10   lunch.  Let's see what time it is.  It's 11:40.  Let's come

11   back at 1:00 and we will begin the closing arguments then.

12        Please don't talk about the case.  Please leave the

13   charge here in the courtroom on your chair.  We'll see you at

14   1:00.  Thank you.

15        (Jury excused)

16        (In open court; jury not present)

17        THE COURT:  You may be seated.

18        I received from you all a long time ago a verdict

19   sheet, which was a joint verdict sheet.  I plan to use that and

20   hand it to all members of the jury.  We're adjourned.

21        MR. DRATEL:  I reassert my objection.  After the

22   charge, I have to reassert what we had gone through in the

23   redline and then this morning.

24        THE COURT:  Thank you.  The motion is denied.

25        Thank you.  We'll break for lunch.

1            MR. ARAVIND:  Thank you.

2            (Pause)

3            THE COURT:  I wanted to ask about length of summations

4    before our break so we all understand what the plan is when we

5    come back.  Let me ask Mr. Dratel.  How long are you planning

6    to sum up?

7            MR. DRATEL:  I would like to keep it at 35 minutes.

8            THE COURT:  Thirty-five?

9            MR. DRATEL:  Yes.  I think certainly less than 45.  It

10   depends on what the government does.

11           THE COURT:  Thirty-five to 45.  Assuming if you had

12   the same amount of time as 45 minutes, is that sufficient?

13           MR. ARAVIND:  I think I was timing it so far to be 45

14   to an hour, so I think about an hour is probably more.

15           THE COURT:  Total time?

16           MR. ARAVIND:  For the opening summation and then

17   Ms. Tekeei will do rebuttal, which will be shorter.

18           THE COURT:  It sounds like we're talking about over an

19   hour.

20           MR. ARAVIND:  I think the opening summation is looking

21   like about an hour.  I think the rebuttal will probably be 20

22   minutes.

23           MS. TEKEEI:  Yes.

24           MR. ARAVIND:  Again, depending on how long Mr. Dratel

25   takes.

1          THE COURT:  Mr. Dratel.

2          MR. DRATEL:  You know, it all depends on what --

3          THE COURT:  On how long they speak.

4          MR. DRATEL:  Right, but also just in terms of rebuttal

5   as a genuine rebuttal and not just a second summation --

6          THE COURT:  Right.  I think we should agree on a time

7   and that you should reserve some time for rebuttal; that way,

8   Mr. Dratel has the opportunity to use an equal amount of time

9   if he wants to.  Can you?

10          MR. ARAVIND:  Your Honor, we have been preparing this

11   summation for the last few days.

12          THE COURT:  I understand, so you think it's an hour.

13          MR. ARAVIND:  I think the opening summation is an

14   hour.  We have to marshal a lot of evidence.

15          THE COURT:  I understand.

16          MR. ARAVIND:  Now given the Court's ruling today, I

17   have to pay particular attention to some of the circumstantial

18   evidence and the phone records that are in evidence, which take

19   a little bit more time to explain.

20          THE COURT:  Okay.

21          MR. ARAVIND:  That was my estimate when I did this at

22   3:00 o'clock in the morning last night.  I'm not sure how that

23   would be now.

24          THE COURT:  How it plays out.  Okay.  At least we have

25   a preview.  We think it's an hour.  You think it's 20 minutes.

1    And the defense can sum up for an equal amount of time if you

2    want but at some point, it's not advocacy anymore.  At some

3    point, you put your jurors to sleep and the jury is not well

4    served and your case is not well served, but I leave the

5    strategic decisions to all of you.

6            MR. DRATEL:  I'm not intending just to fill up the

7    time because they used up more time.  Obviously, what the

8    government does in its opening summation may affect whether

9    it's 35 or 40 or 45 minutes.

10           THE COURT:  Sure.  I won't ring a bell.  I won't hold

11   up any signs.  I'll let you proceed.

12           MR. ARAVIND:  Thank you.

13           (Luncheon recess)

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

                           AFTERNOON SESSION

                              1:05 p.m.

          THE COURT:  Welcome back, ladies and gentlemen.  I
gave you the instructions about closing statements before our
lunch break, so I won't repeat that.  We can start now, if you
are ready, Mr. Aravind.

          MR. ARAVIND:  Thank you, your Honor.

          Good afternoon.  Get on the top of the bed.  Look
forward.  Don't look back.

          That's what that man shouted at Emma Torruella when he
forced her onto the bed in her bedroom, her hands bound tightly
with a scarf.  That's what this man said when he kidnapped
Ms. Torruella, grabbed her neck and forced her into a car to go
pick up a bag full of money.  That's what this man said during
the course of kidnapping and robbing Ms. Torruella and David
Barea.  That's what this man said and did to make Ms. Torruella
believe that she was going to die.

          What Antione Chambers didn't count on when he ran out
of 1403 Overing Street the morning of March 25, 2013 with
$20,000 was that he would end up here.

          He didn't count on the fact that David Barea and Emma
Torruella would come here and testify and tell you exactly
about their nightmare that they experienced that night or that
Ms. Torruella would remember part of the license plate of
Chambers' girlfriend's car that they used to abduct her during

1    the robbery.

2         He didn't count on the fact that a friend from his

3    neighborhood would show an agent a cracked cell phone screen

4    with Twizzie's name and contact information.

5         He didn't count on the fact that eventually the FBI

6    would get involved in this case and identify him as the user of

7    his phone or that an FBI agent would track his phone, showing

8    him going from the apartment that he shared with Zaporia Dunbar

9    directly to Tyrone Brown's apartment after Brown called him to

10   tip him off about a robbery at the exact time of the robbery.

11        It's simple.  This defendant didn't count on getting

12   caught redhanded that day.  But when the defendant eventually

13   realized that the NYPD and the FBI were looking for him, he

14   fled.  And when he was caught, finally, the defendant was

15   caught in a rental car that wasn't in his own name with a whole

16   new identity.

17        Earlier this week we told you that we would prove to

18   you that Antione Chambers committed a brutal armed robbery and

19   kidnapping of David Barea and Emma Torruella last March and

20   that is exactly what the evidence has shown.

21        In this trial you heard testimony from 11 witnesses.

22        You heard from Ms. Torruella, who told you that she

23   was robbed by a man who grabbed her neck and forced her into a

24   car and pushed her on the floor just as she thought she was

25   going to die.

1        You heard from David Barea, who told you in clear

2    detail about what happened to him at Tyrone Brown's apartment

3    at 1338 Croes Avenue and then at Emma Torruella's apartment at

4    1403 Overing.

5        You heard from Demi Torres about what she unmistakably

6    saw that night, her mother in distress.  You saw phone record

7    evidence showing that the defendant was in contact with Tyrone

8    Brown, another drug dealer who had purchased crack from Barea

9    and who set up the robbery just before the robbery happened.

10       You saw the video of Barea being attacked and robbed

11   by two men.  You also saw the cell site location evidence which

12   showed you that the defendant traveled from his apartment in

13   the north Bronx to the robbery scene right before the robbery

14   and then traveled back to his apartment right after the robbery

15   and then went to Pennsylvania the next day.

16       And you saw that fake ID that the defendant was found

17   with when he was arrested in New Jersey.

18       This afternoon, ladies and gentlemen, I am going to go

19   through the evidence that you have heard and seen and that

20   establishes how the evidence proves that the defendant is

21   guilty.

22       While I go through the evidence I'm also going to

23   address some of the arguments that I expect the defense

24   attorney will make in his summation.

25       I want to be clear.  The defendant has absolutely no

1    burden.  It is the government's burden to prove the defendant's

2    guilt.  It is a burden we embrace and which we have met here.

3    But when a defendant chooses to cross-examine witnesses and

4    make arguments, we can address those arguments in summation,

5    and I'll be doing that today.

6         I'm also going to talk very, very briefly about some

7    of the charges, but I am not going to spend much time on that

8    because you just heard the charge from Judge Schofield.

9         First, I want to talk about what's not in dispute.

10   There is no serious dispute that David Barea and Emma Torruella

11   were robbed and kidnapped at gunpoint on March 25 of last year.

12   Even in his opening, defense counsel conceded that there is no

13   dispute that there was a robbery and Emma Torruella and David

14   Barea were taken against their will to get money.

15        There is also no dispute that David Barea was a

16   serious drug dealer and one of his customers was Tyrone Brown,

17   another drug dealer.  You heard the wiretap calls.  There is no

18   dispute about that, ladies and gentlemen.

19        There is also no dispute that the defendant was in a

20   relationship with Zaporia Dunbar, that they had a child

21   together, and they previously lived at 4782 Barnes Avenue,

22   before they both left town suddenly once the FBI came knocking

23   on their door.

24        So what is in serious dispute?  It's simple.  The one

25   thing the defense has to dispute, the one thing that they

1    cannot admit, in spite of all the evidence to the contrary, is

2    obvious.  They have to dispute that the defendant was one of

3    the robbers, the identity of the tall guy.  But you know that

4    he was one of the robbers because of all of the evidence you

5    heard and saw in this case.

6          So what evidence am I talking about?  During the

7    course of the summation I am going to focus on eight main forms

8    and types of evidence.

9          First, you heard the testimony of Ms. Torruella, the

10   woman who woke up to find the defendant at her doorstep in the

11   middle of a robbery and a kidnapping.  Now, she made a prior

12   identification that it was the defendant who grabbed her neck

13   and took her to her mother's apartment so that she could get

14   that bag of cash under her mom's bed.  I am going to spend some

15   time talking about Ms. Torruella's testimony.

16         And what happens when they go to Emma's mother's

17   house?  You next had the testimony of Demi Torres.

