UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x
                                              :
UNITED STATES OF AMERICA,                     :
                                              :
                                              :
         – against –                          :        13 Cr. 345 (LGS)
                                              :
ANTIONE CHAMBERS,                             :        (Filed Electronically)
                                              :
                  Defendant.                  :
                                              :
-------------------------------------------------------x


MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT ANTIONE
CHAMBERS'S MOTION FOR ACQUITTAL, AND/OR A NEW TRIAL
   PURSUANT TO RULE 29(c), AND RULE 33, FED.R.CRIM.P.


                              JOSHUA L. DRATEL
                              JOSHUA L. DRATEL, P.C.
                              29 Broadway, Suite 1412
                              New York, New York 10006
                              (212) 732-0707
                              jdratel@joshuadratel.com

                              *Attorneys for Defendant Antione Chambers*


*– Of Counsel –*

Joshua L. Dratel
Whitney G. Schlimbach

TABLE OF CONTENTS

Table of Contents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT

POINT I

THE EVIDENCE WAS NOT SUFFICIENT
TO PERMIT A RATIONAL JUROR TO
CONVICT MR. CHAMBERS ON ANY
OF THE THREE COUNTS CHARGED    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

A.    *The Applicable Legal Standard.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

B.    *The Evidence Was Insufficient to Permit*
      *A Rational Juror to Convict Mr. Chambers.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      1.    *The Eyewitness Identification Testimony.* . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      2.    *The Remaining Evidence Was Insufficient to Sustain a Conviction.* . . . . . . . . . . . 6
            a.    *The Testimony of David Barea and Ms. Toruella.* . . . . . . . . . . . . . . . . . . 6
            b.    *The Cell Phone Records Do Not Provide Sufficient Evidence.*. . . . . . . . . . 8

            c.    *The Cell Phone Records Do Not Support the Government's Theory.* . . . . 9

            d.    *The Cell Site Evidence Is Insufficient to Sustain A Guilty Verdict.* . . . . . 13

            e.    *Any Evidence of "Consciousness of Guilt" Is Insufficient*
                  *to Provide Proof Beyond a Reasonable Doubt In This Case.* . . . . . . . . . . 15

      3.    *Even Drawing All Permissible Inferences in the Government's*
            *Favor, the Totality of the Evidence Is Insufficient to Permit a Rational*
            *Juror to Find Mr. Chambers Guilty Beyond a Reasonable Doubt.* . . . . . . . . . . . 16

POINT II

PURSUANT TO RULE 33, FED.R.CRIM.P.,
MR. CHAMBERS SHOULD BE GRANTED
A NEW TRIAL BECAUSE OF (A)  THE FAILURE
TO CONDUCT A PRETRIAL HEARING REGARDING
EYEWITNESS IDENTIFICATION TESTIMONY;
AND/OR (B)  PROSECUTORIAL MISCONDUCT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

A.      *The Failure to Conduct a Pretrial* Wade *Hearing Regarding the Admissibility of
Proposed Eyewitness Testimony Irremediably Prejudiced Mr. Chambers*. . . . . . . . . . . 18

B.      *Three Instances of Prosecutorial Misconduct Irremediably
Prejudiced Mr. Chambers Either Individually or Collectively.* . . . . . . . . . . . . . . . . . . . 22
        1.      *The Government's Remarks During Rebuttal Summation Were Improper.* . . . . . . 23

        2.      *The Government Improperly Elicited a Portion
                of Tyrone Brown's Post-Arrest Statement.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

        3.      *The Government Failed to Discharge Its Duty to Ensure
                That Its Witnessess' Testimony Was Accurate and Truthful.* . . . . . . . . . . . . . . . . 26

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

TABLE OF AUTHORITIES

CASES

*Greer v. Miller*, 483 U.S. 756 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Richardson v. Marsh*, 481 U.S. 200 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Shih Wei Su v. Filion*, 335 F.3d 119 2d Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Broxmeyer*, 616 F.3d 120 (2d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States v. Carneglia*, 256 F.R.D. 384 (E.D.N.Y. 2009)

*United States v. Coppin*, 1 Fed.Appx.283 (6th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Danzey*, 594 F.2d 905 (2d Cir. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . 23, 26

*United States v. Espinal*, 981 F.2d 664 (2d Cir.1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Fama*, 979 F.Supp. 2d 338 (E.D.N.Y. 2013). . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Fell*, 531 F.3d 197 (2d Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Glenn*, 312 F.3d 58 (2d Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Guadagna*, 183 F.3d 122 (2d Cir.1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Guerrero*, 882 F.Supp.2d 463. 479 (S.D.N.Y. 2011)
    *aff'd*, 560 F. App'x 110 (2d Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

*United States v. Jackson*, 335 F.3d 170 (2d Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

*United States v. Lorenzo*, 534 F.3d 153 (2d Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Modica*, 663 F.2d 1173 (2d Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*United States v. Ogando*, 547 F.3d 102 (2d Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Paredes*, 176 F. Supp. 2d 183 (S.D.N.Y. 2001). . . . . . . . . . . . . . . . . . . . . 11

iii

*United States v. Reyes*, 302 F.3d 48 (2d Cir.2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States v. Sanchez*, 969 F.2d 1409 (2d Cir.1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Shareef*, 190 F.3d 71 (2d Cir.1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Spivack*, 376 F. App'x 144 (2d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . 23, 27

*United States v. Thai*, 29 F.3d 785 (2d Cir.1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Torres,* 604 F.3d 58 (2d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Tracy*, 12 F.3d 1186 (2d Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. de Trabuc*, 1989 WL 38119 (S.D.N.Y. Apr. 7, 1989). . . . . . . . . . . . . . . . . . . . 21

*United States v. Viera*, 280 Fed.Appx. 26 (2d Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Wade*, 388 U.S. 218 (1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . 17-19, 20, 22

*United States v. Young*, 745 F.2d 733 (2d Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Watkins v. Sowders*, 449 U.S. 341 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19,

## STATUTES

U.S. Const. Amend. X. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Rule 29, Fed.R.Crim.P.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

Rule 29(c), Fed.R.Crim.P. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 16-17, 28

Rule 33, Fed.R.Crim.P. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 26, 28

iv

**Introduction**

This Memorandum of Law is submitted in support of defendant Antione Chambers's post-trial motions for (1)  a judgment of acquittal pursuant to Rule 29(c), Fed.R.Crim.P.;  and/or (2)  a new trial pursuant to Rule 33, Fed.R.Crim.P.  For the reasons set forth below, as well as those previously posited in Mr. Chambers's prior oral Rule 29 motions during trial (which Mr. Chambers restates but does not repeat herein except as relevant to the points addressed in this Memo of Law), the three counts on which Mr. Chambers was convicted suffer from fatal legal and/or factual deficiencies.

