UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x

UNITED STATES OF AMERICA        :

                      - v.-           :

ANTIONE CHAMBERS,         :
       a/k/a "Twizzie,"

                            :

                Defendant.

                            :
------------------------------------------------------x

S2 13 Cr. 345 (LGS)

**GOVERNMENT'S MEMORANDUM IN OPPOSITION TO THE DEFENDANT'S
MOTIONS FOR A JUDGMENT OF ACQUITTAL AND A NEW TRIAL**

PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States
     of America

NEGAR TEKEEI
Assistant United States Attorney
   - Of Counsel -

## <u>TABLE OF CONTENTS</u>

BACKGROUND ……………………………………………………………………………1

I.   Procedural History…………………………………………………………….………1
II.  Witness Testimony ……………………………………………………………....…3
         A.  Emma Torruella…………………………………………………………………3
         B.  Detective Ellis Deloren………………………………………………………….7
         C.  Kentrell Ferguson…………………………………………………………13
         D.  Rodrigo Ayala…………………………………………………………………14
         E.  David Barea…………………………………………………………………...14
         F.  Officer Michael Whelan……………………………………………………….23
         G.  Sergeant Thomas Derosa………………………………………..……………23
         H.  Isaac Nelson…………………………………………………………………24
         I.  Demi Torres……………………………………………………………………25
         J.  Special Agent John Reynolds……………………………………………………28
         K.  Special Agent Eric Perry………………………………………..………………33

LEGAL STANDARDS...............................................................................................34

I.   Rule 29……………………………………………………………….…………35
II.  Rule 33……………………………………………………………….…………35

DISCUSSION…………………………………………………………………………36

I.   There was Sufficient Evidence for a Rational Jury to Find the Defendant Guilty of the Robbery, Robbery Conspiracy, and Kidnapping……………………….…………36
         A.  Applicable Law…………………………………………………………36
         B.  The Eyewitness Identification Testimony …………………………………38
         C.  The Defendant Used Zaporia Dunbar's Car to Carry Out the Robbery and Kidnapping……………………………………………………………41
         D.  The Cellphone and Cell Site Records Corroborated Torruella's Identification of the Defendant, and the Defendant's Participation in the Robbery and Kidnapping……………………………………………………………42
         E.  The Evidence Relating to the Defendant's Arrest for False Identification in New Jersey, Viewed in the Context of All of the Other Evidence, Supports the Jury's Verdicts…………………………..…………………………...49

II.  The Defendant has Failed to Demonstrate that the Interest of Justice Requires a New Trial…………………………………………………………………51
         A.  Applicable Law…………………………………………………………51
         B.  The Lack of a Pretrial Wade Hearing Did Not Irremediably Prejudice the Defendant…………………………...…………………………………52
         C.  There Was No Misconduct in the Government's Rebuttal Summation…………56

D. The Government Did Not Act Improperly by Eliciting the Fact that Law Enforcement Interviewed Brown…………………………………………………..59

E. The Government Interviewed and Prepared with Torruella, Torres and Detective Deloren Multiple Times, and Upheld its Duties Regarding its Witnesses…………………………………………………,,,………………………61

CONCLUSION…………………………………………………………………….………64

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Delaware* v. *Van Arsdall*, 475 U.S. 673 (1986)........................................................................ 66

*Holland* v. *United States*, 348 U.S. 121 (1954) ...................................................................... 39

*Jackson* v. *Virginia*, 443 U.S. 307 (1979)............................................................................... 37

*Manson* v. *Brathwaite*, 432 U.S. 98 (1977) ............................................................................. 58

*Stovall* v. *Denno*, 388 U.S. 293 (1967).................................................................................... 58

*United Sates* v. *Melendez*, 57 F.3d 238 (2d Cir. 1995)............................................................. 61

*United States* v. *Aguilar*, 585 F.3d 652 (2d Cir. 2009)........................................................... 37

*United States* v. *Aina-Marshall*, 336 F.3d 167 (2d Cir. 2003)................................................ 37

*United States* v. *Arias–Javier*, 392 Fed.Appx. 896 (2d Cir.2010)............................................ 61

*United States* v. *Autuori*, 212 F.3d 105 (2d Cir. 2000)........................................................ 38, 39

*United States* v. *Baccollo*, 725 F.2d 170 (2d Cir. 1983)........................................................ 59

*United States* v. *Banki*, 685 F.3d 99 (2d Cir. 2012)............................................................... 54

*United States* v. *Carbonell-Iznaga*, No. 87 CR. 0518 (RWS), 1988 WL 3666 (S.D.N.Y., Jan.
    1988) ..................................................................................................................................... 56

*United States* v. *Casamento*, 887 F.2d 1141 (2d Cir.1989) ................................................... 61

*United States* v. *Cook*, 432 F.2d 1093 (7th Cir. 1970).......................................................... 57

*United States* v. *Coplan*, 703 F.3d 46 (2d Cir. 2012) .......................................................... 54, 61

*United States* v. *Coppin*, 1 Fed. Appx. 283 (6th Cir. 2001) ................................................ 50

*United States* v. *Eppolito*, 543 F.3d 25 (2d Cir. 2008) ......................................................... 38

*United States* v. *Espinal*, 981 F.2d 664 (2d Cir.1992).......................................................... 61

*United States* v. *Ferguson*, 246 F.3d 129 (2d Cir. 2001)..................................................... 37, 53

*United States* v. *Glenn*, 312 F.3d 58 (2d Cir. 2002) ............................................................. 37

*United States* v. *Guadagna*, 183 F.3d 122 (2d Cir. 1999) .............................................. 36, 38, 39

*United States* v. *Jackson*, 335 F.3d 170 (2d Cir. 2003) ...................................................... 38

*United States* v. *Jakobetz*, 955 F.2d 786 (2d Cir. 1992) ...................................................... 58

*United States* v. *Lorenzo*, 534 F.3d 153 (2d Cir. 2008) ...................................................... 50

*United States* v. *Martinez*, 54 F.3d 1040 (2d Cir. 1995)................................................. 38, 39

*United States* v. *Matthews*, 20 F.3d 538 (2d Cir. 1994)..................................................... 38

*United States* v. *McCourty*, 562 F.3d 458 (2d Cir. 2009) ................................................... 37

*United States* v. *Payton*, 159 F.3d 49 (2d Cir. 1998)....................................................... 37

*United States* v. *Pena*, 793 F.2d 486 (2d Cir.1986)....................................................... 61

*United States* v. *Persico*, 645 F.3d 85 (2d Cir. 2011) ..................................................... 54

*United States* v. *Plitman*, 194 F.3d 59 (2d Cir. 1999) ..................................................... 39

*United States* v. *Rosa*, 17 F.3d 1531 (2d Cir. 1994) ....................................................... 39

*United States* v. *Thomas*, 981 F. Supp. 2d 244 (S.D.N.Y. 2013) ................................... 39

*United States* v. *Torres*, 604 F.3d 58 (2d Cir. 2010) ..................................................... 49

*United States* v. *Truman*, 688 F.3d 129 (2d Cir. 2012) ................................................... 36

*United States* v. *Walker*, 191 F.3d 326 (2d Cir. 1999)..................................................... 38

*United States* v. *Wexler*, 79 F.2d 526 (2d Cir. 1935)..................................................... 54

*United States* v. *Young*, 470 U.S. 1 (1985) ............................................................... 61

*United States* v. *Zackson*, 12 F.3d 1178 (2d Cir.1993)................................................. 61

*Watkins* v. *Sowders*, 449 U.S. 341 (1981) ............................................................... 58

## Federal Rules

Fed. R. Crim. P. 29 ........................................................................................... 36

Fed. R. Crim. P. 33 ........................................................................................... 37

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

UNITED STATES OF AMERICA　　　　　　:

　　　　　　　　　　　　- v.-　　　　　　:

ANTIONE CHAMBERS,　　　　　　　　　:
　　　　　a/k/a "Twizzie,"

　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　Defendant.
　　　　　　　　　　　　　　　　　　:
--------------------------------------------------------x

S2 13 Cr. 345 (LGS)

**GOVERNMENT'S MEMORANDUM IN OPPOSITION TO THE DEFENDANT'S
MOTIONS FOR A JUDGMENT OF ACQUITTAL AND A NEW TRIAL**

The Government respectfully submits this memorandum of law in opposition to the

defendant's January 15, 2015 motions for a judgment of acquittal and, in the alternative, for a

new trial.   For the reasons set forth below, the motions should be denied and the jury's verdicts

should not be disturbed.

## BACKGROUND

### I.　　Procedural History

The defendant was charged by Indictment S2 13 Cr. 345 (LGS) as follows:

(1)　　conspiring to commit a Hobbs Act robbery in or about March 2013, in violation
of Title 18, United States Code, Section 1951 (Count One);

(2)　　committing a Hobbs Act robbery on or about March 25, 2013, and aiding and
abetting the same, in violation of Title 18, United States Code, Sections 1951 and
(2) (Count Two);

(3)　　committing a kidnapping, on or about March 25, 2013, and aiding and abetting
the same, in violation of Title 18, United States Code, Sections 1201 and 2 (Count
Three); and

1

(4)     using and carrying firearms during and in relation to, and possessing firearms in furtherance of the robbery conspiracy charged in Count One and the kidnapping conspiracy charged in Count Three, during which firearms were brandished, and aiding and abetting the same, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(ii) and (2) (Count Four).

Trial in this case began on September 29, 2014.   At trial, and as set forth below, the Government offered the testimony of law enforcement agents involved in the investigation, the victims of the charged robbery and kidnapping, and witnesses who knew the defendant personally.   The Government offered evidence in the form of surveillance videos capturing the initiation of the robbery at Tyrone Brown's apartment; audio recordings of Tyrone Brown discussing narcotics transactions with the male victim; phone records for telephones used by the defendant and Tyrone Brown, among other phone records, showing their communications leading up to the robbery and kidnapping; cell-site location information for a cellphone the defendant used during the robbery and kidnapping showing that he was at Tyrone Brown's apartment during the robbery and showing him, later, returning to the apartment that he shared with his girlfriend; photographs of the car, registered to the defendant's girlfriend, that the defendant and his co-conspirators drove during the robbery and kidnapping; the defendant's fake drivers' license that he was arrested with in New Jersey a few weeks after the robbery and kidnapping; and the photo array from which the female victim identified the defendant as one of her robbers and kidnappers, among other physical evidence.

The jury began deliberations on October 3, 2014.   During five full days of deliberations, the jury requested and received: time stamps from the video surveillance at Brown's apartment where the robbery and kidnapping was initiated (Tr. 835); an excerpt of testimony regarding certain of the phone numbers reflected in phone records that were admitted during the trial (Tr. 839); the testimony of Emma Torruella (Tr. 843); the testimony of Demi Torres (Tr. 852); Government Exhibits 160B (records for 717-743-6130), C (records for 717-743-6130), and G

2

(917-659-9696); the testimony of Detective Ellis Deloren (Tr. 880); the testimony of David

Barea (Tr, 880); Government Exhibit 3 (photograph of Steven Glisson); the testimony of Special

Agent Eric Perry (Tr. 894); the testimony of Special Agent John Reynolds (Tr. 894); the

testimony of Isaac Nelson (Tr. 894); the testimony of Officer Michael Whelan (Tr. 894); and the

testimony of Sergeant Thomas Derosa (Tr. 894).   After five full days of deliberations, on

October 10, 2014, the jury found the defendant guilty of Counts One, Two and Three, and not

guilty of Count Four.

## II. Witness Testimony At Trial

### A. Emma Torruella

The first witness called by the Government was Emma Torruella, the female victim of the

robbery and kidnapping.   Torruella described, in detail, how the defendant, Steven Glisson, and

a third man robbed and kidnapped her during the early morning hours of March 25, 2013.   (Tr.

139-215).   She described how she was asleep when she heard David Barea, the male victim,

calling her name.   (Tr. 141).   She went to her front door and saw Barea with his hands tied

behind his back, blood on his face, and who mean standing next to Barea, one of them holding a

gun with a potato on the end of it to Barea's head.   (Tr. 141-142).   She described the defendant

as "tall," and called him the "tall guy" throughout her testimony.   (Tr. 142).   She described

Steven Glisson as the "heavy guy," whom she called "Dee," and the third, unidentified, male, as

"light eyes." (Tr. 144, 153).   She described how the defendant was carrying a hammer, had a

mask on his face, was wearing gloves, and how, at that point, she could only see his eyes.   (Tr.

143, 146).   She described how the defendant and Glisson were upset that there was no money in

the house, and how the defendant beat Barea with a hammer and continued to threaten Barea

until she and Barea told the defendant and Glisson where the money was—hidden at Torruella's

mother's home.   (Tr. 145-149).   The defendant and Glisson would not let Torruella go to her

3

mother's home on her own to retrieve the money, so the defendant took her.   (Tr. 150).   He

grabbed her by her neck, and walked her out of her home to a car that was parked down the

block from her home.   (Tr. 150-151).   Torruella described the car as a black four-door vehicle

bearing a license plate with "7788" as the last four digits.   (Tr. 153).   When she and the

defendant reached the car, she saw a light-skinned male with light eyes standing in front of the

car wearing a mask and all black.   (Tr. 153).   She could only see the light-skinned male's eyes.

(Tr. 154).   Torruella described how the light-skinned male was upset that she had been looking

at the license plates.   (Tr. 154).   The defendant put her in the front passenger seat of the car,

while the light-skinned robber climbed into the back seat of the car.   (Tr. 155).   The defendant

drove the car while she gave him directions to her mother's home.   (Tr. 155).   Torruella

described how she was crying, and the defendant told her to "shut up."   (Tr. 155).   During the

ride to her mother's home, the defendant took of his mask, saying he did not care because he was

from Brooklyn.   (Tr. 156).   Torruella described how the defendant was sitting right next to her

when he took his mask off.   (Tr. 156).   She then identified the defendant, in the courtroom ,as

the "tall guy"—the robber and kidnapper who had attacked her husband, forced her out of her

home and into his car, and who took of his mask while driving to her mother's home.   (Tr.

156-157).   Torruella was so emotional about the identification that she needed to take time to

collect herself.   (Tr. 157).

Torruella then described how the defendant parked his car in the parking lot of her

mother's apartment building, opened the front passenger side door, grabbed her by the neck and

walked her toward the building.   (Tr. 164).   They entered the building and, as they were

waiting for the elevator, the defendant and the other robber told her she was pretty.   (Tr. 165).

She described how they went to her mother's door, and described how the hallways always have

lights at all times.   (Tr. 168).   While the other robber stood back in the hallway, she knocked

4

on the door with the defendant to her left. (Tr. 170).   She told her daughter she had to get

something from the room, and went inside while the defendant also entered the apartment and

stood by the door.   (Tr. 171).   She retrieved the a bag of money from under her mother's bed

and walked out of the apartment, handing the bag to the defendant.   (Tr. 171).   After handing

the bag to the defendant, he grabbed her by the neck again as they walked back to his car.   (Tr.

172).   During the ride back, the defendant called Glisson and said he had the bag.   (Tr. 172).

When they arrived at her home, Glisson opened the door and was upset that there was not

enough money in the bag.   (Tr. 173).   Glisson thought Barea had more money, and the

defendant started hitting Barea again in the back of the legs with a hammer.   (Tr. 173).

