UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
                                          :
UNITED STATES OF AMERICA,                 :
                                          :
                                          :
            – against –                   :       13 Cr. 345 (LGS)
                                          :
ANTIONE CHAMBERS,                         :       (Filed Electronically)
                                          :
                  Defendant.              :
                                          :
------------------------------------------------------x


REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT ANTIONE
CHAMBERS'S MOTION FOR ACQUITTAL, AND/OR A NEW TRIAL
PURSUANT TO RULE 29(c), AND RULE 33, FED.R.CRIM.P.


JOSHUA L. DRATEL
JOSHUA L. DRATEL, P.C.
29 Broadway, Suite 1412
New York, New York 10006
(212) 732-0707
jdratel@joshuadratel.com

*Attorneys for Defendant Antione Chambers*


– *Of Counsel* –

Joshua L. Dratel
Whitney G. Schlimbach

TABLE OF CONTENTS

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT

POINT I

THE EVIDENCE WAS NOT SUFFICIENT
TO PERMIT A RATIONAL JUROR TO
CONVICT MR. CHAMBERS ON ANY
OF THE THREE COUNTS CHARGED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

A.      Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

B.      The Government's Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        1.      The Testimony of Emma Toruella . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        2.      The Description of the Car . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        3.      The Testimony of Demi Torres . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        4.      The Testimony of Officer Whelan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        5.      The Lack of Evidence That Tyrone Brown Was a Conspirator . . . . . . . . . . . . . 11

        6.      Testimony and Evidence Regarding Zaporia Dunbar . . . . . . . . . . . . . . . . . . . 12

        7.      "Twizzie" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        8.      The Telephone and Cell Site Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        9.      Mr. Chambers's Post-Arrest Statements . . . . . . . . . . . . . . . . . . . . . . . . . . 15

C.      The Facts and Case Law Compel a Judgment of Acquittal In This Case . . . . . . . . . . . 16

POINT II

PURSUANT TO RULE 33, FED.R.CRIM.P.,
MR. CHAMBERS SHOULD BE GRANTED
A NEW TRIAL BECAUSE OF (A)  THE FAILURE
TO CONDUCT A PRETRIAL HEARING REGARDING
EYEWITNESS IDENTIFICATION TESTIMONY;
AND/OR (B)  PROSECUTORIAL MISCONDUCT     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

TABLE OF AUTHORITIES

CASES

*Bourjailay v. United States*, 483 U.S. 171 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*Cosby v. Jones*, 682 F.2d 1373 (11th Cir.1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Dunnigan v. Keane*, 137 F.3d 117 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Gannett Co. v. DePasquale*, 443 U.S. 368 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Jackson v. Virginia*, 443 U.S. 307 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

*Perry v. New Hampshire*, 132 S. Ct. 716 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Sullivan v. Louisiana,* 508 U.S. 275 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Andujar*, 49 F.3d 16 (1st Cir.1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Argentina*, 173 F. App'x 90 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Autuori,* 212 F.3d 105 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Berganza*, ___ F.Supp.2d ___, 2005 WL 372045 (S.D.N.Y. Feb. 16, 2005) . . 19

*United Bhd. of Carpenters & Joiners of Am. v. United States,* 330 U.S. 395 (1947) . . . . . . . . . 4

*United States v. Cassese*, 428 F.3d 92 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Clark,* 740 F.3d 808 (2d Cir.2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Coplan,* 703 F.3d 46 (2d Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 17

*United States v. D'Amato*, 39 F.3d 1249 (2d Cir.1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 17

*United State v. Desena*, 260 F.3d 150 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Geaney,* 417 F.2d 1116 (2d Cir.1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Glenn,* 312 F.3d 58 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 16, 17

*United States v. Gotti*, 457 F. Supp.2d 403 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . 14

iii

*United States v. Huezo,* 546 F.3d 174 (2d Cir.2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17

*United States v. Jackson,* 368 F.3d 59 (2d Cir.2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Johnson*, 513 F.2d 819 (2d Cir.1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Jones,* 393 F.3d 107 (2d Cir.2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Kapelioujnyj,* 547 F.3d 149 (2d Cir.2008) . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Lopez*, 74 F.3d 575 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Lorenzo,* 534 F.3d 153 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 11

*United States v. Macklin,* 671 F.2d 60 (2d Cir.1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Mankani*, 738 F.2d 538 (2d Cir.1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Mariani*, 725 F.2d 862 (2d Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Martinez*, 54 F.3d 1040 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Martino,* 759 F.2d 998 (2d Cir.1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Maldonado-Rivera*, 922 F.2d 934 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . 20

*United States v. Mulheren,* 938 F.2d 364 (2d Cir.1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Nusraty,* 867 F.2d 759 (2d Cir.1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Oguns,* 921 F.2d 442 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Rodriguez,* ___ F.Supp.2d ___, 2002 WL 313894 (S.D.N.Y. Feb. 27, 2002) . . 19

*United States v. Rodriguez,* 392 F.3d 539 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . 11, 16

*United States v. Soto*, 47 F.3d 546 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Truesdale*, 152 F.3d 443, 448–49 (5th Cir.1998) . . . . . . . . . . . . . . . . . . . . 16

*United States v. Valle*, 301 F.R.D. 53 (S.D.N.Y. 2014) . . . . . . . . . . . . . . . . . . . . . . 3, 4, 8, 11, 15

*United States v. Volpe*, 42 F. Supp.2d 404 (E.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Wade*, 388 U.S. 218 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19, 20

