

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 4, 2015

Honorable Lorna G. Schofield
United States District Judge
Thurgood Marshall Federal Courthouse
40 Foley Square
New York, NY 10007

Re: *United States v. Antione Chambers*, 13 Cr. 345 (LGS)

Dear Judge Schofield:

The Government respectfully submits this letter in reply to defense counsel's opposition to the Government's motion to reconsider the Court's adverse credibility finding against Detective Deloren.  Simply put, the record in this case is immensely confusing as to the precise sequence of events concerning Ms. Torres's identification of the defendant.  Both at trial, and again in his opposition brief, Mr. Dratel speculates and concocts a series of events and concludes:  (1) that events in fact must have happened that way; and (2) that Detective Deloren acted corruptly during the version of events assumed by Mr. Dratel.  However, as spelled out in our opening letter, Mr. Dratel's version of events assumes several crucial facts not in the record, and often contradicts the existing record.  The Government respectfully submits that to make an adverse credibility finding on this record is not appropriate.  The Court should not take Mr. Dratel's invitation to speculate about facts not in evidence and on the basis of that speculation conclude that an experienced New York City Police Department Detective, and federal task force officer, willfully lied on the stand.

As we did in our opening brief, the Government acknowledges that the identification procedures and related record keeping in this case were far from "best practices."  As a result of the failure to properly document the identification procedures and the confusing record that resulted, Ms. Torres's identification of the defendant—both her prior identifications and her emphatic in-court identification—was suppressed at trial.  Notwithstanding the verdict in this case, the suppression of that evidence was a crushing blow to the Government's case and was a significant remedial measure taken to address the shortcomings in procedures surrounding the identifications in this case.  In addition, the undersigned supervisory AUSAs have thoroughly discussed these issues with Detective Deloren's supervisors on the federal robbery task force, and with the chief counsel of the ATF-NY Field Office (ATF is the lead federal agency on the robbery task force).  Further, in light of the issues with record keeping in this case, the U.S. Attorney's Office is arranging additional training on proper record keeping protocols for the detectives and agents on the federal robbery task force, including but not limited to Detective Deloren.

March 4, 2015
Page 2

In his letter, Mr. Dratel repeatedly takes issue with the fact that the AUSAs who conducted the trial were not signatories to the Government's motion, and then proceeds to attack the integrity and ethics of the AUSAs who did author the letter. In doing so, Mr. Dratel displays the same lack of perspective and extreme vitriol that underlies many of his attacks on Detective Deloren. Although we have known and respected Mr. Dratel for years, his willingness in this instance to casually accuse experienced prosecutors of grossly unethical conduct should give the Court further pause in relying on Mr. Dratel's biased speculation about events not in the record. The simple reason that AUSAs Garnett, Fischman and Korenbaum authored the Government's motion is that we are the chiefs of the Violent and Organized Crime Unit with, collectively, over thirty years of experience as federal prosecutors in this Office.[1] We felt it appropriate that before filing the instant motion, experienced supervisory prosecutors who were not part of the trial team should take an independent look at the record and determine whether such a motion should be filed. (The trial team fully supported the filing of the motion and, but for our decision that supervisory prosecutors not on the trial team perform an independent review of the record, they would have authored the motion themselves). After a lengthy and careful review of the record it was clear to us that there was, at a minimum, great ambiguity in the record as to what happened concerning the identification procedures, and to find that Detective Deloren knowingly lied about those procedures and his associated record-keeping required speculation and guesswork. Simply put, the record does not support a finding that would effectively ruin this detective's career.

Finally, as set forth in detail below, the Government would like to correct a number of the more egregious factual mischaracterizations in the defense opposition letter.

## A.  The Argument that Detective Deloren's "Lack of Credibility Has Been Established At Least Four Times" is Incorrect.

Mr. Dratel argues in his letter that, in addition to the adverse credibility finding in this case, Detective Deloren's lack of credibility has been established on other occasions. This is simply not correct.

