UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  7/9/15
```

-------------------------------------------------------------X
                  :

UNITED STATES OF AMERICA         :

               :

           :         13 Cr. 345 (LGS)

      -against-        :

               :       OPINION AND ORDER

ANTOINE CHAMBERS,         :

            Defendant.  :

               :

------------------------------------------------------ X

LORNA G. SCHOFIELD, District Judge:

      After a 10-day jury trial, Defendant Antoine Chambers was convicted of conspiracy to rob, robbery and kidnapping, and acquitted of possession of a firearm during a crime of violence, all violations of the Hobbs Act and the Federal Kidnapping Statute, 18 U.S.C. §§ 924(c), 1201, 1951.  The Government presented its evidence over three days.  Defendant did not put on a case. The jury deliberated for five full days before delivering its verdict.

      Defendant moves pursuant to Federal Rule of Criminal Procedure 29(c) for a judgment of acquittal based on the insufficiency of the evidence, and pursuant to Rule 33 for a new trial based on the lack of a pretrial *Wade* hearing and alleged prosecutorial misconduct.  The Government moves to vacate the Court's adverse credibility finding concerning testimony of New York City Police Department ("NYPD") Detective Ellis Deloren, which led to the Court to strike the identification testimony of a witness.  For the reasons below, all three motions are denied.

I.      **BACKGROUND**

      The parties agree that the central contested fact at trial was the identity of one of four coconspirators who participated in a kidnapping and robbery, i.e., whether the Government "had the wrong guy."  Although Defendant did not put on a case, the theory of the defense was clear.

To sustain its burden on the issue of identity, the Government offered two eyewitnesses and substantial circumstantial evidence.  The undisputed evidence of what happened on the night of the robbery and the Government's evidence to show that Defendant was one of the perpetrators are summarized below.

**A.      The Robbery and Kidnapping**

Shortly after midnight on March 25, 2013, David Barea went to Tyrone Brown's apartment on Croes Avenue in the Bronx to collect money that Brown owed him for drugs.  Video from a security camera shows that Barea arrived at Brown's house at 1:17 a.m., and Brown let Barea in at 1:18 a.m.  At 1:19 a.m., a car pulled into the view of the camera, two men got out and made their way to Brown's door.  One of the two men was Steven Glisson, who was carrying a .38 revolver.[1]  The second man was dressed in black, had covered his face from the nose down with a black scarf, wore a black hat and gloves, had an automatic gun at his waist and carried a hammer.  According to the Government, this second man was Defendant.

While the two men waited outside Brown's door, inside the apartment, Brown gave Barea $800.  At 1:26 a.m., Barea opened the door to leave Brown's apartment, and the two men pushed Barea back inside.  The second man -- whom Barea called the "tall guy" -- and Barea tussled until Glisson threatened Barea with his gun.  Barea stopped fighting, but the "tall guy" kept hitting Barea with the hammer on his back and legs, all the while telling Barea not to look at his face.  Glisson and the "tall guy" eventually took all of Barea's money, about $900, including what Brown had given him.  They threatened Barea and asked where his money was, apparently expecting him to be carrying more cash.  Barea told them that he had more money at home, even

---

[1]      Co-defendants Tyrone Brown and Steven Glisson pleaded guilty but did not testify at trial.

though he knew he did not.  Glisson and the "tall guy" bound Barea's hands, covered his face, and at 1:34 a.m., according to the security camera, took Barea to their car.  The four men -- the two robbers, an unidentified coconspirator and Barea -- then drove to Barea's apartment on Overing Street in the Bronx.  The two robbers and Barea went into the apartment, where Barea's wife, Emma Torruella, was.  When they discovered he had no money there (*id.*), the "tall guy" again beat Barea with the hammer until Torruella told the robbers that the money was at her mother's house.

The "tall guy" forced Torruella to their car so she could take them to her mother's home.  She described the car as a black four-door sedan with a license plate whose last four digits were 7788.  The "tall guy" drove the car, Torruella sat in the front passenger seat, and the unidentified man sat in the backseat.  As she directed them to her mother's house, the "tall guy" took off his mask.

Once they reached Torruella's mother's apartment, Torruella knocked on the apartment door while the "tall guy" and the unidentified man waited in a brightly-lit hallway outside the apartment.  Torruella's teenage daughter, Demi Torres, answered the door.  Torruella went into a bedroom to retrieve the money while the "tall guy" waited inside the apartment.  Torruella got a bag of money from her mother's room, handed it to the "tall guy" and left the apartment with him.

Upon their return to Barea's apartment, the "tall guy" gave the bag of money to Glisson and beat Barea with the hammer again.  Eventually, the two robbers ran out of the house with the money.

**B.      Eyewitness Testimony**

*1.      Emma Torruella*

Emma Torruella had a difficult time on the witness stand.  After she described her ordeal during the early morning hours of March 25, 2013, the Government asked Torruella to identify the "tall guy" in the courtroom.  She identified Defendant.  Torruella was upset and, at her request, was temporarily excused from the witness stand.  The jury was excused for a break.

