UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                        :

UNITED STATES OF AMERICA                  S2 13 Cr. 345 (LGS)

                        :

      - v. -

                        :

ANTIONE CHAMBERS,
   a/k/a "Twizzie,"                :

            Defendant.     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

### GOVERNMENT'S SENTENCING MEMORANDUM

PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Amy Lester
Assistant United States Attorney
 -Of Counsel-

The Government respectfully submits this memorandum in connection with the sentencing of the defendant, Antione Chambers, which is scheduled to take place on December 21, 2015, at 2:30 p.m.  For the reasons that follow, the Government respectfully requests that the Court sentence Chambers to a substantial term of imprisonment that takes into account his conduct in this case and his violation of the terms of his supervised release.

A significant sentence of a substantial term of imprisonment would take into account Chambers' role in carrying out a brutal robbery and kidnapping that terrorized two victims.  Such a sentence is also necessary to punish Chambers and to protect the public, because he is a dangerous and violent criminal who has demonstrated his utter lack of respect for the law and inability to refrain from repeated criminal conduct.  In short, such a sentence would be sufficient, but not greater than necessary, to account for the factors set forth at Title 18, United States Code, Section 3553(a).

## I.    BACKGROUND

### A.    The Trial

On October 10, 2014, Chambers was convicted after trial of Counts One, Two, and Three of Superseding Indictment S2 13 Cr. 345 (LGS) (the "Indictment").[1]  The jury found Chambers guilty of (1) conspiring to commit a Hobbs Act robbery in or about March 2013, in violation of Title 18, United States Code, Section 1951 (Count One); (2) committing a Hobbs Act robbery on or about March 25, 2013, and aiding and abetting the same, in violation of Title 18, United States Code, Sections 1951 and (2) (Count Two); and (3) committing a kidnapping, on or about March 25, 2013, and aiding and abetting the same, in violation of Title 18, United States Code, Sections 1201 and 2 (Count Three).  As a result, Chambers faces an advisory Sentencing Guidelines range

---

[1] Chambers was acquitted of Count Four, which charged him with violating Title 18, United States Code, Section 924(c)(1)(A).

of a term of 360 months' to life imprisonment.

As established at the trial, Chambers and his co-defendants, Steven Glisson and Tyrone Brown, agreed to rob a known drug dealer, David Barea, when he was collecting a drug debt at Brown's apartment.  On March 25, 2013, Chambers and Glisson, abducted Barea from Brown's apartment in the Bronx and took Barea to his own residence, where Glisson held Barea at gunpoint while Chambers forcefully took Barea's wife to her relative's house to retrieve approximately $20,000.  (Presentence Investigation Report dated October 1, 2015 ("PSR") ¶¶ 14-16).  At trial, the Government offered evidence in the form of surveillance videos capturing the initiation of the robbery at Brown's apartment; audio recordings of Brown discussing narcotics transactions with Barea; phone records for telephones used by Chambers and Brown, among other phone records, showing their communications leading up to the robbery and kidnapping; cell-site location information for a cellphone Chambers used during the robbery and kidnapping showing that he was at Brown's apartment during the robbery and showing him, later, returning to the apartment that he shared with his girlfriend; photographs of the car, registered to Chambers' girlfriend, that the defendant and his co-conspirators drove during the robbery and kidnapping; Chambers' fake drivers' license that he was arrested with in New Jersey a few weeks after the robbery and kidnapping; and the photo array from which the female victim identified Chambers as one of her robbers and kidnappers, among other physical evidence.  (PSR ¶ 20).

Barea and his wife testified at length and in detail about the night of the robbery and kidnapping.  Shortly after midnight on March 25, 2013, Barea had arranged to meet Brown at Brown's home because Brown owed him money for a prior drug transaction.  (Trial Transcript ("Tr.") 357).  When Barea entered Brown's apartment, the two spoke, and Brown gave Barea the

money he owed Barea—$800—and asked if Barea had more drugs for him.  (Tr. 358, 359).  As Barea exited Brown's building, two men—Chambers and Glisson—rushed in and attacked him.  (Tr. 359).  Chambers—whom Barea and his wife referred to in their testimony as the "tall guy"—came in first, his face covered from his nose down, dressed in black, wearing gloves, and carrying an automatic gun in his waist and a hammer.  (Tr. 359).  Glisson, who Barea knew from a prior meeting as "Dee," was heavy-set, his face covered with a black mask, was wearing gloves, and was carrying a .38 revolver with a potato on the front.  (Tr. 360-61).

