RECEIVED

March 7, 2023

CHAMBERS OF
LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,    )
        Plaintiff,     )
                  )
v.                  )
                  )
ANTIONE CHAMBERS,       )
        Defendant.     )
_____)

Case No. 13-cr-345-03

Honorable Judge Schofield

## MOTION FOR A REDUCTION IN SENTENCE

COMES NOW THE DEFENDANT, Antione Chambers, in pro se, and respectfully moves this Honorable Court for a reduction in sentence pursuant to Title 18 U.S.C. § 3582(c)(1)(A)(i). In support of said request, Defendant states the following:

### I. PROCEDURAL ISSUES

### A. Exhaustion of Remedies

A defendant may bring a § 3582(c)(1)(A) motion after 30 days have lapsed from the receipt of a request by the defendant's facility. Thirty days have lapsed since Chambers' request. See Exhibit A (Copy of said request). Therefore, Chambers has exhausted his remedies.

### B. Statement of Layman

As this Honorable Court acknowledges, Chambers proceeds in pro se; therefore, "the court . . . liberally interpret[s] his submission 'to raise the strongest arguments that [it] suggest[s].'" U.S. v. Chambers, 2021 U.S. Dist. LEXIS 32182, at LEXIS 3 (S.D.N.Y) (Schofield, L.) (quoting Williams v. Annucci, 895 F.ed 180, 187 (2d Cir.2018)).

### C. Background

Succinctly, on 10/10/2014, this Honorable Court convicted Chambers of both conspiracy to commit and of the substantive offense

of Hobbs Act robbery and kidnapping. On 12/21/2015, this Court sentenced him to 240 months, a below the guideline sentence. For the remaining background, see this Court's denial of Chambers' compassionate release on 2/22/2021.

D. Legal Framework for a Reduction of Sentence

This Honorable Court may reduce a defendant's sentence if it finds that the defendant has exhausted administrative remedies, it considers the § 3553(a) factors that are applicable, and if it finds that extraordinary and compelling reasons exist. Moreover, "[a] court may 'consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them' and has 'discretion in determining what are extraordinary circumstances.'" U.S. v. Flores-Mendez, 2022 U.S. Dist. LEXIS 197682, at LEXIS 3 (S.D.N.Y.) (quoting U.S. v. Brooker, 976 F.3d 228, 234, 237 (2d Cir.2020)).

II. EXTRAORDINARY AND COMPELLING REASONS

A. Chambers Would No Longer Qualify for the Career Offender Enhancement

Due to two predicate offenses, a 2006 conviction for distribution and possession with intent to distribute a controlled substance in violation of 21 USC § 841(a)(1) and 18 USC § 2 and a 2010 conviction for use of a communication facility to facilitate drug trafficking in violation of 21 USC § 843(b), the Government found that Chambers qualified for the career offender enhancement. Per the enhancement, Chambers' guidelines range was 360 months to life imprisonment. Without the enhancement, Chambers' range was 210 to 260 months. This Honorable Court sentenced Chambers to a below-the-Guidelines sentence of 240 months.

Again, this Court sentenced Chambers on 12/21/2015. Chambers filed a timely appeal in January of 2016. Shortly after--and while his appeal was pending--the Second Circuit decided U.S. v. Maldonado, 636 Fed. Appx. 802 (2d Cir.2016) on January 20, 2016. In Maldonado, the Second Circuit ruled that 21 USC § 843(b) does not qualify as a predicate under the career offender enhancement "[b]ecause § 843(b) contains additional elements not included in the definition of 'controlled substance offense' [and] is broader than the generic offense laid out in the Guidelines." Id. at 812. A copy of said case is provided as Exhibit ₴ pursuant to Federal Rule of Appellate Procedure, 32.1(b). See Exhibit ₴.

Defendants who are incorrectly sentenced as career offenders under the Guidelines can meet extraordinary and compelling reasons for a sentence reduction. See, e.g., U.S. v. Lopez, 523 F.Supp.3d 432 (S.D.N.Y.2021) (Castel, P.); U.S. v. Carlton, 2022 U.S. Dist. LEXIS 211831 (S.D.N.Y.) (Gardephe, P.); U.S. v. Dilworth, 2021 U.S. Dist. LEXIS 42619, at LEXIS 13 (M.D.N.C.) (Eagles); U.S. v. Kanohokula, 572 F.Supp.3d 895 (D.Haw.2021); U.S. v. Robinson, 2022 U.S. Dist. LEXIS 233985 (D.Kan.) (Crabtree). See also U.S. v. Warren, 22 F.4th 917, 919 (10th Cir.2022) (instructing that a career offender enhancement "should be reviewed as part of a First Step Act motion.").

In Molina-Martinez v. United States, 578 U.S. 189 (2016), the court reasoned that the "Guidelines are not only the starting point for most federal sentencing proceedings but also the lodestar" and that "when a Guidelines range moves up or down, offenders' sentences [tend to] move with it. Id. at 199. Therefore, "if 'the court's starting point is skewed' it stands to reason that

'its final sentence is skewed too.'" U.S. v. Zander, 773 Fed. Appx. 481, 482 (10th Cir.2019) (quoting U.S. v. Sabillon-Umana, 772 F.3d 1328, 1333 (10th Cir.2014).

The Court chose to sentence Chambers without the enhancement, explaining why it chose to do so. The fact that this Court did depart is "strong evidence that the erroneously calculated guide-line range influenced the Court's chosen sentence." U.S. v. Loving, 22 F.4th 630, at LEXIS 13 (7th Cir.2022); see also Molina-Martinez, supra, at 199 (explaining that if a court explains the chosen sentence relative to the sentencing range, "then the Guidelines are in a real sense the basis for the sentence." (emphasis in original)). And "[t]he farther [a sentencing court] diverges from the advisory guideline range, the more compelling the reasons for the divergence must be." U.S. v. Moreland, 437 F.3d 424, 434 (2d Cir.2006).

While the Maldonado case could have rendered procedural error in terms of Chambers' sentence and that error could have been deemed harmless, see U.S. v. Jass, 569 F.3d 47, 68 (2d Cir. 2009), only this Court--at this point--can decide whether it may have departed, provided a downward variance, or sentenced Chambers at the low end of the guideline range if the enhancement did not apply. See, e.g., Brooks v. Rickard, 2020 U.S. Dist. LEXIS 152390, at footnote 2 (S.D.W.V.) ("Because Petitioner's reduced sentence still appears to be influenced by the career offender enhancement, the undersigned does not believe that the sentence reduction moots his present claim."); U.S. v. Bennett, 839 F.3d 153, 163 (2d Cir.2016) (Held that such an error was not harmless even though the district court asserted that it

4

was "not moved by" the Guidelines and imposed a seven-year-below-
Guidelines sentence.); see also U.S. v. Lopez, 724 F. App'x
90 (2d Cir.2018) (same); U.S. v. Munoz-Camarena, 631 F.3d 1028,
1031 (9th Cir.2011) (per curiam) (Because the error resulted
in an incorrect criminal history score and an incorrect Guidelines
range, the district court might have arrived at a different
sentence).

One thing for sure, the "career offender status creates
'a category of offender subject to particularly severe punishment.'"
Spencer v. U.S., 727 F.3d 1076, 1089 (11th Cir.2013) (quoting
Buford v. U.S., 532 U.S. 59, 60 (2001)). This Court chose to
depart, explaining its reasons for doing so. Again, "the farther
it departs, the more compelling its justification must be." U.S.
v. Holt, 486 F.3d 997, 1004 (7th Cir.2007). Perhaps this Court
could not justify a further departure at the time, and perhaps
those reasons still stand for a departure from where Chambers
stands in the Guidelines today without the enhancement. It seems
that there is "a reasonable probability of a different outcome
absent the error." Molina-Martinez, supra, at U.S. 198.

B. Trial Penalty Plays a Role in Chambers' Sentence

After rejecting the Government's initial offer and then
asserting his right to trial, Chambers was superceded, when
charges, including the § 924(c) charge, were added[1]. Chambers
again elected to exercise his Sixth Amendment right to a trial
by jury. While the Government can surely attribute its superceding
to other factors, the Government nevertheless superceded Chambers.
See Docket # 49 sub judice.

When Chambers elected to proceed to trial, roughly 95% of

felony cases were a result of guilty pleas. Today, that percentage
is roughly 97.8. See Sentencing Commission, 2020 Sourcebook of
Federal Sentencing Statistics, 56 (2020). The system has become
a system of pleas, where defendants are often charged with crimes
they are innocent of and are merely offered plea deals that
dismiss the very charges the defendants are innocent of anyway,
leaving defendants with technically no deals at all.