18         Third, you have the testimony of David Barea.  Barea

19   is a drug dealer, pure and simple.  But he did not deserve to

20   be robbed and kidnapped at gunpoint, and his testimony of that

21   evening was devastating and detailed, and it is completely

22   corroborated by the other evidence in this case.

23         Fourth, you have that surveillance video at Croes

24   Avenue which corroborates what David Barea told you.

25         Fifth, you have the testimony of law enforcement

1    officers.  You heard from Detective Deloren, who responded to

2    the robbery.  He found Barea with bruises.  You also heard that

3    he found a hammer in Chambers' girlfriend's Honda Accord that

4    was used during the robbery.  You heard from Special Agent John

5    Reynolds, who analyzed the cell phone evidence and was able to

6    determine who Antione Chambers was.  The testimony of these law

7    enforcement agents corroborates what the victims told you.

8            Sixth, you had the unmistakable evidence from numerous

9    sources, the prison guard, the screen shot from Kentrell

10   Ferguson's phone, Tyrone Brown's phones, and the toll records

11   that the defendant Antione Chambers' nickname was Twizzie and

12   that the defendant used a phone to communicate with Brown

13   before and right after the robbery.

14           Seventh, you have the cell site location evidence that

15   shows where that phone associated with Twizzie was that

16   morning.  You know, ladies and gentlemen, that that is the

17   defendant.  The evidence showed you that right before the

18   robbery the defendant traveled from Barnes Avenue to Croes

19   Avenue, and then right after the robbery he traveled back to

20   his place on Barnes Avenue.

21           Eighth, you have the testimony of Officer DeRosa, who

22   stopped and eventually arrested the defendant.  That testimony

23   shows that after he knew the FBI and the NYPD were out looking

24   for him, the defendant and his girlfriend left down.  They were

25   eventually found in New Jersey with the defendant with a fake

1    driver's license in a rental car he didn't even rent.

2            Let's talk about the evidence.  And this case starts

3    with David Barea.  David Barea sold drugs, then he became a

4    confidential informant, and then he sold drugs again when he

5    wasn't supposed to.  One of David Barea's customers was Tyrone

6    Brown.  And Brown used to buy cocaine and crack cocaine from

7    Barea.  Brown was also a drug dealer.  In fact, he was caught

8    with this package of drugs when he was arrested as part of this

9    case.  This is Government Exhibit 600.

10            And you know, on March 25, 2013, Barea went to Tyrone

11    Brown's apartment.  Brown had purchased crack cocaine from

12    Barea a little while earlier.  And as part of their usual

13    arrangement, Barea was coming over to pick up the money.

14            There is David Barea.  And before David Barea met up

15    with Tyrone Brown, he contacted him, as he usually did.  What

16    did Barea tell you?

17    "Q.  Did you tell him you were going there?

18    "A.  Yeah.  I had spoken to him during the day.

19    "Q.  How did you communicate with him?

20    "A.  By phone or text."

21            What do the phone records show?  Exactly that.  Here

22    is the call.  We talked about it.  At 12:56, Barea sends a text

23    message to Tyrone Brown.  Remember, it looks like 11:56.  You

24    heard testimony from Special Agent Reynolds that that is a text

25    message.  And the text message is kept in central time.  That

1    call actually takes place at 12:56, after midnight, just

2    minutes before the robbery.  We don't know the content of that

3    message, but you know from your common sense what it said.  I'm

4    coming over.

5          What does Tyrone Brown do?  One minute later, at

6    12:57, he calls that 6130 phone number.  Who is that?  That's

7    the defendant, Antione Chambers.  And they have a 33-second

8    call.  What does your common sense tell you happened during

9    that call?  It's time.  He is coming over.  You and Dee should

10   come over and do this.  This is the setup call, ladies and

11   gentlemen.  This sets up the robbery.  Brown is calling his

12   coconspirator, Antione Chambers, and tipping him off that David

13   Barea is about to show up.

14         What happens next?  1:02, five minutes later, Brown

15   gets a call, again, now from Chambers, and, again, you can use

16   your common sense to infer what this call is about.  Is he here

17   yet?  Three minutes later.  Brown calls back.  He's on his way.

18   He's almost here.  And then David Barea shows up outside of

19   1338 Croes Avenue.  Again, there is that screen shot.  Brown

20   let's Barea enter the apartment to finish their drug business.

21   And shortly afterward Steven Glisson and Antione Chambers show

22   up just like clock work.  There they are.

23         As Barea leaves the apartment, Chambers and Glisson

24   push through the door with guns.  The defendant and Glisson

25   immediately began shouting at Barea demanding where the money

1    was.  That's the video.  Chambers is the first man.  Dee,

2    Steven Glisson, is the second.  How do you know that that's

3    Antione Chambers assaulting the victim?  Because of all of the

4    other evidence in this case.

5            The rest of the story is taken over by David Barea.

6    Chambers hits Barea, you have seen it in the video, and Barea

7    fights back.  Two things happened that are very significant.

8    The first is Barea's words.  We were tussling for a couple of

9    seconds.  We were fighting.  I was slamming him on the wall.

10   He slammed me.  And as we were still struggling, Dee came in

11   right after him and put the gun to my head and was like, stay

12   the fuck still, stay the fuck still.  Glisson brandishes a gun

13   and points it to the defendant's head.

14           And what does the defendant say?  Again, David Barea:

15   The tall guy kept beating me.  He put my face to the wall and

16   told me not to look at him.  He was just beating on me.  He had

17   a hammer in his hand hitting me on my back, my shoulder blade,

18   my legs.

19   "Q.  What, if anything, did he say to you?

20   "A.  That not to look at him, don't look at my fucking face,

21   don't look at me, don't look at me."

22           You know, ladies and gentlemen, that this is the

23   hammer.

24           Now, that's what the defendant told David Barea, not

25   to look at him, because that was the most important thing that

1    concerned the defendant, not to be seen, not to be detected,

2    not to be identified.

3          And you heard that the robbers were very careful that

4    evening.  They wore gloves, masks.  They had part of their

5    faces covered.  They used a gun with a potato on it so it would

6    muffle the sound in case there was violence, a homemade

7    silencer.  They were cautious and they didn't take chances.

8          Remember this video?  This is Steven Glisson and

9    Antione Chambers approaching David Barea's apartment.  What

10   happens?  The light goes on and look at their reaction.  They

11   were afraid of being seen.  They are afraid of the light.  And

12   then they finally recover and they get ready to do the robbery.

13         These guys were professionals.  They didn't leave a

14   trace in that apartment.  You heard that the DNA on the duct

15   tape turned out to exclude Chambers, and there was enough DNA

16   on that hammer.

17         What happens next?  With a gun pointed to his head,

18   Barea made a quick decision.  He wanted to stall for time, so

19   he told Chambers and Glisson that there was money at the

20   apartment he shared with Emma Torruella.  And so what did they

21   do?  They took him that way.  And then you see Tyrone Brown.

22   This is them leaving the apartment and there is David Barea

23   with his hands behind his back and the defendant.  Chambers and

24   Glisson grab Barea.  They bind his hands with duct tape.  They

25   take him to Torruella's house so they can get the money that

they wanted.  You heard they hit Barea with a hammer.  They

pointed a gun at him.  Meanwhile, Tyrone Brown, the setup man,

walked calmly to the door, locked it, and then walks out a few

minutes later.  Do you remember that part of the video.  Brown

is cool as a cucumber.

Before we continue to talk about that night, we need

to take a minute to talk about the relationship between Antione

Chambers and Tyrone Brown.  They are friends.  They are also

partners in crime.  You can see that from the phone evidence

that is admitted as part of this case.  Remember, this is the

chart that Special Agent Reynolds prepared.  It shows all the

phone contact between Tyrone Brown and Twizzie, who you know is

Antione Chambers, calls on March 17, March 18, over and over

and over again, a week before the robbery.  They talked to each

other all the time.  And guess what?  They talked to each other

on the phone, especially when David Barea is around.  Here we

have the phones, the calls between Brown and Twizzie before the

robbery on the 17th and the 18th.  What did David Barea tell

you about that?  Barea said that about a week before the

robbery he sees Tyrone Brown in the area around his apartment.

Just like on the day of the robbery, a week before the

robbery takes place, Chambers is home on Barnes Avenue.  He

starts talking to Brown, who has been in contact with Barea.

And Chambers heads down to Brown's apartment.  That was

reflected in the cell site map that Special Agent Perry

1    prepared.  Remember what Barea told you.  He said that he and

2    Tyrone Brown called, exchanged calls the week before the

3    robbery, and they met up.  And you saw the cell sites.  The

4    defendant, Antione Chambers, also went to the vicinity of

5    Brown's apartment that day, the exact same thing he does a week

6    later, the day of the robbery, when David Barea calls Brown and

7    meets up with Brown.

8            You can infer what's happening here, ladies and

9    gentlemen.  The defendant is casing out his target.  He was a

10   professional.  He wanted to make sure that it went off without

11   a hitch.  And he enlisted Tyrone Brown to help him.

12           You heard during the jury charge the members of a

13   conspiracy don't sit around a table planning crimes.  Often we

14   have to use circumstantial evidence to figure out what

15   criminals are doing.  And the pattern of calls between Tyrone

16   Brown and Antione Chambers on March 17 and 18 and then the

17   calls right before the robbery show that conspiracy forming,

18   and eventually Tyrone Brown tips off his friend, the defendant,

19   about the robbery.