 Accordingly, it is respectfully submitted that Mr. Chambers's convictions on all counts be vacated, and a judgment of acquittal be entered, or alternatively, a new trial ordered.

**Statement of the Facts**

Having presided over the entire case, including the trial, the Court is fully aware of the facts of this case.  Therefore, rather than set forth a separate statement of facts, this Memo of Law will incorporate the relevant facts with each respective Point.

**ARGUMENT**

**POINT I**
**THE EVIDENCE WAS NOT SUFFICIENT**
**TO PERMIT A RATIONAL JUROR TO**
**CONVICT MR. CHAMBERS ON ANY**
**OF THE THREE COUNTS CHARGED**

The government's case was premised, both factually and legally, upon two purported eyewitness identifications of Mr. Chambers – by Emma Toruella and her daughter, Demi Torres – as one of the perpetrators of the robbery and kidnapping charged in the Indictment.  However, by the conclusion of trial, the government's case had been stripped of both alleged

1

identifications:  one by affirmative, unequivocal recantation, and the other by the Court's ruling striking the witness's identifications of Mr. Chambers both during the investigation and in court.

As detailed below, the remaining evidence, consisting of ambiguous and inconclusive cell phone and cell site records, is plainly insufficient to sustain Mr. Chambers's convictions on any of the three counts charged.[1]  Even in the light most favorable to the government, any inferences generated by the cell phone and cell site records – absent the eyewitness identifications – simply fail to satisfy the appropriate standard of proof:  that a rational juror could return a verdict of guilty beyond a reasonable doubt.

As a result, the evidence at trial was insufficient to support Mr. Chambers's convictions on Counts One, Two, and/or Three, and, pursuant to Rule 29(c), Fed.R.Crim.P., a judgment of acquittal should be entered on all three counts.

A.      *The Applicable Legal Standard*

The standard for a Rule 29 motion is simple and well-settled.  As the Second Circuit has instructed, when the review of the evidence permits the conclusion "that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt," a motion for acquittal must be granted.  *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003), *citing United States v. Reyes*, 302 F.3d 48, 52 (2d Cir.2002).

In making such a determination, a court must consider "the evidence 'in the light most favorable to the Government' and draw 'all permissible inferences' in [the prosecution's] favor[.]"  *United States v. Broxmeyer*, 616 F.3d 120, 125 (2d Cir. 2010), *quoting Jackson*, 335

---

[1]  Mr. Chambers was acquitted of the fourth count alleging possession of a weapon in the course of the robbery.

2

F.3d at 180.

However, if the evidence is "meager," if not "nonexistent," and/or the conviction is impermissibly "based on mere speculation or guesswork[,]" the prosecution has not met even that standard of review. *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir.1999), *quoting United States v. Thai*, 29 F.3d 785, 818–19 (2d Cir.1994).

While circumstantial evidence alone can support a finding of guilt beyond a reasonable doubt, under Rule 29, Fed.R.Crim.P., the "totality of admissible evidence presented at trial" must be sufficient to convince a "rational trier of fact" of the defendant's guilt beyond a reasonable doubt. *United States v. Fama*, 979 F.Supp. 2d 338, 341 (E.D.N.Y. 2013), *citing United States v. Young*, 745 F.2d 733, 762 (2d Cir. 1984).

Critically, "if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008), *citing United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002)).

**B.**      ***The Evidence Was Insufficient to Permit A Rational Juror to Convict Mr. Chambers***

Here, even considering "the evidence 'in the light most favorable to the Government' and draw[ing] 'all permissible inferences' in its favor," the evidence at trial would not have been sufficient to obtain even an indictment, much less a conviction beyond a reasonable doubt.

Indeed, New York City Police Department (hereinafter "NYPD") Detective Ellis DeLoren conceded as much during his trial testimony. Detective DeLoren testified that despite the initial failure of Ms. Toruella and Ms. Torres to identify Mr. Chambers as one of the robbers, he continued to show them photographs of Mr. Chambers "so that [Det. DeLoren] could arrest

3

him, so that [Det. DeLoren] could arrest him and charge him with this crime." T. 248.[2]

Similarly, Det. DeLoren added that he "felt that as the investigation was going on, to get a positive identification of Mr. Chambers would be necessary." *Id*. Thus, even the government's witness, an experienced detective who has made hundreds of arrests personally, and participated in thousands, T. 217-18, deemed the eyewitness identification of Mr. Chambers a prerequisite to formal charges against him.

### 1. *The Eyewitness Identification Testimony*

However, as the trial revealed, those eyewitness identifications of Mr. Chambers were illusory. During redirect examination, Ms. Toruella *twice* categorically recanted her identifications of Mr. Chambers, emotionally stating in a tearful and halting voice "it's not him." T. 214-15. That testimony, the most powerful in the case and the most extraordinary as well, provided by the witness with the best and longest opportunity to view the second robber – indeed, by the end of the case the *only* eyewitness testimony – by itself should be sufficient to preclude *any* rational factfinder from returning a verdict of guilty against Mr. Chambers.

Regarding Ms. Torres's putative identification, the Court struck such testimony from the record because it had been obtained via means so suggestive that its reliability was fatally compromised. T. 486-89, 500-02. Consequently, Ms. Torres's identification testimony cannot be factored into the evaluation of the sufficiency of the evidence.

Also, Det. DeLoren's conduct during the investigation and testimony at trial further materially undercut any claim that the evidence was sufficient. For example, despite having the car in police custody by June 2013, Det. DeLoren did not request that either witness view the

---

[2] "T." refers to the trial transcript.

blue Honda Civic, either in person or in photographs, to determine whether it was the car both victims of which both victims provided a detailed description.[3]  T. 270-71.  Similarly, despite showing Ms. Torruella many mugshots of individuals with teardrop tattoos initially, she testified that he told her to "forget about the teardrop" when he came to her with the final photo array containing Mr. Chambers and five tattoo-less fillers.[4]  T. 196, 213-14, 275.

While Det. DeLoren did show Mr. Barea the hammer recovered from the Honda Civic, which Mr. Barea testified looked like the one used to hit him during the robbery, the hammer was utterly generic and non-descript, and therefore hardly probative of anything.  T. 272-73, 291, 402-03.  Moreover, Det. DeLoren's failure to perform any DNA or other forensic tests on the hammer or the duct tape – even though, with respect to the latter, DNA was recovered from two sources, GX 2006 – further and critically undermines any confidence in a rational juror's ability to find sufficient evidence to convict.