Torruella put her hands up to try to prevent the defendant from hitting Barea with the hammer,

and he took a scarf and tied her hands together.   (Tr. 174).   He told her to kneel down, and,

crying, she did.   (Tr. 174).   When she knealt down, it was Glisson who became upset and told

her to get back up.   (Tr. 174).   She stood back up and the defendant and Glisson walked her

and Barea to her bedroom.   (Tr. 174).   During the walk to the room, Barea tried to open the

bathroom door, where the couple's dog was being contained, and the defendant and Glisson,

angered, began hitting Barea again.   (Tr. 174-175).   When they reached her bedroom, she

noticed that the room had been completely ransacked – clothes out of drawers, the closet inside

out, and the room "destroyed."   (Tr. 175).   The defendant told her to get on top of the bed,

look forward, and not look back.   (Tr. 175).   Glisson grabbed Barea, threw him onto the bed,

and began whispering in Barea's ear.   (Tr. 175).   Torruella thought the defendant and Glisson

were going to kill her.   (Tr. 175).   Finally, the defendant and Glisson ran out.   (Tr. 176).

After untying themselves, Torruella and Barea fled her home, went to Barea's car and,

eventually, drove to meet Tyrone Brown.   (Tr. 176-179).   Torruella considered Brown a

friend, someone she knew from the neighborhood.   (Tr. 179).   While Barea and Brown were

engaged in a discussion, Torruella stayed in the car with her window down slightly.   (Tr. 181).

Brown apologized to her about what had happened.   (Tr. 181).   Brown gave Barea his keys

and wallet, and Barea and Torruella left the meeting.   (Tr. 180-181).   After meeting with

Brown, Torruella and Barea went to a hotel where Barea made a telephone call.   (Tr. 181-182).

Torruella noticed that the backs of Barea's legs were bruised and his upper lip was cut from

where the defendant and Glisson had hit him.   (Tr. 183).

      Later that day, Torruella met with law enforcement officers, including Detective Ellis

Deloren.   (Tr. 183).   She told Detective Deloren what had happened, and law enforcement

examined her home.   (Tr. 183).   On June 6, 2013, Torruella identified the defendant from a

photographic array as the "tall guy" who had robbed her and Barea, and who had kidnapped her

from her home to her mother's home in order to retrieve the bag of money.   (Tr. 185-186).

      During cross-examination, Torruella stated that she had previously told the police and the

Government that both the "tall guy" and Glisson had teardrop tattoos.   (Tr. 196, 201).   Defense

counsel then told Torruella that the defendant did not have a teardrop tattoo and it "[c]an't be the

guy if he doesn't have a teardrop tattoo, right?"   (Tr. 202).   The Government's objection to

that question was sustained.   (Tr. 202).   In response to questioning by defense counsel, she

stated that the car the defendant was driving was black and had an "A" on it, and that at one

point she told police it was an Acura.   (Tr. 200).

      Torruella testified that she saw multiple photo arrays of various individuals and had been

unable to identify any of them as the "tall guy."   (Tr. 203).   In June, two months after the

incident, Detective Deloren came to her work and showed her another photo array.   (Tr. 204).

She did not conclude that Detective Deloren coming to her place of work meant that the "second

robber" was in the array.   (Tr. 204).   She testified that she knew her daughter was a witness in

the case, but that she did not discuss the case with her daughter.   (Tr. 206).

On redirect examination, Torruella stated that, after the robbery and kidnapping, she remembered some of the letters as well as the numbers on the license plate of the car the defendant was driving.   (Tr. 209).   She stated that today, she remembered only the numbers. (Tr. 209).   She also stated that she didn't know her cars well, but that she believed the "A" was for "Acura."   (Tr. 211).   Torruella stated that she saw photographs of individuals with and without tattoos because "they are saying that if the person, had a case, it could have been from a long time ago, so not to look at the tattoos, the hair, and the facial.   To look at other stuff, like the nose, the eyes, stuff like that."   (Tr. 212-213).   She followed those instructions.   (Tr. 213). When she saw the photo array from which she identified the defendant, she stated:   "The first thing I said when I saw the picture was that he didn't have the teardrop here in the picture.   And Officer Ellis said forget about the teardrop.   You have to look at the face. . . . I looked at the pictures and it looked like him."   (Tr. 213-214).   When asked if she believed the defendant seated in the courtroom was the same person as the "tall guy," Torruella looked at the picture in the photo array, looked at the defendant, and then said "No. . . . Features are different. . . . I can't. I'm sorry. . . It looks like him.   His eyes.   But something is not – I can't explain.   I just kept looking.   It's not him.   . . . He had hair, I know that grows and you can cut it.   Just looking at him from over there, it's not him.   He was more – the features of his face was more in."   (Tr. 215).

## B.  Detective Ellis Deloren

Detective Deloren was the case detective assigned to the investigation of the March 25, 2013 robbery and kidnapping.   Detective Deloren responded to Torruella's home the morning of March 25, 2013.   (Tr. 218).   He observed the scene and spoke with other law enforcement agents who were present before interviewing Barea and Torruella separately.   (Tr. 219).   Barea looked as though he had been assaulted, and had several bruises on his legs and his back.   (Tr.

219).   Torruella provided a description of the car that the robbers and kidnappers had used, as well as six out of seven of the car's license plate digits.   (Tr. 220).   He testified that she was absolutely positive about the last four digits, but less sure about two of the digits in the beginning of the sequence.   (Tr. 220).

Detective Deloren also went inside of Torruella's apartment and observed that it was a mess—closets were pulled open and things were pulled out of the closet, and drawers were pulled open.   (Tr. 220).   He noted the evidence that needed to be collected and contacted the NYPD's evidence collection team to respond to the scene.   (Tr. 219).   Duct tape was recovered from the bed and collected.   (Tr. 220).   Detective Deloren then drove the victims by the location that Barea said the robbery had started—1338 Croes Avenue—and then took them to his office.   (Tr. 220-221).   At his office, Detective Deloren put Barea and Torruella on separate machines to view mugshots based on the descriptions they had given of their attackers. (Tr. 221).   Barea identified Tyrone Brown and Steven Glisson.   (Tr. 221).   At the time, Detective Deloren considered Brown a witness since it was Brown's house where Barea was originally robbed and abducted.   (Tr. 221).   Torruella also identified Glisson as one of the robbers and kidnappers.   (Tr. 223).   After these identifications, Deloren took the victims home.

The following day, March 26, 2013, Detective Deloren went to Brown's residence to interview Brown because Brown was a witness to the robbery and abduction, and because Deloren wanted to ascertain whether Brown had any role in it.   (Tr. 223).   He provided a description of the building at that address—a side-by-side single-family house—and where Brown's apartment was located—one of several rooms in a basement that was partitioned into single-room-occupancy apartments.   (Tr. 225).   Detective Deloren also described where there were surveillance cameras installed on the property.   (Tr. 227-228).   He described how he observed and obtained video surveillance that captured portions of the robbery, including Barea

8

walking down the driveway of the building, knocking on the door and waiting outside for Brown, and Brown letting Barea in to the apartment.   (Tr. 229).   Shortly after Barea entered Brown's apartment, two men came down the driveway and waited outside of the basement door for several minutes until Barea left through the basement door.   (Tr. 230).   As Barea opened the basement door, the two men pushed him back inside of the apartment.   (Tr. 230).   A short while later, Barea was seen escorted out of the building with his hood pulled up over his head and his hands behind his back.   (Tr. 230).   Deloren described how he initially recorded the video on his iPhone, and later obtained a copy of the recording from the landlord's surveillance system.   (Tr. 231).

On March 26, 2013, Detective Deloren, using his cellphone with a number that ended in 1507, called Tyrone Brown and instructed Brown to meet him at his office.   (Tr. 232-233). Brown did not meet Detective Deloren.   (Tr. 233).   After interviewing some of Brown's relatives and the mother of Brown's child, he obtained a difference cellphone number for Brown and was able to locate Brown after obtaining a court-authorized tracking warrant.   (Tr. 233). On April 6, 2013, Detective Deloren and other NYPD officers located and arrested Brown at 1810 Watson Avenue in the Bronx, New York.   (Tr. 233-234).   Brown was initially arrested for narcotics possession, and the officers seized a quantity of crack cocaine, marijuana, and a scale from 1810 Watson Avenue in connection with the arrest.   (Tr. 234-236).

Also during the investigation, Detective Deloren was able to locate a car that matched the description of the car that was provided by Torruella when he interviewed her.   (Tr. 236).   The car was located in front of the apartment of Zaporia Dunbar, located at 4782 Barnes Avenue in the Bronx, New York.   (Tr. 236, 240, 243).   When he arrived at that location on May 23, 2013, Detective Deloren observed a car matching the description of the car that Torruella had provided, including the license plate sequence, parked in front of Dunbar's residence, a multi-family

dwelling.   (Tr. 241).   He observed Dunbar get into the car, drive to a school, and then drive

back home.   (Tr. 241).   He, Detective Angelo Tessitore, and Special Agent John Reynolds

then interviewed Zaporia Dunbar, who was at home with her infant son, Dante Chambers.   (Tr.

241).   After he interviewed Dunbar that day, he and other law enforcement agents tried to

interview Dunbar again, but could not locate her or her children either at her home or at their

school.   (Tr. 242).

 After he first interviewed Dunbar, Detective Deloren located the car again, on or about

June 6, 2013, at a car impound lot where the car had been towed after it was involved in a motor

vehicle accident.   (Tr. 243).   The car was a wreck, with obvious damages to it from a serious

accident.   (Tr. 244).   Detective Deloren recovered a hammer, and no other tools, from the back

seat of the car.   (Tr. 244-245).

 Detective Deloren also testified about photographs of the defendant that he showed to

Torruella and Demi Torres.   (Tr. 245-249).   Deloren testified that, sometime at the end of May

2013, he came into possession of an old FBI photograph of the defendant, from 2003 or 2004,

and that the photograph was "on the grainy side, fuzzy."   (Tr. at 245; 254).   Deloren described

how pursuant to the NYPD's photo array procedure, the photo was placed into a photo array with

five other photographs on the same page, and how he showed the resulting array, separately, to

Torres and Torruella. (Tr. 245-246).   Prior to showing the photo arrays to the witnesses,

Deloren instructed them to view the photo array, take as much time as they needed, not to

assume that he knew who the suspect was, and that the suspect may or may not be in the photo

array.   (Tr. 246).   Deloren testified that neither Torruella nor Torres signed or circled a picture

from that photographic array, but that Torres indicated that she recognized the individual in the

"grainy" photograph as the defendant.   (Tr. 247).   Deloren also testified that on the same day

Torres "recognized [the defendant] in the photo array, we were able to locate [the Newspaper

Photograph]," and that Deloren showed Torres the Newspaper Photograph while she was still at his office. (Tr. at 247).    Deloren testified that the defendant's name appeared at the bottom of the Newspaper Photograph.    (Tr. at 256).    He testified that he showed Torres the Newspaper Photograph in order to confirm her recognition in the photo array because that photograph was very old and fuzzy.    (Tr. 248).    Deloren testified that the purpose of trying to identify the defendant was so that law enforcement could arrest him and charge him with the crime, and that his "goal in this investigation and in any other investigation is to identify the robber, the right person, no matter who that is."    (Tr. 248, 291).

Deloren testified that at a later date he came into possession of an "updated newer photo" of the defendant.    (Tr. at 249).    Deloren testified that he put this "newer" photograph into a photo array and on June 6, 2013, showed the resulting array, separately, to Torres and Torruella. (Tr. 249)    Deloren testified that both Torres and Torruella positively identified the defendant as one of the robbers and indicated so by circling the defendant's picture and signing the array. (Tr. 249).    As described in further detail below, Deloren's testimony (and all evidence) related to Torres's identification of the defendant was struck from the record of the trial.

Detective Deloren also testified about interviewing Kentrell Ferguson, who showed Detective Deloren a telephone contact from his cellphone that listed several phone numbers associated with someone named "Twizzie."    (Tr. 250-251).    Deloren described Government Exhibit 4000, a picture of Kentrell Ferguson's phone showing the contact information for "Twizzy."    (Tr. 252; GX 4000).    The telephone numbers on Ferguson's cellphone contact for "Twizzy" were as follows:    646-725-4043; 631-377-6204; 757-320-6727; and 646-721-8504. (GX 4000).

On cross-examination, Deloren admitted that he did not write a report of Demi Torres's identification of the defendant from the first photo array in May or of the Newspaper

Photograph, and, when she saw the first photo array, she did not positively identify him as the robber.   (Tr. 254).   Detective Deloren was asked on multiple occasions when he had disclosed to the Government that he had shown the Newspaper Photograph to Torres. (See Tr. at 255, 261).   Detective Deloren testified that he did not recall an exact date but believed that the U.S. Attorney's Office was aware that he had showed Torres the Newspaper Photograph "from the beginning," and "I don't know if it was in May of 2013, but it was certainly prior to February of 2014." (Tr. at 255, 261).[1]

Deloren also testified that, in his notes from his interview with Barea, he had written down the following description of the car that was used during the robbery:   "dark green/black four-door Acura CL, '97/'98."   (Tr. 265).   In his notes from his interview with Torruella, he had written down "black Acura four-door prime," meaning "primer paint," and digits from the license plate—"7788."   (Tr. 266).   When asked about Dunbar's car, which was a Honda, Detective Deloren testified that Hondas and Acuras are similar-looking vehicles and made by the same manufacturer.   (Tr. 267-268).   Deloren testified that Dunbar's vehicle is dark blue and had a North Carolina license plate.   (Tr. 269).   His notes reflected that the license was possible a New York plate.   (Tr. 269).   Detective Deloren also testified that he did not show a picture of Dunbar's car to Barea and Torruella.   (Tr. 271).

Detective Deloren also testified, on cross-examination, that both Barea and Torruella had described the second robber—the "tall guy"—as having a teardrop tattoo, and that he had shown

---

[1]  As described in further detail below, Detective Deloren's testimony on this point was inconsistent with the representation made in the Government's February 24, 2014, letter that the Government had only recently learned about the Newspaper Photograph.   As a result, the Government and defense counsel stipulated that: "Members of the United States Attorney's Office were not aware that [the Newspaper Photograph] was shown by Detective Deloren to Demi Torres until on or about January 24, 2014, when Demi Torres told members of the United States Attorney's Office."   (Tr. 669; GX 2007).   Although the Government believes that Detective Deloren was incorrect in his recollection on this issue, we do not believe that his testimony on this point was deliberately false.

Torruella photo arrays of individuals with teardrop tattoos.   (Tr. 275).   When he showed

Torruella the second photo array from which she identified the defendant, he did not tell her

"forget about the teardrop."   (Tr. 282-283).

On redirect, Detective Deloren testified that when he asks for a description of a car, he

looks for "makes or possible makes because some cars look like each other, especially Hondas

and Acuras.   We are looking for colors.   And we are also looking for, obviously, plate

numbers, most importantly."   (Tr. 292).

### C.  Kentrell Ferguson

Kentrell Ferguson testified that he knew the defendant from going to school with the

defendant and from "around the way."   (Tr. 298).   The last time he had seen the defendant was

at a baby shower.   (Tr. 298).   Ferguson testified that he calls the defendant "Twin," and was

initially reluctant to admit that he called the defendant by any other name.   (Tr. 299).   When

shown Government Exhibit 4000, a photograph of his contact information for "Twizzy," he

admitted that "Twizzy" was the defendant.   (Tr. 3000).