*United States v. Ward*, 505 F. App'x 18 (2d Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Wiley*, 846 F.2d 150 (2d Cir.1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Wilson*, 493 F. Supp.2d 364 (E.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Wright*, 835 F.2d 1245 (8th Cir.1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## STATUTES

18 U.S.C. §924(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Rule 29, Fed.R.Crim.P. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 4, 8, 9, 10, 13, 20

Rule 29(c), Fed.R.Crim.P. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 21

Rule 33, Fed.R.Crim.P. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 18, 21

Rule 801(d)(2)(E), Fed.R.Evid. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

## OTHER AUTHORITIES

1A John Henry Wigmore, Wigmore on Evidence § 25 (Tillers rev.1983) . . . . . . . . . . . . . . . . . 16

Irene Merker Rosenberg & Yale L. Rosenberg, *"Perhaps What Ye Say Is Based Only on Conjecture"—Circumstantial Evidence, Then and Now*, 31 Hous. L.Rev. 1371(1995) . . . . . 16

v

**Introduction**

This Reply Memorandum of Law is submitted on behalf of defendant Antione Chambers in support of his motions, pursuant to Rules 29(c) and 33, Fed.R.Crim.P., for, respectively, a judgment of acquittal on all remaining counts in the Indictment, or a new trial.  Much of the government's Memorandum of Law in opposition to Mr. Chambers's motions does not require rejoinder because it replicates the problem with the trial itself:  rather than distill the evidence to that which was admissible, and from which reasonable inferences could be drawn, the government presents the entirety of the trial (albeit selectively in important aspects), including the portions that were inadmissible and substantially prejudicial to Mr. Chambers (and subsequently stricken).

That failure of precision muddles – rather than clarifies – the analysis the Court must perform in determining Mr. Chambers's Rule 29 motion, and amplifies the underlying basis for his Rule 33 motion.  Limited to its proper elements, the trial record establishes that Mr. Chambers's Rule 29 motion should be granted, and/or that the extraneous portions were so prejudicial as to require a new trial pursuant to Rule 33.

Indeed, the government detailed recitation of the trial record demonstrates the danger – and inadequacy – of promoting quantity over quality, as very little of what the government recounts contributes to any inference of Mr. Chambers's guilt, and even that is well below the threshold required for conviction under the standards of a Rule 29 motion.  While the government attempts to assemble a snowball rolling downhill, accumulating more mass as it travels, the tiny kernel of probative material remains minuscule, and insufficient to establish Mr. Chambers's guilt beyond a reasonable doubt.

1

In that context, perhaps the most illustrative means of evaluating whether the evidence was sufficient is to imagine the trial without *any* of the positive identification evidence – that is, in practical terms, to imagine *no trial at all*, as it is doubtful the government would, or even could, proceed with only ambiguous cell phone and cell site records that failed even to link Mr. Chambers conclusively to the phone number in question on the night of the robbery/kidnapping.

Add to that the material evidence *contradicting* the government's case:  (1)  Emma Toruella's testimony that the second robber/kidnapper was *not* Mr. Chambers;  (2)  Ms. Toruella's and David Barea's description of the second robber having a tear drop tattoo;  (3)  Ms. Toruella's and Mr. Barea's description of the car (including, in Ms. Toruella's case, the license plate color and state) that deviated in every material respect from the 1995 blue Honda Civic owned by Mr. Chambers's girlfriend (and which the government could not prove at all that Mr. Chambers ever drove);  and (4)  the lack of any forensic evidence linking Mr. Chambers to the crime, *i.e.*, DNA evidence available from the duct tape used to restrain Mr. Barea and Ms. Toruella, or fingerprints therefrom (or from the hammer purportedly found in the Honda months later).

Confronted with this set of facts, it is inconceivable the government would have proceeded to trial, much less obtained convictions against Mr. Chambers.  Accordingly, it is respectfully submitted that, for the reasons set forth below as well as in Mr. Chambers's Initial Memo of Law in support of these motions ("Initial Memo of Law"), his Rule 29 motion for a judgment of acquittal, and/or his Rule 33 motion for a new trial, should be granted.

**ARGUMENT**

**POINT I**

**THE EVIDENCE WAS NOT SUFFICIENT
TO PERMIT A RATIONAL JUROR TO
CONVICT MR. CHAMBERS ON ANY
OF THE THREE COUNTS CHARGED**

**A.**     *Applicable Law*

While, as the government notes in its Memo of Law, at 36, a "defendant challenging a jury's verdict 'carries a heavy burden,' [*United States v. Oguns,* 921 F.2d 442, 449 (2d Cir. 1990)], that 'burden is not an impossible one.'" *United States v. Valle*, 301 F.R.D. 53, 79 (S.D.N.Y. 2014), *quoting United States v. Kapelioujnyj,* 547 F.3d 149, 152–53 (2d Cir.2008) (*citing United States v. Jones,* 393 F.3d 107, 111 (2d Cir.2004)).

Indeed, as the Court in *Valle* noted,

> "if [courts] are to be faithful to the constitutional requirement that no person may be convicted unless the Government has proven guilt beyond a reasonable doubt, [however,] [they] must take seriously [their] obligation to assess the record to determine, as *Jackson* [*v. Virginia*], 443 U.S. 307 (1979)] instructs, whether a jury could *reasonably* find guilt beyond a reasonable doubt."