### 1.  The Court's Ruling Regarding Tyrone Brown's First Motion to Suppress

Mr. Dratel argues that the Court's ruling regarding co-defendant Tyrone Brown's first motion to suppress demonstrates an instance of Detective Deloren's lack of credibility. That is incorrect. The Government does not seek to re-litigate the suppression issues here. However, it is important to point out that the Court took issue with the Government's *arguments* in its pre-trial briefing with respect to Brown's motions, and not with any of Detective Deloren's statements. Indeed, the Government sought a hearing with respect to Brown's later-filed pretrial motions, seeking to develop the factual record regarding Detective Deloren's initial entry into

---

[1] Since the filing of the Government's initial motion, Ms. Garnett has changed supervisory positions within the Office and is now a Deputy Chief of Appeals.

March 4, 2015
Page 3

Brown's apartment.  *See* May 21, 2014 Tr. at 11.  In short, the Government disagrees with Mr. Dratel's characterization of the Court's decision with respect to Brown's motion.

### 2.  Judge Batts' Decision in *United States* v. *Cooper*

Second, Mr. Dratel points to Judge Batts' 2006 opinion in *United States* v. *Cooper*.  Consistent with the Government's position in its prior briefing on Judge Batts' decision in *United States* v. *Cooper*, Judge Batts' crediting of the defendant's statement that he told the police he had a gun while he was being patted down, over Detective Deloren's testimony that the defendant made the statement as he was exiting the car and prior to being searched, does not constitute a finding that Detective Deloren lied in that testimony.  We respectfully submit, as we did in our prior briefing, that Judge Batts's finding was in no way addressed to Detective Deloren's veracity generally.  This Court has already ruled on the relevance of Judge Batts' finding—and against the Government's position—and we do not seek to re-litigate those issues here.  The defendant was permitted to cross-examine Detective Deloren regarding Judge Batts' finding, and, when asked if Judge Batts found that he was not credible, Detective Deloren stated "Absolutely not true," and later testified, truthfully, that Judge Batts ruled in favor of the defendant in *Cooper*.  (Tr. at 285; 289).

Prior to his testimony in this case, Detective Deloren had more than fifteen years of experience as a police officer and detective with the NYPD, and testified hundreds of times in various legal proceedings, without incident.  Indeed, as recently as March 11, 2014, the Honorable Katherine B. Forrest found Detective Deloren to be "very credible" after his testimony in a suppression hearing.  (March 11, 2014 Memorandum Decision and Order, *United States* v. *Delva*, 12 Cr. 802 (KBF)).   The Government respectfully submits that, if the Court is to take into consideration the 2006 statements by Judge Batts, the Court should also consider Detective Deloren's history and experience as a law enforcement officer, including Judge Forrest's recent decision finding Detective Deloren "very credible."

### 3.  The Government's Stipulation Regarding When it Learned About a Newspaper Photograph Shown to Ms. Torres

As we explained in our initial motion, while we agree that Detective Deloren's recollection as to when he informed the Government about certain newspaper photographs was inconsistent with the prosecutors' belief as to when that happened, that does not mean that Detective Deloren "brazenly lied," as Mr. Dratel characterizes it in his letter.  Detective Deloren was forthcoming and accurate about the underlying facts concerning the newspaper photographs. His testimony in no way tried to conceal that he showed the newspaper photographs to Ms. Torres. To conclude that Detective Deloren "brazenly lied" because he was mistaken as to when he told the U.S. Attorney's Office about the photographs is a wholly unwarranted conclusion.[2]

---

[2] Mr. Dratel draws an additional unwarranted conclusion regarding Detective Deloren's credibility when he cites to a sentence in the Complaint, which was neither written by nor sworn to by Detective Deloren, and statements about which neither Ms. Torruella nor Ms. Torres were questioned during the trial.  (Def. Letter at 11).   Yet another example of an unwarranted

March 4, 2015
Page 4

**B. The Assertions Regarding the Identification Procedures Employed with Respect to Ms. Torres Are Speculative and Contrary to the Record.**

 Mr. Dratel's "chronology" of the identification procedures employed with respect to Ms. Torres contains assertions that are improperly speculative and contrary to the established record.