On cross-examination, defense counsel pressed Torruella about her identification of Defendant, both in court as well as her earlier selection of his photo from a photo array.  On redirect, as the Government returned to the issue of her identification of Defendant, Torruella again was upset.  At her request, she again was excused from the witness stand.  When she returned to complete here redirect testimony, she recanted her prior in-court identification of Defendant:

> Q. Ms. Torruella, I have two more questions.  Do you want to be here today?
> A. Right now, no.
> Q. Ms. Torruella, sitting here today, do you believe that the person sitting at the second table with the blue shirt is the tall guy?
> A. No.
> Q. Why don't you believe that?
> A. Features are different.  I can't.  I'm sorry.
> Q. Ms. Torruella, can you please explain that answer.
> A. It looks like him.  His eyes, but something is not – I can't explain.
> Q. I can't understand you.  I'm sorry.
> A. I just keep looking.  It's not him.
>            [AUSA] ARAVIND: Your Honor, may I have a moment?
> Q. Ms. Torruella, I don't want you to look at government Exhibit 1000 [the photo array from which Torruella identified Defendant].  I want you to put that to the side.
>            [AUSA] ARAVIND: Your Honor, may I have just one moment?
>            THE COURT: Yes.
> Q. Ms. Torruella, you said that something about the hair and facial part was different.  Can you explain?
> A. He had hair, I know that grows and you can cut it.  Just looking at him from over there, it's not him.  He was more – the features of the face was more in.

4

[AUSA] ARAVIND: Nothing further, your Honor.

### 2.     *Suppression of Demi Torres' Eyewitness Testimony*

Demi Torres, Torruella's daughter, testified on October 1, 2014.  She identified Defendant in court as the "tall guy"[2] who came into her grandmother's apartment with her mother on the night of the robbery.  She also described the events leading to her identification of Defendant.

Torres' testimony contradicted Detective Deloren's prior trial testimony in several important respects.  Deloren said that he and Torres had met only twice to look at photos; that on the first occasion he showed her a photo array (that included a picture of Defendant) from which she did not identify the "tall guy," as well as a single photo of Defendant in a news article on the internet; and on the second occasion, he showed her a photo array that included a different photo of Defendant which she positively identified as the robber.  In contrast, Torres described meeting with Deloren on four separate occasions to look at photos of Defendant, and said that on two of those occasions Deloren showed her a single photo of Defendant without photos of anyone else.[3]

Specifically, Torres testified that on the first occasion, Deloren showed her a photo array and Torres identified Defendant as someone who looked familiar but not from the night of the robbery.  On a second occasion, Deloren showed her a photo of only Defendant.  This second photo had never before been disclosed and was not entered into evidence.  At their third meeting, Deloren showed her yet another single photo of Defendant, this one in a news article on the internet, and told her that it was "an updated photo."  Torres said that she recognized Defendant as the "tall guy" from the internet photo, in which Defendant, like the "tall guy," wore a hat.  The

---

[2]     Although Torres did not refer to the man who entered the apartment with her mother as the "tall guy," for sake of consistency, the Opinion uses that term.

[3]     Torres refers to Deloren, whose full name is Ellis Deloren, as "Ellis."

caption under Defendant's photo contained his full name, which Torres noted and used when she got home to find the same article along with three more photos of Defendant. At their fourth and final meeting, after Torres had already positively identified Defendant from the single internet photo, and had already looked at six photos of Defendant, Deloren presented her with a photo array from which Torres selected Defendant's photo as the man she thought she had seen the night of the robbery.

Defendant moved to exclude her identification testimony in its entirety. After overnight briefing from the parties, the motion was granted in an oral ruling on October 3, which is included in full in the trial transcript. The ruling began with the observation, "Over the course of Detective Deloren and Ms. Torres's testimony, it has become clear to me that the facts are yet again different from what had been represented to the Court [at least three times before trial], and apparently to the prosecutors as well." The ruling detailed the substance of Torres' trial testimony, and concluded that her testimony was credible while Deloren's contrary testimony was not credible. In addition to observing the witnesses, relevant factors were:

- The continuing revision, over the months and days preceding the trial, of what supposedly happened during the identification process, as detailed in the ruling.

- Deloren's failure to inform the prosecutors about showing Torres Defendant's single internet photo, until Torres herself informed them during an interview. When confronted on cross, Deloren insisted that he had told the prosecutors and the FBI about showing Torres Defendant's internet photo around the time she viewed it, and in any event much closer to May 2013 than January 2014, when the Government informed the Court that they had "just learned" about this incident. The Government, as it is ethically required to do, corrected Deloren's misstatement. The resulting stipulation was read to the jury and admitted into evidence as Government Exhibit 2007.

- Deloren's failure ever to tell prosecutors about the second meeting with Torres and his showing her the first single photo, which she described as a mug shot and the only photograph that he had opened on a computer screen for her to view.

- Deloren's failure to make any kind of record of the two most suggestive instances – the

6

two times he showed Torres a single photo of Defendant.