When Chambers and Glisson rushed into the apartment, Barea tussled with Chambers until Glisson came in, put a gun to Barea's head, and demanded that Barea stay still.  (Tr. 361-62).  Chambers beat Barea with a hammer, hitting Barea's back, shoulder blade, and legs while telling Barea not to look at him, and "don't look at my fucking face, don't look at me, don't look at me."  (Tr. 363).  Glisson and Chambers then told Barea to get on the floor, which he did, and they searched him and took his money, wallet and car keys out of his pockets.  (Tr. 363).  Barea had approximately $800 in his wallet.  (Tr. 364).  After Chambers and Glisson searched Barea, Glisson asked Barea "where's the money, where is the money."  (Tr. 364).  When Barea asked what money he was referring to, Glisson put the gun to Barea's head and said "don't fucking play with me, I'll pop you right here, I'll leave you right here."  (Tr. 364).  Barea pleaded with them to take it easy on him, and Chambers tied Barea's hands with some grey duct tape that was in a chair by the kitchen.  (Tr. 364).  Barea eventually told Chambers and Glisson that he had money at his home.  (Tr. 364).  Barea knew there was no money there, but was trying to plan his next steps and how he could try to escape from his attackers.  (Tr. 364-65).  While he was still tied up, Barea heard Glisson go toward the door and scream to someone outside to bring the car in or bring the car down.  (Tr. 365).  Chambers and Glisson then picked up Barea, put his hood

over his head all the way down past his neck so he could not see, and forced him into a car that was waiting in the driveway.  (Tr. 365-66).  Chambers and Glisson put Barea in the rear passenger seat of the car, placing him sideways with the front passenger seat fully reclined so that he could not move.  (Tr. 366).  Also in the car was a fourth member of the crew – a man who was dressed in dark clothing and whom Barea could not see.  (Tr. 366).

Once inside the car, Barea gave the robbers directions to the house where he lived with his wife.  (Tr. 372-73).  During the approximately ten-minute drive, Glisson threatened Barea, demanding to know how much money Barea had, and someone put a gun to Barea's leg.  (Tr. 374-75).  When they arrived at the location, Chambers, who was still wearing his mask, and Glisson, who was no longer wearing a mask, led Barea to the door.  (Tr. 380).  When they reached the door to the apartment, Chambers and Glisson unlocked the door and opened and shut it quickly because Barea's dog was inside.  (Tr. 381).  Glisson held the gun toward Barea's head as Barea called out to his wife to come to the door.  (Tr. 382).  When she came to the door, Glisson, pointing the gun through the door, told her to tie the dog up and put him in the bathroom.  (Tr. 383).  The gun Glisson was carrying still had a potato at the end of it, and, when he pointed the gun through the door, it fell off.  (Tr. 383).  After Barea's wife put the dog in the bathroom, Chambers, Glisson, and Barea entered the apartment.  (Tr. 384).  Chambers and Glisson forced Barea to a room where Barea told them there was a safe.  (Tr. 384).  Glisson was holding Barea by the arm and had a gun on Barea.  (Tr. 384-85).  There was no safe in the closet of the room, as Barea had told them there would be, and Glisson demanded to know where the money was.  (Tr. 385).  Barea's wife told the robbers that she had taken it to her mother's house, and Glisson threatened to kill Barea for lying to him.  (Tr. 385).  Barea offered to retrieve the money from his mother-in-law's home and come back, but Glisson refused.  (Tr. 386).