A statistical analysis of 207,352 federal convictions from
2006 through 2008, for which the U.S. Sentencing Commission's
database was utilized, adduced that "defendants convicted at
trial received a sixty-four percent longer sentence than similar
defendants who plead guilty to similar crimes." U.S. v. Abraham,
498 F.Supp.3d 175, 184 (D.Mass.2020) (citing Andrew Chongseh
Kim, Understanding the Trial Penalty: An Empirical Analysis of
the Trial Penalty and Critique of the Abrams Study, 84 Miss.
L.J. 1195, 1236 (2015). Chambers was partly punished for not
accepting responsibility for a firearm that the jury acquitted
him of. Had he plead guilty to the § 924(c) charge, the two--
possibly three--point reduction under U.S.S.G. § 3E1.1(a), (b)
would not have even had an effect compared to being acquitted
of it. Moreover, most often when the Government agrees to dismiss
a § 924(c) charge, defendants are not told that the U.S.
Sentencing Guidelines account for the same behavior, leaving
defendants with no bargain at all. See, e.g., Section 2B3.1(b)(2)-
(A), (B), (C). Sadly, "there is empirical evidence that trial
penalty is so large that it is encouraging actual innocents to
plead out." Abraham, supra, at 184 (citing John H. Blume & Rebecca
K. Helm, The Unexonerated: Factually Innocent Defendants Who

6

Plead Guilty, 100 Cornell L. Rev. 157, 173 (2014).

As shown by Attorney Joshua L. Dratel in his sentencing letter, Docket # 244, Chambers' co-defendant, Mr. Glisson, had a similar criminal record and received 97 months simply because his predicates, consisting of two criminal possessions of a weapon, did not qualify for the career offender enhancement. See Sentencing letter at pages 52-53. Courts have found that a gross disparity between sentences of co-defendants resulting from one's choice to exercise his/her constitutional right to trial is an extraordinary and compelling factor. See U.S. v. Ballard, 552 F.Supp.3d 461, 486 (S.D.N.Y.2021). "If the only meaningful difference between" codefendants' sentences is "that one went to trial and the others did not," there can very well be a presumption of trial penalty. U.S. v. Gozes-Wagner, 977 F.3d 323, 337 (5th Cir.2020). "On the other hand, [. . .] when the government seeks a sentence that exceeds the plea offer, it appears to constitute punishment of the defendant for the exercise of his right to proceed to trial." U.S. v. Wright, 2022 U.S. Dist. LEXIS 104747, at LEXIS 44 (D.Md.); see also U.S. v. Sessoms, 565 F.Supp.3d 325 (E.D.N.Y.2021) (Block, F.) (finding extra-ordinary and compelling reasons, partly, because the defendant received a harsher sentence than defendants who did not elect trial); U.S. v. Cabrera, 531 F.Supp.3d 863, 869 (S.D.N.Y.2021) (Rakoff, J.) (granting a compassionate release motion after criticizing "the corrosive effects of the trial penalty" and "refus[ing] to punish a defendant for his choice to exercise his constitutional rights . . . .").

7

Trial penalty can offend the vindictive sentencing doctrine. See, e.g., Garcia v. Herbert, 2018 U.S. DIst. LEXIS 20345, at LEXIS 103-107 (E.D.N.Y.) (Weinstein, J.). And no where is it more pervasive and routinely applied than in the federal system, which can be evidenced simply by Section 3E1.1 of the Guidelines. From this section alone there exists much debate and obvious friction. Id. at 105. Chambers lost out on a three-level reduction--two for not accepting responsibility (3E1.1(a)) and one for not doing so in a timely manner (3E1.1(b))--for exercising his constitutional right and being acquitted of a five-year-consecutive charge. "U.S.S.G. § 3E1.1(b) should be amended to authorize courts to award a third point for acceptance of responsibility if the interests of justice dictate without a motion from the government and even after trial." National Association of Criminal Defense Lawyers, The Trial Penalty: The Sixth Amendment Right to Trial on the Verge of Extinction and How to Save it, 12 (2018) (emphasis added). This Court can still take that one-point reduction into account.

C. Sentencing Disparity Plays a Role
   in Chambers Sentence

Without the career offender enhancement, Chambers' 240-month sentence results in sentencing disparity. "While disparity is usually considered on a nationwide basis under § 3553, there are cases in which disparity in sentences between codefendants in a single case is also a relevant consideration." U.S. v. Garza, 2018 U.S. Dist. LEXIS 100400, at 7 (N.D.Ill.).

Counsel Dratel's sentencing letter, Docket # 244, supra, delineates facts and sentencing data that are extremely relevant to Chambers' current motion. Chambers would request this Honorable Court to revisit it. Compared to Chambers' criminal record, Mr.

Dratel notes on page 53, Mr. Glisson does "not have [a] dissimilar criminal record[.]" However, Glisson received a 97-month sentence. Dratel further reflects on the more culpable Glisson at pages 52-53:

> The testimony at trial clearly placed Mr. Glisson in a leadership position in the offense conduct. He possessed a firearm during the robbery (outfitted with a makeshift homemade silencer), threatened the victim David Barea with it, physically assaulted Mr. Barea, and made ominous comments to Mr. Barea at the conclusion of the kidnappings (including a desire to kill his own codefendants in the crime).

In U.S. v. Cheese, 2022 U.S. Dist. LEXIS 226679 (D.Md.), Judge Hollander noted that Cheese's codefendant had his sentence reduced by the previous Judge Bredar, who found that "Brown's excessively long sentence, which is out of step with the lesser sentence received by his more culpable co-defendant [. . .] qualifies as an extra-ordinary and compelling reason for a reduction" of his sentence. Id. at 41. Judge Hollander, therefore, reduced Cheese's sentence under the same reasoning. In U.S. v. Tucker, 2021 U.S. Dist. LEXIS 158909, at 10 (S.D.N.Y.) (Nathan, A.), the court found that Tucker had a "more extensive criminal history" but that "the size of the present disparity between" the sentences of his codefendants was "unwarranted."[4]

Despite Glisson's leadership role, possession of a pistol, and violent demeanor, he has already been released.[5] "[A] disparity exists because of all Chambers's codefendants have been released." U.S. v. Chambers, 2021 U.S. Dist. LEXIS 33228, at 10 (E.D.Mich.); see also Tucker, supra, at 10 (emphasizing, contrastly, that the two codefendants charged with the same offense had already been released when granting a reduction); U.S. v. Thomas, 2021 U.S. Dist. LEXIS 170205, at LEXIS 5 (E.D.N.Y.) (Nathan, A.) (finding

that all of the codefendants were still incarcerated; therefore, granting the defendant "an early release would" have created "an arbitrary disparity.")

It is not "secret that those convicted of federal crimes generally receive longer sentences than individuals convicted of similar state offenses." Oklahoma v. Castro-Huerta, 142 S.Ct. 2468, 2525 (2022). In fact, in New York "the [median] time served by state prisoners released in 2016, from their date of initial admission to their date of initial release, was . . . 13.4 years for murder." U.S. Dep't of Justice, Office of Justice Programs, Bureau of Justice Statistics, Time Served in State Prison (2016).[6]

However, on the federal level, the length of the median sentence "for murder for fiscal year 2015 through 2021 was 240 months and the average was 262 months." U.S. v. FLores-Mendez, 2022 U.S. Dist. LEXIS 197682, at 10 (S.D.N.Y.) (citation omitted). In U.S. v. Quinn, 467 F.Supp.3d 824, 828 (N.D.Cal.), it states that "in 2019, the median sentence for murder was 20 years, for sexual abuse 15 years, for kidnapping 10 years." (citing 2019 Annual Report and Sourcebook of Federal Sentencing Statistics, U.S. Sentencing Comm'n, at 64 (Mar. 23, 2020).[7]

The average national sentence for fiscal year 2019 imposed for robbery was 109 months; for murder 255 months; for kidnapping 171 months; for child pornography 103 months; and for extortion/racketeering 32 months. See Table 15, Sentence Imposed by Type of Crime.[8] In 2021, the average sentence in federal court for murder was 244 months; for kidnapping 166 months; and for robbery 104 months. 2021 SOurcebook of Federal Sentencing Statistics, Table 15.[9]

The Sixth Circuit relies on Table 14 in the Sentencing Commission's Annual Sourcebook of Federal Sentencing Statistics, stating that it "is a starting point for district judges in their efforts to 'avoid unwarranted sentence disparities among defendants with similar criminal records who have been found guilty of similar conduct.'" U.S. v. Stock, 685 F.3d 621, 629 n.6 (6th Cir.2012) (quoting § 3553(a)(6)); see also U.S. v. Powell, 852 Fed. Appx. 978, 980 (6th Cir.2021) ("We've repeatedly consulted the national averages ourselves when deciding whether a sentence is substantively reasonable."); U.S. v. Patriarca, 807 F.Supp. 165 (D.Mass.) ("With some specified exceptions, the Guidelines are intended to duplicate national averages of pre-guidelines sentencing practices.")

Again, in 2019 the median sentence for kidnapping was 10 years. The average was 171 months. In 2021, the average sentence for kidnapping was 166 months, according to Table 15 of the sourcebook. What is more astounding is that the average sentence for murder in 2021 was 244 months--four more months than Chambers' sentence. A disparity exists not only with his codefendants but also with the national averages

D. Inadequate Health Care

As noted in his previous request for compassionate release, Chambers putatively suffers from optic neuritis. See Docket No. 284, sub judice. The BOP transferred him to FCI Butner II, so the BOP could test for other possible disorders and provide better health care.

Optic neuritis is the inflammation of the optic nerve, which is a group of nerve fibers that transmit stimuli from the eye

to the brain.