20           Let's go back now to the day of the robbery and let's

21   fast forward until we get to 1403 Overing.  Once the defendant

22   and Glisson and the light-skinned or light-eyed robber, as Emma

23   Torruella called him, kidnapped Barea, they take him to Emma

24   Torruella's apartment and Barea and Torruella told you what

25   happened next.  They told you what happened inside their own

1    apartment, their home, two strange men wearing masks, gloves,

2    going through their things and demanding money.

3           Torruella told you that they then went to a third

4    apartment, her mom's apartment, where she took out a bag that

5    she stashed there, a bag containing $20,000 which contained her

6    boyfriend or her common law husband's dirty drug money.  The

7    other witness who told you about that was Demi Torres, who was

8    present when the defendant came to her door to pick up that bag

9    of money.

10          Now you know what happens next.  The testimony of

11   Barea, Torruella, and Torres is not disputed when it comes to

12   the brutality and the violence that the robbers committed.

13   What is disputed is the identity of the tall guy.  We know the

14   identity of the tall guy from all of the objective evidence in

15   this case and what the witnesses told you that led law

16   enforcement to find and apprehend the defendant.

17          Let's start with Emma Torruella.  You heard that Emma

18   Torruella got a good look at the defendant when he took off his

19   mask when he was in the Honda Accord.  Let's talk for a second

20   about Emma Torruella.  Let's talk about what happened during

21   her testimony.

22          What I submit happened to you and what you witnessed

23   was a witness who came into this courtroom that day ready to

24   confront the man who had grabbed her neck and kidnapped her.

25   She told you in detail what happened to her.  She told you that

1    she thought she was going to die.  And she was strong.  She

2    identified the defendant in court and told her account of what

3    happened.  But then you saw what happened to her.

4            Ladies and gentlemen, what you saw, I submit, was a

5    witness who had a breakdown before your very eyes.  You saw a

6    woman who was confronted repeatedly with the face of her

7    attacker.

8            MR. DRATEL:  Objection.

9            THE COURT:  Overruled.

10           MR. ARAVIND:  Staring up at her from the exhibits and

11   his face staring at her from the courtroom, and she fell apart.

12   She was asked to identify the defendant and then she just

13   couldn't do it anymore.  That happened, ladies and gentlemen.

14   This is real life.  And what happened to Emma Torruella was

15   real.

16           But this trial didn't end when Emma Torruella got off

17   the witness stand.  Instead, you heard all of the evidence that

18   shows that Antione Chambers is guilty of the charges in this

19   case.  Let's talk about that evidence right now.  And let's

20   look at the phone calls during the robbery.  You heard from

21   David Barea that the two robbers took his phone and used it.

22   Here is the testimony:

23           I asked him, you know, if he could please call the

24   tall guy because they were taking too long.

25           Yes.

1            And how did he do that?  He used a phone that was on

2       top of the table.  There was a table by the kitchen in the

3       hallway, my phone.  That's David Barea's testimony.

4            What did Emma Torruella say?  The exact same thing?

5       Let's look at the phone evidence first and then we will look at

6       Ms. Torruella's testimony.

7            This is the reports for one of David Barea's phones.

8       And what does it show you?  Special Agent Reynolds told you

9       exactly what it did.  That's that 8485 number which we know is

10      one of Groovy, David Barea's number, calling that 9462 number,

11      which you remember is the John 129 cell phone.  It's one call

12      from one Barea number to another Barea number, exactly like

13      David Barea told you.

14           What is also the significance of that?  It means that

15      the robbers are using Barea's cell phones that he took with him

16      to communicate with each other.  And it's precisely why you

17      don't see any phone contact on Antione Chambers' Twizzie phone.

18      That's the 6130 phone that we looked so much at.

19           Remember that gap that Special Agent Reynolds told you

20      about?  That's what that was.  These guys were professionals.

21      They wanted to use their victim's phones to contact each other

22      because they didn't want to leave a trace.  They didn't want to

23      have anything to link them to the scene of the crime.  That's

24      why we don't have cell sites for the Twizzie phone at Overing

25      or Bruckner, because the defendant didn't use his cell phone

1    then.  He was using Barea's phone.

2            And what happened when Emma and the defendant left to

3    go to Emma's mother's apartment on Bruckner?  Emma Torruella

4    got a good look at that car, that Honda Accord, that same car

5    that was sitting outside of Zaporia Dunbar's apartment after

6    the robbery.  That's the car.

7            This is a very important moment, ladies and gentlemen.

8    Emma Torruella told you on the witness stand that she

9    remembered the numbers 7788, and I bet it's four numbers that

10   she will never ever forget.  At the time of the robbery she

11   remembered two letters, two.  Who testified to that?  Both

12   Special Agent Reynolds and Detective Deloren.

13           Think about that for a minute, ladies and gentlemen.

14   Emma Torruella is in the middle of her nightmare and she

15   remembers six out of the seven digits or numbers on the license

16   plate.  She wants to remember because she doesn't want to

17   forget.  She wants to know who did this to her.  And she tells

18   the agents that and that's exactly what they do during the

19   investigation.  They find the car that was used during the

20   robbery right outside the defendant's front door on Barnes

21   Avenue.

22           Now, I expect Mr. Dratel to argue that you should

23   discount Ms. Torruella's identification of that car.  She said

24   Acura, not Honda.  And when the agents found that Honda Accord,

25   and not that Acura, it must mean that the agents have the wrong

1    color and they got the wrong guy.

2              You can use your common sense, ladies and gentlemen,

3    to reject that argument.  You can reject it because you know

4    all of the evidence that points to that car being used during

5    the robbery.  Let's think about it.  A dark-colored, four-door

6    sedan, Japanese make and model, mid 1990s, a license plate

7    ending in 7788 with two letters that Ms. Torruella remembered,

8    A and K.  Is that really so far off from Zaporia Dunbar's car?

9    It is remarkable that she remembered that much information in

10   the first place.

11             So what if the agents or the victims got the state

12   wrong.  They got the numbers right and that's what matters.

13   Emma Torruella told you that she said that the car had an A in

14   it.  There should be no doubt in your mind that the car used

15   during the robbery was Zaporia Dunbar's car.  And you know from

16   your common sense the defendant was driving that car that day.

17             The third stop during the day of the robbery is going

18   to Demi's grandmother's house.  Demi Torres is on the phone

19   getting ready for bed.  She was very matter of fact about what

20   she observed on the witness stand.  My mom came to the house.

21   She had no keys.  She didn't call.  I was in my room.  And she

22   was banging on the door.  And someone was with her that was

23   unknown.  I didn't know him.

24             You saw Demi Torres' demeanor on the stand.  Did she

25   look like someone who was making up a story to you?  You also

1    heard about the person in that room who kept the door open and

2    kept avoiding eye contact.

3              MR. DRATEL:  Objection.

4              THE COURT:  I'll allow it.

5              MR. ARAVIND:  While Emma Torruella went into her

6    grandmother's bedroom and took a book bag full of $20,000.

7              You heard from Barea and Torruella what happened back

8    at 1403 Overing, and there is no real dispute about those

9    facts.

10             You also heard about the aftermath of the robbery.

11   David Barea calls Tyrone Brown repeatedly, but can't get in

12   touch with him.  Remember these calls?  This is David Barea's

13   testimony saying he tried to call him repeatedly, and here are

14   all the phone call contacts between David Barea and Tyrone

15   Brown's phone, just as Special Agent Reynolds laid out for you.

16   He's upset.  He has a suspicion that Brown has set him up.  He

17   wants to confront him.  He calls him and calls him and calls

18   him.  And what does Brown do?  He calls his buddy, Antione

19   Chambers, that 6130 number, on March 26 at 10:53 a.m. his

20   partner in crime.

21             Let's talk a little bit about the cell site evidence.

22   The cell side evidence corroborates the narrative of that

23   evening.  It shows that the defendant was involved.  That

24   evidence is devastating, ladies and gentlemen.

25             And just to be clear, there should be no question in

1    your mind that that 6130 number that was Twizzie's number on

2    Brown's iPhone was right at 1338 Croes Avenue right at the time

3    of the robbery, right around 1 am.  You heard that from Special

4    Agent Eric Perry, the cell site guy.  The phone was there.

5            What did he show you?  Here is the map that he showed

6    you.  There is 1338 Croes Avenue, where the A is.  And you can

7    see six phone calls from 12:13 to 1:16 a.m., right as that

8    robbery is about to begin.

9            Then he showed you the movement of that cell phone.

10   The first call is at 120, cell tower 120 and then the phone

11   goes up to cell tower 90, which is near Zaporia Dunbar's

12   apartment on Barnes Avenue.

13           You also heard a lot of testimony about the

14   investigation in this case.  You heard testimony, you saw

15   evidence related to that investigation by the NYPD and the FBI.

16   You heard that because the defendant and his robbery crew were

17   professionals.  They didn't leave a trace at the scene.  And so

18   you heard that the NYPD and the FBI had to piece together the

19   story of what happened that day from the victims and from

20   information that the victims provided.  There are two critical

21   pieces of that puzzle, the Honda Accord and the phone evidence.

22           Let's take a minute to talk about those.  You heard

23   that the agents found that Honda Accord right outside the

24   defendant's apartment on May 23, 2013.  You heard that the

25   agents learn about 4782 Barnes Avenue through that 911 call

that was placed by another one of Antione Chambers' phone numbers.  You heard about Detective Deloren and Special Agent Reynolds going to that location and Detective Deloren saying that he nearly jumped out of his seat when he saw that car, a dark-colored Honda Accord with a license plate that nearly matched the license plate given by David Barea and Emma Torruella.

They ran that plate, AKW-7788, and the plate came back to Zaporia Dunbar.  That is part of that Department of Motor Vehicles stipulation.  They conducted surveillance of the car and saw Zaporia Dunbar in that car.  They were able to establish the relationship between the car and Dunbar.