Deprived of the eyewitness identifications, the government's case consisted merely of a combination of weak and ultimately insupportable inferences that fail to provide any rational juror guilt beyond a reasonable doubt.  As detailed below, that circumstantial evidence – the cell phone (which could not firmly or conclusively be linked to Mr. Chambers, particularly the night of the robbery) and cell site records – is insufficient to permit a reasonable jury to find guilt beyond a reasonable doubt, *even if* the evidence supported those inferences.  *See e.g. United*

---

[3] Det. DeLoren did show Mr. Barea the utterly nondescript, generic hammer recovered from the Honda Civic, which Mr. Barea testified looked like the one used to hit him during the robbery.  P.272-73, 291, 402-03.

[4] Detective DeLoren denied making this statement to Ms. Torruella when he showed her the photo array on June 6, 2013, although he "wouldn't say it's improper."  P.282-83.

*States v. Ogando*, 547 F.3d 102, 107 (2d Cir. 2008) ("[g]overnment must show 'more than

evidence of a . . . mere association with others engaged in criminal activity'").

## 2.    *The Remaining Evidence Was Insufficient to Sustain a Conviction*

In addition, the remaining evidence either contradicts the government's theory of guilt, or

does not permit a reasonable inference supporting that theory.  As a threshold matter, two pieces

of the government's evidence are more important for what they do *not* demonstrate:  neither the

testimony of the other victim, David Barea, nor the security camera video from outside Tyrone

Brown's apartment (or from the corresponding camera inside the apartment building door)

provided any basis to identify Mr. Chambers, or incriminate him, and certainly fail to provide

sufficient justification for conviction.

### a.    *The Testimony of David Barea and Ms. Toruella*

Mr. Barea testified he could not see the second perpetrator's face (although he did

recognize the other robber as Steven Glisson), and the security camera video failed to

substantiate any allegation that Mr. Chambers was the second robber.  In fact, the reverse is true

with respect to both Mr. Barea's testimony and the security camera video, as well as other

evidence in the case.

For instance, both Mr. Barea and Ms. Toruella provided police descriptions of the robbers

and the car used in the robbery.[5]  Ms. Toruella had the longest opportunity and closest vantage

point from which to view the second robber, as she accompanied him in the car ride to and from

her mother's apartment, a time during which he had removed his mask.  T. 198, 204.  Ms.

---

[5]  Ms. Toruella testified that she and Mr. Barea spoke to detectives separately on the morning following
the robbery, and, following the detectives' instructions, did not speak to each other about the details of
the robbery.  T. 191-92, 209-10.

Toruella described him to  police as 6'3", with a teardrop tattoo under his left eye.  T. 196.  She

also testified that he said he was not worried about Ms. Torruella seeing his face because he was

from Brooklyn.  *Id.*

Similarly, Mr. Barea described the robber he did not recognize as 6'1", with a medium

build and a teardrop tattoo on his face, although he never saw him without the mask.  T. 274-75,

406-07.  Even at trial both Ms. Torruella and Mr. Barea acknowledged that they believed the

robber alleged to be Mr. Chambers had a teardrop tattoo.[6]  T. 201-02, 208, 407.  As pointed out

at trial, Mr. Chambers does not have a teardrop tattoo.  T. 202.

The distinction between the victims' descriptions (and testimony) and the government's

theory extended to the car the robbers used during the crime.  Ms. Toruella described the car she

rode in with the second robber as a black, four door Acura, and stated the last four numbers of

the yellow New York license plate were "7788."  T. 153, 195, 200, 266.

Like Ms. Toruella, Mr. Barea described the car in which he was transported from Tyrone

Brown's apartment to his own residence as a 1997 or 1998 dark green or black Acura CL.  At

trial, he testified that the car was matte black, like it was painted with primer.  T. 265, 377.  In

contrast, the car owned by Zaporia Dunbar, the mother of Mr. Chambers's son, was a blue 1995

Honda Civic with North Carolina license plates.  T. 268-70.

Although Mr. Barea and Detective DeLoren both insisted at trial that Mr. Barea described

the car to police as merely "similar" to a dark green or black 1997/1998 Acura CL with matte

---

[6] Although the government suggested during summation that Ms. Toruella's unwavering conviction that
both robbers had teardrop tattoos was the result of confusion (a statement to which the defense objected),
Mr. Barea, who testified to the same thing, knew Mr. Glisson prior to the robbery and would not have
been susceptible to such confusion.  T. 361, 406.

paint, Mr. Barea nevertheless admitted that he is familiar with cars and had owned a Honda Civic within a year or so of the robbery.  T. 268-69, 407-08.  In fact, when Mr. Barea was asked about the last time he had seen Tyrone Brown before the robbery, he testified that he saw him sitting in a "midnight blue" Impala.  T. 403.  Moreover, Det. DeLoren admitted he had issued an Informational Report/Wanted Flyer related to the robbery with a photo of a black, late model *Acura*, not a Honda or other make or model automobile.  T. 267-68.

###### b.     *The Cell Phone Records Do Not Provide Sufficient Evidence*

Any significance of the phone records for Tyrone Brown's cell phone and the (717) 743-6130 number (hereinafter "the 6130 number"), is contingent on two inferences:  that the content of the phone calls between one of Tyrone Brown's cellphones and the 6130 number was related to the robbery, and that the 6130 phone was used by Mr. Chambers the night of the robbery.  However, there is not sufficient evidence to support *either* inference;  moreover, phone records alone are insufficient evidence on which to find guilt beyond a reasonable doubt.

Cell phone records, although they may be used to corroborate other evidence, are insufficient on their own to demonstrate anything other than association, particularly when the content of the phone calls at issue is unknown and therefore the subject of pure speculation.  For example, in *United States v. Torres,* 604 F.3d 58 (2d Cir. 2010), the Second Circuit reversed a narcotics conspiracy conviction on the basis of insufficient evidence, finding that phone records showing calls between a phone tenuously connected to the defendant and the individuals shipping the drugs "did not provide a basis for a finding [guilt] beyond a reasonable doubt."  *Id.*, at 67.  *See also Lorenzo*, 534 F.3d at 159;  *accord United States v. Coppin*, 1 Fed.Appx.283, 289 (6th Cir. 2001) (finding government's evidence, which consisted "in essence" of phone records

and a relationship with a conspirator, was insufficient to sustain the conspiracy conviction because it "requires conjecture and inference upon inference").