### D.  Rodrigo Ayala

The Government also called Detective Rodrigo Ayala, who testified regarding his

participation in the NYPD's investigation of David Barea's narcotics trafficking activities, which

included wire intercepts of Barea which were entered into evidence as Government Exhibit 3000,

and 3002-T through 3006-T.   (Tr. 301).   He described Barea's arrest and status as a

confidential informant for the NYPD, and how Barea did not provide useful information while

he was working as a confidential informant.   (Tr. 310-311, 314-316).   Detective Ayala also

testified that there was still an open investigation into Barea.   (Tr. 317).

### E.  David Barea

David Barea described, in detail, his relationship with Tyrone Brown, and what happened the night of the robbery and kidnapping.   (Tr. 341-404).   Barea testified that he had been in a relationship with Torruella for approximately 12 years.   (Tr. 342).   He stated that he was previously employed as a truck driver, and also sold drugs to make money.   (Tr. 342-43).   Barea stated that he was testifying pursuant to an immunity order which did not protect him from lying on the stand.   (Tr. 343).   Barea, whose nickname is "Groovy," described his background, including information about his family, education, work history, and criminal history.   (Tr. 342-46).   He described how he started selling powder cocaine in 2008 and crack cocaine in 2012.   (Tr. 346).   His customers, some of whom were friends and others who would resell the drugs, would pay him in cash or on credit.   (Tr. 346).   Barea would save the money he made from his drug dealing and put some of it in the bank.   (Tr. 347).   Barea carried firearms in connection with his drug dealing.   (Tr. 347).   He would store firearms and drugs in secret compartments in two of his vehicles.   (Tr. 348).

Barea described his arrest in January 2013 by the NYPD and how he became a confidential informant.   (Tr. 350).   He testified that, even after he became a confidential informant, he sold drugs to Tyrone Brown.   (Tr. 351).   Barea had been selling powder cocaine and crack cocaine to Tyrone Brown for approximately one year, and continued to do so after he became a confidential informant for the NYPD.   (Tr. 351).   Barea and Brown communicated with each other by telephone and text messages.   (Tr. 352).   Barea listened to recordings of telephone conversations he had with Brown regarding selling Brown cocaine, and described the transactions discussed on the telephone calls.   (Tr. 353-57).   Barea discussed how he would meet Brown at Brown's apartment on Croes Avenue to conduct narcotics transactions.   (Tr.

356).    Sometimes Brown paid in cash, and sometimes Barea sold Brown narcotics on credit.
(Tr. 357).

Approximately one or two weeks before the robbery and kidnapping. Barea saw Brown
in a dark blue or midnight blue Impala that had hub caps on the wheels, like a police car.    (Tr.
403).    Brown was with two other people—a light-skinned driver with light blondish hair and an
African-American male.    (Tr. 404).

Barea discussed the night of the robbery and kidnapping.    He testified that he went to
meet Brown at Brown's home because Brown owed him money for a prior drug transaction.
(Tr. 357).    Barea remembered going to Brown's apartment shortly after midnight on March 25,
2013.    (Tr. 357).    Barea remembered that, prior to meeting with Brown, he telephoned or
texted Brown.    (Tr. 358).    He described how he would typically either call Brown or, if Brown
was expecting him, knock on the door or window.    (Tr. 358).    That day, in addition to
communicating with Brown before going to Brown's apartment, he also knocked on the window
when he arrived and Brown opened the door.    (Tr. 357, 358).    Barea entered Brown's
apartment, the two spoke, and Brown gave Barea the money he owed Barea—$800—and asked
if Barea had more drugs for him.    (Tr. 358, 359).    Barea remembered being inside of Brown's
apartment for approximately a couple of minutes.    (Tr. 359).    As Barea exited Brown's
building, two men rushed in and attacked him.    (Tr. 359).    A "tall guy" came in first, his face
covered from his nose down, dressed in black, wearing gloves, and carrying an automatic gun in
his waist and a hammer.    (Tr. 359).    The second man who came in, and individual Barea knew
from a prior meeting as "Dee," was heavy-set, his face covered with a black mask, was wearing
gloves, and was carrying a .38 revolver with a potato on the front.    (Tr. 360-361).    Barea
testified that the purpose of the potato was to muffle the sound if there was a shot.    (Tr. 363).
Barea identified Steven Glisson as "Dee."    (Tr. 362).

15

When the tall guy and Glisson rushed into the apartment, Barea tussled with the tall guy until they tripped back into the kitchen area of the basement of Brown's building.   (Tr. 361). The tall guy never took off his mask in front of Barea.   (Tr. 362).   While struggling with the tall guy, Glisson came in, put a gun to Barea's head, and demanded that Barea stay still.   (Tr. 362).   While this was happening, Brown was in the bathroom area of the basement.   (Tr. 363). After Glisson put a gun to Barea's head, Barea stopped fighting but the tall guy kept beating him. (Tr. 363).   The tall guy put Barea's face to the wall and told Barea not to look at him.   (Tr. 363).   The tall guy beat Barea with a hammer, hitting Barea's back, shoulder blade and legs while telling Barea not to look at him, and "don't look at my fucking face, don't look at me, don't look at me."   (Tr. 363).   Glisson and the tall guy then told Barea to get on the floor, which he did, and they searched him and took his money, wallet and car keys out of his pockets. (Tr. 363).   Barea had approximately $800 in his wallet.   (Tr. 364).   After the tall guy and Glisson searched Barea, Glisson asked Barea "where's the money, where is the money."   (Tr. 364).   When Barea asked what money he was referring to, Glisson put the gun to Barea's head and said "don't fucking play with me, I'll pop you right here, I'll leave you right here."   (Tr. 364).   Barea pleaded with them to take it easy on him, and the tall guy tied Barea's hands with some grey duct tape that was in a chair by the kitchen.   (Tr. 364).   Barea eventually told the tall guy and Glisson that he had money at his home.   (Tr. 364).   Barea knew there was no money there, but was trying to plan his next steps and how he could try to escape from his attackers.   (Tr. 364-65).   While he was still tied up, Barea heard Glisson go toward the door and scream to someone outside to bring the car in or bring the car down.   (Tr. 365).   The tall guy and Glisson then picked up Barea, put his hood over his head all the way down past his neck so he could not see, and forced him into a car that was waiting in the driveway.   (Tr. 365-366). The tall guy and Glisson put Barea in the rear passenger seat of the car, placing him sideways

16

with the front passenger seat laid back onto his hip so he could not move.   (Tr. 366).   Also in

the car was a fourth member of the crew – a man who was dressed in dark clothing and whom

Barea could not see.   (Tr. 366).

After Barea described what he could remember from the initiation of the robbery and

abduction at Brown's apartment, the Government played Government Exhibits 200 and 201,

copies of the video surveillance recordings from 1338 Croes Avenue, Brown's apartment

building, on the night of the robbery and kidnapping.   (Tr. 367).   Barea identified himself

walking up the driveway of Brown's building and knocking on the door waiting for Brown to

open the door.   (Tr. 367).   When Brown did not answer, Barea knocked on the window.   (Tr.

368).   Brown ultimately let Barea in and Barea locked the door behind him so that no one could

come in behind them.   (Tr. 368).   Shortly after Barea entered Brown's apartment, a car pulled

up to the driveway and two men approached the door that Barea had used to enter Brown's

apartment.   (Tr. 368-369).   Barea recognized the two men as his attackers—the tall guy and

Glisson.   (Tr. 369).   Barea described the portion of the videos showing the tall guy and Glisson

moving in to attack him as he tried to leave Brown's apartment.   (Tr. 369).   He testified that

Brown asked who the two men were, and Barea demanded to know the same from Brown.   (Tr.

369).   Brown remained in the kitchen area during the attack.   (Tr. 370).   Barea then described

how the tall guy and Glisson were seen walking Barea toward the car.   (Tr. 369).   Barea then

identified Brown, several minutes later, leaving his apartment building with what appeared to

Barea to be a gun in his hand.   (Tr. 371).

Barea described how, after he was forced into the car, the fourth member of the crew,

who was seated in the back seat (and whom Barea described as light-skinned), was beating him

for trying to get his wrists loose.   (Tr. 372).   The tall guy, Glisson, and the fourth man

demanded to know where the money was, and Barea gave them directions for how to get to

17

where he was living with Torruella on 1403 Overing Street.   (Tr. 372-373).   During the approximately 10-minute drive, Glisson threatened Barea, demanding to know how much money Barea had, and someone put a gun to Barea's leg.   (Tr. 374-375).   When they arrived near 1403 Overing Street, they parked the car near Barea's home and asked him who was there.   (Tr. 375).   When Barea told the crew that his wife was home, they wanted to him to call her but he could not because his hands were tied.   (Tr. 376).   At that time, Barea had two cellphones, one of which he remembered ended in 2216.   (Tr. 376).   The crew asked him for Torruella's number and Barea gave them his own number instead.   (Tr. 376).   The crew became impatient when Torruella did not answer the phone, and ultimately took Barea out of the car and searched his pockets for his housekeys.   (Tr. 377).   Barea described the "black, like a faded color, like a primer black."   (Tr. 377).

The tall guy, who was still wearing his mask, and Glisson, who was no longer wearing his mask, led Barea to the door.   (Tr. 380).   Barea, trying to gain Glisson's confidence, told Glisson to put his mask on because there were cameras in front of the house.   (Tr. 380).   In fact, the cameras were not working.   (Tr. 380).   The tall guy and Glisson began opening the doors to the building to get into Torruella's apartment.   (Tr. 381).   When they reached the door to Torruella's apartment, the tall guy and Glisson unlocked the door and opened and shut it quickly.   (Tr. 381).   Barea's dog was tied to the door on the inside, and the chain had moved when the tall guy and Glisson opened the door.   (Tr. 381).   Glisson asked if Barea had a dog, and then told Barea to call out to Torruella.   (Tr. 381).   Glisson held the gun toward Barea's head as Barea called out to Torruella to come to the door.   (Tr. 382).   When she came to the door, Barea told Torruella to get the money in the safe in the room, not because there was actually money in the safe but as a way of warning her that something was wrong.   (Tr. 382). When Torruella returned to the door, Glisson, pointing the gun through the door, told her to tie

the dog up and put him in the bathroom.    (Tr. 383).    The gun Glisson was carrying still had a

potato at the end of it, and, when he pointed the gun through the door, it fell off and Torruella

kicked it away.    (Tr. 383).    After Torruella put the dog in the bathroom, the tall guy, Glisson

and Barea entered the apartment.    (Tr. 384).    The tall guy and Glisson forced Barea to a room

where he told them there was a safe.    (Tr. 384).    Glisson was holding Barea by the arm and

had a gun on Barea.    (Tr. 384-85).    There was no safe in the closet of the room, as Barea had

told them there would be, and Glisson demanded to know where the money was.    (Tr. 385).

Torruella told them that she had taken it to her mother's house, and Glisson threatened to kill

Barea for lying to him.    (Tr. 385).    Barea offered to retrieve the money from Torruella's

mother's home and come back, but Glisson refused.    (Tr. 386).

Barea testified that had withdrawn approximately $50,000 from his bank account after he

was arrested in January 2013 so that he could have money to pay a lawyer and so that his

account would not be seized.    (Tr. 387).    There was approximately $20,000 in the bag that was

at Torruella's mother's home, and approximately $30,000 stored at his sister's home.    (Tr. 387).

The money included what he earned while employed as a truck driver and cash deposits from

selling drugs.    (Tr. 387).

After learning that the money was actually at Torruella's mother's home, the tall guy and

Glisson then said they were going to take Torruella, and the tall guy left to go with Torruella to

her mother's home to get the money.    (Tr. 386).    Glisson stayed back with Barea and locked

the front door after the tall guy and Torruella left.    (Tr. 386).    Glisson returned to the room and

searched the closet and the dresser drawers.    (Tr. 386).    Barea was thirsty, and asked Glisson

for some water.    (Tr. 388).    Glisson pointed the gun at Barea, whose hands were still tied

behind his back, to the kitchen and poured water from a water bottle into Barea's mouth.    (Tr.

388).    Barea then asked Glisson to call the tall guy because they were taking a while and he was

afraid the crew was going to harm his wife.   (Tr. 388).   Glisson then used Barea's cellphone to

make a call, and Barea overheard Glisson speaking with someone.   (Tr. 389).   After this phone

call, Glisson led Barea at gunpoint to the window and looked out the window.   (Tr. 389).

Approximately ten minutes after the phone call, Torruella and the tall guy returned.   (Tr.

390).   Glisson opened the door and asked the tall guy if he had the money.   (Tr. 390).   The

tall guy responded that he did, and that the fourth member of the crew was in the car counting it.

(Tr. 390-91).   The tall guy then locked the door, and Glisson and the tall guy walked Barea

toward the kitchen area.   (Tr. 391).   Then, the tall guy told Torruella to kneel on the floor and

grabbed a scarf from a chair, telling Torruella that he was going to tie her up with the scarf.

(Tr. 391).   Glisson interceded, and told Torruella to get up.   (Tr. 391).   The tall guy, Glisson,

Barea and Torruella then headed toward the bedroom.   (Tr. 391).   On the way, Barea tried to

open the bathroom door and let the dog out, but was unsuccessful.   (Tr. 392).

When they reached the bedroom, Glisson told Barea and Torruella to lay down on their

chests on the bed.   (Tr. 393).   Glisson then flipped Barea over, put his knee on Barea's chest,

and complained about the $20,000, telling Barea he would have to split it with the rest of the

crew, whom he felt like killing.   (Tr. 393).   Barea told Glisson to take his phone and call him

the next day so that Barea could give Glisson the rest of his money.   (Tr. 393).   Glisson and

the tall guy then left.   (Tr. 393).

After the tall guy and Glisson left, Barea and Torruella untied themselves, waited for a

few minutes to see if they heard anything and, when they did not, Barea locked the door.   (Tr.

393).   Barea did not immediately call the police because of his drug dealing.   (Tr. 393).   He

also wanted to leave the home, because Glisson and the tall guy had his house keys, to be safe.

(Tr. 393).   Barea and Torruella then left the apartment and went to a parking lot on Parkchester

Avenue, where Barea kept a spare key to the car that he had left parked near Brown's house.

20

(Tr. 394).    He did not have his keys to that car because the robbery and kidnapping crew had

taken everything out of his pockets.    (Tr. 394).    Barea asked the parking garage attendant for

his spare key, and asked for some money to take a cab to his car.    (Tr. 394).    Once he and

Torruella got to his car, Barea called Brown to see where Brown was and whether Brown had his

wallet, drivers' license, and car keys.    (Tr. 396).

      After calling a few times, Brown answered the phone.    (Tr. 396).    Brown told Barea he

was "off that, meaning that he had left his house," and was in the vicinity of 170th and

Claremont Avenue.    (Tr. 396).    Barea and Torruella went to that area, and Barea tried to call

Brown multiple times.    (Tr. 396).    When Brown finally answered, he told Barea that he was on

his way, and later met Barea.    (Tr. 396).    Barea was upset, and, when he saw Brown, said "you

set me up," to which Brown responded that he did not set Barea up.    (Tr. 396-97).    However,

Brown had Barea's belongings in his possession and gave them to Barea.    (Tr. 397).    Barea

gave Brown a ride to Brown's home because he wanted to get information from Brown—to see

whether he could get the video from Brown's house and to find out information about Glisson.