301 F.R.D. at 79, *quoting United States v. Clark,* 740 F.3d 808, 811 (2d Cir.2014) (emphasis in original) (brackets by the Court in *Valle*).

In addition, as the Second Circuit instructed in *United States v. D'Amato,* 39 F.3d 1249 (2d Cir.1994), "a conviction based on speculation and surmise alone cannot stand." *Id.*, at 1256. *See also Valle*, 301 F.R.D. at 79.  Thus, "the government must introduce sufficient evidence to allow the jury to reasonably infer that each essential element of the crime charged has been proven beyond a reasonable doubt."  39 F.3d at 1256, *citing Jackson,* 443 U.S. at 319;  *United*

3

*States v. Macklin,* 671 F.2d 60, 65 (2d Cir.1982);  *Valle*, 301 F.R.D. at 79.  *See also United States v. Jackson,* 368 F.3d 59, 63 (2d Cir.2004) ("[t]he evidence, in other words, must be of such persuasive quality that a jury could reasonably find the essential elements *beyond a reasonable doubt* on the basis of that evidence") (emphasis in original).

As a result, "while a jury is 'permitted to enter an unassailable but unreasonable verdict of "not guilty,"' it does not have the "'power to enter an unreasonable verdict of guilty.'" *Valle*, 301 F.R.D. at 79-80, *quoting Jackson v. Virginia,* 443 U.S. at 318 n. 10 (*citing United Bhd. of Carpenters & Joiners of Am. v. United States,* 330 U.S. 395, 408 (1947)).

Moreover, the Second Circuit has repeatedly directed that "'[i]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt.'" *United States v. Coplan,* 703 F.3d 46, 69 (2d Cir. 2012) (*quoting United States v. Huezo,* 546 F.3d 174, 193 (2d Cir.2008)) (alteration in original);  *see also D'Amato,* 39 F.3d at 1256 ("government must do more than introduce evidence 'at least as consistent with innocence as with guilt'") (*quoting United States v. Mulheren,* 938 F.2d 364, 372 (2d Cir.1991)); *United States v. Mankani*, 738 F.2d 538, 547 (2d Cir.1984);  *Valle*, 301 F.R.D. at 80.

Accordingly, as the Court in *Valle* pointed out, "a district court must grant a defendant's Rule 29 motion where the evidence 'viewed in the light most favorable to the government, remains, at best, in equipoise.'" *Id.*, *quoting Coplan,* 703 F.3d at 69.  *See also Coplan,* 703 F.3d at 69 (granting Rule 29 appropriate if evidence, "'viewed in the light most favorable to the prosecution[,] gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence'") (*quoting Huezo,* 546 F.3d at 193).

**B.**     ***The Government's Case***

The government's description of the evidence at trial need not be addressed point-by-point because, as noted above, much of that evidence lacks any probative value with respect to proving Mr. Chambers's guilt beyond a reasonable doubt.  For example, David Barea's testimony did not incriminate Mr. Chambers *at all*.  Rather, it exculpated Mr. Chambers in significant fashion as detailed in Mr. Chambers's Initial Memo of Law, at 6-8, 11.  Similarly, other arguments raised by the government were anticipated and rebutted in Mr. Chambers's Initial Memo of Law.

As a result, this Reply will focus on a discrete number of contentions made by the government in its opposition papers.

**1.**     ***The Testimony of Emma Toruella***

Try as it might, the government cannot escape the most important part of Ms. Toruella's testimony:  her recantation of her identification of Mr. Chambers as the second robber/kidnapper.  In its effort to do so, the government attempts certain transparent linguistic techniques – repeatedly, at 3-5, using the term "the defendant" when, in fact, the only conclusion any observer could draw by the end of Ms. Toruella's testimony was that the person whom she denominated the "Tall Guy," and whose activities she described in her testimony, was *not* Mr. Chambers – as well as unavailing arguments.

For example, the government, in its Memo of Law, at 38, attempts to lend credence to Ms. Toruella's alleged identification of Mr. Chambers from a photo array back in June 2013. Not only was that superseded by Ms. Toruella's in-court repudiation of her earlier identification of Mr. Chambers (which applied as well to her in-court identification of Mr. Chambers, which

she acknowledged during cross-examination was, given the configuration of the courtroom, a
"no brainer," T. 202), but even that earlier identification from a photo array was of dubious
reliability.

As Ms. Toruella testified at trial, on the back of the array Detective DeLoren wrote that
she said "it kind of looks like the guy," T. 213 – a most salient fact not mentioned even once in
the government's Memo of Law.  That is hardly a firm identification, much less one that could in
any way counteract an in-court recantation.

Also, Det. Deloren's importuning Ms. Toruella to "forget about the teardrop" tattoo when
reviewing that array also deprives any identification resulting therefrom of any value.  In that
context, the government's claim, in its Memo of Law, at 40-41, that Ms. Toruella's reference to
the "Tall Guy's" teardrop tattoo was the result of confusion is belied dispositively by Mr.
Barea's identical description to the police the morning after the robbery/kidnapping:  that the
second robber had a teardrop tattoo.

Nor was Det. Deloren's claim that including an array without *any* photos with teardrop
tattoos would not be appropriate procedure credible, as Ms. Toruella testified that that was
precisely what occurred initially after the robbery:  she was shown a number of arrays in which
*all* of the photos were of persons with teardrop tattoos.[1]

Thus, Mr. Toruella's earlier identification of Mr. Chambers was so rife with ambiguity
(her tenuous written confirmation), if not improper suggestion ("forget the teardrop") and
manipulation (the latter occurring as a result of Det. Deloren's manual placement of Mr.