 **1. The "Thumbnail Afro Photo"**

 Mr. Dratel argues that the "Thumbnail Afro Photo" must be the single photograph that Ms. Torres[3] recalled as the first photograph of the defendant shown to her by Detective Deloren. There is nothing in the record that supports that assertion and, in fact, the piecemeal testimony and portions of 3500 material the defendant cites in support of this speculative assertion only further confuse the record. The facts are simply unclear as to the picture that Ms. Torres recalled—for the first time—during her cross-examination, but the record that exists runs counter to Mr. Dratel's argument for at least three reasons.

 First, an objective review of the "Thumbnail Afro Photo," attached to Mr. Dratel's letter as Exhibit 3, reveals why the Mr. Dratel chooses to characterize it as an "Afro Photo"—it is the only photograph in which the defendant's hair is distinctively in an "Afro" style, as opposed to the braided style he wore in every other photograph at issue in this case. If the "Thumbnail Afro Photo" was in fact the first photograph that Ms. Torres recalled seeing, is it not more likely that she would have remembered a photograph of the defendant in which his hair was in a distinctive Afro style, and described it as such in her testimony, rather than as a photograph of the defendant

---

conclusion is Mr. Dratel's assertion that Detective Deloren somehow lied when he did not recall saying to Ms. Torruella the words "forget about the teardrop." (Def. Letter at 12; Tr. 282-83). During cross-examination, Ms. Torruella testified that, with respect to Detective Deloren's instructions to her when she viewed the photo array, she was instructed "not to look at the tattoos, the hair, and the facial. To look at other stuff, like the nose, the eyes, stuff like that," and, when she viewed the second photo array, to "forget about the teardrop. You have to look at the face." (Tr. 212-13). That Detective Deloren did not remember using the specific words "forget about the teardrop"—as opposed to some other instruction that would have conveyed a similar meaning, and about which he was not questioned—does not mean he *lied*. Furthermore, there is nothing improper about instructing a witness to focus on the facial features of individuals depicted in a photo array as opposed to the presence of a tattoo or hairstyle, which can be changed by a person and may pre-date or post-date a given photo. Indeed, such instructions are entirely routine.

[3] To be clear, the Government is not "blaming" or casting "aspersions" on Ms. Torres in our motion, as Mr. Dratel claims. The Government is simply pointing out that her testimony under the stress of cross-examination about the fourth photograph differed from what was told to prosecutors in preparation for trial and her sworn testimony on direct examination and that should give the Court some pause in concluding, on the basis of that testimony, that Detective Deloren intentionally lied.

March 4, 2015
Page 5

in which he looked "younger"?  That Mr. Dratel's argument raises this obvious question reveals another flaw with his argument regarding the "Thumbnail Afro Photo"—the argument is based on pure conjecture and speculation.  After Ms. Torres's testimony, the Government made Detective Deloren available for further questioning regarding the photo identification procedures, and also requested a hearing to further develop the record.  At that point neither of the two witnesses—Detective Deloren or Ms. Torres—had been asked any questions at all about the "Thumbnail Afro Photo."  The Government made Detective Deloren available for further questioning precisely because the record regarding the photographs was confusing after  Ms. Torres's testimony, and in light of the questions and issues raised by the defendant *after* those witnesses had already testified.

Second, as stated in the Government's October 2, 2014 Letter to the Court, we believe, if re-called to testify, Detective Deloren would testify that he did not show a single, full-screen picture of Mr. Chambers to Ms. Torres.

Third, as was discussed in pretrial briefing and as the defendant and the Court are aware, the first photo array (attached to the defendant's letter as Exhibit 1) that was shown to both Ms. Torres and Ms. Torruella contained a "grainy" and "fuzzy" photograph of the defendant that was "older" in that it had been taken several years before the robbery charged in this case.  Detective Deloren testified that he recalled he obtained the photograph from the FBI and that he believed it was from "2003 or 2004."  Mr. Dratel argues that the photograph in the first photo array was instead taken in 2010.  Regardless of when the photograph was taken, the photograph in the first photo array itself refutes the defendant's assertion that the "Thumbnail Afro Photo" was the only "older" photo of the defendant and a photo in which the defendant "appears noticeably 'younger.'"  (Def. Letter at 5).  A plain review of the defendant's photograph in the first photo array demonstrates that the defendant does, in fact, look younger in that photograph and it is, in fact, "fuzzy" and "grainy."  Indeed, the NYPD's photo unit had to modify the other photographs in that array to match the quality of that photograph so that it did not stand out in the photo array.  (*See* Tr. at 245-46; 3502-18 at p. 2 (NYPD Photographic Unit Photo Array Image Editing Report, stating "Images were pixelated and crystalized to simulate quality of provided suspect image.")).