The ruling concluded that the identification process had been unduly suggestive and
conducive to misidentification and granted the defense motion to strike Torres'
identification evidence.

Based on this ruling, all exhibits associated with Torres' identification testimony were
removed from the record.  The Court gave the jury the following curative instruction:

> I will now instruct you that I am striking the testimony of Ms. Torres.  That's
> Ms. Torruella's daughter who you heard testify a couple of days ago that relates
> to her identification of the defendant, including her in-court identification that
> you witnessed.  I am also striking exhibits relating to that identification . . . . It is
> your duty to disregard the evidence that I have just spoken about in your
> deliberations.  This means that you are required to deliberate as though the
> testimony of Ms. Torres relating to identification of the defendant did not occur.
> It should play no role in your verdict.

During the jury's extended deliberations, they requested almost all of the testimony in the case,
including that of Torres and Deloren.  The transcripts of both of these witnesses were redacted to
eliminate all reference to Torres' identification.   The Court sent the jury the following note
along with Torres' redacted testimony:

> Members of the Jury: Attached is the transcript of testimony of witness Demi
> Torres.  The redactions were made to reflect the Court's ruling, striking all of
> the identification testimony of Ms. Torres.  You may not consider any of her
> testimony, including what is unredacted, for the issue of identification.

## C.    Cellphone and Cell Site Evidence

The Government also introduced circumstantial evidence to prove that Defendant was
"the tall guy" who had participated in the robbery.  A reasonable juror could conclude from the
evidence that (1) Defendant Antoine Chambers was known as "Twizzie," (2) Twizzie used a cell
phone that ended in the numbers 6130, (3) just before Barea was expected to arrive at Brown's

apartment for the money, and minutes before the robbers apprehended Barrea there, the 6130 Twizzie phone was located in the vicinity of Brown's apartment and was in communication with Brown, (4) several hours later, presumably after the robbery was over, the Twizzie phone was in the vicinity of Defendant's home on Barnes Avenue in the Bronx, (5)  the day after the robbery, after Detective Deloren was in contact with Brown, Brown's phone was in contact with Twizzie's phone, and later in the day the Twizzie phone left New York City for Pennsylvania.

The Government introduced testimony and a stipulation to show that Defendant was known as "Twizzie."  Kentrell Ferguson testified that he knows Defendant from school, and that Defendant is the "Twizzie" referenced in Ferguson's cell phone contacts.  In addition, the parties stipulated that on February 2, 2013, less than two months before the robbery, a male caller who identified himself as "Antwan" called 911 from a cellphone number ending in 3425.  (The 3425 number is listed in both of co-conspirator Brown's cellphones as a mobile number for "Twizie.") The caller asked for an ambulance to come to 4782 Barnes Avenue, the address at which Defendant, whose first name is "Antoine," lived with his girlfriend.  After his arrest, Defendant confirmed to Special Agent Reynolds that he had placed the 911 phone call because his girlfriend was giving birth.  A birth certificate for Dante Chambers lists "Antoine Chambers" as the father, Defendant's girlfriend as the mother, and provides 4782 Barnes Avenue as the mother's address.

The Government relied on the contacts in Brown's cell phone to show that Twizzie used several phone numbers, including one ending in 6130.  The Government also established Brown's cell phone number and two of Barea's cell phone numbers.

Cell phone records showed that on March 24, 2013, the Brown phone and Barea phone were texting each other throughout the evening, just hours before the robbery, until 11:56 p.m.

8

These texts were followed by four brief phone calls and one text message between the Brown phone and the Twizzie phone between 12:13 and 1:05 a.m. on March 25, 2013. Cell site records show that at the time of these four phone calls, the Twizzie phone was located in the vicinity of Brown's Croes Avenue apartment. As stated above, the time stamps from the security camera at Brown's apartment show the two robbers entering Brown's apartment at 1:26 and leaving at 1:34 a.m.

The next call on the Twizzie phone that law enforcement was able to map occurred at 4:40 a.m. on the same day, March 25, 2013. At that time, the Twizzie phone was somewhere between Brown's apartment and Defendant's residence. According to cell site records, the remaining 10 calls on the Twizzie phone on the morning of March 25, 2013, between 4:55 a.m. and 10:19 a.m., occurred in the vicinity of Defendant's home on Barnes Avenue.

Detective Deloren testified that on March 26, 2013, the day after the robbery, he contacted Brown, whom he considered to be a witness to the robbery. Phone records show several calls from Deloren's phone to Brown's phone at around 10:20 a.m. Approximately 30 minutes later, Brown's phone called the Twizzie phone. Cell site records show that between 3:55 p.m. and 11:52 p.m. the same day, the Twizzie phone moved from the vicinity of Defendant's residence, arrived at the vicinity of the George Washington Bridge in Manhattan around 6:28 p.m., travelled west through New Jersey into Pennsylvania, and at 11:52 p.m., ended up in the vicinity of Lebanon, Pennsylvania.

The landlord for the Barnes Avenue address testified that Defendant's girlfriend lived in the apartment with her child and Defendant. They left the apartment around May or June, and the landlord never heard from them again.