4

After learning that the money was actually at the mother-in-law's home, Chambers forced Barea's wife left to go to her mother's home to get the money, while Glisson held Barea at gunpoint.  Chambers grabbed Barea's wife by her neck, and walked her out of her home to a car that was parked down the block from her home.  (Tr. 150-51).  Chambers and the fourth robber drove to Barea's mother-in-law's house, where Chambers forced Barea's wife to retrieve a bag containing approximately $20,000.  (Tr. 171).  After handing the bag to Chambers, he grabbed Barea's wife by the neck again as they walked back to the car.  (Tr. 172).  During the ride back, Chambers called Glisson and said he had the bag.  (Tr. 172).

When Chambers returned with Barea's wife, Glisson opened the door and was upset that there was not enough money in the bag.  (Tr. 173).  Chambers told Barea's wife to kneel on the floor and grabbed a scarf from a chair, telling her that he was going to tie her up with the scarf.  (Tr. 391).  Glisson interceded, and told Barea's wife to get up.  (Tr. 391).  Chambers, Glisson, Barea, and his wife then headed toward the bedroom, where Glisson told Barea and his wife to lay down on their chests on the bed.  (Tr. 393).  After complaining further about the small amount of money they had obtained, Glisson and Chambers finally left.  (Tr. 393).

**B.    The Violations of Supervised Release**

Chambers is also charged with three violations of his supervised release arising from this same conduct.  (*See* Request for Court Action dated June 17, 2013 in Case No. 12 Cr. 853 (LGS) (the "Violation Petitition"), at 3-4).   The Government's proof at trial established by a preponderance that Chambers is guilty of all three violation specifications, including the specification relating to the possession and use of a firearm in connection with the robbery.[2]  As

_____

[2] The Government does not intend to pursue the remaining two specifications, which allege that Chambers failed to report to the Probation Office as directed in May and June 2013 and that he

indicated by the excerpts from the trial transcript cited above, both Barea and his wife testified that Glisson carried a gun throughout the March 25 robbery, which he used explicitly to threaten Barea and his wife, and Barea testified that Chambers also had a gun in his waistband. Moreover, both Glisson and Brown pled guilty pursuant to plea agreements with the Government in which they agreed that a firearm was possessed or brandished in connection with the robbery conspiracy.[3]   The fact that the jury did not convict Chambers of the firearms offense charged in the Indictment does not impact the Court's ability to consider this proof at sentencing.   *See United States* v. *Gomez*, 580 F.3d 94, 105 (2d Cir. 2009) ("A sentencing court is free to consider hearsay evidence, evidence of uncharged crimes, dropped counts of an indictment and criminal activity resulting in acquittal in determining sentence."); *United States* v. *Vaughn*, 430 F.3d 518, 526-27 (2d Cir. 2005) (district courts may "find facts relevant to sentencing by a preponderance of the evidence, even where the jury acquitted the defendant of that conduct"); *United States* v. *Garcia*, 413 F.3d 201, 220 n.15 (2d Cir. 2005) (disputed facts relevant to sentencing need only be found by the district court by a preponderance of the evidence).

The Government respectfully submits that there is ample proof to support a finding that the Government established by a preponderance of the evidence that Chambers violated 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2, and is therefore guilty of Specification 3 in the Violation Petition.

---

failed to notify the Probation Office of his change in residence on or about June 5, 2013.  (*Id.* at 4).

[3]   Both plea agreements contained a five-level enhancement under United States Sentencing Guidelines Section 2B3.1(b)(2)(C), stipulated to by the parties, for the possession or brandishing of a firearm in connection with the robbery conspiracy.

## II.    ARGUMENT

### A.    The Governing Legal Framework

The Guidelines still provide strong guidance to the Court in light of *United States* v. *Booker*, 543 U.S. 220 (2005) and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005). Although *Booker* held that the Guidelines are no longer mandatory, it held also that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing.  543 U.S. at 264.  As the Supreme Court has stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range": that "should be the starting point and the initial benchmark."  *Gall* v. *United States*, 55 U.S. 38, 49 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, *see* 18 U.S.C. § 3553(a)(2); "the kinds of sentences available," 18 U.S.C. § 3553(a)(3); the Guidelines range itself, *see* 18 U.S.C. § 3553(a)(4); any relevant policy statement by the Sentencing Commission, *see* 18 U.S.C. § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants," 18 U.S.C. § 3553(a)(6); and "the need to provide restitution to any victims," *id.* § 3553(a)(7).  In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)    to afford adequate deterrence to criminal conduct;
>
> (C)    to protect the public from further crimes of the defendant; and

7

> (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Courts may not presume that the appropriate sentence necessarily lies within Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall* v. *United States*, 552 U.S. at 50 n.6. Their relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita* v. *United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46; *see also Rita* v. *United States*, 551 U.S. at 349. To the extent a sentencing court varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50.