> Common symptoms of optic neuritis include pain with eye movement
> and temporary vision loss in one eye. Signs and symptoms of
> optic neuritis can be the first indication of multiple sclerosis
> (MS), or they can occur later in the course of MS. MS is a disease
> that causes inflammation and damage to nerves in your brain as
> well as the optic nerve.[11]

Chambers also experiences blurry vision, dizziness, and light
sensitivity at times. "It can cause rapid and progressive
temporary vision loss." Bowen v. Astrue, 2011 U.S. Dist. LEXIS
33879, at 9 n.5 (D.S.C.).

As shown, "optic neuritis [. . .] could lead to a multiple
sclerosis diagnosis." Gibson v. Astrue, 2011 U.S. Dist. LEXIS
43669, at 15 (N.D.Ill.). "[O]tic neuritis is a precursor to MS
[and] proper diagnosis [is] difficult [and] expensive . . . ."
McVicker v. Comacho, 2022 U.S. Dist. LEXIS 206223, at 6 (W.D.Penn).
"Although multiple sclerosis frequently involves the optic nerve,
a demyelinating disease that is not multiple sclerosis could
also involve dysfunction of the optic nerve." Hitchcock v. U.S.,
479 F.Supp. 65, 67 (D.D.C.1979) (Testimony from doctors). In
fact, there are a number of disorders that Chambers may be
inflicted with. Neuromyelitis optica (Devic's disease) is an
autoimmune disorder that causes the body's immune system to attack
the optic nerves and/or the spinal cord. See Devic's Disease
(Neuromyelitis), Cleveland Clinic. Cerebrovascular disease could
be the problem, or it could be a demyelination disorder.

The fact is that the BOP has not conducted the proper tests
to exclude the potential disorders, despite it saying it is.
See this Court's order denying Chambers compassionate release
("A lab test to determine whether this medical condition is
associated with other medical issues is pending." 2021 U.S. Dist.

LEXIS 32182, at 2. In fact, the BOP's treatment of Chambers has decreased since being transferred to Butner. Chambers cannot get any solid answers, and the treatment is not working. While Chambers cannot claim--nor even rule out--gross mismanagement yet, he can claim inadequate care.

Chambers' medical records adduce inadequate care, and "once a defendant goes to prison, courts may use poor medical care to release a defendant." U.S. v. Eccleston, 2021 U.S. Dist. LEXIS 108879, at 97 (D.N.M.) (citing U.S. v. Beck, 425 F.Supp.3d 573, 586 (M.D.N.C.2019). And in as much as the Government and the courts seem to believe that prisoners receive such good health care, there are countless cases adducing the truth of that. See, e.g., Beck, supra (BOP's "gross mismanagement" caused her to lose a left breast and almost her right one); U.S. v. Shope, 2020 U.S. Dist. LEXIS 155756 (S.D.OH) (BOP's inattention and gross mismanagement caused his leg to be amputated); U.S. v. Roman, 2021 U.S. Dist. LEXIS 138299 (N.D.OH) (Glaucoma lead to blindness by the BOP's inadequate care); U.S. v. Derentz, 2022 U.S. Dist. LEXIS 108440 (E.D.Penn) (unjustified and unexplained delays by the BOP caused blindness in left eye); U.S. v. Bardell, 2022 U.S. Dist. LEXIS 181785 (M.D.Fla.) (Had the BOP treated him properly, he had a 71% chance to live).

Some courts have found that extraordinary and compelling circumstances exist because of the BOP's failing "to provide necessary treatment" and delaying treatment of "serious medical conditions." U.S. v. Verasawmi, 2022 U.S. Dist. LEXIS 125856 (D.N.J.) (not life threatening but could become fatal); U.S.

13

v. Almontes, 2020 U.S. Dist. LEXIS 62524 (D.Conn.) (indifferent
to spinal issue by delaying treatment and surgery for years);
U.S. v. Robles, 2022 U.S. Dist. LEXIS 14554 (S.D.Cal.) (lack
of proper care).

D. Miscellaneous Cicumstances

    In 2011, African Americans were incarcerated at nearly six
times the rate of caucasians. See Dep't of Justice, Bureau of
Justice Statistics, E.A. Carson & W. Sabol, Prisoners in 2011,
at 7-8; 26 (2012). By the end of 2015, 169 in 100,000 caucasians
were in jail, 174 in 100,000 Latino adults, and 607 in 100,000
African American adults. See Zhen Zeng, Jail Inmates in 2016, Bureau
of Justice Statistics (Feb. 2018) at Tabel 2.[12] That is 3.6 times
more black adults in jail than whites.

    Also at the end of 2015, 312 in 100,000 caucasians were
incarcerated for sentences longer than one year, 820 in 100,000
Latinos, and 1,745 African Americans. See E. Ann. Carson and
Elizabeth Anderson.[13] That is 5.6 times more African Americans
incarcerated than caucasians.

    Without a doubt, there is a disproportionate involvement with
the authorities when in comes to blacks. See Michelle Alexander,
The New Jim Crow: Mass Incarceration in the Age of Colorblindness
(2010). As this Court knows, many variables play a role in this,
including poverty. As of September 2017, 22% of African Americans
still suffered in poverty, compared with 11.6% of the total
population. See U.S. Poverty Statistics, Federal Safety Net.[14] All
these variables result in a very high-incarceration rate for
African Americans. See, e.g., Ta-Nehisi Coates, The Black Family
in the Age of Mass Incarceration, Atlantic (2015).[15]

On top of it all, federal sentences remain the harshest throughout the Nation, and people are still being imprisoned at unprecedented rates. See The Sentencing Project, Fact Sheet: Trends In U.S. Corrections 1, 3 (2021)[16]; see also U.S. Gov't Accountability Off, GAO-12-743, Bureau of Prisons: Growing Inmate Crowding Negatively Affects Inmates, Staff, and Infrastructure (2012).[17] Yet "there is little [empirical] evidence that increases in the length of already long prison sentences yield general deterrent effects that are sufficiently large to justify their social and economic costs." Daniel S. Nagin, Deterrence in the Twenty-First Century, 201, 42 Crime and Justice 199, 201 (M. Tonry, ed. 2013).

But to say the Chambers sits without fault would be a blatant lie; however, to say that the cards were not stacked against him would be false. The majority of prisoners in the U.S. prisons "come largely from the most disadvantaged segments of the population." Prisons are filled with mostly "minority men under age [of] 40, poorly educated[,]" often addicted to drugs or alcohol, and have "a lack of work preparation or experience . . . ." National Research Council, J. Travis, et.al., The Growth of Incarceration in the United States: Exploring Causes and Consequences 9, at 2 (2014). See also The Hamilton Project, M. Kearney, et. al., Ten Economic Facts About Crime and Incarceration in the United States 13, at 17 (2014) ("There is nearly a 70 percent chance that an African American man without a high school diploma will be imprisoned by his mid-thirties."). Surely Chambers supports this study.

In Dratel's sentencing letter (see, e.g., pages 22-25), it elucidates some of Chambers' adverse childhood experiences

15

(AECs), including sexual abuse, foster homes, inter alia.

> Exposure to significant childhood adversity affects a daunting proportion of young people, constituting one of the most detrimental impacts on youth development. Early life adversities include experiences such as maltreatment, neglect, witnessed violence, and household dysfunctions [. . .]. Elisa W. v. City of New York, 2018 U.S. Dist. LEXIS 33857, at 50 n.7 (S.D.N.Y.) (Pitman, H.).

> Findings from population-based studies indicate that childhood adversity is common and associated with development of psychological disorders not only in childhood but in adolescence and adulthood. More specifically, adverse childhood experiences . . . have demonstrated increased risk of depression, anxiety, aggression, suicide risk, personality disorders, and substance Id.

Chambers has only recently—along his path of seeking betterment—come to truly understand the affect of his adverse childhood experiences. He understands that in his crucial development period he was denied some of the basic requirements for healthy human development. He understands now that all those unfortunate variables help create a part of him that he no longer wishes to be. He understands now that allowing those variables to influence his behavior will only lead to incarceration--or worse, death. "Research into ACEs has shown the greater traumatic experiences in childhood correspond with riskier behavior and a greater likelihood of involvement in the criminal legal system." U.S. v. Johnson, 2021 U.S. Dist. LEXIS 209833, at 6 (N.D.Cal.) (Alsup, W.).

At this point, Chambers fears for his sons. He fears that his sons will suffer adverse childhood experiences because of Chambers' absence, inter alia. As Chambers knows firsthand, "research in cognitive neuroscience [. . .] suggests younger persons are 'more vulnerable or susceptible to negative influences and outside pressures, including peer pressure.'" U.S. v. Banks, 2022 U.S. Dist. LEXIS 198064 at 21 (S.D.N.Y.) (Chin, D.) (quoting U.S.

16

v. Ramsay, 538 F.Supp.3d 407, 420 (S.D.N.Y.2021)). Chambers is worried that his absence will cause this vicious cycle to be repeated. As the late Honorable Judge Weinstein averred in U.S. v. Bannister, 786 F.Supp.2d 617, 653 (S.D.N.Y.2011), "[i]ncarceration affects the lives not only of prisoners but of those around them. Families of prisoners face higher rates of divorce, separation, domestic violence, and developmental and behavioral problems among children than the families on non-prisoners." Chambers needs to be home with his sons during their crucial years of human development.