The next step was finding out Dunbar and Antione Chambers.  And systematically, step by step, they were able to do that.  Special Agent Reynolds walked you through that testimony yesterday.  You heard about the birth certificate. You heard about how they conducted surveillance and were able to make the purchases.

You also heard about, four days later, that car sustained major damage during a car accident.  Officer Whelan told you that he was following that car on White Plains Road when it committed several traffic violations.  He got a good look at the person and then the car sped off, causing an accident near the defendant's residence, four days after Special Agent Reynolds and Detective Deloren first went out to

1   Barnes Avenue.

2           Here is a map of where Zaporia Dunbar's apartment is,

3   4782 Barnes Avenue, very close to where that accident took

4   place.  You heard that the Honda Accord was involved in an

5   accident and the driver, a black male, fled the scene.

6           You also heard that when Detective Deloren went to

7   find the Honda in that impound lot, he found this hammer.  And

8   that's Government Exhibit 500.  That same hammer was shown to

9   David Barea, who identified it as the hammer that was used

10  repeatedly by the defendant to hit him on the legs when Barea

11  was not forthcoming enough to tell him where the money was.

12          Based on all of that evidence related to the car, is

13  there any doubt that the Honda Accord with the license plate

14  AKW-7788, used by the defendant, Antione Chambers, when he

15  drove Emma Torruella to Emma's mother's house to get that bag

16  of money.  There should be no doubt in your mind once you make

17  all the connections and use your common sense.

18          What about that hammer.  When the defendant was

19  arrested, he told Special Agent Reynolds that it was just one

20  of the tools when he worked on his houses.  But Detective

21  Deloren told you he found no other tools in that regard when it

22  was found.

23          Before we begin, I expect defense counsel is going to

24  stand up and say that there was no way that 6130 number can be

25  connected with Antione Chambers.  Why does he have to make that

1    argument?  Because the objective phone evidence is so

2    devastating.  And you know that argument isn't true, ladies and

3    gentlemen.  Why?  Because the evidence shows that the user of

4    that 6130 phone is Twizzie, and you know that Twizzie is

5    Antione Chambers.

6            Let's go through the evidence.  Tyrone Brown's iPhone.

7    There is the Twizzie home number, 717-743-6130.  That's the

8    Twizzie phone that we got the cell sites for.  Who else told

9    you that Antione Chambers was Twizzie?

10           You heard from Kentrell Ferguson.  Kentrell Ferguson

11   was an interesting witness.  He didn't want to be here.  But he

12   showed up in a suit and he didn't want to tell you about

13   Antione Chambers.  But he did tell you about him anyway.  He

14   said his nickname first was Twin and then admitted that the

15   nickname was Twizzie in his phone.  That's that cracked cell

16   phone screen that we looked at.  Twizzie, with four other

17   numbers associated with it.

18           How else do you know that Antione Chambers is Twizzie?

19   Because the investigation that the agents did after finding out

20   about the contacts between the Tyrone Brown phone and Twizzie's

21   phone right before the robbery.  You heard from Special Agent

22   Reynolds.  He looked through Brown's phone, found that contact,

23   saw that number and then made all the connections, the

24   subpoenas, the public records, like the birth certificate and

25   the DMV records.  He was able to establish that Twizzie was the

1    man who lived at 4782 Barnes Avenue and was the father of

2    Dunbar's child; this man, Antione Chambers.

3           Now, you just heard from Judge Schofield that if you

4    find the defendant attempted to evade arrest by fleeing, you

5    may, but are not required to infer that the defendant believed

6    he was guilty for the crimes for which he is here today.  I

7    submit that is exactly the inference that you should draw from

8    the evidence about the defendant's flight.

9           What happens after the robbery?  The first thing that

10   happens after the robbery is the day afterwards, when the

11   defendant gets out of town.  He gets a call from Tyrone Brown

12   and later that day he leaves the area, and that's what Special

13   Agent Perry's slide showed.  March 26, the day after the

14   robbery, the phone travels from New York to the vicinity of

15   Lebanon, Pennsylvania.

16          What happens the day after Brown is arrested?  Brown

17   is arrested on May 8, 2013.  And by that time the defendant is

18   no longer in the New York area.  What did Special Agent Perry

19   say?  Do you see any records from April 4 to April 30

20   referencing a cell tower in New York?  Answer:  I do not.

21          In fact, ladies and gentlemen, you should take a look

22   at the cell site records that day.  All of this evidence is

23   before you and you can take a look at it during your

24   deliberations.  This is in evidence as Government Exhibit 160B,

25   which is the cell sites for the Twizzie 6130 phone.

1          What was the last day that was used to make an

2     outgoing call?  The last day, if you look at the records, is

3     April 8, 2013, the same day that Tyrone Brown is arrested.  Is

4     that a coincidence, ladies and gentlemen, or does that mean

5     that the police are circling and the defendant wants to get rid

6     of himself, any of his ties to his coconspirators?  Your common

7     sense tells you, this is the defendant who told David Barea not

8     to look at him during the robbery.  This is the defendant who

9     didn't want to show his face to Demi Torres.  This is the

10    defendant who wanted to eliminate his connection to Tyrone

11    Brown, so he dropped his phone.

12         And what happens when the agents start focusing on

13    Chambers?  Let's go through the events on May 23.  They go see

14    Zaporia Dunbar, see that Accord.  They look for the defendant.

15    They can't find him.  A week later they go look and try again.

16    They speak to more people.  And no one knows where the

17    defendant is.  Why?  Because the defendant has gone

18    underground.  And what do Zaporia Dunbar's records reflect?

19    Isaac Nelson:  When she left, did you try and contact her?

20    Yes, I did.  Were you successful?  No.  I called her and then

21    she didn't answer her phone.  It wasn't working.

22         What did Special Agent Perry tell you about Zaporia

23    Dunbar's records?  As reflected in this exhibit, that there are

24    no more outgoing calls after that day.  Like the defendant, she

25    drops her phone.

1          Isaac Nelson doesn't have any skin in this game,

2     ladies and gentlemen.  He's just a normal guy who came here and

3     testified and told you exactly what happened.  And then you

4     finally heard from Sergeant DeRosa, who stopped the defendant

5     while he was driving a rental car not in his own name, and he

6     was found with a fake driver's license.  This is the license

7     and the name Jerome Adams and that, ladies and gentlemen, is

8     the defendant.

9          Take a look at that picture, ladies and gentlemen.

10    Defense counsel has never challenged that this is a picture of

11    Antione Chambers, the defendant.  You should look at all of the

12    photographs that are in evidence.  And I submit to you that the

13    only inference that can be drawn from this fact that the

14    defendant was found in a different state with a fake ID in a

15    car that was not his own and that he repeatedly refused to give

16    his name to Sergeant DeRosa.  What's the inference?  He is

17    trying to hide his tracks.  He knows the cops are after him and

18    he doesn't want to get caught.

19         Before I sit down, ladies and gentlemen, I want to

20    talk briefly about the charges.  You have just heard them now,

21    so I am not going to belabor them.  You have Count One, which

22    is the robbery conspiracy count.  And there is no question

23    there was a robbery conspiracy here to rob Mr. Barea of his

24    money from the drug business.  You heard repeatedly there are

25    two robbers working together to rob them this morning.  You

1    also know that interstate commerce element that the judge just

2    told you was effective.  Judge Schofield just instructed you,

3    the government only needs to show you a minimal or subtle or

4    potential effect.  Did we show that to you here?  Absolutely.

5    You heard from Mr. Barea the defendant stole money that he had

6    saved up in part from his drug business, his cocaine dealing

7    business.  And you saw a stipulation that said that cocaine is

8    not manufactured in New York State.  That's interstate commerce

9    right there.

10            Count Two is the robbery.

11            Count Three is the kidnapping.  And on this point I

12   just want to talk about the fact, the undisputed fact that the

13   interstate commerce, the means, facility, or instrumentality of

14   interstate or foreign commerce, which is a big way of saying,

15   was a phone used during the kidnapping.  Ladies and gentlemen,

16   you know that a phone was used during the kidnapping.  We have

17   shown it to you repeatedly.

18            Count Four charges the defendant with possessing,

19   using, or carrying a firearm that was brandished during the

20   March 25, 2013 robbery.  Was the gun brandished and used during

21   the robbery?  Of course it was.  You heard from Mr. Barea and

22   Ms. Torruella about how the defendant held a gun -- how a gun

23   with a potato was pointed during the robbery.  You also heard

24   from David Barea that Antione Chambers had another gun that he

25   kept on his waist.

1          One of the things that I have tried to stress this

2     afternoon is how all of the evidence supports each other and

3     how it all points in one direction, there, to the defendant,

4     Antione Chambers.  The testimony of the witnesses, the physical

5     evidence, the photographs, they all tell you the same thing.

6     Antione Chambers committed a vicious, brutal armed robbery and

7     kidnapping on March 23, 2013.  You heard the violence and the

8     force that this defendant committed against Mr. Barea and

9     Ms. Torruella.  That evidence, combined with the objective

10    evidence, the phone records, the cell site records, the

11    evidence about the car, the fake driver's license, all of that

12    other evidence supports the testimony and tells you that

13    Antione Chambers is guilty.  The setup call from Brown to

14    initiate the robbery.  The cell site location evidence that

15    shows that he was there.  The fact that he drops his phone and

16    skips town once he knows the feds are on him.

17         I am going to sit down now.  And after Mr. Dratel

18    speaks we will have an opportunity to speak to you again.  I

19    submit to you that when you consider the testimony and all of

20    the evidence you have heard and seen, the only just and fair

21    view, the only view that makes sense here and is supported by

22    the evidence is that the defendant is guilty.  Thank you.