Other cases, by comparison, illustrate the insufficiency here.  In *United States v. Viera*, 280 Fed.Appx. 26 (2d Cir. 2008), the Second Circuit affirmed a conspiracy conviction because in addition to "telephone records which revealed that more than 350 calls were made between phones registered to [the defendant] and [the conspirator] over a six-month period," the other evidence included a drug ledger as well as testimony establishing the drug relationship between the defendant and a conspirator, and documentary evidence that the defendant was using his father's business in a drug importation scheme.  280 Fed.Appx. 26, 28 (2d Cir. 2008).

Accordingly, even if the evidence supported the government's theories at trial that the 6130 phone belonged to Mr. Chambers and was used the night of the robbery, phone records alone are insufficient to support a verdict of guilty.

      **c.**      ***The Cell Phone Records Do Not Support the Government's Theory***

The government's inability to establish a conclusive link between Mr. Chambers and the 6130 number on the night of the robbery renders the phone records irrelevant.  The government could not produce subscriber or registration information confirming that the phone belonged to Antione Chambers.  Nor was there any testimony placing the 6130 number in Mr. Chambers's possession *at any time*, much less on the night of the robbery and kidnapping.

Instead, the government attempted to demonstrate that Mr. Chambers is "Twizzie" and thus, that the 6130 number, which was listed under a "Twizie" contact in Tyrone Brown's iPhone, belonged to him.  The government also pointed to a February 2, 2013, telephone call from the second phone number (ending in 3425) under the "Twizie" contact in Mr. Brown's

iPhone, which number (ending in 3425) was connected to Mr. Chambers.  *See* 911 Call

Stipulation, GX 2005.[7]  That – at best – extremely attenuated connection between Mr. Chambers,

the nickname "Twizzie," and possession of the 6130 phone cannot suffice for proof beyond a

reasonable doubt.

      In its attempt to connect the nickname "Twizzie" to Mr. Chambers, the government also

called as a witness Kentrell Ferguson and played a recording of a phone call from Mr. Chambers

(who was at the time confined at Metropolitan Detention Center [hereinafter "MDC"] awaiting

trial in this case) and an unknown individual, during which the nickname was used.  However,

those attempts to solidify the connection between Mr. Chambers and the 6130 phone only

discredit it.

      Mr. Ferguson testified that he knows Mr. Chambers as "Twin."  T. 299-300.  In an

attempt to impeach Mr. Ferguson, the government introduced a "Twizzy" contact in Mr.

Ferguson's phone listing four numbers, none of which were the 6130 number, or any of the other

numbers listed under "Twizie" in Tyrone Brown's phones.  *See* GX 4000.  That increased the

total number of phone numbers associated with "Twizzie" to seven, according to the contact

information across three different cellphones, with only one overlapping phone number, ending

in 3425, which was also the only number with *any* connection to Mr. Chambers.

      The other attempt to associate Mr. Chambers with "Twizzie" was even less enlightening.

During the MDC phone call between Mr. Chambers and an unidentified individual, the salutation

---

[7] In Tyrone Brown's Pantech cell phone, the "Twizie" contact lists the phone number from which the 911
call was made, as well as a third number, (717) 379-3425.  Noted in the 3500 material, an additional, and
completely different number, 917-213-4864, was given to police by Zaporia Dunbar and Mr. Chambers's
mother when they were interviewed in late May 2013.

by Mr. Chambers during the interval in which an inmate states his name was, according to the transcript prepared by the government, "[unintelligible] my man Twiz."  *See* GX 125-T.

However, using the phrase "my man *before* uttering the nickname indicates more that the person called, rather than the speaker, Mr. Chambers, was nicknamed "Twiz."  Nor could the government provide a probative explanation why the phone call should be interpreted any differently than common sense, common usage, and common experience, would dictate.

Therefore, rather than cementing any alleged connection between Mr. Chambers and the nickname "Twizzie," this evidence actually supports the obvious:  that there is more than one person with the nickname "Twizzie."  Even in the light most favorable to the government, the piling of these weak inferences upon each other is not a substitute for proof beyond a reasonable doubt.

In addition, to support the inference that the individual in possession of the phone with the 6130 number was involved in the robbery, the government pointed to a phone call, made approximately 20 minutes prior to Mr. Barea's arrival at Mr. Brown's apartment, by Mr. Brown to the 6130 number after Mr. Brown had received a text from Mr. Barea.  T. 780-81.

However, that assertion was contradicted by Mr. Barea's testimony.  Mr. Barea testified that he called Mr. Brown earlier in the day to inform Mr. Brown that Mr. Barea would be coming to Mr. Brown's apartment, and that he (Mr. Barea) recalled knocking on Mr. Brown's window (rather than texting him) to let Mr. Brown know Mr. Barea had arrived.  T. 357-58.

The government's contention is entirely speculative because it did not establish, through inference or otherwise, either that Mr. Brown was a co-conspirator, or that Mr. Chambers was in possession of the phone with the 6130 number that evening, or that the content of the phone call

11

was related to the robbery.  T. 620.

In addition, other evidence seriously undermines the government's claims.  For instance, the records show phone calls between Mr. Brown and the 6130 number from earlier in the night, and three additional phone calls between Mr. Brown and the 6130 number before the robbery occurred, thereby substantially reducing the significance of the single phone call relied upon by the government to allege Mr. Brown's participation in the robbery.  *See* GX 160C & 160G.

Also, there was not sufficient evidence that Mr. Brown was a co-conspirator.  Other than Mr. Brown's arguably inadmissible expression of condolence[8] to Ms. Toruella, hours after the robbery, there is no further evidence in the record that Mr. Brown helped arrange the robbery. T. 181-82.  Indeed, Mr. Brown denied to Mr. Barea that he was involved in setting up the robbery.  T. 397.

Moreover, even assuming *arguendo* Mr. Brown was involved in the robbery, as discussed **ante**, at n.6, the phone records alone are insufficient to support a guilty verdict.  Mr. Brown's cell phone was in almost constant contact with another, unidentified number during the same period

---

[8] The defense unsuccessfully objected to testimony regarding Mr. Brown's statement.  T. 181-82.  In order to admit hearsay pursuant to the co-conspirator exception to the hearsay rule, Fed.R.Evid. 801(d)(2)(E), it must be established by a preponderance of the evidence "(1)  that there was a conspiracy, (2)  that its members included the declarant and the party against whom the statement is offered, and (3) that the statement was made both (a)  during the course of and (b)  in furtherance of the conspiracy." *United States v. Paredes*, 176 F. Supp. 2d 183, 186-87 (S.D.N.Y. 2001).  In addition to the government's failure to put any evidence on the record, let alone any non-hearsay evidence, that Tyrone Brown was a conspirator, the statement was "not made in the course of the conspiracy [as] it [wa]s made after the main objective of the conspiracy ha[d] been accomplished[;]"  nor was the apology in furtherance of the conspiracy, as it did not "prompt the listener to respond in a way that facilitates the carrying out of criminal activity."  *Id.*, at 189-90;  *see also United States v. Tracy*, 12 F.3d 1186, 1196-97 (2d Cir. 1993).