(Tr. 397).    After he dropped Brown off, Barea and Torruella went to a hotel because Barea was

scared that Glisson and the tall guy, who had Barea's house keys, would come back.    (Tr. 398).

Barea tried to call Brown a couple of days later, but Brown did not answer his phone.    (Tr.

398-399).

      At the hotel, Barea called Officer Lennon, his NYPD handler.    (Tr. 398).    Later that

day, Barea met with police officers back at Torruella's home at 1403 Overing Street.    (Tr. 399).

He was interviewed by different police officers and Detective Deloren.    (Tr. 399).    After the

interview, he went to the precinct and viewed photographs.    (Tr. 399-400).    He identified

Glisson and Tyrone Brown.    (Tr. 400).    Barea also testified that the hammer the tall guy used

was beige or light-brown and had a silver head.    (Tr. 402).    Barea testified that GX 500, the

hammer that was retrieved from Zaporia Dunbar's car, looked like the one the tall guy used on

him the night of the robbery.   (Tr. 403).

On cross-examination, Barea testified that he saw a mark on the tall guy's face, but did

not remember if it was a tattoo.   (Tr. 406).   He acknowledged that after the robbery he told

Detective Deloren that the tall guy had a teardrop tattoo.   (Tr. 407).   He also testified about the

description of the car he provided to Detective Deloren, and, on redirect, stated that "I told him

that it was a dark car, that it looked like a primal color, like back, but I really couldn't see

because it was like -- it was, like, a midst in the air, like a drizzle that day and I could only see

from my knees down basically."   (Tr. 410).   Barea also stated that he told Detective Deloren

that the car was similar to an Acura CL, and, on re-cross, that he was guessing when he told

Detective Deloren that it was an Acura CL, '97 or '98, and black.   (Tr. 410).

### F.  Officer Michael Whelan

Officer Whelan testified about being on patrol on May 27, 2013, when he observed a

dark-colored with multiple traffic infractions.   (Tr. 417-18).   Officer Whelan testified that he

first noticed the car, a dark-colored vehicle, in the vicinity of White Plains Road and 242nd

Street.   (Tr. 418).   As Officer Whelan pulled up near the car, the driver, a male black with dark

skin and short hair, made eye contact with him in a "deer in the headlights" look, and then sped

away.   (Tr. 420-421).   By the time Officer Whelan could pull a U-turn and catch up to the car,

it had been in a vehicle accident and the driver was no longer in the car.   (Tr. 420).   A witness

told Officer Whelan that the driver had fled into the subway station, and Officer Whelan

unsuccessfully searched for the driver.   (Tr. 420).   After attempting to locate the driver,

Officer Whelan called for an ambulance for the other person involved in the accident, and

prepared a report.   (Tr. 421).   The license plate numbers of the car were "AKW7788."   (Tr.

422).   On cross-examination, Officer Whelan confirmed that the car had a North Carolina

license plate and that the description that the witness had provided of the driver included that the driver was approximately 5'10".   (Tr. 422).

### G.  Sergeant Thomas Derosa

Sergeant Thomas Derosa testified about the defendant's arrest in New Jersey for presenting false identification, which led to the defendant's arrest in this case.   (Tr. 444-58). Sergeant Derosa testified that, on July 3, 2013, he was in the vicinity of Route 22 West when he stopped a car being driven by the defendant for a traffic infraction.   (Tr. 445-46).   Sergeant Derosa stopped the defendant, asked for his credentials, and explained to the defendant why he was stopped.   (Tr. 447).   The defendant was driving a white Dodge rental car.   (Tr. 447). The defendant, speaking in a very low voice, provided Sergeant Derosa with a driver's license and registration, but could not provide Sergeant Derosa with the rental agreement or insurance card for the car.   (Tr. 447).   Also in the car were Zaporia Dunbar and two children.   (Tr. 447).

Through Sergeant Derosa, the Government entered a Pennsylvania driver's license in the name of "Jerome Adams," the license that the defendant had given to Sergeant Derosa.   (Tr. 448; GX 801).   When he first saw the driver's license, Sergeant Derosa thought it looked peculiar compared to other Pennsylvania driver's licenses he had seen.   (Tr. 448-49).   Sergeant Derosa went back to his car and called his dispatch to run the driver's license number for him. (Tr. 449).   After speaking with someone at dispatch, he was not able to determine that "Jerome Adams" was the name associated with the driver's license number on GX 801.   (Tr. 450). Sergeant Derosa then inquired about who that driver's license number belonged to.   (Tr. 452). Ultimately, Sergeant Derosa arrested the defendant for providing false identification and hindering apprehension.   (Tr. 454).   Sergeant Derosa confirmed that neither "Jerome Adams" nor the defendant were listed as the person who rented the car the defendant was driving.   (Tr. 454).   Sergeant Derosa repeatedly asked the defendant for his true identity, and the defendant

refused to acknowledge that his name was Antione Chambers.   (Tr. 457).   Sergeant Derosa

subsequently learned that the defendant's real name was Antione Chambers.   (Tr. 458).

### H.  Isaac Nelson

Isaac Nelson, the landlord of a building located at 4782 Barnes Avenue in the Bronx,

New York, testified about renting an apartment to Zaporia Dunbar.   (Tr. 459-60).   Nelson

rented Dunbar an apartment at 4782 Barnes Avenue from approximately August or September

2012 through approximately May or June of 2013.   (Tr. 460).   Dunbar lived there with her

child and the defendant.   (Tr. 460).   In approximately June 2013, law enforcement agents with

the FBI interviewed Nelson regarding Dunbar and the defendant.   (Tr. 460).   Around that same

time, Dunbar left her apartment and Nelson never heard from her again.   (Tr. 460-61).   Nelson

tried to contact Dunbar, but she did not answer her telephone.   (Tr. 461).   Dunbar owed rent on

the apartment, and Nelson kept it open for her for some time, but she never returned.   (Tr. 461).

### I.  Demi Torres

Demi Torres testified that, the night of the robbery and kidnapping, her mother,

Torruella, came to her grandmother's home, where Torres also lived, and was banging on the

door.   (Tr. 464.)   Torres was away and watching television in her room.   (Tr. 464).   Torres's

grandmother and brother were also at home, in the grandmother's room.   (Tr. 464).   When

Torres heard the banging on the door, she went to check who it was.   (Tr. 464).   She looked

through the peephole and saw her mother and a guy.   (Tr. 465).   Her mother looked nervous

and Torres hesitated to open the door.   (Tr. 465).   Her mother would typically call if she came

over, and she had a pair of keys.   (Tr. 464-65).   That night, her mother had not called and had

not used the keys.   (Tr. 464-65).   Torres testified that she was unsure what was happening at

first.   (Tr. 465).   The man her mother was with looked like one of the guys from the

neighborhood, and was wearing a hat and a jacket.   (Tr. 465).   When she looked through the

24

peephole, she asked her mother who it was and her mother told her it was Groovy's friend.   (Tr. 465).   Groovy was a nickname for her stepfather, David Barea.   (Tr. 465).   Torres opened the door a little bit and let her mother in.   (Tr. 465-66).   Torres said her mother asked about where her grandmother was, and came in to the apartment with the man.   (Tr. 466).   Torres went back to her room to change her clothes, and the man stood in the living room next to the table.   (Tr. 466).   The stove light and the hallway light were on.   (Tr. 466).   When she returned to the living room, Torres notice that her mother was really nervous and was not talking to her.   (Tr. 467).   The man stood by the dining table the whole time her mother was in the apartment.   (Tr. 467).   Torres could see him.   (Tr. 467).   The man was wearing a black skully and a black jacket with leather patches on the top, black gloves, boots and black jeans.   (Tr. 467).   Torres testified that she could see his face.   (Tr. 467).   The man kept looking away from her, and she kept looking at him the majority of time that her mother and the man were in the apartment.   (Tr. 468).   Torres identified the defendant as the man in her apartment that night.   (Tr. 468).   The man appeared nervous when she saw him, but he didn't say anything and was just waiting.   (Tr. 469).   Torres kept looking at him because he was avoiding eye contact.   (Tr. 469).   Torres thought he was from the neighborhood because of the way he was dressed, and she figured that it was just one of the guys from the neighborhood.   (Tr. 469).   When her mother and the man left that night, she went back to her room.   (Tr. 469).   Torres thought the man looked familiar, and looked on Facebook to see if she knew him from somewhere or if he was a friend of a friend.   (Tr. 470).   She did not see him on Facebook.   (Tr. 470).   Torres saw her mother again later that day when her mother woke her up to tell her what had happened.   (Tr. 470).

    A day or two after that night, Torres met with Detective Deloren and looked at photographs.   (Tr. 470).   The first time she looked at photographs, she did not pick out the

man in her apartment.   (Tr. 470).   She did, ultimately, pick the man out of a photo array.   (Tr. 471; GX1001).   She reviewed the photo array after Detective Deloren brought it to her.   (Tr. 471).   When she identified the photograph in GX1001, no one had indicated to her which photograph she should identify.   (Tr. 472).   Before she saw that photo array, she had seen another photo array but did not sign her name under any other pictures.   (Tr. 472).   Also before she saw GX1001, a few months after the first time she was in the precinct, she saw an article online at the precinct with Detective Deloren.   (Tr. 472).   In addition to the picture in the article, she noticed the name of the person photographed in the article, and went home and looked up the name on Google.   (Tr. 472).   Her Google search did not change her impression of what she had thought about the picture.   (Tr. 473).

After Torres saw the photo array in GX1001, she did not talk to anyone about it—not even her mother.   (Tr. 473).   Her mother asked her if she had seen photographs, but Torres did not tell her mother that she had signed or circled any of the photographs.   (Tr. 473).

On cross-examination, Torres testified that in addition to reviewing the photographs she described on direct examination, Detective Deloren also showed her a single photograph of the defendant on a computer screen at the precinct.   (Tr. 486-87).   Torres testified that she saw this single photograph of the defendant at some point prior to seeing the Newspaper Photograph and making the positive identification of the defendant on GX1001.   (Tr. 486-87).   Torres testified:

> Q: So he provided you with a single screen shot of [the defendant], right?
>
> A: Yes, that was the second time I went there.
>
> Q: He did that for you?
>
> A: It was already there.
>
> Q: It was already there?

26

> A: Yes.
>
> . . . .
>
> Q: Of him alone, just Mr. Chambers?
>
> A: Yes.
>
> Q: Single shot, single screen?

(Tr. 501).   Torres also testified on cross-examination that she came to recognize the defendant

as one of the robbers from viewing the Newspaper Photograph, rather than from the final photo

array she was shown on June 6, 2013. (Tr. 491 ("once I saw [the Newspaper Photograph], I said

that's a better photo and that's him")).   Finally, Torres testified that when she "Googled" the

defendant's name, she had found a total of four photographs of the defendant on the internet. (Tr.

at 492).

Based on Torres's testimony regarding the identification procedures, the defendant

moved to strike her testimony or "dismiss" the case.   (Tr. 503, 507).   Defense counsel stated:

"I can't move for a mistrial because I have no idea of the evidence that's going to come in.   It's

not fair to Mr. Chambers to have a mistrial, but her testimony should be stricken."   (Tr. 503).

After argument and briefing by the parties, the Court granted that motion, and struck all

testimony and exhibits regarding Torres's identifications, including testimony by Detective

Deloren.   The Court instructed the jury to disregard the testimony regarding Torres's

identifications, an instruction that was reinforced when the jury requested and received a

heavily-redacted version of transcript of Torres's testimony that reflected none of her testimony

regarding identification.   As a result, neither the Government nor the defendant discussed or

argued about Torres's identifications in their summations.

**J.   Special Agent John Reynolds**

Special Agent John Reynolds, the case agent in this investigation, testified next.   (Tr.

516).   Special Agent Reynolds testified that he interviewed Tyrone Brown on April 8, 2013

after Brown had been arrested by the NYPD on narcotics charges.   (Tr. 518-19).   Brown was

later arrested federally for narcotics charges.   (Tr. 523).   In connection with Brown's arrest,

Special Agent Reynolds recovered two cellular telephones—an iPhone (the "Brown iPhone")

and a Pantech cellphone (the "Brown Pantech Phone").   (Tr. 523).   After reviewing the

contents of the Brown iPhone, Reynolds obtained the telephone number associated with the

Brown iPhone, and found certain contacts and names associated with the contacts on the Brown

iPhone to be of evidentiary value.   (Tr. 525).   Special Agent Reynolds took photographs of

those contacts.   (Tr. 525-26; GX601A (the Brown iPhone number); GX601B ("Grovey");

GX601C ("John 129"); and GX601D ("Twizie")).   Reynolds, with the aid of the exhibits,

described the telephone numbers associated with each contact:

| | | |
|---|---|---|
| GX601A | the Brown iPhone number | 917-659-9696 |
| GX601B | "Grovey" | 917-935-8485 |
| | | (the "Barea 8485 Cellphone") |
| GX 601C | "John 129" | 347-638-6653<br>(the "Barea 6653 Cellphone") |
| | | 917-370-9462<br>(the "Barea 9462 Cellphone") |
| GX 601D | "Twizie" | 717-379-3425<br>(the "Twizie 3425 Cellphone") |
| | | 717-743-6130<br>(the "Twizie 6130 Cellphone") |

(Tr. 525-27).   Reynolds also searched the Brown Pantech Phone, and reviewed the contacts on

that phone.   (Tr. 527).   Brown had two additional telephone numbers for "Twizie" on the

Brown Pantech Phone: 631-377-6204 and 717-379-3425.   (Tr. 528-29; GX602A).

28

Through the use of subpoenas, Special Agent Reynolds obtained subscriber information and toll records for various telephone numbers in the course of the investigation.    (Tr. 529). He created a summary chart of various communications, reflected in Government Exhibit 5000. (Tr. 531; GX5000).     Using the information obtained from the victims and the time stamps on the video surveillance of Brown's apartment, Special Agent Reynolds focused on communications that occurred the day before the robbery, around the time of the robbery—approximately 1:17 a.m. on March 25, 2013, and the day after the robbery.    (Tr. 535-37; 564).    The phone records and evidence established that the "John 129" number and the "Grovey" numbers were used by the victim, David Barea.    The phone records and evidence also established, as described in further detail below, that Brown communicated with one of the "Twizie" telephone numbers—717-743-6130 (the "Twizie 6130 Cellphone")—at significant times related to the robbery and kidnapping.    (Tr. 565-69).    Here is what the phone records demonstrated:

| **Time and Date** | **Event** |
| --- | --- |
| March 25, 2013 12:56 a.m. | Text message between the Barea 9462 Cellphone and the Brown iPhone |
| March 25, 2013 12:57 a.m. | Telephone call from the Brown iPhone to the Twizie 6130 Cellphone, lasting 33 seconds |
| March 25, 2013 1:02 a.m. | Telephone call from the Twizie 6130 Cellphone to the Brown iPhone |
| March 25, 2013 1:05 a.m. | Telephone call from the Brown iPhone to the Twizie 6130 Cellphone |
| March 25, 2013 1:17 a.m. | Barea arrives outside of Brown's apartment |
| March 25, 2013 1:43 a.m. to 1:44 a.m. | Telephone calls from the Barea 9462 Cellphone to the Barea 2215 Cellphone |

| March 25, 2013<br>2:17a.m., 2:20<br>a.m., and 2:53<br>a.m. | Telephone calls form the Barea 8485 Cellphone to the Barea 9462 Cellphone |
|---|---|
| March 25, 2013<br>3:21 a.m. | Telephone call from the Barea 8485 Cellphone to the Brown iPhone |
| March 26, 2013<br>10:21 a.m. to<br>10:23 a.m. | Telephone calls from Detective Deloren to the Brown iPhone |
| March 26, 2013<br>10:53 a.m. | Telephone calls from the Brown iPhone to the Twizie 6130 Cellphone |

(Tr. 559-76; GX5000; GX5001; GX5002; GX5003).