---

[1]  The 3500 material for Det. Deloren confirmed that there were a number of arrays in
which all of the photos were of persons with teardrop tattoos.

Chambers's photo in a computer-generated array in which he did not appear) that it loses any probative value, much less that capable of overcoming her in-court affirmation – *twice* – that Mr. Chambers *was not the "Tall Guy."*

Likewise, the government's assertion, in its Memo of Law at 4, that Ms. Toruella was "emotional" during her testimony points in a direction opposite that claimed by the government. Her progressively more emotional affect was attributable to her realization, as she testified, that Mr. Chambers (whom she had never seen before) was *not* the second robber (the "Tall Guy"), and over the course of her testimony she gained the courage to say so at the very end.  Ms. Toruella took the witness stand prepared to incriminate and convict (and put behind bars) the person(s) responsible for her harrowing ordeal, but was shaken by her recognition that the person at the defense table was "not him."  T. 214-15.

Moreover, contrary to the government's suggestion, in its Memo of Law, at 39, Ms. Toruella's in-court recantation was not that Mr. Chambers did resemble the person in the photograph, but rather that Mr. Chambers was *not the second robber/kidnapper*.  Indeed, it was the government, during redirect, that instructed Ms. Toruella to stop looking at the photographs that were in evidence, compelling her to focus on Mr. Chambers as he sat in the courtroom.  T. 215.

Ultimately, it cannot be disputed that Ms. Toruella's testimony not only did not advance the government's case, but that it eviscerated it entirely.  The person with the best and longest opportunity to view the Tall Guy – and the only person at trial whose testimony was admissible on that issue – testified that Mr. Chambers was "not him."  If the trial had ended after Mr.

Toruella's testimony, a successful Rule 29 motion would have been a foregone conclusion.[2]

## 2.     *The Description of the Car*

In its Memo of Law, the government at various points (at 38, 42) points out that a Rule 29 motion must be evaluated in the context of the "totality" of the evidence, and not by considering any particular piece of evidence in isolation.  In *Valle*, the Court explained that

> [i]n assessing a sufficiency challenge, a court "'looks at the "evidence in its totality"' and collectively, *United States v. Lorenzo,* 534 F.3d 153, 159 (2d Cir. 2008) (*quoting United States v. Glenn,* 312 F.3d 58, 63 (2d Cir. 2002) (*quoting United States v. Autuori,* 212 F.3d 105, 114 (2d Cir. 2000))) – "'not in isolation but in conjunction.'"

301 F.R.D. at 80, *quoting United States v. Mariani,* 725 F.2d 862, 865 (2d Cir. 1984) (*quoting United States v. Geaney,* 417 F.2d 1116, 1121 (2d Cir.1969)).

Yet here with respect to the description (by Ms. Toruella and Mr. Barea) of the robbers' car the government disregards entirely the very principle it cites, and focuses exclusively on a single element – the portion of the license plate number – and does so inaccurately.  For instance, the government, in its Memo of Law, at 8 & 41, contends that the only information about which Ms. Toruella was certain was the license plate number.

However, Det. Deloren, in his police report the day after the robbery noted that the vehicle "has been described as a primer paint 1997-98 Acura with a *possible* partial NY plate of 7788."  T. 267 (emphasis added).  Thus, the record reflects the opposite of what the government

---

[2]  In its Memo of Law, at 32, the government notes that FBI Special Agent John Reynolds obtained the arrest warrant for Mr. Chambers in June 2013 – *after* the purported positive identifications by Ms. Toruella and Ms. Torres.  Thus, as noted in Mr. Chambers's Initial Memo of Law, at 4, even the government believed that a positive identification of Mr. Chambers was a prerequisite for charging him formally, and that the case against him could not otherwise proceed.

maintains:  Ms. Toruella (the only person who provided any license plate information) was *not* certain of the plate number.  Also, she described it as a New York license plate, which is different in color and design from the North Carolina license plate on the Honda Civic belonging to Zaporia Dunbar, Mr. Chambers's girlfriend.  In addition, *only* the license plate number, and *none* of the other information about the car – including the make, model, color, and year, was described equivocally in that police report.  *See also* Mr. Chambers's Initial Memo of Law, at 6-8.

Thus, the government's focus on four license plate numbers (as opposed to the state of issuance, or the remainder of the license plate), and not *everything else* about the car is myopic and contrary to the standards for review of a Rule 29 motion, which is that evidence is evaluated "collectively," and not in isolation.

Taken together, the descriptions with respect to the car and the license plate, do not support an inference that Zaporia Dunbar's Honda Accord was the car in which Mr. Barea and Ms. Toruella were transported the night of the robbery.  In fact, there was no evidence that Ms. Dunbar's Honda had "primer paint" or anything similar, *see* Government's Memo of Law, at 12, or that either Ms. Toruella or Mr. Barea confused it with a 1997-98 model Acura.

Nor did either Ms. Toruella or Mr. Barea describe the car as "Japanese," *see* Government's Memo of Law, at 39;  instead, both told police it was an Acura.  T. 200, 407, 410. Nor did Ms. Toruella or Mr. Barea provide a "general" description of the car.  Rather, each description was specific as to make, color, and (in Mr. Barea's case) year.  Nor was there ever, contrary to the government's contention, in its Memo of Law, at 41, any description of the robbers' car as "midnight blue" in color.  Rather, that was the color Mr. Barea attributed to a

Chevrolet Impala in which he saw Tyrone Brown riding in as a passenger a week earlier.