2. **The Procedures Employed to Create the Second Photo Array Were Proper and Consistent with NYPD Practices and Procedures.**

Simply put, Detective Deloren followed correct procedures in creating the photo array at issue here.  The second photo array, which was based on a federal probation photo of the defendant, did not use the NYPD's "Photo Manager" system to generate the array because that was not possible.  Having spoken with the NYPD supervisor of the joint NYPD-federal robbery task force to which Detective Deloren is assigned, Lieutenant Keith Smith, Detective Deloren followed the appropriate protocol in creating the second photo array.  NYPD procedure dictates that if an officer cannot create a photo array within the Photo Manager system—because, for example, the photo of the target subject is from an outside law enforcement agency as was the case here—the officer should instead send the photo of the suspect and the NYSID numbers (identifying numbers attached to arrests) of the five other individuals the officer would like in the

March 4, 2015
Page 6

photo array to the Photographic Unit.  The Photographic Unit then puts together the requested photo array.  (*See* 3502-18 at 57 (NYPD Photographic Unit Adult Photo Array Editing Report, describing the process by which the second photo array was created)).  In other words, if the suspect's photo is not in the Photo Manager system, that system cannot generate the photo array.  Detective Deloren didn't "purposefully and corruptly bypass" the system, as the defense alleges, he simply could not use it and did what he was supposed to do in that situation.  Finally, any time a photo array is created using the Photographic Unit, rather than Photo Manager, the commanding officer, in this case Lieutenant Smith, must be notified and must give approval— which he did in this instance because the proper protocols were followed.

Mr. Dratel also argues that the photographs in the second photo array contained "subjects whose features did not match a description" of the defendant.  (Def. Letter at 8).  But the description that the defendant attributes to the other individuals in the photo array *does* match the general description of the defendant, who is African-American, at least 6'1" (one inch taller than the height range provided) and at least 180 pounds (which is the high range of the description provided).[4]  Furthermore, an objective review of the second photo array shows that it depicts all African-American males with similar features, including hair style and facial hair.  (*See* GX1000).  Mr. Dratel also takes issue with the positioning of the defendant's photograph in the second photo array.  (Def. Letter at 5 ("Mr. Chambers's photo in the prominent number 2 position").  This argument ignores that the defendant's photo was placed in a different position in the first photo array (Def. Letter Exhibit 1), and, therefore, it made sense to change the placement of the photograph for the second array so as not to unconsciously influence the witnesses.

***

In conclusion, the Government respectfully renews its request that Your Honor reconsider and remove the Court's adverse credibility finding against Detective Deloren.  The Government takes seriously the issues that existed in this case and is taking steps to try and ensure that it does not happen again.  However, notwithstanding flaws in the photo identification procedures and associated record-keeping, we simply do not believe that the record reflects that Detective Deloren knowingly lied.  To arrive at that conclusion one must engage in speculation and guesswork, and draw every possible inference in favor of the conclusion that an experienced detective and federal task force officer with his career at stake willfully lied under oath.  The Government does not make this application lightly or out of some blind sense of fidelity to any person or entity.  The Government makes this application because it firmly believes it is the right

---

[4] In fact, the defendant was measured at 6'1" and 180 pounds upon his arrest and processing by the United States Marshals Service.

March 4, 2015
Page 7

thing to do—consistent with our obligations and duties as federal prosecutors to be ministers of justice in all respects.

Respectfully submitted,

PREET BHARARA
United States Attorney

by: _____/s/_____
    Harris M. Fischman
    Margaret Garnett
    Laurie A. Korenbaum
    Assistant United States Attorneys
    (212) 637-2200

Cc: Joshua Dratel, Esq.