### D.       The Car

The Government argued that a blue 1995 Honda Civic registered to Defendant's girlfriend was the car used in the robbery and kidnapping.  The numbers on the car's license plate matched the numbers that Torruella remembered from the car that took her to and from her mother's house.  Torruella reported the numbers as "7788"; the entirety of the car's license plate reads "AKW-7788."

The remaining details regarding the car provided by Torruella and Barea did not match Defendant's girlfriend's car.  Torruella stated that the car was a black Acura with a yellow New York license plate.  Barea described the car as 1997 or 1998 dark green Acura.  Defendant's girlfriend's car was a dark blue Honda and had white North Carolina plates.

An NYPD officer testified that while patrolling in the Bronx on May 27, 2013, approximately two months after the robbery, he pulled up to Defendant's girlfriend's car because it had multiple traffic infractions.  As he pulled up, the driver, a black male with short hair, sped away.  By the time the officer reached the car, it had been in an accident and the driver had left the scene.  The car was impounded.  Detective Deloren eventually recovered a hammer from the car, which he found at an impound facility.  Defendant later told Agent Reynolds that he used the hammer recovered from the car as one of the tools to work on houses.

### E.       Defendant's Arrest

Law enforcement could not locate Defendant or his girlfriend until July 3, 2013, when Defendant was arrested in New Jersey near the Pennsylvania border.  Defendant was in a rental car with his girlfriend and their children.  He could not produce a rental agreement for the car or an insurance card.  Defendant provided the police officer who stopped his car with a fake

10

Pennsylvania driver's license in the name of "Jerome Adams."  Neither Antoine Chambers nor Jerome Adams had rented the car.  Defendant was arrested for providing false identification and hindering apprehension and was later transferred to federal custody.

###    F.    Jury Deliberations

The jury deliberated for five days.  When it retired to the jury room, it had a copy of the charge and almost all the exhibits entered into evidence.  During deliberations, the jury requested and received: (1) time stamps from the video surveillance at Brown's apartment; (2) testimony regarding phone numbers in contact with Brown's phone; (3) Government exhibits showing certain phone records; (4) the Government exhibit showing the photograph of Glisson; and transcripts of the following witnesses, which is virtually all of the trial testimony: (i) David Barea and Emma Torruella, the victims; (ii) Demi Torres, Torruella's daughter; (iii) Detective Ellis Deloren and Special Agent John Reynolds, the law enforcement officers responsible for investigating the case; (iv) Special Agent Eric Perry, who performed the cell site analysis; (v) Officer Michael Whelan, who attempted to stop Defendant's girlfriend's car; (vi) Sergeant Thomas Derosa, who apprehended Defendant in New Jersey; and (vii) Defendant's girlfriend's landlord.

## II.    DISCUSSION

###    A.    Rule 29 Motion

In his Rule 29 motion, Defendant argues that a verdict of not guilty should be entered on all counts because the evidence at trial does not sufficiently support the jury's verdict.  Because Defendant asks the Court impermissibly to substitute its judgment for that of the jury, the motion is denied.

11

### 1.    Legal Standard

Rule 29(c) allows a defendant to move for a judgment of acquittal based on the insufficiency of the evidence.  Courts "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence."  *United States v. Coplan*, 703 F.3d 46, 62 (2012).  "The jury may base its verdict entirely on inferences from circumstantial evidence," and the evidence "need not have excluded every possible hypothesis of innocence."  *United States v. Oguns*, 921 F.2d 442, 449 (1990) (internal quotation marks omitted).  "A reviewing court may set aside the jury's verdict on the ground of insufficient evidence *only* if *no* rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011) (emphases added).  "In assessing a sufficiency challenge, a court looks at the evidence in its totality and collectively – not in isolation but in conjunction." *United States v. Valle*, 301 F.R.D. 53, 80 (S.D.N.Y. 2014) (internal citations and quotation marks omitted) (collecting cases).

### 2.    Application

Defendant's Rule 29(a) motion was denied at the close of the Government's case.  The renewed motion, which is based on the same evidence, is denied again.[4]  Defendant principally argues that "[a]ny inferences from the evidence remaining once the eyewitness identifications were eliminated are -- both independently and in combination -- too weak and attenuated to convince any rational trier of fact beyond a reasonable doubt."  Both Defendant's fundamental premise and the attendant arguments fail.

---

[4]      The only evidence entered after the ruling was an amendment to a stipulation regarding phone records, which was already in the record.

12

As an initial matter, Defendant erroneously assumes that "the eyewitnesses identifications were eliminated" from consideration by the jury.  To the contrary, only Demi Torres' eyewitness testimony was removed from the record.  Emma Torruella's photo identification, court room identification and her recantation of the latter were all fairly before the jury.  The jury could have credited one or both of her identifications or neither one.  After the Court struck Torres' eyewitness testimony, defense counsel explicitly agreed with the Government that Torruella's identification testimony and the photo array from which she previously had identified Defendant could be considered by the jury.  A rational juror could have credited some or all of her identification testimony along with the circumstantial evidence to find that the Government had sustained its burden of proving Defendant's guilt beyond a reasonable doubt.