### B.    The Court Should Impose a Substantial Sentence That Ensures That Chambers Is Imprisoned for a Significant Period of Time

In the present case, a substantial sentence that ensures that Chambers is imprisoned for a significant period of time would be sufficient, but not greater than necessary, to comply with the purposes of sentencing. Consideration of several of the Section 3553(a) factors, in addition to the advisory Guidelines—which, as discussed below, recommend a sentence of 360 months' to life imprisonment—warrants such a sentence for Chambers. The Section 3553(a) factors most applicable in this case include the nature and circumstances of the offenses of conviction, the

seriousness of those offenses, the need to provide just punishment, the need to promote respect

for the law, the need to afford adequate deterrence to criminal conduct, and the history and

characteristics of this defendant.

### 1.      The Advisory Guidelines Range

The parties and the Probation Office agree that the applicable advisory Guidelines range

in this case is 360 months to life because of Chambers' status as a career offender.  (PSR ¶ 101).

The defense submission contains several arguments that center on the purported unfairness of the

Career Offender Guidelines, both in general and as applied to this case.[4]  The Government does

not intend to respond to these arguments in detail, other than to note that the application of the

Career Offender Guidelines has been upheld in a variety of contexts, *see, e.g.*, *United States* v.

*Torres*, 295 Fed. App'x 461, 462 (2d Cir. 2008) (rejecting constitutional attacks on the Career

Offender Guidelines under the Fifth and Sixth Amendments); *United States* v. *Torres*, 295 Fed.

App'x 461, 462 (2d Cir. 2008) (rejecting constitutional attacks on the Career Offender

Guidelines under the Fifth and Sixth Amendments); *United States* v. *Garcia*, 20 F.3d 670 (6th

Cir. 1994) (262 month sentence pursuant to the Career Offender Guidelines for possession of

cocaine did not constitute cruel and unusual punishment under Eighth Amendment); *United*

*States* v. *Bannister*, 786 F. Supp. 2d 617, 668 (E.D.N.Y. 2011) (holding, with regard to the

sentencing of defendants convicted of crack cocaine conspiracy, that despite the racial impact of

---

[4] A related argument by the defense is that the imposition of a sentence within the advisory range
under the Career Offender Guidelines will result in unwarranted sentence disparities among the
defendants in this case.  While it is true that a sentencing court must consider "the need to avoid
unwarranted sentence disparities among defendants with similar records who have been found
guilty of similar conduct," pursuant to § 3553(a)(6), Congress adopted that provision "to
eliminate unwarranted disparities nationwide."  *United States* v. *Williams*, 524 F.3d 209, 215 (2d
Cir. 2008).  Thus, "a district court may—but is not required to—consider sentencing disparity
among co-defendants under 18 U.S.C. § 3553(a)(6)."  *United States* v. *Johnson*, 567 F.3d 40, 54
(2d Cir. 2009) (citing *United States* v. *Frias*, 521 F.3d 229, 236 & n.8 (2d Cir. 2008)).

the applicable sentencing statutes, Second Circuit jurisprudence precludes a finding of unconstitutionality of sentencing statutes), and the defense puts forth no compelling reasons for this Court to question the overall validity or constitutionality of the Career Offender Guidelines. Moreover, the Guidelines as a whole reflect the considered judgment of the Sentencing Commission, after examining "tens of thousands of sentences and work[ing] with the help of many others in the law enforcement community over a long period of time" in an effort to fulfill the same objectives set out in Section 3553(a). *Rita*, 551 U.S. at 349. The Guidelines "seek to embody the § 3553(a) considerations, both in principle and in practice," and accordingly, the Guidelines "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Id.* Thus, the Government submits that the Court should consider the applicable range as calculated under the Career Offender Guidelines as a starting point in fashioning an appropriate sentence for Chambers.