On 3/11/2020, the World Health Organization declared COVID-19 a global pandemic. It spawned "a public health crisis more severe than any seen for a hundred years." Antietam Battlefield KOA v. Hogan, 461 F.Supp.3d 214, 223 (D.Md.2020). Shortly after, in accordance with CDC guidance, the BOP instituted a nationwide lock down in order to try and mitigate risks to prisoners. Prisoners were allowed out of their cells for approximately 2 hours every three days. Prisoners were urged to practice some hopeless attempt at "social distancing" while being told the virus was very contagious and potentially deadly.

Even the toughest prisoners began to fear contracting it. Prisoners were not able to secure masks, hand sanitizers, nor able to distance themselves. See Kim Bellware, Prisoners and Guards Agree About Federal Coronavirus Response: 'We do not Feel Safe,' Wash. Post (Aug. 24, 2020). And when the first cases appeared, Prisoners watched it literally work its way around the cells of the tiers in the units--as if creeping through the vents--in an

17

eerie-looking-systematic effect. Inmates felt like animals trapped in cages, waiting for the inevitable. The biggest slap in the face is the way the BOP told the public how it was handling it, not disclosing cases, talk of mass testing, making infected inmates house with inmates that were not infected, etc. It was a complete failure. See, e.g., U.S. v. Newell, 2021 U.S. Dist. LEXIS 143059, at  (M.D.N.C.) (Eagles) ("These defendants watched as the BOP made decisions that increased their risk of exposure to the potentially deadly virus, all while having limited contact with their families and attorneys.").

That was the first wave. There has been several more smaller ones. In short, however, there were 31 months of lock downs and restrictions never experienced before by prisoners. Then in October of 2022, the BOP finally resumed normal operations. It felt as if prisoners were being released in a sense. However, that was short lived at FCI Butner II because in January of 2023 another short wave hit. It truly appears that prosecutors, judges, etc, undermine these very tedious, harsh restrictions, or they simply cannot fathom the role COVID-19 has played on prisoners, especially the ones who have endured the entirety of it.

Some courts reason that "the harsh conditions of confinement do not, on their own, constitute extraordinary and compelling reasons" but can be considered in combination with other factors. U.S. v. Tellier, 2022 U.S. Dist. LEXIS 84489, at 11 (S.D.N.Y.) (Schofield) (quoting U.S. v. Rodriguez, 492 F.Supp.3d 306, 311 (S.D.N.Y.2020), recognizing that COVID-19 has made "incarceration harsher and more punitive than would otherwise have been the case.")

18

Some courts, however, recognize that the harsh and punitive conditions created by the pandemic create an "independent" reason, ipso facto. U.S. v. Nolan, 2022 U.S. Dist. LEXIS 204518, at 7 (N.D. OH) (Gwin, J.) ("All told, Nolan's incarceration entails harsher and more punitive conditions than the court contemplated at sentencing. His incarceration during the pandemic therefore presents a second, independent extraordinary and compelling reason to modify his sentence."); U.S. v. Lora, 2022 U.S. Dist. LEXIS 65734, at 14 (S.D.N.Y.) (Failla) (denying motion as to the medical reasons but granting a 10 month reduction based on "the conditions of confinement during the COVID-19 pandemic."). Honorable Judge Failla appears to be the first judge who really perceives just how harsh and more punitive it truly has been for prisoners due to the pandemic, especially for inmates, such as Chambers, who were housed in medium or high security facilities. Judge Failla's reasoning is as follows:

> In short, the court believes that pandemic-induced conditions of confinement may constitute 'extraordinary and compelling' circumstances warranting compassionate release, particularly for defendants who have (i) served long sentences and (ii) been detained for the entirety of the pandemic. Id. at 14-15.

In granting "a one year reduction," Honorable Judge Nathan reflected on the conditions being "more onerous than the court contemplated when it sentenced him." U.S. v. Tucker, 2021 U.S. Dist. LEXIS 158909, at 9 (S.D.N.Y.) (Nathan, A).

> The sentence the court imposed was, at the time, sufficient but no greater than necessary to achieve the purposes of sentencing. But that analysis has changed because the realities of incarceration have changed. Although the court does not believe immediate release would be consistent with the seriousness of Mr. Tucker's offense, it concludes that a modest reduction [. . .] is appropriate. Id. at 10-11.

See also U.S. v. Dunes, 2021 U.S. Dist. LEXIS 243953, at 15 (D.Conn)

19

("the court will reduce Mr. Dunes's sentence [from a term of 100 months] to a term of sixty months to reflect the extraordinary and compelling conditions to which he has been subjected").

As Dratel's sentencing letter, supra, elucidates, Chambers endured "29 months under harsh conditions at MDC and MCC" during pretrtial. See letter at page 57. In fact, Chambers also endured harsh conditions at FCI Bennettsville. The facility had problems with black mold and cells that leaked when it rained, soaking the cells.

On top of all that, prisoners at FCI Butner II are enduring other forms of adverse conditions. For years the roofs above many departments have leaked when it rains. For many years inmates have mopped the pools of water up, so the areas could be used—food service, VT, Commissary, Education, Recreation, etc. Food Service has leaked for years, yet food was still prepared there.

Recently, however—as if it did not exist for years—an officer "discovered" black mold in the ceiling tiles in Food Service; therefore, the tile was removed. However, inmates were still forced to eat there at times when water was leaking down from above them. Finally, due to an assistant supervisor, OSHA shut Food Service down. The meals are now prepared at other facilities in the complex and brought to Food Service at Butner II. Lunch is supposed to be the only warm meal, but it is often cold, being pushed over on handcarts and often sitting for an hour or more before being passed out. The meals are despicable. In the evening, inmates are often served on little pack of peanut butter, no jelly, and shredded cabbage, neither cooked nor dressed.

20

On Thanksgiving and Christmas, countless inmates became very sick because of the turkey. Some had to be taken out to the local hospital. Others have become sick from other foods. Some believe it is because of dirty trays.

Now that the employees have started to complain because of the black mold and electrical danger due to water leaks, when it rains all those departments are shut down. For years inmates have endured black mold, leaks, cleaning up large pools of water, etc, but it was never an issue till staff complained. What is more concerning is that Warden Kelly keeps denying "the union's request for an air quality and mold test" in any parts of the facility. See Exhibit B (Copy of News Article from New Observer in Raleigh).

Like many other inmates, about a month ago, Chambers had to be taken to a          hospital due to a "respiratory virus" that was inflicting prisoners at Butner II.

In U.S. v. Batista, 2022 U.S. Dist. LEXIS 100688 (S.D.N.Y.) (Swain, L.), the defendant was forced to endure leaking roofs, "toxic, black mold," bad conditions in the "Food Service areas," etc, at FCI Tallahassee. Taking those conditions and the pandemic induced conditions into account, Judge Swain reasoned that a 22 month reduction in sentence "to reflect the unexpectedly harsh and challenging conditions" was warranted. Id. at 13-14. "[T]he harsher the conditions, the shorter the sentence should be." U.S. v. Span, 476 F.3d 476, 479 (7th Cir.2007).

Chambers does have some disciplinary infractions, five in total, the last in 2021. But as can be evidenced, Chambers has come to a realization in the last two years: In order to change, he must not only stop doing the "big" wrongful things but also stop doing the "little" wrongful things. Since his last infraction,

he has decided to do the right instead of wrong. Even though "the opportunities to participate in programs have been reduced during the pandemic throughout the BOP" (see U.S. v. Chavis, 2021 U.S. Dist. LEXIS 124143, at 13 (M.D.N.C.)), he has accumulated 386 hours of programs, including plumbing. See Exhibit C (Copy of Educational Transcript). In U.S. v. Malone, 2021 U.S. Dist. LEXIS 108022, at 15 (N.D.Okla.), the court stated that the defendant had an "extensive inmate transcript," logging "over 500 hours in courses in 22 years." See also U.S. v. Williams, 2021 U.S. Dist. LEXIS 136524, at 14 (D.Minn) (remarking on defendant's transcript of "426 hours from 2006 to 2018).

And while disciplinary infractions can speak volumes, "evidence of post-sentence rehabilitation is likely the most critical of core considerations for the court in a § 3582(c) proceeding." U.S. v. Cavely, 2021 U.S. Dist. LEXIS 128647, at 11 (N.D.Okla). "None of these incidents cut against his rehabilitative efforts." U.S. v. Steele, 2021 U.S. Dist. LEXIS 122992, at 8 (D.Kan.); see also U.S. v. Jones, 2021 U.S. Dist. LEXIS 12078, at 3 (N.D.OH) (Gwin, J.) (noting that the defendant "had a clean disciplinary record for the last year" when granting relief.).

Chambers has served 56% of his time "[a]djusting for good time credit[.]" U.S. v. Crumb, 2021 U.S. Dist. LEXIS 78988, at 5 (D.Minn) (recognizing when granting relief that the defendant served "half of his sentence" with good time); U.S. v. Evans, 2020 U.S. Dist. LEXIS 206232, at 19 (N.D.Ga) ("He has served half of his imposed sentence when accounting for his good time credit."); U.S. v. Brickhouse, 2020 U.S. Dist. LEXIS 84987, at 12 (D.Conn) ("when including good time credit, has served roughly half of his sentence.").