23         THE COURT:  Mr. Dratel.

24         MR. DRATEL:  Thank you.

25         It's not him.  Wow.  Powerful, dramatic, genuine,

1    honest.  It's not him.  She said it twice.  Not during

2    cross-examination.  Not under pressure of cross-examination.

3    When the Assistant United States Attorney was questioning her.

4    Breakdown.  She couldn't do the wrong thing.

5            I don't even know if I even have to say anymore.  I

6    don't think I should have to say anymore than what you saw on

7    that witness stand from Ms. Torruella.  But I am going to

8    because I couldn't leave a stone unturned here.  That's more

9    than enough reasonable doubt.  That is the definition of

10   reasonable doubt, the person with the longest, with the best,

11   with the closest look, without a mask, at the second robber got

12   on the witness stand and said, it's not him.  Teardrop tattoo.

13   It's not him.  She said the features were different.  She

14   explained it.  That's the only ID witness that's in this case.

15   It's not him.

16           Page 215 of the transcript.  She was traumatized by

17   that robbery, no question.  She suffered at the hands of those

18   robbers.  Imagine the anger.  You could see it.  You could see

19   the impact that it had on her.  You can see it in Mr. Barea as

20   well.  She want here to exonerate Mr. Chambers.  She was here

21   to put that robber away for as long as possible, but she

22   couldn't do the wrong thing.  And she exonerated Mr. Chambers.

23   There is only one reason.  It's not him.  No amount of cell

24   phone records that have no content whatsoever.  The only person

25   in this case who has testified about any phone conversations is

1    the Assistant United States Attorney during the past 45

2    minutes.  You can scour the entire record.  That's not

3    testimony.  That's not evidence.  It's not him.  That's

4    evidence.  None of it can overcome that.

5        I want to thank you for paying attention.  I want to

6    thank you for being here.  This is my last opportunity to speak

7    to you, so I feel I have to take advantage of it and go through

8    the evidence as a whole as well.

9        Now, there is no identification of Mr. Chambers as the

10   second robber in this case.  In the opening I told you you are

11   going to see identifications.  There is no identification of

12   Mr. Chambers as the robber in this case.  I told you they were

13   tainted.  Now they don't exist at all.

14       Eleven witnesses.  Not a single one.  By the way, not

15   a single one had any connection of Mr. Chambers to the robbery.

16   Not a single one even knows Mr. Chambers except for Kentrell

17   Ferguson, who says his nickname is Twin.  He was their witness.

18       There is a lot more reasonable doubt.  I'm not asking

19   you for inferences, to pile on speculation upon speculation,

20   making up conversations that you don't know what was in them,

21   making up, connecting someone to something without any

22   evidence.  In my head, no.  Dispositive reasonable doubt from

23   the witness stand.

24       Start with David Barea, detail, devastating detail.

25   It is.  For Mr. Chambers' benefit.  Teardrop tattoo on the

1    second robber, just like Ms. Torruella told you.  He spent a

2    lot of time on Mr. Barea's testimony.  Left that out.

3          Mr. Barea said the second robber was a little taller

4    than Mr. Barea, who is five-six, not seven inches taller.

5          The car.  From both Ms. Torruella and Mr. Barea,

6    independently and separately.  Remember she said they didn't

7    talk about it.  They were instructed not to talk about it.

8    Both of them said an Acura.  Both of them said black or dark

9    green, New York plate.  They said a bunch of different colors:

10   Black, dark green, dark black, flat black; never blue.  And Mr.

11   Barea knows colors on cars because we heard, when he talked

12   about seeing Tyrone Brown in a midnight blue Impala.  He knows

13   the difference.  Make, model, color, year, plates, all

14   different than that Honda that caused Detective Deloren to jump

15   out of his seat.  We will talk about that some more in a little

16   bit.

17         Detective Deloren, you heard him testify that he even

18   wrote a memo and sent it out to people with a picture of an

19   Acura, a '97, '98 Acura describing it with details, partial New

20   York plate, '97, '98 year.  Do we have any evidence that they

21   even checked New York plates to see if there was a similar car?

22   Agent Reynolds said, they are not always right about cars.  How

23   about numbers?  Maybe they are a number off.  Maybe.  Who

24   knows.  Maybe she didn't see it as detailed as she thought she

25   might have.  That didn't occur to them to check New York plates

1    to see if there was a car, an Acura that possibly matched

2    something like that.  No.  They had it in their head.

3            You heard the Assistant United States Attorney say

4    they were careful, so careful that the second robber in the

5    car, sitting next to her in the passenger's seat -- by the way,

6    she is in the car, in the passenger's seat.  No hoodie, no

7    nothing.  She has got a chance to examine that care on the way

8    to her mother's house and on the way back.  She didn't waffle

9    on the Acura part.  And you heard from even Detective Deloren,

10   from his notes, Acura, not possible Acura.

11           But she said the tall guy wasn't worried about the

12   examining the license plate.  You remember?  It was the other

13   guy.  They don't even know it was Mr. Chambers.  Light skinned,

14   speaking Spanish.  He is the one who was worried about

15   examining the license plate.  The tall guy took his mask off

16   and says, I don't care.  I'm from Brooklyn.  That's what she

17   told you.  How is that for careful.

18           The car.  I got to say, imagine, you can be in one of

19   two situations.  You can be the employee, the employer, you can

20   be both, you can be in the middle.  Imagine if you were tasked

21   as the employee or you were the employer tasking the employee

22   and said, I have a request.  Please find me a specific car, a

23   specific make and model from a specific year and a specific

24   color with New York plates.  An Acura, '97, '98.  I would like

25   it to be black or midnight green.  I want it to have New York

1   plates.  I want it to be '97, '98.  I may have said that

2   already.  And the employee comes back with a Honda Accord

3   that's blue with North Carolina plates from '95.  How do you

4   think that employee review is going to go?

5          Just to prove it, they had all those photos they would

6   show you.  They didn't even show them on the witness stand or

7   any time.  They never showed that blue Honda to Ms. Torruella

8   or Mr. Barea.  And you know why?  Talk about the Honda.

9   Mr. Chambers, when he was taken back from New Jersey, told

10  Agent Reynolds in the car that Ms. Dunbar wouldn't let him

11  drive the Honda.  And you know that's true.

12         How do you know that's true?  Another piece of

13  evidence the government put in.  The government put in.

14  Remember the 911 call, February 1, 2013, five or six weeks

15  before the robbery.  Somebody named Antione calls an ambulance.

16  That's the same day, by the way, that him and Zaporia Dunbar's

17  child was born, February 1, 2013, February 2.  She went into

18  labor and they called the ambulance.  You think if he was

19  allowed to drive the car they are waiting for an ambulance?

20  No.  They are in that Honda on the way to the hospital.  You

21  all know that from your common sense.

22         As I said in opening, circumstantial evidence goes

23  both ways.  That's all you've got and it's weak, doesn't

24  connect, and it doesn't matter because you heard the witnesses.

25  David Barea, he never identifies the second robber except for

1   the teardrop tattoo.  Ms. Torruella has a teardrop tattoo on

2   that second robber, too.  Didn't hear a word about that in the

3   government's summation.  Maybe they will come back with

4   something.  Who knows what they will come back with.  I won't

5   be able to talk to you again about it.  I will talk to you

6   about that process, too.

7           By the way, in that conversation on the way back from

8   New Jersey everything that Mr. Chambers told him was true, that

9   you can try to verify this.  He knew Glisson.  He didn't say I

10  don't know Glisson, I don't know Brown.  He said he knew them.

11  He said he made the 911 call.  He said he was the father of

12  Ms. Dunbar's child.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1            MR. DRATEL:  Not true.

2            The Honda accident, there's no evidence it was

3    Mr. Chambers driving the car.  You heard Mr. Whelan.  He looked

4    in the car.  He saw the driver.  Deer in the headlights.  Was

5    he asked to identify?  No.  Did he have any identification?

6    No.  So it was 5'10".  That's the only description:  Black

7    male 5'10".  Really?  Really?  This is what they want you to

8    pile on top of each other to get nowhere.  It collapses.  Every

9    time you put another piece on, it collapses.

10            I asked Detective Deloren about confirmation bias,

11   confirmation bias being the tendency to interpret --

12            MR. ARAVIND:  Objection.

13            THE COURT:  Sustained.

14            MR. DRATEL:  This case is about trying over and over

15   again and pounding a square peg into a round hole in which it

16   does not fit.

17            Now, the hammer, you couldn't find a more generic

18   hammer.  I could have bought that at a hardware store yesterday

19   and brought it in.  It looked the same.  No DNA.  Did they

20   check it for fingerprints maybe?  No.  Nothing.  You know why.

21   You saw Detective Deloren.  You know why.  You know what this

22   investigation was about.  This was about him jumping out of his

23   seat making up his mind right there.

24            The assistant United States Attorney's summation said

25   you know it was used during the robbery.  You know this is the

1      hammer.  How?  How?  There is no evidence that that hammer has

2      anything to do with this robbery.  The only

3      testimony -- there's no testimony.  The only time it comes in

4      from him.  Even Mr. Barea said it looks like the hammer.  Of

5      course it looks like the hammer.  It looks like every hammer.

6              By the way, he's shown him the hammer two months after

7      the robbery.  The car, the Honda parked on the street on Barnes

8      Avenue, wide open.  No intention to hide, do anything.  By the

9      way, talk about this investigation:  They knew that Zaporia

10     Dunbar lived in North Carolina.  Did they follow up with her?

11     No.  She didn't answer the landlord's calls.  She owed him

12     money.  She moved to North Carolina.  Maybe that's the reason,

13     but I'm not going to ask you to speculate.  I'm going to ask

14     you to demand evidence, demand proof.  Don't let a lawyer put

15     in your head a theory that doesn't fit what you heard from the

16     witness stand.