However, even assuming *arguendo* that Mr. Brown's statement was not inadmissible hearsay, an expression of sympathy to a longtime female friend who had just endured a terrifying ordeal falls well short of providing a reasonable basis for inferring that Mr. Brown was admitting involvement in the robbery and kidnapping.

that Mr. Brown's phone was in contact with either the 6130 number or Mr. Barea's number, and the 6130 number was similarly in contact with other numbers during the same period.

Significantly, between 1:19 a.m., when the robbers arrived outside Mr. Brown's apartment, and the start of the robbery at 1:26 a.m., both individuals involved in kidnapping Mr. Barea from Mr. Brown's apartment, one of whom is alleged to be Mr. Chambers, and thus allegedly in possession of the 6130 phone, are visible on surveillance video.  Yet at no point during the video is either individual holding a phone even though the phone records show the 6130 number receiving a text message from Mr. Brown at 1:25 a.m.

Accordingly, phone records are not the type of evidence that may reasonably support a verdict of guilty without significant corroborating evidence, absent here, and the inference that the 6130 number was involved in the robbery is unsupported by the evidence.

> ### d.    *The Cell Site Evidence Is Insufficient to Sustain A Guilty Verdict*

Suffering from the same flaw as the phone records, the cell site location information constitutes even weaker support for a rational guilty verdict.  Without sufficient evidence to support the connections between Mr. Chambers, the 6130 number, and the crimes charged, the cell site information merely provides general location data for a single phone among thousands in the area of the robbery on the night it occurred.

Cell site evidence, by its nature, is not strong evidence of location, and should be corroborated if at all possible.  Cell sites were not developed for the purpose of pinpointing location, but rather to provide the strongest cell signal available within a certain range of a provider's cellphone.  T. 657.  Consequently, cell site information suffers from three major flaws as a conclusive investigative tool.

13

First, cell towers necessarily prioritize cell reception over accurate location data, and thus, as the government's own witness acknowledged, location data obtained from cell site records is susceptible to myriad factors unrelated to the phone's location, like building materials or population density, which skew location information in favor of providing the best signal to a customer.  T. 631-32, 650-56.

Second, cell site data is available *only* when a phone is being used, and cannot provide any information whatsoever regarding a phone's location at any other time.  Finally, cell site data provides information about the location of a cell phone (or other communications device) *only*, and cannot provide any location information regarding an individual.  T. 627 (agent was able to "offer an opinion of general location of where the phone was").

Here, the government did not present *any* evidence to corroborate the assumption that the movements of the 6130 phone coincided with Mr. Chambers's whereabouts the night of the robbery.  The cell site evidence shows that the 6130 cellphone signal was picked up by a cell tower in the area of the robbery from 11 p.m., where it was in use in that area until 1:15 a.m.  Its signal was next picked up by another cell tower a few miles north around 4:30 a.m., entirely because those were the periods of time in which the phone in use.  *See* Gov't Ex. 50.

The government relied solely on the fact that Mr. Chambers's girlfriend lived in the area of the cell tower which picked up the 6130 phone's signal at 4:45 a.m., and could not in any way corroborate the contention that Mr. Chambers was in either the area of the robbery or his girlfriend's apartment[9] – both densely populated urban areas in the Bronx, with many possible

---

[9] The government presented the testimony of Ms. Dunbar's landlord, Isaac Nelson, to demonstrate that Mr. Chambers resided with her.  However, Mr. Nelson testified only that Ms. Dunbar lived in the apartment between September 2012 and May or June, 2013, and that Ms. Dunbar's boyfriend and her

destinations other than the two the government proffered – at the same time as the 6130 phone.[10]

Accordingly, given their limited probative value, the cell site records are similarly insufficient to independently support a guilty verdict, and cannot provide sufficient corroboration of the inferences the government seeks be drawn from the phone records.

### e.   *Any Evidence of "Consciousness of Guilt" Is Insufficient to Provide Proof Beyond a Reasonable Doubt In This Case*

Mr. Chambers was arrested in New Jersey July 3, 2103, approximately an hour from New York, for presenting false identification documents during a traffic stop.  The government argued that this evidence demonstrated Mr. Chambers's consciousness of guilt.  However, the connection between Mr. Chambers's arrest in New Jersey and guilt for the crimes charged is so tenuous as to be nonexistent.

As set forth in more detail during the pre-trial briefing on the issue of consciousness of guilt, Mr. Chambers was arrested only an hour from New York, without any luggage or anything else to indicate he would not return, in possession of a false license of unknown origin.  While the picture is not of a man of unquestionable innocence, this conduct was never sufficiently tied to the crimes charged here Thus, the inference that Mr. Chambers was fleeing because of his involvement in the robbery is not supported by the record.

---

daughter "stayed with her."  First, Mr. Nelson's testimony does not establish that Mr. Chambers lived primarily with Ms. Dunbar, nor that he was "stay[ing]" with her at the time of the robbery in March 2013.

[10] The government further failed to present any corroboration that Mr. Chambers was in the same location at the same time as the 6130 phone at any point, despite having almost two months of cell site location data, indicating the exact dates and times that the phone's signal was picked up by cell towers throughout New York, New Jersey, and Pennsylvania.  *See* Gov't Ex. 50.

Furthermore, evidence of consciousness of guilt, while it "may strengthen inferences supplied by other pieces of evidence," is "insufficient proof on which to convict" where the other evidence does not provide an independent basis for a finding of guilt, as is the case here. *United States v. Cassese*, 428 F.3d 92, 101 (2d Cir. 2005).

Accordingly, evidence related to Mr. Chambers's arrest in New Jersey is inconclusive, and furthermore, consciousness of guilt evidence is insufficient to support a guilty verdict.

### 3. *Even Drawing All Permissible Inferences in the Government's Favor, the Totality of the Evidence Is Insufficient to Permit a Rational Juror to Find Mr. Chambers Guilty Beyond a Reasonable Doubt*

Even viewed in the light most favorable to the government, the evidence is insufficient to convince a rational juror of Mr. Chambers's guilt beyond a reasonable doubt.   Any inferences from the evidence remaining once the eyewitness identifications were eliminated are – both independently and in combination – too weak and attenuated to convince any rational trier of fact beyond a reasonable doubt.