Special Agent Reynolds also testified about communications involving the Brown iPhone, the Barea 9462 Cellphone, and the Twizie 6130 Cellphone approximately a week before the robbery and kidnapping.   (Tr. 577-79).   Telephone records from March 17, 2013 and March 18, 2013 showed a pattern of communications between the Brown 9462 Cellphone and the Twizie 6130 Cellphone on the same days and around the same times as communications between the Brown 6130 Cellphone and the Barea 9462 Cellphone.   (Tr. 577-78).   Again, on March 23, 2013, two days before the robbery and kidnapping, telephone records showed a pattern of communications between the Brown 9462 Cellphone and the Twizie 6130 Cellphone on the same days and around the same times as communications between the Brown 6130 Cellphone and the Barea 9462 Cellphone.   (Tr. 578-79).

Special Agent Reynolds also testified that, after obtaining telephone records for the Twizie 6130 Cellphone, he obtained cell site records for the Twizie 6130 Cellphone and provided those records to the FBI's cellular analysis survey team, which specializes in tracking and plotting cell site tower information.   (Tr. 576).   After seeing the Twizie 6130 Cellphone in contact with the Brown iPhone immediately before the robbery and kidnapping, Special Agent

30

Reynolds attempted to identify the user of the Twizie 6130 Cellphone.   (Tr. 579).

Special Agent Reynolds provided the cellphone numbers associated with the "Twizie"
contact (GX601D)—the Twizie 3425 Cellphone and the Twizie 6130 Cellphone—to the NYPD.
(Tr. 580).   The NYPD provided information that, on February 2, 2013, an individual who
identified himself as "Antwan" called 9-1-1 from a telephone with the call number 717-379-3425
(the Twizie 3425 Cellphone) and identified his location as 4782 Barnes Avenue.   (Tr. 581;
GX2005).   After Special Agent Reynolds obtained a copy of the 9-1-1 records from the NYPD,
he went to 4782 Barnes Avenue on May 23, 2013 with Detective Deloren and Detective Angelo
Tessitore with the NYPD.   (Tr. 582).   When he went to 4782 Barnes Avenue, Special Agent
Reynolds did not know who the defendant was—he did not know the defendant's name or what
the defendant looked like.   (Tr. 582).   As he approached 4782 Barnes Avenue, Special Agent
Reynolds observed a car parked in front of the residence that matched the description of the
vehicle used during the robbery and kidnapping—the car was a similar color, similar make, and
bore a license plate that showed six out of seven digits that matched what was previously
provided by the victims.   (Tr. 584-85; GX400A; GX400B; GX400C; GX400D.

After observing the car, Special Agent Reynolds and the detectives decided to conduct
surveillance and watch the car.   (Tr. 588).   They also ran the license plate of the vehicle, and
determined that the car was registered to Zaporia Dunbar.   (Tr. 589; GX903).   While
conducting surveillance of the car, they observed a woman, whom they later identified as
Zaporia Dunbar, enter the car, drive to a local school and pick up children, and then return in the
car.   (Tr. 590).   Special Agent Reynolds interviewed Zaporia Dunbar that day.   (Tr. 593).
He asked her if there were any males living with her, and who was the father of her children.
(Tr. 593).   In the course of the investigation, Special Agent Reynolds obtained a birth certificate
for "Dante Chambers," whose mother was listed as Zaporia Dunbar, residing at 4782 Barnes

Avenue, and whose father was listed as the defendant, Antione Chambers.    (Tr. 594-95; GX901).

Also during the course of the investigation, Special Agent Reynolds obtained a recorded telephone call of the defendant in which the defendant, when asked to identify himself by a pre-recorded operator message, identified himself as "my man Twiz."    (Tr. 599-600; GX125T). Special Agent Reynolds testified that he had spoken with Kentrell Ferguson during the course of the investigation, and recognized GX4000, which was a photograph of Ferguson's cellphone with the contact "Twizzy."    (Tr. 600).

Special Agent Reynolds also testified that he had interviewed the defendant's mother and his sister approximately a week after he interviewed Zaporia Dunbar.    (Tr. 601).    He asked them questions, and was unable to locate the defendant after those interviews.    (Tr. 601). Special Agent Reynolds also spoke with Isaac Nelson, the landlord for 4782 Barnes Avenue, and asked if Nelson had seen Dunbar or Chambers.    (Tr. 602).    Based on his interview of Nelson, Special Agent Reynolds was unable to locate either Dunbar or Chambers.    (Tr. 602).    Special Agent Reynolds testified that he had subpoenaed call records for a cellphone belonging to Zaporia Dunbar.    (Tr. 602).    Those records showed that, after May 23, 2013, the day that Special Agent Reynolds had spoken to Dunbar, there were no longer any outbound calls or activity on that cellphone.    (Tr. 602).

In June 2013, Special Agent Reynolds obtained an arrest warrant for the defendant.    (Tr. 606).    After obtaining the arrest warrant, he tried to locate the defendant and entered the warrant into the NCIC database.    (Tr. 606).    Similarly, he obtained an arrest warrant for Steven Glisson, and located and arrested Glisson on June 20, 2013 at a home in Long Island.    (Tr. 607). After a search of the bedroom where Glisson had been staying, Special Agent Reynolds seized

32

two magazines for a semiautomatic pistol that was loaded with 9 millimeter ammunition.   (Tr. 607-08).

On July 3, 2013, Special Agent Reynolds located the defendant, and, on July 15, 2013, arrested the defendant in Huntington, New Jersey.   (Tr. 609).   Upon his arrest, Special Agent Reynolds advised the defendant of his *Miranda* rights.   (Tr. 609).   The defendant made some statements after his arrest.   (Tr. 612).   The defendant stated that he knew Tyrone Brown and Steven Glisson, but that he did not have much contact with them.   (Tr. 612).   The defendant stated that he had a child with Zaporia Dunbar, and that he had called 9-1-1 in February 2013 because she was having a child.   (Tr. 612).   The defendant said that Dunbar did not let him drive her car.   (Tr. 612).   The defendant stated that the hammer in his car was one of the tolls that he used to work on houses.   (Tr. 612).

### K.  Special Agent Eric Perry

Special Agent Eric Perry testified about the historical cell site records obtained for the Twizie 6130 Cellphone.   Special Agent Perry testified about the mechanics of cell site data and records, his training in analyzing the data, and testing that he had done on previous occasions to determine the accuracy of cell site data—all leading to the conclusion that cell site data is reliable.   (Tr. 621-27).   Special Agent Perry also testified about how he analyzed cell site records obtained from service providers, including identifying the cell tower that was used and the sector, or area covered by that cell tower, that was used in order to identify the location of a cellphone while it was being used.   (Tr. 627-628).

In connection with this investigation, Special Agent Perry analyzed cellphone records for the Twizie 6130 Cellphone, including cell site data and the underlying phone records.   (Tr. 630; GX150; GX160).   Based on this data, and the data regarding the cell towers provided by the service provider, Special Agent Perry prepared a map that reflected a total of six calls that

33

occurred over the Twizie 6130 Cellphone in the early morning hours of March 25, 2013.   (Tr.

639).   The cell site and call data demonstrated that, between 12:13 a.m. and 1:16 a.m. on March

25, 2013, six voice calls were initiated over the Twizie 6130 Cellphone approximately one block

from 1338 Croes Avenue (Tyrone Brown's apartment), over sector 1 of cell tower 61.   (Tr. 640;

GX150).

        Special Agent Perry also analyzed the cell site and call data for a slightly expanded time

period—from 12:02 a.m. through 10:19 a.m. on March 25, 2013.   (Tr. 642; GX150).   From

approximately 4:55 a.m. through 10:19 a.m., the Twizie 6130 Cellphone utilized a cell tower and

sector—tower 90, sector 1—in the vicinity of Barnes Avenue (specifically, 4782 Barnes

Avenue).   (Tr. 642-44; GX150).

        Special Agent Perry also analyzed the cell site and call data for calls that occurred over

the Twizie 6130 Cellphone on March 17 and March 18, 2013, and determined that the Twizie

6130 Cellphone traveled from the cell tower 90, sector 1 (4782 Barnes Avenue) to tower 61,

sector 1 (1338 Croes Avenue), and then back to cell tower 90, sector 1 (4782 Barnes Avenue).

(Tr. 646; GX150).

        Next, Special Agent Perry analyzed the cell site and call data for calls that occurred over

the Twizie 6130 Cellphone on March 26, 2013, the day after the robbery and kidnapping.   (Tr.

648).   The Twizie 6130 Cellphone utilized cell tower 90 (4782 Barnes Avenue) during a call at

approximately 3:35 p.m., was utilizing cell towers in the vicinity of the George Washington

Bridge in Manhattan around 6:28 p.m., and, as time progressed, the Twizie 6130 Cellphone

traveled throughout New Jersey into Pennsylvania, ending in Lebanon, Pennsylvania at 11:52

p.m.   (Tr. 648-49; GX150).   The next day, March 27, 2013, the Twizie 6130 Cellphone

returned to the New York area.   (Tr. 668).   The last telephone call over the Twizie 6130

Cellphone in the New York area was April 4, 2013.   (Tr. 668).

34

Finally, Special Agent Perry testified that the wireless communication networks that he analyzed can make calls or use networks that are capable of replacing calls between states, and one can make phone calls from New York and hit every state.    (Tr. 649).    Verizon, the service provider for the Twizie 6130 Cellphone, had offices predominately in Basking Ridge, New Jersey and Bedminster, New Jersey.    (Tr. 649).

## LEGAL STANDARDS

### I.    Rule 29

"Rule 29 does not provide the trial court with an opportunity to substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury."    *United States* v. *Truman*, 688 F.3d 129, 139 (2d Cir. 2012) (internal quotation marks omitted).    Rather, "the court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt."    *United States* v. *Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (internal quotation marks omitted).

### II.    Rule 33

Under Rule 33, a district court may, upon a defendant's motion, "vacate any judgment and grant a new trial if the interest of justice so requires."    Fed. R. Crim. P. 33(a).    "The defendant bears the burden of proving that he is entitled to a new trial under Rule 33 . . . ." *United States* v. *McCourty*, 562 F.3d 458, 475 (2d Cir. 2009).    "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice.    The trial court must be satisfied that competent, satisfactory and sufficient evidence in the record supports the jury verdict."    *United States* v. *Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (citation and internal quotation marks omitted).    To grant a Rule 33 motion, "[t]here must be a real concern that an innocent person may have been convicted."    *Id.* (internal quotation marks omitted).

## DISCUSSION

I.    **There was Sufficient Evidence for a Rational Jury to Find the Defendant Guilty of the Robbery, Robbery Conspiracy, and Kidnapping.**

The defendant challenges the sufficiency of the evidence supporting his convictions on several grounds.    However, his arguments mischaracterize the record and ignore substantial parts of the record that squarely support the jury's verdicts.

### A.    Applicable Law

"A defendant challenging a conviction based on insufficient evidence bears a heavy burden."    *United States* v. *Aina-Marshall*, 336 F.3d 167, 171 (2d Cir. 2003).    "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."    *Jackson* v. *Virginia*, 443 U.S. 307, 319 (1979). A jury's verdict must be upheld if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States* v. *Aguilar*, 585 F.3d 652, 656 (2d Cir. 2009) (quoting *Jackson* v. *Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also United States* v. *Glenn*, 312 F.3d 58, 63 (2d Cir. 2002); *United States* v. *Payton*, 159 F.3d 49, 55-56 (2d Cir. 1998).    "In other words, the court may enter a judgment of acquittal only if the evidence that the defendant committed the crime is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt."    *United States* v. *Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (internal citation and quotation omitted).

In considering a Rule 29 motion, the Court should "review all of the evidence presented at trial in the light most favorable to the government, crediting every inference that the jury might have drawn in favor of the government."    *United States* v. *Walker*, 191 F.3d 326, 333 (2d

36

Cir. 1999) (internal quotation marks omitted); *accord United States* v. *Martinez*, 54 F.3d 1040, 1042 (2d Cir. 1995).   Even where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the Court] must let the jury decide the matter."   *United States* v. *Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) (internal quotation marks omitted).   Thus, the task of choosing among the permissible competing inferences that can be drawn from the evidence is for the jury, not for the reviewing court.   *See, e.g.*, *United States* v. *Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008) (when there are "competing interests, we must defer to the jury's choice" because "it is the task of the jury, not the court, to choose among competing inferences that can be drawn from the evidence.") (internal quotations omitted)); *United States* v. *Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) ("courts must be careful to avoid usurping the role of the jury when confronted with a motion for acquittal") (citing *Guadagna*, 183 F.3d at 129 ("Rule 29(c) does not provide the trial court with an opportunity to substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury.")); *United States* v. *Matthews*, 20 F.3d 538, 548 (2d Cir. 1994) (stating that the Court must affirm conviction "so long as, from the inferences reasonably drawn from the record as a whole, the jury might fairly have concluded that the defendant was guilty beyond a reasonable doubt").

"The fact that a trier of fact has declined to draw one of two or more competing inferences does not mean that the inferences drawn were not available or were not reasonable." *United States* v. *Rosa*, 17 F.3d 1531, 1542 (2d Cir. 1994); *see also United States* v. *Plitman*, 194 F.3d 59, 67 (2d Cir. 1999) ("Even if there had been evidence regarding these [defense] theories in the record, the jury was free to reject it").   Accordingly, "the government need not 'exclude every reasonable hypothesis other than that of guilt.'"   *Guadagna*, 183 F.3d at 130 (quoting *Holland* v. *United States*, 348 U.S. 121, 139 (1954)); *see Martinez*, 54 F.3d at 1042 ("it is the task of the jury, not the Court, to choose among competing inferences").

"Pieces of evidence must be viewed not in isolation but in conjunction, and when evaluating the sufficiency of the evidence, courts do not assess witness credibility, resolve inconsistent testimony against the verdict, or otherwise weigh the significance of the evidence." *United States* v. *Thomas*, 981 F. Supp. 2d 244, 243-44 (S.D.N.Y. 2013) (internal quotation marks and citations omitted)).   In other words, the court "may not substitute [its] own determinations of credibility or relative weight of the evidence for that of the jury."   *United States* v. *Autuori*, 212 F.3d 105, 114 (2d Cir. 2000).   Further, the court "is to apply this test to 'the totality of the government's case and not to each element, as each fact may gain color from others.'"   *United States* v. *Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999)).