**3.      *The Testimony of Demi Torres***

The government's detailed reference to the testimony of Demi Torres, Ms. Toruella's daughter, *see* Government's Memo of Law, at 10-11 & 24-27, is classic deflection, as there is nothing in Ms. Torres's testimony – other than her stricken identification of Mr. Chambers – remotely relevant to Mr. Chambers's Rule 29 motion.  Nor does the government cite anything from her testimony in that regard.

Again, imagining the trial without Ms. Torres's identification testimony only supports Mr. Chambers's Rule 29 motion, as it does not contribute any evidence to connect him to the robbery/kidnapping.  Also, the government's emphasis, in its Memo of Law, at 10-11, on Ms. Torres's testimony about her supposed identification of Mr. Chambers's photograph merely replicates the problem of having that information before the jury, yet asking jurors to ignore it entirely.[3]

**4.      *The Testimony of Officer Whelan***

Tying Mr. Chambers to the incident involving Ms. Dunbar's Honda, witnessed and testified to by New York City Police Department ("NYPD") Officer Michael Whelan, is simply not a permissible inference from any information in the record.  As a threshold matter, there was not any evidence that Mr. Chambers ever drove that car, and the only evidence in the record is

---

[3]  The sequence of photographs of Mr. Chambers shown to Ms. Torres by Det. Deloren will be addressed in Mr. Chambers's upcoming response to the government's application to have the Court revisit its adverse credibility finding with respect to Det. Deloren.  The same is true for the government's belief, expressed in n. 1 (at 12), that Det. Deloren's testimony about when he first alerted the prosecution of his display (to Ms. Torres) of newspaper photos of Mr. Chambers (or even if he disclosed that at all prior to Ms. Torres informing the government in February 2014) was not "deliberately false."

that Mr. Chambers was not permitted to do so.  T. 612.

Also, Officer Whelan, who made eye contact with the driver of the Honda Civic, described him as "dark-skinned," approximately 5'10", with short hair.  T. 420-22.  *None* of those features match Mr. Chambers.  Nor was Officer Whelan asked to identify Mr. Chambers in the courtroom, or via any other means.

Consequently, the encounter between Officer Whelan and the Honda fails to support the government's case – indeed, it achieves the opposite, as it establishes that *another male, and not Mr. Chambers*, drove the car in proximity in time to the robbery.[4]

As the Court in *Valle* observed, in reviewing a sufficiency challenge, "'specious inferences are not indulged, because [it] would not satisfy the [Constitution] to have a jury determine that the defendant is *probably* guilty.'"  301 F.R.D. at 80, *quoting United States v. Lorenzo,* 534 F.3d at 159 (*quoting United States v. Rodriguez,* 392 F.3d 539, 544 (2d Cir. 2004) (*quoting Sullivan v. Louisiana,* 508 U.S. 275, 278 (1993)) (emphasis and alterations in original) (internal quotation marks and citations omitted).

### 5. *The Lack of Evidence That Tyrone Brown Was a Conspirator*

The government also makes a futile effort to find sufficient evidence that Tyrone Brown was a conspirator.  However, as pointed out in Mr. Chambers's Initial Memo of Law, at 12, Mr.

---

[4]  Also, the only evidence with respect to the condition of the Honda at some point afterward was from Det. Deloren, and did not include any photos or other corroboration. Similarly, Det. Deloren failed to perform any forensic tests on the hammer he purportedly recovered from the Honda, T. 272-73, 291, 402-03, just as he failed to perform DNA testing (with respect to Mr. Chambers) on the duct tape until the eve of trial – which results were negative.  T. 219-20.  The hammer itself, of course, was of a generic type that could have been purchased at any hardware store in New York.  T. 272-73, 291.  *See also* Mr. Chambers's Initial Memo of Law, at 5.

Brown's expression of condolence to Ms. Toruella after the robbery, even if admissible, cannot suffice.  Also, when confronted by Mr. Barea, Mr. Brown *denied* involvement in the robbery.  T. 397.

The government, in its Memo of Law, at 46, also mentions Mr. Barea's testimony that a week before the robbery he saw Mr. Brown riding in an Impala.  Yet the government fails to explain how that is in way linked to the robbery/kidnapping.  In fact, the evidence fails to meet the standard set forth in *Bourjailay v. United States*, 483 U.S. 171 (1987), with respect to the evidence sufficient to qualify a statement as a co-conspirator's statement, and, therefore, an exception to hearsay pursuant to Rule 801(d)(2)(E), Fed.R.Evid.  As a result, the record does not in any fashion establish Mr. Brown's complicity in the robbery and kidnapping of Mr. Barea.

> **6.**      ***Testimony and Evidence Regarding Zaporia Dunbar***

The inferences the government seeks to draw from the testimony and evidence regarding Zaporia Dunbar are not viable, and even if they were they would establish Mr. Chambers's guilt beyond a reasonable, nor be a factor in any such determination.  For example, no particular reason was ascribed to Ms. Dunbar's move from the Bronx to North Carolina.  As a result, any attempt by the government to connect it to the robbery/kidnapping, or to Mr. Chambers at all, is pure speculation and not a proper basis for inference, particularly when the investigators were made aware that she had relocated to North Carolina, where her mother lived – a fact that could easily have been necessitated or at least motivated by Mr. Chambers's incarceration in this case. Also, Ms. Dunbar's landlord testified she owed rent, which could also have been her motive in leaving without notice or contact information.  T. 461.