The Second Circuit's decision in *United States v. Anglin*, 169 F.3d 154 (2d Cir. 1999) is instructive.  The court reasoned that while one of the two eyewitness' "inability to make an in-court identification, and the discrepancies between the two [eyewitness'] descriptions of the robber, furnished defense counsel with legitimate arguments[,] . . . [s]uch arguments are customary grist of the jury mill," and barring "a very substantial likelihood of irreparable misidentification" in all cases, "such evidence is for the jury to weigh."  *Id.* at 159-60 (internal citation and quotation marks omitted).  This is because "[j]uries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature."  *Id.*  Similarly, here, Torruella's recantation provided defense counsel with potent arguments that he later made to the jury; Torruella's statement that "it's not him" was the central theme of defense counsel's summation.  Defendant now essentially repeats those arguments.  The jury considered the evidence in light of this argument and, as it was empowered to do,

13

rejected it.

Further, even if a rational juror credited Defendant's argument that there was no eyewitness testimony in the case at all, the juror could still reach the same verdict because "there is no rule of law that requires identity to be established by an eyewitness. Identity can be inferred through circumstantial evidence." *United States v. Kwong*, 14 F.3d 189, 193 (2d Cir. 1994). The circumstantial evidence in the present case was sufficiently strong to permit such a conclusion.

Viewing the evidence in the light most favorable to the government, as required on this motion, a reasonable juror could have concluded that Defendant is Twizzie;[5] that he (and not merely his phone) went to Brown's apartment the night of the robbery; that the robbers used the dark-colored, four-door sedan that belonged to Defendant's girlfriend, with license plate number ending in 7788, precisely the numbers provided by one of the victims; that Defendant beat Barea with the hammer found in his girlfriend's car; that Brown informed Defendant of the police investigation the day after the robbery causing him to flee New York for Pennsylvania; and that Defendant's arrest in New Jersey near the Pennsylvania border two months later and his false statements post-arrest constituted evidence of flight and consciousness of guilt. "While this evidence may not have compelled the jury to the draw the inferences of identity and guilt suggested by the government, it certainly permitted it to do so." *Anglin*, 169 F.3d at 160. Accordingly, the jury's verdict will not be disturbed for insufficiency of the evidence.

---

[5]     A recording introduced by the Government of Defendant saying "my man Twiz" on the phone to another person is inconclusive. Defendant is correct that it is unlikely that someone would refer to himself as "my man," at least in ordinary circumstances. However, Defendant's circumstances in making a pre-conviction prison phone call to an unknown third person are hardly ordinary; and as explained above, other more reliable evidence linked Defendant to the name "Twizzie."

Defendant's arguments to the contrary fail.  Defendant suggests that because it is unlikely that the Government would have pressed charges against him without reliable eyewitness identifications, no reasonable juror could have convicted Defendant.  This argument is irrelevant now.  Whatever the Government may have done in the absence of unimpeachable identification testimony *before* bringing charges, the question *after* trial is whether, considering all of the evidence in its totality, a reasonable juror could vote to convict.  For the reasons already explained, the answer is yes.

Similarly irrelevant are Defendant's criticisms of the police practices, whether in securing Torruella's identification or in not showing Defendant's girlfriend's car to either Torruella or Barea.  As the jury was instructed, "[t]here is no legal requirement that the government prove its case through any particular means."  *See United States v. Bautista*, 252 F.3d 141, 145 (2d Cir. 2001) (finding that "the summation arguments at issue amounted to an (improper) invitation for the jury to consider the government's choice of investigative techniques"); *see generally United States v. Cheung Kin Ping*, 555 F.2d 1069, 1073-74 (2d Cir. 1977) (explaining that "law enforcement policy" is not jury's concern).  Defense counsel made the same arguments to the jury, and the jury apparently rejected them.

Defendants' remaining arguments suffer from a common flaw -- they take too myopic a view of the "totality" standard that governs review under Rule 29.  Instead of viewing all the evidence in its totality, Defendant insists that *individual* pieces of evidence should be rejected as insufficient.  To the contrary, the "totality" inquiry under Rule 29, is not targeted at specific pieces of evidence, but at the evidence when considered in the context of the entire case.  For example, Defendant argues that the evidence regarding Defendant's girlfriend's car is insufficient to tie that car and Defendant to the robbery, because Barea and Torruella's detailed

15

descriptions of the car and license plate were conflicting and/or incorrect.  However, based on Torruella's precise recollection of the four digits of the license plate, together with all of the other evidence, a rational juror could conclude that Chambers was "the tall guy."

Similarly, the evidence that Defendant's girlfriend's car contained a generic hammer is trivial when considered in isolation.  However, when considered in conjunction with the remaining evidence tying Defendant to the car, the hammer provides additional support for a rational juror to conclude that Defendant supplied the car, participated in the robbery, and beat Barea with a hammer on the night of March 25.