###    2.    The Nature and Seriousness of the Offense, and the Need to Provide Just Punishment

The most significant factor weighing in favor of a sentence that ensures that Chambers remains imprisoned for a significant period of time in this case is the "nature and circumstances of the offense[s]" of conviction. 18 U.S.C. § 3553(a)(1). Chambers planned and participated in a heinous attack of the victims in this case. He and his co-conspirators used firearms, threats of violence and death, and spread their violence, over the course of a single night, throughout three separate locations. The seriousness of the violent armed robbery that involved the assault and abduction of Barea and his wife, and which exposed other individuals—namely, the family members of Barea's wife—to additional potential violence cannot be overstated. In addition, Chambers and his co-conspirators hand-picked Barea precisely because he, too, had committed crimes. Barea was a drug dealer and, as a result, far less likely to report such a robbery to law

enforcement.  Put simply, Chambers and his co-conspirators chose their victim because they did not think they would get caught—in complete disrespect for the law and the seriousness of the violence that they would perpetrate throughout the course of the robbery.  The mental, emotional, and physical toll of being a victim of an armed robbery cannot be overstated, and multiple victims have suffered at the hands of this defendant and his co-conspirators.  As the Court saw at trial, the victims' anguish in even recounting the events of the night of March 25, 2013 was heartrending.  In sum, the seriousness of Chambers' conduct militates forcefully in favor of a significant sentence.

### 3. The Need to Promote Respect for the Law, and the Need to Afford Adequate Deterrence

This Court must, in crafting a sentence for Chambers, promote respect for the law and ensure that Chambers does not have the opportunity to commit further crimes; a sentence that ensures Chambers' imprisonment for a significant period of time has the best chance of accomplishing both goals.  Such a sentence will also provide general deterrence to others.  Indeed, a defendant such as Chambers, whose criminal conduct spans a period of more than ten years, and has continued unabated despite periods of incarceration and court supervision, clearly will not be deterred from future criminal conduct without a significant penalty, if at all.  One key objective for this Court must be to prevent Chambers from harming another member of society, in addition to punishing him for his crime.  A sentence of a significant term of imprisonment would also provide deterrence to other young men who may consider committing violent robberies, and who would consider violence to be a normal and integral part of life.  In committing the offense conduct in this case, the defendant proved himself to be more than willing to participate in violent and dangerous conduct with others.  A substantial sentence is necessary to deter the defendant from future criminal activity and to protect the public from this

11

defendant's further criminal conduct.   Furthermore, a substantial Guidelines sentence that reflects the seriousness of the instant offense is necessary to deter others from committing similar crimes in the future.

### 4.   The History and Characteristics of the Defendant

For many of the reasons discussed above, Chambers' history and characteristics do not counsel against the appropriateness of a substantial sentence of a significant term of imprisonment.   Based on the information in the PSR and the defense submission, there can be no doubt that Chambers had an extremely difficult, and in many ways, tragic, upbringing.   But Chambers has not shown any sustained ability to move beyond his circumstances and to function as a productive member of society.   Chambers sustained three adult convictions by the time he was 23 years of age.   And as the Court is well aware, Chambers was on supervised release as a result of the last of those convictions at the time that he committed the offenses in this case.   He has essentially shown himself to be unable to curb his criminal conduct, even when under court supervision.   Accordingly, this factor does not seriously discount the need for a substantial sentence in this case.

### III.    CONCLUSION

For the reasons set forth above, the Government respectfully submits that the Court should impose on Antoine Chambers a substantial term of imprisonment, sufficient to ensure that Chambers be imprisoned for a significant period of time, based on his conduct in this case and his violation of the terms of his supervised release.  Such a term of imprisonment would be sufficient, but not greater than necessary, to accomplish the goals set forth in Title 18, United States Code, Section 3553(a).

Dated: New York, New York
       December 17, 2015

                                        Respectfully submitted,

                                        PREET BHARARA
                                        United States Attorney

                           By:     __/s/ Amy Lester_____ _
                                        Amy Lester
                                        Assistant United States Attorney
                                        (212) 637-2416