22

With his infractions and the severity of his crime, Chambers truly understands why "immediate release is wholly unwarranted." U.S. v. Cheese, 2022 U.S. Dist. LEXIS 226679, at 44 (D.Md) (Hollander, E.). Like Cheese--but not as many infractions nor as severe--Chambers' "conduct is troubling." Id. at 44. "However, the length of [Chambers'] sentence, as compared to that of certain codefendants, coupled with his medical conditions, andthe challenges posed by the pandemic, [as well as Chambers' other factors] combine to create a basis for a reduction of defendant's sentence." Id. at 44-45.

In Concepcion v. United States, 142 S.Ct. 2389, 2401 n.4 (2022) the supreme court spoke on the "venerable tradition of discretion," heeding the fact that while "there are differences between [sentencing hearings and proceedings for modification of sentences]" the inherent "feature common to both is that only Congress and the constitution limit the historic scope of district courts' discretion." The FIrst Step Act text clearly "does not so much as hint that district courts are prohibited from considering evidence of rehabilitation, disciplinary infractions, or unrelated Guidelines changes." Id. at 2401. "Proponents of the Act have 'lauded it as a success for the movement to end mass incarceration.'" U.S. v. Russo, 2022 U.S. Dist. LEXIS 213643, at 30 (E.D.N.Y.) (Block, F.) (quoting Siobhan A. O'Carroll, Extraordinary and Compelling Circumstances: Revisiting the Role of Compassionate Release in the Federal Criminal Justice System in the Wake of the First Step Act, 98 Wash. U.L. Rev. 1543, 1548 (2021).

More than ever, Chambers understands the impact his actions

may have had--or still have--on the victims of his crime, on his sons, on his criminal record, and on his future. See Cameron Kimble & Ames Grawert, Collateral Consequences and the Enduring Nature of Punishment, Brennan Ctr. for Just. (June 21, 2021) ("[A] prior criminal conviction is devastating to an individual's earning prospects, but a prison record all but ensures a lifetime straddling the poverty threshold."); Jaboa Lake, Criminal Records Create Cycles of Multigenerational Poverty, CTR for Am. Progress (Apr. 15, 2020).

He understands the futility of crime, and he understands that he has only one option remaining in life: do right or do incarceration or death. He chooses his sons and life. He truly believes that a sentence reduction would still reflect "the seriousness of his offense, still promotes respect for the law, still provide just punishment, and has already provided a deterrent effect. A reduction would not override the punishment he has and continues to be subjected to, nor will it eradicate the inherent effect of this Court's original sentence. "Congress should be lauded for enacting the First Step Act and the judiciary should whole-heartedly embrace it." Russo, supra, at 30.

WHEREFORE, the Defendant requests this Honorable Court grant him a sentence reduction.

Dated:                          Respectfully submitted,


CERTIFICATE OF SERVICE

I, Antione Chambers, certify that a true copy of the foregoing motion has been sent to the AUSA's Office on this   day of 2023.

                                Respectfully submitted,

F O O T N O T E S

1.
The Government made a verbal offer for 28 years then for 25 years.

2.
See 2B3.1(b)(2) and 2B3.2(b)(3).

3.
The second offer, which is in writing, was for 150 to 188 months.

4.
U.S. v. Garza, supra, at 7 ("It would be a unwarranted disparity for Garza to serve 360 months or more while his more culpable codefendant served far less").

5.
Both of Chambers' codefendants have been released.

6.
https://www.bjs.gov/content/pub/pdf/tssp16.pdf

7.
https://www.ussc.gov/research/sourcebook-2019

8.
https://www.ussc.gov/2019-Annual-Report-and-Sourcebook

9.
https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and sourcebooks/2021/Table15.pdf.

10.
It appears that the material in Table 14 is now referenced in Table 15.

11.
https://www.mayoclinic.org/diseases-conditions/optic-neuritis/symptoms-causes/syc-20354953 (last updated May 9, 2022)

12.
https://www.bjs.gov/content/pub/pdf

13.
https://www.bjs.gov/index.cfm?ty=pbdetail18iid=5869

14.
https://federalsafetynet.com/us-poverty-statistics.html

15.
https://www.theatlantic.com/magazine/archive/2015/10/the-black-family-in-the-age-of-mass-incarceration/403246

16.
https://www.sentencingproject.org/wp-content/uploads/2021/07/Trends-in-us-corrections.pdf

17.
https://www.gao.gov/assets/gao-12-743.pdf

18.
https://perma.cc/GF8K-JxSS

# EXHIBIT

# A

TO: Warden's Office
     FCI Butner II

Date: 1|31|2023

FROM: CHAMBERS, Antoine
      Reg. No. 13576-067
      M/B Unit

SUBJECT: Request for Compassionate Release/Reduction of Sentence
        pursuant to 18 USC § 3582(c)(1)(A)(i); USSG § 1B1.13

## I. FACTUAL BASIS

Succinctly, Chambers was convicted of both conspiracy to commit and to the substantive offense of Hobbs Act robbery and kidnapping. The court sentenced him to 240 months. Although Chambers qualified for the career offender enhancement, the court sentenced him to a below the guideline sentence.

## II. EXTRAORDINARY AND COMPELLING REASONS

While the BOP does not exercise its authority to file motions on the behalf of inmates due to sentencing issues, Chambers must properly raise the following issues to preserve them for the district court.

When Chambers was sentenced, he qualified for the career offender enhancement due to a conviction under 21 USC § 843(b). According to case law in the Second Circuit, Chambers may no longer qualify for the enhancement. This enhancement was taken into account by the sentencing judge when Chambers was sentenced.

Chambers went to trial; therefore, he seeks a reduction because of trial penalty. He was penalized for exercising his constitutional right.

Chambers seeks a reduction for sentence disparity between his sentence and his similarly-situated codefendants's sentences.

Due to the pandemic, Chambers has endured a harsher and more punitive sentence due to lock downs, etc.

Chambers has family that depends on him, and he needs to be home to help take care of them.

Chambers has medical issues, but taken alone, they would not amount to compassionate release.

Since his incarceration, Chambers has made great efforts to rehabilitate himself. He has completed many programs and shown a desire to change his life around.

Chambers contends that the aforementioned issues qualify him for a sentence reduction.







**U.S. Department of Justice**

Federal Bureau of Prisons

*Federal Correctional Complex*
*Federal Correctional Institution II*

*P.O. Box 1500*
*Butner, NC 27509*

DATE:      November 29, 2022

REPLY TO   F&R   ZZ
ATTN OF:   L.B. Kelly, Warden
           FCI Butner II, North Carolina

TO:        CHAMBERS, Antione
           Register No.: 13576-067

SUBJECT:   Reduction in Sentence- Non Medical Compassionate Release

This is in response to your Request for Compassionate Release received in my office, wherein you request to be considered for a compassionate release/Reduction in Sentence for Extraordinary and Compelling reasons.

BOP Program Statement No. 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g), provides guidance on the types of circumstances that present extraordinary or compelling reasons, such as the inmate's terminal medical condition; debilitated medical condition; status as a "new law" elderly inmate, an elderly inmate with medical conditions, or an "other elderly inmate"; the death or incapacitation of the family member caregiver of the inmate's child; or the incapacitation of the inmate's spouse or registered partner. Your request has been evaluated consistent with this general guidance.

The issue you have stated is about an eye disease and no longer being considered a career offender. Unfortunately, the program statement governing the granting of compassionate release, as stated above, does not apply in your situation.

Based on the above information, your request for Compassionate Release is denied.

EXHIBIT

C

# Certificate of Achievement



Awarded to:

## Antione Chambers

For the completion of

### Threshold

The Federal Bureau of Prisons Interfaith Life Skills Reentry Program: 72 Hours of Course Credit
Federal Correction Institution #2 Butner, North Carolina

_August 20, 2022_
Date

_Signed:_ Chaplain O. Muhammad



# NCCER

Board of Trustees confers upon

*antoine chambers*

this certificate of completion for

*Plumbing Level One*

in the Standardized Craft Training Program
on this Eighth day of September, in the year 2022

Boyd D. Worsham
President & CEO, NCCER





# NCCER

Board of Trustees confers upon

*antoine chambers*

this certificate of completion for

*Core*

in the Standardized Craft Training Program
on this Eleventh day of July, in the year 2022



Boyd D. Worsham
President & CEO, NCCER





# NCCER

Board of Trustees confers upon

*antoine  chambers*

this certificate of completion for

## Construction Site Safety Orientation

in the Standardized Craft Training Program
on this Eleventh day of July, in the year 2022

Boyd D. Worsham
President & CEO, NCCER



# Certificate of Completion

Presented to

**ANTIONE CHAMBERS #13576-067**

For successfully completing the

**Drug Abuse Education Course**

The Drug Abuse Education Course is a minimum of 12 hours. The goal of this program is to help the offender to make an accurate evaluation of the consequences of his/her alcohol/drug use and consider the need for treatment.

M. Lardin          DTS          3/13/2019
United States Penitentiary Hazelton  Institution



# Certificate of Achievement

This Certifies that

## Antione Chambers

has satisfactorily completed

**ANGER MANAGEMENT**

at the Federal Correctional Institution - II
in Butner, North Carolina.

This certificate is hereby issued October 25, 2022.