17             The New Jersey arrest:  It's an hour from New York.

18     He's with Ms. Dunbar and the kids.  That's not much flight four

19     months after the event.  The phoney license:  No telling when

20     he had it.  No telling if he ever had a license in any state,

21     what the status of his license was, or why he has a phoney

22     license.  That's nothing.  It's a series of hollow,

23     insupportable inferences piled on each other getting you

24     nowhere.

25             Also, as the judge instructed you, even if you think

1    that that's some kind of inference that you can draw, it alone

2    is not sufficient for proof beyond a reasonable doubt.

3          Phone records:  No content.  All those messages going

4    back and forth, it's from him.  I don't recall anybody, there's

5    no paper, there's no person, there's no evidence, there's no

6    testimony.  There's nothing.  That's speculation.  That's not

7    even proof, much less beyond a reasonable doubt.  Pure

8    speculation.

9          Compare that speculation with the testimony

10   of Ms. Torruella, "It's not him;" with Mr. Barea, "teardrop

11   tattoo," go ahead and compare.  It's easy.

12         Also the phone, there's no connection -- they don't

13   have any proof putting that phone in Mr. Chambers' hands during

14   this whole period.  We don't know who has that the phone.  We

15   don't know about those contacts.  We don't know what they mean.

16   No one explained them.  No one knows if the phone is shared,

17   borrowed.  Nobody knows this.  There's no proof.  There's also

18   other phone calls during that period, texts right around the

19   time that Mr. Barea shows up.  In fact, you'll see some of the

20   communications with Mr. Barea are followed -- were preceded by

21   a whole other number, which is a lot of calls.  Who knows?  You

22   can't just make it up and fit it in, pound that square peg into

23   that round hole.  You can't do it.

24         The cell site:  They wanted to make it like the 26th

25   was something important, that he left New York, right, this

1    device left New York.  Well, it shows that the device went back

2    and forth and back and forth and back and forth over the entire

3    period well before and well after.

4          Now, the most common tower used was Harrisburg,

5    Pennsylvania, and half the time, that device is in Pennsylvania

6    somewhere or in the corridor between New York and Pennsylvania

7    if you look at that arc.  Did they put Mr. Chambers there at

8    any point during that period?  Do you think they might have

9    investigated it?  No, they made up their minds.  Detective

10   Deloren jumped out of his seat and that was it.  He liked that

11   car.

12         And then, by the way, after the 26th, it turns out the

13   device is back in the Bronx on the 27th, the 28th, the 29th.

14   There's no connection between the device leaving on the 26th

15   and the robbery.  Those are not valid inferences.  These are

16   what I would call digital diversions that we're capable of now

17   because everything is monitored and tracked and records of

18   everything.  You can put together something that can show

19   anything with this kind of evidence.  So much information.

20         What you really need is proof.  You need something

21   from the witness stand that will tell you what happened in this

22   case, and you heard them.  Would you want to be judged on the

23   standard of proof?

24         Remember the judge's reasonable doubt instruction:

25   Something important in your own life that would cause you to

 1    hesitate.  Is that what you would want to be judged on?  Loved

 2    ones, would you want them to be judged on that standard, or on

 3    the standard of the victim of a robbery who comes in here and

 4    tells you it's not him.

 5          The call from the Metropolitan Detention Center where

 6    there's something unintelligible and it says "My man Twiz."  I

 7    don't know about you, but I'd never refer to myself by my name

 8    after I said "my man."  That's usually referring to someone

 9    else.  Think about that.  Think about the syntax.  Doesn't make

10    sense, common sense.  Your every day experience applies.

11          It says identify yourself, the prompt says identify

12    yourself and then there's unintelligible and then it says "My

13    man Twiz."  Figure it out.

14          Certainly can't draw a conclusion from that.  You just

15    don't know.  That's proof beyond a reasonable doubt.  You could

16    pile that a pile high.  It's not proof beyond a reasonable

17    doubt.  By the way, there are 81 other calls during that time

18    period.  There are hundreds of emails during that time period.

19    It's the only reference we see.  That doesn't tell you

20    anything.

21          You heard a lot of instructions about the law and just

22    remember the government says that he was that second robber.

23    It's not an aiding and abetting case.  They say he's there.

24    They say he's in it.  They say he's the guy.

25          Detective Deloren, the stipulation, the Government

1    Exhibit 2007, tried to throw them under the bus:  I told

2    everybody about that photo.  No.  Didn't.  You heard that in

3    another case, he testified and the judge found for the

4    defendant despite his testimony at a hearing, not a trial.

5          Remember Ms. Torruella's testimony.  She was shown

6    that second photo array and he told her forget about the

7    teardrop and then he denied it.  Who do you believe?  I think

8    it's an easy one.  "Forget about the teardrop."  What does that

9    tell you?  Nobody's interested in this case.  She never wavered

10   from the fact that the second robber had a teardrop tattoo.

11   David Barea said the same thing.  And he said forget about the

12   teardrop.  He liked that car, and he jumped out of his seat.

13   Game over.

14          He thought game over for Mr. Chambers when he got

15   Ms. Torruella to pick him out of an array, but she could not do

16   the wrong thing.  He wasn't depending on that, and he wasn't

17   depending on you.  He didn't know that you would hear that and

18   you would be here to do your duty.

19          DNA, none on the duct tape.  Now, they said they were

20   wearing gloves, but we don't know when the duct tape was

21   bought, handled, we don't know any of that.  And also there is

22   DNA on that duct tape.  There are two DNA samples -- there are

23   two persons on that duct tape, DNA from two people.  The only

24   one we know for sure it's not is Mr. Chambers.

25          They took samples from Ms. Torruella and Mr. Barea.

1    They took samples in March of 2013, the day of -- the day of

2    the robbery March 25.  They never tested them.  I think they

3    were worried about the answer that they would be on there, and

4    then we'd have two robbers.  They didn't test Glisson.  They

5    didn't test anybody.  They didn't test Chambers 'til last week.

6    Think about it.  Think about this case.  Think about this

7    investigation.  "I liked that car."  That's what this

8    investigation was all about.

9            Think about when Mr. Chambers was arrested in New

10   Jersey.  Did you hear about anything that was recovered from

11   him that is any way connected to this crime.  When they

12   arrested Glisson, he had ammo.  He had magazines for weapons,

13   not I don't mean reading magazines, I mean clips.  Tyrone Brown

14   had drugs and a scale.  By the way, I don't remember anybody

15   saying Tyrone Brown was a coconspirator.  I don't remember any

16   testimony that said that Tyrone Brown was in on the robbery.

17   It's just from him.  There's no witness who said that.  So the

18   only reason those phone calls could make any sense is if that's

19   the case, but you don't have any evidence.  Speculation; not

20   evidence.  Nothing about Mr. Chambers, nothing recovered from

21   him that has anything to do with this robbery, no spending, no

22   money, no nothing.

23           As I said, this will be the last time I'll get a

24   chance to talk to you.  I'm going to ask you that when

25   Ms. Tekeei gets up to do a rebuttal, which I will not be able

1    to respond to, that you take that responsibility and you say to

2    yourself, Ms. Tekeei, what about Ms. Torruella's testimony?

3    What about Mr. Barea's testimony?  What about the complete lack

4    of any evidence to support your theory?  What about Detective

5    Deloren?  What about the car?  What about the teardrop?  What

6    about "It's not him"?  What about the DNA?  What about all

7    this?

8           That is reasonable doubt.  There's enough reasonable

9    doubt, one for each of you.  You only need one among you.  I

10   said in the opening statement that I was confident that after

11   hearing the evidence, and the lack of evidence, that you would

12   find Mr. Chambers not guilty on all the charges.  The trial has

13   only reinforced that conclusion.  Your common sense reinforces

14   that conclusion.

15          You've had the privilege here of seeing something very

16   special.  You could sit through a thousand trials and not see

17   what you saw here:  The truth flowing out of someone

18   unstoppable, like her tears, inexorable, more powerful than

19   Detective Deloren's manipulation poisoning this investigation,

20   more powerful than any sterile evidence, without support.

21          She refused to do the wrong thing.  It was moving.  It

22   was courageous.  It was authentic.  It was really all you need

23   to decide this case, but there is so much more, but it's all

24   you need.

25          I can still hear her sobbing.  I can still hear her

1    voice, the raw emotion, the raw honesty.  I won't describe it

2    any more because I won't bother because I assume you can still

3    hear it yourselves.  "It's not him."

4               Thank you.

5               THE COURT:  Ms. Tekeei.

6               MS. TEKEEI:  Thank you, your Honor.

7               First, I want to be very clear about something:  Emma

8    Torruella testified the very first day of this trial.  She sat

9    there in that witness stand and she looked around the courtroom

10   carefully and she told you unequivocally that the man sitting

11   at that table, Antione Chambers, the defendant, was the man who

12   kidnapped her on March 25, 2013.  And then she sat there and

13   she told you, complete strangers, what had happened to her.

14              She told you how she saw the father of her son bloody,

15   hands tied behind his back, how the defendant beat him with a

16   hammer, how they threatened him with a gun.  She told you how

17   the defendant grabbed her by the neck, how he forced her into a

18   car, how he told her she was pretty, how she thought she was

19   going to be raped, killed.