Accordingly, it is respectfully submitted that pursuant to Rule 29(c), Fed.R.Crim.P., the jury's verdict must be vacated because even viewed in the light most favorable to the government, the evidence at trial was not sufficient to persuade any rational juror to find Mr. Chambers's guilt beyond a reasonable doubt.

## POINT II

**PURSUANT TO RULE 33, FED.R.CRIM.P.,**
**MR. CHAMBERS SHOULD BE GRANTED**
**A NEW TRIAL BECAUSE OF (A)  THE FAILURE**
**TO CONDUCT A PRETRIAL HEARING REGARDING**
**EYEWITNESS IDENTIFICATION TESTIMONY;**
**AND/OR (B)  PROSECUTORIAL MISCONDUCT**

Even if the evidence was sufficient to sustain Mr. Chambers's convictions (which, as demonstrated in POINT I, it was not), it is respectfully submitted that pursuant to Rule 33, Fed.R.Crim.P., the Court should grant Mr. Chambers a new trial because (a)  the failure to conduct a pretrial hearing on the admissibility of eyewitness identification testimony prejudiced Mr. Chambers irremediably;  and (b)  three instances of prosecutorial misconduct irreparably prejudiced Mr. Chambers either individually, or in combination.

Rule 33, Fed.R.Crim.P., provides the court broad discretion to grant a new trial when it would be a "manifest injustice to let the guilty verdict stand," a less exacting burden than Rule 29, and which does not require the Court to assume "the truth of the prosecution's evidence." *United States v. Fama*, 979 F. Supp. 2d 338, 341 (E.D.N.Y. 2013), *citing United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir.1992).

A pretrial hearing, pursuant to *United States v. Wade*, 388 U.S. 218 (1967), to determine whether the proffered eyewitness identification testimony was admissible, would have avoided the prejudice Mr. Chambers suffered from the prejudicial testimony of the two purported eyewitnesses, neither of whose testimony ultimately (and for different reasons) resulted in positive identification of Mr. Chambers.

Also, the unfair and incurably prejudicial effect of the government's misconduct was sufficiently substantial to warrant a new trial.  In addition to insinuating improperly during summation that Emma Toruella's recantation on the stand was the result of her fear of Mr. Chambers, the government also elicited a reference to the post-arrest interview with Tyrone Brown in violation of the Court's pre-trial order that Mr. Brown's post-arrest statements could be introduced only by the defense, and abjectly failed in its duty to vet adequately the testimony of its witnesses prior to trial.

**A.**   ***The Failure to Conduct a Pretrial* Wade *Hearing Regarding the Admissibility of Proposed Eyewitness Testimony Irremediably Prejudiced Mr. Chambers***

Prior to trial, the defense made several motions for a pre-trial hearing to explore the manner by which the identifications of both Ms. Toruella and Ms. Torres were obtained, all of which were denied.  *See* Docket #s 16, 83.  That failure to conduct a *Wade* hearing prior to trial resulted in trial testimony that irreparably prejudiced Mr. Chambers in a manner that the Court's curative actions during trial could not overcome.

A *Wade* hearing would have avoided several problems:  it would have eliminated the identification  testimony of Demi Torres (and probably her testimony altogether), rather than requiring the jury to ignore its most critical and relevant portion (as it was instructed to do once the Court struck Ms. Torres's identification testimony).  It would also have avoided Ms. Toruella's in-court identification of Mr. Chambers, and her testimony that she had identified him from a prior photo array.  While Ms. Toruella categorically recanted that identification, the jury's verdict strongly intimates that it somehow credited that initial testimony about a positive identification (as well as Det. DeLoren's testimony about her positive identification of Mr.

18

Chambers).

Indeed, that is the purpose of a *Wade* hearing:  to air the sensitive issue of eyewitness

identification evidence before such testimony achieves the capacity to influence a jury.  A

"judicial determination outside the presence of the jury . . . may often be advisable[, and] [i]n

some circumstances . . . may be constitutionally necessary."  *Watkins v. Sowders*, 449 U.S. 341,

349 (1981).

Here, Mr. Chambers certainly suffered prejudice as a consequence of such testimony,

none of which would have been admissible or admitted once a *Wade* hearing had exposed the

suggestive and improper procedures that attended the positive identification(s) of Mr. Chambers.

Ironically, during trial, the *government* (in an unprecedented application) moved for a

*Wade* hearing (albeit in an unavailing attempt to protect Ms. Torres's testimony), but only *after*

the jury had heard the very damaging but inadmissible testimony.  Of course, the government's

application missed the point entirely:  that genie was already out of the bottle, and could not be

returned to it.

The Court's ruling on the motion to strike Ms. Torres's identification testimony also

necessarily involved an assessment of the credibility of the testimony of Detective DeLoren to

the extent it conflicted with that of Ms. Torres.  T.703-05.  The Court's finding that Det.

DeLoren was not credible was based on his failure "to make any kind of record of the two most

suggestive" identification procedures used to obtain Ms. Torres's identification, as well as his

testimony regarding whether he disclosed the newspaper photograph procedure to the

government at any point.  T.703-04.

Yet a pretrial *Wade* hearing would also have exposed Det. DeLoren's prevarications, his

19

departures from proper identification procedures, and the improper influence he exerted on both Ms. Toruella (*i.e.*, to "forget about the teardrop" tattoo) and Ms. Torres.  Again, the jury never should have heard his testimony about the identification procedures.

Consequently, the failure to grant a pre-trial *Wade* hearing resulted in the admission of identification evidence irreparably tainted by the suggestive procedures employed by Detective DeLoren, in violation of Mr. Chambers's due process right to a fair trial and warranting a new trial pursuant to Rule 33, Fed.R.Crim.P.

Nor could the resulting prejudice Mr. Chambers endured as a result be cured by striking Ms. Torres's testimony.  In a trial consisting of just two days of testimony, Ms. Torres's testimony (and Det. DeLoren's about the identification procedures) could not be airbrushed from the jury's consideration.  That practical reality was demonstrated by the jury's request to review the unstruck portion of Ms. Torres's testimony, as that small and inconsequential segment of her testimony did not address a single contested issue.

In striking Ms. Torres's testimony, the Court instructed the jury as follows:

I will now instruct you that I am striking the testimony of Ms. Torres. That's Ms. Toruella's daughter who you heard testify a couple of days ago that relates to her identification of the defendant, including her in-court identification that you witnessed.I'm also striking exhibits relating to that identification, which are Government Exhibit 1001 and Defendant's Exhibits A, B, and C.