## B.   The Eyewitness Identification Testimony

The defendant argues that the Government's case "was premised, both factually and legally, upon two purported eyewitness identifications" of the defendant, and that by the end of the trial the Government "had been stripped of both alleged identifications."   (Def. Mem. at 1).   That is incorrect.   While it is true that the Court struck all evidence regarding the eyewitness testimony of Demi Torres, the record regarding Emma Torruella's identifications was still properly before the jury and for the jury to weigh and consider.   Torruella unequivocally identified the defendant as one of the men who had robbed and kidnapped her.   (Tr. 156-57).   She unequivocally identified her signature and the photograph of the defendant that she circled, nine weeks after the robbery and kidnapping, from a photo array.   (Tr. 185-186).   She testified in detail about the horrific events of March 25, 2013, and how she thought the defendant and Glisson were going to kill her.   (Tr. 175).   Then, Torruella, who was clearly in an emotional state, endured a difficult cross-examination during which she was shown multiple pieces of 3500 material and questioned extensively about her prior descriptions that the defendant had a teardrop tattoo on the night of

March 25, 2013.   (Tr. 187-208).[2]   At the end of the cross-examination, defense counsel showed Torruella the photo array in which had circled the defendant's picture and signed her name under it.   (Tr. 208).   Toward the end of re-direct, Torruella had a meltdown.   (Tr. 214).   She left the witness stand to compose herself.   (Tr. 214).   When she returned, and was asked by the Government whether she believed the defendant was the "tall guy," Torruella compared the defendant's picture in GX 1000, the photo array that she had signed and circled only nine weeks after the robbery and kidnapping, with the defendant's appearance sitting in the courtroom and determined that they did not appear to be the same person.   (Tr. 215).

All of these facts regarding Torruella's identification were properly before the jury to consider: (1) Torruella's initial in-court identification of the witness, (2) the circumstances of her photo array identification only nine weeks after the robbery and kidnapping, including what defense counsel elicited on cross-examination, (3) the fact that the defendant never disputed during the trial that the picture Torruella had circled on the photo array was a picture of him, (4) the differences in the defendant's appearance at trial and his appearance in the photo array that Torruella had circled and signed, (5) the differences in the defendant's appearance in all of the photographs entered into evidence of him—GX4A, GX801, and GX1000, (6) Torruella's difficult and emotional testimony on direct and cross-examination, (7) the trauma that Torruella had experienced and then recounted for the jury, the Court, and the defendant, and (8) her statements that the defendant, sitting in the courtroom that day, was not the tall guy.   Significantly, Torruella never said that the person she had circled in the photo array was not the person who had robbed and kidnapped her—only that the defendant, as he sat in the courtroom during her testimony, did not look like him.

---

[2]  Also during cross-examination, defense counsel showed Torruella a piece of 3500 material that inadvertently included her then-current home address.   (Tr. 198, 553).   The jury was not aware of this fact, as it was discussed during a sidebar during the fourth day of the trial.   (Tr. 553).

The defendant also argues about Detective Deloren's conduct during the investigation—namely, that (a) he did not show the witnesses a picture of Dunbar's car, (b) he did not perform DNA or forensic tests on the hammer or the duct tape, and (c) and told Torruella to "forget about the teardrop" when viewing the photo array of the defendant that she signed.   (Def. Mem. 5).   With respect to investigative steps taken, and as the Court instructed the jury, "there is no legal requirement that the Government prove its case through any particular means."   (Tr. 761).   With respect to Detective Deloren's instructions to Torruella, she was instructed "not to look at the tattoos, the hair, and the facial.    To look at other stuff, like the nose, the eyes, stuff like that," and to "forget about the teardrop.   *You have to look at the face.*" (Tr. 212-13) (emphasis added).    After receiving these instructions, Torruella "*looked at the pictures and it looked like him.*"   (Tr. 213-14).   There is nothing improper about instructing a witness to focus on facial features as opposed to tattoos, and even the defendant's arguments cannot be read to allege that it was improper for Detective Deloren to tell Torruella to focus on the facial features of the individuals depicted in the photographs.

The defendant also argues that the fact that Barea and Torruella both described the "tall guy" as having a teardrop tattoo is inconsistent with the defendant being the "tall guy."   (Def. Mem. at 7).   The defendant also made this argument during summation.   (Tr. 802-03, 809). The jury was entitled to focus not on the fact that the defendant does not currently have a teardrop tattoo, but on the fact that, when viewing the photo array, Torruella focused carefully on the facial features of the photographs she viewed and determined that the defendant was the tall guy notwithstanding the lack of a permeable feature such as a teardrop tattoo.   As the Government argued during summation, the victims' belief that the tall guy had a teardrop tattoo could easily be attributed to the fact that Glisson had a teardrop tattoo.   This was a reasonable

inference that the jury was entitled to draw on their own, after hearing arguments from both sides—which they did.

### C.   The Defendant Used Zaporia Dunbar's Car to Carry Out the Robbery and Kidnapping.

The defendant argues now, as he did extensively throughout the trial and in summation, that victims' descriptions of the car used during the robbery and kidnapping were inconsistent with the description of Zaporia Dunbar's car.   (Def. Mem. at 7).   What the defendant does not address when making this argument are the indisputable facts regarding the license plate sequence that Torruella identified, and which matches the license plate of Zaporia Dunbar's car.   Dunbar, who was mother of the defendant's child, was the registered owner of the car.   (GX2003).   The car parked in front of the residence the defendant shared with Dunbar when law enforcement first went to their home, not knowing whose home it was or even the defendant's name.   (Tr. 241, 582; GX400A; GX400B; GX400C; GX400D).   The defendant does not—and cannot—challenge the fact that Torruella provided a license sequence that matched the Zaporia Dunbar's car.   The witnesses reported that the car was dark-colored, four-door sedan, of Japanese make and model, and mid-1990s model, and Torruella testified that the license plate ended in 7788 and, when she was first interviewed by law enforcement, she had remembered two of the letters.   (Tr. 153, 209).   The pictures of the car, entered as Government Exhibits 400A, 400B, 400C and 400D, demonstrate that Dunbar's car matched the description that the victims provided.   The jury was entitled to use its common sense regarding the state that the license plate was issued, or whether the car was "black" or "dark" or "dark green" or "midnight blue" or had "primer," and draw the appropriate conclusion that these minor differences simply did not matter in light of the license plate sequence and general description of the car provided by the victims.

41

### D. The Cellphone and Cell Site Records Corroborated Torruella's Identification of the Defendant, and the Defendant's Participation in the Robbery and Kidnapping.

In his moving papers, the defendant argues that the cellphone records should be evaluated on their own and do not support the jury's verdicts.   (Def. Mem. at 8).   What the defendant misstates is that the cellphone records were offered into evidence in the context of other evidence that was admitted throughout the trial, including the cellphones seized from Tyrone Brown, the testimony of Kentrell Ferguson and the contact information obtained from his cellphone, and the cell site records for the Twizie 6130 Cellphone—all of which demonstrate that the defendant was known as "Twizie," that he communicated with Brown at key times during the night of the robbery and kidnapping and again the following day, and that he was present at crucial locations a week prior to the robbery and kidnapping, the night of the robbery and kidnapping, and after the robbery and kidnapping.

### 1.     The Defendant is "Twizie"

Kentrell Ferguson testified unequivocally that he had known the defendant for a significant period of time, and that the contact information on his cellphone for "Twizzy" was contact information for the defendant.   (Tr. 298-300; GX 4000).   He was at first reluctant to admit that the defendant was known as "Twizzy," but ultimately confirmed that "Twizzy" referred to the defendant.   (Tr. 300).   There were four telephone numbers on Ferguson's cellphone under the "Twizzy" contact:   646-725-4043; 631-377-6204; 757-320-6727; and 646-721-8504.   (GX 4000).   The 631-377-6204 number matched a number that Brown listed, in the Brown Pantech Phone, for "Twizie."   (GX602A).   In his post-arrest statements, the defendant admitted that he knew Brown.   (Tr. 612).   That a number that Brown had listed for "Twizie" in the Brown Pantech Phone matches a number that Ferguson, a lay witness, had for the defendant, whom he admitted he referred to as "Twizzy," is confirmation that "Twizie" is the

defendant.    Brown had two cellphones—the Brown iPhone and the Brown Pantech Phone.    On

the Brown iPhone, Brown listed two numbers for "Twizie," the defendant:    717-379-3425

(the "Twizie 3425 Cellphone") and 717-743-6130 (the "Twizie 6130 Cellphone").    Based on

9-1-1 records obtained in the course of the investigation, it was confirmed—and the defendant

did not dispute—that the defendant, using the Twizie 3425 Cellphone, called 9-1-1 on February

2, 2013 to respond to 4782 Barnes Avenue, the location where he lived with Zaporia Dunbar.

(Tr. 460, 581; GX2005).    The Twizie 3425 Cellphone, the phone that the defendant does not

dispute he used, appears directly above the phone number for the Twizie 6130 Cellphone on the

Brown iPhone contact on the Brown iPhone.    (GX601D).    Cell site location records, which

will be discussed more fully below, show the numerous occasions, especially at key times before

and after the robbery, that the Twizie 6130 Cellphone was located at or in the vicinity of 4782

Barnes Avenue, the defendant's home.    (GX150).    This evidence is not coincidental.    This

evidence establishes, and a reasonable trier of fact could conclude, that the defendant is

"Twizie," and that the defendant used the Twizie 6130 Cellphone.

### 2.    Records Regarding Communications between Barea and Brown, and Brown and the Defendant, at Times Significant to the Robbery and Kidnapping Corroborate that Brown and the Defendant Participated in the Robbery.

The defendant argues that the evidence did not establish "through inference or otherwise"

that Brown was a co-conspirator or involved in the robbery, and that the records of the

communications involving Barea, Brown and the defendant are not significant.    That assertion

flies in the face of the undisputed facts.    The indisputable evidence at trial established that

Tyrone Brown and Barea engaged in ongoing narcotics transactions over a significant period of

time.    (Tr. 351-57; 403-04).    The evidence established that Barea and Brown conducted

transactions at Brown's home, and that Barea would call or text Brown prior to arriving at

Brown's home.    (Tr. 352-56).    The evidence established that Barea had met Glisson before

43

during one such exchange.   (Tr. 360-61).   Evidence at the trial established the following

powerful sequence of events on and after the night of the robbery and kidnapping:

| Time and Date | Event |
| --- | --- |
| March 25, 2013<br>12:56 a.m. | Text message between the Barea 9462 Cellphone and the Brown iPhone. (GX5000). |
| March 25, 2013<br>12:57 a.m. | Telephone call from the Brown iPhone to the Twizie 6130 Cellphone, lasting 33 seconds. (GX5000). |
| March 25, 2013<br>1:02 a.m. | Telephone call from the Twizie 6130 Cellphone to the Brown iPhone. (GX5000). |
| March 25, 2013<br>1:05 a.m. | Telephone call from the Brown iPhone to the Twizie 6130 Cellphone. (GX5000). |
| March 25, 2013<br>12:13 a.m. to<br>1:16 a.m. | Six voice calls initiated over the Twizie 6130 Cellphone approximately one block from 1338 Croes Avenue (Tyrone Brown's apartment). (Tr. 640; GX150). |
| March 25, 2013<br>1:17:52 a.m. | Barea arrives outside of Brown's apartment and rings Brown's doorbell for the first time.   (GX200, GX201). |
| March 25, 2013<br>1:18:08 a.m. | Barea rings Brown's doorbell again.   (GX200, GX201). |
| March 25, 2013<br>1:18:50 a.m. | Brown lets Barea in. (GX200, GX201). |
| March 25, 2013<br>1:19:30 a.m. | Car (later identified as the car registered to the defendant's girlfriend) pulls up near the driveway to Brown's building.   (GX200, GX201). |
| March 25, 2013<br>1:20:00 a.m. | Two men (later identified as the defendant and Steven Glisson) walk down driveway and approach the door to Brown's apartment building.   (GX200, GX201). |
| March 25, 2013<br>1:20:40 a.m. | The two men get to the door of Brown's apartment building and stand outside.   (GX200, GX201). |

| | |
|---|---|
| March 25, 2013<br>1:26:41 a.m. | The two men enter Brown's apartment building and begin attacking Barea.<br><br>(GX200, GX201). |
| March 25, 2013<br>1:34:20 a.m. | The door to Brown's apartment building opens, and the two men force Barea, hands tied behind his back and hood pulled over his face, down the driveway and to the car.   (GX200, GX201). |
| March 25, 2013<br>1:39:39 a.m. | Brown exits his apartment building.   (GX200, GX201). |
| March 25, 2013<br>1:43 a.m. to 1:44 a.m. | Telephone calls from the Barea 9462 Cellphone to the Barea 2215 Cellphone.   (GX5000). |
| March 25, 2013<br>2:17a.m., 2:20 a.m., and 2:53 a.m. | Telephone calls from the Barea 8485 Cellphone to the Barea 9462 Cellphone. (GX5000). |
| March 25, 2013<br>3:21 a.m. | Telephone call from the Barea 8485 Cellphone to the Brown iPhone. (GX5000). |
| March 25, 2013<br>4:55 a.m. through 10:19 a.m. | The Twizie 6130 Cellphone utilized a cell tower and sector—tower 90, sector 1—in the vicinity of Barnes Avenue (specifically, 4782 Barnes Avenue).   (Tr. 642-44; GX150). |
| March 26, 2013<br>10:21 a.m. to 10:23 a.m. | Telephone calls from Detective Deloren to the Brown iPhone.   (GX5000). |
| March 26, 2013<br>10:53 a.m. | Telephone calls from the Brown iPhone to the Twizie 6130 Cellphone. (GX5000). |
| March 26, 2013<br>3:35 p.m. through 11:52 p.m. | The Twizie 6130 Cellphone utilizes cell tower 90 (4782 Barnes Avenue) during a call at approximately 3:35 p.m., was utilizing cell towers in the vicinity of the George Washington Bridge in Manhattan around 6:28 p.m., and, as time progressed, the Twizie 6130 Cellphone traveled throughout New Jersey into Pennsylvania, ending in Lebanon, Pennsylvania at 11:52 p.m. (Tr. 648-49; GX150). |

(GX 200, GX 201, GX 559-76; GX5000; Tr. 559-76).   The evidence at trial also established

that, approximately one week before the robbery and kidnapping, Barea went to Brown's home

45

and saw Brown in a dark blue or midnight blue Impala that had hub caps on the wheels, like a police car.   (Tr. 403).   Brown was with two other people—a light-skinned driver with light blondish hair and an African-American male.   (Tr. 404).   Telephone records from March 17, 2013 and March 18, 2013, approximately one week before the robbery and kidnapping, showed a pattern of communications between the Brown 9462 Cellphone and the Twizie 6130 Cellphone on the same days and around the same times as communications between the Brown 6130 Cellphone and the Barea 9462 Cellphone.   (Tr. 577-78)   The cell site records for the Twizie 6130 Cellphone demonstrated that, on March 17 and March 18, 2013, the Twizie 6130 Cellphone traveled from the cell tower 90, sector 1 (4782 Barnes Avenue) to tower 61, sector 1 (1338 Croes Avenue), and then back to cell tower 90, sector 1 (4782 Barnes Avenue).   (Tr. 646; GX150).   This evidence establishes that approximately one week before the robbery, Barea and Brown communicated with each other and met at Brown's home.   That same day, the defendant also went, from his home on 4782 Barnes Avenue, to the vicinity of Brown's apartment, and then back home.   This pattern matches the pattern the night of the robbery—Barea and Brown communicate about meeting up, the defendant travels to the location and then, when the robbery and kidnapping is over, back home.   Brown's false denial of involvement when he spoke with Barea after the robbery is contradicted by his apology to Torruella and his actions as soon as he learned about police involvement—he called the defendant after he talked to Detective Deloren, and the defendant left New York City that day.