Also, Mr. Chambers told police the truth about his relationship with Ms. Dunbar, and his

911 call.  *See* Government's Memo of Law, at 33.  Mr. Chambers also acknowledged that he

knew Mr. Glisson and Mr. Brown.  Mr. Chambers also told police Ms. Dunbar would not let him

drive her Honda – a statement for which there was no contradictory evidence.

### 7.    *"Twizzie"*

In its effort to link Mr. Chambers to the "Twizie" in Tyrone Brown's phone contacts, the

government, in its Memo of Law at 32, maintains that Mr. Chambers, in the recorded telephone

call he made from the Metropolitan Detention Center (Government Exhibit 125-T), identified

himself during that call as "my man Twiz."

Yet if that were the case, it would represent the first time in the history of conversation,

formal, vernacular, or otherwise, that someone would refer to *themselves* as "my man."  Yet that

flight from logic is what the government relies upon.  Also, while the government, in its Memo

of Law, at 42, points to Kentrell Ferguson's testimony about the "Twizzy" entry in his phone

contacts, *none* of the telephone numbers listed under "Twizzy" in Mr. Ferguson's phone matched

those associated with "Twizie" in Mr. Brown's phone.

### 8.    *The Telephone and Cell Site Records*

As a threshold matter, because the government failed to adduce evidence sufficient to

support a finding under *Bourjaily* that Mr. Brown was a conspirator, the contacts entry on Mr.

Brown's phone constituted inadmissible hearsay, and therefore should not be considered in

determining Mr. Chambers's Rule 29 motion.  At the very least, the entry should not be

considered for its truth.

Indeed, there was neither testimony nor other evidence that Mr. Brown's phone contacts

entries were accurate or current.  In fact, one of the entries in Mr. Brown's phone associated with

Mr. Barea's numbers was "john 129," yet there was no evidence that bore any relation to Mr. Barea.  Again, the inference that Mr. Brown's contacts entries were accurate or current was not permissible in the absence of any evidence or testimony establishing either.

Also, the texts from Mr. Brown cited by the government in its Memo of Law, at 15, 43-45, could not have been that Mr. Barea had arrived at Mr. Brown's apartment because the phone records and Mr. Barea's testimony, as well as the security camera video (Government Exhibits 200, 210 & 202) establish that Mr. Barea did *not* call Mr. Brown either just before or upon arrival, but instead knocked on Mr. Brown's window.  T. 357-58.

In addition, as discussed in Mr. Chambers's Initial Memo of Law, at 13-15, the cell site evidence is not sufficient because relates only to the location of the *device*, not to either *who possessed* it at the time, who was *using* it at the time, or the *contents* of the communications.

In that context, the *entirety* of the government's position with respect to the content of any electronic communications (other than those testified to by Mr. Barea) is rank speculation, as none of the content was either preserved, intercepted, or the subject of any testimony or evidence. Thus, the government's theory depends entirely on its hypothesis regarding the content of a series of communications lasting more than a week without *any* verification in the record substantiating that purported content. As the Court pointed out in *United States v. Gotti*, 457 F. Supp.2d 403, 409 (S.D.N.Y. 2006), "[a]n inference cannot be based on speculation or guesswork.  It must be based on the evidence in the record."  Here, the record is devoid of such evidence.

Moreover, in light of Ms. Toruella's testimony that Mr. Chambers was not the "Tall Guy," the only reasonable inferences are either that the communications from the 6130 telephone

14

number were not connected to the robbery, or that Mr. Chambers was not connected to those communications.[5]

### 9.   *Mr. Chambers's Post-Arrest Statements*

The government, in its Memo of Law, at 49-51, also relies on Mr. Chambers's post-arrest statements following the traffic stop in New Jersey.  However, as discussed in Mr. Chambers's Initial Memo of Law, at 15-16, those statements are not sufficient to establish Mr. Chambers's guilt.

As explained by the Second Circuit in *United States v. Johnson*, 513 F.2d 819 (2d Cir.1975),

> falsehoods told by a defendant in the hope of extricating himself from suspicious circumstances are insufficient proof on which to convict where other evidence of guilt is weak and the evidence before the court is as hospitable to an interpretation consistent with the defendant's innocence as it is to the Government's theory of guilt.

*Id*., at 824.  *See also United States v. Nusraty,* 867 F.2d 759, 765 (2d Cir.1989) (*quoting United States v. Di Stefano,* 555 F.2d 1094, 1104 (2d Cir.1977)).

Consequently, here, as in *Nusraty*, any "false exculpatory statement here 'fail[s] to save an otherwise inadequate case[.]'" 867 F.2d at 765, *quoting United States v. Martino,* 759 F.2d 998, 1005 (2d Cir.1985) (alteration in *Nusraty*).  *See also Valle*, 301 F.R.D. at 93.

---

[5]  The communications could easily have been from a customer of Mr. Brown being notified by Mr. Brown that Mr. Brown had a supply of drugs to sell.  That is just as, if not more, likely a scenario.  *See Huezo*, 546 F.3d at 193 ("[i]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt") (internal quotation marks omitted).

**C.**     ***The Facts and Case Law Compel a Judgment of Acquittal In This Case***

The guiding principles for Rule 29 motions compel a judgment of acquittal in this case.