Defendant also relies on inapposite cases where, unlike the present case, the defendant's mens rea was in dispute.  For example, in a narcotics conspiracy case Defendant cites, *United States v. Torres*, 604 F.3d 58, 70 (2d Cir. 2010), the Second Circuit found that "telephone records," which were the only evidence of requisite knowledge, "did not provide a basis for a finding beyond a reasonable doubt that Torres had knowledge that the [relevant] Packages contained narcotics."  Here, by contrast, the issue was not knowledge, but identity, and the telephone records constitute only one piece of the circumstantial evidence of identity. Defendant's reliance on cases questioning a defendant's criminal intent is also misplaced.  *See, e.g., Coplan*, 703 F.3d at 69 (Government failed to prove "beyond a reasonable doubt that Shapiro joined the alleged conspiracy with the specific intent to violate the law"); *United States v. Lorenzo*, 534 F.3d 153, 160 (2d Cir. 2008) (finding "insufficient evidence to show that [Defendant participated in events in furtherance of the conspiracy] knowingly and with the specific intent to further a cocaine smuggling and distribution conspiracy."); *United States v. Cassese*, 428 F.3d 92, 103 (2d Cir. 2005) ("when the evidence is viewed in its totality, the evidence of willfulness is insufficient to dispel reasonable doubt").

16

Defendant's extensive reliance on *United States v. Glenn*, 312 F.3d 58 (2d Cir. 2002), for the first time in his reply is similarly unavailing. *Glenn* explained that "if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *Id.* at 70 (internal quotation marks omitted). This is not such a case. For the reasons already explained, the evidence in the present case viewed in the light most favorable to the Government provided a sufficient basis for the jury to conclude beyond a reasonable doubt that Defendant was the "tall guy" and therefore guilty of the crimes charged.

Finally, although Defendant does not explicitly argue that the jury's verdict should be set aside because of an inconsistent verdict, he repeatedly points out that the jury's choice to acquit Defendant of the fourth count cannot square with the evidence because Defendant's theory of the case -- and the entirety of each party's argument -- solely concerned whether Defendant was guilty of either *all* of the counts or none of them. To the extent Defendant seeks to challenge the verdict on the basis of inconsistency, the argument is rejected because it is well settled that "a conviction on one count of an indictment may not be challenged merely because it is inconsistent, or in tension, with an acquittal on another count." *United States v. Urena*, --- F. Supp. 3d. ---, No. S5 11 Cr. 1032, 2014 WL 4652480, at *4 (S.D.N.Y. Sept. 18, 2014) (collecting cases); *see United States v. Powell*, 469 U.S. 57, 69 (1984) ("no reason to vacate . . . conviction merely because the verdicts cannot rationally be reconciled").

At the close of the Government's case, the Court rejected Defendant's Rule 29(a) motion. Defendant then urged on the jury many of the same arguments he makes now. The jury heard the arguments and evidence and scrutinized them for five days before ultimately reaching its verdict, which is well supported by the evidence. The Rule 29(c) motion is denied.

**B.      Rule 33 Motion**

Defendant moves for a new trial under Rule 33 on two grounds.  First, he argues that the lack of a pretrial hearing regarding the admissibility of eyewitness identification testimony irremediably prejudiced him.  Second, Defendant argues that three separate instances of alleged prosecutorial misconduct -- whether in isolation or in combination -- irreparably prejudiced him.  Both arguments are rejected, and the motion is denied.

Under Rule 33, a "court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  The motion should not be granted "unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice."  *United States v. Triumph Capital Grp., Inc.*, 544 F.3d 149, 159 (2d Cir. 2008) (citation omitted).  Courts should grant a new trial under Rule 33 "sparingly" and in "the most extraordinary circumstances." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (citation omitted).

### 1.      Pre-Trial Hearing

Defendant argues that the Court's failure to conduct a pretrial hearing pursuant to *United States v. Wade*, 388 U.S. 218 (1967), "irreparably prejudiced Mr. Chambers in a manner that the Court's curative actions during trial could not overcome."  The argument is incorrect for two reasons.