Dr. Mastias, Psy.D.
Staff Psychologist
FCC Butner, North Carolina



----------------------------------------------------------------------

FROM: ▓▓▓▓▓▓▓▓▓
TO: 07006041
SUBJECT: 1
DATE: 12/30/2022 07:06:06 PM

*Butner union demanding roof repairs after month of inaction*
*Raleigh News & Observer          The News Observer*

NC prison afflicted by mold, flooding and electrical hazards, but repairs are far off

In May 2020, officials at the Butner federal prison complex north of Durham drew up an estimate for the cost of roof repairs at FCI Butner II, one of the complex's medium-security prisons.

Water had been seeping through the roof in multiple areas, including the commissary and laundry, and continued to leak for several months. By early 2021, roof leaks, some of them described as "severe" by the prison's environmental and safety compliance department, were being reported throughout the prison. And then earlier this year, employees working at FCI II started to notice what looked like mold  dark-colored, fuzzy spots on the ceilings  growing near areas with water damage.

The union that represents many of FCI II's employees  around 200 in total  has been pressing prison officials to make necessary repairs to ensure the prison is a safe working environment. But documents obtained by The News & Observer including requests for funding, monthly inspection reports, and correspondence between the union and prison officials, show that more than two-and-half years after the initial estimate was generated, conditions have continued to worsen, and no repair work has taken place.

And now, nearly a year after federal officials allocated money to replace a portion of the roof, the union's patience is running out.

After the union filed a complaint about the leaks and mold growth with the U.S. Occupational Safety and Health Administration in late November, prison officials were given a week to look into the allegations of unsafe working conditions and remedy any that existed. The prison initially asked for an extension of a week or so to make repairs, before requesting an additional six-month extension.

For union leaders and members who have been waiting for repairs to begin since January 2022, that was unacceptable.

"The Agency has acknowledged that the deteriorating conditions have (worsened) significantly over the past two years," wrote Delshon Harding, president of AFGE Local 408, in a letter Dec. 22 to OSHA officials who are considering the request for an extension until June 2023.

"Yet, OSHA grants the Agency a second extension to gamble (6) six more months with the lives of Federal Law Enforcement officers and individuals affected. One thing that cannot be denied, Management Officials at FCC Butner are knowingly and (willingly) refusing to lower these hazards that can cause or are likely to cause death or serious physical harm."

If OSHA approves the prison's request, Harding wrote, the union is prepared to try every available option to get its concerns addressed, including potentially filing a complaint with the Federal Labor Relations Authority, requesting a congressional investigation, or pursuing legal action

In an email prior to the union's letter to OSHA, Eric Lucero, a spokesperson for the U.S. Department of Labor, told The N&O that OSHA officials were unable to comment since their investigation is ongoing.

'SIGNIFICANT AMOUNT' OF WATER LEAKING FROM ROOF

Harding has served as president of the local American Federation of Government Employees union since January 2021, but has been a member of the union since 2003. Roof issues at FCI II and FCI I, another medium-security prison in the complex, date back nearly a decade, according to Harding.

At FCI II, as the leaks got worse, prison officials started removing ceiling tiles that had become saturated with water. In their response to OSHA officials in December, prison officials said the tiles that had been removed were not being replaced. According to Harding, that has only made the problem worse.

We were finding that every time it rains, there was a significant amount of rain water that was leaking in from the roof, into the ceiling, onto tables, work areas, staff offices, documents, equipment, even down to the food service department where the meals are prepared," Harding said.

TRULINCS 07006041  - Unit: BTF-L-B

------------------------------------------------------------------------------------------



In some cases, the union reported in its complaint to OSHA, rain water leaking into the building caused flooding as well.

Prison officials acknowledged that water can accumulate in certain parts of the building, like the education department. In those situations, "inmate orderly crews are sent to those areas to mop up any accumulated water and to place water attainment devices, such as buckets, in the area to ensure that water does not accumulate," Warden Lynne B. Kelly reported to OSHA officials.

A separate issue emerged when employees began reporting that water dripping through the roof was pooling inside light fixtures.

In the prison's request for an additional six-month extension, Kelly wrote that the prison was taking multiple steps to ensure the safety of employees, including putting up cautionary signs near fixtures that should be avoided, and shutting off any electrical components where water was found.

"When water impacts electrical components, such as lights, work orders are promptly submitted to disconnect power to that specific electric component and that power remains disconnected until the roof leak impacting the area is completely resolved," Kelly wrote. "When roof leaks cause the saturation of building materials, such as ceilings or walls, the (affected) materials are removed and the area is sanitized to inhibit the growth of mold."

A YEAR LATER, NO REPAIRS HAVE BEGUN

The ongoing roof leak problems date back to at least May 2020, when prison officials estimated the cost of at least some needed repairs at $1.6 million. It was not clear from records how extensive those repairs would have been. In January 2022, more than a year-and-a-half later, the Federal Bureau of Prisons, the agency in charge of Butner and other federal prisons, notified Butner officials that they would receive $500,000 to replace the roof above the commissary and laundry.

But a little more than a month later, prison officials went back to the BOP to report that conditions had significantly worsened. It wasn't just one or two departments of the prison that needed a new roof; now, it was the entire prison's roof system that had to be replaced.

And $500,000 wasn't going to cut it. Now, the request from Butner officials was for $7.49 million.

In a Feb. 25 letter to BOP officials, Warden R. Ramos wrote that the prison's roof had seriously deteriorated, and was allowing "large quantities" of water to pour into the building. In addition to ceiling damage, the leaks had damaged insulation and some equipment as well. Ramos also noted there were concerns of mold growing from moisture.

The leaks may have been contained to certain parts of the building earlier, but they were widespread now. The areas of the prison experiencing leaks, according to Ramos, now included: "Health Services, AW Complex, Visitation, Education, Recreation, Religious Services, Psychology, Vo-Tech, UNICOR, Facilities, FCI 2 Powerhouse and Food Service."

"The roof system has high amounts of moisture trapped in the insulation boards. This water infiltration should be considered a complete failure of the roofing system for the FCI 2," Ramos wrote.

Ramos also told BOP officials that the roof damage had reached the point where there were "no maintenance or temporary repairs that can be made to stop the leaks due to the roof membrane deterioration." Those repairs had already been tried, he said, and had failed since the new materials wouldn't bind to the water-soaked membrane.

In an email, Scott Taylor, a BOP spokesperson, said BOP and Butner officials take seriously their duty "to protect the individuals entrusted in our custody as well as maintain the safety of correctional staff and the community, as this remains one of the highest priorities for the BOP."

Since January 2022, an additional $1.4 million   for a total of $1.9 million   has been allocated to FCI II for roof repairs, Taylor said.

Taylor said prison officials recently awarded the $1.9 million in total funds to a roofing contractor to begin replacing the roof over the food service department, as well as the commissary and laundry. But work isn't expected to start until the spring, Taylor said, when the weather is suitable.

PRISON REFUSES TO CONDUCT MOLD TEST

TRULINCS 07006041 - ████████, ████████ ████████ - Unit: BTF-L-B

---------------------------------------------------------------------------------

In its complaint to OSHA, the union also reported that there were ceiling tiles in the food service department with visible mold growth.

But even though the mold was visible to employees, and prison officials later had areas with possible mold growth treated with chemical sprays, officials hesitated to grant the union's request for an air quality and mold test to be conducted, to confirm the presence of mold and any airborne toxins.

In August, the union asked two different wardens to conduct the test. Both of those requests were denied. Months later, in late November, prison officials agreed to do a test, but in FCI I. That test showed the presence of mold. The union's request for FCI II to be checked for mold continued to be denied.

In their response to OSHA, prison officials said they did not find any "mold affected ceiling tiles" in the food service department. Asked why officials have declined to conduct a test in FCI II, despite multiple requests from the union since August, Taylor said the prison "has determined an air quality test is not indicated at this time."

TRULINCS 07006041 - ████████████████████ - Unit: BTF-L-B

----------------------------------------------------------------------------------------

FROM: ███████████
TO: 07006041
SUBJECT: 2
DATE: 12/30/2022 07:06:06 PM

WHAT HAPPENS NOW?

The next step in this case is for OSHA to determine if it will grant the six-month extension to prison officials, giving them until June to repair roof leaks and prevent water from collecting inside electrical panels or light fixtures. According to Taylor, OSHA gave the union 10 days to review the prison's request for an extension, which he said was submitted on Dec. 21.

Harding provided OSHA with the union's response the day after it was notified of the request.

If the extension is granted, Harding said the union is ready to pursue multiple options to try to expedite the process and allow repairs to begin quickly.

"The last thing we want is to be silent on this issue," Harding said.