20              She told you how she was forced to take the defendant

21   into her mother's apartment, how she tried to persuade her

22   daughter that everything was fine, how her son, David's son,

23   was sleeping in that apartment, and she told you how the

24   defendant took the money, forced her back home, how he tied up

25   her hands and made her kneel to the floor, how he then made her

1    lay faced down on her bed.  She told you all of these things

2    and all the while, she glanced at that man.

3            We were here.  She looked over at him, her kidnapper,

4    the man who had done all of these horrible things and she was

5    confronted with a picture of him on that witness stand.  She

6    had him looking up at her from the table, and she had that

7    picture in front of her, and she had him staring at that

8    table --

9            MR. DRATEL:  Objection.

10           THE COURT:  Sustained.

11           MS. TEKEEI:  And we all saw what happened:  She fell

12   apart, she completely fell apart.  And who wouldn't?

13           Ladies and gentlemen, we have all seen the defendant

14   throughout this trial and we looked at many pictures of him,

15   not just the pictures in the photo array, but also the very

16   picture that he provided on his fake ID.  Look at the man

17   sitting here today.  Look at the pictures of him.  Emma

18   Torruella did.

19           First she said that is the man who kidnapped me that

20   night.  She had picked him out, Antione Chambers, out of a

21   photo array nine weeks after he kidnapped her and robbed and

22   violently attacked her husband; and sitting here on Monday,

23   after she looked him in the eyes and told you the defendant was

24   her kidnapper, she fell apart.  And with this photo array

25   picture that nobody disputes is the defendant in front of her

1    she broke down and she compared them.  We all saw that happen.

2    People's appearances change.

3         And you heard about that teardrop tattoo, the one

4    Steven Glisson had.  How easy would it be to confuse the

5    teardrop, to think that both of your robbers --

6         MR. DRATEL:  Objection.

7         THE COURT:  Overruled.

8         MS. TEKEEI:  How easy would it be for her to have

9    confused that and thought that the two people who committed

10   these violent acts both had a teardrop tattoo?

11        This afternoon you heard several arguments from

12   Mr. Dratel on behalf of his client.  As you know, though, there

13   is a critical difference between argument and evidence.  And

14   argument is only as good as the facts and the evidence on which

15   it is based; and what Mr. Dratel provided you was argument and

16   an invitation to speculate.

17        What we have presented to you, and what we think you

18   should be focused on when you go back and deliberate, is the

19   evidence, the facts and the reasonable inferences that you can

20   draw from the facts.

21        And why is this so important?  Because much of what

22   you heard from the defense was designed to distract you from

23   the evidence and the facts that you should be considering.

24        Ladies and gentlemen, at the beginning of this trial,

25   I told you that this case was not going to be like a television

1    show that you might watch, but I was wrong.  There were some

2    dramatic moments, but that's also what happens in real life;

3    and that's how you know that when David and Emma took the stand

4    and told you what happened to them, they were being brave; and

5    that's how you know that the defendant was one of the men who

6    robbed and kidnapped them that night.

7              In his opening, and in his closing statements, defense

8    counsel tried to minimize Emma Torruella's identification of a

9    defendant from a photo array in which she circled his picture

10   and signed his name nine weeks after the robbery.

11             The compelling phone evidence in this case showing you

12   that the defendant Antione "Twizzie" Chambers was intricately

13   involved this the robbery and kidnapping that night.  The

14   indisputable evidence regarding the car that the defendant and

15   his coconspirators used the night of the robbery, his

16   girlfriend's car, the one that was parked outside of their

17   apartment when the agents, who had no idea at that time who

18   Antione Chambers was or that he even existed, went to try to

19   interview the residents of 4782 Barnes Avenue.

20             When you consider carefully the evidence in this case,

21   you can see why the defense would try to distract you, because

22   if you focus on the facts and the evidence, all the details are

23   there, it's clear that the defendant is guilty.  Antione

24   Chambers is Twizzie.  Kentrell Ferguson told you that.  He

25   tried not to, but he ultimately admitted that Antione Chambers,

1    the man sitting there, is Twizzie.

2              Tyrone Brown's first call after David Barea called him

3    the night of the robbery to tell him he was on his way over;

4    Twizzie, the owner of the phone that happens to be located at

5    the robbery location during the time of the robbery, during the

6    time of the kidnapping, and then after the robbery and

7    kidnapping are all over, he goes back to 4782 Barnes Avenue.

8    Indisputable.

9              MR. DRATEL:  Objection.

10             THE COURT:  Overruled.

11             MS. TEKEEI:  The apartment where Antione Chambers

12   lived, and you heard that from the landlord Isaac Nelson who

13   has nothing to do with this case, you heard him tell you about

14   where Chambers lived.

15             Twizzie, Tyrone Brown's first call after Detective

16   Deloren, investigating the robbery, called Brown to interview

17   him; the number that after Brown's arrest on April 8, 2013

18   stops being used; and then Twizzie, the defendant, is stopped

19   in New Jersey with a fake driver's license and refuses to give

20   his real name.

21             Antione "Twizzie" Chambers must be the unluckiest man

22   in the world.  His phone, his girlfriend's car, his fake

23   driver's license, his refusal to give his real name when he

24   knows the authorities are looking for him, ladies and

25   gentlemen, Antione "Twizzie" Chambers was one of the robbers

1  that night, and you know this because the indisputable evidence

2  tells you that.

3          Now, Mr. Dratel spent some time trying to tell you

4  that the NYPD was targeting the defendant.  That is not true.

5  How do you know that?  Because it was good old-fashioned police

6  work.  Here's what you learned from Special Agent Reynolds and

7  Detective Deloren:  After the robbery and kidnapping, they

8  responded to the location where the robbery started, Tyrone

9  Brown's apartment, 1338 Croes Avenue.

10         They found video surveillance that showed them exactly

11  what David Barea had told them happened:  Two men covered from

12  head to toe to finger rushed him as he was leaving Brown's

13  apartment, attacked him, let him out with his hands tied behind

14  his back, shoved him into a car.  And they got a description of

15  that car:  A dark-colored sedan, possibly an Acura, four doors,

16  license sequence at least ending in 7788.

17         Now, ladies and gentlemen, we heard a lot about that

18  car today.  Look back at the picture of that car in your

19  exhibits binder.  Is it black?  Is it midnight blue?  How can

20  you tell?  It is dark.  It is dark, dark, dark, and that is

21  what the victims told the detectives that night.

22         They arrested Brown and what did they get?  Two

23  phones.  And when they looked at those phones, guess what they

24  found?  Guess who Tyrone Brown, the tipster, called immediately

25  after talking to David Barea the night of the robbery?

1   Twizzie; the only number that Brown communicated with

2   extensively that night leading up to the robbery and

3   kidnapping.

4           And then what did the agents and the detectives do?

5   They began to research all of the phone numbers on those phones

6   for Twizzie and you saw them, there were three of them, and one

7   of them matched the same number Kentrell Ferguson had for

8   Twizzie for Antione Chambers.

9           MR. DRATEL:  Objection.

10          THE COURT:  Overruled.

11          MS. TEKEEI:  Guess what they found.  One of those

12  numbers had been used by a man who called himself Antione when

13  he called 9-1-1 and gave an address, 4782 Barnes Avenue.  And

14  then they went to that address, old-fashioned police work, and

15  what did they find?

16          They found a car, the very car that had been used in

17  the robbery, six out of seven of the license plate sequence

18  numbers matched the numbers and sequence that the victims had

19  given.

20          Was it a Honda?  Was it an Acura?  New York plates?

21  North Carolina plates?  It does not matter.  Six out of the

22  seven license sequence matched.

23          So what happened next?  They did surveillance.  They

24  observed.  They saw a woman Zaporia Dunbar driving that car.

25  They didn't know who she was.  They didn't know anything about

1    her.  But they learned her son's name and what did they do?

2    They subpoenaed records to find out who her son's father was.

3    Antione, Antione Chambers.  And they kept investigating

4    Twizzie's phones.  Mr. Aravind went through this extensively.

5           And what does the 6130 Twizzie phone do a week before

6    the robbery when David Barea shows up to Tyrone Brown's house,

7    and then the very night of the robbery minutes, before and

8    after David Barea is at Brown's apartment?  It's there:  1338

9    Croes Avenue.  Special Agent Eric Perry told you that.  That is

10   not a coincidence, ladies and gentlemen.

11          Mr. Dratel spent some time trying to convince you that

12   there's no hard evidence tieing Mr. Chambers to the scene.

13   That's because this was a professional job.  They were covered

14   from head to toe.

15          Why is there no DNA evidence tieing Mr. Chambers to

16   that duct tape?  Because he was wearing gloves.  You heard

17   David Barea tell you that.  You heard Emma Torruella tell you

18   that.

19          Why did he tell Emma he was from Brooklyn?  Because he

20   wanted to take his mask off, because he was trying to throw her

21   off.  And it's true:  He did take that mask off.  He made that

22   mistake, and that's why we're here today, because he never

23   expected that someone would be able to describe him, to pick

24   him out of a photo array nine weeks after the incident, nine

25   weeks after being robbed and kidnapped.

1            Ladies and gentlemen, over the past week, because of

2       the careful attention you have paid to the evidence in this

3       case, the defendant has received a fair trial.  He has had his

4       day in court.

5            Judge Schofield has instructed you on the law and when

6       we sit down, it will be time for you to go into the jury room

7       and do your duty, to decide this case without bias or fear or

8       prejudice or sympathy, but based solely on the facts and the

9       evidence.

10           We urge you again to do that:  Focus on the evidence,

11      follow the judge's instructions, and, most of all, to use your

12      common sense.  Use your common sense when you evaluate what you

13      saw and what you heard from the witnesses on the stand, when

14      you think about how difficult it is to come into this

15      courtroom, how difficult it was for her to talk about the

16      serious night of her life, to walk you through her nightmare,

17      the night she thought she was going to die.