It is your duty to disregard the evidence that I have just spoken about in your deliberations. This means that you are not to discuss the evidence and you are to deliberate as though the testimony of Ms. Torres relating to identification of the defendant did not occur. It should not play any role in your verdict.

T. 718-19.

20

In seeking Ms. Torres's testimony during deliberations despite that instruction, the jury demonstrated that the instruction did not have the desired or necessary effect.  The normal presumption that a jury will follow instructions to disregard evidence is overcome when there exists "an 'overwhelming probability' that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be 'devastating' to the defendant."  *United States v. de Trabuc*, 1989 WL 38119, at *4-5 (S.D.N.Y. Apr. 7, 1989), *quoting Greer v. Miller*, 483 U.S. 756, 767 (1987).

Ms. Torres's identificaiton was unarguably "devastating" in the context of the trial.  The eyewitness identifications of Ms. Toruella and Ms. Torres were the centerpiece of the government's case, and following Ms. Toruella's unequivocal recantation on the stand, the identification testimony of Ms. Torres provided the only direct evidence of Mr. Chambers's alleged participation in the crimes charged.

Here, the jury was instructed to disregard only that portion of Ms. Torres's testimony related to her identifications of Mr. Chambers, the primary contested issue at trial.  The "risk that the jury will not, or cannot, follow instructions is so great" here that the "practical and human limitations of the jury system cannot be ignored."  *Richardson v. Marsh*, 481 U.S. 200, 207 (1987).

Courts have further cautioned that where a jury is required to "perform olympian mental gymnastics," curative instructions are unlikely to be effective.  *de Trabuc*, 1989 WL 38119, at *5 (jury was able to follow instructions because the entirety of the testimony was struck, but noting that the "conclusion is not entirely free of doubt," as the testimony was lengthy).

When a jury is asked to disregard one statement, or conversely, the entirety of a witness's

21

testimony, the task is less onerous than instructing a jury to put out of its mind substantial

portions of a witness's testimony that were directly relevant to the issue most likely to be debated

among the jurors.  Furthermore, the jury's request for the remainder of Ms. Torres's testimony,

which was immediately preceded by a request for Ms. Toruella's testimony, made clear that the

Court's curative instruction was not effective, as there were no contested issues in the unstruck

portion of Ms. Torres's testimony.  T. 844, 852.[11]

As a result, the Court's instruction to disregard the identification testimony of Ms. Torres

was insufficient to cure, or even mitigate, the tremendously prejudicial effect of the testimony.

Accordingly, Mr. Chambers's Fifth Amendment due process right to a fair trial was violated by

the failure to grant a pre-trial *Wade* hearing, and the resulting prejudice warrants a new trial,

pursuant to Rule 33, Fed.R.Crim.P.

**B.**      ***Three Instances of Prosecutorial Misconduct Irremediably***
            ***Prejudiced Mr. Chambers Either Individually or Collectively***

A new trial is warranted pursuant to Rule 33, Fed.R.Crim.P., because the instances of

improper government conduct during trial caused Mr. Chambers to suffer substantial prejudice,

thereby depriving him of his due process right to a fair trial.  *See generally United States v.*

*Modica*, 663 F.2d 1173, 1178-86 (2d Cir. 1981).

As detailed below, three instances of such prosecutorial misconduct prejudiced Mr.

Chambers beyond repair:  (1)  during its rebuttal summation, the government inappropriately

implied that Ms. Toruella's recantation was a product of her fear of Mr. Chambers;  (2)  the

government elicited a reference to the suppressed statements of Tyrone Brown during the

---

[11] The defense objected, moving to preclude any of Ms. Torres's testimony from being provided
to the jury on the ground that "[i]t doesn't address any disputed issues." T. 869.

testimony of Special Agent John Reynolds;  and (3)  despite ample notice of the risk, the

government failed in its pre-trial duties to ensure that the testimony of Ms. Toruella and Ms.

Torres would "stand up" in court, and to avoid eliciting false testimony, even inadvertently.

*United States v. Danzey*, 594 F.2d 905, 916 (2d Cir. 1979);  *see also United States v. Spivack*,

376 F. App'x 144, 145-46 (2d Cir. 2010).

Whether the defendant suffered the requisite prejudice from prosecutorial misconduct

depends on three considerations:  "[1] the seriousness of the misconduct, [2] the measures

adopted by the trial court to cure the misconduct, and [3] the certainty of conviction" absent the

misconduct.  *United States v. Banki*, 685 F.3d 99, 120 (2d Cir. 2012), as amended (Feb. 22,

2012).  When the misconduct has caused "substantial prejudice implicating the right to due

process," the defendant's conviction should be vacated.  *United States v. Fell*, 531 F.3d 197, 209

(2d Cir. 2008).

     **1.**    ***The Government's Remarks During Rebuttal Summation Were Improper***

During rebuttal summation, the prosecutor attempted to justify Ms. Toruella's recantation

by asserting that "she had him looking up at her from the table, and she had that picture in front

of her, and she had him staring at that table," at which point defense counsel's objection was

sustained.  T. 816.

Despite the permissive approach taken toward statements made by parties during

summation, the insinuation that a defendant is intimidating a witness "has a special potential for

prejudice," especially as it comes from a prosecutor. *Modica*, 663 F.2d at 1180.  Objectionable

remarks by a prosecutor must be evaluated "within the context of the entire trial," and require a

new trial where the comments "deprived the defendant of a fair trial."  *United States v. Guerrero*,

882 F.Supp.2d 463. 479 (S.D.N.Y. 2011) *aff'd*, 560 F. App'x 110 (2d Cir. 2014), *quoting United States v. Espinal*, 981 F.2d 664, 666 (2d Cir.1992).  In addition to considering the remarks themselves, the Court also considers measures taken to correct their effect, and the "certainty of conviction" without the remarks.  *United States v. Melendez*, 57 F.3d 238, 241 (2d Cir.1995).

Here, the prosecutor's comments were directed at the recantation of the government's primary eyewitness, which, notably, occurred while the government questioned her, not during cross-examination.  T. 214-15.  The prosecutor crossed a clear line by implying that Ms. Toruella's recantation was prompted by the intimidating stare of the defendant, a proposition that had no basis and which is extremely prejudicial, especially in light of the witness's emotional state on the stand.

In addition, the Court sustained the defense's objection to the comment, further demonstrating its improper nature in the context of the trial.  At that point, however, the damage had been done.  Moreover, given the length of deliberations and the weakness of the government's case, there cannot be confidence in the "certainty of conviction" absent the improper remarks.