The defendant's argument that Brown was in contact with other, unidentified, numbers during the robbery, or that Brown had communicated with the defendant on and off for a period of time and, therefore, the calls leading up to the robbery and kidnapping are not significant is a

non-starter.[3]   The timeline establishes an undeniable relationship between Brown's communications to the defendant, the defendant's presence at Brown's apartment, and, afterward, Brown's continued role as tipster when, after speaking with Detective Deloren, Brown communications with the defendant who then leaves New York City for the day.   Likewise, the defendant's argument that the Government did not establish the defendant was in possession of the Twizie 6130 Cellphone that evening ignores the common sense inferences that the jury, based on the other indisputable evidence, could reasonably draw.   These phone records and cell site records, which will be discussed in further detail below, viewed in the context of all of the other evidence in this case, demonstrate the defendant's participation in the robbery and kidnapping and support the jury's verdicts.

The narcotics conspiracy cases the defendant cites, in which the defendants' knowledge and specific intent regarding the charged conspiracy were at issue, are inapposite.   In *United States* v. *Torres*, 604 F.3d 58 (2d Cir. 2010), the issue before the Second Circuit was whether the Government had proven beyond a reasonable doubt that the defendant, who was charged with narcotics conspiracy, acted knowingly and with the specific intent to further a conspiracy for the distribution of narcotics.   604 F.3d at 61.   Boxes containing cocaine had been shipped to the defendant, and the Government's evidence at trial consisted of the cocaine that had been shipped to the defendant and testimony of law enforcement agents and United Parcel Service employees regarding the defendant's efforts to take delivery of the boxes.   *Id.*   In addition, the

---

[3]  The defendant also argues that there was a communication between the Brown iPhone and the Twizie 6130 Cellphone at 1:25 a.m., and that the video surveillance does not depict either of the two men standing outside of Brown's apartment checking their cellphones.   (Def. Mem. at 13). The Government has reviewed the toll records, Government Exhibit 5001 and 160G, which do not reflect any communications between the Brown iPhone and the Twizie 6130 Cellphone at 1:25 a.m.   (GX5001).   But, even if there were a text message from the Brown iPhone to the Twizie 6130 Cellphone at that time, the defendant was already standing outside of Brown's apartment, ready to initiate the robbery.   Whether the video surveillance showed him checking his phone is meaningless.

Government introduced records of telephone calls, including a telephone that it attributed to the defendant but for which the phone records showed continued activity *after* the defendant was in custody and other records showed that other individuals had used the phone.   *Id*. at 70. Therefore, the Court found that the "the telephone records did not provide a basis for a finding beyond a reasonable doubt that Torres had knowledge that the packages contained narcotics." *Id.* at 70.   Similarly, in *United States* v. *Lorenzo*, 534 F.3d 153 (2d Cir. 2008), in which the Second Circuit found that, while there was ample evidence that the defendant "was present and participated in the events that furthered the conspiracy, there was insufficient evidence to show that he did so *knowingly* and *with specific intent* to further a cocaine smuggling and distribution conspiracy."   534 F.3d at 159.   And, in *United States* v. *Coppin*, 1 Fed. Appx. 283 (6th Cir. 2001), again, the issue was whether the defendant's association with another individual and phone records were alone enough to connect the defendant to the conspiracy.   1 Fed. Appx. at 289.   Unlike in *Torres*, *Lorenzo*, and *Coppin*, the phone records here demonstrate a definitive pattern of communication between Brown and the defendant, and at significant points in time related to the robbery and kidnapping.   The phone records in this case, when viewed in the context of all of the evidence described above, corroborate, for example, Torruella's initial identification of the defendant, the victims' identification of the car used during the kidnapping, the cell site records showing the defendant's presence at key locations around the time of the robbery and kidnapping, and the roles that the defendant and his co-conspirators played throughout the course of robbery and kidnapping, among other evidence.

### 3.   The Cell Site Records Support the Jury's Verdicts.

The defendant argues, as with the phone records, that the cell site location information is insufficient to support the verdicts because it suffers from certain "flaws"—namely, that the cell towers prioritize cell reception over accurate location data and there are factors that could affect

the location information, location information is available only when a phone is being used, and

the data provides information only about the location of the phone and not information about an

individual.   (Def. Mem. at 14).   These arguments do not undermine the jury's verdicts.   The

cell site evidence demonstrated that the Twizie 6130 Cellphone, which, as discussed above, was

the defendant's phone, was consistently located at or near 1338 Croes Avenue, where the

robbery was initiated, and at the defendant's home, 4782 Barnes Avenue, over the course of

multiple communications—not just one or two—at significant time periods related to the robbery

and kidnapping.   (GX 150).   That location information is available only when a phone is

being used, when considered in the context of the timeline of events surrounding and after the

robbery and kidnapping, *supports* the conclusion that the defendant is guilty—he was present at

the robbery location a week before the robbery when Barea was also there, he was present at the

robbery during the robbery, and he went home after the robbery and kidnapping.   He used the

Twizzie 6130 Cellphone during significant events related to the robbery and kidnapping.

Finally, the defendant's argument that the location information cannot identify the user, only the

location of the phone, is incorrect when the location information is considered in the context of

locations significant to this defendant.   The jury can reasonably infer that the defendant was the

holder and user of the Twizie 6130 Cellphone by considering where the defendant went after the

robbery and kidnapping—to his home.   That, in addition to the other powerful evidence,

described above, linking the defendant, "Twizie," to the Twizie 6130 Cellphone, supports the

jury's verdicts.

###   E.   The Evidence Relating to the Defendant's Arrest for False Identification in New Jersey, Viewed in the Context of All of the Other Evidence, Supports the Jury's Verdicts.

The defendant argues that his arrest in New Jersey on July 3, 2013 does not demonstrate

his consciousness of guilt.   (Def. Mem. at 15).   When he was arrested, the defendant had a

fake driver's license in someone else's name and refused to provide his real name to the arresting officer.   (Tr. 444-58).   At the time, the defendant was driving a rental car that was not under his name or the name on his fake driver's license, and was with Zaporia Dunbar and two children.   (Tr. 454).   The arresting officer repeatedly asked the defendant for his true identity, and the defendant refused.   (Tr. 457).

The Government's arguments regarding these facts were not that the defendant was, at that very moment, fleeing from the authorities but, instead, that the fact that the defendant was driving a rental car not in his name, using a fake driver's license, and refusing to provide his true identity is powerful evidence of the defendant's overall flight and consciousness of guilt.   It is undisputed that the Zaporia Dunbar's landlord never saw or heard from her or the defendant again after law enforcement came to interview him, only a week after they had interviewed Dunbar.   It is undisputed that, after she was interviewed by law enforcement, Dunbar stopped making telephone calls from a cellphone she used, left her apartment and stopped paying rent, and pulled her children out of the school they attended.   (Tr. 602).   It is undisputed that, after interviewing the defendant's family members, law enforcement could not locate the defendant. (Tr. 601).   It is undisputed that, a week after law enforcement went to speak with Dunbar, her car—the car used during the robbery and kidnapping—was involved in a car accident after which the driver, an African-American male, fled on foot from police.   (Tr. 417-22).   It is undisputed that her car was impounded and abandoned at the impound facility when Detective Deloren located it and found the hammer that the male victim identified was like the hammer used during the robbery and kidnapping.   (Tr. 243-45).   It is undisputed that Dunbar and two children were in the car with the defendant when he was arrested by the New Jersey state police, driving a rental car not in his name, carrying a fake driver's license, and refusing to provide his real name to the police.   (Tr. 444-58).   From this evidence, in the context of all the other evidence

described above, a reasonable jury could infer consciousness of guilt from this pattern of flight.

## II.   The Defendant has Failed to Demonstrate that the Interest of Justice Requires a New Trial.

The defendant argues that the Court should grant a new trial based on issues regarding the eyewitness identifications and alleged instances Government misconduct.   However, his arguments are unsupported by the record and the evidence admitted at trial, and even the defendant does not argue—and the record does not support—that "there is a real concern that an innocent person may have been convicted."   *United States* v. *Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (internal quotation marks omitted)).

### A.   Applicable Law

Federal Rule of Criminal Procedure 33 provides, in relevant part, that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." In light of the deference owed to a jury's verdict, this Court has cautioned district courts to exercise their Rule 33 authority only "sparingly and in the most extraordinary circumstances." *United States* v. *Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (internal quotation marks omitted).   A motion for a new trial should not be granted unless, after evaluating "the entire case," the District Court is left with a "real concern that an innocent person may have been convicted." *Id.* at 134 (internal quotations omitted); *see also United States* v. *Persico*, 645 F.3d 85, 109 (2d Cir. 2011) ("The ultimate test is whether letting a guilty verdict stand would be a manifest injustice." (internal quotation marks omitted)).

"[A] defendant asserting that a prosecutor's remarks warrant a new trial faces a heavy burden, because the misconduct alleged must be so severe and significant as to result in the denial of his right to a fair trial." *United States* v. *Coplan*, 703 F.3d 46, 86 (2d Cir. 2012) (citing *United States* v. *Banki*, 685 F.3d 99, 120 (2d Cir. 2012)) (internal quotation marks omitted). "It is

51

well established that the Government 'has broad latitude in the inferences it may reasonably suggest to the jury during summation.'" *Coplan*, 703 F.3d at 87 (quoting *United States* v. *Edwards*, 342 F.3d 168, 181 (2d Cir.2003)). Even if a defendant can meet the heavy burden of demonstrating that a prosecutor's remarks were improper, he must demonstrate that the remarks caused "substantial prejudice" in order to demonstrate that a new trial is warranted.   *Banki*, 685 F.3d at 120.   Moreover, courts should be mindful that "[i]t is impossible to expect that a criminal trial shall be conducted without some showing of feeling; the stakes are high, and the participants are inevitably charged with emotion."   *United States* v. *Wexler*, 79 F.2d 526, 529-530 (2d Cir. 1935) (L. Hand, J.).

### B.   The Lack of a Pretrial *Wade* Hearing Did Not Irremediably Prejudice the Defendant.

The defendant argues that the failure to hold a pretrial *Wade* hearing would have (1) eliminated Torres's testimony altogether, and (2) avoided Toruella's in-court and out-of-court identifications of the defendant.   (Def. Mem. at 18).   The defendant also argues that the lack of a pretrial *Wade* hearing so prejudiced him that he did not receive a fair trial.   (Def. Mem. at 18). In making this argument, the defendant complains that the combination of testimony from Torruella, Torres, and Detective Deloren regarding identification so tainted the proceedings that for the jury to render a verdict was a manifest injustice.   (Def. Mem at 20).   But that argument is undercut by the defense counsel's own statements after Torres's testified:   "I can't move for a mistrial because I have no idea of the evidence that's going to come in.   It's not fair to Mr. Chambers to have a mistrial, but her testimony should be stricken."   (Tr. 503).   Even setting aside these statements—which came after all three of the witnesses the defendant now complains of testified—the Government disagrees that a *Wade* hearing would have necessarily had the effect the defendant argues, in hindsight, that it would.

First, the defendant had an opportunity, after Torres's testimony, to make the argument that he makes now regarding the prejudicial effect of the witnesses' combined statements on identification, and he decided that the trial had, in fact, been so fair that he would not seek a mistrial:   "It's not fair to Mr. Chambers to have a mistrial[.]"     (*See* Tr. 503).   Instead, the defendant moved to strike Torres's testimony—a motion that, after additional briefing on the issue, he won.   (Tr. 700-11).   Defense counsel also stated "this case should be dismissed" and, later, that his "application is either to strike her testimony, strike her testimony or dismiss, frankly."   (Tr. 503, 507).   However, the defendant did not make an application for a mistrial because none was necessary.   And the Court agreed.   In granting the defendant's motion, the Court held:

> In sum, I grant Mr. Chambers' motion to strike.   The Second Circuit "generally presumes the juries limiting instructions." *United States* v. *Gomez*, 617 F.3d 88, 96 (2d Cir. 2010). The presumption is dropped where there is an overwhelming probability that the jury will be unable to follow the Court's instruction and the evidence is devastating to the defense. I do not find that the eyewitness evidence that Ms. Torres offered was so devastating that the jury will be unable to follow a curative instruction. Therefore, I find that a curative instruction to the jury to disregard Ms. Torres' identification evidence is an appropriate remedy, and that a mistrial is not warranted.

> After striking Ms. Torres' eyewitness testimony and given that I based my decision to allow expert testimony on the matter based on the procedures used in Ms. Torres' case, any expert testimony on eyewitness identification should not be admitted.

(Tr. 711).   Immediately after the Court's ruling, defense counsel made sure that all exhibits related to the Court's ruling were also struck, rested its case, and renewed its Rule 29 motion. (Tr. 712).   In addition, the Court and the parties all agreed on suitability of the Court's proposed limiting instruction, which was thorough, effective, and reinforced by the redacted transcripts of Torres's and Deloren's testimony provided to the jury upon its request.   (Tr. 717).

The defendant had multiple opportunities—after Torres's testimony, after the Court's ruling on his motion to strike, and after all of the evidence had come in and the Government had rested—to move for a mistrial based on his current argument regarding the cumulative prejudicial effect of Torruella's, Torres's and Detective Deloren's testimony, but chose not to because, as the Court agreed in its ruling, none was warranted.    The trial *was* fair.    The defendant (a) won almost every substantive motion, (b) obtained a statement from Torruella that the defendant, sitting in the courtroom, was not one of her robbers and kidnappers, and (c) successfully moved to strike all of Torres's identification testimony.    The case proceeded to a verdict because the trial was fair and nothing that occurred during the course of the trial caused the defendant substantial prejudice.    The defendant apparently believed that the trial had been so fair, and so favorable to him, that he was likely to be acquitted.    Now, disappointed by the verdict, he raises the arguments that he affirmatively rejected when he agreed it would not be fair to have a mistrial.    *See United States* v. *Carbonell-Iznaga*, No. 87 CR. 0518 (RWS), 1988 WL 3666, at *3 (S.D.N.Y., Jan. 1988) (Rule 33 motion denied where defendant, who was given an option at trial "after all errors were exposed" either to move for a mistrial or to have a witness's testimony stricken, chose the latter course and, therefore, waived any mistrial motions) (citing *United States* v. *Cook*, 432 F.2d 1093, 1101 (7th Cir. 1970), *cert. denied*, 401 U.S. 996 (1971) (where parties in criminal case knowingly and deliberately turn down course of procedure which at time appears to be to their best interest, they cannot be permitted, after decision has been rendered adverse to them, to obtain retrial according to procedure which they voluntarily discarded and waived)).

Second, the defendant's arguments that the jury could not have disregarded the testimony, as instructed, is undercut by the jury's requests for various witness's testimony, including the testimony of Torruella, Torres and Detective Deloren.    Each witnesses' testimony

54

was carefully redacted in accordance with the Court's rulings regarding Torres's identification testimony, as well as other objections made and sustained during each witnesses' testimony.   As the Court recognized, the jury legitimately wanted to know what it was they were supposed to disregard (Tr. 858), and, by having an opportunity to see exactly what they could consider, the jury did not have to "perform Olympian mental gymnastics" (Def. Mem. at 21) to understand the Court's curative instructions.