While the government may prove its case by circumstantial evidence alone, *United States v.*

*Rodriguez*, 392 F.3d 539, 544 (2d Cir. 2004), the government cannot simply pile speculative or

even tenuous inferences upon each other to satisfy its burden of proof.

As the Second Circuit explained in *United States v. Glenn*,

> the jury must have been presented with a sufficient evidentiary
> predicate to support the conclusion that, beyond a reasonable
> doubt, [the defendant committed the charged offense].  *See* [*United
> State v. Desena*, 260 F.3d 150, 154 (2d Cir. 2001)];  *United States
> v. Truesdale*, 152 F.3d 443, 448–49 (5th Cir.1998).

312 F.3d at 69-70.

Expounding on that proposition, the Court in *Glenn* reasoned that

> [a]s the name "circumstantial evidence" suggests, the strength of a
> particular piece of evidence turns on the specific circumstances
> that accompany the evidence.  Wigmore observed that, "[a]side
> from autoptic proference,5 [ ] all evidence must involve an
> inference from some fact to the proposition to be proved."  *See* 1A
> John Henry Wigmore, Wigmore on Evidence § 25 (Tillers
> rev.1983).

*Id*. (brackets by the Court in *Glenn*).

However, as the Court in *Glenn* cautioned, "as the inferential leap between the fact and

the proposition to be derived grows, the probative value of the evidence diminishes. *See* Irene

Merker Rosenberg & Yale L. Rosenberg, *"Perhaps What Ye Say Is Based Only on*

*Conjecture"—Circumstantial Evidence, Then and Now*, 31 Hous. L.Rev. 1371, 1385, 1423

(1995)."  *Id*.

Thus, as the Second Circuit has emphasized repeatedly,

16

> it is not enough that the inferences in the government's favor are
> permissible.  We must also be satisfied that the inferences are
> sufficiently supported to permit a rational juror to find that the
> element, like all elements, is established beyond a reasonable
> doubt.

*United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995), *citing United States v. Soto*, 47

F.3d 546, 549 (2d Cir. 1995);  *D'Amato*, 39 F.3d at 1256.

As a result, "a conviction based on speculation and surmise alone cannot stand."

*D'Amato*, 39 F.3d at 1256, *citing United States v. Wiley*, 846 F.2d 150, 155 (2d Cir.1988).  Here,

the "inferential leap[s] between the fact[s] and the proposition[s] to be derived" the government

seeks to assert are multiple and far too lengthy to traverse, both individually and collectively.

They constitute theory and supposition rather than inferences sufficiently supported in the

record.

As in *United States v. Cassese*, 428 F.3d 92 (2d Cir. 2005), "viewed singly, each of the

areas of proof by the Government was characterized by modest evidentiary showings, equivocal

or attenuated evidence of guilt or a combination of the three."  *Id.*, at 103.  Yet, here, as in

*Cassese*, the government's case "failed to reach [the requisite] threshold" for conviction.  *Id.*

As referenced **ante**, at 4, in a multitude of cases, the Second Circuit has instructed that

> if the evidence viewed in the light most favorable to the
> prosecution gives "equal or nearly equal circumstantial support to
> a theory of guilt and a theory of innocence," then "a reasonable
> jury must necessarily entertain a reasonable doubt."

*Coplan*, 703 F.3d at 69, *quoting Huezo*, 546 F.3d at 193.  *See also Cassese*, 428 F.3d at 103;

*Glenn*, 312 F.3d at 70.[6]

---

[6]  The Court in *Glenn* quoted the pertinent language from *United States v. Lopez*, 74 F.3d
575, 577 (5th Cir. 1996) (internal quotation marks and emphasis removed), which has also been

Here, in light of the evidence, including but not limited to Ms. Toruella's categorical and repeated testimony that Mr. Chambers was *not* the "Tall Guy," that is the *best* case scenario for the government.  Accordingly, it is respectfully submitted that Mr. Chambers Rule 29(c) motion for a judgment of acquittal should be granted as to all remaining counts.

## POINT II

### PURSUANT TO RULE 33, FED.R.CRIM.P., MR. CHAMBERS SHOULD BE GRANTED A NEW TRIAL BECAUSE OF (A)  THE FAILURE TO CONDUCT A PRETRIAL HEARING REGARDING EYEWITNESS IDENTIFICATION TESTIMONY; AND/OR (B)  PROSECUTORIAL MISCONDUCT

Regarding Mr. Chambers's motion for a new trial pursuant to Rule 33, Fed.R.Crim.P., the government's position, in its Memo of Law, at 52-56, that a hearing pursuant to *United States v. Wade*, 388 U.S. 218 (1967) was not necessary is curious given its application, during trial, for just such a hearing.  *See* Mr. Chambers's Initial Memo of Law, at 19.

As discussed in Mr. Chambers's Initial Memo of Law, at 16-21, a pretrial hearing would have obviated the need to strike Ms. Torres's testimony regarding the identification, and instruct the jury to disregard it (and again during deliberations when it asked for Ms. Torres's testimony), and perhaps – given the testimony of Ms. Toruella as well that would have been explored at a pretrial *Wade* hearing – obviated the need for a trial at all.[7]

---

adopted by other Circuits as well.  *See, e.g., United States v. Andujar*, 49 F.3d 16, 20 (1st Cir.1995);  *United States v. Wright*, 835 F.2d 1245, 1249 (8th Cir.1987);  *Cosby v. Jones*, 682 F.2d 1373, 1383 (11th Cir.1982).