First, the argument assumes that a *Wade* hearing would have resulted in the suppression of Torres' identification testimony.  That assumption is unfounded because a *Wade* hearing would have elicited only Detective Deloren's uncontradicted version of the events.  The Government closely guarded the identity of Torres throughout the pretrial proceedings.  At a

hearing, Deloren presumably would have stated, as he did at trial, that he met with Torres on two occasions -- first, when he showed her two photos of Defendant, one in a photo array and the other a single internet photo; and a second time when he showed her a photo array from which Torres identified Defendant.  It was only after Torres' testimony at trial, when she described a quite different and impermissibly suggestive course of events, that it became clear that her identification testimony should be suppressed.  Torres credibly testified that Deloren showed her photos of Defendant on four different occasions, not two, and that before her positive identification of Defendant in a photo array, she had viewed six separate photos of Defendant, five of which had been single photos and not a part of any array.  A *Wade* hearing would not have uncovered these facts contradicting Deloren's testimony, and therefore would not have resulted in the suppression of Torres' identification testimony at trial.[6]

Second, Defendant was not irreparably prejudiced by Torres' identification evidence because it was struck from the record, and the jury was properly instructed to disregard it.  Juries generally are presumed to follow a court's limiting instructions.  *In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 93, 136 (2d Cir. 2008).   Defendant invokes an exception to the general rule "where there is an overwhelming probability that the jury will be unable to follow the court's instructions and the evidence is devastating to the defense."  *United States v. Gomez*, 617 F.3d 88, 96 (2d Cir. 2010) (quoting *United States v. Becker*, 502 F.3d 122, 130 (2d

---

[6]      Defendant similarly argues that a *Wade* hearing concerning Torruella's testimony would have avoided her identification testimony.  Had one been held, nothing in Deloren's hearing testimony -- assuming it was the same as his trial testimony -- would have resulted in suppression, and Defendant has failed to show that the absence of such a hearing irreparably prejudiced him.  First, Deloren's instruction to Torruella to "ignore the teardrop" she remembered on the "tall guy" was the subject of extensive cross-examination.  Second, such an instruction was not facially improper since the "tall guy" could have had a temporary tattoo.  Defendant cannot claim that he was prejudiced by her testimony, when she not only recanted her identification but affirmatively testified that Defendant was "not the guy."

Cir. 2007)).  First, the identification was not necessarily devastating, since it was undermined by the same cross-examination that resulted in the suppression of the identification.  Second, there was no "overwhelming probability that the jury w[ould] be unable to follow the court's instruction."  The jury had a clear roadmap to follow.  They requested and were provided transcripts of Torres' and Deloren's testimony, which were redacted to delete all references to the events leading to Torres' identification of Defendant.  Torres' transcript in particular, marked as Court Exhibit 4, dramatically illustrated what had been struck with page after page of blacked out text, revealing only the limited portions that remained.  "The jury was not asked to perform olympian mental gymnastics."  *United States v. Paone*, 782 F.2d 386, 395 (2d Cir. 1986).  The jurors were shown clearly and precisely what parts of the testimony they could consider and what parts they could not.  No new trial is warranted on this ground.

### 2.    *Prosecutorial Misconduct*

"A defendant asserting that a prosecutor's remarks warrant a new trial faces a heavy burden, because the misconduct alleged must be so severe and significant as to result in the denial of his right to a fair trial."  *United States v. Banki*, 685 F.3d 99, 120 (2d Cir. 2012), *as amended* (Feb. 22, 2012) (alterations and internal quotation marks omitted).  "When evaluating a claim of improper argument," courts "must consider the objectionable remarks within the context of the entire trial."  *Id.*  "In determining whether an inappropriate remark amounts to prejudicial error," courts consider "the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the misconduct."  *United States v. Caracappa*, 614 F.3d 30, 41 (2d Cir. 2010) (citation omitted).

Defendant objects to three instances of alleged prosecutorial misconduct that warrant a new trial, but does not press any of the arguments in his reply.  First, he argues that the

Government's attempt on rebuttal to explain away Torruella's recantation "so infect[ed] the trial with unfairness as to make the resulting conviction a denial of due process." *United States v. Shareef*, 190 F.3d 71, 78 (2d Cir. 1999) (citation omitted).  The argument was:

> [AUSA] TEKEEI: We were here.  She looked over at him, her kidnapper, the man who had done all of these horrible things and she was confronted with a picture of him on that witness stand.  She had him looking up at her from the table, and she had that picture in front of her, and she had him staring at that table --
> MR. DRATEL:  Objection.
> THE COURT:  Sustained.
> [AUSA] TEKEEI:  And we all saw what happened:  She fell apart, she completely fell apart. And who wouldn't?  . . . after she looked him in the eyes and told you the defendant was her kidnapper, she fell apart.  And with this photo array picture that nobody disputes is the defendant in front of her she broke down and compared them.  We all saw that happen.  People's appearances change.

Defendant claims that the Government impermissibly suggested that Defendant's "intimidating stare" prompted her recanting.  The Government denies the allegation.  Whatever the Government might have said had there been no objection, in the context of the entire trial, indeed in the context of the rebuttal argument that actually was made, the Government's reference to "staring at the table" cannot be said to have irreparably prejudiced Defendant.

Defendant argues that, in light of the length of the deliberations and the weakness of the Government's case, there could have been no certainty as to Defendant's conviction absent the Government's alleged suggestion in rebuttal.  To the contrary, the length of the deliberations and the jury's review of virtually the entire trial transcript suggest the opposite -- that the jury fully and carefully considered all of the evidence instead of being swayed by a single phrase in the Government's argument.

Defendant's second claim of prosecutorial misconduct warranting a new trial concerns Special Agent Reynolds' statement that he conducted a post-arrest interview of co-conspirator

Tyrone Brown, without disclosing the substance of the interview.   Defendant argues that this was a violation of the Court's prior evidentiary ruling precluding the Government from introducing Brown's post-arrest statement.  Eliciting this testimony was not improper because it was neither hearsay nor contrary to the Court's prior ruling.  Because there was no misconduct, there is no need to inquire whether the prosecutor's misconduct was so severe as to constitute prejudicial error.