The NEWS & OBSERVER
421 Fayetteville St, Suite 104
Raleigh, NC 27601

```
  BTFDZ  540*23 *              SENTENCE MONITORING          *     01-24-2023
PAGE 001        *              COMPUTATION DATA             *     17:20:03
                                 AS OF 01-24-2023

REGNO..: 13576-067 NAME: CHAMBERS, ANTIONE


FBI NO...........: 462260LC8          DATE OF BIRTH: 02-01-1986  AGE:  36
ARS1.............: BTF/A-DES
UNIT.............: M UNIT              QUARTERS.....: M02-013U
DETAINERS........: NO                 NOTIFICATIONS: NO

FSA ELIGIBILITY STATUS IS: INELIGIBLE

THE FOLLOWING SENTENCE DATA IS FOR THE INMATE'S CURRENT COMMITMENT.

HOME DETENTION ELIGIBILITY DATE....: 05-11-2030

THE INMATE IS PROJECTED FOR RELEASE: 11-11-2030 VIA GCT REL


---------------------CURRENT JUDGMENT/WARRANT NO: 040 ----------------------
COURT OF JURISDICTION...........: NEW YORK, SOUTHERN DISTRICT
DOCKET NUMBER...................: 12 CR. 853 (LGS)
JUDGE...........................: SCHOFIELD
DATE SENTENCED/PROBATION IMPOSED: 01-13-2010
DATE SUPERVISION REVOKED........: 12-21-2015
TYPE OF SUPERVISION REVOKED.....: REG
DATE COMMITTED..................: 05-31-2017
HOW COMMITTED...................: COMMIT OF SUPERVISED REL VIOL
PROBATION IMPOSED...............: NO

                  FELONY ASSESS  MISDMNR ASSESS  FINES        COSTS
NON-COMMITTED.: $100.00         $00.00         $500.00       $00.00

RESTITUTION...:  PROPERTY:  NO  SERVICES:  NO      AMOUNT:  $00.00

------------------------CURRENT OBLIGATION NO: 010 ------------------------
OFFENSE CODE....:  388    21:843 USE FICT,REV,SUSP NBR
OFF/CHG: 21:843(B) USE OF S COMMUNICATION FACILITY YO FACILITATE
         DRUG TRAFFICKING (SRT VIOL)

 SENTENCE PROCEDURE.............: SUPERVISED RELEASE VIOLATION PLRA
 SENTENCE IMPOSED/TIME TO SERVE.:    11 MONTHS
 RELATIONSHIP OF THIS OBLIGATION
  TO OTHERS FOR THE OFFENDER....: C/C TO 050
 DATE OF OFFENSE................: 03-01-2009




 G0002       MORE PAGES TO FOLLOW . . .
```

```
  BTFDZ  540*23 *            SENTENCE MONITORING          *     01-24-2023
PAGE 002           *           COMPUTATION DATA           *     17:20:03
                                AS OF 01-24-2023

REGNO..: 13576-067 NAME: CHAMBERS, ANTIONE


---------------------CURRENT JUDGMENT/WARRANT NO: 050 ------------------------

COURT OF JURISDICTION...........: NEW YORK, SOUTHERN DISTRICT
DOCKET NUMBER...................: 13 CR. 345-03 (LGS)
JUDGE...........................: SCHOLFIELD
DATE SENTENCED/PROBATION IMPOSED: 12-21-2015
DATE COMMITTED..................: 05-31-2017
HOW COMMITTED...................: US DISTRICT COURT COMMITMENT
PROBATION IMPOSED...............: NO

                   FELONY ASSESS  MISDMNR ASSESS  FINES          COSTS
NON-COMMITTED.: $300.00          $00.00          $00.00         $00.00

RESTITUTION...:  PROPERTY:  NO  SERVICES:  NO      AMOUNT:  $00.00

-----------------------CURRENT OBLIGATION NO: 010 ---------------------------
OFFENSE CODE....:  540     18:1951 RACKETEER, VIOLENCE
OFF/CHG: 18:1951 INTERFERENCE WITH COMMERCE BY THREAT OR VIOLENCE
         (HOBBS ACT ROBBERY CONSPIRACY) (CT1S-2S) 18:1201 KIDNAPPING

 SENTENCE PROCEDURE.............: 3559 PLRA SENTENCE
 SENTENCE IMPOSED/TIME TO SERVE.:  240 MONTHS
 TERM OF SUPERVISION............:   3 YEARS
 RELATIONSHIP OF THIS OBLIGATION
  TO OTHERS FOR THE OFFENDER....: C/C TO 040
 DATE OF OFFENSE................: 07-15-2013




 G0002       MORE PAGES TO FOLLOW . . .
```

```
BTFDZ  540*23 *             SENTENCE MONITORING           *      01-24-2023
PAGE 003 OF 003 *           COMPUTATION DATA              *      17:20:03
                            AS OF 01-24-2023

REGNO..: 13576-067 NAME: CHAMBERS, ANTIONE


------------------------CURRENT COMPUTATION NO: 030 -------------------------

COMPUTATION 030 WAS LAST UPDATED ON 03-03-2021 AT DSC AUTOMATICALLY
COMPUTATION CERTIFIED ON 06-22-2017 BY DESIG/SENTENCE COMPUTATION CTR

THE FOLLOWING JUDGMENTS, WARRANTS AND OBLIGATIONS ARE INCLUDED IN
CURRENT COMPUTATION 040 010, 050 010

DATE COMPUTATION BEGAN..........: 12-21-2015
AGGREGATED SENTENCE PROCEDURE...: AGGREGATE GROUP 800 PLRA
TOTAL TERM IN EFFECT............: 240 MONTHS
TOTAL TERM IN EFFECT CONVERTED..:  20 YEARS
AGGREGATED TERM OF SUPERVISION..:   3 YEARS
EARLIEST DATE OF OFFENSE........: 03-01-2009

JAIL CREDIT.....................:  FROM DATE     THRU DATE
                                   07-03-2013    12-20-2015


TOTAL PRIOR CREDIT TIME.........: 901
TOTAL INOPERATIVE TIME..........: 0
TOTAL GCT EARNED AND PROJECTED..: 964
TOTAL GCT EARNED................: 370
STATUTORY RELEASE DATE PROJECTED: 11-11-2030
ELDERLY OFFENDER TWO THIRDS DATE: 11-02-2026
EXPIRATION FULL TERM DATE.......: 07-02-2033
TIME SERVED.....................:      9 YEARS     6 MONTHS    22 DAYS
PERCENTAGE OF FULL TERM SERVED..: 47.8
PERCENT OF STATUTORY TERM SERVED: 55.0

PROJECTED SATISFACTION DATE.....: 11-11-2030
PROJECTED SATISFACTION METHOD...: GCT REL

REMARKS.......: 06-22-17:ASSESSMENT & FINE ADDED.JDB/D
                10-27-17:DIS GCT D/SIG. 4/7/20: FSA/GCT UPD D/JNW.
                03-03-21: GCT UPD D/LLF







G0000      TRANSACTION SUCCESSFULLY COMPLETED
```

TRULINCS  13576067 - CHAMBERS, ANTIONE - Unit: BTF-M-B

--------------------------------------------------------------------------------------------------------------------------

FROM: 13576067
TO: Tty, Be
SUBJECT: RE: cent
DATE: 02/23/2023 11:25:32 AM

I write today in earnest hope that you will assist me with my dilemma.. I write with the utmost sincerity and honesty.. you may very well say you heard this before, but if you've never heard it truthfully, you will hear now. I can only pray that it doesn't fall on deaf ears.. I've had a lot of time to do some soul searching and what piece of crap I've really been. What a waste of life I've been living. I held no regard for feeling or property of others; including my family who I've been the worse to. At first I tried to blame my problems on the unfortunate events in my life. I realized that  I -ME- chose to go down that negative path. I let my criminal thinking dictate my every move while I was out there. In hindsight- and I express this with the utmost disgust and disappointment- criminal thinking and disregard for the law and humanity were the very dynamics of my daily existence. While my incarceration is an utmost disappointment. I can only be grateful that it happened to me because it gave me time to really introspect and retrospect; time to rationally reflect on the path that I chose. More importantly it gave me time to reflect on the path I'm destined for, a path of respect and success and becoming the best father I can be.
Everyday I think about what I put my son, my daughter and victims through- still am for that matter.. I can't change my past.They truly need me out there in their lives. I know they need me in there lives. But what I found out is that I need them in my life even more. My mother has health problems. I'm hardest on myself because of how I disregarded them. I'm terribly sorry for my actions.
I'm now in a self inflicted hell, where people are still the way I was; however most have not the slightest inclination to change. They still chase and abuse drugs, hate , steal, etc.... I feel like I do not belong or fit in with the majority. Most are trying to find ways and people to help them do more crime upon release. I associate with very few. The ones I do are experiencing big changes in life and seeking betterment. I'm also practicing my religion with determination. Right now I'm in the process of having my Book copy written. (That should be completed by next month. The name will be: Escaping Eastern Congo) I starting writing a book for a variety of reason's. One of the reason's was to mentally escape the murders and stabbings that were going on in Hazelton USP when i was there and also taking that first step into prosperity. Everyday is a struggle for better thinking, actions and mindfulness.
I have a tremendous amount of work to do upon release  from here. I have experience in basic plumbing and electrical work. I apologize for the long diatribe of myself, but it feels good to finally express my emotions. While I'm living in a hell. I'm on the stairs walking upward  with the sunshine pouring through. I'm very optimistic; I know I'm going to make it out there.. I have will and desire

As for me being a father to my kids; I have been doing the best I can. I have hurt them in so many ways and I know the hurt continues because of my absence. My youngest son asked me a few months ago how much time I was sentenced to, but before I could answer him, he told me not to tell him because he doesn't believe he would be able to handle it. That was just one of the many heartbreaking phones calls that has occurred through out my time in prison. (which I take full responsibility for) I also found out I had another Son. He is about to be 11 years old in June. As much as I didn't want to, I spoke to him and was able to see him on Face Time. At the time I had already lost a lot of friends and family members either to Covid or other illnesses. The world was in a complete panic and so was I.  The Doctors  told me that they were not sure what disease was causing my eye disease but they knew it was bad. I didn't know what the future held for me or the World at that moment, so I decided to take that chance of using a cell phone in prison to see my son for the first time. His name is Amir Dante Chambers. My father took a DNA test for me. Both of my parents had the unfortunate experience of growing up with out their father's which has some what become hereditary. I've already been in prison for my kids entire life. I want nothing more then to break this negative cycle in my family and be the law abiding citizen I know I can be.

If I was able to, I would apologize to my victims and ask for their forgiveness. I have done some bad things and made some bad choice's in life that I can not change. I looked at people that committed crimes like me as people that the government or law enforcement would not care about. So committing crimes against them was "fair game". I never thought about the Trauma I would cause them and their children. I realize now that nobody deserves to be traumatized. The only thing I can do is continue to mentally ascend in a positive way and pray that I get judge by who I am today because my past will forever be my past.

Now is my time to give back to society. To teach the kids the right way and not the wrong way

-----Tty, Be on 2/2/2023 8:36 PM wrote:

>

Got u bro

Your Honor,

I AM WRITING YOU THIS LETTER IN REGARD TO MR. CHAMBERS, I WANT TO TELL YOU HOW HE'S HELPED ME TO BETTER MYSELF DURING MY INCARCERATION.

HE & I TOOK A VOCATIONAL PLUMBING CLASS. I WAS ON THE VERGE OF BEING KICKED OUT OF THE CLASS FOR FAILING THE SAME TEST TWICE. ONCE MORE, & I WOULD BE KICKED OUT. MR. CHAMBERS TOOK IT UPON HIMSELF & TOOK THE TIME TO HELP ME UNDERSTAND & GRASP THE THINGS WE WERE BEING TAUGHT.

THANKS TO HIS PATIENCE & WILLINGNESS TO HELP ME, I AM NOW AN N.C.C.E.R. CERTIFIED PLUMBER. I NOW HAVE A PLIABLE SKILL THAT WILL CHANGE MY LIFE & HELP ME BRAKE THE CYCLE OF INCARCERATION. & FOR THAT, I AM FOREVER GRATEFUL.

I CAN NOT VOUCH FOR THE TYPE OF PERSON MR. CHAMBERS WAS PRIOR TO PRISON, BUT FROM MY EXPERIENCES WITH HIM & WATCHING HIM LIVE ON THE SAME COMPOUND, I CAN CONFIDENTLY SAY HE IS REFORMED & REHABILITATED.

HE DESERVES ANOTHER CHANCE AT

LIFE, IF THE SYSTEM'S GOAL NOW IS NOT TO JUST PUNISH BUT TO REHABILITATE AS THEY SAY — THEN THAT GOAL HAS BEEN ACHIEVED IN MR. CHAMBERS.

I HUMBLY ASK YOU TO WHOLEHEARTEDLY CONSIDER THE AFOREMENTIONED WHEN CONSIDERING MR. CHAMBER'S SITUATION.

I THANK YOU FOR YOUR TIME & CONSIDERATION.

SINCERELY,

Jemel Williams

JEMEL WILLIAMS

# 75862067

MB

Antoine Chambers
#13576067
FCI Butner 2
P.O Box 1500
Butner, NC 27509
27509-450000

Kyle Allman
526 Alabama Ave

Kyle V. Allman
526 Alabama Avenue
Brooklyn, NY 11207

November 30, 2022

The Honorable Judge Lorna G. Schofield

Dear Judge Schofield:

I am Kyle Allman, SVP, National Director, Multi-media Sales for Black Enterprise. I am writing this letter to you to serve as a character witness for cousin, Antoine Chambers. I have known Antoine to be a polite, well-mannered young man. When Antoine was about 13 to 14 years old, he was in my care and was a joy to have around my then 2-year-old son. He certainly took on the role of big brother with honors.

While Antoine and I had lost contact over the years prior to his incarceration, it has been a joy getting reconnected with him these past 5-6 years. My wife and I actually visited Antoine when he was at the Federal Correctional facility in South Carolina. More recently, I have been extremely impressed with his maturity level as it relates to his desire to be an active parent in his children's lives, his natural appreciation of reading books, and a profound connection with being a productive member of society when he is released.

I consider Antoine a person that lives with integrity and is prepared to tackle a new chapter in his life. As one of senior officers of Black Enterprise and, more importantly, his family member, I am confidant of his ability to reacclimate himself back into society.

Sincerely

Kyle Allman

Greetings Your Honor.

My name is Albi Xhemali. My inmate ID was 72926054. I am writing this letter to help portray what type of person my friend Antione Chambers is in hopes of helping him get released and to continue the rest of his life free and a productive member of society.

I first met Antione in MCC Manhattan when I was fighting my case. We became roommates and got to know each other very well. Even though we are from two different nationalities and races it didn't take long for us to realize that we had a lot in common. Antione was different from the rest. He had a lot of honor and integrity. Despite our circumstances him and me both never succumbed to being conformed by our surroundings. There was something humane and noble about Antione that made me feel safe and gain confidence in him. He was a good father and talked about his son all the time, and he was also a good friend to everyone around him. He was a very positive and motivating person, inspiring hope and courage to those around him that had their backs against the corner. Even though we only spent a few months together he left an everlasting impression on me to the point that I kept in touch with him throughout all of these years while I was doing my sentence and since I came out. I consider Antione like my brother and would do anything to help him and be there for him.

Since I Have been released, I have accomplished a few good things, but the biggest accomplishment is that I have realized my potential and the fact that I never need to break the law again to make a living, and this has made me feel secure being that I know I will never return to that place again. I learned the skill of selling by getting a Job selling cars for Nissan, and this led me to take my talents to the Merchant Cash Advance business which resulted in me opening up my own Merchant Cash Advance brokerage company.

I say this to say that there is hope for people that are incarcerated right now. Especially if they have a sense of direction when they come home. I was one of those people where my future was uncertain when I got released because I didn't have any job skills. I had never worked before. I was scared that I was going to fall into temptation and go back to my old ways. With courage and determination, I was able to break out of that cycle and found my way. Closing deals became my passion and I wish I had found this joy before I entered the life of crime.

Being that I am well established at the moment I will be there for my friend Antione when he gets released and offer him a job and be there for him until he gets his life in order. Sometimes all someone needs is a friend and a support system and I know how it feels to not have that when you come home. Releasing Antione is going to bring a smile to your face Judge when a few years down the line he writes you a letter telling you about his accomplishments and how far he has come in life. It will be a decision that you're going to be proud of knowing that your judgement call led to something positive.

Thank you for reading my letter.

Respectfully, Albi Xhemali.

To Whom It May Concern

Hi' my name is Minerva Montanez. My Daughter Davida Montanez is a very Close friend ta Antione, I have knowen him for over 15yrs. When he needed help I have had an open door for him. He has always showen Respect to me. He also has helped me a lot around my old House. I truely believe in my heart that now that he is older he has gotten a lot wiser in his age. We all have done some crazy thing while we was younger. I have talked to him Since his locked down He has Mature So much I guess that's What happens When you have nothing but time on you hand but to think. I believe he deserver another chance at this thing called life. He needs a chance to show you. I know With people like my daughter & I will always be by his side. If you have any further questions please feel free to contact me 610-930-3445

Thank You Very Much

Minerva

2.24.23

Hello,

My name is Davida Montanez And I'm Sending this letter on behalf of my Best Friend / Family Not by blood but by life. Antione Chambers and I have been friends for 20 plus years, And I miss him dearly. He always been there for me, my family + my 2 Kids And throughout the years we have went in different ways but we always keep In touch Now with In the last 2 years I have seen a great change in him, And his mind set I belive + Know that when we are young we do things that we can't Chge or take back, we can only live + learn from the Past. He has lived + learned And its made him such a wiser Man, I Know he seen what Is important to him and that Is seeing his 2 boys grow up And be A positive role model to them. Aslo to make sure he chages the Cycle of life for himself + his 2 boys. I Know given the opportunity he can + will do great things for them + his family + friends. Im going to end this But I would like to thank you for your time, And have a bless day

Thank you so much
Davida Montanez

Your Donation Information

From:  St. Jude Children's Research Hospital (noreply@stjude.org)

To:     vidamontanez2016@yahoo.com

Date:  Tuesday, September 6, 2022, 05:57 PM EDT

Trouble viewing? Read this online.



# Thank you, Antione!



Artwork by St. Jude patient **Paige**

## Your donation information

Case 1:13-cr-00345-LGS   Document 294   Filed 03/07/23   Page 54 of 54

Confirmation Number
**4-4165895**

Date
**September 06, 2022 4:57 PM CST**

Payment Method
**Credit Card - Visa**

Bill to
**Antione Chambers**
**12 CATHERINE ST**
**LEWISTOWN, PA 17044**

Email Address
**Vidamontanez2016@yahoo.com**

Donation Amount (USD)
**$19.00**

Donation Frequency
**Monthly**

Contributions are tax deductible to the extent allowed by law. No goods or services were provided for the donation.



# Finding cures. Saving children. ®

CONNECT WITH US