18           If you do those things, there is only one verdict you

19      can return that is consistent with the evidence and reflects

20      the truth of what the defendant did, that the defendant is

21      guilty.

22           THE COURT:  Ladies and gentlemen, that concludes the

23      lawyers' arguments.  You have now heard all the evidence and

24      all the arguments.

25           I have just a couple minutes of final instructions to

1    give you and then you can adjourn to the jury room and begin

2    your deliberations.

3         You're about to go into the jury room and begin doing

4    that, and you are to conduct your duty as jurors in an

5    atmosphere of complete fairness and impartiality, without bias

6    for or against the government or the defendant.

7         I don't think you really need to follow along on this,

8    but you can if you want.

9         You're not to consider what the reaction of the

10   parties or the public to your verdict will be, whether it will

11   please or displease anyone, be popular or unpopular, or,

12   indeed, any consideration outside the case as it has been

13   presented to you in the courtroom.

14        You should find the facts from what you consider to be

15   believable evidence and apply the law as I gave it to you.

16   Your verdict will be determined by the conclusion you reach, no

17   matter whom the verdict helps or hurts.

18        For the same reason, the personality and conduct of

19   any attorney is not in any way at issue.  If you formed

20   opinions of any kind as to those matters, they should not enter

21   into your deliberations.

22        The first thing you should do when you enter the jury

23   room is you should elect one member of the jury as your

24   foreperson.  The person will preside over the deliberations and

25   speak for you here in open court.

1          The foreperson has no greater voice or authority than

2    any other juror.  The foreperson will send out notes and when

3    the jury has reached a verdict, he or she will notify

4    Mr. Street that the jury has reached a verdict.

5          You each have a copy of most of the exhibits that have

6    been admitted into evidence.  The only exhibits that are

7    missing are voluminous exhibits.

8          You also have your notebooks, your own notes, you have

9    my jury instructions.  You should feel free to refer to any of

10   those during your deliberations.

11         If you want any of the testimony read back to you, you

12   may request that.  Please remember that when you request

13   testimony, the lawyers must agree on what portions may be

14   called for; and if they disagree, I must rule on and resolve

15   those disagreements.  That can be a time-consuming process, so

16   please try to be as specific as you possibly can in requesting

17   any portion of testimony.

18         Your requests for testimony, in fact, any

19   communication with the Court should be made to me in writing

20   signed by the foreperson and then given to Mr. Street in an

21   envelope.  In any event, do not tell me or anyone how the jury

22   stands on any issue until a verdict is reached.

23         The most important part of the case is the part that

24   you, as jurors, are now about to play as you deliberate on the

25   issues of fact.  It is for you, and you alone, to decide

1    whether the government has sustained its burden of proof as I
2    have explained it to you with respect to each charge against
3    the defendant.

4            If you find the government has met its burden of proof
5    on a particular charge, you must find the defendant guilty on
6    that charge.

7            If you find the government has failed to meet its
8    burden on any element of a charge, you must find the defendant
9    not guilty of that charge.

10           I know you will try the issues that have been
11   presented to you according to the oath that you have given as
12   jurors.  In that oath, you promised you would well and truly
13   try the issues joined in this case and render a true verdict.

14           It is your duty as jurors to consult with each other
15   and to deliberate with a view to reaching agreement.  Each of
16   you must decide the case for yourself, but you should do so
17   only after consideration of the case with your fellow jurors.
18   Moreover, you should not hesitate to change an opinion when
19   convinced that it is wrong.

20           Every juror should be heard.  No one juror should hold
21   center stage in the jury room.  No one juror should control or
22   monopolize the deliberations.

23           Your verdict must be unanimous, but you are not bound
24   to surrender your honest convictions concerning the effect or
25   weight of the evidence for the mere purpose of returning a

1     verdict or solely because of the opinion of other jurors.

2          Discuss and weigh your respective opinions

3     dispassionately, without regard to sympathy, without regard to

4     prejudice or favor of either party, and adopt the conclusion

5     that in your good conscious appears to be in accordance with

6     the truth.

7          Again, each of you must make your own decision about

8     the proper outcome of the case based on your consideration of

9     the evidence and your discussion with fellow jurors.  No juror

10    should surrender his or her conscientious beliefs solely for

11    the purpose of returning a unanimous verdict.

12         We have a verdict form for you.  Mr. Street, maybe you

13    can pass it out while I finish.

14         The purpose of the form is to help us – the Court, the

15    attorneys, the defendant – to understand what your findings

16    are.  No inference is to be drawn from the way the questions

17    are worded as to what the answers should be, and the questions

18    are not to be taken as any indication that I have any opinion

19    how they should be answered.  I have no opinion and even if I

20    did, it would not be binding on you.

21         You should answer every question unless you are

22    directed to skip certain questions.  You should also proceed to

23    the questions in the order in which they're listed.

24         After you have reached a verdict, the foreperson

25    should fill in the verdict sheet, sign and date it, and then

1    give a note to the deputy stating that you've reached a

2    verdict.

3          Do not specify what the verdict is in your notes.

4    Again, just so it's clear, there should be one verdict sheet

5    filled out at the end of your deliberations.

6          When you have reached a verdict, you should tell

7    Mr. Street in a written note from the foreperson and do not say

8    what the verdict is, and then you can bring it with you into

9    the courtroom.

10          I'll stress that each of you must be in agreement with

11    the verdict that is announced in court.  Once your verdict is

12    announced by the foreperson in open court and officially

13    recorded, it cannot ordinarily be revoked; and I will ask you

14    one by one if that is your verdict.

15          I remind you that you took an oath to render judgment

16    impartially and fairly without prejudice or sympathy and

17    without fear solely upon the evidence in the case and the

18    applicable law.  Your oath sums up your duty.  I know you will

19    do your duty and reach a just and true verdict.

20          Finally, I say this not because I think it's

21    necessary, but because it's a custom in this courthouse:  You

22    should treat each other with courtesy and respect during your

23    deliberations.

24          All litigants stand equal in this room.  All litigants

25    stand equal before the bar of justice.  Your duty is to decide

 1   between those parties fairly and impartially to see that

 2   justice is done, all in accordance with your oath as jurors.

 3            Mr. Street.

 4            (Marshal sworn)

 5            THE DEPUTY CLERK:  Jurors, you're in the hands of the

 6   marshal.

 7            (At 2:44 p.m., the jury retired to deliberate)

 8            THE DEPUTY CLERK:  Juror numbers 13 and 14, you're

 9   going to come with me.

10            (Alternate jurors excused)

11            THE COURT:  Counsel, if you decide to leave the

12   courtroom, please don't go far, and please be sure that

13   Mr. Street or whoever of my staff is here has to a way to reach

14   you, okay?

15            MR. DRATEL:  Thank you.

16            MR. ARAVIND:  Thank you.

17            (Recess pending verdict)

18            (In open court; jurors not present; defendant not

19   present)

20            MR. DRATEL:  What's the Court's practice with respect

21   to -- do you want us all assembled at 9:45 are or do they just

22   come in and start deliberating.  I'll be here.  I wanted to

23   know what the Court likes to do.

24            THE COURT:  I typically have everybody come, but if

25   you have a strong preference not to do that --

ea3gcha5                          Trial

 1              MR. DRATEL:  I'll be here at 9:45.

 2              THE COURT:  Does government have any preference?

 3              MR. ARAVIND:  We'll do whatever the Court wants.

 4              THE COURT:  Why don't we all gather because if they're

 5      being diligent, it's nice to show them that we're here and

 6      attentive and waiting for them.

 7              MR. DRATEL:  Obviously, the defendant will be produced

 8      at 9:45 as well.  Yes.

 9              THE COURT:  Hopefully, that will happen.  They're

10      getting Mr. Chambers.

11              THE DEPUTY CLERK:  Yes.  He's on the way up.  I closed

12      the door.

13              THE COURT:  What I think I'll do is, ask them to come

14      at 9:30 and as soon as they're all here, then we'll convene.

15              Did all exhibits go back to the jury room with them,

16      the hammer and the duct tape?

17              MR. DRATEL:  I don't think the duct tape.

18              MR. ARAVIND:  Not the hammer or the drugs or the duct

19      tape.

20              THE COURT:  Just documents.

21              MR. ARAVIND:  Right.

22              THE COURT:  Okay.  Just curious.  Thanks.

23              (Pause)

24              (In open court; all parties present)

25              (Jury present; time noted: 4:38 p.m.)

1          THE COURT:  Ladies and gentlemen, it's the end of the

2     week and the end of the first day of your deliberations and

3     we're going to break for the day.  We will reconvene on Monday

4     at our usual time.  Be here at 9:30.  We'll come out at 9:45,

5     but if you're all here earlier, we will come out earlier.  We

6     will basically keep the same hours.

7          If you're still deliberating at lunch time on Monday,

8     we'll bring your lunch in and you can have lunch here.

9          I just want to remind you, you'll be away for two days

10    with family and friends.  Please remember, don't talk about the

11    case at all, especially now that you're in the midst of

12    deliberations, and don't look anything up.

13          I wish you a good weekend.  Thank you.  Just one

14    minute.

15          The other thing is that when you do come in, please

16    don't start your deliberations until I bring you all out here

17    and I know you're all here.  Then I'll let you go back in the

18    room to deliberate.  Okay.  Thank you.

19          Have a good evening.  The alternates can leave.  See

20    you in the morning.

21          (Jurors excused)

22          (Alternate jurors excused)

23          (Adjourned to October 6, 2014 at 9:30 a.m.)

24                              * * *

25