Therefore, because the credibility of Ms. Toruella's recantation was an absolutely essential issue to be resolved by the jury, the government's entirely unsupported allusion to witness intimidation as an explanation for the recantation "cause[d] the defendant substantial prejudice," and "so infect[ed] the trial with unfairness as to make the resulting conviction a denial of due process."  *United States v. Shareef*, 190 F.3d 71, 78 (2d Cir.1999).

24

2. ***The Government Improperly Elicited a Portion
of Tyrone Brown's Post-Arrest Statement***

Prior to trial, the Court ruled that although the government was precluded from doing so, the defense was permitted to introduce the post-arrest statements of Tyrone Brown, which the defense eventually declined to do.  T.334.  However, during the direct examination of Special Agent John Reynolds, the prosecutor elicited a reference to the interview conducted with Tyrone Brown after his arrest, directly violating the Court's pre-trial ruling regarding the admissibility of the statements, and resulting in prejudice warranting a new trial under Rule 33, Fed.R.Crim.P.

In making its ruling, the Court found that the government was precluded from introducing police reports against a defendant in a criminal case, in light of the legislative history accompanying the rules regulating the admissibility of hearsay evidence.  *See United States v. Carneglia*, 256 F.R.D. 384, 391 (E.D.N.Y. 2009).  However, the same limitation is not present where a defendant seeks to introduce a police report, and consequently, the Court ruled that the post-arrest statements of Tyrone Brown were admissible only if introduced by the defense.  *See id.*

During the testimony of SA Reynolds, the government elicited a statement that he conducted a post-arrest interview with Tyrone Brown, at which point defense counsel objected. T.520-22.  That reference directly violated the Court's order that the post-arrest statements of Tyrone Brown could not be introduced against Mr. Chambers by the government.  As corrective action beyond sustaining the defense objection would only have emphasized the reference to the jury, the misconduct was sufficiently prejudicial to deprive Mr. Chambers of his due process right to a trial in accordance with the Court's pre-trial evidentiary rulings.

Accordingly, the reference during Agent Reynolds's testimony to evidence which the government was precluded from introducing by order of the Court, constituted a violation Mr. Chambers's due process rights, and warrants a new trial pursuant to Rule 33, Fed.R.Crim.P.

**3.     *The Government Failed to Discharge Its Duty to Ensure That Its Witnesses' Testimony Was Accurate and Truthful***

During trial, the testimony of Ms. Toruella and Ms. Torres made abundantly clear that the government had not fully vetted its witnesses prior to trial, despite the fact that those two witnesses testified with respect the most important fact at issue in the trial: the identity of the second perpetrator. As a result of the government's failure to "make certain that [its] witness[es]'s testimony is going to stand up," Ms. Torres's testimony was struck and Ms. Toruella recanted her identification on the stand. *See Danzey*, 594 F.2d at 916.

The duty of the prosecutor was particularly pronounced in this case, not only because of the significance of the testimony of Ms. Toruella and Ms. Torres, but because there was substantial indication that the information was not only obtained from other investigating officers (NYPD), but also that the information was not entirely reliable. *See id*. at 916 (government's duty is particularly strong "where other law enforcement agents have conducted the previous photographic spread"). The government should have been especially aware of this duty from the moment Ms. Torres made them aware, in February 2014, of an additional identification procedure that had not been disclosed, or even recorded, by the lead detective on the investigation.

Beyond this clear indication that the facts as presented to the government by Detective DeLoren may not have been complete, the government should have been fully aware of its

heightened duty to vet its evidence thoroughly prior to trial after the Court, in granting Mr.

Brown's pretrial motion to suppress evidence recovered from a warrantless search of his

apartment, admonished it for making an argument in support of the legality of the search of Mr.

Brown's apartment "without an independent good faith basis and without checking the facts."

Transcript of May 21, 2014, Pre-Trial Conference, at 11.  Notwithstanding the Court's explicit

warning, the government adamantly opposed all of the defense's pre-trial requests for a *Wade*

hearing to explore the circumstances of the identification procedures.

In addition to the government's duty to ensure that the testimony presented will "stand

up" in court, the government has a fundamental duty to ensure that testimony elicited from

government witnesses is true.  *See Shih Wei Su v. Filion*, 335 F.3d 119, 126-27 (2d Cir. 2003)

("[t]he prosecutor is an officer of the court whose duty is to present a forceful and truthful case to

the jury, not to win at any cost").  The presentation of false testimony, even unknowingly, is

serious misconduct.  *Spivack*, 376 Fed.Appx. at 145.  Detective DeLoren's testimony regarding

whether he disclosed the newspaper photo identification procedure to the government was

directly relevant to the reliability of the procedures which resulted in two eyewitness

identifications, the government's central evidence.

Although the Court took measures to ameliorate the prejudicial effect of the testimony of

the three witnesses, instructing the jury by way of stipulation that the newspaper photo

identification procedure was disclosed to the government by Ms. Torres for the first time in

February 2014, and striking the identification testimony of Ms. Torres, the substantial prejudice

that resulted was not cured.  Each witness' testimony related to some aspect of the reliability of

the identifications, the essential issue at trial, and consequently, in the absence of the

27

government's misconduct, the certainty of conviction was significantly lessened.  *See id.*

Consequently, the government's failure to fulfill its duty with respect to vetting the testimony of Ms. Torres, Ms. Toruella and Detective DeLoren resulted in substantial prejudice to Mr. Chambers, depriving him of his due process right to a fair trial, and warranting a new trial pursuant to Rule 33, Fed.R.Crim.P.

Accordingly, it is respectfully submitted that these three instances of prosecutorial misconduct, whether operating individually or collectively, denied Mr. Chambers Due Process, and warrant a new trial pursuant to Rule 33.

## Conclusion

Accordingly, for all the reasons set forth above, as well as those previously stated as part of Mr. Chambers's motions at trial, it is respectfully submitted that Mr. Chambers's motions pursuant to Rule 29(c) and Rule 33, Fed.R.Crim.P., should be granted in their entirety, that his conviction on Counts One, Two, and Three should be vacated, and a judgment of acquittal entered, or alternatively, a new trial granted.

Dated: 15 January 2015
      New York, New York

                                  Respectfully submitted,

                                  /s/Joshua L. Dratel
                                  Joshua L. Dratel
                                  JOSHUA L. DRATEL, P.C.
                                  29 Broadway, Suite 1412
                                  New York, New York 10006
                                  (212) 732 - 0707
                                  jdratel@joshuadratel.com
                                  *Attorneys for Defendant Antoine Chambers*

 – Of Counsel –
Joshua L. Dratel
Whitney G. Schlimbach