Third, the Court's pretrial rulings regarding a *Wade* hearing properly applied the law to the facts, and the defendant does not argue they did not.   The defendant does not argue that the legal standards that the Court applied to the facts as they were known were wrong.   Even the defendant acknowledged that there had been no previous reference to the single photograph that Torres testified about during the trial:

| | |
|---|---|
| THE COURT: | That's a shot we didn't know about before today, right? |
| MR. DRATEL: | Single shot, no, no one has talked about that. |

(Tr. 509).   The defendant's argument tries to predict what would have happened if the requested *Wade* hearing had taken place.   But it is not clear that even a *Wade* hearing would have resulted in the outcome the defendant predicts.   A trial is a vehicle for the defendant to confront witnesses and vet the issues that the defendant seeks to argue before the jury.   There is no requirement that a witnesses' testimony be predictable or set in stone.   After the defendant's cross-examinations of Torruella and Torres, the defendant got exactly what he wanted—he had a chance to argue that Torruella's out-of-court identification was unreliable, that her in-court identification should be disregarded given her later statements that the defendant was not the same person as the person she had previously identified as her attacker, and he was able to strike all of Torres's testimony regarding identification, both in-court and out-of-court.   In addition,

55

he obtained an adverse credibility finding against Detective Deloren, and was able to argue in

summation that the jury should not credit Detective Deloren.    (Tr. 811-12).    The defendant

was entitled to a fair trial—not a perfect trial—and he received a fair trial with rulings and

instructions that were considerably favorable to him.

Setting aside the issues with respect to Torres's identifications, there was no reason to

have a *Wade* hearing with respect to Torruella's identification because the identification

procedures with respect to Torruella were not "so unnecessarily suggestive and conducive to

irreparable mistaken identification that [the defendant] was denied due process of law."    *Stovall*

v. *Denno*, 388 U.S. 293, 302 (1967), *abrogated on other grounds*, *Griffith* v. *Kentucky*, 479 U.S.

314 (1987); *United States* v. *Jakobetz*, 955 F.2d 786, 803 (2d Cir. 1992).    Identification

evidence with respect to Torruella, even if it, as the defendant argued, had some element of

untrustworthiness, was for the jury to weigh and credit or discredit.    *Manson* v. *Brathwaite*, 432

U.S. 98, 116 (1977); *see also Watkins* v. *Sowders*, 449 U.S. 341, 348 (1981).    Any issues with

respect to Torruella's identifications were properly the subject of cross-examination and

argument at trial, which sufficed as a test of reliability in a case, such as this one, where the

Torruella "had seen the defendant in person and in action at approximately the time of the

violations charged in the indictment."    *United States* v. *Baccollo*, 725 F.2d 170, 173 (2d Cir.

1983) (no pretrial proceeding or voir dire required before witnesses made in court identification).

### C.    There Was No Misconduct in the Government's Rebuttal Summation.

The defendant argues that, during rebuttal summation, the Government insinuated that

the defendant had intimidated the defendant.    That simply did not happen.    Describing the

facts that preceded Torruella's testimony that the defendant, as he appeared in Court that day,

was not her robber and kidnapper, the Government stated during rebuttal:

56

| | |
|---|---|
| MS. TEKEEI: | We were here. She looked over at him, her kidnapper, the man who had done all of these horrible things and she was confronted with a picture of him on that witness stand. She had him looking up at her from the table, and she had that picture in front of her, and she had him staring at that table. |
| MR. DRATEL: | Objection. |
| THE COURT: | Sustained. |
| MS. TEKEEI: | And we all saw what happened: She fell apart, she completely fell apart. And who wouldn't? Ladies and gentlemen, we have all seen the defendant throughout this trial and we looked at many pictures of him, not just the pictures in the photo array, but also the very picture that he provided on his fake ID. Look at the man sitting here today. Look at the pictures of him. Emma Torruella did. |

(Tr. 816). As is abundantly clear by the entirety of the Government's statements, the argument was not that the defendant was intimidating Torruella, but that he looked like a different person than the person depicted in the photo array that was in front of her—that she was comparing the picture that was staring up at her from the witness stand to the person who was staring at her (as a factual matter, not as a way of intimidation or threat) in real life and she decided that those images did not look the same. The Government's argument had nothing to do with any argument that the defendant was somehow being intimidating, and everything to do with the fact that the defendant's appearance had changed radically enough that it had rattled Torruella—a perfectly appropriate argument to make in summation. During its argument, the Government reiterated this point by using a slide that showed all of the pictures of the defendant—his picture in the photo array that Torruella signed, his picture on his fake driver's license, and his arrest photo, and asked the jury to do what Torruella did: compare the person sitting in the courtroom today with those photographs. The point was that the defendant never disputed that those

pictures—the photo array, the picture on his fake driver's license and his arrest photo—were not

pictures of him, and it was appropriate to show how the defendant's appearance had changed

between his arrest and the trial.   There was nothing improper about the Government's rebuttal

argument on this issue.

Moreover, nothing that the Government said, even if it could have been interpreted as

implying that the defendant was being intimidating—which the Government disputes—rises to

the level of "misconduct . . . so severe and significant as to result in the denial of his right to a

fair trial."   *United States* v. *Coplan*, 703 F.3d 46, 86 (2d Cir. 2012) ("As a general matter, a

defendant asserting that a prosecutor's remarks warrant a new trial "'faces a heavy burden,

because the misconduct alleged must be so severe and significant as to result in the denial of his

right to a fair trial.'") (citing *United States* v. *Banki*, 685 F.3d 99, 120 (2d Cir. 2012)) (internal

quotation marks omitted).   The Government appropriately described what happened leading up

Torruella's breakdown, and, especially, the fact that she was comparing the photograph of the

defendant to the defendant in court that day.   "The government has broad latitude in the

inferences it may reasonably suggest to the jury during summation." *United States* v. *Zackson*,

12 F.3d 1178, 1183 (2d Cir.1993) (quoting *United States* v. *Casamento*, 887 F.2d 1141, 1189 (2d

Cir.1989)).   Prosecutors are granted greater leeway in rebuttal summations, which are often

improvised.   *United States* v. *Arias–Javier*, 392 Fed.Appx. 896, 898 (2d Cir.2010).   In

evaluating a claim of improper argument, a court "must consider the objectionable remarks

within the context of the entire trial," *United States* v. *Espinal*, 981 F.2d 664, 666 (2d Cir.1992)

(citing *United States* v. *Young*, 470 U.S. 1, 11–12, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985)),

granting relief only if the remarks, "viewed against 'the entire argument before the jury,'

deprived the defendant of a fair trial."   *United States* v. *Pena*, 793 F.2d 486, 490 (2d Cir.1986);

*see also United Sates* v. *Melendez*, 57 F.3d 238, 240 (2d Cir. 1995) (prosecutor's remark during

summation in narcotics prosecution, telling jury they should believe testimony of key prosecution witness because trial judge "knows he is telling the truth," though clearly improper, was not prejudicial error requiring reversal of conviction.).

The defendant also argues that due to the "length of deliberations and the weakness of the government's case, there cannot be confidence in the 'certainty of conviction' absent the improper remarks."   (Def. Mem. at 24).   The length of the deliberations undercuts the defendant's argument that any remarks during rebuttal—which occurred a week before the jury returned its verdict and for which the jury did not receive a transcript—caused prejudice to the defendant.   Between the rebuttal and the jury's verdict, the jury examined hundreds of pages of transcripts of multiple witnesses' testimony and exhibits.   This was a deliberative, hard-working jury—they combed through the admissible evidence before they reached their verdict a week after rebuttal arguments.   As to the defendant's arguments about the "weakness" of the Government's case, the Government disputes that characterization and, as discussed in detail in Section I, above, believes strongly that there was more than sufficient evidence for a rational jury to find the defendant guilty of Counts One, Two and Three of the Indictment.

### D.   The Government Did Not Act Improperly by Eliciting the Fact that Law Enforcement Interviewed Brown.

The defendant argues that the Government "improperly elicited a portion of Tyrone Brown's post-arrest statement."   (Def. Mem. at 25).   That is incorrect and unsupported by the record.   The testimony to which the defendant cites in support of his argument is the following:

> Q.   What did you do at Simpson Street?
>
> A.   Once I arrived at Simpson Street, I briefly spoke with Detective Deloren, and myself and Detective Deloren interviewed Tyrone Brown.

(Tr. 519).   Eliciting the fact that Special Agent Reynolds interviewed Tyrone Brown—an investigative step that involved no hearsay or other violation of the rules of evidence—was

59

neither "a portion of Tyrone Brown's post-arrest statement" nor in contravention of the Court's pretrial ruling regarding the admissibility of the substance of Brown's post-arrest statements.

The defendant argues that this fact—that Special Agent Reynolds interviewed Brown—resulted in prejudice warranting a new trial.   (Tr. 25).   This argument is has no basis in fact or law.   The Government never elicited any of Brown's post-arrest statements.   As the Court is aware, Brown's post-arrest statements were the subject of extensive pre-trial litigation because *the defendant*, not the Government, wanted to elicit those statements at trial.   After a pretrial hearing on the issue, the Court ruled that the defendant could admit both the report of Brown's statements and testimony by Special Agent Reynolds regarding Brown's post-arrest statements.   (Tr. 124).   The Court's ruling did not address or preclude the Government, or defense counsel, from eliciting the simple fact that law enforcement interviewed Brown after he was arrested, and there was nothing improper about doing so.   At sidebar, for the very first time and notwithstanding protracted litigation and a pretrial hearing seeking to admit Brown's post-arrest statements, defense counsel, after objecting to Special Agent Reynold's statement that he interviewed Brown, stated that he no longer intended to present any evidence of Brown's post-arrest statements.   (Tr. 520-21).   Defense counsel objected, also for the first time, to the mere mention of the interview.   (Tr. 521).   The statement that Special Agent Reynolds interviewed Brown neither violated the Court's ruling regarding the admissibility of Brown's post-arrest statements, nor any other evidentiary rule or principle.   The Government did not seek to introduce Brown's post-arrest statements against the defendant, and no such testimony was elicited.   Therefore, the defendant suffered no prejudice, much less any prejudice that would warrant a new trial.

### E.   The Government Interviewed and Prepared with Torruella, Torres and Detective Deloren Multiple Times, and Upheld its Duties Regarding its Witnesses.

The defendant argues that the Government should have done more to makes sure that the testimony of Torruella and Torres was going to "stand up," and that it was the Government's failure to do so that caused Torres's testimony to be stricken and Torruella to "recant[] her identification on the stand."   (Tr. 26).   As reflected in the 3500 materials, and as the defendant does not dispute, the Government and law enforcement agents met with Torruella and Torres multiple times in the course of preparing for trial.   (*See* 3506-1, 3506-2, 3506-3, 3506-4, 3506-6, 3506-7, 3506-8, and 3506-13 (Torruella); 3507-1, 3507-2, 3507-3, 3507-4, 3507-6 (Torres)).   Presumably, had Torruella's and Torres's testimony "stood up," by the defendant's standards, he would have argued that the Government rehearsed their testimony or otherwise improperly coached its witnesses.   Obviously, that did not occur.   Therefore, the defendant is left with the argument that the Government did not prepare its witnesses enough.   But that is belied by the 3500 material, which demonstrates that not only did the Government meet with its witnesses multiple times, but it continued to ask questions about issues such as the witness's identifications of the defendant.   (*See* 3506-1, 3506-2, 3506-3, 3506-4, 3506-6, 3506-7, 3506-8, and 3506-13 (Torruella); 3507-1, 3507-2, 3507-3, 3507-4, 3507-6 (Torres)).   The Government vetted the witnesses' memories and their beliefs, and it vetted their prior identifications of the defendant during meetings with both Torruella and Torres.   With respect to Torres, even after Torres had described, in January 2014, to the best of her recollection the identification procedures and photographs of the defendant she could remember—which resulted in the Government's disclosures—the Government continued to ask Torres about photographs of the defendant that she saw and noted her statements in the 3500 material.   (*See* 3507-3, 3507-6).   Torruella and Torres, lay witnesses who had never testified before, endured difficult

cross-examinations.    But that is the purpose of a trial—for the defendant to be able to confront the witnesses against him and to attempt to make points and arguments through various techniques of cross-examination.    And that is precisely what the defendant did here.    Had Torruella's and Torres's testimony been perfect and irrefutable, the defendant would now be arguing that the Government committed some sort of misconduct by meeting with the witnesses too many times.    That is simply not the case.

With respect to Detective Deloren, the Government does not believe that Detective Deloren intended to mislead the Court or the Government, or that the facts support a finding that Detective Deloren lied during his testimony.    In fact, after the defendant moved to strike Torres's testimony, the Government offered and made Detective Deloren available for *additional* testimony and cross-examination.    The defendant argues that, after the Court's ruling regarding Brown's pretrial motion to suppress the evidence seized from his apartment, the Government "should have been fully aware of its heightened duty to vet its evidence."    (Def. Mem. at 27). The Government's briefing after the Court's initial ruling on the evidence in Brown's apartment state fully its position regarding those issues, and the Government does not seek to relitigate them here.    In fact, as the Court acknowledged—and defense counsel did not dispute—during the trial, the Government upheld its duty to ensure that testimony elicited from Government witnesses was true by entering a stipulation regarding when it learned about the newspaper photograph that Detective Deloren showed Torres.

As described above, the Government met with Torruella and Torres multiple times during the course of preparing for trial, and made timely disclosures of what it learned from those witnesses regarding the identification procedures throughout the course of the preparation sessions.    After Torres's testimony, the Government made him available to defense counsel to provide further testimony regarding the identification procedures.    The Government also wrote

62

a detailed letter to the Court regarding its understanding of the photographic identification procedures in response to the defendant's motion to strike Torres's testimony.   As with Torres and Torruella, the Government met with Detective Deloren multiple times during the course of the case and in preparation for his testimony.   (3502-11, 3502-12, 3502-13, 3502-14, 3502-19, 3502-20).   The Government more than met its obligation to prepare its witnesses and to understand the substance of their testimony.   The Government was surprised and confused by Torres's testimony, and undertook to try to understand it immediately afterward.   (Tr. 698).

Neither the Government's preparation of its witnesses nor the testimony of those witnesses prejudiced the defendant.   What happened during the trial is why trials are held—to vet and challenge witnesses, their recollections, and their statements of events.   As discussed above, after all of the evidence had come in and both sides had rested, the defendant believed he had received a fair trial.   Only now, disappointed with the result of the jury's verdict, does the defendant argue that the witnesses' testimony was so prejudicial that the jury should not have been allowed to reach a verdict in this case.

"[T]he Constitution entitles a criminal defendant to a fair trial, not a perfect one," *Delaware* v. *Van Arsdall*, 475 U.S. 673, 681 (1986).   The defendant obtained a fair—if not perfect—trial, and any argument that the defendant was so severely prejudiced by a combination of witness testimony and the Government's actions that he is entitled to a new trial is unsupported by the record, the Court's rulings and curative jury instructions, and the jury's deliberate and methodical review of the admitted evidence and testimony prior to reaching its verdicts.

## **CONCLUSION**

For the foregoing reasons, the defendant's motions should be denied.

Dated: New York, New York
February 6, 2015

Respectfully submitted,

PREET BHARARA
United States Attorney

By: _____
Negar Tekeei
Assistant United States Attorney
Telephone: (212) 637-2482