[7]  In its Memo of Law, at 53, the government misconstrues defense counsel's reluctance to seek a mistrial, which was based on the abject lack of sufficient admissible evidence, which entitled Mr. Chambers to an *acquittal*, not a second trial.

18

As the Supreme Court has explained, the purpose of pre-trial suppression hearings is to "screen out unreliable or illegally obtained evidence and insure that this evidence does not become known to the jury." *Gannett Co. v. DePasquale*, 443 U.S. 368, 378 (1979). The purpose of the pre-trial hearing when there is a contention that an identification was the product of impermissibly suggestive procedures, is to ensure that the jury is not exposed to "the fruit of a suspect pretrial identification which the accused is helpless to subject to effective scrutiny," consequently depriving him "of that right of cross-examination which is an essential safeguard" of a fair trial. *Wade*, 388 U.S. at 235.

Although the Constitution does not require a pre-trial hearing to ensure that identification evidence comports with Due Process, the Second Circuit and district courts within it in have consistently urged that "[w]here there is a contention that the pretrial identification was the result of impermissibly suggestive procedures, a *Wade* hearing is advisable." *Dunnigan v. Keane*, 137 F.3d 117, 128-29 (2d Cir. 1998) *abrogated on other grounds by Perry v. New Hampshire*, 132 S. Ct. 716 (2012). *See also United States v. Berganza*, ___ F.Supp.2d ___, 2005 WL 372045, at *9 (S.D.N.Y. Feb. 16, 2005), *accord United States v. Rodriguez*, ___ F.Supp.2d ___, 2002 WL 313894, at *3 (S.D.N.Y. Feb. 27, 2002).

Many courts in the Second Circuit indicate that pre-trial *Wade* hearings are not only advisable, but preferred and even "favored." *United States v. Volpe*, 42 F. Supp.2d 404, 223 (E.D.N.Y. 1999) (granting a *Wade* hearing "in an abundance of caution" despite the defendant's failure to "challenge the fairness of the array . . . [or to] suggest any particular impropriety regarding the surrounding procedures"). *See also United States v. Wilson*, 493 F. Supp.2d 364, 382-83 (E.D.N.Y. 2006) ("preference in [the Second C]ircuit for pre-trial Wade hearings to

19

ensure the protection of a criminal defendant's due process rights").

Here, the facts alleged here amply justified a pre-trial *Wade* hearing. *See, e.g.,*
*United States v. Ward*, 505 F. App'x 18, 23 (2d Cir. 2012) (*Wade* hearing conducted when one
witness, after viewing initial photo array and making no identification, conducted Internet
research on identities of participants in robbery, and subsequently she and her husband made
identifications from second photo array containing new photograph of the defendant);[8] *United*
*States v. Argentina*, 173 F. App'x 90, 94 (2d Cir. 2006) (*Wade* hearing conducted when photo
arrays shown to participant and victim of robbery repeatedly placed the targets in the same
position). *See also United States v. Maldonado-Rivera*, 922 F.2d 934, 974 (2d Cir. 1990) (*Wade*
hearing held to assess identification by cooperating witness who provided a detailed description
of the perpetrator and picked defendant's photo from an array with nine photographs, most of
whom matched her description).

In fact, the government's comment, in its Memo of Law, at 55, that Det. Deloren's
showing of a single photograph of Mr. Chambers to Ms. Torres was unknown until her testimony
both misses and proves Mr. Chambers's point: that is the very type of fact that would have been
adduced at a pretrial *Wade* hearing, thereby avoiding the prejudice and confusion Ms. Torres's
testimony produced at trial.[9]

---

[8] The facts in *Ward* were obtained from pp. 3-4 of Defendant-Appellant's Brief on
Appeal, Dkt. No. 23, Case No. 11-3058.

[9] That the jury's determination was flawed, and likely influenced improperly by Ms.
Torres's stricken testimony or other evidence or argument cited in Mr. Chambers's Initial Memo
of Law, is demonstrated by its acquittal of Mr. Chambers on Count Four, which charged him
under 18 U.S.C. §924(c) with possessing a firearm in the course of the robbery/kidnapping. Mr.
Chambers's defense at trial did not contest that a firearm was used; rather, it was that he was not
involved in the crime *at all*.

Accordingly, it is respectfully submitted that in the event Mr. Chambers's Rule 29 motion is denied, his Rule 33 motion for a new trial should be granted in its entirety.

**Conclusion**

Accordingly, for all the reasons set forth above, as well as those previously stated as part of Mr. Chambers's Initial Memo of Law, as well as his motions and arguments pretrial and at trial, it is respectfully submitted that Mr. Chambers's motions  pursuant to Rule 29(c) and Rule 33, Fed.R.Crim.P., should be granted in their entirety, that his conviction on Counts One, Two, and Three should be vacated, and a judgment of acquittal entered, or alternatively, a new trial granted.

Dated:  20 February 2015
New York, New York

Respectfully submitted,

 /s/Joshua L. Dratel
Joshua L. Dratel
JOSHUA L. DRATEL, P.C.
29 Broadway, Suite 1412
New York, New York 10006
(212) 732 - 0707
jdratel@joshuadratel.com
*Attorneys for Defendant Antoine Chambers*

 – Of Counsel –

Joshua L. Dratel
Whitney G. Schlimbach

21