Third, Defendant argues that "the government's failure to fulfill its duty with respect to vetting the testimony of Ms. Torres, Ms. Torruella and Detective Deloren resulted in substantial prejudice to Mr. Chambers" and warrants a new trial.  This argument is baseless.  Factually, there is no dispute that the Government met with all three witnesses multiple times before the trial.  That the witnesses' testimony was ultimately inconsistent shows that defense counsel's cross-examination served its intended purpose – "determining the reliability of testimony in criminal trials[.]"  *Crawford v. Washington*, 541 U.S. 36, 67 (2004).  Legally, it is unclear what "duty" Defendant seeks to impose on the Government or what basis there is for such a duty.  He essentially argues that he is entitled to a new trial because the Government's witnesses failed to answer in perfect synchrony.  However, had they done so, he likely would have complained that the witnesses had been improperly coached.  As explained in the Court's ruling striking Torres' testimony, the fault for Torres' identification testimony "not standing up" in court lay not with the prosecutors, but with Detective Deloren who did not adequately document or disclose the pertinent facts before or during trial.

Accordingly, Defendant's motion for a new trial under Rule 33 is denied.

### C.      Credibility Determination

The Government, in a detailed letter motion, "request[s] that the Court revisit one limited aspect of its ruling" striking Torres' identification testimony.  The Government "does not request that the Court reconsider the result of its ruling."  Rather, the Government "submits that the Court's findings as to credibility of [NYPD] Detective Ellis Deloren was unnecessary to the result and not fully supported by the record" and accordingly "should be modified." (footnote omitted).

Defendant vigorously objects to the Government's request.  Among other arguments, Defendant asserts that, in addition to the reasons already stated on the record for the adverse credibility determination, the Court had reason to question Detective Deloren's credibility even before trial.  In granting a prior motion of co-defendant Brown to suppress evidence recovered from the warrantless search of his home, the Court rejected both the Government's argument that the "exigent circumstances" warrant exception applied, and Detective Deloren's justification in his police report that he directed Brown's landlord "to open the door to ensure [he] was not injured inside."  The Court concluded that "[t]here was no indication that the defendant was hurt inside his home, or was otherwise in immediate need of Detective Deloren's assistance."

Having reviewed the record and considered the submissions from both sides, the Government's motion is denied.  The reasons for the credibility determination are fully stated in the ruling at trial striking Torres' eyewitness testimony, and are further supported by the Court's contemporaneous credibility determinations and observations of the witnesses as they testified. The Government has provided neither compelling reason nor authority for its "limited" reconsideration motion urging a contrary conclusion.

The Government principally relies on *United States v. Espino-Urvan*, No. 12 Cr. 337,

2013 WL 2255953 (S.D.N.Y. May 21, 2013), as authority for the relief it seeks.  In that case, Judge Swain initially granted the defendant's motion to suppress by assuming without deciding that the police had reasonable suspicion for a *Terry* stop, but had not sustained their burden of showing that the recovered drugs were in plain view.  In so ruling, Judge Swain did "not find that [the police officer's] testimony that he looked into the parked car and saw the drugs in plain view credible." *United States v. Espino-Urvan*, No. 12 Cr. 337, 2013 WL 1746616, at *8 (S.D.N.Y. Apr. 23, 2013), *order vacated on reconsideration*, 2013 WL 2255953 (S.D.N.Y. May 21, 2013). The government asked Judge Swain to reconsider the basis for her decision – i.e., it asked Judge Swain to decide that there was no reasonable suspicion for a *Terry* stop, rendering the credibility determination unnecessary.  *See* 2013 WL 2255953, at *1  With the understanding that the Government was seeking the same outcome but a different rationale, and that the defendant took no position, Judge Swain vacated the prior opinion and changed the legal basis for her ruling.  *Id.*

 *Espino-Urvan* is inapplicable here for three reasons.  First, that decision was based on the court's own assessment of the unique testimony and facts of that case.  Second, Defendant here, unlike the defendant in that case, objects to the Government's motion.  Third, and most important, *Espino-Urvan* is inapposite.  On reconsideration, the court in that case relied on an alternative legal theory that ultimately made the court's credibility determination unnecessary. Here, by contrast, there is no alternative legal theory.  The oral opinion explicitly adopted Torres' view of events, which the Court found credible, and rejected the contrary version offered by Detective Deloren.  The adverse credibility determination was necessary and central to the ultimate holding to strike her testimony.

 The Government's motion is accordingly denied.

### III.    CONCLUSION

For the foregoing reasons, Defendant's motion for a judgment of acquittal is DENIED. Defendant's motion for a new trial is DENIED.  The Government's motion for limited reconsideration is also DENIED.  A schedule for sentencing will be set by separate order.

The Clerk of Court is directed to close the motion at Dkt. No. 214.

SO ORDERED.

Dated: July 9, 2015
       New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE